**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEVE CHAMBERS, et al., | Case No. SA CV 11-1733 FMO (MLGx) |
| Plaintiffs, | |
| v. | **ORDER CERTIFYING CLASS ACTION, PRELIMINARILY APPROVING CLASS ACTION SETTLEMENT AND CLASS NOTICE, AND SETTING FINAL FAIRNESS HEARING** |
| WHIRLPOOL CORPORATION, et al., | |
| Defendants. | |

Having reviewed and considered all the briefing filed with respect to the Joint Motion of All Parties for Preliminary Approval of Class Action Settlement ("Motion," Dkt. No. 192) and the oral argument presented at the hearing on October 23, 2015 (see Minutes of October 23, 2015 Hearing, Dkt. No. 195), the court concludes as follows.

**INTRODUCTION**

Plaintiffs filed this class action against Whirlpool Corporation ("Whirlpool"), Sears Holdings Corp., and Sears, Roebuck & Co., Inc. (together with Sears Holdings Corp., "Sears") (collectively, "defendants") on November 9, 2011. (See Complaint, Dkt. No. 1). The Fourth Amended Complaint ("4AC"), the operative complaint in this mater, alleges 25 causes of action for violations of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq.; breach of express and implied warranty; violations of the Song-Beverly Act, Cal. Civ. Code §§ 1792 et seq.; strict product liability; failure to warn; unjust enrichment/restitution; fraudulent concealment/nondisclosure; negligence;

1  violations of the consumer protection statutes of Ohio, California, Georgia, Illinois, Maryland,

2  Massachusetts, Missouri, New Jersey, New York, Utah, and Virginia; and declaratory judgment,

3  28 U.S.C. § 2201.  (See 4AC, Dkt. No. 98, at ¶¶ 216-553).

4  The parties engaged in substantial discovery and settlement negotiations, and they reached

5  a settlement in September, 2015.  (See Motion at 6-8).  In their Motion, the parties seek an order:

6  (1) certifying a settlement class and appointing plaintiffs as class representatives and their counsel

7  as class counsel; (2) preliminarily approving the proposed settlement between plaintiffs and

8  defendants; (3) directing notice of the proposed settlement to the class; (5) setting a schedule for

9  final approval of the proposed settlement; and (6) setting a schedule for class counsel to move for

10  entry of an order approving attorney's fees, reimbursement of litigation expenses, and service

11  awards for plaintiffs.  (See [Proposed] Preliminary Approval Order, Dkt. No. 192-2, at 2-15).

12  **BACKGROUND**

13  This case arises from plaintiffs' allegations that certain Whirlpool-manufactured

14  dishwashers branded "Whirlpool®," "Kenmore®," or "KitchenAid®" had a design defect that

15  caused overheating in high current connections to the electronic control board ("ECB"), causing

16  the ECB consoles to smoke, emit fumes and sparks, or catch fire ("Overheating Events"), thereby

17  posing a safety risk.  (See Motion at 1).  Plaintiffs allege that the Overheating Events were caused

18  by a design defect that rendered certain high-current connections to the ECBs insufficiently robust.

19  (See 4AC at ¶¶ 163-65).  That allegedly led to gradual degradation of the electrical pathways,

20  causing resistance heating, leading to overheating to extreme temperatures and ignition of

21  surrounding plastics and wire insulation.  (See id. at ¶¶ 7-8, 50 & 164-65).  Plaintiffs further allege

22  that defendants failed to disclose, or actively concealed, this defect.  (See id. at ¶¶ 189-91).  The

23  group of plaintiffs, 18 persons from 11 different states, sued on behalf of a class of millions of

24  consumers who have owned such Whirlpool-manufactured dishwashers, whether or not the

25  consumers experienced an Overheating Event.  (See Motion at 5).

26  After participating in "intense negotiations that spanned more than a year, including 6 full-

27  day mediation sessions[,]" the parties reached a settlement, (see Declaration of Charles S. Fax

28  in Support of Joint Motion for Preliminary Approval of Class Action Settlement ("Fax Decl.," Dkt.

No. 192-3) Exhibit ("Exh.") A ("Settlement")), which they assert "provides substantial benefits to purchasers and owners" of Whirlpool-manufactured dishwashers.  (See Motion at 1-2).  The Settlement contemplates providing benefits to purchasers and owners of certain Whirlpool-manufactured dishwashers that utilized four models of ECBs: Rush, Rushmore, NewGen, and Raptor.  (See id. at 2).  The benefits will be provided to those who purchased or owned "Class Dishwashers" as well as those that did not.  (See Motion at 2-4).

"Class Dishwashers" are defined as those manufactured between October 2000 and January 2006 that contained a Rush or Rushmore ECB.  (See Settlement at 6).  The "Settlement Class" includes:

> all residents in the United States and its territories who (a) purchased a new Class Dishwasher, (b) acquired a Class Dishwasher as part of the purchase or remodel of a home, or (c) received as a gift, from a donor meeting those requirements, a new Class Dishwasher not used by the donor or by anyone else after the donor purchased the Class Dishwasher and before the donor gave the Class Dishwasher to the claimant.

(Settlement at 13).  The Settlement Class includes[1] two subclasses, the Past Overheating Subclass (those who experienced an Overheating Event within 12 years after the purchase date but before the Notice Date[2]), (see id. at 10), and the Future Overheating Subclass (those who experience an Overheating Event within ten years after the purchase date or within two years of

---

[1]  The Settlement to which the court refers was amended such that the statement that "[t]he Settlement Class consists of two subclasses" is now "[t]he Settlement Class includes two subclasses."  (See Joint Stipulation to Amend Class Action Settlement Agreement and Release of All Claims and Certain Exhibits to Same Agreement ("Joint Stip. to Amend," Dkt. No. 197), at 2) (emphasis added).  Throughout this order, any citation to the "Settlement" refers to the full Settlement that was filed with the parties' preliminary approval papers.  But, if any provision or exhibit is affected by the amendments described in the Joint Stip. to Amend, the court notes the relevant change.  The court discussed the minor amendments with the parties at the hearing on October 23, 2015, and finds that the Joint Stip. to Amend accurately and completely reflects that discussion.

[2]  "Notice Date" is the date on which the settlement administrator completes the initial mailing of settlement notices to class members.  (See Settlement at 9).

the date of the class settlement notice in this action, whichever is later).  (See id. at 9).  The relief that will be available to the members of the Settlement Class, including the subclasses, is summarized as follows:

- Full reimbursement of repair costs (with a minimum $200 cash payment with inadequate documentary proof of repair costs) for those who had an Overheating Event before the Notice Date and within 12 years of purchase;

- Cash payment of $200-$300 for Settlement Class members who replaced, rather than repaired, their dishwasher before the Notice Date and within 12 years of purchase;

- Prequalified Class Members[3] will be offered compensation without any need to submit documentary proof;

- A choice of $100 payment or 30% off rebate for a new KitchenAid- or Whirlpool-brand dishwasher for those who have an Overheating Event at any time within two years after the Notice Date;

- In addition to direct mail, email, and publication notice, a sticker will be placed on relevant replacement part packaging notifying consumers and service personnel of the availability of benefits;

- All class members, even those who never experienced an Overheating Event and those who no longer own the dishwasher, will be entitled to a 10% rebate off a new Whirlpool-brand dishwasher, or 15% off a new KitchenAid dishwasher;

- An enhanced 15% rebate off a new Whirlpool-brand dishwasher, or 20% off a new KitchenAid dishwasher for any class member who had a Thermal Cut Off ("TCO") repair[4]; and

---

[3] Prequalified Class Members are those who can be identified in Whirlpool's, Sears's, or the Consumer Product Safety Commission's databases as having paid some amount for a qualifying dishwasher repair.  (See Settlement at 11).

[4] TCOs are heat-activated fuses intended to trip the circuit in the event that the surface temperature of the ECB reaches a certain level, and thus cut power, to prevent the Overheating Event from spreading beyond the ECB enclosure.  (See Settlement at 14 ("'TCO' is defined as the

1  • Revision of Whirlpool's service kit pointers and training bulletins to provide important
2  information about the safety function of TCOs and to instruct technicians and
3  consumers about the dangers of bypassing TCOs.

4  (See Motion at 2-3).

5  The Settlement also contemplates the provision of benefits to dishwasher owners who are
6  not part of the Settlement Class, i.e., dishwasher owners who own or owned dishwashers with a
7  NewGen or Raptor ECB as opposed to a Rush or Rushmore ECB (see Settlement at 9), but who
8  have had or will have an Overheating Event.  (See Motion at 4).  Those individuals will be eligible
9  to receive:

10  • Reimbursement of full repair costs (with a minimum $200 cash payment if there is
11  inadequate documentary proof of repair costs) for those who had an Overheating
12  Event before the Notice Date and within 12 years of purchase;

13  • Cash payment of $200 to $300 if they replaced their dishwasher;

14  • Prequalified owners will be offered compensation without any need to submit
15  documentary proof;

16  • A 30% off rebate off a new KitchenAid- or Whirlpool-brand dishwasher for those who
17  experience an Overheating Event at any time within two years after the Notice Date,
18  and those who have an Overheating Event within two years of the Notice Date and
19  ten years of the dishwasher purchase will have a choice of the 30% rebate or $100.

20  (See Motion at 4).

21  Finally, the settlement amount is uncapped, as defendants have agreed to compensate all
22  eligible class members.  (See Motion at 9).  Defendants will also pay class counsel's attorney's
23  fees and expenses awarded by the court, pay costs of notice and settlement administration,

24
25
26
27  ─────────────────────
28  thermal cut-off device found on certain" ECBs)).

1   purchase the websites of plaintiff Steve Chambers ("Chambers Websites"),[5] and make payments

2   to the named plaintiffs as awarded by the court.  (See id.).

3   **LEGAL STANDARD**

4   "[I]n the context of a case in which the parties reach a settlement agreement prior to class

5   certification, courts must peruse the proposed compromise to ratify both the propriety of the

6   certification and the fairness of the settlement." Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir.

7   2003).

8   I.   CLASS CERTIFICATION.

9       At the preliminary approval stage, the court "may make either a preliminary determination

10  that the proposed class action satisfies the criteria set out in Rule 23 or render a final decision as

11  to the appropriateness of class certification."[6] Smith v. Wm. Wrigley Jr. Co., 2010 WL 2401149,

12  *3 (S.D. Fla. 2010) (internal citation omitted); see also Sandoval v. Roadlink USA Pac., Inc., 2011

13  WL 5443777, *2 (C.D. Cal. 2011) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620, 117

14  S.Ct. 2231, 2248 (1997)) ("Parties seeking class certification for settlement purposes must satisfy

15  the requirements of Federal Rule of Civil Procedure 23[.]").  "A court considering such a request

16  should give the Rule 23 certification factors 'undiluted, even heightened, attention in the settlement

17  context.'" Sandoval, 2011 WL 5443777, at *2 (quoting Amchem, 521 U.S. at 620, 117 S.Ct. at

18  2248).  "Such attention is of vital importance, for a court asked to certify a settlement class will lack

19  the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings

20  as they unfold." Amchem, 521 U.S. at 620, 117 S.Ct. at 2248.

21

22

23      [5]   Plaintiff Steve Chambers ("Chambers") experienced an Overheating Event and then
24  "developed and managed a website, www.KitchenAidFire.com, to collect data to ascertain the
    extent of the problem. [He] prepared a 'fire incident report' form for consumers to report, and
25  provide the details of, their combusting Whirlpool-manufactured dishwashers[.]" (Fax Decl., Exh.
    B, Declaration of Plaintiff Steve Chambers ("Chambers Decl.," Dkt. No. 192-21) at ¶ 9).  He later
26  created a second site, www.whirlpoolsafetydefect.com, "to collect additional consumer complaints
    regarding the subject dishwashers." (Id. at ¶ 21).  As a material term of the Settlement, Whirlpool
27  will purchase these websites from Chambers for $100,000.  (See Settlement at 35).

28      [6]   All "Rule" references are to the Federal Rules of Civil Procedure.

A party seeking class certification must first demonstrate that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

"Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2548 (2011). Rule 23(b) is satisfied if:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>>
>> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
>> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>>
>> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

1            (C) the desirability or undesirability of concentrating the litigation of the

2            claims in the particular forum; and

3            (D) the likely difficulties in managing a class action.

4 Fed. R. Civ. P. 23(b)(1)-(3).

5       The party seeking class certification bears the burden of demonstrating that the class meets

6 the requirements of Rule 23.  See Dukes, 131 S.Ct. at 2551 ("Rule 23 does not set forth a mere

7 pleading standard.  A party seeking class certification must affirmatively demonstrate his

8 compliance with the Rule – that is, he must be prepared to prove that there are in fact sufficiently

9 numerous parties, common questions of law or fact, etc.").  However, courts need not consider

10 the Rule 23(b)(3) considerations regarding manageability of the class action, as settlement

11 obviates the need for a manageable trial.  See, e.g., Rosenburg v. I.B.M., 2007 WL 128232, *3

12 (N.D. Cal. 2007) (discussing "the elimination of the need, on account of the [s]ettlement, for the

13 Court to consider any potential trial manageability issues that might otherwise bear on the

14 propriety of class certification."); Morey v. Louis Vuitton N. Am., Inc., 2014 WL 109194, *12 (S.D.

15 Cal. 2014) ("because this certification of the Class is in connection with the Settlement rather than

16 litigation, the Court need not address any issues of manageability that may be presented by

17 certification of the class proposed in the Settlement Agreement.").

18 II.     FAIRNESS OF CLASS ACTION SETTLEMENT.

19       Rule 23 provides that "the claims, issues, or defenses of a certified class may be settled

20 . . . only with the court's approval."  Fed. R. Civ. P. 23(e).  "The primary concern of [Rule 23(e)]

21 is the protection of th[e] class members, including the named plaintiffs, whose rights may not have

22 been given due regard by the negotiating parties."  Officers for Justice v. Civil Service Comm'n

23 of the City & Cnty. of San Francisco, 688 F.2d 615, 624 (9th Cir. 1982), cert. denied 459 U.S.

24 1217 (1983).  Accordingly, a district court must determine whether a proposed class action

25 settlement is "fundamentally fair, adequate, and reasonable."  Staton, 327 F.3d at 959; see Fed.

26 R. Civ. Proc. 23(e).  Whether to approve a class action settlement is "committed to the sound

27 discretion of the trial judge."  Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir.), cert.

28

1  denied, Hoffer v. City of Seattle, 506 U.S. 953 (1992) (internal quotation marks and citation

2  omitted).

3      "If the [settlement] proposal would bind class members, the court may approve it only after

4  a hearing and on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).

5  "[S]ettlement approval that takes place prior to formal class certification requires a higher standard

6  of fairness [given t]he dangers of collusion between class counsel and the defendant, as well as

7  the need for additional protections when the settlement is not negotiated by a court designated

8  class representative[.]"  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998).  As the

9  Ninth Circuit has observed, "[p]rior to formal class certification, there is an even greater potential

10  for a breach of fiduciary duty owed the class during settlement.  Accordingly, such agreements

11  must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of

12  interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair."

13  In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 946 (9th Cir. 2011).

14      Approval of a class action settlement requires a two-step process – a preliminary approval

15  followed by a later final approval.  See West v. Circle K Stores, Inc., 2006 WL 1652598, *2 (E.D.

16  Cal. 2006) ("[A]pproval of a class action settlement takes place in two stages.");  Tijero v. Aaron

17  Bros., Inc., 2013 WL 60464, *6 (N.D. Cal. 2013) ("The decision of whether to approve a proposed

18  class action settlement entails a two-step process.").  At the preliminary approval stage, the court

19  "evaluate[s] the terms of the settlement to determine whether they are within a range of possible

20  judicial approval."  Wright v. Linkus Enters., Inc., 259 F.R.D. 468, 472 (E.D. Cal. 2009).  Although

21  "[c]loser scrutiny is reserved for the final approval hearing[,]" Harris v. Vector Mktg. Corp., 2011

22  WL 1627973, *7 (N.D. Cal. 2011), the showing at the preliminary approval stage – given the

23  amount of time, money and resources involved in, for example, sending out new class notices –

24  should be good enough for final approval.  At this stage, the court may grant preliminary approval

25  of a settlement and direct notice to the class if the settlement: "(1) appears to be the product of

26  serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not

27  improperly grant preferential treatment to class representatives or segments of the class; and (4)

28  falls within the range of possible approval."  Id. at *7; Alvarado v. Nederend, 2011 WL 90228, *5

(E.D. Cal. 2011) (same); Cordy v. USS-Posco Indus., 2013 WL 4028627, *3 (N.D. Cal. 2013) ("Preliminary approval of a settlement and notice to the proposed class is appropriate if the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval.") (internal quotation marks omitted). To undertake this analysis, the court "must consider plaintiffs' expected recovery balanced against the value of the settlement offer." In re Nat'l Football League Players' Concussion Injury Litig., 961 F.Supp.2d 708, 714 (E.D. Pa. 2014) (internal quotation marks omitted).

## DISCUSSION

I.   CLASS CERTIFICATION.

    A.   Rule 23(a) Requirements.

        **1.   Numerosity**.

The first prerequisite of class certification requires that the class be "so numerous that joinder of all members is impractical[.]" Fed. R. Civ. P. 23(a)(1). Although impracticability does not hinge only on the number of members in the putative class, joinder is usually impracticable if a class is "large in numbers." See Jordan v. Cnty. of Los Angeles, 669 F.2d 1311, 1319 (9th Cir.), vacated on other grounds, 459 U.S. 810 (1982) (class sizes of 39, 64, and 71 are sufficient to satisfy the numerosity requirement). "As a general matter, courts have found that numerosity is satisfied when class size exceeds 40 members, but not satisfied when membership dips below 21." Slaven v. BP Am., Inc., 190 F.R.D. 649, 654 (C.D. Cal. 2000); see Tait v. BSH Home Appliances Corp., 289 F.R.D. 466, 473 (C.D. Cal. 2012) ("A proposed class of at least forty members presumptively satisfies the numerosity requirement").

Here, the members of the Settlement Class are so numerous that joinder of all members is impracticable. Whirlpool claims that approximately six million Class Dishwashers were manufactured between 2000 and 2006. (See Fax Decl., Exh. V, Declaration of Gina M. Intrepido-Bowen ("Intrepido-Bowen Decl.," Dkt. No. 192-41), Exh. A (Settlement Notice Plan) at 10) ("The Class consists of approximately 5,788,410 Class Members."). The class therefore meets the

1  numerosity requirement.  Further, although they are not part of the class, the parties estimate that

2  there are approximately 18 million owners of non-class dishwashers (those with NewGen and

3  Raptor ECBs) who may be eligible for relief under the terms of the Settlement.  (See Motion at 24).

4         **2.**       **Commonality.**

5        The commonality requirement is satisfied if "there are common questions of law or fact

6  common to the class[.]"  Fed. R. Civ. P. 23(a)(2).  Commonality requires plaintiff to demonstrate

7  that her claims "depend upon a common contention . . . [whose] truth or falsity will resolve an

8  issue that is central to the validity of each one of the claims in one stroke."  Dukes, 131 S.Ct. at

9  2551; see also Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1172 (9th Cir. 2010) (The

10  commonality requirement demands that "class members' situations share a common issue of law

11  or fact, and are sufficiently parallel to insure a vigorous and full presentation of all claims for

12  relief.") (internal quotation marks omitted).  "The plaintiff must demonstrate the capacity of

13  classwide proceedings to generate common answers to common questions of law or fact that are

14  apt to drive the resolution of the litigation."  Mazza v. Am. Honda Motor Co., 666 F.3d 581, 588

15  (9th Cir. 2012) (internal quotation marks omitted).  "This does not, however, mean that every

16  question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single

17  significant question of law or fact."  Abdullah v.  U.S. Sec. Assocs., Inc., 731 F.3d 952, 957 (9th

18  Cir. 2013), cert. denied, 135 S.Ct. 53 (2014) (emphasis and internal quotation marks omitted); see

19  Mazza, 666 F.3d at 589 (characterizing commonality as a "limited burden[,]" stating that it "only

20  requires a single significant question of law or fact").  Proof of commonality under Rule 23(a) is

21  "less rigorous" than the related preponderance standard under Rule 23(b)(3).  See Mazza, 666

22  F.3d at 589.  "The existence of shared legal issues with divergent factual predicates is sufficient,

23  as is a common core of salient facts coupled with disparate legal remedies within the class."

24  Hanlon, 150 F.3d at 1019.

25        Here, the litigation involves common class-wide issues that, absent the Settlement, would

26  drive the resolution of plaintiffs' claims.  The common questions include, among others: whether

27  Class Dishwashers are materially defective due to a design flaw; whether the defendants knew

28  or should have known that the Class Dishwashers were defective; whether the Class Dishwashers

are not of merchantable quality; whether the Class Dishwashers will fail before the end of their reasonable expected life span; whether the existence of the alleged design defect is a material fact reasonable purchasers would have considered in making their purchase decisions; whether the alleged design flaw in the Class Dishwashers creates an unreasonable safety risk to owners and users; and whether defendants had a duty to disclose that the Class Dishwashers could smoke, shoot flames, arc, and cause property damage.  (See, e.g., 4AC at ¶ 200).

### 3.  Typicality.

To demonstrate typicality, a plaintiff "must show that the named parties' claims are typical of the class."  Ellis v. Costco Wholesale Corp., 657 F.3d 970, 984 (9th Cir. 2011) (citing Fed. R. Civ. P. 23(a)(3)).  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  Id. (internal quotation marks and citation omitted).  "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought."  Id. (internal quotation marks and citation omitted).  The typicality requirement demands that a named plaintiff's claims be "reasonably co-extensive with those of absent class members," although "they need not be substantially identical."  Hanlon, 150 F.3d at 1020.

Here, the claims of the representative plaintiffs are typical of the claims of the Settlement Class.  They all owned the Class Dishwashers, and therefore their claims arise from the same factual basis and are based on the same legal theory, i.e., that the Class Dishwashers had a design defect that defendants failed to disclose.  (See, e.g., 4AC at ¶¶ 8-9).  Additionally, the court is not aware of any facts that would subject the class representatives "to unique defenses which threaten to become the focus of the litigation."  Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).

1                      **4.**    **Adequacy of Representation**.

2         "The named Plaintiffs must fairly and adequately protect the interests of the class." Ellis,

3 657 F.3d at 985 (citing Fed. R. Civ. P. 23(a)(4)). "To determine whether named plaintiffs will

4 adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and

5 their counsel have any conflicts of interest with other class members and (2) will the named

6 plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" Id. (internal

7 quotation marks and citation omitted). "Adequate representation depends on, among other

8 factors, an absence of antagonism between representatives and absentees, and a sharing of

9 interest between representatives and absentees." Id.

10         The proposed class representatives do not appear to have any conflicts of interest with the

11 absent class members, especially given that they have no individual claims separate from the

12 class claims. As Chambers states, "I have no interests that are antagonistic to or in conflict with

13 the interests of other proposed class members. To the contrary, I and the other class members

14 seek to recover from [defendants] for the identical defect in the subject dishwashers[.]"

15 (Chambers Decl. at ¶ 19). The class representatives understand their responsibilities "not to put

16 [their] own interests ahead of the members of the Class or to act to the disadvantage of other

17 Class Members." (See, e.g., Chambers Decl. at ¶ 17; Fax Decl., Exh. C, Declaration of Lynn Van

18 Der Veer ("Van Der Veer Decl.," Dkt. No. 192-22) at ¶ 12; Id., Exh. D, Declaration of Kevin

19 O'Connell ("O'Connell Decl.," Dkt. No. 192-23) at ¶ 22). This case is particularly suitable for class

20 treatment because, as the parties point out, "the claims of fraudulent omissions and other

21 breaches . . . focus on [d]efendants' conduct. Defendants either had an obligation to disclose their

22 knowledge of the problems with the Class Dishwashers or they did not. Defendants did not owe

23 this obligation to some [c]lass members but not others. Similarly, it is implausible that the effect

24 of Defendants' alleged misstatements and omissions differed between purchasers." (See Motion

25 at 26). In short, "[t]he adequacy-of-representation requirement is met here because Plaintiffs have

26 the same interests as the absent Class Members[.] Further, there is no apparent conflict of interest

27 between the named Plaintiffs' claims and those of the other Class Members' – particularly because

28

1    the named Plaintiffs have no separate and individual claims apart from the Class." Barbosa v.

2    Cargill Meat Solutions Corp, 297 F.R.D. 431, 442 (E.D. Cal. 2013).

3           Additionally, the court is satisfied that plaintiffs' counsel are competent and willing to

4    prosecute this action vigorously.  Plaintiffs' counsel request, and the Settlement provides, that the

5    court appoint as class counsel lawyers from the firms Rifkin, Weiner, Livingston Levitan & Silver

6    LLC; Weinstein Kitchenoff & Asher LLC; Chimicles & Tikellis LLP; Leiff Cabraser Heimann &

7    Bernstein, LLP; and Cohon & Pollak, LLP.  (See Motion at 27 n. 14).  They further request that the

8    court appoint as co-lead counsel the firms Rifkin, Weiner, Livingston Levitan & Silver LLC and

9    Chimicles & Tikellis LLP.  (Id.).  The attorneys from these firms – Charles Fax, Robert Kitchenoff,

10   Timothy Mathews, Steven Schwartz, Nicole Sugnet, and Jeff Cohon – are from "several of the

11   most distinguished plaintiffs' class action law firms in the country" and have "vast experience in

12   complex litigation generally."  (See Fax Decl. at ¶ 18 & n. 2).  The parties' mediator, Professor Eric

13   Green, states that "Class Counsel are among the most capable and experienced lawyers in the

14   country in these kind of cases.  Class Counsel took on an extremely risky and complicated case,

15   invested a lot of time and resources, and achieved a good result for the Class."  (Fax Decl., Exh.

16   W, Declaration of Eric D. Green ("Green Decl.," Dkt. No. 192-42) at ¶ 15).  Based on such

17   representations, and the court's having observed counsel's diligence in litigating this case, the

18   court finds that plaintiffs' counsel are competent, and that the adequacy of representation

19   requirement is satisfied.  See Barbosa, 297 F.R.D. at 443 ("There is no challenge to the

20   competency of the Class Counsel, and the Court finds that Plaintiffs are represented by

21   experienced and competent counsel who have litigated numerous class action cases."); Avilez v.

22   Pinkerton Gov't Servs., Inc., 286 F.R.D. 450, 457 (C.D. Cal. 2012) vacated and remanded on

23   other grounds, 595 Fed. Appx. 579 (9th Cir. 2015) ("Defendants do not dispute and the evidence

24   confirms that, as detailed in their declarations, Plaintiff's counsel are experienced class action

25   litigators who have litigated many . . . class actions and have been certified as class counsel in

26   numerous other class actions[.]").

27

28

1  **B.**     Rule 23(b) Requirements.

2       "Where, as here, a plaintiff moves for class certification under Rule 23(b)(3), the plaintiff

3  must prove[] the questions of law or fact common to the members of the class predominate over

4  any questions affecting only individual members, and that a class action is superior to other

5  available methods for the fair and efficient adjudication of the controversy." Sandoval, 2011 WL

6  5443777, at *2; see Fed. R. Civ. P. 23(b)(3).

7       **1.    Predominance.**

8       "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

9  cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623, 117 S.Ct. at 2249.

10  "Rule 23(b)(3) focuses on the relationship between the common and individual issues.  When

11  common questions present a significant aspect of the case and they can be resolved for all

12  members of the class in a single adjudication, there is clear justification for handling the dispute

13  on a representative rather than on an individual basis."  Hanlon, 150 F.3d at 1022 (internal

14  quotation marks and citations omitted); see In re Wells Fargo Home Mortg. Overtime Pay Litig.,

15  571 F.3d 953, 959 (9th Cir. 2009) ("[T]he main concern in the predominance inquiry . . . [is] the

16  balance between individual and common issues.").  Additionally, the class damages must be

17  sufficiently traceable to plaintiffs' liability case.  See Comcast Corp. v. Behrend, 133 S.Ct. 1426,

18  1433 (2013).

19       Here, the 4AC sufficiently demonstrates that "[a] common nucleus of facts and potential

20  legal remedies dominates this litigation." Hanlon, 150 F.3d at 1022.  As discussed above, see

21  supra at § I.A.2., there are many common questions regarding the existence of design defects in

22  defendants' dishwashers and defendants' knowledge of the same.  (See also 4AC at ¶ 200).  The

23  answers to these questions, which would drive the resolution of the litigation, do not depend on

24  the individual facts or circumstances of an individual plaintiff's purchase and use of defendants'

25  dishwashers.  On the contrary, and as discussed briefly above, the dishwashers either had design

26  defects or they did not; defendants knew or should have known about the defects or they did not;

27  and defendants withheld or omitted material information from consumers or they did not.  These

28  questions predominate over all others in this litigation, and they are common to all plaintiffs.

Additionally, because plaintiffs seek "the difference between the value Defendants promised and the value received by Plaintiffs and the Settlement Class" (see Motion at 26), class members' damages are traceable to their liability case.  See Comcast, 133 S.Ct. at 1433.  Courts frequently determine that such difference in value is an appropriate measure of restitution, see, e.g., In re Vioxx Class Cases, 180 Cal.App.4th 116, 131 (2009) ("The difference between what the plaintiff paid and the value of what the plaintiff received is a proper measure of restitution."), and ascertaining that difference is amenable to resolution on a class-wide basis.

### 2.   Superiority.

"The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case" and "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." Hanlon, 150 F.3d at 1023.  Rule 23(b)(3) provides a list of four non-exhaustive factors relevant to superiority.  See Fed. R. Civ. P. 23(b)(3)(A)-(D).

The first factor considers "the class members' interests in individually controlling the prosecution or defense of separate actions."  Fed. R. Civ. P. 23(b)(3)(A).  "This factor weighs against class certification where each class member has suffered sizeable damages or has an emotional stake in the litigation." Barbosa, 297 F.R.D. at 444.  Here, plaintiffs do not assert claims for emotional distress damages, nor is there any indication that the amount of damages any individual class member could recover is significant or substantially greater than the potential recovery of any other class member.[7]  (See, generally, 4AC).  Rather, plaintiffs seek as a "base measure of damages" the "difference between the value Defendants promised and the value received[.]" (Motion at 26).  This amount should be roughly the same for all class members, as they purchased the same dishwashers that suffered from the same defects.  (See, e.g., 4AC at ¶¶ 196, 202 & 205).  Further, the amount of economic damages suffered by each plaintiff is relatively small.  (See, e.g., 4AC at ¶¶ 26, 33, 41, 55, 64, 72, 78, 95, 101, 107, 120, 126, 132 &

---

[7]  Additionally, although personal injuries and/or other property damage may have occurred as a result of the alleged defects and may have varied from plaintiff to plaintiff, the 4AC does not seek recovery for such claims.  (See, generally, 4AC).

140 (alleging dishwasher purchases ranging from approximately $450 to $1,100); id. at ¶¶ 28, 35, 44, 51, 60, 68, 76, 91 (alleging inspection, replacement, and repair costs ranging from $0 to $1,000).  The alternative method of resolution is individual claims for a relatively small amount of damages, and such claims would likely never be brought, as "litigation costs would dwarf potential recovery."  Hanlon, 150 F.3d at 1023; see Leyva v. Medline Indus., Inc., 716 F.3d 510, 515 (9th Cir. 2013) ("In light of the small size of the putative class members' potential individual monetary recovery, class certification may be the only feasible means for them to adjudicate their claims.  Thus, class certification is also the superior method of adjudication"); Bruno v. Quten Research Inst., LLC, 280 F.R.D. 524, 537 (C.D. Cal. 2011), reconsideration denied, 280 F.R.D. 540 (2012) ("Given the small size of each class member's claim, class treatment is not merely the superior, but the only manner in which to ensure fair and efficient adjudication of the present action.").  For all of these reasons, "there is no evidence that Class members have any interest in controlling prosecution of their claims separately nor would they likely have the resources to do so."  Munoz v. PHH Corp., 2013 WL 2146925, *26 (E.D. Cal. 2013).

The second factor to consider is "the extent and nature of any litigation concerning the controversy already begun by or against class members."  Fed. R. Civ. P. 23(b)(3)(B).  There is no indication that any class member is involved in any other litigation concerning the claims in this case.  (See, generally, Motion & Fax Decl., Exhs. B-S).

The third factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," and the fourth factor is "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(C)-(D).  As noted above, "[i]n the context of settlement . . . the third and fourth factors are rendered moot and are irrelevant."  Barbosa, 2013 WL 3340939, at *11;  Amchem, 521 U.S. at 620, 117 S.Ct. at 2248 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial.") (citation omitted).

The only factor in play here weighs in favor of class treatment.  Further, the filing of separate suits by several thousand class members "would create an unnecessary burden on

1   judicial resources." Barbosa, 297 F.R.D. at 445.  Under the circumstances, the court finds that

2   the superiority requirement is satisfied.

3   II.   FAIRNESS,   REASONABLENESS,   AND   ADEQUACY   OF   THE   PROPOSED

4          SETTLEMENT.

5          The court's preliminary evaluation of the Settlement Agreement "does not disclose grounds

6   to doubt its fairness[,] . . . such as unduly preferential treatment of class representatives or of

7   segments of the class, or excessive compensation for attorneys, and appears to fall within the

8   range of possible approval[.]"  In re Vitamins Antitrust Litig., 2001 WL 856292,*4 (D.D.C. 2001)

9   (internal quotation marks omitted).

10         A.    The Settlement is the Product of Arm's-Length Negotiations.

11         "This circuit has long deferred to the private consensual decision of the parties." Rodriguez

12   v. W. Publ'g Corp., 563 F.3d 948, 965 (9th Cir. 2009).  The Ninth Circuit has "emphasized" that:

13                  the court's intrusion upon what is otherwise a private consensual agreement

14                  negotiated between the parties to a lawsuit must be limited to the extent

15                  necessary to reach a reasoned judgment that the agreement is not the

16                  product of fraud or overreaching by, or collusion between, the negotiating

17                  parties, and that the settlement, taken as a whole, is fair, reasonable and

18                  adequate to all concerned.

19   Id. (internal quotation marks omitted).  The Ninth Circuit does not follow the approach of other

20   circuits that requires district courts to "specifically weigh[] the merits of the class's case against

21   the settlement amount and quantif[y] the expected value of fully litigating the matter." Id.  Rather,

22   the Ninth Circuit examines whether the settlement is "the product of an arms-length, non-collusive,

23   negotiated resolution[.]"   Id.   When it is, courts afford the parties the presumption that the

24   settlement is fair and reasonable.  See, e.g., In re Heritage Bond Litig., 2005 WL 1594403, *9 ("A

25   presumption of correctness is said to 'attach to a class settlement reached in arm's-length

26   negotiations between experienced capable counsel after meaningful discovery.'") (internal

27   quotation marks omitted).

28

Here, there is no evidence of collusion or fraud leading to, or taking part in, the settlement negotiations between the parties.  On the contrary, the parties initially engaged in "extensive" discovery, including:

> 3 sets of document requests (over 80 in number) and interrogatories to Whirlpool and Sears; 2 sets of document requests (over 80 in number) and 1 set of interrogatories to [p]laintiffs; production of over 350,000 pages of documents by [d]efendants and third parties (including numerous detailed and lengthy spreadsheets, engineering drawings, and other complex documents); [p]laintiffs' experts' inspection of over 40 burned ECBs and numerous damaged dishwashers; depositions of all 18 [p]laintiffs; 5 days of depositions of [d]efendants' 30(b)(6) engineer-designees and employees; 1 non-party deposition; document productions in response to subpoenas served on Whirlpool's component part suppliers; and document productions in response to over 40 subpoenas served on insurance carriers that paid claims to Whirlpool-manufactured dishwasher owners.

(See Fax Decl. at ¶ 9).  In the fall of 2013, after having litigated the case for several years, the parties began to engage in settlement discussions.  (Id. at ¶ 10).  The parties jointly retained an experienced mediator, and over the next year and a half they participated in six full-day mediation sessions.  (Id.).  The parties "exchanged 3 sets of primary mediation briefs, as well as rebuttal briefs."  (Id.).  The negotiations paused in March 2014 after the parties reached an impasse, at which point the parties resumed "litigating intensively[,]" including taking and defending depositions, producing documents, and working with experts.  (See id. at ¶ 12).

The discussions resumed in the Spring of 2015, and the parties submitted supplemental memoranda to the mediator before additional face-to-face mediation sessions.  (See Fax Decl. at ¶ 13).  On May 5, 2015, the parties reached a settlement in principle on all material terms, and continued to negotiate the remaining matters, including the details of class notice and settlement administration.  (See id. at ¶ 14).  Final agreement was achieved in early September, 2015.  (See id.).  It is the mediator's opinion that "the proposed settlement is the result of a mediated

19

1  negotiation after a difficult, comprehensive, informed, protracted, adversarial arms-length

2  bargaining process, and is consistent with the risks and potential rewards of the claims asserted

3  when measured against the 'no-agreement alternative' of continued, uncertain litigation." (Green

4  Decl. at ¶ 6).

5       Based on the evidence and record before the court, the court is persuaded that this

6  resolution demonstrates that the parties thoroughly investigated and considered their own and the

7  opposing parties' positions.  The parties clearly had a sound basis for measuring the terms of the

8  Settlement against the risks of continued litigation, and there is no evidence that the Settlement

9  is "the product of fraud or overreaching by, or collusion between, the negotiating parties[.]"

10  Rodriguez, 563 F.3d at 965 (quoting Officers for Justice, 688 F.2d at 625).

11       B.    The Amount Offered In Settlement Falls Within a Range of Possible Judicial

12             Approval and is a Fair and Reasonable Outcome for Class Members.

13             1.    Recovery for Class Members.

14       The settlement is fair, reasonable, and adequate, particularly when viewed in light of the

15  litigation risks in this case.  As described above, the benefits to the Settlement Class members

16  include: full recovery of amounts spent on parts and labor for Qualifying Repairs; $200 or $300

17  in cash for those who replaced their dishwashers; $100 or a 30% rebate on the purchase of a new

18  dishwasher for those who have a future Overheating Event; and a rebate of 10% or 15% on the

19  purchase of a new dishwasher, regardless of dishwasher failure or repair history.  (See Motion at

20  21).  The Settlement thus confers an adequate recovery for plaintiffs.  The "claims of some class

21  members might prove valuable if successful at trial, but that does not cast doubt on the district

22  court's conclusion as to the fairness and adequacy of the overall settlement amount to the class

23  as a whole."  Lane v. Facebook, Inc., 696 F.3d 811, 824 (9th Cir. 2012), reh'g denied, 709 F.3d

24  791 (2013), cert. denied, Marek v. Lane, 134 S.Ct 8 (2013) (emphasis in original omitted); see also

25  In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir. 2000) (ruling that "the [s]ettlement

26  amount of almost $2 million was roughly one-sixth of the potential recovery, which, given the

27  difficulties in proving the case, [was] fair and adequate."); Rodriguez, 563 F.3d at 964 (affirming

28  settlement approval where the settlement represented 30% of the damages estimated by the class

expert); Linney Cellular Alaska P'ship, 151 F.3d 1234, 1242 (9th Cir. 1998) ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.") (internal quotation marks and citation omitted).

Additionally, the Settlement promotes public safety by requiring new warnings about the dangers of removing or bypassing TCOs, and by creating an incentive for current owners to replace their Class Dishwashers. (See Motion at 22). This broader public safety benefit, along with the safety warning to be distributed to service personnel, supplies a further reason for approving of the Settlement. (See Fax Decl. at ¶ 16) ("Thus the three objectives that motivated Lead Plaintiff Chambers to go down this long road, starting in 2009 and culminating only now, are satisfied – persuading Whirlpool to confront the matter of its combusting Dishwashers, making the class whole, and furthering public safety."); see, also, Hanlon, 150 F.3d at 1026 ("It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness[.]");

The Settlement is even more compelling given the substantial litigation risks in this case. Nationwide class certification under California law, or under the laws of multiple states, would be very difficult for plaintiffs. See, e.g., Mazza, 666 F.3d at 590-94; In re Pharm. Indus. Average Wholesale Price Litig., 252 F.R.D. 83, 94 (D. Mass. 2008) (noting that "[w]hile numerous courts have talked-the-talk that grouping of multiple state laws is lawful and possible, very few courts have walked the grouping walk."). Further, for plaintiffs' fraud-based claims, the potentially individualized issue of purchasers' reliance upon defendants' representations or omissions might raise an additional hurdle. See, e.g., McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 222-26 (2nd Cir. 2008), abrogated on other grounds, Bridge v. Phx. Bond & Indem. Co., 553 U.S. 639 (2008). It is also clear that defendants would have challenged plaintiffs' express warranty claims and argued that Whirlpool's limited warranty covering "defects in materials and workmanship" does not extend to the design defect alleged in this action. (See Motion at 22). They would have also argued that the warranty claims lack merit because plaintiffs did not satisfy all conditions precedent to coverage, and that the defect did not manifest itself and/or was not substantially

1  certain to manifest in many of the Class Dishwashers.  (See id.).  Because the Class Dishwashers

2  were no longer manufactured after 2006, defendants would assert that any warranties that were

3  in effect had expired, and that most class members received the full value of the useful life of the

4  Class Dishwashers.  (See id. at 22-23).  Plaintiffs' counsel acknowledge that "even assuming

5  [these challenges] were overcome and a class certification order were issued and upheld on

6  interlocutory appeal, defeating summary judgment and winning the case at trial, and sustaining

7  the final judgment on appeal, could be daunting."  (Id. at 23).  In short, the risks of continued

8  litigation are formidable, and the court takes these real risks into account.  Weighed against those

9  risks, and coupled with the delays associated with continued litigation, the Settlement's benefits

10  to the class falls within the range of reasonableness.

11                    **2.**      **Release of Claims.**

12        Beyond the value of the settlement, potential recovery at trial, and inherent risks in

13  continued litigation, courts also consider whether a class action settlement contains an overly

14  broad release of liability.  See Newberg on Class Actions § 13:15, at 326 (5th ed. 2014) ("Beyond

15  the value of the settlement, courts have rejected preliminary approval when the proposed

16  settlement contains obvious substantive defects such as . . . overly broad releases of liability.");

17  see also Fraser v. Asus Computer Int'l, 2012 WL 6680142, *3 (N.D. Cal. 2012) (denying

18  preliminary approval of proposed settlement that provided defendant a "nationwide blanket

19  release" in exchange for payment "only on a claims-made basis," without the establishment of a

20  settlement fund or any other benefit to the class).

21        Here, plaintiffs and Settlement Class members who do not exclude themselves from the

22  Settlement  release all claims that they "now have, or, absent [the Settlement], may in the future

23  have had . . . by reason of any act, omission, harm, matter, cause, or event . . . that relates to any

24  of the defects, malfunctions, or inadequacies of the Class Dishwashers that are alleged or could

25  have been alleged" in this lawsuit.  (See Settlement at 48-49).[8]  The release does not, however,

26  _____

27      [8]  NewGen and Raptor owners who have paid for qualifying repairs or who have paid for
qualifying replacements may also obtain relief under the Settlement, even though they are not

28  members of the Settlement Class.  The reimbursements they receive will be in consideration for
their individual execution of a one-page release, releasing their claims against Whirlpool, Sears,

extinguish "claims for personal injury or for damage to property other than to the Class Dishwasher itself." (Id. at 49).  The Settlement's provision regarding future harm contains this same carve-out: "The Release in this Agreement, and the compromise on which it is based, are expressly intended to and do cover and include a release by each Plaintiff and Settlement Class Member of all such future injuries, damages, losses, or future consequences or results, excluding any future injury to person or to property other than the Class Dishwasher itself[.]" (Id. at 50).  Finally, the provision regarding unknown harm includes a waiver of rights protected by California Civil Code § 1542 ("§ 1542"), which preserves unknown claims.  (See Settlement at 50-51); See also Cal. Civ. Code § 1542 ("A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.").  The parties state in the Settlement that "this waiver is an essential and material term of this release and the compromise settlement that led to it, and that without this waiver the compromise settlement would not have been accomplished." (Settlement at 51).  However, the fact that the preceding sections contain language that explicitly carves out claims for personal injury and damage to property other than the Class Dishwasher itself indicates that such claims are not unknown, and are not – nor are they intended to be – within the scope of the § 1542 waiver.  For these reasons, and with the above-described understanding of the release, i.e., that neither the general release nor the § 1542 waiver applies to claims of personal injury and damage to property other than Class Dishwashers, the court finds that the release adequately balances fairness to absent class members and recovery for plaintiffs with defendants' business interest in ending this litigation with finality.  See, e.g., Fraser, 2012 WL 6680142, *4 (recognizing defendant's "legitimate business interest in 'buying peace' and moving on to its next challenge" as well as the need to prioritize "[f]airness to absent class member[s]").

---

and any other entity in the chain of manufacture or distribution of their dishwashers.  (See Settlement at 30 & Exh. 12).  Because these releases will be signed on an individual basis, are not part of the relief available to Settlement Class members, and will not bind any absent parties, the court need not analyze them here.

C.    The Settlement Agreement Does Not Improperly Grant Preferential Treatment to the Class Representatives.

"Although [the Ninth Circuit] ha[s] approved incentive awards for class representatives in some cases, [it has instructed] district courts to scrutinize carefully the awards so that they do not undermine the adequacy of the class representatives." Radcliffe v. Experian Info. Solutions Inc., 715 F.3d 1157, 1163 (9th Cir. 2013) (reversing the district court's class action settlement approval).  In Radcliffe, the court cast doubt, but did not rule on, "whether class representatives could be expected to fairly evaluate whether awards ranging from $26 to $750 is a fair settlement value when they would receive $5,000 incentive awards." Id. at 1165.

In Staton, the Ninth Circuit reversed the district court's approval of a class-action settlement where the incentive payments of up to $50,000 were disproportionately large as compared to class members' payments averaging $16,500 for one subclass, and $1,000 for another. See 327 F.3d at 948-49 & 977.  The court stated that class representatives receiving special incentive awards "may be more concerned with maximizing those incentives than with judging the adequacy of the settlement as it applies to class members at large."  Id. at 977.  In such cases, "the class representatives [may not] adequately represent the class."  Radcliffe, 715 F.3d at 1164.  The Staton court, however, approvingly cited to Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998), in which the Seventh Circuit allowed an incentive payment of $25,000 "in the context of a recovery of more than $14 million[,]" where the plaintiff "spent hundreds of hours with his attorneys and provided them with 'an abundance of information[.]'" 327 F.3d at 976 (quoting Cook, 142 F.3d at 1016). Staton also cited favorably to In re SmithKline Beckman Corp. Sec. Litig., 751 F.Supp.525, 535 (E.D. Pa. 1990), which approved "$5,000 awards for one named representative of each of nine plaintiff classes involving more than 22,000 claimants in a settlement of $22 million[.]"  327 F.3d at 977.

With this guidance in mind, the court must examine whether there is a "significant disparity between the incentive awards and the payments to the rest of the class members" such that it creates a conflict of interest. See Radcliffe, 715 F.3d at 1165. Further, "[i]n deciding whether [an incentive] award is warranted, relevant factors include the actions the plaintiff has taken to protect

the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." Cook, 142 F.3d at 1016.

The parties indicate that the defendants will not oppose a service award of $4,000 to each of the plaintiffs "to compensate them for their efforts in pursuing litigation on behalf of the Settlement Class and NewGen and Raptor Dishwasher Owners." (Settlement at 47). However, they also agree that the service awards will be included in class counsel's fee application, and "considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of this . . . Settlement[.]" (Id. at 48). Further, the parties agree that the court's failure to approve any service award "shall not affect the validity or finality of the Settlement, nor shall such non-approval be grounds for rescission of the [Settlement.]" (Id.). Accordingly, the court considers the fairness and adequacy of the Settlement without any incentive awards to the named plaintiffs. Nonetheless, because the parties agree that the Settlement shall remain in force regardless of any service awards, the court notes that the awards are unlikely to create a conflict of interest between the named plaintiffs and absent class members. Plaintiffs agreed with their attorneys that if the action succeeded, they would "share in any class recovery on the same basis as other class members, and would not receive any other recovery from a class

1  action settlement or judgment except as approved by the Court."[9]  (See Van Der Veer Decl. at ¶

2  12).

3          While the service awards for plaintiffs are not part of the Settlement, the Settlement does

4  contemplate payment of $100,000 to Chambers by Whirlpool for all "right[s], title, and interest to

5  the Chambers Websites[,]" the value of which is based upon "Whirlpool and Mr. Chambers'

6  respective valuations of the website[s], and taking into account the significant investment by Mr.

7  Chambers into the creation and maintenance of the website[s], the amount of traffic generated,

8  and other factors relevant to the valuation of a website."  (See Settlement at 35).  Chambers

9  created the websites after he experienced an Overheating Event, contacted Whirlpool, and the

10  "Whirlpool representative with whom [he] spoke seemed unresponsive to [his] complaint."  (See

11  Chambers Decl. at ¶ 8).  This "caused [Chambers] to wonder whether other consumers had

12  experienced the same problem[,]" so he "developed and managed" the websites "to collect data

13  and ascertain the extent of the problem."  (See id. at ¶ 9).  He "prepared a 'fire incident report' form

14  for consumers to report, and provide the details of, their combusting Whirlpool-manufactured

15  dishwashers[.]"  (Id.).  After he heard from numerous individuals who experienced similar

16  problems, he made reports of his findings to Whirlpool, Sears, and the Consumer Product Safety

17  Commission.  (See id. at ¶¶ 11-12).  After having heard from approximately 500 consumers,

18  _____

19      [9]  Regardless of the amount the court ultimately does or does not approve, it is clear that the
    plaintiffs in this action have taken on substantial responsibility in litigating this case, and the class
20  has benefitted from the time and effort they spent doing so.  (See, e.g., Van Der Veer Decl. at ¶¶
    13-18 (describing the "considerable time and effort" she spent on the litigation, including
21  communicating with her attorneys, providing comments and ideas, conferring during mediation,
    reviewing each complaint and authorizing their filing, suggesting edits, answering interrogatories,
22  searching her emails for document requests, preparing for and testifying at her deposition,
    reviewing the deposition transcript, and communicating with her counsel regrading settlement);
23  O'Connell Decl. at ¶¶ 16-18 & 23-28 (describing his report to the Consumer Product Safety
    Commission, report to Chambers's website, communication with Chambers and his attorneys,
24  providing comments and ideas, reviewing complaints and suggesting edits, preparing for his day-
    long deposition and reviewing the transcript, and communicating "many times" with his attorneys
25  during settlement negotiations); Fax Decl., Exh. E, Declaration of Joseph Cicchelli ("Chiccelli
    Decl.," Dkt. No. 192-24) at ¶¶ 13 & 16-22 (same, and further describing his meeting with defense
26  counsel and defendants' expert at his home so the expert could examine his dishwasher); Fax
    Decl., Exh. F, Declaration of Kurt Himler ("Himler Decl.," Dkt. No. 192-25) at ¶¶ 15-21 (same, and
27  further describing defense counsel and defendants' expert's inspection of the counter area above
    his dishwasher where the fire occurred)).
28

collecting their forms, and "[r]eceiving no indication from Whirlpool that it was prepared to address the problem voluntarily[,]" Chambers obtained counsel and "gave [his attorneys] all of the data assembled . . . up to that point, which included approximately 500 fire incident reports that [he] had collected, plus the laboratory causation analysis for [his] dishwasher."  (See id. at ¶¶ 13-15). Throughout the course of the litigation, Chambers maintained the Chambers Websites, upgraded them and added additional information including news stories and interviews with counsel, and answered questions and communicated directly with concerned consumers.  (See id. at ¶ 21). As of June 2015, Chambers collected 1,323 fire incident reports on these websites from the United States and Canada.  (See id. at ¶ 22).  He estimates that he spent approximately 220 hours "collecting/sharing/archiving/and posting fire incident reports" from the Chambers Websites. (See id. at ¶ 31).

Valuing his websites using the "traffic value" valuation method,[10] Chambers has "recently calculated the value of the www.KitchenAidFire.com website in excess of $400,000 and the value of the www.WhirlpoolSafetyDefects.com website in excess of $7,000." (See Chambers Decl. at ¶ 43).  He states that it may also be valued according to its "impact on the manufacturer's reputation."  (See id. at ¶ 46).  The Settlement makes clear that the parties understand the substantial role that the Chambers Websites have played in the litigation so far, and will continue to have as administration of the Settlement continues.  For example, the Settlement indicates that "[b]etween the Preliminary Approval Date and the Effective Date, the Chambers Websites may be used to communicate the fact of the Settlement and include a link to the Settlement Administration Website." (Settlement at 37).  The Chambers Websites "may also be used to communicate the fact of the relief available to NewGen and Raptor Owners who have experienced, or who will in the future experience, an Overheating Event."  (Id.).  Likely in recognition of the substantial traffic to the Chambers Websites, the parties have agreed that written statements about the proposed class or non-class settlement must be reviewed and

---

[10]   This method researches the top key phrase or phrases that drive the majority of traffic to the website and locates the cost-per-click value of the keywords at Google Adwords's key word tool.  (See Chambers Decl. at ¶ 45).

1  approved by counsel in advance of posting.  (See id.).  Finally, "no later than five business days

2  after the Effective Date, . . . Chambers will cooperate with Whirlpool to take down and render

3  inoperative the Chambers Websites[.]" (Id.).  He will also direct Settlement class members and

4  NewGen and Raptor owners who contact him to contact Whirlpool directly.  (See id.).

5      Not only did the Chambers Websites play a large role in the initiation of this action, it was

6  also a vital method of communication between the named plaintiffs, their counsel, and absent

7  class members since 2011.  (See, e.g., Fax Decl. at ¶ 6 (describing his reviewing the Chambers

8  websites' database of persons who had experienced dishwasher fires); Chambers Decl. at ¶ 23

9  (describing his identifying "particularly noteworthy incidents and alert[ing] counsel] for follow-up with

10 such consumers")).  They will continue to be an important source of communication and

11 information during the class notice period.  (See Settlement at 37).  For these reasons, the court

12 finds it fair and reasonable for Whirlpool to purchase the Chambers websites for $100,000.  (See

13 also Chambers Decl. at ¶ 46) ("I accept Whirlpool's estimation that it is worth $100,000 for it to

14 acquire my websites.").  While a disparity exists between this payment and the potential monetary

15 awards to the other plaintiffs and absent class members, the court does not believe, under the

16 circumstances here, that such disparity rises to the level of unduly preferential treatment.  On the

17 contrary, the payment is warranted based on the role of the Chambers websites in protecting the

18 interests of the class and ensuring that the class benefits from the litigation.  That the Chambers

19 websites are currently owned and operated by a plaintiff does not compel a different conclusion.

20      D.    Proposed Class Notice and Notification Procedures.

21      Upon a settlement of a certified class, "[t]he court must direct notice in a reasonable

22 manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).

23 Federal Rule of Civil Procedure 23(c)(2) prescribes the "best notice that is practicable under the

24 circumstances, including individual notice" of particular information.  Fed. R. Civ. P. 23(c)(2)(B)

25 (enumerating notice requirements for classes certified under Rule 23(b)(3)).

26      A class action settlement notice "is satisfactory if it generally describes the terms of the

27 settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come

28 forward and be heard."  Churchill Vill., LLC v. Gen. Elec., 361 F.3d 566, 575 (9th Cir.), cert.

1  denied, 543 U.S. 818 (2004) (internal quotation marks omitted).  "The standard for the adequacy

2  of a settlement notice in a class action under either the Due Process Clause or the Federal Rules

3  is measured by reasonableness."  Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 113 (2d

4  Cir.), cert. denied, 544 U.S. 1044 (2005).  Settlement notices must "fairly apprise the prospective

5  members of the class of the terms of the proposed settlement and of the options that are open to

6  them in connection with the proceedings."  Weinberger v. Kendrick, 698 F.2d 61, 70 (2d Cir. 1982),

7  cert. denied, 464 U.S. 818 (1983) (internal quotation marks and brackets omitted); see Trotsky v.

8  Los Angeles Fed. Sav. & Loan Ass'n., 48 Cal.App.3d 134, 151-52 (1975) (same);  Wershba v.

9  Apple Computer, Inc., 91 Cal.App.4th 224, 252 (2001) ("As a general rule, class notice must strike

10  a balance between thoroughness and the need to avoid unduly complicating the content of the

11  notice and confusing class members.").  The notice should provide sufficient information to allow

12  class members to decide whether they should accept the benefits of the settlement, opt out and

13  pursue their own remedies, or object to its terms.  See Wershba, 91 Cal.App.4th at 251-52.

14  "[N]otice is adequate if it may be understood by the average class member."  4 Newberg on Class

15  Actions § 11:53, at 167 (4th ed. 2013).

16      Here, the FAQ Settlement Notice[11] describes the nature of the action, including the class

17  claims. (See Settlement Agreement, Exh. 3 ("FAQ Settlement Notice," Dkt. No. 197-2[12]) at 2); see

18  Fed. R. Civ. P. 23(c)(2)(B)(I) & (iii).  The class definition is conspicuously included in a section

19  entitled, "Who is included in the Settlement?," and that section also explains that benefits may be

20  available to owners of dishwashers that are not Class Dishwashers, and directs them to the

21  settlement website for a list of those other model and serial numbers.  (See FAQ Settlement

22  Notice at 3); see Fed. R. Civ. P. 23(c)(2)(B)(ii).  The FAQ Settlement Notice also explains the

23  _____

24  [11]  The "FAQ Settlement Notice" refers to the full notice that will go out to class members, and
    it is referred to by the parties as the "FAQ" or "FAQ Settlement Notice" because it is in the form
25  of frequently asked questions and answers.  (See Settlement at 8).

26  [12]  The parties agreed in their Joint Stip. to Amend that an amended version of the FAQ
    Settlement Notice, which was revised to accurately correspond with the claims submission and/or
27  objection schedule set forth in the Settlement, should replace the original FAQ Settlement Notice.
    (See Joint Stip. to Amend at 6 & Amended Exh. 3).  Accordingly, all references to the FAQ
28  Settlement Notice are to the amended version rather than the originally-filed one.

terms of the Settlement, including the benefits class members will receive and contains separate sub-sections providing additional information about cash rebates, reimbursements, cash payments available for future Overheating Events, and the replacement part box stickers that advise service technicians about the benefits of the Settlement.  (See FAQ Settlement Notice at 3-5).  It explains to consumers what they need to do in order to obtain each of the available types of relief.  (See id.).  The FAQ Settlement Notice also includes an overview and detailed explanation laying out the class members' options under the settlement: they may exclude themselves, object, or do nothing.  (See id. at 6-8); see also Fed. R. Civ. P. 23(c)(2)(B)(v)-(vi).  The Settlement and FAQ Settlement Notice provide that class members may elect to exclude themselves from the Settlement by completing and mailing a simple Opt-Out Form or a letter to the settlement administrator, which will be available at the settlement website (www.DishwasherSettlement.com).  (See FAQ Settlement Notice at 6).  The FAQ Settlement Notice also states that if class members choose to object to the settlement, they may object by submitting their written objections to the court, and they may attend the Final Approval Hearing.  (See id. at 7); see Fed. R. Civ. P. 23(c)(2)(B)(iv).  It also explains that all members of the Settlement Class will release all claims that relate to the claims or issues asserted in the lawsuit, and it indicates, in bold, that the release does not include claims for property damage or personal injury.  (See FAQ Settlement Notice at 2 & 5-6); see Fed. R. Civ. P. 23(c)(2)(B)(vii).  Information regarding the final approval hearing is also included.  (See FAQ Settlement Notice at 7-8).

The Settlement proposes that Whirlpool will pay for all notice and administration expenses, excluding those incurred by plaintiffs or class counsel in responding to inquiries about the Settlement or defending the Settlement or any challenge to it.  (See Settlement at 38).  Whirlpool will select a Settlement Administrator, subject to the approval of plaintiffs' counsel.  (See id.).  The parties have selected Kurtzman Carson Consultants, LLC ("KCC"), an "experienced national class action notice provider and class administrator."  (See Fax Decl., Exh. V, Declaration of Gina M. Intrepido-Bowen ("Intrepido-Bowen Decl.," Dkt. No. 192-41) at ¶ 1).  The notice program KCC developed for this matter ("Notice Plan") "utilizes a combination of individual notice to known Class Members and a schedule of paid notices in consumer magazines, on a variety of websites,

including the social media website Facebook, to effectively reach the Class." (Id. at ¶ 4). KCC anticipates that the Notice Plan will reach at least 76.4% of likely Class Members. (See id.).

Within 10 days of preliminary approval (see Settlement at 41), KCC will mail notices to each mailing address of record for members of the Settlement Class and will email such notices to all members of the Settlement class for whom valid email addresses are known to Whirlpool or Sears. (See id. at 39; Intrepido-Bowen Decl. at ¶¶ 22-23; & id., Exh. A, Notice Plan at 15). These postcard-sized notices will include the Summary Notice, the basic overall summary of the Settlement (see Settlement at 14); the Prequalified Notice, a summary of the Settlement that will go to Settlement Class members who can be identified in Whirlpool's, Sears's, or the Consumer Products Protection Commission's databases as having paid to repair their dishwashers after Overheating Events (see id. at 11)[13]; and the TCO Repair Notice, a summary of the Settlement tailored for Settlement Class members whom defendants identify as having experienced a TCO repair (see id. at 14). Notices will also be mailed to owners of NewGen and Raptor dishwashers, who are not part of the class but may still be entitled to relief under the Settlement. (See id. at Exhs. 15 & 16).

To build on the reach of the individual mailed notices, a notice will also be placed in leading consumer magazines among dishwasher owners (see Notice Plan at 16), internet banner ads will be posted online (see id. at 17), and KCC will create a settlement website that will include all necessary and pertinent information for Settlement Class members and NewGen and Raptor owners, including the claim form, the FAQ Settlement Notice, and information relating to relevant deadlines. (See id. at 18 & Settlement at 39). The design and content of all of these materials are consistent with the Federal Judicial Center's "illustrative" forms of model plain language notices; they feature bold headlines to capture attention, Spanish language options, concise plain language, and embedded links to allow immediate access to more detailed information. (See

---

[13] The Prequalified Notice will inform class members that they will receive at least $100 and up to the full cost of repair (or a reimbursement if they replaced their dishwashers) if they enter or confirm their current name and address, check the necessary eligibility boxes on the online claim form for prequalified members, and electronically sign the claim form. (See Settlement at 39 & id., Exh. 7 ("Prequalified Notice," Dkt. No. 192-7)).

Notice Plan at 19).   Within 50 days of preliminary approval, KCC will file with the court a declaration of compliance with its Notice Plan, including a statement of the number of persons to whom the notices were mailed and emailed.  (See Settlement at 41).

Based on the foregoing, the court finds that there is no alternative method of distribution that would be more practicable here, or any more reasonably likely to notify the class members. Under the circumstances, the court finds that the procedure for providing notice and the content of the class notice constitute the best practicable notice to class members.

**This Order is not intended for publication.  Nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

## CONCLUSION

1.   The Joint Motion of All Parties for Preliminary Approval of Class Action Settlement **(Document No.192)** is **granted** upon the terms and conditions set forth in this Order.

2.   The court preliminarily certifies the class, as defined in § I.ZZ of the Settlement Agreement and Release of All Claims ("Settlement") (Document No. 192-4), as amended by the Joint Stip. to Amend (Document No. 197) for the purposes of settlement.

3.   The court preliminary appoints plaintiffs Steve Chambers, Lynn Van Der Veer, Kevin O'Donnell, Joseph Cicchelli, Kurt Himler, Gary LeBlanc, George Bliss, Lyndee Walker, W. David Beal, Zila Koswener, Pamela Walchli, Raymond Paolini, Jr., and Jackie Steffes as class representatives for settlement purposes.

4.   The court preliminarily appoints Charles Fax of Rifkin, Weiner, Livingston, Levitan & Silver LLC; Robert Kitchenoff of Weinstein Kitchenoff & Asher LLC; Steven Schwartz and Timothy Mathews of Chimicles & Tikellis LLP; Nicole Sugnet of Leiff Cabraser Heimann & Bernstein, LLP; and Jeff Cohon of Cohon & Pollak, LLP as class counsel for settlement purposes.

5.   The court preliminarily finds that the terms of the Settlement are fair, reasonable and adequate, and comply with Rule 23(e) of the Federal Rules of Civil Procedure.

6.   The proposed manner of the notice of settlement set forth in the Settlement constitutes the best notice practicable under the circumstances and complies with the requirements of Due Process.

7.  The court approves the form, substance, and requirements of the FAQ Settlement Notice (Settlement, Amended Exh. 3, Dkt. No. 197-2); the Claim Form (id., Amended Exh. 1, Dkt. No. 197-1); the Prequalified Notice (id., Exh. 7, Dkt. No. 192-11); the Publication Notice (id., Exh. 8, Dkt. No. 192-12); the Summary Notice (id., Exh. 9, Dkt. No. 192-13); the TCO Repair Notice (id., Exh. 10, Dkt. No. 192-13); Tailored Notice to Non-Prequalified with Overheating Event (id., Exh. 11, Dkt. No. 192-14); and the Sticker for Rush and Rushmore Service Parts (id., Exh. 13, Dkt. No. 192-16).

8.  The court approves the form, substance, and requirements of the notices and forms to be used for non-Settlement Class members: the Short Form Release (Settlement, Exh. 12, Dkt. No. 192-15); the Prequalified NewGen Raptor Notice (id., Exh. 15, Dkt. No. 192-19) and the Non-Prequalified NewGen Raptor Notice (id., Exh. 16, Dkt. No. 192-20).

9.  The parties shall carry out the settlement and claims process according to the terms of the Settlement.

10.  Kurtzman Carson Consultants, LLC ("KCC") is hereby appointed as the Claims Administrator.  Promptly following entry of this order, KCC will prepare final versions of the notice and claim forms, incorporating the relevant dates and deadlines set forth in this order and the Settlement, and will commence the notice process, in accordance with the Settlement.

11.  The deadlines for class members to file requests for exclusion and objections to the Settlement shall be in conformity with the Settlement, as amended by the Joint Stip. to Amend. Any class member may submit objections to the Settlement or, upon request, may be excluded from the Settlement by submitting an Opt-Out Form, no later than **Friday, April 1, 2016** and as further instructed in the FAQ Settlement Notice and Opt-Out Form.

12.  The deadline by which any person or attorney seeking to appear at the fairness hearing, for the purpose of objecting to the Settlement or the amount of fees and expenses requested by class counsel, must file with the court and serve on class counsel and defendants a notice of entry of appearance in the lawsuit and notice of intention to appear at the fairness hearing is **Friday, April 1, 2016.**

13.  The deadline by which all claims for replacement dishwasher cash rebates or for Past Overheating Events must be postmarked or received by the Settlement Administrator is **Monday, May 2, 2016**.

14.  A final approval (fairness) hearing is hereby scheduled for **Friday, June 10, 2016,** at **10:00 a.m.** in Courtroom 22, to consider the fairness, reasonableness, and adequacy of the Settlement as well as the award of attorney's fees and costs to class counsel, and service awards to the class representatives.

15.  Plaintiffs shall file a motion for an award of class representative service payments and attorney's fees and costs no later than **Friday, February 26, 2016,** and notice it for hearing for the date set forth in paragraph 14 above.  Any opposition or objection to the motion for an award of class representative service payments and attorney's fees and costs, by class members or by defendants, shall be filed no later than **Friday, April 1, 2016.**  In the event any objections or opposition to the motion for an award of class representatives service payments and attorney's fees and costs are filed, class counsel shall, no later than **Wednesday, May 11, 2016**, file a reply addressing the objections.

16.  The parties shall file and serve a motion for final approval of the Settlement and any response to objections to the Settlement no later than **May 11, 2016,** and notice it for hearing for the date set forth in paragraph 13 above.

Dated this 12th day of November, 2015.


                                    /s/
                              Fernando M. Olguin
                              United States District Judge