FILED
CLERK, U.S. DISTRICT COURT

JUN - 1 2016

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

1   Jan L. Miorelli
    Agent by Durable Power of Attorney for George Liacopoulos
2   4715 N Harbor City Blvd
    Melbourne, FL 32935
3   Telephone: (321) 544-0230

4
    *Pro Se Objector*
5

6                    **UNITED STATES DISTRICT COURT**
                 **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
7

8   STEVE CHAMBERS, *et al.*, on behalf of   )   Case No.: 8:11-cv-01733-FMO-MLG
    themselves and all others similarly      )
9   situated,                                )   Honorable Fernando M. Olguin
                                             )
10                          Plaintiff,       )   **OBJECTION TO CLASS ACTION**
    v.                                       )   **SETTLEMENT OF GEORGE**
11                                           )   **LIACOPOULOS**
    WHIRLPOOL CORPORATION,                   )
12                                           )   Date:        August 25, 2016
                            Defendant.       )   Time:        10:00 a.m.
13                                           )   Courtroom:   22

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

# TABLE OF CONTENTS

I.     Mr. Liacopoulos is a class member and intends to appear at the fairness hearing through his counsel...................................................................2

II.    The Court has a fiduciary duty to the unnamed members of the class. ..............3

III.   There are improper intra-class conflicts which makes class certification improper...................................................................................................5

    A.   The Non-Class compensation to NewGen and Raptor Owners agreed to in the Settlement Agreement is improper...................................6

    B.   The Class and Subclasses were improperly represented by the same counsel. .......................................................................................8

IV.    The Settlement is a tiny percentage of the value of the Class' damages, demonstrating that Class Counsel and the representative class members sold out the absent class members........................................................9

    C.   The total recovery is a fraction of the class' injury. ................................9

    D.   Even accepting, *arguendo*, Class Counsel's inflated valuation of the Settlement Agreement, the benefit to the absent class members is miniscule.................................................................................11

    E.   This one-penny settlement is either a sellout by Class Counsel and the named Plaintiffs or a nuisance settlement whose only purpose is the generation of legal fees, incentive awards, and the sale of two overpriced domain names. .................................................12

V.     The "cash rebates" are coupons under the Class Action Fairness Act (CAFA)..................................................................................................13

VI.    As interpreted in *HP Inkjet Printer*, CAFA prohibits the assignment of any value to the unredeemed coupons............................................................16

    A.   CAFA section 1712(a) prohibits assignment of any value to coupons for the purposes of determining a contingent attorneys' fee award until after the coupons are redeemed....................................16

    B.   CAFA section 1712(b) does not permit an award of contingent or lodestar-based attorneys' fees for the Proposed Settlement because there is no equitable relief........................................................18

    C.   CAFA section 1712(c) requires that any percentage of the recovery analysis only assign value to coupons actually redeemed. ......19

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

VII.   The value to Class Members of the Future Overheating Subclass is
       inflated. .................................................................................................. 19

VIII.  A class action settlement should not be approved when the primary
       beneficiaries are the class representatives and class counsel. ......................... 21

       A.     A large disparity between the recovery of the representative class
              member and the absent class members is not permitted under
              Ninth Circuit precedent. ...................................................................... 21

       B.     There is no basis in law for payment of incentive awards in a class
              action settlement to class members who were not named class
              representatives in the case being settled. ................................................. 23

IX.    Class Counsel should not get more than 25% in a contingent fee-based
       attorneys' fee. ............................................................................................ 24

       A.     The Court should follow the Ninth Circuit's 25% benchmark. .............. 24

       B.     The basis for a contingent fee should exclude costs of class notice,
              Class Counsel's costs, and any incentive payments. ............................... 25

       C.     Class Counsel's lodestar should be calculated using the *Laffey
              Matrix*. ............................................................................................... 26

X.     CONCLUSION ........................................................................................ 27

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1

# TABLE OF AUTHORITIES

2

**Cases**

3    *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)............................................3, 4, 8

4    *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013) ..................................................6

5    *Chanel, Inc. v. Doan*, 2007 WL 781976 (N.D. Cal. 2007)..........................................26

6    *Davis v. Cole Haan, Inc.*, No. 11-cv-01826-JSW, 2015 WL 7015328 (N.D.

7      Cal. Nov. 12, 2015) .................................................................................................14

8    *Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012)...................................................4

9    *Diaz v. Trust Territory of Pacific Islands*, 876 F.2d 1401 (9th Cir. 1989) ..................4

10   *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ...........................................5

11   *Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir. 1983)........................22, 23

12   *In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748 (7th Cir. 2011) .............................23

13   *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ......5, 24, 26

14   *In re General Motors Corp. Pickup Truck Fuel Tank Prods. Liab. Litig.*, 55

15     F.3d 768 (3d. Cir. 1995)........................................................................................4, 7

16   *In re HP Inkjet Printer Litig.*, 716 F.3d 1173 (9th Cir. 2013).............................passim

17   *In re Literary Works in Electronic Databases Copyright Litig.*, 654 F.3d 242

18     (2d Cir. 2011) ...........................................................................................................8

19   *In re Online DVD-Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015) .............................15

20   *In re Relafen Antitrust Litigation*, 360 F.Supp.2d 166 (D. Mass. 2005).....................3

21   *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) .........................3

22   *In Re Washington Public Power Supply Syst. Lit.*, 19 F.3d 1291 (9th Cir. 1994) ........5

23   *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241 (8th Cir. 1996)...............................7

24   *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354 (D.D.C. 1983)..........................26

25   *Melong v. Micronesian Claims Comm.*, 643 F.2d 10 (D.C. Cir 1980) ........................6

26   *Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003)..........................................................4

27   *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006) ...........................12, 13

28

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

*Napoleon Ebarle, et. al. v. Lifelock, Inc.*, 2016 WL 234364 (N.D. Cal. Jan. 20, 2016) .......................................................................................... 12, 23

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ............................................ 6, 8

*Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268 (9th Cir. 1989) .............. 24

*Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir. 1982) .......................... 22, 23

*Plummer v. Chemical Bank*, 91 F.R.D. 434 (S.D.N.Y. 1981) ........................... 22

*Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157 (9th Cir. 2013) .................................................................................... 21, 22, 23

*Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014) ............................ 25

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002) ...................... 3

*Silber v. Mabon*, 957 F.2d 697 (9th Cir. 1992). ............................................ 4

*Staton v. Boeing*, 327 F.3d 938 (9th Cir. 2003) .......................................... 4, 5

*True v. American Honda Co.*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010) ................ 4

*Vassalle v. Midland Funding, LLC*, 708 F.3d 747 (6th Cir. 2013) ................ 22, 23

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) .................. 5, 24, 25

*Yamada v. Nobel Biocare Holding AG*, No. 14-55263, 2016 WL 1579705 (9th Cir. April 20, 2016) .................................................................... 17

*Young v. Polo Retail, LLC.*, No. C-02-4546, 2006 WL 3050861 (N.D. Cal. 2006) ........................................................................................... 15

**Statutes**

28 U.S.C. § 1712(a) (2005) ........................................................ 16, 17, 18, 19

**Rules**

Federal Rule of Civil Procedure 23 ......................................... 5, 6, 7, 20

**Other Authorities**

American Law Institute, *Principles of the Law of Aggregate Litig.*, § 3.05(c) (2010) ........................................................................................... 4

Federal Judicial Center, Manual on Complex Litigation §21.27 (4th ed.) ............ 8

George P. Liacopoulos, *Call of the Moon* (2013) (Sam A. Miorelli & Jan Liacopoulos Miorelli, eds.) ............................................................... 2

-v-

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS



Herbert Newberg & Alba Conte, Newberg on Class Actions (4th ed. 2002). ..............4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

# INTRODUCTION

George Paul Liacopoulos ("Mr. Liacopoulos"), appears herein, *pro se*, through his daughter, Jan Liacopoulos Miorelli ("Mrs. Miorelli"), who is Mr. Liacopoulos' Agent by his Durable Power of Attorney for all of his affairs in his incapacity. (Declaration of Jan Liacopoulos Miorelli at Exhibit A). Mrs. Miorelli had ghostwriting assistance on the instant Objection from her son, Sam A. Miorelli, E.I., Esq. who is also Mr. Liacopoulos' grandson and a member of the Florida Bar (but not the bar of this Court). Mrs. Miorelli, as Mr. Liacopoulos' Agent by Durable Power of Attorney, files this Objection *pro se*.

Mr. Liacopoulos is an 87-year-old U.S. Army Veteran of the Korean War who resides in Cocoa Beach, FL with his wife of almost 59 years, Marylyn Liacopoulos, RN (Retired) ("Mrs. Liacopoulos"). Following his honorable discharge from the U.S. Army, Mr. Liacopoulos became a mechanical engineer whose career included extensive leadership on the Apollo Program at Cape Canaveral, FL through the completion of the Apollo 11 mission,[1] where he was the lead engineer for the fueling of the Service Module[2] with cryogenic consumables. Mr. Liacopoulos also spent many

---

[1] The National Aeronautics and Space Administration Space Science Data Coordinated Archive reports that "Apollo 11 was the first mission in which humans walked on the lunar surface and returned to Earth. On 20 July 1969 two astronauts (Apollo 11 Commander Neil A. Armstrong and LM pilot Edwin E. "Buzz" Aldrin Jr.) landed in Mare Tranquilitatis (the Sea of Tranquility) on the Moon in the Lunar Module while the Command and Service Module (with CM pilot Michael Collins) continued in lunar orbit. . . The LM took off from the Moon on 21 July and the astronauts returned to Earth on 24 July." NASA Space Science Data Coordinated Archive, NSSDCA/COSPAR ID: 1969-059A, http://nssdc.gsfc.nasa.gov/nmc/spacecraftDisplay.do?id=1969-059A.
[2] "As the name implies, the Command and Service Module (CSM) comprised two distinct units: the Command Module (CM), which housed the crew, spacecraft operations systems, and re-entry equipment, and the Service Module (SM) which carried most of the consumables (oxygen, water, helium, fuel cells, and fuel) and the main propulsion system. The total length of the two modules attached was 11.0 meters with a maximum diameter of 3.9 meters." NASA Space Science Data Coordinated Archive, NSSDCA/COSPAR ID: 1969-059A, http://nssdc.gsfc.nasa.gov/nmc/spacecraftDisplay.do?id=1969-059A.

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

years working on the Space Shuttle program and is a self-published author. *See* George P. Liacopoulos, *Call of the Moon* (2013) (Sam A. Miorelli & Jan Liacopoulos Miorelli, eds.).

Sadly, Mr. Liacopoulos is presently hospitalized due to complications resulting from falling in the home he has shared with Mrs. Liacopoulos since 1965. That is the same home where they raised their daughter, Mrs. Miorelli, and the home where their Class Dishwasher is installed. Prior to his incapacity, Mr. Liacopoulos granted Mrs. Miorelli a durable power of attorney which is effective for each and every of Mr. Liacopoulos' affairs. Mrs. Liacopoulos, presently living alone in their beloved home, suffers from limited mobility due to her own medical conditions and requires the use of a walker.

If their dishwasher were to catch fire as described in the Fourth Amended Complaint, the outcome could be catastrophic for the Liacopoulos family. This Settlement Agreement will do nothing to protect Mr. and Mrs. Liacopoulos from that risk: protection which they are entitled to at law. Consequently, Mr. Liacopoulos prays this Court reject the Settlement Agreement.

## I.    Mr. Liacopoulos is a class member and intends to appear at the fairness hearing through his counsel.

Mr. Liacopoulos, who resides with Mrs. Liacopoulos at 19 Azalea Drive, Cocoa Beach, FL 32931, is a Class Member (capitalized terms used in this Objection have the same meaning as used in the Settlement Agreement unless otherwise defined). Mr. Liacopoulos purchased his Whirlpool-brand Class Dishwasher new, Model #GU2500XTPQ7, Serial #FT1307102. That dishwasher was manufactured between 2004-2006 and is in the Serial Number Range for Class Dishwasher Models. (Dkt 192-6 at 8). Mr. Liacopoulos received a post card notice with Claim #WCH-12184695701.

Upon receipt of the postcard class notice, Mr. and Mrs. Liacopoulos alerted Mrs. Miorelli. Mrs. Miorelli filed Mr. Liacopoulos' claim on his behalf, #12184695701.

-2-

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1  Mrs. Miorelli prepared and submits this Objection *pro se* but intends to retain
2  counsel to represent Mr. Liacopoulos at the Fairness Hearing. Consequently, Mr.
3  Liacopoulos hereby provides his Notice of Intent to Appear at the Fairness Hearing by
4  and through counsel who shall file a notice of appearance at an appropriate time. To
5  the extent that other class members file objections which are not inconsistent with the
6  objections raised herein, Mr. Liacopoulos reserves the right to adopt those objections
7  and address them at the Fairness Hearing as well. To the extent that any objector
8  participates in discovery relating to the Settlement Agreement, Mr. Liacopoulos joins
9  their motion to do so and requests equal access to such proceedings. Mr. Liacopoulos
10 also hereby requests the opportunity to depose and cross-examine any witness
11 presenting evidence in support of the Settlement Agreement.

12 **II.    The Court has a fiduciary duty to the unnamed members of the class.**

13      A district court must act as a "fiduciary for the class who must serve as a guardian
14 of the rights of absent class members." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d
15 516, 534 (3d Cir. 2004). "Both the United States Supreme Court and the Courts of
16 Appeals have repeatedly emphasized the important duties and responsibilities that
17 devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and
18 settlement of a class action suit." *In re Relafen Antitrust Litigation*, 360 F.Supp.2d 166,
19 192-94 (D. Mass. 2005) (*citing, inter alia, Amchem Prods., Inc. v. Windsor*, 521 U.S.
20 591, 617, 623 (1997) ("Rule 23(e) protects unnamed class members from 'unjust or
21 unfair settlements' agreed to by 'fainthearted' or self-interested class
22 'representatives.'")); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir.
23 2002) ("district judges [are] to exercise the highest degree of vigilance in scrutinizing
24 proposed settlements of class actions").

25      "Under Rule 23(e) the district court acts as a fiduciary who must serve as a
26 guardian of the rights of absent class members . . . [T]he court cannot accept a
27 settlement that the proponents have not shown to be fair, reasonable and adequate." *In*
28

-3-

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1   re General Motors Corp. Pickup Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 785
2   (3d. Cir. 1995) ("*GM Pickup Truck*") (internal quotation and citation omitted). "A trial
3   court has a continuing duty in a class action case to scrutinize the class attorney to see
4   that he or she is adequately protecting the interests of the class." Herbert Newberg &
5   Alba Conte, Newberg on Class Actions § 13:20 (4th ed. 2002). "Both the class
6   representative and the courts have a duty to protect the interests of absent class
7   members." *Silber v. Mabon*, 957 F.2d 697, 701 (9th Cir. 1992). *Accord Diaz v. Trust*
8   *Territory of Pacific Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989) ("The district court
9   must ensure that the representative plaintiff fulfills his fiduciary duty toward the absent
10  class members").

11      There should be no presumption in favor of settlement approval: "[t]he
12  proponents of a settlement bear the burden of proving its fairness." *True v. American*
13  *Honda Co.*, 749 F. Supp. 2d 1052, 1080 (C.D. Cal. 2010) (*citing* 4 Newberg on Class
14  Actions § 11:42 (4th ed. 2009)). *Accord* American Law Institute, *Principles of the Law*
15  *of Aggregate Litig.*, § 3.05(c) (2010) ("*ALI Principles*").

16      "Where the court is '[c]onfronted with a request for settlement-only class
17  certification,' the court must look to the factors 'designed to protect absentees.'" *Molski*
18  *v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003) (*quoting Amchem*, 521 U.S. at 620).
19  "[S]ettlements that take place prior to formal class certification require a higher
20  standard of fairness." *Molski*, 318 F.3d at 953. "[P]re-certification settlement
21  agreements require that we carefully review the entire settlement, paying special
22  attention to 'terms of the agreement contain[ing] convincing indications that the
23  incentives favoring pursuit of self-interest rather than the class's interest in fact
24  influenced the outcome of the negotiations.'" *Dennis v. Kellogg Co.*, 697 F.3d 858, 867
25  (9th Cir. 2012) (*quoting Staton v. Boeing*, 327 F.3d 938, 960 (9th Cir. 2003)). "These
26  concerns warrant special attention where the record suggests that settlement is driven
27  by fees; that is, when counsel receive a disproportionate distribution of the settlement."
28

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998); *In re Bluetooth*
2  *Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

3      It is insufficient that the settlement happened to be at "arm's length" without
4  express collusion between the settling parties. *Bluetooth*, 654 F.3d at 948 (*quoting*
5  *Staton*, 327 F.3d at 960). Because of the danger of conflicts of interest, third parties
6  must monitor the reasonableness of the settlement as well. *Id.* "Because in common
7  fund cases the relationship between plaintiffs and their attorneys turns adversarial at
8  the fee-setting stage, courts have stressed that when awarding attorneys' fees from a
9  common fund, the district court must assume the role of fiduciary for the class
10 plaintiffs." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002) (*quoting*
11 *In Re Washington Public Power Supply Syst. Lit.*, 19 F.3d 1291 (9th Cir. 1994)).
12 "Accordingly, fee applications must be closely scrutinized." *Id.*

### III.   There are improper intra-class conflicts which makes class certification improper.

15     The Settlement Agreement addresses claims arising from two categories of
16 dishwasher: Class Dishwashers and NewGen/Raptor dishwashers. (Dkt 192-4 at ¶I.I
17 and ¶I.O). Class Members are only those people who purchased, acquired through
18 purchase or remodel of a home, or received as a gift a Class Dishwasher. *Id.* at ¶I.ZZ
19 and ¶I.AAA. Class Dishwashers were all produced between October 2000 and January
20 2006. *Id.* at ¶ I.I. The Settlement Agreement explicitly declares that NewGen/Raptor
21 owners are not Class Members, despite still providing them "Settlement Benefits." *Id.*
22 at 19:20 and 30:3-34:23. The Settlement Agreement further sets up two subclasses: the
23 Past Overheating Subclass and the Future Overheating Subclass. *Id.* at ¶I.V and ¶I.FF.

24     This entire structure is improper: non-class members cannot be intermingled
25 with class members in a settlement under Rule 23 and there is improper conflict of
26 interest between the Class Members and the members of the two subclasses.

27
28

-5-

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

A. The Non-Class compensation to NewGen and Raptor Owners agreed to in the Settlement Agreement is improper.

Clearly the four groups of absent class members receiving a "Settlement Benefit" under the Settlement Agreement have divergent interests. Class Members who are not members of a subclass have defective dishwashers which present a danger in their homes but which have not *yet* had a catastrophic failure. Class Members who are part of the Past Overheating Subclass have a different interest as they have already had a catastrophe in their home kitchen and have significant monetary losses which have long been left unpaid. Class Members who eventually become part of the Future Overheating Subclass would, at that time, have a similar interest to Past Overheating Subclass members, but not exactly the same as they would not have to wait as long to recover. Finally, outside the class entirely are NewGen/Raptor owners who, despite being outside the class, would stand to benefit from the Settlement Agreement.

Despite calling the NewGen/Raptor owners group "non-class," by settling their claims through the Settlement Agreement, their claims are improperly comingled into the settlement of the Class Members. This violates the Rule 23(a)(4) requirement of interclass equity. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857-58 (1999). While the Courts of Appeals regularly reject class action settlements which improperly comingle strong and weak claims of absent class members in the same class, the Settlement Agreement goes well beyond that line and even comingles non-class-members into the Settlement Agreement. *See Ortiz* 527 U.S. at 857; *Melong v. Micronesian Claims Comm.,* 643 F.2d 10, 15 (D.C. Cir 1980) (holding that persons who had signed a release, even if the release may prove to be invalid, cannot represent and have their claims comingled with absent class members who had not signed a release).

Additionally, by granting a "Settlement Benefit" to NewGen/Raptor owners, the Settlement Agreement improperly dilutes the value of the claims of Class Members. *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013) (reversing approval of a settlement including an option for self-certification of absent class members because

-6-

1 │ of an unacceptable risk of dilution of the benefit to actual class members). This dilution
2 │ is evident because, even though this is a claims-made Settlement Agreement where the
3 │ attorneys' fees are supposedly paid separately from the class recovery, "in essence the
4 │ entire settlement amount comes from the same source. The award to the class and the
5 │ agreement on attorney fees represent a package deal. Even if the fees are paid directly
6 │ to the attorneys, those fees are still best viewed as an aspect of the class' recovery."
7 │ *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996); *see also GM*
8 │ *Pickup Truck*, 55 F.3d at 821 ("Courts have relied on 'common fund' principles and
9 │ the inherent management powers of the court to award fees to lead counsel in cases
10 │ that do not actually generate a common fund. The rationale behind the percentage of
11 │ recovery method also applies in situations where, although the parties claim that the
12 │ fee and settlement are independent, they actually come from the same source." (internal
13 │ citations omitted)).

14 │ Since the recovery of Class Members and Non-Class "Settlement Benefits" both
15 │ come from Whirlpool, it is reasonable to treat them as part of the same constructive
16 │ common fund. It appears the only reason to include Non-Class "Settlement Benefits"
17 │ is to inflate the supposed value of the "Settlement Benefits" for the purposes of
18 │ supporting a larger attorneys' fee as it increases the number of affected dishwashers
19 │ from 6 million to 24 million and significantly increases the "value" of the future
20 │ overheating protection by extending coverage to 6 million dishwashers manufactured
21 │ in 2008 and later, even though the Defect at the heart of the Class stopped being used
22 │ in Whirlpool dishwashers in 2006. This improperly dilutes the value of the Settlement
23 │ Agreement to Class Members and violates Rule 23(a)(4) since Class Members are
24 │ being treated inequitably. The Settlement Agreement should only provide relief to
25 │ Class Members, and to the extent that it provides benefits to non-class members, it
26 │ violates Rule 23 and defeats class certification, let alone final approval of the
27 │ Settlement Agreement's terms for fairness.

28 │

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1

**B. The Class and Subclasses were improperly represented by the same counsel.**

Even if the non-class members were removed from the Settlement Agreement, the Settlement Agreement is also impermissible because the Class and each of the two subclasses' interests are adverse to each other and require independent representation. As described previously, the quality of the claim, the amount of injury, and the other interests of the members of the two subclasses and the Class Members who are not members of either subclass are different.

Having subclasses with different interests in the same action is not a problem, but the Supreme Court commands that such subclasses must have "separate representation to eliminate conflicting interests of counsel." *Ortiz*, 527 U.S. at 856 (*citing Amchem*, 521 U.S. at 627). Having separate class representatives is insufficient, the attorneys themselves must be separate, reflecting the fact that different interests are at the bargaining table. *Id.* at 857. "Only the creation of subclasses, and the advocacy of an attorney representing each subclass, can ensure that the interests of that particular subgroup are in fact adequately represented." *In re Literary Works in Electronic Databases Copyright Litig.*, 654 F.3d 242,252 (2d Cir. 2011). *See also* Federal Judicial Center, Manual on Complex Litigation §21.27 (4th ed.) ("If the certification decision includes the creation of subclasses reflecting divergent interests among class members, each subclass must have separate counsel to represent its interests.").

No such safeguards protect the class in the Settlement Agreement. The attorneys are all paid by a secret agreement (in as much as it is not in the record or available for absent class member review) from a common pool of over $15 million paid by Whirlpool. There is no declaration in the record or in the Settlement Agreement apportioning representational responsibility amongst the various law firms involved in the case or even amongst the various named plaintiffs. The closest the Settlement Agreement comes to this is declaring that Plaintiffs Bathon, Beal, Meneghetti, Milicia, and Sample are actually members of the non-class group. (Dkt 192-4 at fn 1). However,

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1   the declaration that a few of the named Plaintiffs are actually not members of the Class

2   is not the same or sufficient: there must be separate named Plaintiffs and separate

3   counsel for each subclass who are also separate from the named Plaintiffs and counsel

4   for absent class members who are in neither subclass. The Settlement Agreement and

5   declarations supporting it and the Motion for Award of Attorneys' Fees and Expenses

6   and for Service Awards for Plaintiffs ("Class Counsel's Motion for Fees") makes none

7   of the distinctions required by *Ortiz* when subclasses are certified. On this basis alone

8   the class and subclasses cannot be certified, even for settlement purposes, let alone the

9   fairness of the Settlement Agreement be even considered.

10   **IV.   The Settlement is a tiny percentage of the value of the Class' damages,**
11   **demonstrating that Class Counsel and the representative class members
sold out the absent class members.**

12       C. <u>The total recovery is a fraction of the class' injury.</u>

13       Clearly the Defect (as defined in the Fourth Amended Complaint) is extremely

14   serious and hazardous, particularly to elderly and disabled persons such as Mr. and

15   Mrs. Liacopoulos. (Dkt 98 at ¶ 163-79). Considering the seriousness of the Defect, it

16   is important to consider the scale of the absent class members' likely entitlement to

17   recovery if they were successful at trial. This analysis is somewhat more complicated

18   because the Fourth Amended Complaint defines the State Classes much more narrowly

19   than the Settlement Agreement defines the Class and the Release, so for purposes of

20   evaluating the value of the Release, Mr. Liacopoulos assumes the Prayer for Relief in

21   the Fourth Amended Complaint would be applicable to all absent class members had

22   each state been pled in the Fourth Amended Complaint. Additionally, as described

23   above, the non-class claims should not be part of the Settlement Agreement, so they

24   are not considered by Mr. Liacopoulos for this analysis.

25       The Fourth Amended Complaint prays for the Court to "order Defendants to

26   engage in a corrective notice and recall campaign." (Dkt 98-2 at 133:10-11). Using

27   Class Counsel's estimate of approximately 6 million Class Dishwashers, this prayer

28

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1 would result in a significant recall. (Dkt. 218-1 at 1:6-7). The combined average of the

2 17 models of Kitchenaid and Whirlpool brand dishwashers currently on the market and

3 listed for the Court by Plaintiff's counsel Timothy Matthews is $955.88. (Dkt 218-7 at

4 26:9-27:10). Assuming that the cost to recall could not be lower than the most-recently-

5 reported out-of-pocket average of reimbursement claims submitted to the Settlement

6 Administrator ($528.64) and probably no more than the average new dishwasher price,[3]

7 this results in a likely range of the value of a recall to the class: $3.17 billion to $5.74

8 billion.

9       Clearly that is a wide range in need of some refinement but it is mostly uncertain

10 because Class Counsel and Whirlpool sealed of vast swaths of the filings in Class

11 Counsel's Motion for Fees. (Dkt 216). Consequently, the uncertainty of the number

12 should not be held against Mr. Liacopoulos, but against Class Counsel and Whirlpool

13 for hiding relevant information from absent class members. As far as absent class

14 members are concerned, the $5.74 billion estimated cost of a recall is actually the more

15 accurate value because that represents the cost the absent class members would incur

16 if they went to the open market and replaced their defective dishwashers themselves.

17       On top of a recall, the prayer for relief calls for "restitution to Plaintiffs and . . .

18 require Defendants to disgorge their ill-gotten gains." (Dkt 98-2 at 133:22-3). While

19 restitution runs into the same valuation challenges described previously, disgorgement

20 can be readily estimated using public information despite the sealed documents.

21 Whirlpool's Gross Margin for the last year was 20.60%. (Exhibit A). Gross Margin

22 would be a good approximation for Whirlpool's ill-gotten gains from the sale of

23 dishwashers with the Defect as it shows the operating-basis gain Whirlpool has from

24 appliance sales before going-concern costs like interest, taxes, and depreciation are

25

26 [3] For example, the average dishwasher MSRP does not include the cost to remove an

27 old dishwasher and dispose of it, the cost to deliver and install the new dishwasher,

28 but also includes profit margin which Whirlpool would not have to pay itself in the event of a recall.

-10-

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1  removed. In other words, what Whirlpool gained from each sale of a defective

2  dishwasher is its Gross Margin, any difference between Gross Margin and Profit is a

3  function of how Whirlpool runs its business and not taxable to the absent class

4  members. Assuming again the $955.88 average price of a Whirlpool dishwasher, the

5  disgorgement alone for 6 million Class Dishwashers would be $1.18 billion *on top of*

6  the $5.74 billion recall, bringing the value of the class injury to about $6.92 billion. It

7  bears noting that while the recall would benefit the class in the form of fixed or replaced

8  dishwashers, the additional disgorgement remedy would result in actual cash payments

9  to the absent class members. The Settlement Agreement provides neither.

10  Punitive damages could add billions more. At some point the additional billions

11  might not matter: Whirlpool's total market capitalization is only about $13.25 billion,

12  so even a punitive damage multiplier of less than 2 would consume the entire market

13  value. (Exhibit B). This case is potentially company-killing.

14        D. Even accepting, *arguendo*, Class Counsel's inflated valuation of the
          Settlement Agreement, the benefit to the absent class members is
15        miniscule.

16  Class Counsel claims the gross value of the Settlement Agreement is between

17  $55.7 and $116.7 million. (Dkt 218-1 at 44:7). Mr. Liacopoulos believes those numbers

18  are wildly inflated, but even still, they prove his point. Compared to the gross value of

19  the injury being released, even assuming the absent class members could never recover

20  and amount greater than the market capitalization of Whirlpool, the total recovery of

21  the Settlement Agreement is 0.81% to 1.69%. Facing a case which could have spelled

22  corporate extinction, perhaps multiple times over, Whirlpool would escape from its

23  legal liabilities to absent class members for about one-penny for each dollar of their

24  injuries. In other words: a nationwide class action sellout.

25  According to Class Counsel, this is "outstanding and far-reaching,"

26  "comprehensive," and even "a better result" than Class Counsel could have gotten if

27  he had litigated the case to trial. (Dkt 218-1 at 1:2, 1:6, and 9:19-10:4). Mr. Liacopoulos

28

-11-

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1  thinks those claims are ridiculous.

2       It is illustrative to compare this case to another which was recently before the

3  Northern District of California. In *Napoleon Ebarle, et. al. v. Lifelock, Inc.*, 2016 WL

4  234364 (N.D. Cal. Jan. 20, 2016), the court reviewed carefully before preliminarily

5  approving a proposed settlement which, according to the Federal Trade Commission

6  and the defendant, may have only been worth $10 million, but yet settled for $68

7  million. *Id.* at 7. Compare that to this 1% recovery of known, ascertainable damages.

8       E.  This one-penny settlement is either a sellout by Class Counsel and the
9            named Plaintiffs or a nuisance settlement whose only purpose is the
10           generation of legal fees, incentive awards, and the sale of two overpriced
             domain names.

11      Basic economic theory teaches that rational actors settling litigation matters

12  agree to an amount of money approximating their estimation of the amount of their

13  damages discounted by their probability of success at trial. Either this Settlement

14  Agreement is the veiled admission of Class Counsel that the case is frivolous, with

15  99% chance of failure at trial, or, more likely, Class Counsel seeks only a nuisance

16  settlement to justify his outrageous fee, Plaintiff Chambers happily accepts an

17  enormous check, and Whirlpool eagerly closes a potentially company-ending case.

18      The Seventh Circuit addressed a situation like this in *Murray v. GMAC Mortg.*

19  *Corp.*, 434 F.3d 948, 952 (7th Cir. 2006) (Easterbrook, J.). In *Murray*, the defendant

20  and class representative proposed to settle the case for single-digit percentage of the

21  value of their damages in payments that similarly were in the range of $1 per absent

22  class member, while the lawyers received enormous fees and the representative

23  plaintiff received thousands of times more money than the absent class members. *Id.*

24  Judge Easterbrook said "[s]uch a settlement is untenable. We don't mean by this that

25  all class members must receive [full compensation]; risk that the class will lose should

26  the suit go to judgment on the merits justifies a compromise that affords a lower award

27  with certainty." *Id.* at 952. However,

28

-12-

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

> if the chance of success really is only 1%, shouldn't the suit be dismissed as frivolous and no one receive a penny? If, however, the chance of success is materially greater than 1%, as the proposed payment [of an incentive award to representative plaintiff] Murray implies, then the failure to afford effectual relief to any other class member makes the deal look like a sellout.

*Id.* This Settlement Agreement is much the same as that rejected in *Murray.* Just as in *Murray*, here the lawyers will receive a huge fee while absent class members receive coupons. Also, just as in *Murray*, the class representatives will receive thousands of dollars, one receiving $100,000, while absent class members get coupons.

It is impossible to imagine any rational actor pursuing millions of dollars in litigation which they and their lawyers all agreed had less than 1% chance of success on the merits. Certainly it seems unlikely that Whirlpool's lawyers have advised their clients that this Settlement Agreement is *worse* than their likely outcome had the case proceeded to trial as Class Counsel represents. For the purposes of this Objection, Mr. Liacopoulos believes it is unnecessary to take a position as to whether the Settlement Agreement is a sellout or nuisance settlement. It certainly must be one of the two, and whichever it is, it falls well outside the discretion of this Court to approve.

## V.   The "cash rebates" are coupons under the Class Action Fairness Act (CAFA).

The Settlement Agreement provides non-subclass Class Members with the "Whirlpool-sponsored New Dishwasher Rebate Program." (Dkt 192-4 at 19:22). The "cash rebate" must first be applied for by Class Members by June 27, 2016. (Class Notice at 1). Then, Class Members must purchase a new Whirlpool or Kitchenaid brand dishwasher and submit the "rebate form" and proof of purchase by October 25, 2016 (120 days after the claims deadline of June 27, 2016). (Dkt 192-4 at 22:10-13). The

-13-

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1    "cash rebate" would be 10% off the retail purchase price excluding tax, delivery fees,
2    and installation charges for Whirlpool dishwasher purchases and 15% for Kitchenaid.
3    *Id.* at 19:27-20:5. Based on an average MSRP of $629.00 for Whirlpool dishwashers
4    and $1,234.29 for Kitchenaid dishwashers, this would require Class Members to spend,
5    on average, $566.10 for Whirlpool or $1,049.15 for Kitchenaid to realize the "benefit"
6    of the "cash rebate." In other words: Class Members who currently have a dishwasher
7    installed in their home (which Whirlpool still does not admit are fire hazards), have to
8    trust Whirlpool and pay them hundreds or even more than $1000 to buy a new
9    dishwasher to get *any* benefit from the Settlement Agreement. *See id.* at 3.

10        That arrangement makes the "cash rebate" a coupon for purposes of the Class
11    Action Fairness Act (CAFA), codified at 28 U.S.C. § 1712.

12        California U.S. District Courts recognize that calling a coupon in a settlement
13    agreement by a different name "is not dispositive." *Davis v. Cole Haan, Inc.*, No. 11-
14    cv-01826-JSW, 2015 WL 7015328, at *3 (N.D. Cal. Nov. 12, 2015). Judge Jeffrey S.
15    White held that a "voucher" for $20 off any merchandise purchase was a coupon for
16    the purposes of CAFA. *Id.* at *5. Additionally, Judge White held that "if the Court were
17    to conclude that this is not a coupon settlement, it could incentivize counsel in future
18    cases to add a non-coupon option that provides some minimal benefit to class members
19    so that counsel can receive fees using the lodestar method." *Id.*

20        The Ninth Circuit, in *In re HP Inkjet Printer Litig.*, 716 F.3d 1173 (9th Cir. 2013)
21    ("*HP Inkjet Printer*") addressed a very similar factual circumstance as the Settlement
22    Agreement and its holding in *HP Inkjet Printer* was extensively relied upon in *Davis*.
23    In *HP Inkjet Printer*, the class received "e-credits" which would not issue until after all
24    appeals were resolved in the case. *Id.* at 1176. The court held that "e-credits" was "a
25    euphemism for coupons." *Id.*

26        It is instructive also to compare the "cash rebates" to "gift cards" recently
27    approved as non-coupon recovery in *In re Online DVD-Antitrust Litig.*, 779 F.3d 934

28

-14-

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1  (9th Cir. 2015) ("*Online DVD*"). *Online DVD* provided class members with $12 gift
2  cards redeemable at Walmart stores. *Id.* at 941. The Ninth Circuit rejected the argument
3  of objectors that the gift cards were coupons within the meaning of CAFA reasoning,

> Instead of merely offering class members the chance to
> receive a percentage discount on a purchase of a specific item
> or set of items at Walmart, the settlement gives class
> members $12 to spend on any item carried on the website of
> a giant, low-cost retailer. The class member need not spend
> any of his or her own money and can choose from a large
> number of potential items to purchase.

12  *Id.* at 951. The Ninth Circuit then surveyed other cases where gift cards were held to
13  not be CAFA coupons and concluded the Walmart $12 gift cards were not coupons
14  because "the Walmart gift cards can be used for any products on walmart.com, are
15  freely transferrable . . . and do not expire, and do not require consumers to spend their
16  own money." *Id.*

17      The Ninth Circuit also pointed out that when the non-cash recovery for class
18  members forces them to purchase more of the very products which were the basis of
19  the underlying litigation, that presents a particularly acute problem which CAFA aims
20  to prevent. *Id.* at 952 *citing Young v. Polo Retail, LLC.*, No. C-02-4546, 2006 WL
21  3050861, *3-5 (N.D. Cal. 2006) ("Why would former employees, who allegedly were
22  forced to buy a great deal of unwanted Polo products, desire product vouchers so that
23  they could purchase even more clothes?"). The Ninth Circuit also pointed out that the
24  *Online DVD* gift cards were more like cash than coupons because they "provide class
25  members with the ability to purchase a wide variety of items." *Id.* at fn 11.

26      In this case, a Class Member who is not a member of a subclass only has one
27  way to realize any value from the Settlement Agreement: the purchase, at a cost of
28

-15-

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1    hundreds or over $1,000, of a new dishwasher from the very company who sold them

2    the unsafe and Defective dishwasher in the first place. Class Members cannot buy a

3    different brand and there is no way to realize the benefit of the Settlement Agreement

4    without giving Whirlpool more money. This is very much like the problem the Ninth

5    Circuit said CAFA was meant to prevent. While the ultimate cash recovered is fungible,

6    the means to get the cash is functionally indistinguishable from a coupon settlement –

7    the only difference is whether the price reduction happens at the cash register or

8    through an odious mail-in-rebate program. Consequently, regardless of the Settlement

9    Agreement calling it a "cash rebate," the recovery for Class Members is a coupon

10   subject to CAFA.

11   **VI.    As interpreted in *HP Inkjet Printer*, CAFA prohibits the assignment of**
         **any value to the unredeemed coupons.**
12

13       A. <u>CAFA section 1712(a) prohibits assignment of any value to coupons for
         the purposes of determining a contingent attorneys' fee award until after
         the coupons are redeemed.</u>
14

15   Section 1712(a) of CAFA requires,

16          If a proposed settlement in a class action provides for a

17          recovery of coupons to a class member, the portion of any

18          attorney's fee award to class counsel that is attributable to the

19
            award of the coupons shall be based on the value to class
20
            members of the coupons that are redeemed.
21

22   28 U.S.C. § 1712(a) (2005). The Ninth Circuit held "an attorney's fees award is

23   'attributable to' an award of coupons where the attorneys' fees award is a

24   'consequence' of the award of coupons." *HP Inkjet Printer*, 716 F.3d at 1181.

25        Class Counsel's Motion for Fees argues for attorneys' fees that are "attributable

26   to" or "a consequence of" the award of coupons. (Dkt 218-1 at 43:21-44:22). While

27   Class Counsel argues that he is entitled to fees entirely on the basis of his lodestar, the

28   Ninth Circuit requires a lodestar cross check unless the "classwide benefits are not

-16-

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1    easily monetized." *Yamada v. Nobel Biocare Holding AG*, No. 14-55263, 2016 WL

2    1579705, at *7 (9th Cir. April 20, 2016).

3        In this case, the only hindrance to easy monetization of the benefits is the order

4    of deadlines in the case. Having the Final Fairness Hearing prior to the final date to

5    submit "cash rebate" claims means that objectors and the Court will not know exactly

6    how many of the coupons that are requested in this claims-made settlement are actually

7    used. That problem can easily be resolved by delaying the Final Fairness Hearing, but

8    to the extent that it is not delayed, Class Counsel should only receive fees on the basis

9    of claims paid prior to the date of the Final Fairness Hearing. In any event, Class

10   Counsel's own declarations state his belief that all only one of the seven types of

11   recovery for Class Members are readily monetized, and even at most he only applies a

12   value of about 8.6% to the hard-to-monetize portion, so he has no basis to argue that a

13   cross-check is not required by Ninth Circuit precedent. (Dkt 218-1 at 43:20-44:7).

14    *HP Inkjet Printer* holds that the only legal basis for an award of attorneys' fees

15   under section 1712(a) is the "redemption value of the coupons." *HP Inkjet Printer*, 716

16   F.3d at 1186. However, just as in *HP Inkjet Printer*, Class Counsel seeks to have their

17   attorney fee awarded prior to the redemption of the coupons, whose submittal deadline

18   is several months after the Final Fairness Hearing. *See supra,* at V.

19           Because the settlement agreement specifies that no coupons

20           may issue until after entry of a final judgment, it would have

21           been impossible for the district court to calculate the

22

23           redemption value of the coupons as required by § 1712(a).

24           By structuring the settlement in this way, the parties

25           essentially invited the error here.

26   *HP Inkjet Printer*, 716 F.3d at 1186. The structure of the redemption deadlines of the

27   coupons in the Settlement Agreement is similar to that rejected in *HP Inkjet Printer*.

28

-17-

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1    The Ninth Circuit also prohibits district courts from making an estimate of the value of
2    the coupons for purposes of granting a contingent attorneys' fee in cases such as this
3    where the coupons have not yet been redeemed. *Id.* This means it is impossible to grant
4    a contingent fee award under section 1712(a) with regard to any of the coupons because
5    the redemption value of those coupons is impossible to determine since they have not
6    been issued yet.

7         B. <u>CAFA section 1712(b) does not permit an award of contingent or
8            lodestar-based attorneys' fees for the Proposed Settlement because there
             is no equitable relief.</u>

9         *HP Inkjet Printer* is emphatic that the language of sections 1712(a) and (b) are
10   not permissive: a settlement can only award attorneys' fees on the basis of coupons
11   according to one of these provisions or their hybrid in section 1712(c) if the
12   requirements of the respective section are met. *Id.* at 1183. With regard to section
13   1712(b), the Ninth Circuit held,

14             [I]f class counsel wants to be paid 'any' fees, and the
15             'recovery of the coupons is not used to determine' those fees,
16
17             the entirety of the payment 'shall be' calculated 'based upon
18             the amount of time class counsel reasonably expended
19             working on the action,' *i.e.*, using the lodestar method.

20   *Id.* Additionally, "[s]ection 1712(b) . . . can only come into play when a settlement
21   contains both coupon relief and equitable relief." *Id.* at 1185.

22        As discussed *supra* in Section VII.A of this Objection, the only recovery for the
23   class in the Proposed Settlement is $8 million in cash and $4 million in coupons. There
24   is no equitable relief in this Settlement Agreement. Since there is no equitable relief,
25   *HP Inkjet Printer* holds that section 1712(b) cannot be used to award a lodestar-based
26   attorneys' fee for the Proposed Settlement.

27
28

-18-

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

C. CAFA section 1712(c) requires that any percentage of the recovery analysis only assign value to coupons actually redeemed.

*HP Inkjet Printer* explained the applicability and purpose of CAFA section 1712(c) as:

> subsection (c) applies whenever a settlement provides both coupon and equitable relief. In such "mixed" settlements, § 1712(c) serves to ensure that class counsel get paid for all of the benefits they secure for the class. Specifically, the statutory language in § 1712(c), which in part incorporates the standard of § 1712(a), establishes this general rule: If a settlement gives coupon and equitable relief and the district court sets attorneys' fees based on the value of the entire settlement, and not solely on the basis of injunctive relief, then the district court must use the value of the coupons redeemed when determining the value of the coupons part of the settlement.

*Id.* at 1184. Section 1712(c) only allows a lodestar method for analyzing the value of an attorney's equitable recovery. *Id.* Further, section 1712(c), like section 1712(a), only allows a percentage fee recovery based on the value of redeemed coupons, and no coupons have been redeemed in this case since they have not been issued yet. *Id.*

Since no coupons, or "cash rebates" have been issued to-date in this case (that is, no checks have gone to Class Members for these coupons), the Class Members have recovered no benefit from them. Consequently, for the required percentage cross-check of Class Counsel's proposed lodestar-based fee, no coupon value may be considered.

**VII. The value to Class Members of the Future Overheating Subclass is inflated.**

-19-

1    As described *supra*, inclusion of the "non-class benefits" for persons who own
2  dishwashers that are not in the Dishwasher Class would violate Rule 23 and make
3  certification illegal. Consequently, Class Counsel and their expert, Peter A. Salomon,
4  CPA, CFF, which considers millions of dishwashers outside the Dishwasher Class,
5  wildly inflates the value of the Future Overheating Subclass.

6    Since dishwashers outside the Dishwasher Class cannot be legally included in
7  the Settlement Agreement and must be struck, the only benefit of the Future
8  Overheating Subclass is its two years of coverage for Dishwasher Class dishwashers
9  as all Dishwasher Class dishwashers are already 10 years old or older. (Dkt 192-4 at
10  I.V). Mr. Salomon estimates that the value of the recovery for the Future Overheating
11  Subclass is $6 per dishwasher. (Dkt 218-12 at ¶ 23). According to Mr. Salomon, only
12  5% of Class Dishwashers manufactured in 2002 are still in service, only 10%
13  manufactured in 2003 are still in service, only 25% manufactured in 2004 are still in
14  service, only 40% manufactured in 2005 are still in service, and only 50%
15  manufactured in 2006 are still in service (dishwashers manufactured before 2002 are
16  considered entirely out of service). *Id.* at ¶ 13. Since Class Counsel and Whirlpool
17  redacted the actual sales numbers to keep relevant information from absent class
18  members, the best way to estimate how many Class Dishwashers are still in service is
19  to average those values, which would estimate that only 18.57% of Class Dishwashers
20  are still in service.[4] Since there are approximately 6 million Dishwasher Class
21  dishwashers, 18.57% of them remaining in service creates a Future Overheating
22  Subclass of 1,114,286 dishwashers. At $6 per dishwasher, the total value for the Future
23  Overheating Subclass is $6,685,716. However, Mr. Salomon also estimates that there
24  will be 28,000 Overheating Events per year. (Dkt 218-12 at ¶ 21). Since the Future
25  Overheating Subclass only has two years of value, not five, it only will cover about

26  ───────────────

27  [4] 0% for 2000 + 0% for 2001 + 5% for 2002 + 10% for 2003 + 0.25% for 2004 +
28  0.4% for 2005 + 0.5% for 2006 divided by 7 years = 18.57%. If anything, this
overestimates the amount since only one-month of 2006 should be included.

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

56,000 Overheating Events. Class Counsel argues that the value of the Future Overheating Subclass is based on the benefit to the class, which means the benefit of the Future Overheating Subclass should be valued at $6.69 million, not $26-50 million.

**VIII. A class action settlement should not be approved when the primary beneficiaries are the class representatives and class counsel.**

Under the Settlement Agreement and Class Counsel's Fee Motion, while class members will get coupons, the class representatives will receive $4,000 cash and Plaintiff Chambers will receive $100,000. Even assuming the coupon has value to class members, which as set forth above, is a dubious assumption, it would be worth, on average, $95.59 (10% of the average dishwasher price of $955.88). This would mean the disparity between the average Class Member and Plaintiff Chambers would be 1,046X and even to the other class representatives, the disparity would be almost 42X. These incentive awards are also purely conditional – they are only paid if the settlement with all of its many fatal defects is approved. (Dkt 192-4 at V.C.2). That conditionality makes the incentive awards even more odious.

> A. <u>A large disparity between the recovery of the representative class member and the absent class members is not permitted under Ninth Circuit precedent.</u>

Courts around the country, including the Ninth Circuit, while often approving incentive awards to class representatives who are actually named in the case, regularly reverse when those awards represent a large disparity when compared to the absent class members. In *Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013), the Ninth Circuit reversed an approved settlement due to a 6.67-192.3 times disparity between class representatives' recovery and that of absent class members. The Ninth Circuit reasoned that "the significant disparity between the incentive awards and the payments to the rest of the class members further exacerbated the conflict of interest caused by the conditional incentive awards." *Id.* "There is a serious question whether class representatives could be expected to fairly evaluate

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1    whether awards ranging from $26 to $750 is a fair settlement value when they would

2    receive $5,000 in incentive awards." *Id.*

3        The Sixth Circuit has also rejected a large disparity between the named plaintiffs

4    and absent class members' treatment in *Vassalle v. Midland Funding, LLC*, 708 F.3d

5    747 (6th Cir. 2013). In *Vassalle*, the settlement provided for absent class members to

6    receive $17.38 each while the named plaintiffs would be paid $2,000 each plus, in the

7    case of one named plaintiff, have $4,516.57 in debt forgiven. *Id.* at 755-56. In total,

8    this resulted in named plaintiffs receiving approximately 374 times as much benefit

9    from the settlement as absent class members. The Sixth Circuit found the settlement

10   was unfair and that the district court abused its discretion by approving it. *Id.* at 756.

11       The Second Circuit also is skeptical of the fairness of incentive payments. In

12   *Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir. 1982), the Second Circuit affirmed

13   the Southern District of New York's denial of a proposed class action settlement where

14   absent class members received $1,000 each while the four representative class

15   members received between $8,500 and $17,500 each. The district court held that

16   "where representative plaintiffs obtain more for themselves by settlement than they do

17   for the class for whom they are obligated to act as fiduciaries, serious questions are

18   raised as to the fairness of the settlement to the class." *Plummer v. Chemical Bank*, 91

19   F.R.D. 434, 441-42 (S.D.N.Y. 1981), *aff'd*, 668 F.2d 654 (2d Cir. 1982).

20       The Eleventh Circuit directly cited that same district court language in *Plummer*

21   when it rejected a class settlement which allocated approximately 6.25% of a lump sum

22   settlement to the eight representative class members, while the absent class members

23   each received, on average, approximately 0.42% of the settlement. *Holmes v.

24   Continental Can Co.*, 706 F.2d 1144, 1146, 1148 (11th Cir. 1983). The court found the

25   14.75 times disparity between representative and absent class member recovery was

26   facially unfair and reversed the district court's approval of the settlement. *Id.* at 1151.

27

28

-22-

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1     In *Radcliffe* the disparity between the class representatives and the absent
2 members of the class was about 6 to 192 times, in *Vassalle* it was 374 times, in
3 *Plummer* it was 8.5 to 17.5 times, and in *Holmes* the disparity was 14.75 times. In each
4 of those cases, the appellate court rejected the settlement as unfair.

5     This Court has also expressed concern about other proposed settlement
6 agreements recently before it which suggested large-multiple incentive awards. In
7 *Lifelock*, this Court noted with caution that "Plaintiffs, thus far, have provided no
8 explanation for why the named Plaintiffs deserve an award 100 times greater than the
9 settlement value of the other Class Members." *Lifelock*, 2016 WL 234364 at *7.

10     In this case the disparity is about 42X to 1,046X. That disparity is vastly above
11 the levels which the Ninth, Second, and Eleventh Circuits have all rejected. This Court
12 would invite error to approve this much-worse disparity. Class certification is not
13 appropriate when the class representative and class counsel bring a lawsuit to benefit
14 not the class, but themselves. *See In re Aqua Dots Prod. Liab. Litig.,* 654 F.3d 748, 752
15 (7th Cir. 2011). This Settlement Agreement, with its enormous attorneys' fee and
16 thousands of times difference in recovery between the class representative and absent
17 class members appears to be just such a self-serving case and should be rejected.

18     B. <u>There is no basis in law for payment of incentive awards in a class action
19     settlement to class members who were not named class representatives
in the case being settled.</u>

20     In addition to the fact that it is improper for non-class members to receive the
21 benefit of the Settlement Agreement, it is also improper for "Class Representatives"
22 who actually represent non-class members and are themselves not Class Members to
23 receive incentive awards. In the Settlement Agreement, Plaintiffs Susan Bathon, W.
24 David Beal, Maureen Meneghetti, Susan Milicia, Linda Simple, and Shirl Mederlet are
25 due to be awarded incentive awards of $4,000 each. However, Susan Bathon, Shirl
26 Mederlet, Linda Sample, Susan Milicia, and Maureen Meneghetti are not defined in
27 the Settlement Agreement as "Class Representatives" and indeed, are not members of
28

1    the Settlement Class. (Dkt 192-4 at fn 1) (stating that each will receive benefits as

2    members of the NewGen and Raptor Owners group, not as Class Members). None of

3    these individuals should receive incentive awards of any amount. Additionally, W.

4    David Beal is listed as a Class Representative, yet he too is listed as a NewGen and

5    Reptor Owner, not as a Class Member in footnote 1 of the Settlement Agreement. For

6    this reason W. David Beal should also not receive any incentive award. *Id.* at fn 1 and

7    I.HH.

8         Class Counsel's Motion for Fees cites no law supporting the proposition that the

9    non-Class Member Plaintiffs should be treated differently than any other absent class

10   member. All of the cases cited in the incentive award section of Class Counsel's Motion

11   for Fees relate to incentive awards to named class representatives. The Court should

12   not award anything beyond their recovery as an ordinary absent class member.

13   **IX.   Class Counsel should not get more than 25% in a contingent fee-based**
          **attorneys' fee.**
14

15        A. <u>The Court should follow the Ninth Circuit's 25% benchmark.</u>

16        In the Ninth Circuit, the 25% benchmark for calculating a contingent attorneys'

17   fee in a class action is settled law. *Bluetooth*, 654 F.3d at 942 (*citing Paul, Johnson,*

18   *Alston & Hunt v. Graulty*, 886 F.2d 268, 273 (9th Cir. 1989) (establishing that 25% of

19   the fund is the "benchmark" award that should be given in common fund cases)). While

20   the Ninth Circuit has set forth an analytical framework for consideration of an upward

21   departure in *Vizcaino*, such a departure requires more than the puffery Class Counsel

22   offers.

23        As explained *supra*, there is nothing extraordinary about a recovery amounting

24   to just 1% of the class members' injuries. A comparison to the upward departure from

25   the 25% benchmark approved in *Vizcaino* is instructive. The class lawyers in *Vizcaino*

26   pursued their case with zero supporting precedents and agreements signed by the class

27   members waiving the very benefit the class sought to vindicate <u>in spite of the written</u>

28   <u>agreements!</u> *Vizcaino*, 290 F.3d at 1048. Compared that to here: a parade of burned-

-24-

out dishwashers across the country with a mountain of expert testimony pointing the finger at Whirlpool. This case was a walk in the park compared to *Vizcaino*.

Compared to *Vizcaino*, Class Counsel faced significantly less risk. *Vizcaino* approved the district court calling a case extremely risky where the plaintiffs had lost once on the merits and a second time on the class definition yet both times managed to revive the case. *Id.* at 1048. In this case, Class Counsel was consistently building a discovery record which was harmful to Whirlpool that brought Whirlpool to the table for the final settlement discussions. (Dkt 218-7 at ¶ 54). Class Counsel did not settle this case from a position of procedural or strategic weakness. Class Counsel's claims to the contrary are yet more puffery.

B. The basis for a contingent fee should exclude costs of class notice, Class Counsel's costs, and any incentive payments.

Mr. Liacopoulos believes that the baseline recovery to calculate any contingent fee should exclude the costs of class notice, Class Counsel's costs, and, to the extent they are awarded, any incentive payments.

While the Ninth Circuit does not require a net-based analysis, the Seventh Circuit does. *Redman v. RadioShack Corp.*, 768 F.3d 622, 633 (7th Cir. 2014) ("Those [administrative] costs are part of the settlement but not part of the value received from the settlement by the members of the class. The costs therefore shed no light on the fairness of the division of the settlement pie between class counsel and class members.") Since the Ninth Circuit leaves the question of gross or net-based to the district court, the reasoning of the Seventh Circuit should be persuasive to the Court.

As explained above, CAFA and *HP Inkjet Printer* require this Court to assign zero value to the coupons provided for in the Settlement Agreement. Assuming Class Counsel's representation of $418,628 in prequalified claims is *actually claimed*, and that non-prequalified reimbursement claims of $6.15 million are *actually paid*, and following Mr. Liacopoulos' argument *supra* that the value of the Future Overheating Coverage is $6.69 million, the maximum total value of the recovery is approximately

-25-

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1  $13.3 million. Applying the Ninth Circuit's 25% benchmark results in an attorneys'
2  fee of $3.325 million, or 22.2% of the amount requested by Class Counsel. This
3  demonstrates that Class Counsel's lodestar would be excessive, as even his lodestar of
4  $8,948,487.98 is 2.7X what is permitted under the Ninth Circuit's 25% benchmark.

5       Even if this Court were inclined to use the gross method of calculating fees, the
6  total recovery for the class including notice costs and incentive awards is only about
7  $14.9 million, so Class Counsel's $15 million request would be more than even the
8  total gross recovery of the class! In *Bluetooth*, the Ninth Circuit reversed a gross-
9  calculated attorney's fee, in part, because the fee, when calculated on a net basis,
10 resulted in an attorneys' fee award far greater than the 25% benchmark. *Bluetooth*, 654
11 F.3d at 943.

12      Mr. Lindberg proposes that the Court, if it chooses to approve the Proposed
13 Settlement despite its many flaws detailed in this Objection, award an attorneys' fee of
14 $3.325 million. Additionally, the Court should not allow the difference to revert to
15 Whirlpool but should award the difference to be paid as a cash payment to the Class
16 Members on a *pro rata* basis.

17            C. Class Counsel's lodestar should be calculated using the *Laffey Matrix*.

18      One of the most common ways to determine the reasonability of an attorney's
19 declared hourly rate is by comparison of it with that year's *Laffey* Matrix and then
20 adjusted to local geographic cost of living. *See Chanel, Inc. v. Doan*, 2007 WL 781976,
21 *6-7 (N.D. Cal. 2007) (citing *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354
22 (D.D.C. 1983), aff'd in part, rev'd in part on other grounds, 746 F.2d 4 (D.C. Cir.
23 1984)). Following the *Chanel* method, the Court should use the Judicial Salary Plan's
24 locality percentages to adjust the *Laffey Matrix* to the location of each of the attorneys
25 claiming fees in this case, then adjust their hourly rate accordingly to recalculate the
26 lodestar. Doing so would result in a significantly-reduced lodestar. Additionally, Class
27 Counsel is not entitled to hide his bills from absent class members. The Court should
28

-26-

1  order that Class Counsel's detailed billing records be unsealed and grant Mr.
2  Liacopoulos leave to supplement this Objection on the basis of arguments regarding
3  the excessiveness of Class Counsel's hours worked and hourly rate billed.

4  **X.    CONCLUSION**

5      For the reasons set forth herein, the Settlement Agreement sets forth a class
6  which cannot be certified and provides a recovery which is unfair to absent class
7  members. Therefore, Mr. Liacopoulos prays this honorable court:

8      (a) Reject the Settlement Agreement; or,

9      (b) If the Court chooses to approve the Second Proposed Settlement, to:

10         i.    Reduce the attorneys' fees to $3.325 million;

11         ii.   Refuse to award any incentive payments; and

12         iii.  Reserve jurisdiction to grant incentive awards to Mr. Liacopoulos and,
13               to the extent Mr. Liacopoulos retains counsel to represent him
14               subsequently in this matter, reasonable attorney's fees to his counsel.

15  DATED: May 27, 2016

16

17  _____
    Jan Liacopoulos Miorelli, executing the
18  Objection as required by the Class Notice as
    Agent for George Liacopoulos pursuant to the
19  attached Durable Power of Attorney

20

21

22

23

24

25

26

27

28

-27-

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Objection was mailed via U.S. Certified Mail on May 27, 2016 to the following address:

Clerk of the Court
United States Courthouse
312 North Spring Street
Los Angeles, CA 90012-4701

_Jan Liacopoulos Miorelli_

Jan Liacopoulos Miorelli

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

1    Exhibit A – Whirlpool Corp Key Ratios
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

# Whirlpool

| Price and Volume | | Valuation Ratios | |
|---|---|---|---|
| Recent Price $ | 174.25 | Price/Earnings (TTM) | 18.60 |
| 52 Week High $ | 193.59 | Price/Sales (TTM) | 0.64 |
| 52 Week Low $ | 123.60 | Price/Book (MRQ) | 2.78 |
| Average Vol (Mil) (RTMA) | 0.97 | Price/Cash Flow (TTM) | 9.10 |
| Beta | 1.78 | | |

| Share Related Items | | Per Share Data | |
|---|---|---|---|
| Market Cap. (Mil) $ | 13,237.22 | Earnings (TTM) $ | 9.36 |
| Shares Out (Mil) | 75.97 | Sales (TTM) $ | 271.97 |
| Float (Mil) | 76.78 | Book Value (MRQ) $ | 62.61 |
| | | Cash Flow (TTM) $ | 19.15 |

| Dividend Information | | | |
|---|---|---|---|
| | | Cash (MRQ) $ | 9.20 |
| Yield % | 2.30 | Management Effectiveness | |
| Annual Dividend | 4.00 | Return on Equity (TTM) | 16.40 |
| Payout Ratio (TTM) % | 38.00 | Return on Assets (TTM) | 4.00 |
| | | Return on Investment (TTM) | 9.70 |

| Financial Strength | | | |
|---|---|---|---|
| Quick Ratio (MRQ) | 0.40 | Profitability | |
| Current Ratio (MRQ) | 0.90 | Gross Margin (TTM) % | 20.60 |
| LT Debt/Equity % (MRQ) | 68.00 | EBIT Margin (TTM) % | 6.10 |
| Total Debt/Equity % (MRQ) | 105.00 | Profit Margin (TTM) % | 3.80 |

Historical financial information is provided by MorningStar, Inc. Whirlpool Corporation makes no representations or warranties with respect to the information contained herein and takes no responsibility for supplementing, updating, or correcting any such information.

Mil = Millions  RTMA = Rolling Three Month Average

TTM = Trailing Twelve Months   MRQ = Most Recent Quarter

Pricing and volume data as of 05/26/16.

1    Exhibit B – Bloomberg Stock Quote for WHR May 26, 2016
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

OBJECTION TO CLASS ACTION SETTLEMENT OF GEORGE LIACOPOULOS

Whirlpool Corp

# WHR:US NEW YORK

+ Watchlist

⬆ **174.39** USD

+0.14
+0.08%

| OPEN | DAY RANGE | VOLUME | PREVIOUS CLOSE | 52WK RANGE | 1 YR RETURN | YTD RETURN | CURRENT P/E RATIO (TTM) |
|---|---|---|---|---|---|---|---|
| 174.56 | 173.59 - 176.46 | 691,936 | 174.25 | 123.60 - 193.59 | -5.24% | 18.74% | 13.64 |

| EARNINGS PER SHARE (USD) (TTM) | MARKET CAP (B USD) | SHARES OUTSTANDING (M) | PRICE/SALES (TTM) | DIVIDEND INDICATED GROSS YIELD |
|---|---|---|---|---|
| 12.79 | 13.248 | 75.967 | 0.66 | 2.29% |

| SECTOR | INDUSTRY | SUB-INDUSTRY |
|---|---|---|
| **Consumer Discretionary** | **Home & Office Products** | **Home Improvement** |

Quote Search      🔍

Recently Viewed:
**WHR:US**

## Related Videos

There are currently no related videos for this ticker. Please check back later.

Company News | **Press Releases**

🕐 4/27/2016    **Whirlpool (WHR) Earnings Report: Q1 2016 Conference Call Transcript** - THE STREET

🕐 4/26/2016    **Whirlpool (WHR) Stock Slips, Q1 Results Fall Short of Expectations** - THE STREET

🕐 4/26/2016    **iShares U.S. Construction vs. SPDR Homebuilders: Comparing Homebuilder ETFs (ITB, XHB)** - INVESTOPEDIA

**Resilience to Cyber Risks: The Board in Action**

🕐 4/26/2016    **Unusual Social Activity Today Around Whirlpool (WHR)** - THE STREET

🕐 4/26/2016    **Whirlpool Tumbles After Profit Trails Analysts' Expectations**

🕐 4/26/2016    **3 Consumer Goods Stocks Dragging The Sector Down** - THE STREET

**Profile**

| | |
|---|---|
| **Jeff Maurice Fettig** | Chairman/CEO |
| **Marc R Bitzer** | President/COO |
| **Larry M Venturelli** | Exec VP/CFO |
| **Joseph T Liotine "Joe"** | Exec VP/Pres:North America |
| **Esther Berrozpe Galindo** | Exec VP/Pres:EMEA |

Case 8:11-cv-01733-FMO-AN   Document 235   Filed 06/01/16   Page 42 of 63   Page ID #:6410

Terms of Service Trademarks Privacy Policy
©2016 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices ▶ Website Feedback Help

1  Jan L. Miorelli
   Agent by Durable Power of Attorney for George Liacopoulos
2  4715 N Harbor City Blvd
   Melbourne, FL 32935
3  Telephone: (321) 544-0230

4  *Pro Se Objector*

5

6              **UNITED STATES DISTRICT COURT**
           **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
7

8  STEVE CHAMBERS, *et al.*, on behalf of  )  Case No.: 8:11-cv-01733-FMO-MLG
   themselves and all others similarly      )
9  situated,                                )  Honorable Fernando M. Olguin
                                            )
10             Plaintiff,                    )  **DECLARATION OF JAN**
    v.                                       )  **LIACOPOULOS MIORELLI**
11                                           )
    WHIRLPOOL CORPORATION,                   )  Date:       August 25, 2016
12                                           )  Time:       10:00 a.m.
               Defendant.                    )  Courtroom:  22
13                                           )

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              -1-
            DECLARATION OF JAN LIACOPOULOS MIORELLI

I, Jan Liacopoulos Miorelli, declare as follows:

1.   I am a resident of 4715 N Harbor City Blvd., Melbourne, FL 32935 and am the daughter of George and Marylyn Liacopoulos.

2.   George is 87 years old and a veteran of the Korean War where he served in the U.S. Army until his honorable discharge. He attended university on the G.I. Bill and became a mechanical engineer. We moved to Cocoa Beach, FL when he got his job in the 1964 working on the Apollo Program. George is very proud of his participation in that project and his role fueling the Service Modules of Apollo 8-11. He is also very proud of his participation in numerous important milestones in the Space Shuttle program, including Sally Ride's landing after being the first woman in space. My parents have been married for 59 years.

3.   George Liacopoulos created a Durable Power of Attorney pursuant to Part II of Chapter 709 of the Florida Statutes naming me his Agent on April 29, 2014. A true and correct copy of the Durable Power of Attorney ("George's Durable Power of Attorney") is attached to this Declaration as Exhibit A.

4.   My participation in the above-captioned matter is pursuant to the authority in George's Durable Power of Attorney.

5.   Recently, George fell in his home and broke his hip. He is currently in his second hospitalization and incapable of handling affairs such as the above-captioned case.

6.   My mother, Marylyn, lives at the home she has shared with George since 1965 at 19 Azalea Drive, Cocoa Beach, FL 32931. She has limited mobility and must use a walker at all times.

7.   I filed George's claim online on his behalf.

8.   I worked with my son, Sam A. Miorelli, E.I., Esq. to prepare the *pro se* Objection which I have filed as Agent for George.

-2-

DECLARATION OF JAN LIACOPOULOS MIORELLI

9.      By signing this sworn Declaration, I intend this Declaration to function as the equivalent of George signing and dating the Objection himself personally.

I declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing is true and correct. Executed on May 27, 2016 at Melbourne, Brevard County, Florida.

Jan Liacopoulos Miorelli, for herself, and simultaneously executing the Objection as required by the Class Notice as Agent for George Liacopoulos pursuant to the attached Durable Power of Attorney

-3-

DECLARATION OF JAN LIACOPOULOS MIORELLI

1

**Exhibit A**
**Durable Power of Attorney of George P. Liacopoulos Dated April 29, 2014**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-
DECLARATION OF JAN LIACOPOULOS MIORELLI

This document prepared by:
Kurt C. Weiss, Esq.
BETTEN MURPHY & WEISS, Attorneys, P.A.
2627 W. Eau Galle Boulevard, Suite 105
Melbourne, Florida 32935
(321) 676-2525

# DURABLE POWER OF ATTORNEY

I, GEORGE P. LIACOPOULOS, (the "Principal") am creating a durable power of attorney pursuant to Part II of Chapter 709 of the Florida Statutes.

## Section 1 - Appointment

I appoint JAN L. MIORELLI to serve as my initial Agent.

I appoint the following persons to serve as my successor Agent, in the following order:

First:      LUKE MIORELLI;
Second:     SAM A. MIORELLI.

(If more than one Agent is serving concurrently under this power of attorney, the signature of any one of them is sufficient to endorse checks or drafts and to draw checks or drafts on my financial accounts.)  The use of the term "Agent" and any similar or equivalent term includes the singular and the plural and refers to any gender.

## Section 2 - Effectiveness, Durability, Resignation & Revocability

2.01    Effectiveness.  This durable power of attorney is effective immediately and will not be affected by my subsequent incapacity, except as provided in Part II of chapter 709 of the Florida Statutes.  It will remain valid until I die, I revoke this Durable Power of Attorney or I am adjudicated totally or partially incapacitated, unless the court determines that certain authority in this document is to remain exercisable by my Agent.

2.02    Original.  If this durable power of attorney has been executed in multiple originals, each such original will have equal force and effect.  Copies, whether electronic, digital, facsimile, photocopy or any other reproduction of the original are not valid and do not have the force and effect of the original durable power of attorney.

2.03    Successor Agent.   If my initial Agent or a successor Agent passes away, resigns as Agent, becomes incapacitated, is not qualified to serve as Agent, declines to serve as Agent or is otherwise unable to act as Agent, the next successor Agent named above will serve as Agent.  Proof that an acting Agent is unwilling or unable to continue to act, as described above, may be established by an affidavit signed by the next successor Agent.  That affidavit may, but need not, be supported by documents showing that the acting Agent has passed away, is incapacitated, has resigned or is otherwise unwilling to act as Agent.

1

2.04    Validity of Acts.   All acts of my Agent taken or done without knowledge of the termination or suspension of authority under this durable power of attorney are valid and effective, unless otherwise invalid or unenforceable. All acts done by my Agent pursuant to this durable power of attorney shall bind me and my successors in interest.

2.05    Resignation.  My Agent may resign by signing a written resignation delivered to me or my guardian if I am incapacitated and a guardian has been appointed for me, and to any co-agent or if there is no co-agent to the next successor agent named in this document.  If I am mentally disabled, notice may be delivered  to any person with whom I am residing or who has my care and custody.

2.06    Revocation.  I may revoke this durable power of attorney at any time allowed by law.  If  it is revoked no person or entity will incur any liability to me or my estate or successors as a result of allowing my Agent to exercise powers granted in this document prior to that person or entity's receipt of notice that this durable power of attorney was revoked.

2.07    Notice.  Pursuant to section 709.2121, Florida Statutes, my Agent will provide notice, or is entitled to receive notice, as follows:

(a)    A notice of revocation, notice of partial or complete termination by adjudication of incapacity or by the occurrence of an event referenced in this power of attorney, notice of my death, notice of suspension by initiation of proceedings to determine incapacity or to appoint a guardian, or other notice, is not effective until written notice is provided to my Agent or any third person or entities relying on this power of attorney.

(b)    Notice must be in writing and must be accomplished in a manner reasonably suitable under the circumstances and likely to result in the receipt of the notice or document. Permissible methods of notice or for sending a document include first-class mail, hand or personal delivery, delivery to the person's last known place of residence or place of business, or a properly directed facsimile or other electronic message.

(c)    Notice to a financial institution must contain the name, address, and the last four digits of my taxpayer identification (Social Security) number and be directed to an officer or a manager, in this state, of the financial institution.

(d)    Notice is effective when given, except that notice upon a financial institution, brokerage company, or title insurance company is not effective until 5 days, excluding Saturdays, Sundays, and legal holidays, after it is received.

2

2.08   Third Party Rejection.  Pursuant to section 709.2120, Florida Statutes, a third person must accept or reject this power of attorney within a reasonable time.  A rejection must be in writing, stating the reasons for the rejection.  Four days, excluding Saturdays, Sundays, and legal holidays, is presumed to be reasonable for a financial institution to accept or reject a power of attorney with respect to a banking or security transaction pursuant to sections 709.2208(1) and (2), Florida Statutes.  A third person may not require any additional or different form of power of attorney, such as a financial institution's power of attorney form, to allow my Agent to act under any authority granted in this durable power of attorney.

Except as provided in section 709.2119(5), Florida Statutes, no person or entity that relies in good faith on the authority of my Agent under this durable power of attorney will incur any liability to me, my estate, my heirs, successors and assigns.

Any party dealing with my Agent may conclusively rely on an affidavit or certificate signed by my Agent that states:

(a)   where I am domiciled;

(b)   that I am not deceased;

(c)   that there has been no revocation, partial or complete termination of this durable power of attorney by an adjudication of my incapacity or by the occurrence of an event referenced in this power that terminates this durable power of attorney;

(d)   that there has been no suspension of this durable power of attorney by the initiation of proceedings to determine my incapacity or to appoint a guardian for me; and

(e)   if my Agent is a successor agent, the reason or reasons for the unavailability of the predecessor agent or agents to be able to act at the time the authority is being exercised.

### Section 3 - General Powers

The validity and interpretation of this durable power of attorney is governed by Part II of Chapter 709, Florida Statutes and, to the extent permitted by law, is applicable to all of my property, whether real property, including homestead real property, personal property, whether intangible or tangible, including, but not limited to, powers of appointment, chooses in action, contractual or statutory rights of election, legal or equitable.  If any provision of this durable power of attorney is declared invalid, the remaining provisions will remain in full force and effect.  This is a general power of attorney and should be interpreted as granting my Agent all powers permitted under Florida law.

3

3.01   <u>Powers</u>.  I hereby grant to my Agent the following described powers so that my Agent can act on my behalf.   My Agent has authority to sign, endorse, acknowledge, deliver, file or record all appropriate documents necessary to exercise the powers granted herein. In addition to the following described powers my Agent is authorized to do anything and everything necessary or incidental to exercising the powers as described in this documents.

3.02   <u>Personal Property</u>.  Buy or sell any personal property I own or have an ownership interest in and determine the terms of such purchase or sale. My Agent may buy, sell or manage any tangible personal property or other fixtures or personalty I own or may acquire in the future, including motor vehicles and tangible personal property evidenced by titles or certificates.

3.03   <u>Accounts</u>.  Collect and settle all accounts, rights and benefits to which I am entitled now or become entitled to in the future, including, but not limited to rights to, cash payments, property, debts, accounts, legacies, bequests, devises, dividends and annuities. In collecting my obligations, my Agent may demand, sue for, arbitrate, settle, compromise, receive, deposit, expend for my benefit, reinvest or otherwise dispose of these matters as my Agent determines appropriate.

3.04   <u>Employment</u>.  Retain, discharge and pay for, in the sole discretion of my Agent, the services of attorneys, accountants, financial planners, geriatric care managers, social workers, and any other health care professionals.

3.05   <u>Domicile</u>.  Change or maintain my domicile and/or residency for any and all purposes and take all actions and sign all documents necessary to effectuate changing or maintaining  my domicile or residence.

3.06   <u>Credit</u>.  Use any credit card that is held in my name to make purchases on my behalf; to open a new credit card account and to close any existing credit card accounts.

3.07   <u>Mail</u>.  Open, read, respond to and redirect my mail; represent me before the United States Postal Service in all matters pertaining to my mail.

3.08   <u>Expenditures</u>.

(a)   Take reasonable and necessary actions to maintain my standard of living including the power to maintain my residence by paying all operating costs, homeowners fees, condominium fees, co-op fees, interest on mortgages or deeds of trust, amortization payments, repairs, insurance and taxes; purchase lease or make other arrangement for a different residence; provide normal domestic help; provide clothing, incidentals, transportation, medicine, food, recreational travel or activities; enter into contracts and pay for services and merchandise for my funeral and burial arrangements; initiate, continue or

4

cancel my membership in organizations and associations of all kinds; make all necessary arrangements, contractual or otherwise, for my care at any hospital, rehabilitation hospital, hospice, nursing home, assisted living facility, group home, adult family care home, continuing care retirement community, convalescent home or similar establishment, or in my own residence should I desire it, and assure that all of my essential needs are met wherever I may be.

(b)    In addition my Agent may make payments as my Agent deems necessary for the health, education, maintenance or support of my spouse or other persons that my Agent determines to be dependent on me for support.

(c)    Make reasonable expenditures for the care, maintenance, support and welfare of any pets I may own.  Payments from my funds for pet care may be made to any person or entity, including my Agent.

3.09    Accounting.  My Agent has a duty to account for and disclose all receipts, disbursements and transactions conducted on my behalf under this document if ordered by a court; requested by me, a court-appointed guardian or another fiduciary acting on my behalf; requested by a governmental agency having authority to protect my well being or welfare; or upon my death if requested by the personal representative of my estate.  If requested my Agent must comply with the request within 30 days or state in writing to the person or entity who made the request why additional time is needed to comply with the request.  No such extension will be granted for more than an additional 60 days.

3.10    Equitable and Legal Rights.

(a)    Start, supervise, intervene in, prosecute, dismiss, defend, appeal, arbitrate, assign, waive and settle all legal or equitable rights, actions, judicial or administrative proceedings of any kind or nature, affecting me or my property or any matter in which I may be concerned in any way.

(b)    Commence any court proceedings necessary to protect my legal rights and interests under this power of attorney including, but not limited to bringing actions for declaratory judgments in any court of competent jurisdiction interpreting the validity of this power of attorney and any of the acts sanctioned by this power of attorney; provided, however, that my Agent need not seek a declaratory judgment to perform any act sanctioned by this power of attorney; bringing actions for mandatory injunctions requiring any person or entity to comply with my Agent's directions as authorized by this power of attorney; and bringing actions for actual and punitive damages together with recoverable costs and expenses, including reasonable attorneys fees incurred in bringing any such litigation against any person or entity who negligently or willfully fails or refuses to follow my Agent's directions as authorized by this power of attorney and law.

5

3.11   Business Interests.   Continue operating and managing any business I now own or may later own for the period of time and in any manner my Agent considers appropriate, including the power to act as a director, general or limited partner, or associate or officer of the business; select and vote for directors, partners, associates and officers of the business and enter into agreements with other owners of the business; execute agreements and amendments to agreements necessary to the operation of the business including, but not limited to, stockholder agreements, partnership agreements, buy-sell agreements and operating agreements for limited liability companies; hire and fire employees; pay employees' salaries and provide for employee benefits; employ legal, accounting, financial and other consultants; continue, modify, terminate, renegotiate and extend any contracts with any person, firm, association or corporation; sign business tax returns and other government forms required for my business; pay all business related expenses; transact business for me in my name and on my behalf; contribute additional capital to the business; change the name or the form of the business; incorporate the business; enter into a partnership agreement with other persons or entities; join in a plan to reorganize, consolidate or merge my business with any other business; establish the value of the business under "buy-out" or "buy-sell" agreements to which I am a party; create, continue or terminate retirement plans for my business' employees and make contributions required by those plans; advance money or other property to the business and make loans of cash or securities to the business as my Agent considers appropriate; borrow for the business and secure any loans with business assets or my personal assets and sell, liquidate or close a business upon terms my Agent considers appropriate, including a sale in exchange for cash an installment note or any combination thereof.

Manage any general, limited or special partnership interest I own now or may later own, including the power to exercise any right, power, privilege or option I may have or may claim under any contract with the partnership; modify or terminate my interest on terms and conditions my Agent considers appropriate; enforce the terms of the partnership agreement for my protection by instituting or maintaining any action, proceeding or otherwise as my Agent considers appropriate; and defend, arbitrate, settle or compromise any action or other legal proceeding to which I am a party because of my membership in the partnership.

3.12   Marital Property.   Transfer, exchange or partition any marital property, whether separate or community property between my spouse and myself; enter into and sign on my behalf marital property agreements or other documents and agreements to implement these powers; enforce, amend or revoke any marital property agreement between my spouse and myself but only with respect to rights and obligations for property owned by my spouse, by me or by both of us.

6

3.13   Insurance.   Apply for, purchase, increase or decrease coverages, maintain, pay premiums upon, abandon, cancel, take loans against, make investment decisions, exercise any rights in or surrender any life insurance policy, long term care insurance policy, commercial or private annuity that I may own or have any incidents of ownership in, whether they insure my life and care or any other person.  This authority expressly includes the right and power for my Agent to transfer ownership of any interest I may have in any insurance policy or annuity.

3.14   Taxation.   No Agent may exercise any fiduciary power or discretion if the exercise of that power or discretion would cause any income generated by my property to be attributed to my Agent for federal income tax purposes; cause the value of any property subject to this power of attorney to be included in my Agent's gross estate for federal estate tax purposes; cause any distribution made or allowed to be made by my Agent to be treated as a gift from my Agent; or discharge a legal obligation of my Agent.  If the exercise of a power by my Agent under this power of attorney would cause any of the foregoing results, any named successor agent has the authority to exercise the power or discretion.

3.15   Personal Rights.   Under section 709.2201(3) of the Florida Statutes, notwithstanding the authority of my Agent granted in this power of attorney, my Agent may not perform duties under a contract that requires the exercise of my personal services; make any affidavit as to my personal knowledge; vote in any public election on my behalf; execute or revoke any will or codicil for me; or exercise powers and authority granted to me as trustee or as court-appointed fiduciary.

## Section 4 - Real Property

4.01   Sell, purchase, insure, repair, maintain, improve, demolish structures, abandon, develop, convey, subdivide, grant easements, partition, mortgage, rent, lease or sublease for any term, collect and sue for rents, eject and remove tenants from property and recover the property by all lawful means, release liens, pay or contest taxes on the property, employ agents or laborers for the management and maintenance, or exchange any real property or interests in real property for such considerations and upon such terms and conditions as my agent may see fit and execute, acknowledge, and deliver all instruments or documents necessary to the exercise of these powers, including conveying or encumbering title to property owned by me alone as well as any owned by me jointly or as tenants by the entireties. **This authority specifically includes my homestead located at 19 Azalea Drive, Cocoa Beach, Florida 32931, which has a legal description as follows:**

> Lot 19, North Isle No. 1, RIVER ISLES SUBDIVISION, according to the plat as recorded in Plat Book 12, Page 42, Public Records of Brevard County, Florida.

7

## Section 5 - Investment, Banking and Securities

5.01   Borrow and Lend.   Borrow or lend money on such terms and with such security or no security, as my Agent may decide in it's sole discretion, and execute all notes, mortgages, and other instruments necessary or desirable in this regard, including the forgiveness of any debt owed to me.  In lending money the loan must carry a fair market interest rate, taking into account the circumstances of the loan, existing market conditions, the borrower and their relationship to me.

5.02   Banking Transactions.  My Agent has authority to conduct banking transactions as provided in section 709.2208(1), Florida Statutes. Without limiting such authority, my Agent may establish bank accounts of any type in one or more banks, savings and loans, credit unions, investment banks, brokerage house or other financial institutions that my Agent may choose. My Agent may modify, terminate, make deposits to, transfer to or from accounts, write checks on, make withdrawals from and grant security interests in any account in my name or to which I am an authorized signatory, except accounts held by me in a fiduciary capacity.  In exercising this authority, it does not matter whether or not the account was established by me or for me by my Agent. My Agent is authorized to negotiate, endorse or transfer any check or other instrument with respect to any account, to contract for any services rendered by any bank or financial institution, and to execute, on my behalf as principal, any agency or power of attorney forms furnished by a bank with respect to accounts with the bank that appoints the bank or any person as my agent.

5.03   Investing.  My Agent has authority to conduct investment transactions as provided in section 709.2208(2), Florida Statutes. Without limiting such authority, my Agent may invest and reinvest all or any part of my property in any other property of whatever type, real or personal, tangible or intangible, and whether located inside or outside the geographic borders of the United States and its possession or territories. Unless specifically limited by the other provisions of this power of attorney, my Agent may invest in securities of all kinds, limited partnership interests, real estate or any interest in real estate whether or not productive at the time of investment, commodities contracts of all kinds, interests in trusts including investment trusts; participate in common, collective or pooled trust funds or annuity contracts; sell or otherwise terminate any investment made by me or on my behalf; establish and terminate accounts with securities brokers and use brokerage accounts to make short sales and to buy on margin, and pledge any securities held or purchased in brokerage accounts as security for loans and advances made to the account; establish and terminate agency accounts with corporate fiduciaries; employ and fire financial and investment advisors; redeem or purchase bonds issued by the United States government or any of its agencies.

5.04   Securities.  Exercise all rights regarding securities that I own now or in the future, including the power to buy, sell, and exchange all types of securities and financial instruments including but not limited to stocks, bonds, mutual funds and commodity futures contracts and call and put options on stocks and stock indexes; receive certificates and other

8

evidences of ownership with regard to securities; hold securities in bearer or uncertified form and use a central depository, clearing agency or book-entry system; place all or any part of my securities in the custody of a bank or trust company or in the name of its nominee; employ a broker-dealer as custodian for my securities and register the securities in the name of the broker-dealer or its nominee; exercise voting rights with respect to securities in person or by proxy, enter into voting trusts, and consent to limitations on the right to vote; participate in any reorganization, recapitalization, merger or similar transaction; exercise any subscription rights, option rights (whether or not qualified under the Internal Revenue Code) or other rights to which I am entitled now or in the future, or to sell and dispose of these rights, and, if required, to sign my name to rights, warrants or other similar instruments; delegate investment responsibility to a third party and grant any such person discretionary trading authority over my assets, accounts and investments, as permitted by law.

5.05   IRA's and Annuities.   Open, close, access, manage, control, make and implement any investment, withdrawal, rollover, recalculation, redemption, annuitization, or distribution decisions for any individual retirement account or annuity I now own or may own, or any similar tax deferred, qualified, non-qualified or retirement accounts or annuities of any kind or nature whatsoever.

5.06   Safe Deposit Box.   Contract for, close or enter any safe deposit box or other place of safekeeping standing in my name alone or jointly with another, remove the contents and make additions, substitutions, and replacements of the contents thereof. My Agent shall create and sign a complete inventory of the contents of any such safe deposit box or other place of safekeeping for each time it is accessed by my Agent.

5.07   Disclosure.   My Agent may release and provide or request and obtain any and all information regarding my financial investments and taxes, including any information regarding stocks, bonds, certificates of deposit, bank accounts, tax returns, retirement accounts, pension plans, and any other documents or information regarding my financial affairs and taxes from my agents, employees, financial advisors, insurance professionals, accountants, attorneys, stockbrokers, stock transfer agents, and any other persons having such information.   I release these persons or entities from any liability for releasing the above-referenced information to my Agent in reliance on this Section.

5.08   Confidentiality.   If my Agent is an attorney-at-law or other accounting or financial professional, the professional regulations of my Agent's profession and the law may prohibit my Agent from releasing information about my financial affairs to others if I am a client of my Agent. This instrument, therefore, is a limited waiver of any privilege (such as the attorney-client privilege) that I have established with any Agent as a client. The privilege is waived for the limited purpose of permitting my Agent to perform the duties imposed and exercise the powers provided under this power of attorney.

5.09  Enforcement.  Commence enforcement proceedings under section 709.2116(3), Florida Statutes, at my expense, against any bank, savings and loan association, credit union, financial institution, brokerage firm, stock transfer agent, insurance company, title insurance company, or other person or entity that unreasonably or improperly fails or refuses to honor this durable power of attorney and seek all remedies and damages permitted by law. Any person or entity, who in violation of Florida Statutes section 709.2120, refuses to accept this durable power of attorney is subject to liability for damages incurred, including reasonable attorney's fees and costs, in any action or proceeding that confirms the validity of the power of attorney or mandates acceptance of the power of attorney for the purpose for which it was tendered.

## Section 6 - Healthcare

6.01  General.  Arrange for, consent to, authorize, or refuse medical, therapeutical, and surgical procedures for me. To take care of, contract for, make arrangements for and make financial commitments for, on my behalf, the medical care and attention of myself, including, without limiting the foregoing, to engage doctors and nurses and to enter into or modify care giver agreements and personal services contracts for my care and provide companion care, even if the care giver is my Agent and is being paid for the care, so long as the care services are paid at fair market value.  If I have executed a living will or an advance directive appointing a health care surrogate under chapter 765, Florida Statutes to serve as my health care surrogate or agent as to health care matters, I request that my Agent cooperate with such surrogate and keep such surrogate reasonably advised of any financial matters relating to my health care, and to the extent possible cooperate with such health care surrogate and abide by that person's decisions and actions concerning my health care and the matters covered in such documents and assist in providing financial resources reasonably needed to implement such decisions. My Agent may reimburse my surrogate under any health care directive, including but not limited to a Designation of Health Care Surrogate, even if such surrogate is my Agent, for any costs (including legal fees) reasonably incurred in or as a result of acting pursuant to such health care directive.

6.02  HIPAA.  I further grant my Agent the authority to act as my personal representative for all purposes of and as defined by and under HIPAA - the Health Insurance Portability and Accountability Act of 1996, with full authority to exercise, enforce or waive any and all of my rights under or requirements of HIPAA and to sign on my behalf any documents required or allowed by HIPAA.

6.03  Return To Home.  If at any time I am in a hospital, rehabilitation center, assisted living facility or skilled nursing facility I state that it is my intent to return to my home and my Agent shall take all reasonable steps, including signing any document, affidavit or declaration of intent on my behalf to evidence my intent to return to home.

## Section 7 - Estate Planning, Appointment, Gifting & Annuities

7.01   <u>Review of estate plan</u>. My Agent will make reasonable efforts to obtain and review my estate plan. I authorize any person with knowledge of my estate plan or possession of my estate planning documents to disclose information to my Agent and to provide copies of documents to my Agent.

7.02   <u>Integrity of Estate Plan</u>.   If it is necessary for my Agent to liquidate or reinvest any of my assets to provide support for me or conduct estate planning on my behalf, I direct that my Agent, to the extent that it is reasonably possible, avoid disrupting the dispositive provisions of my estate plan as established by me prior to my incapacity.

If it is necessary to disrupt the dispositive provisions of my estate plan, my Agent will use his or her best efforts to restore my plan as soon as possible.

7.03   <u>Fiduciary Positions</u>.

(a)   My Agent may serve in any other fiduciary capacity for me or for my benefit, including being my trustee, the guardian of my person or property, and my personal representative.

(b)   Resign or renounce for me any fiduciary position I now hold or may hold in the future including personal representative, guardian, trustee, trust protector, trust advisor, agent, officer or director of a corporation, and take the necessary steps to implement that resignation.   My Agent may engage in estate transactions on my behalf, including signing any Receipts, Release and Refunding Agreements, Waivers and Consents.

7.04   <u>Waiver of Conflict</u>.   My Agent may employ the attorney who prepared this power of attorney or any other attorney employed by me in connection with my estate plan or business matters and in doing so I waive any and all conflicts of interest that might arise through such employment; authorize the attorney to make full disclosure of my estate plan and business to the Agent; and authorize the attorney to accept the engagement.

7.05   <u>Disclaimer</u>. Make statutory elections and renounce or disclaim any interest in property by testate or intestate succession or by inter vivos transfer consistent with Florida law.

(initial)_____-by the foregoing initials I expressly authorize my Agent to exercise the powers contained in this sub-paragraph 7.05.

(initial)_____-by the foregoing initials I expressly **Do Not** authorize my Agent to exercise the powers contained in this sub-paragraph 7.05

7.06   Power of Appointment.   Exercise in whole or in part, or decline to exercise, or disclaim, my rights under any special or general power of appointment or any rights retained by me in any trust or otherwise, whether or not any such trust or other instrument was created by me or others.

(initial)_____-by the foregoing initials I expressly authorize my Agent to exercise the powers contained in this sub-paragraph 7.06.

(initial)_____-by the foregoing initials I expressly **Do Not** authorize my Agent to exercise the powers contained in this sub-paragraph 7.06

7.07   Trust Creation and Funding.   Create inter vivos trusts, including but not limited to, the power to execute, implement, administer and fund with my income, a qualified income trust as defined in United States Code, Title 42, Section 1396p(d)(4)(b) as required by any state or federal governmental entity to entitle me to become qualified for Medicaid benefits or assistance; access and make any decisions or exercise any rights I may have in any income, benefits or pension to which I am entitled to fund such a trust; execute all documents necessary to join a pooled trust as defined in United States Code, Title 42, Section 1396p(d)(4)(c) and fund that pooled trust with my assets or income and exercise any and all rights I may have in that pooled trust.  Fund or add property to an existing or subsequently created trust and accept transfers or distributions from any trustee of any trust.

(initial)_____-by the foregoing initials I expressly authorize my Agent to exercise the powers contained in this sub-paragraph 7.07

(initial)_____-by the foregoing initials I expressly **Do Not** authorize my Agent to exercise the powers contained in this sub-paragraph 7.07

7.08   Trust Amendment, Modification, & Termination.   Amend, modify or terminate inter vivos trusts created by or on my behalf.

(initial)_____-by the foregoing initials I expressly authorize my Agent to exercise the powers contained in this sub-paragraph 7.08.

(initial)_____-by the foregoing initials I expressly **Do Not** authorize my Agent to exercise the powers contained in this sub-paragraph 7.08.

12

7.09   Annuities.  Waive my right to be a beneficiary of a joint and survivor annuity, including a survivor benefit under a retirement plan.

(initial)_____ -by the foregoing initials I expressly authorize my Agent to exercise the powers contained in this sub-paragraph 7.09.

(initial)_____ -by the foregoing initials I expressly **Do Not** authorize my Agent to exercise the powers contained in this sub-paragraph 7.09.

7.10   Gifting.   Make gifts to any person or entity, including persons who are not my ancestor, spouse or descendant, in any amount and not be limited to the annual dollar limits of the federal gift tax exclusion under United States Code, Title 26, Section 2503(b). While gifts under this provision may be made to my Agent, only a named successor agent, may make gifts to my Agent.  Neither my Agent nor the successor agent may make gifts to himself or herself, his or her estate, his or her creditors, or the creditors of his or her estate.  My Agent may make, join and consent to gifts by my spouse pursuant to the Internal Revenue Code which is sometimes referred to as "gift-splitting".

(initial)_____ -by the foregoing initials I expressly authorize my Agent to exercise the powers contained in this sub-paragraph 7.10.

(initial)_____ -by the foregoing initials I expressly **Do Not** authorize my Agent to exercise the powers contained in this sub-paragraph 7.10.

7.11   Ownership and Rights of Survivorship.  Select, create, or change the ownership and rights of survivorship on any and all of my property, whether real or personal, including bank and investment accounts and real property interests.

(initial)_____ -by the foregoing initials I expressly authorize my Agent to exercise the powers contained in this sub-paragraph 7.11.

(initial)_____ -by the foregoing initials I expressly **Do Not** authorize my Agent to exercise the powers contained in this sub-paragraph 7.11.

7.12   Beneficiary Designations.  Select, create, or change beneficiary designations on any and all of my accounts, insurance policies, and qualified or non qualified retirement plans or annuities.

(initial)_____ -by the foregoing initials I expressly authorize my Agent to exercise the powers contained in this sub-paragraph 7.12.

(initial)_____ -by the foregoing initials I expressly **Do Not** authorize my Agent to exercise the powers contained in this sub-paragraph 7.12.

## Section 8 - Government Agency and Benefits

8.01    Internal Revenue and Taxing Authorities.  To execute Federal Tax Form 2848 or Form 8821 or any form required by the Internal Revenue Service, covering any tax years; to prepare, sign and file federal, state, or local income, gift, other tax returns of all kinds, FICA returns, payroll tax returns, claims for refunds, requests for extensions of time, ruling requests, petitions to the tax court or other courts regarding tax matters, and any and all other tax related documents, including, without limitation, receipts, offers, waivers, consents (including, but not limited to, consents and agreements under Internal Revenue Code Section 2032A, or any successor section thereto), closing agreements and any power of attorney form required by the Internal Revenue Service, Florida taxing authority, or other taxing body with respect to any tax period; to consent to extension of any limitation of action relating to assessments; to pay estimated or actual taxes due, collect refunds, post bonds, receive confidential information and contest deficiencies determined by the Internal Revenue Service, Florida taxing authority, or other taxing body; to exercise any elections I may have under federal, state or local tax law; and generally to represent me in all tax matters and proceedings of all kinds and for all periods before or after the date of this delegation, before all offices and officers of the Internal Revenue Service, Florida taxing authority, and any other taxing body.  I authorize my agent to substitute a representative and to delegate authority to a new representative and to retain and discharge professional counsel.

8.02    Government Agencies.  To deal with and obtain maximum entitlements and benefits relating to the Social Security Administration, Veterans Administration, Florida Department of Children & Families, Florida Agency for Persons with Disabilities or other social services agencies, Social Security Disability Insurance, Supplemental Security Income, Medicaid, Medicare, Worker's Compensation and all other government benefits or entitlement programs, including pursuing claims, planning for eligibility, and the submission of applications and appeals. In this regard, my Agent is authorized to execute and deliver any power of attorney or authorization to act form requested or required by a governmental agency. This power shall impose no affirmative duty on my Agent to provide information and/or documentation to any government agency.

## Section 9 - Asset Protection, Estate and Long Term Care Planning

9.01    Estate and Long Term Care Planning.  My Agent may engage in estate and long term care planning in furtherance of achieving asset preservation based on all relevant factors, including the value and nature of my property; my foreseeable obligations and need for maintenance; minimization of taxes, including income, estate, inheritance, generation skipping transfer, and gift taxes; and eligibility for a benefit, a program, or assistance under a statute or government regulation.  Property transfers made pursuant to the authority granted herein shall, for all purposes, be deemed to have been "in my best interest" if they are made in accordance with the provisions of this section and made in the

14

context of estate planning, financial planning, Medicaid planning, long term care planning and/or asset preservation planning pursuant to the recommendations of an attorney-at-law experienced in such matters.

9.02   Government Benefits. To effectuate the foregoing powers my Agent may take any action necessary to qualify me for Social Security Benefits, Supplemental Security Income, Veterans Benefits, Medicaid or any other government benefit program. Such actions may include but are not limited to converting non-exempt resources into exempt resources; divesting me of assets; if my Agent is my spouse, my spouse may protect our assets, whether owned by me alone, my spouse alone, or by us together as husband and wife, so that my spouse's impoverishment because of my health care costs can be avoided, by whatever lawful methods that might be available; signing a spousal refusal statement; signing  an Assignment of Support on my behalf; signing an application for Medical Assistance or any other government benefit program; serving as representative payee; making home improvements and additions to my homestead or other real property; paying off, partly or in full, any encumbrance on my homestead or other real property; purchasing a homestead or other real property, if I do not own a homestead or other real property; purchasing a more expensive homestead; transferring the homestead to a spouse who does not need long-term health or nursing care; dividing community property or marital assets equally or unequally between my spouse and me; and attending and representing me at Fair Hearings or other judicial or quasi-judicial proceedings.

9.03   Maximize Estate Valuation.   It is my desire that my Agent take into consideration what a reasonable and prudent person would do under the same circumstances wherein such person would wish to limit the expenditure of estate, gift, income and generation skipping transfer taxes (collectively "taxes") or the expenses of probate administration or to obtain government assistance with the cost of nursing home care or other public benefits to which I could become entitled. This authority is granted by me so that my Agent, my spouse, my descendants and any other beneficiaries of my estate, as well as any institution or court of competent jurisdiction, are aware of my desire to minimize the obligation of my estate to pay taxes or costs of administration and to maximize the value of my estate for the benefit of the beneficiaries of my estate, utilizing advanced tax and medicaid planning techniques. It is my intention that this authority be honored and that my Agent use this authority on my behalf to implement tax, medicaid or estate planning techniques.

## Section 10 - Acknowledgment

10.01   By signing this document I understand and agree that this is an important legal document and that, prior to signing, my attorney explained to me that this durable power of attorney gives my Agent broad powers to deal with my rights, obligations, property and assets; that this document will exist for an indefinite period of time unless I revoke it; and that it will remain in effect even if I become disabled or incapacitated.

15

This instrument is executed by me in the State of Florida, but it is my intention that this power of attorney shall be exercisable in any other state or jurisdiction where I may have any property or interest in property.

Dated this 29th day of April, 2014.

_____          _____
Nicole Therrien                          GEORGE P. LIACOPOULOS, Principal

_____
KURT C. WEISS

STATE OF FLORIDA - COUNTY OF BREVARD

On this 29th day of April, 2014, before me, a Notary Public in and for the State of Florida duly commissioned, personally came and appeared GEORGE P. LIACOPOULOS, who is personally known to me or who produced proper identification and who acknowledged this DURABLE POWER OF ATTORNEY to be his act.

NOTARY PUBLIC

_____ (L.S.)

KURT C. WEISS
Commission # EE 196102
Expires September 7, 2016

16

