1   Christopher T. Cain
    SCOTT & CAIN
2   Suite 601
    550 Main Street
3   Knoxville, TN 37902
    Tel: (865) 525-2150
4
    *Counsel for Objector,*
5   *W. Allen McDonald*

6

7                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF CALIFORNIA
8

9   STEVE CHAMBERS, et al.,          )   Case No. 8:11-cv-01733-FMO (ANx)
    on behalf of themselves and all  )
10  others similarly situated,       )
                                     )   Honorable Fernando M. Olguin
11            Plaintiffs,            )
                                     )
12  v.                               )
                                     )
13  WHIRLPOOL CORPORATION, et al.,   )
                                     )   Date: August 25, 2016
14            Defendants.            )   Time: 10:00 am
                                     )   Place: Courtroom 22
15  ─────────────────────────────────

16            OBJECTION TO PROPOSED SETTLEMENT
              AND MOTION FOR ATTORNEYS' FEES
17  ─────────────────────────────────────────────

18          W. Allen McDonald, by and through the undersigned counsel,[1] pursuant to (1) the Notice of

19  Proposed Settlement of Class Action, (2) Rule 23(d) of the Federal Rules of Civil Procedure, and

20  (3) equity, and respectfully submits this Objection to the Proposed Settlement and Motion for

21  Attorneys' Fees.

22

23

24

25

26

27

28  ─────────────────────────

        [1]The undersigned has searched for but has yet to secure local counsel in this matter.  He is
    endeavoring to do so.

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.   LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       A.    Class Counsel Seek an Exorbitant Amount of Attorneys' Fees . . . . . . . . . . . . . . 6

       B.    The Proposed Settlement Is, In Large Part, Little More than a Run-of-the-Mill
             Over-Valued Coupon Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       C.    The Proposed Settlement Unfairly Extends to Consumers Who Are Not Class
             Members and Does Not Require Them to Release Claims . . . . . . . . . . . . . . . . 16

       D.    Intra-Class Conflicts: Named Plaintiff Steve Chambers is Not a Typical or
             Adequate Class Member, But One With Interests Antagonistic to the Interests
             of Other Class Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       E.    $72,000 In Incentive Awards Is Excessive . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       F.    Class Members Were Misled About Settlement Approval Deadlines . . . . . . . . 18

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# I. PRELIMINARY STATEMENT

> "The settlement papers commonly stress the dollar size of the settlement. After all, a large number is presented as the result of substantial efforts by class counsel capped by a wonderful result. But dollars alone are not the full story."[2]

W. Allen McDonald ("McDonald")[3] purchased a Whirlpool-brand dishwasher, Model No. DU1148XTPQ6, Serial No. FS4302224, manufactured during the Class Period (between October 2000 and January 2006). McDonald submits that the proposed settlement is unfair and unreasonable and should be denied final approval.

It cannot be disputed that the amount the class *actually* receives under any settlement is a critical component in the settlement approval process. After all, determining the fairness of any settlement naturally requires knowing what the class will actually receive once the claims process is complete. As one Circuit Court recently made clear in its decision vacating a settlement:

> If the parties have not on their own initiative supplied the information needed to make the necessary findings, the court should affirmatively seek out such information . . . [and] withhold final approval of a settlement until the actual distribution of funds can be estimated with reasonable accuracy.

*In re Baby Products*, 708 F.3d 163, 173 (3rd Cir. 2013).

***Class Counsel's fees are excessive, based upon the theoretical – and not the actual – value of the proposed settlement.*** At the outset, Class Counsel seek an exorbitant amount of attorneys' fees – $15 Million – plus expenses of $508,292.67 (as well as additional, yet-to-be-incurred expenses), another $72,000 for incentive awards to eighteen (18) representative named Plaintiffs, and a payment of $100,000 to one named Plaintiff, Steve Chambers, to purchase two websites. The parties suggest that the proposed settlement is valued at anywhere between $55,675,260 and $116,725,260. However, this is little more than wishful guesswork, speculation, and conjecture, and in the end, pure fiction. In reality, the actual value of the parties' deal is a mystery, largely depending upon potential future rebate and repair claims and the response of 24 million dishwasher owners –

---

[2]Hon. Elaine Bucklo and Thomas R. Meites, *What Every Judge Should Know about a Rule 23 Settlement (But Probably Isn't Told),* 41 Litigation 1, 3 (ABA Litig. Spring 2015).

[3]*See* Exhibit 1, Declaration of Wallace Allen McDonald.

1   18 million of which are not even part of the Class – and will not be known until at least 2021. [Doc.

2   218-1, at Page ID#: 5365].

3          Yet, Class Counsel seek $15,000,000 in attorneys' fees *now*, maintaining that their fees

4   should be calculated now, based upon their 5-year projections of future claims, repairs, and damages

5   – regardless of the settlement's real value. As McDonald demonstrates below, this fee is grossly

6   excessive, characterized by circumstances that illustrate collusion by Class Counsel and the

7   Defendants. Based upon the known and actual claims and benefits, *i.e.*, discounting Class Counsel's

8   projections of possible future claims, rebates, purchases, and repairs, the participants in the proposed

9   settlement - the named Plaintiffs, Class Counsel, and the Administrator – profit substantially more

10  than do Class members.

11         Simply put, the fee-calculation should not be based upon fictional, nominal, or theoretical

12  Class benefits. Awarding fees based upon an estimated gross settlement range – separated by

13  $61,050,000, an amount which, by itself, substantially exceeds the low-end gross value of the

14  proposed settlement – would provide an enormous windfall to Class Counsel, overcompensating

15  them with a fee largely disproportionate to the relief they purportedly obtained for the Class. In other

16  words, Class Counsel seek an award largely based on theoretical settlement funds.

17         Whether the rebates offered by the proposed settlement are more akin to coupons than cash

18  is also an important distinction with wide-ranging ramifications. 28 U.S.C. § 1712 of the Class

19  Action Fairness Act ("CAFA") requires that attorneys' fees in a coupon settlement "attributable to

20  the award of the coupons shall be based on the value to class members of the coupons that are

21  redeemed." Here, there appears to have been no discussion whatsoever about whether the

22  dishwasher "rebates" are actually coupons, as is demonstrated below.

23         In the end, it was up to Class Counsel to ensure that Class members would get the

24  compensation they deserved. They failed. In the end, the proposed settlement is rich for Class

25  Counsel, while making Class members reach for their wallets to obtain much of their "benefits."

26  Class Counsel are more interested in protecting their own fees than protecting Class members'

27  compensation, all but Mr. Chambers, that is.

28

1          ***The value of the proposed settlement is watered down by a large coupon component.***
2    Second, for many Class members, the proposed settlement is little more than a run-of-the-mill
3    coupon settlement, providing them with 10%, 20%, or 30% rebates that require them to again do
4    business with the very companies who sold them allegedly defective and unsafe products.  To
5    achieve the value Class Counsel bestow on the proposed settlement, millions of Class members must
6    spend an average of about $600/$1200 to purchase a new dishwasher from the Defendants.  Thus,
7    not only is the proposed settlement grossly over-valued, but it is also a major marketing gimmick
8    cleverly designed to potentially put hundreds of millions of dollars into Defendants' coffers.

9          ***Benefits to non-Class members dilutes the settlement and is unfair to Class members.***
10   Third, approximately 75% of the dishwashers impacted by the proposed settlement – up to 18
11   million – are non-Class dishwashers.  Had these "non-Class dishwashers" not been covered, Class
12   members conceivably would have garnered more benefits.  And not only does such a component of
13   relief substantially dilute the settlement, but unlike Class members, these owners are not required
14   to release their claims against the Defendants.

15         ***The Chambers' payment demonstrates his – and Class Counsel's – atypicality and***
16   ***inadequacy to represent all Class members.***  Fourth, in addition to negotiating $4,000 incentive
17   awards for each of the eighteen (18) named Plaintiffs, Class Counsel separately negotiated a
18   $100,000 pay-out by the Defendants to Steve Chambers, one of the named Plaintiffs, for the
19   purchase of two websites that he had developed and maintained regarding the dishwashers that are
20   the subject of the litigation.  Chambers' interests plainly conflict with the interests of every other
21   Class member.  Thus, while Class Counsel reap the largest windfall of the proposed settlement,
22   Chambers, not at all typical of other Class members – benefits substantially more than any other
23   Class member, making him – and Class Counsel – poor and inadequate representatives of the Class.

24         ***The gross incentive award is excessive.***  Fifth, the gross amount of incentive awards, totaling
25   $72,000, is excessive.  Simply put, there is no reasonable justification for having eighteen (18)
26   named Plaintiffs in the litigation.

27

28

1    ***The proposed settlement also raises serious concerns that Class members' due process***
2    ***rights have been violated.*** Sixth, the proposed settlement is also procedurally flawed. As recently
3    as May 2016, the Administrator advised Class members, including McDonald, that they have until
4    *May 2, 2016* to object (which had already passed) and *June 2, 2016* to submit a claim.    [*See*
5    McDonald Claim Packet, Exhibit 2]. That same communication from the Administrator also advised
6    McDonald, and presumably other Class members, that the final approval hearing was set for *June*
7    *30, 2016*. In fact, by this time, on motion of the parties, the Court had already changed the objection
8    deadline at least twice (extending the deadline for objecting to the proposed settlement to May 27,
9    2016 and to object to the attorneys' fees request to June 10, 2016) and had also reset the fairness
10   hearing to August 25, 2016.    [Doc. 207, 211]. This misinformation by the Court-approved
11   Administrator necessarily impacted the due process rights of millions of Class members nationwide,
12   who were misled as to the actual deadlines by which they must exercise their rights. The overall
13   effect of the misinformation on the claims, exclusions, or objections by Class members cannot be
14   estimated at this time.

15       In the last analysis, these ingredients of the proposed settlement – and their effect of the
16   claims and rights of Class members – combine to become an insurmountable obstacle to final
17   approval. For all of these reasons, the proposed settlement should be rejected and the application
18   of attorneys' fees should be denied.

19   **II.    STANDARD OF REVIEW**

20           *"Because class actions are rife with potential conflicts of interests*
             *between class counsel and class members, district judges are*
21           *expected to give careful scrutiny to the terms of the proposed*
             *settlements in order to make sure that class counsel are behaving as*
22           *honest fiduciaries for the class as a whole."*[4]

23       Where, as here, "the parties reach a settlement agreement prior to class certification, courts
24   must peruse the proposed compromise to ratify both the propriety of the certification and the fairness
25   of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). The first step is to

26
27       [4]*Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004) (citations omitted)
28   (collecting cases).

1    determine whether a class exists. *Id.* (citing *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620

2    (1997)).

3          In order for approval to be granted, the court must find that the settlement is "fair, reasonable,

4    and adequate," after holding a hearing on the matter. *See* Fed. R. Civ. P. 23(e)(1)(c). At the fairness

5    hearing, the burden is on the  proponents of the settlement to disclose what consideration is being

6    given or paid for the dismissal of the class claims, and they must further prove that: the settlement

7    is not collusive and is the result of arms' length negotiation; sufficient discovery has been conducted

8    by the lawyer representing the class to evaluate claims and defenses; the lawyer recommending the

9    settlement is competent, experienced and not subject to influence by the opposing party; and only

10   a small fraction of the class has objected. *See, e.g., In re General Motors Corp. Pick-Up Truck Fuel*

11   *Tank Prod. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995); *In re Gen. Motors Corp. Engine*

12   *Interchange Litig.*, 594 F.2d 1106, 1126 (7th Cir. 1979).

13         Ultimately, in deciding whether the settlement is fair and reasonable, the court will consider

14   such factors as (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely

15   duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4)

16   the amount offered in settlement; (5) the extent of discovery completed and the stage of the

17   proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant;

18   and (8) the reaction of the class members to the proposed settlement. *Churchill Village, LLC v.*

19   *General Electric*, 361 F.3d 566, 575 (9th Cir. 2004); *see also Rodriguez v. West Publishing Group*,

20   563 F.3d 948, 963 (9th Cir. 2009).

21         "The relative degree of importance to be attached to any particular factor will depend upon

22   and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique

23   facts and circumstances presented by each individual case." *Officers for Justice v. Civil Serv.*

24   *Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). "It is the settlement taken as a whole, rather than the

25   individual component parts, that must be examined for overall fairness, and the settlement must

26   stand or fall in its entirety." *Staton*, 327 F.3d at 960 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d

27   1011, 1026 (9th Cir. 1998)).

28

1    Finally, in addition to these factors, as noted above, where "a settlement agreement is

2    negotiated prior to formal class certification," the court must also satisfy itself that "the settlement

3    is not the product of collusion among the negotiating parties." *In re Bluetooth Headset Prods. Liab.*

4    *Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011) (internal citations, emphasis, and quotations omitted).

5    Accordingly, the court must look for explicit collusion and "more subtle signs that class counsel

6    have allowed pursuit of their own self-interests and that of certain class members to infect the

7    negotiations." *Id.* at 947. Such signs include (1) "when counsel receive a disproportionate

8    distribution of the settlement," (2) "when the parties negotiate a 'clear sailing' arrangement

9    providing for the payment of attorneys' fees separate and apart from class funds," and (3) "when the

10   parties arrange for fees not awarded to revert to defendants rather than be added to the class fund."

11   *Id.* (internal citations and quotation marks omitted).

12   **III.    LEGAL ARGUMENT**

13   Objectors, like McDonald, serve as counterweights to a process that heavily favors settlement

14   approval and its participants – none of whom have any interest in an adversarial debate after the

15   proposed settlement was reached. It is, therefore, crucial that objectors – who monitor class

16   counsel's conduct – have a full and fair opportunity to participate in the settlement process. *See, e.g.*,

17   Deborah R. Hensler, et al., *Class Action Dilemmas – Pursuing Public Goals for Private Gain,*

18   491-96 (Rand 2000). What is more, McDonald has a fundamental right to object. *See Devlin v.*

19   *Scardelletti*, 536 U.S. 1, 8-9 (2002) ("Rule 23(e) entitles *all* class members to an opportunity to

20   object") (emphasis added).

21   **A.    Class Counsel Seek an Exorbitant Amount of Attorneys' Fees.**

22   In the context of class action settlements, the district court has a duty to safeguard the

23   interests of the class members. The Ninth Circuit has referred to this as a "fiduciary duty," subject

24   to the "high duty of care that the law requires of fiduciaries." *Allen v. Bedolla*, 787 F.3d 1218, 1223

25   (9th Cir. 2015) (citing *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 280 (7th Cir. 2002)). To

26   "avoid abdicating its responsibility to review the agreement for the protection of the class, a district

27   court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement

28   agreement." *Staton*, 327 F.3d at 963.

-6-

1      Here, Class Counsel seek $15 Million, plus litigation expenses of $508,292.67 (and

2   additional yet to be incurred expenses), and another $72,000 for incentive awards to eighteen (18)

3   representative named Plaintiffs.[5] As part of the proposed settlement, Defendants agreed to pay Class

4   Counsel's reasonable attorneys' fees and costs "based on their work in prosecuting the Lawsuits and

5   obtaining the benefits in this Agreement, including work for and benefits obtained on behalf of

6   NewGen and Raptor Dishwasher Owners as well as Class Dishwasher owners, and based on both

7   the Class and non-Class benefits created by this Settlement." [Settlement Agreement, at pp. 46-47].

8   Defendants also reserved all their rights to object to the amount of the attorneys' fees and litigation

9   expenses requested by Class Counsel [*Id.*], but they have not yet disclosed whether they will do so.[6]

10      ***Class Counsel over-value the gross settlement.*** Class Counsel say the estimated gross value

11   of the settlement is between $55,675,260 and $116,725,260. However, the full pay-out under the

12   settlement will not be known until 2021. [Doc. 218-1, at Page ID#: 5365]. Meanwhile, Class

---

20   [5]Class Counsel's fee request evokes the observation of the California Court of Appeals

21   nearly forty (40) years ago:

22      [t]hat the use of the device of a class action is subject to abuse in a
       number of ways is a well known fact. . . .[I]t is the responsibility of

23      the court to guard the integrity of the class action device as well as its
       own integrity. . . . The present arrangement leaves the unfortunate

24      impression that defendants are buying themselves out of a lawsuit by

25      direct compensation of plaintiffs' counsel."

26   *Anthony v. Superior Court*, 59 Cal. App.3d 760, 130 Cal. Rptr. 758, 766 (Cal. App. 1976).

27      [6]Like Class members, Defendants have until June 10, 2016 to object to the fees. [Doc.

28   211].

-7-

1  Counsel's claimed lodestar[7] is $8,948,487.98, resulting in a multiplier of 1.68.[8] According to Class
2  Counsel, their requested 1.68 multiplier would represent a 13% fee based on the high-end estimated
3  gross value, and a 27% fee based on the low-end estimated gross value.

4        The fee request is substantially based on projected values that will never come to fruition.
5  Here is what is presently known:

6              Notice costs:                                    $ 1,648,340
7              Pre-qualified claims:                            $    418,628
8              Non-pre-qualified reimbursement claims           $ 4,600,000
9              Rebate claims                                    $ 7,500,000
10             Total:                                           $14,166,968

11       Added to this amount as a Class benefit is Class Counsel's attorneys' fees and expenses –
12  $15,508,292 – the only remaining amount in Class Counsel's tally that is a remotely "known" value,[9]
13  as every other dollar they denote necessarily depends upon a future event. So, at this point, Class
14  Counsel's fee alone surpasses the current Class benefits by $1,341,423.

15       To these, Class Counsel tack on another $26,000,000 to cover "future overheating events"
16  for up to 24 million dishwashers through at least February 2018, and for many through as late as
17  2021. While these owners may, at their option, receive $100 cash for such events, in order to obtain
18  the full value out of their coverage (30% off the price of any new Whirlpool or KitchenAid
19  dishwasher), they are required to purchase a new Whirlpool dishwasher (MSRP $629) or a new
20  Kitchen Aid dishwasher (MSRP $1234), making the value of the rebate from $189 to $370. [Doc.
21  218-1, at Page ID#: 5359].

22

23

24       [7]The lodestar equals "the number of hours reasonably expended on the litigation
25  multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct.
    1933, 76 L. Ed. 2d 40 (1983).

26       [8]However, Class Counsel provide little, if any, detail in their billing records to explain the
27  tasks performed.

28       [9]Of course, even that amount is actually unknown until the Court makes its award.

1    All of this – putting a dollar amount on rebate claims and repair claims that may or may not

2    be made, and future purchases that may or may not occur by as many as 24 million owners over a

3    5-year period – is pure speculation and conjecture, especially when premised upon dishwasher

4    owners paying anywhere from $629 to $1234 out of pocket to even use the rebate.  But Class

5    Counsel push the value of the proposed settlement even more – to $116,725,260 – by adding another

6    $1,550,000 in future non-pre-qualified reimbursement claims, another $25,500,000 in additional

7    rebate claims, another $24,000,000 in future overheating coverage, and the wildly arbitrary

8    $10,000,000 in revisions for safety warnings or training.  [Doc. 218-1, at Page ID#: 5364-65].

9    Significantly, under 28 U.S.C. § 1712, a court must "consider, among other things, the real

10   monetary value and likely utilization rate of the coupons provided by the settlement" to determine

11   the fairness of a coupon settlement.  S. Rep. No. 109-14, at 31.  Here, Class Counsel ask the Court

12   to award them fees based upon a theoretical monetary value and utilization rate.  Again, this

13   valuation is simply too speculative, especially on which to base an award of $15 Million.

14   ***The rebates equate to a coupon settlement, requiring application of 28 U.S.C. § 1712 to***

15   ***the fee award.***  The Class Action Fairness Act ("CAFA") included a consumer class action bill of

16   rights in which Congress remarked:

17   "Class members often receive little or no benefit from class actions,
     and are sometimes harmed, such as where – (A) counsel are awarded
18   large fees, while leaving class members with coupons or other awards
     of little or no value . . . ."
19

20   *Class Action Fairness Act of 2005*, Pub. L. No. 109-2, § 2(a)(3), 119 Stat. 4 (2005).  Under 28 U.S.C.

21   § 1712, a court must "consider, among other things, the real monetary value and likely utilization

22   rate of the coupons provided by the settlement" to determine the fairness of a coupon settlement.

23   S. Rep. No. 109-14, at 31.  Given that CAFA imposes more onerous restrictions on settlements that

24   award coupons, it is not surprising that Class Counsel have failed to provide any analysis as to

25   whether the rebates are coupons.

26   Here, as McDonald demonstrates, the rebates are merely coupons, and thus, § 1712(a)

27   dictates the fee award in this case.  Because the parties structured the settlement to avoid the §

28   1712(a) protections for the Class to the unfair benefit of Class Counsel, it would be reversible error

-9-

1    to fail to apply § 1712(a) and approve the settlement.  What is more, the value of rebates is vastly

2    overstated, prompting serious questions about the propriety of awarding a fee to Class Counsel for

3    unredeemed rebates and rebates which might not, if at all, be redeemed for another five years.

4          28 U.S.C. § 1712 contains three subsections that control the assessment of class counsel's

5    request for attorneys' fees, two are pertinent here:

6               (a) Contingent fees in coupon settlements.  If a proposed settlement
                in a class action provides for a recovery of coupons to a class
7               member, the portion of any attorney's fee award to class counsel that
                is attributable to the award of the coupons shall be based on the value
8               to class members of the coupons that are redeemed.

9               (b) Other attorney's fee awards in coupon settlements.

10              (1) In general.  If a proposed settlement in a class action provides for
                a recovery of coupons to class members, and a portion of the recovery
11              of the coupons is not used to determine the attorney's fee to be paid
                to class counsel, any attorney's fee award shall be based upon the
12              amount of time class counsel reasonably expended working on the
                action.

13

                (2) Court approval. Any attorney's fee under this subsection shall be
14              subject to approval by the court and shall include an appropriate
                attorney's fee, if any, for obtaining equitable relief, including an
15              injunction, if applicable.   Nothing in this subsection shall be
                construed to prohibit application of a lodestar with a multiplier
16              method of determining attorney's fees.

17   28 U.S.C. § 1712.

18         Here, subsection (a) governs, and requires the Court to use "the value to class members of

19   the coupons that are redeemed."  28 U.S.C. § 1712(a).  For reasons explained below, the Court

20   cannot award Class Counsel fees relying upon the theoretical value of rebates.

21         ***The negotiated fee deal has earmarks of collusion.***  While Defendants' agreement to pay

22   Class Counsel's fee, subject to objection, is not a classic "clear-sailing" agreement, their agreement

23   to separately pay Class Counsel what they must have realized would be an eight-figure fee over and

24   above the benefits to be paid to the Class (and non-Class owners) is itself an element of collusion,

25   increasing the likelihood that Class Counsel "will have bargained away something of value to the

26   class." *Bluetooth*, 654 F.3d at 948.  Why, after all, would Defendants agree to pay Class Counsel's

27   fee without a reduction in the part of the settlement that goes to Class members?  And although the

28   settlement agreement provides that the allowance or disallowance of attorneys' fees is not part of the

1  settlement and are to be considered by the Court separately from the Court's consideration of the
2  fairness, reasonableness, and adequacy of the settlement, the parties cannot agree to override Ninth
3  Circuit precedent, which requires the Court to scrutinize the fee arrangement for evidence that the
4  settlement itself was the product of collusion. *See Bluetooth*, 654 F.3d at 947; *Allen*, 787 F.3d at
5  1224.

6       In *Bluetooth*, which involved a classic clear-sailing provision, the Ninth Circuit found that
7  "[g]iven the questionable features of the fee provision," the district court's approval order was
8  required to provide a "clear explanation of why the disproportionate fee is justified and does not
9  betray the class's interests." 654 F.3d at 949. Because the district court did not do so, the approval
10 order was vacated.

11      Similarly, as in *Bluetooth*, based upon the record, the Court here cannot explain why the
12 disproportionate attorneys' fees are justified and do not betray the Class's interests, nor can it meet
13 its special obligation to assure itself that the fees awarded in the agreement are not unreasonably
14 high. Simply put, a proposed settlement where $17,328,632[10] goes to those directly participating in
15 the litigation (*i.e.*, Class Counsel, the settlement administrator, and the Class representatives) while
16 only $14,166,968 is currently slated for disbursement as Class benefits necessarily creates the
17 impression that the proposed settlement has been negotiated for the benefit of Class Counsel, the
18 settlement administrator, and the named Class representatives, all at the expense of absent Class
19 members. Put another way, the tail is clearly wagging the dog.

20      Another recent decision illustrates the dilemma: *Americana Art China Co, v. Foxfire Printing*
21 *& Packaging, Inc.*, 743 F.3d 243 (7th Cir. 2014) involved a proposed fee based on a recovery that
22 was theoretically available, but not actually paid. There, the terms of the settlement agreement made
23 $6.1 million available to claimants. *Id.* at 245. Of that total, "over $2 million" was earmarked for
24 attorneys' fees and incentive awards. *Id.* The remaining $4 million was available for the payment
25 of claims, but anything left over would revert to the defendants. *Id.* Based on claims actually

26
27      [10]This number is reached by adding: Class Counsel attorneys' fees ($15,000,000);
   reimbursement of expenses ($508,292.67); service awards to the named Plaintiffs ($72,000); and
28 Chambers' websites ($100,000).

-11-

1    submitted, not $4 million, but only $397,426.66 was to be awarded to class members. *Id.* Thus, the

2    attorneys sought a $2 million award for securing a class recovery of just under $400,000. The

3    district court reduced the attorneys' fees to $1,147,698. *Id.* While the district court had not relied

4    on the discrepancy between the attorneys' fee and the actual recovery, the Court of Appeals pointed

5    out that it would not have been an error to do so. *Id.* at 247. *See also Lagarde v. Support.com, Inc.*,

6    No. C12-0609, 2013 U.S. Dist. LEXIS 42725, 2013 WL 1283325, at *8, *12 (N.D. Cal. Mar. 26,

7    2013) (finding that the proposed attorneys fee should be evaluated in comparison to "the actual

8    payout" from the full settlement fund, rather than the value that defendants made available in

9    settlement); *Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34 (D. Me. 2005) (rejecting two different

10   settlements where the attorneys' fees were calculated based on the total amount made available to

11   the class but, based on claims submitted, the actual payout to the class would be comparatively low).

12          ***Class Counsel's fee request is excessive and would vastly over-compensate them, based on***

13   ***empirical data.*** Class Counsel maintain that their requested $15 Million fee would be 27% of the

14   low-end gross settlement fund and 13% of the high-end gross settlement fund. However, empirical

15   studies reveal that fees for settlements in the range of the one at bar (assuming an award of a

16   percentage of the low-end gross settlement) range from 20.5% to 21.9%, or between $11,413,428

17   and $12,192,882, on the low-end, and  19.4% to 19.9%, or between $22,644,700 and $23,228,327

18   on the high-end. *See* Theodore Eisenberg & Geoffrey P. Miller, "*Attorney Fees and Expenses in*

19   *Class Action Settlements: 1993-2008*," 7 J. Empirical Legal Stud. 248, 265 (2010); Brian T.

20   Fitzpatrick, "*An Empirical Study of Class Action Settlements and Their Fee Awards*," 7 J. Empirical

21   Legal Stud. 811, 839 (2010) (finding that for settlements ranging from $30 million to $72.5 million,

22   the median attorneys' fee was 22.3% and the mean was 24.9%, translating into a fee of between

23   $12,415,583 and $13,863,140).

24          The primary problem with Class Counsel's fee request from this perspective is that

25   consideration of their fee based upon a valuation of future claims, future rebates, future repairs, and

26   future decisions by Class and non-Class members to purchase new dishwashers is a seriously flawed

27   method to award fees in this case, and a method that also directly contravenes 28 U.S.C. § 1712.

28   However, as an examination of the empirical studies demonstrates, a $15 Million fee, 27% of the

                                                   -12-

1    low-end gross settlement in this case, would allow for a fee well in excess of the average fee in

2    settlements of this size, *i.e.*, in the $11.4-$12.2 Million dollar range.

3           Accordingly, the studies illustrate that Class Counsel will be vastly over-compensated.

4           ***Class Counsel failed to adequately represent Class members.*** Class Counsel had numerous

5    opportunities throughout the settlement proceedings to protect the interests of Class members. Those

6    opportunities were squandered. Instead, Class Counsel took every precaution to protect their own

7    interests. Here, the propriety of awarding Class Counsel such a fee should have been considered in

8    view of the *actual* benefit they obtained for Class members. In the end, the proposed settlement

9    benefits Class Counsel vastly more than it does consumers who comprise the Class.

10   **B.      The Proposed Settlement Is, In Large Part, Little More than a Run-of-the-Mill Over-Valued Coupon Settlement.**

11
12          For many Class members, the proposed settlement is little more than a run-of-the-mill

13   coupon settlement, requiring them not only to do business with the Defendants who sold them an

14   allegedly defective and unsafe product to begin with, but to purchase dishwashers that retail, on

15   average, for over $600 (Whirlpool) and over $1200 (Kitchen-Aid). The proposed settlement

16   provides the relief to Class members, including the subclasses, summarized as follows:

17                ■ Full reimbursement of repair costs (with a minimum $200 cash
                    payment with inadequate documentary proof of repair costs) for those
18                  who had an Overheating Event before the Notice Date and within 12
                    years of purchase;

19                ■ Cash payment of $200-$300 for Class members who replaced,
                    rather than repaired, their dishwasher before the Notice Date and
20                  within 12 years of purchase;

21                ■ Pre-qualified Class Members will be offered compensation without
                    any need to submit documentary proof;
22
23                ■ A choice of $100 payment or 30% off rebate for a new Kitchen
                    Aid- or Whirlpool-brand dishwasher for those who have an
24                  Overheating Event at any time within two years after the Notice Date;

25                ■ All Class members will be entitled to a 10% rebate off a new
                    Whirlpool-brand dishwasher, or 15% off a new Kitchen Aid
26                  dishwasher; and

27                ■ An enhanced 15% rebate off a new Whirlpool-brand dishwasher,
                    or 20% off a new KitchenAid dishwasher for Class members who had
28                  a Thermal Cut Off ("TCO") repair.

-13-

1    [Doc. 199, Preliminary Approval Order, at Page ID#: 4383].[11]

2    Whether the rebates are more akin to coupons than cash is an important distinction with

3    wide-ranging ramifications for every Class member. 28 U.S.C. § 1712 of CAFA requires that

4    attorneys' fees in a coupon settlement "attributable to the award of the coupons shall be based on the

5    value to class members of the coupons that are redeemed." Here, there appears to have been no

6    discussion about whether the rebates are actually coupons.

7        It is no secret that coupon settlements are widely criticized. *See Eubank v. Pella Corp.*, 753

8    F.3d 718, 725 (7th Cir. 2014) (identifying coupons as "a warning sign of a questionable settlement").

9    And courts reject settlements that offer class members coupon-like compensation. *See, e.g., Reed*

10   *v. Cont'l Guest Servs. Corp.*, 2011 U.S. Dist. LEXIS 36814, *3 (S.D. N.Y. Apr. 4, 2011) (discussing

11   problems with proposed settlement agreement that provided vouchers and discount codes).

12        Professor Christopher Leslie identified the "three major problems with coupon settlements":

13   first, "it is doubtful that coupon settlements provide meaningful compensation to most class

14   members"; second, "coupon settlements often fail to disgorge ill-gotten gains from the defendant";

15   and third, "coupon settlements . . . raise concerns because they may require the class members to do

16   future business with the defendant in order to receive compensation." Christopher Leslie, *The Need*

17   *to Study Coupon Settlements in Class Action Litigation*, 18 Geo. J. Legal Ethics 1395, 1396-97

18   (2005).[12]

19        In deciding what is, and what is not, a "coupon," the Court must first look to the statute's

20   text. *See, e.g., In re BankVest Capital Corp.*, 360 F.3d 291, 296 (1st Cir. 2004) (internal citation

21   omitted). CAFA repeatedly references "coupons" in section 1712, but that section does not explain

22   what the term means, and neither does CAFA's "Definitions" section. *See* 28 U.S.C. § 1711

23

24       [11]The settlement also contemplates the provision of benefits to dishwasher owners who

25   are not part of the Class. [*Id.*].

26       [12]Similarly, the Senate Committee on the Judiciary, in its report on *The Class Action*

27   *Fairness Act of 2005*, explained that one of the problems that *CAFA* was designed to address was
"[a]busive class action settlements in which plaintiffs receive promotional coupons or other

28   nominal damages while class counsel receive large fees . . . ." S. Rep. No. 109-14, at 33 (2005),
as reprinted in 2005 U.S.C.C.A.N. 3, 33.

1   (defining several terms but not "coupon" or "coupon settlement"); *In re Online DVD-Rental*
2   *Antitrust Litig.*, 779 F.3d 934, 950 (9th Cir. 2015) ("Congress does not define the ambiguous term
3   'coupon' within [CAFA]") (internal citation omitted).  When, as here, a key term is not defined in
4   the statute, "[courts] look first to the word's ordinary meaning." *Schindler Elevator Corp. v. United*
5   *States ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011).

6          The Ninth Circuit has published an opinion in which it determined whether or not a given
7   settlement contains "coupons." The Court held that $12 gift cards to Wal-Mart are not "coupon[s,],"
8   at least where they are freely transferable, do not "require consumers to spend their own money[,]"
9   and provide class members with "the ability to purchase one of many different types of products."
10  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 951-52.  Obviously, the rebates here would
11  require Class members to spend their own cash, lots of it, and only on dishwashers.

12         Recently, the District of Massachusetts addressed the issue.  *See Tyler v. Michaels Stores,*
13  *Inc.*, 2015 U.S. Dist. LEXIS 165087 (D. Mass. Dec. 9, 2015).  The Court concluded that if an award
14  must be redeemed, it is, necessarily, a coupon.  *Id.* (citing Sarah S. Vance, *A Primer on the Class*
15  *Action Fairness Act of 2005*, 80 Tul. L. Rev. 1617, 1632 (2006) ("CAFA does not define 'coupon,'
16  but it apparently envisions the award of something subject to redemption.").  In contrast, the
17  Wal-Mart gift cards in *In re Online DVD*, "[gave] class members $12 to spend on any item carried
18  on the website of a giant, low cost retailer. *In re Online DVD*, at 951.  Unlike gift cards, the rebates
19  here cannot be used to purchase a pair of jeans, a jacket, or a T-shirt – or even any product in
20  Whirlpool's product inventory.  Rather, Class members are required to redeem the rebates to
21  purchase a new dishwasher, a discount to be applied to a larger purchase.  The rebates have the
22  flavor and scent of coupons and are much more akin to coupons than to cash.

23
24
25
26
27
28

-15-

1

2

3       **C.      The Proposed Settlement Unfairly Extends to Consumers Who Are Not Class Members and Does Not Require Them to Release Claims.**

Approximately 75% of the dishwashers impacted by the proposed settlement are non-Class

4   dishwashers.  Yet, Class Counsel seek millions of dollars in fees for the value of the relief afforded

5   to non-Class owners.  That relief necessarily dilutes the benefits to Class members.  Moreover, the

6   proposed settlement provides benefits to non-Class members (non-Class dishwashers) who, unlike

7   Class members, are not required to release their claims against the Defendants.  [Settlement

8   Agreement, at pp. 49-52].

9       **D.      Intra-Class Conflicts: Named Plaintiff Steve Chambers is Not a Typical or Adequate Class Member, But One With Interests Antagonistic to the Interests of Other Class Members.**

10

Under the terms of the proposed settlement, named Plaintiff and Class representative Steve

11  Chambers will receive $100,000 from Whirlpool, purportedly representing the purchase price of two

12  web-sites developed and maintained by Mr. Chambers.  The sum is based on Whirlpool's and

13  Chambers' respective valuations of the website. [Settlement Agreement, at p. 35].  Thus, under the

14  proposed settlement, Chambers will profit substantially more than any other named Plaintiff or Class

15  member.

16      To be sure, the representative Plaintiffs and Class Counsel cannot represent conflicting

17  interests.  Nor can they hold interests that are antagonistic to other Class members.  Here, Chambers

18  is an atypical Class member whose interests conflict with, and are antagonistic to, other Class

19  members.  Similarly, Class Counsel's negotiation of the $100,000 payment for Chambers put them

20  in conflict with the interests of other Class members.

21      When examining settlement classes, courts emphasize "the special need to assure that class

22  counsel: (1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at

23  arm's length from the defendant."  *In re NFL Players Concussion Injury Litig.*, 2016 U.S. App.

24  LEXIS 6908, at *28 (3d Cir. Apr. 18, 2016).  "The adequacy inquiry under Rule 23(a)(4) serves to

25  uncover conflicts of interest between named parties and the class they seek to represent." *Id.* at *34.

26

27

28

-16-

1   The "linchpin of the adequacy requirement is the alignment of interests and incentives between the

2   representative plaintiffs and the rest of the class." *Dewey v. Volkswagen Aktiengesellschaft*, 681

3   F.3d 170, 183 (3d Cir. 2012).

4        As the Third Circuit astutely observed, "One sign that a settlement may not be fair is that

5   some segments of the class are treated differently from others." *In re General Motors Corp. Pick-Up*

6   *Truck Fuel Tank Prods. Liability Litig.*, 55 F. 3d 768, 808 (3d Cir. 1995); *Ortiz v. Fibreboard Corp.*,

7   527 U.S. 815 (1999) (Court rejected a settlement class that failed to distinguish between more

8   valuable and less valuable claims); *In re Southeastern Milk Antitrust Litigation*, 2012 U.S. Dist.

9   LEXIS 76817 (E.D. Tenn. June 1, 2012) (subclass was decertified until it had separate legal

10  representation due to conflict with another subclass that made joint representation inappropriate).

11  Here, make no mistake, Chambers undeniably has conflicting interests that are also antagonistic to

12  other Class members.  Accordingly, Chambers is not a typical or adequate Class representative.

13       Moreover, Class Counsel negotiated and agreed to a settlement that gave preferential

14  treatment to a single Class member, Chambers, placing his interests above every other named

15  Plaintiff and Class member.

16       **E.    $72,000 In Incentive Awards Is Excessive**

17       Plaintiffs seek $4,000 in incentive awards for each of the eighteen (18) named Plaintiffs,

18  totaling $72,000.   There is nothing in the record to support the necessity of having eighteen (18)

19  named Plaintiffs in this case.  Whether to approve such an award and, if so, the appropriate amount

20  thereof is reserved to the discretion of the Court. *See In re U.S. Bancorp Litig.*, 291 F.3d 1035, 1038

21  (8th Cir. 2002). Factors bearing on the decision include the actions taken by the named plaintiff to

22  protect the class's interests, the degree to which the class has benefitted from those actions, and the

23  amount of time and effort the named plaintiff expended on the litigation. *Id.* A key additional

24  consideration is whether an incentive award was necessary "to induce an individual to participate

25  in the suit." *Fouks v. Red Wing Hotel Corp.*, No. 12-2160, 2013 U.S. Dist. LEXIS 165588, at *2 (D.

26  Minn. Nov. 21, 2013) (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)).

27

28

-17-

1    Despite the fact that there is no evidence before the Court that any of the 18 named Plaintiffs

2    were unwilling participants in this case or that they needed to be incentivized to file suit, *Fouks*, at

3    *2, McDonald does not take much issue with the amount of the individual awards. Rather, the

4    number of named Plaintiffs makes the gross award excessive. There is no reasonable explanation

5    why Class Counsel named 18 different Plaintiffs. Under the circumstances, the Court should compel

6    Class Counsel to pay the incentive awards out of their fees.

7    **F.    Class Members Were Misled About Settlement Approval Deadlines.**

8    Generally, there is certainly nothing wrong with a court resetting a fairness hearing,

9    modifying motion or briefing deadlines, claims deadlines, exclusion deadlines, or even deadlines by

10   which Class members must object. However, this assumes that Class members will be notified of

11   such changes, especially changes in the settlement process that affect their personal due process

12   rights and claims.

13   Here, the Court, on the motion of the parties [Doc. 206], changed the fairness hearing date

14   from June 30, 2016 to August 25, 2016 [Doc. 207]; changed briefing deadlines for Class Counsel's

15   motion for attorneys' fees [Doc. 211]; changed the claims deadline from May 2, 2016 to June 27,

16   2016 [Doc. 207]; and moved the deadline to object to the settlement from May 2, 2016 to May 27,

17   2016 [Doc. 207] and the deadline to object to Class Counsel's motion fir attorneys' fees from May

18   2, 2016 to June 10, 2016 [Doc. 211].

19   However, although the fairness hearing, claims deadline, and objection deadlines were all

20   reset by the Court in February 2016, McDonald recently (May 2016) received a notice from the

21   Administrator that advised him of all of the original dates and deadlines. That is, it was represented

22   to McDonald that his claim was due on May 2, 2016 (which had already passed by the time

23   McDonald received his notice), and not June 27, 2016, the new deadline. It was also represented to

24   McDonald that his objection to the settlement and attorneys' fees was also due on May 2, 2016, even

25   though the Court had already extended those dates to May 27, 2016 (objections to the settlement)

26   and June 10, 2016 (objections to attorneys' fees).

27

28

1    Relevant settlement deadlines were changed in February 2016 [Doc. 207] and again in April

2    2016 [Doc. 211], even Class members who recently received communication regarding the claims

3    and settlement approval process were misled to believe the claims deadline was June 2, 2016, the

4    objection deadline was May 2, 2016, and the fairness hearing was June 30, 2016.  [*See* Exhibit 2].

5    **IV.    CONCLUSION**

6    McDonald requests that this Court:

7    1.    Reject the proposed settlement; and

8    2.    Award such other and further relief as is just and necessary in this matter.

9

10   **NOTICE OF APPEARANCE AND REQUEST**
     **TO BE HEARD AT FAIRNESS HEARING**

11

12   **NOTICE** is hereby given that the undersigned counsel is appearing on behalf of McDonald

     in the above-styled action.  Counsel for McDonald requests that he be allowed to participate via

13   telephone at the Fairness Hearing currently scheduled for 10:00 a.m. on August 25, 2016.

14

15   Respectfully submitted, this 27th day of May, 2016.

16

17

18   Christopher T. Cain
     SCOTT & CAIN
19   Suite 601
     550 Main Street
20   Knoxville, TN  37902
     Tel: (865) 525-2150
21

22   *Counsel for Objector,*
     *W. Allen McDonald*

23

24

25

26

27

28

-19-

**CERTIFICATE OF SERVICE**

I, Christopher T. Cain, declare under penalty of perjury that on May 27, 2016, I mailed the original of the foregoing Objection, postage pre-paid, via First Class U.S. Mail, to the following:

Clerk of the Court
United States District Court
for the Central District of California
312 North Springs Street
Los Angeles, CA 90012-47601

I also certify that I mailed a copy of the foregoing Objection, via First Class U.S. Mail, postage prepaid, to the following:

Jeffrey M. Cohon
Howard Pollak
COHON & POLLAK, LLP
10250 Constellation Boulevard, Suite 2320
Los Angeles, California 90067

Steven A. Schwartz
Timothy N. Mathews
CHIMICLES & TIKELLIS LLP
361 West Lancaster Avenue
Haverford, Pennsylvania 19041

Charles S. Fax
Liesel J. Schopler
RIFKIN WEINER LIVINGSTON, LLC
7979 Old Georgetown Road, Suite 400
Bethesda, Maryland 20814

Nicole Sugnet
LEIFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339

David H. Weinstein
Robert Kitchenoff
WEINSTEIN KITCHENOFF & ASHER LLC
100 South Broad St., Suite 705
Philadelphia, Pennsylvania 19110-1061

Michael T. Williams
Galen Bellamy
WHEELER TRIGG O'DONNELL LLP
370 17th Street, Suite 4500
Denver, Colorado 80202

-20-

1

Dean J. Zipser
Carole E. Reagan

2

UMBERG ZIPSER LLP
1920 Main Street, Suite 200

3

Irvine, California 92614

4

This 27th day of May, 2016.

5

6

Christopher T. Cain

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-21-

## DECLARATION

Under penalty of perjury, I do hereby state that I am a resident of the State of Tennessee and a citizen of the United States and that in or about 2004, I purchased a Whirlpool-brand dishwasher that was manufactured during the Class Period (between October 2000 and January 2006), Model No. DU1148XTPQ6, Serial No. FS4302224.

DATED:      May 26, 2016.

Wallace Allen McDonald
5905 Windtrace Lane
Knoxville, TN 37914
Tel: 865-246-0800