Jeffrey M. Cohon (CSBN 131431)
Howard Pollak (CSBN 147077 )
COHON & POLLAK, LLP
10250 Constellation Boulevard, Suite 2320
Los Angeles, California 90067
Telephone: (310) 231-4470
Facsimile: (310) 231-4610
jcohon@cohonpollak.corn
tnm@chimicles.com

Steven A. Schwartz (pro hac vice)
Timothy N. Mathews (pro hac vice)
CHIMICLES & TIKELLIS LLP
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500
Telecopier: (610) 649-3633
sas@chimicles.corn
tnm@chimicles.com

Charles S. Fax (pro hac vice)
Liesel J. Schopler (pro hac vice)
RIFKIN, WEINER, LIVINGSTON,
LEVITAN & SILVER LLC
7979 Old Georgetown Road, Suite 400
Bethesda, Maryland 20814
Telephone: (301) 951-0150
Telecopier: (301) 951-6535
cfax@rwlls.com
lschopler@rwlls.com

Nicole D. Sugnet (State Bar No. 246255)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008
nsugnet@lchb.com

David H. Weinstein (CSBN 43167)
Robert Kitchenoff (pro hac vice)
WEINSTEIN KITCHENOFF &
ASHER LLC
100 South Broad St., Suite 705
Philadelphia, Pennsylvania 19110-1061
Telephone: (215) 545-7200
Telecopier: (215) 545-6535
weinstein@wka-law.com
kitchenoff@wka-law.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE CHAMBERS, *et al*., in their individual capacities and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>v.<br><br>WHIRLPOOL CORPORATION, *et al*.,<br><br>                Defendants. | Case No. 8:11-cv-01733-FMO-AN<br><br>**DECLARATION OF JEFFREY M. COHON IN SUPPORT OF PLAINTIFFS' MOTION TO DISQUALIFY JOSEPH DARRELL PALMER** |

I, Jeffrey M. Cohon, declare as follows:

1.     I am a partner at the office of Cohon & Pollak, LLP and am counsel of record in the above-entitled action. I am a member in good standing of the California Bar. I submit this declaration in support of Plaintiffs' Motion for Attorneys' Fees and Expenses and for Service Awards for Plaintiffs. I have personal knowledge of the facts set forth herein, and if called to testify thereto, I could and would do so competently.

2.     Attached as **Exhibit A** is a true and correct copy of the July 11, 2014 Decision filed in *In the Matter of Joseph Darrell Palmer, Member No. 125147*, No. 12-O-16924 (State Bar Court July 11, 2014).

3.     Attached as **Exhibit B** is a true and correct copy of the January 6, 2016 Opinion filed in *In the Matter of Joseph Darrell Palmer, Member No. 125147*, No. 12-O-16924 (State Bar Court Jan. 6, 2016).

4.     Attached as **Exhibit C** is a true and correct copy of the Transcript of Motion Hearing, *Arthur v. Sallie Mae, Inc.*, No. 10-198 (W.D. Wash. Sept. 14, 2012).

5.     Attached as **Exhibit D** is a true and correct copy of the Declaration of

1  Bethany Caracuzzo, *In re GIB LLC Cases,* J.C.C.P. No. 4657 (Super. Ct. Cal. Oct.
2  22, 2013).

3      6.      Attached as **Exhibit E** is a true and correct copy of a transcript of a
4  panel discussion entitled *Malee in Manhattan: Class Action Objectors* from the
5  ABA Section of Litigation's 15th Annual National Institute on Class Actions (Oct.
6  14, 2011).

7

8      I declare under penalty of perjury of the laws of California and the United
9  States that the foregoing is true and correct, and that this declaration was executed
10 in Los Angeles on June 22, 2016.

11

12                          */s/ Jeffrey M. Cohon*
                            Jeffrey M. Cohon

13                       **ATTESTATION**

14

15     I, Charles S. Fax, am the ECF user whose identification and password are
16 being used to file this Declaration in Support of Plaintiffs' Motion to Disqualify.  I
17 hereby attest that Jeffrey M. Cohon has concurred in this filing.

18

19              By:   */s/ Charles S. Fax*
                            Charles S. Fax

20

21

22

23

24

25

26

27

28

COHON DECL. ISO MOTION TO DISQUALIFY
DARRELL PALMER
8:11-CV-01733-FMO-AN

# EXHIBIT A

**FILED JULY 11, 2014**

### STATE BAR COURT OF CALIFORNIA

### HEARING DEPARTMENT – LOS ANGELES

| | |
|---|---|
| In the Matter of | Case No.: **12-O-16924-LMA** |
| **JOSEPH DARRELL PALMER,** | **DECISION** |
| **Member No.  125147,** | |
| A Member of the State Bar. | |

## Introduction[1]

In this contested disciplinary proceeding, respondent **JOSEPH DARRELL PALMER** is

charged with three counts of willfully violating section 6106's proscription of acts involving

moral turpitude, dishonesty, or corruption.  Each count is based on the false statement, that

respondent made on or with respect to three applications to appear pro hac vice that he filed in

various federal-court, class-action lawsuits, to the effect that he had never been disciplined by a

court or state bar.

Respondent admits that he made these three statements and that they are false, but asserts

that he did not deliberately make the statements and that he made them inadvertently as a result

of negligence.  Even though the record fails to establish, by clear and convincing evidence, that

respondent deliberately made the false statements or that he made them with the intent to

mislead, the record does clearly establish that the false statements were not the results of

---

[1] Unless otherwise indicated, all references to rules are to the State Bar Rules of
Professional Conduct.  Furthermore, all statutory references are to the Business and Professions
Code unless otherwise indicated.

respondent's mere carelessness or negligence, but were the results of respondent's gross negligence.  As discussed *post*, the court finds that respondent is culpable as charged in each of the three counts because, even in the absence of an intent to mislead, a false statement made through or as a result of gross negligence involves moral turpitude in willful violation of section 6106.

In light of the found misconduct and the aggravating and mitigating circumstances, the court recommends that respondent be placed on two years' stayed suspension and two years' probation on conditions, including a 90-day actual suspension.

## Significant Procedural History

The Office of the Chief Trial Counsel of the State Bar of California (State Bar or California State Bar) initiated this proceeding by filing a notice of disciplinary charges (NDC) against respondent on December 6, 2013.  Respondent thereafter filed his response to the NDC on January 17, 2014.

On April 15, 2014, the parties filed a partial stipulation as to facts and admission of documents.  Also, on April 15, 2014, a one-day trial was held.  The court took the case under submission for decision after the parties made their closing arguments on April 15, 2014.

The State Bar was represented by Senior Trial Counsel Michael J. Glass.  Respondent was represented by Attorney Kenneth C. Kocourek.

## Findings of Fact and Conclusions of Law

Respondent was admitted to the practice of law in California on December 15, 1986, and has been a member of the State Bar of California since that time.  In addition, respondent has been admitted to practice in the State of Colorado since December 1993.  Respondent has also been admitted to practice in the State of Arizona since at least February 2003.

/ / /

- 2 -

/ / /

**Facts**

    **Respondent's Criminal Conviction**

       For about three or four years in the early to mid-1990's, respondent lived in Colorado

where he owned and operated both American Family Homes, Inc. (AFH), which built and sold

homes, and Tri-County Supply, LLC (Tri-County), which sold construction materials to home

builders, including AFH.  During that time, respondent rarely practiced law.

       In 2001, in a Colorado state court, respondent was charged with, pleaded guilty to, and

was convicted on one felony count of violating Colorado sales-tax laws (Colorado Revised

Statutes 39-21-118(2) and 39-26-120).  Respondent's conviction was based on Tri-County's

failure to report and pay over to the Colorado Department of Revenue about $4,000 in sales taxes

that it charged (and presumably collected from) AFH for construction supplies that it sold to

AFH in 1995 and 1996 (Colorado Revised Statutes 39-26-104, 105, and 106).

       Respondent did not deliberately violate the sales-tax laws or personally profit from Tri-

County's failure to report and pay the sales taxes to Colorado.  In fact, a significant cause of this

failure was a turnover in Tri-County's full-time accountants and accounting assistants.

       Following respondent's conviction, the Colorado state court sentenced respondent to two

years of unsupervised probation and ordered respondent to perform 200 hours of community

service in Colorado.  Respondent thereafter successfully completed his probation and community

service.

    **Respondent's Discipline in Three States**

        **Colorado**

       Based on respondent's criminal conviction and on a stipulation that respondent and the

Colorado Office of Attorney Regulation Counsel entered into in June 2002, the Colorado

Supreme Court entered an order on July 1, 2002, suspending respondent "from the practice of law [in Colorado] for a period of sixty days with all but thirty days stayed during a one-year period of probation [with conditions]." The Colorado Supreme Court imposed that discipline on respondent under Colorado Rules of Civil Procedure, rule 251.5(b), which provides that any act or omission that violates, inter alia, Colorado's criminal laws is grounds for disciplining an attorney regardless of whether the attorney is ever charged with or convicted or acquitted of the violation in a criminal proceeding and regardless of whether the attorney committed the act or omission in the course of an attorney-client relationship. In respondent's Colorado disciplinary proceeding, there were no findings of moral turpitude of dishonesty. Nor were any aggravating circumstances found. In mitigation, respondent did not have a prior disciplinary record, made full and free disclosure, had a cooperative attitude towards the proceeding, and was remorseful.

### California

Based on respondent's criminal conviction and a stipulation regarding facts, conclusions of law, and disposition that respondent and the California State Bar entered into in October 2002, the State Bar Court of California filed an order on November 4, 2002, in case number 02-C-11878 (California *Palmer* I) imposing on respondent a public reproval with conditions attached for 12 months that required respondent to complete his unsupervised criminal probation and community service; to keep the California State Bar apprised of his office address; to file quarterly reports; and to attend the California State Bar's Ethics School. In California *Palmer* I, the parties stipulated that neither respondent's criminal conviction nor the facts and circumstances surrounding his conviction involved moral turpitude, but that respondent's conviction involved other misconduct warranting discipline. In addition, the parties stipulated that there were no aggravating circumstances and that in mitigation respondent did not have a prior record of discipline, promptly reported his conviction and Colorado discipline to the

- 4 -

California State Bar, and cooperated extensively with the California State Bar.  Moreover, the parties stipulated that, even though respondent was convicted of a felony in Colorado, the crime of which respondent was convicted does not, as a matter of law, rise to a felony in California. Under California law, it is a felony to evade reporting, assessment, or payment of a tax only if the tax liability aggregates at least $25,000 in a consecutive 12-month period.   (Cal. Rev. & Tax. Code, § 7153.5.)  Respondent's conviction involved only about $4,000 in unpaid taxes over a 24-month period.

### Arizona

Based on the Colorado Supreme Court's July 1, 2002, disciplinary order, the Arizona Supreme Court filed an order February 13, 2003, suspending respondent "from the practice of law [in Arizona] for a period of sixty (60) days, thirty (30) days stayed, to run concurrent with Respondent's Colorado discipline…" and placing respondent "on probation for a period of one (1) year, under the same terms as and to run concurrent with Respondent's Colorado discipline."

### Respondent's False Statements

Notwithstanding the July 1, 2002, Colorado disciplinary order, the November 4, 2002, California disciplinary order, and the February 13, 2003, Arizona disciplinary order, respondent filed, on June 20, 2006, in a civil lawsuit styled *Ingolf R. Dinklage v. Holland America Line-Westours, Inc.* in the United States District Court for the Western District of Washington (*Dinklage*), an application for leave to appear pro hac vice in which respondent falsely declared under penalty of perjury:  "I have not been disbarred or formally censured by a court of record or by a state bar association…."[2]

---

[2] In the present proceeding, respondent is not charged with making this false statement in his June 20, 2006, application in *Dinklage*.  Nonetheless, the court admitted that false statement into evidence because it is relevant on the issues of respondent's intent to mislead, negligence, and gross negligence.  (Cal. Evid. Code, § 1101, subd. (b).)  Moreover, the court considers that

/ / /

In addition, respondent made the same or a similar false statement in or in support of each of the following applications to appear pro hac vice that respondent filed in three separate federal-court lawsuits between 2010 and 2012 as charged in the NDC.

On June 2, 2010, respondent filed, in a class action lawsuit styled *James Gemelas v. The Dannon Company, Inc.* in the United States District Court for the Northern District of Ohio (*Dannon*), an affidavit in support of a motion for admission of counsel pro hac vice in which respondent falsely stated under oath:  "I have never been the subject of disciplinary action of any kind before any bar or court."

On January 7, 2011, respondent filed, in a class-action lawsuit styled *Mark A. Arthur, et al. v. Sallie Mae, Inc.* in the United States District Court for the Western District of Washington (*Sallie Mae*) an application for leave to appear pro hac vice in which respondent falsely declared under penalty of perjury:  "I have not been disbarred or formally censured by a court of record or by a state bar association…."

On July 5, 2012, respondent filed, in a class-action lawsuit styled *Alyson Herfert, et al. v. Crayola, LLC* in the United States District Court for the Western District of Washington (*Crayola*), an application for leave to appear pro hac vice in which respondent falsely declared under penalty of perjury:  "I have not been disbarred or formally censured by a court of record or by a state bar association…."  On August 10, 2012, the district court in *Crayola* filed an order to show cause (OSC) directing respondent to show cause why he should not be sanctioned for submitting a pro hac vice application that contained a false statement.  Thereafter, on August 15, 2012, respondent filed an amended application for leave to appear pro hac vice in *Crayola* in

---

uncharged false statement only for the limited purpose of determining respondent's intent, negligence, and gross negligence with respect to the three charged false statements.

which he disclosed his prior discipline in Colorado, California, and Arizona.  Respondent did not, however, file such an amended application in *Sallie Mae* on August 15, 2012.  As noted

/ / /

*post*, respondent did not file an amended application in *Sallie Mae* until August 27, 2012. Moreover, respondent never filed an amended application in *Dannon*.

On August 20, 2012, the district court in *Crayola* denied respondent's pro hac vice application not because respondent had previously been disciplined in Colorado, California, and Arizona, but because respondent failed to disclose his prior discipline and falsely stated in his application that he had never been disciplined and because respondent failed to appear at a prior hearing.  Also, on August 20, 2012, the plaintiffs in *Sallie Mae* filed a motion to revoke the order granting respondent admission pro hac vice because of respondent's false statement in respondent's January 7, 2011, pro hac vice application.

On August 27, 2012, respondent finally filed an amended pro hac vice application in *Sallie Mae* disclosing his prior discipline in Colorado, California, and Arizona.  However, on September 14, 2012, the district court in *Sallie Mae* revoked respondent's admission pro hac vice in that case not because respondent had previously been disciplined, but because respondent falsely stated that he had never been disciplined in his original application and because respondent did not file an amended pro hac vice application in *Sallie Mae* until August 27, 2012, instead of promptly filing one after his application in *Crayola* was challenged in August 10, 2012, OSC in that case.

**Conclusions**

> ***Count One - § 6106 [Moral Turpitude]***
> ***Count Two - § 6106 [Moral Turpitude]***
> ***Count Three - § 6106 [Moral Turpitude]***

Section 6106 provides, in part, that the commission of any act involving dishonesty, moral turpitude, or corruption constitutes cause for suspension or disbarment.  Even though the term "moral turpitude" in section 6106 is defined very broadly (e.g., *Chadwick v. State Bar* (1989) 49 Cal.3d 103, 110), the Supreme Court has always required a certain level of improper intent or guilty knowledge before holding that an attorney's conduct involves moral turpitude. (e.g., *In the Matter of Temkin* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 321, 330; see also *Sternlieb v. State Bar* (1990) 52 Cal.3d 317, 332.)

Respondent credibly testified both that he did not make any of the three charged false statements deliberately or with any intent to mislead or deceive and that he made each of the false statements inadvertently.  Respondent disclosed his prior discipline in Colorado, California, and Arizona in his applications for admission to the bar of a number of other federal courts. Moreover, respondent did not and could not have reasonably believed that his pro hac vice applications would be denied because of his prior discipline in in Colorado, California, and Arizona because the underlying misconduct was not serious (e.g., did not involve moral turpitude or dishonesty) and was wholly unrelated to the practice of law.

The court, however, rejects respondent's claim that he made the three false statement as a result of mere negligence.  Without question, respondent was grossly negligent in signing and filing his affidavit in support of his pro hac vice applications in *Dannon* and in signing and filing his pro hac vice applications in *Sallie Mae* and *Crayola*, each of which contained a false statement to the effect that respondent had never been disciplined.  This conclusion of gross negligence is clearly supported by the fact that, years earlier, respondent filed a pro hac vice application that contained a virtually identical false statement in *Dinklage*.

Even in the absence of an intent to mislead, a false statement made through or as a result of gross negligence involves moral turpitude in willful violation of section 6106.  (*In the Matter*

- 8 -

*of Moriarty* (Review Dept. 1999) 4 Cal. State Bar Ct. Rptr. 9, 15, and cases there cited.)  A finding of gross negligence will support a charge of moral turpitude, even without an evil intent behind the act committed.  (*In the Matter of Myrdall* (Review Dept. 1995) 3 Cal. State Bar Ct. Rptr. 363, 384; *In the Matter of Dale* (Review Dept. 2005) 4 Cal. State Bar Ct. Rptr. 798, 808 [finding of gross negligence in creating a false impression involves moral turpitude in violation of section 6106].)  In short, just as an attorney may be discipline for a false statement made with reckless disregard for the truth (*In the Matter of Dixon* (Review Dept. 1999) 4 Cal. State Bar Ct. Rptr. 23, 29-30), an attorney may be disciplined for a false statement made through or as a result of gross negligence.

**Aggravation**[3]

### Prior Record of Discipline (Std. 1.5(a))

As noted *ante*, respondent has one prior record of discipline based on his criminal conviction in 2001.  The weight of that prior record is diminished because it is remote in time and because the underlying misconduct was not serious.

### Multiple Acts of Misconduct (Std. 1.5(b))

Respondent's present misconduct involves three acts of misconduct.

**Mitigation**

### Recognition of Wrongdoing (Std. 1.6(g))

Respondent revised his office procedures and now more thoroughly reviews all pleadings, applications, and declarations he signs.

### Good Character (Std. 1.6(f))

---

[3] All references to standards (stds.) are to the Rules of Procedure of the State Bar, title IV, Standards for Attorney Sanctions for Professional Misconduct.

Respondent presented very credible testimony from three attorneys as to his good character, honesty, and integrity.  Respondent, however, is entitled to limited mitigation for this testimony because, while three attorneys is a significant range of references in the legal profession, three attorneys are not a significant range of references in the general community.

/ / /

### Discussion

The purpose of the State Bar disciplinary proceedings is not to punish the attorney, but to protect the public, to preserve public confidence in the profession, and to maintain the highest possible professional standards for attorneys.  (Std. 1.1; *Chadwick v. State Bar* (1989) 49 Cal.3d. 103, 111; *Cooper v. State Bar* (1987) 43 Cal.3d 1016, 1025.)

In determining the appropriate level of discipline, the court looks first to the standards for guidance.  (*Drociak v. State Bar* (1991) 52 Cal.3d 1085, 1090; *In the Matter of Koehler* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 615, 628).  The standards, however, "do not mandate a specific discipline."  (*In the Matter of Van Sickle* (Review Dept. 2006) 4 Cal. State Ct. Rptr. 980, 994.)  It is well established that the court is "not bound to follow the standards in talismanic fashion.  As the final and independent arbiter of attorney discipline, [the Supreme Court is] permitted to temper the letter of the law with considerations peculiar to the offense and the offender."  (*Howard v. State Bar* (1990) 51 Cal.3d 215, 221-222.)  Even though the standards are not binding, they are entitled to great weight.  (*In re Silverton* (2005) 36 Cal.4th 81, 92.)

The applicable sanction in this proceeding is set forth in standard 2.7, which provides: "Disbarment or actual suspension is appropriate for an act of moral turpitude, dishonesty, fraud, corruption or concealment of a material fact.  The degree of sanction depends on the magnitude of the misconduct and the extent to which the misconduct harmed or mislead the victim and related to the member's practice of law."

Respondent committed three acts involving moral turpitude in three separate client matters.  Thus, the magnitude of the misconduct is significant.  Furthermore, the acts of moral turpitude directly relate to and involve respondent's practice of law.  Thus, significant actual suspension from the practice of law is warranted under standard 2.7.  In addition, actual suspension is consistent with standard 1.8(a), which provides:  "If a member has a single prior record of discipline, the sanction must be greater than the previously imposed sanction unless the prior discipline was so remote in time and the previous misconduct was not serious enough that imposing greater discipline would be manifestly unjust."

Second, the court looks to decisional law.  (*Snyder v. State Bar* (1990) 49 Cal.3d 1302, 1310-1311; *In the Matter of Taylor* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 563, 580.)  The court finds *In the Matter of Downey* (Review Dept. 2009) 5 Cal. State Bar Ct. Rptr. 151 and *In the Matter of Dahlz* (Review Dept. 2001) 4 Cal. State Bar Ct. Rptr. 269 instructive on the issue of discipline even though the misconduct and aggravation in both of those matters are greater than the misconduct and aggravation found here.

In *Downey*, the attorney signed and filed a verification in which he falsely attested under penalty of perjury that his clients were out of the county on a specific date.  Even though no intent to defraud was found based on the attorney's testimony, the attorney was found culpable of violating section 6106 when he filed the false verification because he was grossly negligent in concluding that his clients were absent from the county on the date he specified in the verification.  The attorney in *Downey* was also found culpable of violating section 6068, subdivision (j) because he failed to notify the State Bar's membership records office of his new office address until 28 months after he moved into the new office.  In mitigation, the attorney was given limited credit for the good character testimony he presented from six witnesses (four of whom were attorneys) and for cooperating with the State Bar by entering into a pretrial

stipulation of facts, which were not difficult to prove.  In aggravation, the attorney had a prior record of discipline (the attorney was previously placed on one year's stayed suspension and three years' probation on conditions, including a four-month actual suspension) and the attorney's present misconduct was followed by dishonesty and concealment.  In *Downey*, the

/ / /

attorney was placed on two years' stayed suspension and two years' probation on conditions, including a 150-day actual suspension.

In *Dahlz*, the attorney was found culpable, in a single client matter, of failing to perform, improperly withdrawing from representation, and misrepresenting to a worker's compensation insurance adjuster that his client no longer wanted to pursue her claim.  In aggravation, the attorney committed multiple acts of misconduct, had one prior record of discipline, caused significant client harm, and lacked candor toward the Court and the State Bar investigator.  The lack of candor was egregious in that the attorney presented a false telephone log and a falsified stipulation and falsely stated that he was in court when his client's claim was settled.  In mitigation, slight weight was afforded for the limited pro bono services the attorney rendered. As the review department recommended, the Supreme Court placed the attorney in Dahlz on four years' stayed suspension and four years' probation on conditions, including a one-year actual suspension

On balance, the court concludes that the appropriate level of discipline for the found misconduct in the present proceeding is two years' stayed suspension and two years' probation on conditions, including a ninety-day actual suspension.  (See also *Bach v. State Bar* (1987) 43 Cal.3d 848 [60-day actual suspension imposed for misleading a judge; aggravation for prior public reproval, but no mitigation].)

<u>**Recommendations**</u>

**Discipline**

It is recommended that respondent **JOSEPH DARRELL PALMER,** State Bar number

125147, be suspended from the practice of law in California for two years, that execution of that

/ / /

/ / /

period of suspension be stayed, and that respondent be placed on probation[4] for a period of two

years subject to the following conditions:

1. Respondent Joseph Darrell Palmer is suspended from the practice of law for the first 90 days of probation.

2. Respondent must comply with the provisions of the State Bar Act, the Rules of Professional Conduct, and all of the conditions of respondent's probation.

3. Within 10 days of any change in the information required to be maintained on the membership records of the State Bar pursuant to Business and Professions Code section 6002.1, subdivision (a), including respondent's current office address and telephone number, or if no office is maintained, the address to be used for State Bar purposes, respondent must report such change in writing to the Membership Records Office and the State Bar's Office of Probation.

4. Respondent must submit written quarterly reports to the Office of Probation on each January 10, April 10, July 10, and October 10. Under penalty of perjury, respondent must state whether respondent has complied with the State Bar Act, the Rules of Professional Conduct, and all of the conditions of respondent's probation during the preceding calendar quarter. In addition to all quarterly reports, a final report, containing the same information, is due no earlier than 20 days before the last day of the probation period and no later than the last day of the probation period.

5. Subject to the assertion of applicable privileges, Respondent must answer fully, promptly, and truthfully, any inquiries of the Office of Probation or any probation monitor that are directed to Respondent personally or in writing, relating to whether Respondent is complying or has complied with Respondent's probation conditions.

6. Within 30 days after the effective date of the Supreme Court order in this matter, respondent must contact the Office of Probation and schedule a meeting with respondent's assigned probation deputy to discuss these terms and conditions of probation. Upon the direction of the Office of Probation, respondent must meet with

---

[4] The period of probation will begin on the effective date of the Supreme Court order in this matter. (See Cal. Rules of Court, rule 9.18.)

the probation deputy either in person or by telephone.  Respondent must promptly
meet with the probation deputy as directed and upon request.

7.    Within one year after the effective date of the Supreme Court order in this matter,
      respondent must submit to the Office of Probation satisfactory evidence of
      completion of the State Bar's Ethics School and of passage of the test given at the end
      of that session.  This requirement is separate from any Minimum Continuing Legal
      Education (MCLE) requirement, and respondent is order not to claim any MCLE
      credit for attending Ethics School. (Accord, Rules Proc. of State Bar, rule 3201.)

8.    At the expiration of the probation period, if respondent has complied with all
      conditions of probation, respondent will be relieved of the stayed suspension.

**Multistate Professional Responsibility Examination**

It is further recommended that respondent be ordered to take and pass the Multistate

Professional Responsibility Examination (MPRE) within one year after the effective date of the

Supreme Court order in this matter and to provide satisfactory proof of such passage to the State

Bar's Office of Probation in Los Angeles within the same period.

**California Rules of Court, Rule 9.20**

It is further recommended that Respondent be ordered to comply with the requirements of

rule 9.20 of the California Rules of Court and to perform the acts specified in subdivisions (a)

and (c) of that rule within 30 and 40 days, respectively, after the effective date of the Supreme

Court order in this matter.  Failure to do so may result in disbarment or suspension.

**Costs**

Finally, it is recommended that costs be awarded to the State Bar in accordance with

Business and Professions Code section 6086.10 and that the costs be enforceable both as

provided in Business and Professions Code section 6140.7 and as a money judgment.

Dated:  July ___, 2014.                    _____
                                           **LUCY ARMENDARIZ**
                                           Judge of the State Bar Court

- 14 -

# EXHIBIT B

PUBLIC MATTER – NOT DESIGNATED FOR PUBLICATION

**FILED**

JAN 0 8 2016

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

### STATE BAR COURT OF CALIFORNIA

### REVIEW DEPARTMENT

| | |
|---|---|
| In the Matter of | )    Case No. 12-O-16924 |
| | ) |
| JOSEPH DARRELL PALMER, | )    OPINION |
| | ) |
| A Member of the State Bar, No. 125147. | ) |
| | ) |

     Joseph Darrell Palmer appeals a hearing judge's decision finding him culpable of three counts of moral turpitude for the grossly negligent making of false statements in sworn affidavits filed in federal class actions. The judge recommended discipline including a 90-day actual suspension. Palmer admits he swore falsely in each affidavit that he had no history of attorney discipline, and he authorized the affidavits for filing. He argues, though, that he acted with simple negligence, not moral turpitude, and is not culpable of misconduct. Even if he is found culpable, Palmer asserts that the recommended discipline is excessive and a public reproval is appropriate. The Office of the Chief Trial Counsel of the State Bar (OCTC) supports the hearing judge's culpability findings and recommended discipline.

     We review the record independently (Cal. Rules of Court, rule 9.12) and, considering the totality of the circumstances, agree with the hearing judge's conclusion that Palmer acted with gross negligence, amounting to moral turpitude, in executing and filing the false affidavits. We also affirm the recommended discipline, which is supported by the standards[1] and decisional law.

---

[1] Rules of Procedure of the State Bar, title IV, Standards for Attorney Sanctions for Professional Misconduct. Effective July 1, 2015, the standards were revised and renumbered. Since this appeal was submitted for ruling after that effective date, we apply the revised standards, and all further references to standards are to this source.

# I. PROCEDURAL HISTORY

On December 6, 2013, OCTC filed a Notice of Disciplinary Charges (NDC) charging

Palmer with three counts of violating Business and Professions Code, section 6106.[2]  On

April 15, 2014, the parties filed a Joint Stipulation of Facts and Admission of Documents, and

the case was submitted after a one-day trial.  On July 11, 2014, the Hearing Department issued

its decision, finding Palmer culpable as charged.

# II. FACTUAL BACKGROUND

Palmer does not dispute the hearing judge's factual findings.  Clear and convincing

evidence supports the material findings of fact, which we adopt and summarize briefly as

follows.[3]

## A.     Palmer's Criminal Conviction Resulted in Discipline in Three Jurisdictions

Palmer has been admitted to practice law in California since 1986, in Colorado since

1993, and in Arizona since at least February 2003.

During the early to mid-1990s, Palmer owned and operated two businesses in Colorado.

In 2002, he was convicted of a Colorado criminal offense for failing to properly report roughly

$4,000 in sales taxes in his operation of those businesses.  Palmer was sentenced to two years of

unsupervised probation and ordered to complete 200 hours of community service.  As a result of

this conviction, the Colorado Supreme Court imposed discipline on Palmer in July 2002,

including a thirty-day actual suspension, a sixty-day stayed suspension, and a one-year probation

---

[2] Section 6106 provides: "The commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of his relations as an attorney or otherwise, and whether the act is a felony or misdemeanor or not, constitutes a cause for disbarment or suspension."  All further references to sections are to the Business and Professions Code unless otherwise noted.

[3] We afford great weight to the hearing judge's factual findings.  (Rules Proc. of State Bar, rule 5.155(A).)  Clear and convincing evidence leaves no substantial doubt and is sufficiently strong to command the unhesitating assent of every reasonable mind. (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 552.)

period.  Palmer was reciprocally disciplined when the State Bar Court of California publicly

reproved him in November 2002.  In February 2003, the Supreme Court of Arizona also imposed

reciprocal discipline with terms identical to those in Colorado.

**B.      Palmer Admits He Falsely Represented his Disciplinary History in Sworn Affidavits**

Palmer admits that he executed and filed three sworn affidavits, between June 2010 and

July 2012, in which he declared falsely that he had never been subject to attorney discipline.  He

filed each of the affidavits in support of applications to proceed *pro hac vice* in civil class

actions.  First, in June of 2010, Palmer filed an affidavit in *Gemelas v. The Dannon Company*

(*Dannon*), pending in the United States District Court for the Northern District of Ohio, in which

he, "being duly sworn upon oath," declared: "I have never been the subject of disciplinary action

of any kind before any bar or court."  Second and third, in January 2011 and July 2012,

respectively, Palmer filed affidavits in separate class actions in the United States District Court

for the Western District of Washington—*Arthur v. Sallie Mae, Inc.* (*Sallie Mae*) and *Herfert v.

Crayola, LLC* (*Crayola*)—in which he "declare[d] under penalty of perjury" that "I have not

been disbarred or formally censured by a court of record or by a state bar association . . . ."

Palmer admits he was aware of his prior discipline when he signed and filed each

affidavit.  The hearing judge found Palmer credibly testified that he could not remember signing

any of these affidavits nor did he specifically recall if he had read the declarations before

executing them.  Further, he credibly testified that he had no intention of misrepresenting his

disciplinary history and had no reason to do so.  In fact, Palmer had previously disclosed his

prior discipline in multiple *pro hac vice* applications without any being denied due to his

disciplinary record.

**C.      Palmer's False Statements Are Discovered by the Court and Other Counsel**

In early August 2012, the United States District Court for the Western District of

Washington issued an order in the *Crayola* case directing Palmer to show cause why he should

not be sanctioned for submitting a *pro hac vice* application containing a false statement.  Shortly

thereafter, Palmer filed an amended application and supporting affidavit in which he disclosed

his prior discipline.  The district court denied Palmer's *pro hac vice* application in *Crayola* on

August 17, 2012, based on his false statement as to his past discipline and because he failed to

appear at a court hearing.

Palmer did not take immediate action to correct his affidavits in the *Sallie Mae* or

*Dannon* cases after learning of the misrepresentation in his *Crayola* affidavit.  On August 20,

2012, the plaintiffs in *Sallie Mae* moved to revoke Palmer's *pro hac vice* status due to his false

statement.  Seven days later, Palmer filed an amended application in *Sallie Mae*.  Nevertheless,

in September 2012, the district court revoked Palmer's *pro hac vice* status in the *Sallie Mae* case,

based on: (1) his false representation in his affidavit; and (2) the fact that he did not amend his

application until August 27, 2012, rather than correcting it promptly after his *Crayola* application

was challenged.  The record contains no evidence that Palmer ever filed a corrected affidavit in

the *Dannon* matter.

### III.  PALMER IS CULPABLE OF MORAL TURPITUDE

OCTC charged Palmer with committing acts involving moral turpitude by filing

affidavits in the *Dannon* (Count One), *Sallie Mae* (Count Two), and *Crayola* (Count Three)

matters in which he made the false statements regarding his disciplinary history, when he knew,

or was grossly negligent in not knowing, that each declaration was false.  The hearing judge

found Palmer made the misrepresentations inadvertently, without intent to mislead or deceive,

but concluded that they were made with gross negligence amounting to moral turpitude.  We

-4-

give great weight to this finding and adopt it.[4]   We also find his actions were grossly negligent
for the reasons discussed below.

Palmer claims he is not culpable because: (1) he acted with "ordinary," not "gross,"
negligence in failing to read the affidavits closely before signing and filing them; and (2) even if
he were found to be grossly negligent, that finding is insufficient under the circumstances to
support his culpability for moral turpitude.   We disagree on both points.

## A.      Palmer Was Grossly Negligent in Misrepresenting his Disciplinary History

Palmer either personally signed or approved for electronic signature, and authorized for
filing, each of the false affidavits.   However, he did not review the affidavits carefully, as he
failed to notice the plainly false statements contained therein.   In fact, such lack of diligence was
common in Palmer's practice.   His long-time paralegal, who prepared the affidavits for his
approval and signature, testified that Palmer "did not thoroughly review what [she] put in front
of him to sign."  This lack of attention is substantially below the ethical standard of care required
of attorneys when signing and filing documents under oath.   Indeed, the standard of ethical
practice for a reasonable attorney in Palmer's situation, with prior records of discipline, should
be heightened when signing and filing applications intended to demonstrate his suitability to
practice law.   Palmer also failed to act promptly in reviewing and correcting his applications in
other pending cases after learning of his misrepresentation in the *Crayola* affidavit.   We
conclude that the totality of his actions evidences gross negligence.[5]

_____

[4] We reject OCTC's contention that Palmer acted with intent to deceive.  Palmer's
testimony and other evidence demonstrating that he candidly disclosed his discipline history in
the past and had no reason to conceal it support the judge's conclusion.  (*McKnight v. State Bar*
(1991) 53 Cal.3d 1025, 1032 [hearing judge "is best suited to resolving credibility questions"].)

[5] Besides the charged misrepresentations, Palmer admits he filed a 2006 affidavit and *pro
hac vice* application in another lawsuit in the United States District Court for the Western
District of Washington, *Dinklage v. Holland America Line-Westours, Inc.* (*Holland America*), in
which he made a false statement identical to that in the *Sallie Mae* and *Crayola* cases.  Palmer
challenges the hearing judge's finding that "gross negligence is clearly supported" by the

**B.      Whether Grossly Negligent Misconduct Involves Moral Turpitude Depends on the Totality of the Surrounding Circumstances**

An attorney who commits misconduct through gross negligence is not necessarily culpable of moral turpitude.  The Supreme Court has held that gross negligence amounts to moral turpitude when there "is a breach of the fiduciary relationship that binds an attorney to the most conscientious fidelity to the interests of his client." (*Lowe v. State Bar* (1953) 40 Cal.2d 564, 570.)  In *Call v. State Bar* (1955) 45 Cal.2d 104, 109, the Supreme Court explained: "Some cases have said that gross negligence involves moral turpitude in that such conduct is a breach of [an attorney's] fiduciary duty, but in each instance there was a misrepresentation or other improper action, and the statements *must be read in light of the additional facts*." (Italics added.) Thus, in determining whether grossly negligent conduct involves moral turpitude, we must consider the totality of the surrounding circumstances.

For example, where an attorney is charged with misappropriation of entrusted funds, the "critically important rules for safekeeping and disposition of client funds" (*Palomo v. State Bar* (1984) 36 Cal.3d 785, 795) and the non-delegable fiduciary duties of attorneys to comply with those rules are "additional facts" that support a finding of moral turpitude (see *Giovanazzi v. State Bar* (1980) 28 Cal.3d 465; *In the Matter of Malek-Yonan* (Review Dept. 2003) 4 Cal. State Bar Ct. Rptr. 627, 635).  Other than in the misappropriation context, the Supreme Court has found "additional facts" sufficient to elevate grossly negligent misconduct to moral turpitude in cases where an attorney breached a fiduciary duty owing to a particular individual.  (E.g., *Grove v. State Bar* (1967) 66 Cal.2d 680, 683-684 [attorney culpable of moral turpitude based on grossly negligent habitual disregard of clients' interests].)  An attorney's grossly negligent misconduct also may involve the requisite "additional facts" amounting to moral turpitude where

---

*Holland America* affidavit, which was filed four years before the first charged misrepresentation occurred.  Given this temporal gap, we find the 2006 declaration only marginally probative of Palmer's mental state with respect to the current charges.

it affects non-clients or the public in general. (*Vaughn v. State Bar* (1972) 6 Cal.3d 847, 859
[attorney's grossly negligent supervision of office staff, resulting in filing of application for writ
of execution containing false statements, amounted to moral turpitude; Court noted: "In some
instances, as in the matter before us, an attorney's gross negligence may also affect non-clients
with whom he deals or even the public generally"]; *In the Matter of Dale* (Review Dept. 2005)
4 Cal. State Bar Ct. Rptr. 798 [attorney culpable of moral turpitude where he elicited confession
from uneducated, incarcerated young man without presence of young man's counsel and without
disclosing that he represented parties with adverse interests].)

Recently, in *In the Matter of Yee* (Review Dept. 2014) 5 Cal. State Bar Ct. Rptr. 330,
333-334, we applied a totality-of-the-circumstances analysis to find moral turpitude where an
attorney, through gross negligence, affirmed falsely to the State Bar that she had complied with
its Minimum Continuing Legal Education (MCLE) requirements and had the records to prove it.
Our finding there rested on "additional facts" surrounding the misstatement, such as: (1) the
unique significance of MCLE compliance to the State Bar's role in protecting the public and
ensuring public confidence in the legal profession; (2) the high level of materiality of an
attorney's compliance statement to the State Bar's performance of this essential function; (3) the
State Bar's dependence on accurate self-reporting with the MCLE program necessarily relying
on an "honor system"; (4) " 'the additional imprimatur of veracity' " (quoting *In the Matter of
Maloney and Virsik* (Review Dept. 2005) 4 Cal. State Bar Ct. Rptr. 774, 786) attached to an
"affirmation," which "reasonably notifies others that the statements are true and complete"; and
(5) Yee's failure to "mak[e] any effort to confirm [the] accuracy" of her affirmation.

Many of these same considerations guide us in this case to conclude that Palmer's gross
negligence involved moral turpitude.

**C.   The Totality of the Circumstances Surrounding Palmer's Misconduct
Demonstrates Moral Turpitude**

We consider the circumstances surrounding Palmer's misstatements.

Here, Palmer owed duties to the courts and the public to ensure that his under-oath

declarations were true and correct.  Even more than the unsworn affirmation at issue in the *Yee*

matter, Palmer's sworn declarations carried an "imprimatur of veracity" upon which courts and

other parties were reasonably entitled to rely.  (*In the Matter of Maloney and Virsik*, *supra*,

4 Cal. State Bar Ct. Rptr. at p. 786.)  And, similar to the affirmation of compliance in *Yee*,

Palmer's affidavits filed in support of applications to appear *pro hac vice* served a critical

function.  They provided information necessary to the courts' assessment of Palmer's fitness to

practice without presenting a risk to the public.  Palmer's misrepresentations of his disciplinary

history were highly material to that assessment.

Further, Palmer testified that he "routinely represent[s] objectors . . . in class action

settlements" nationwide.  In this capacity, Palmer frequently appeared *pro hac vice* in courts

throughout the country and was aware that many courts require such applicants to disclose past

professional misconduct.  Also, given the brevity of the affidavits—each under a page long—

Palmer could have ensured with minimal effort that his statements were true.  In fact, the two

declarations filed in the United States District Court for the Western District of Washington were

based on the district court's form *pro hac vice* declaration, which requested information

regarding only one aspect of the applicant's qualifications—disciplinary history.  Yet Palmer

failed to accurately respond to this singularly important request even though the offending

misstatements in those two affidavits immediately preceded his avowal: "I declare under penalty

of perjury that the foregoing is true and correct," which was directly above Palmer's signature

line.

Considering the totality of the circumstances, and consistent with our comparable case law, we conclude Palmer's grossly negligent misrepresentations involved moral turpitude.[6] (*In the Matter of Maloney and Virsik, supra,* 4 Cal. State Bar Ct. Rptr. at p. 786 ["It is well established that acts of moral turpitude include an attorney's false or misleading statements to a court or tribunal.  [Citations.]  The actual intent to deceive is not necessary; a finding of gross negligence in creating a false impression is sufficient for violation of section 6106. [Citations.]"]; see also, e.g., *In the Matter of Downey* (Review Dept. 2009) 5 Cal. State Bar Ct. Rptr. 151, 155 [attorney culpable of moral turpitude based on grossly negligent filing of false verification without reasonable basis to believe verified statements were true]; *Vaughn v. State Bar, supra,* 6 Cal.3d 847 [attorney culpable of moral turpitude based on grossly negligent failure to supervise staff who filed application for writ of execution containing false statements]; *In the Matter of Moriarty* (Review Dept. 1999) 4 Cal. State Bar Ct. Rptr. 9 [attorney culpable of moral turpitude based on grossly negligent misrepresentation to superior court that case had settled].)

## IV.  LIMITED AGGRAVATION AND MITIGATION[7]

The hearing judge correctly found Palmer's misconduct was aggravated by his prior record of discipline and multiple acts of wrongdoing, but mitigated by his recognition of wrongdoing and good character.  Weighing these circumstances in aggregate, we conclude that aggravation outweighs mitigation somewhat, though neither is particularly significant.

To begin, Palmer's 2002 public reproval is aggravating.  (Std. 1.5(a).)  Like the judge, we diminish the weight of this prior record.  The misconduct was remote in time as Palmer's tax

---

[6] OCTC argues for the first time on appeal that certain statements the district court made on the *Sallie Mae* record further evidence Palmer's moral turpitude.  Palmer raises several evidentiary objections to those statements and asserts that, in any case, we should not consider OCTC's new argument on appeal.  We need not resolve this evidentiary issue since we find Palmer's culpability was clearly established without considering the contested statements.

[7] Standard 1.5 requires OCTC to establish aggravating circumstances by clear and convincing evidence.  Standard 1.6 requires Palmer to meet the same burden to prove mitigation.

offense occurred in the mid-1990s, roughly 15 years before he filed the first of the false

affidavits at issue in this case. Also, the misconduct was not serious. (*In the Matter of Hanson*

(Review Dept. 1994) 2 Cal. State Bar Ct. Rptr. 703, 713 [prior misconduct that was not serious

and occurred over 17 years before first misconduct in present case did not warrant significant

aggravation].) Turnover in Palmer's accounting department was a significant cause of the

criminal violation, which did not involve moral turpitude. Palmer was not found to have

deliberately avoided his tax obligations or personally profited from his company's failure to

report and pay taxes.[8]

    Palmer's misconduct is also aggravated by his multiple acts of wrongdoing in executing

and filing three separate and unrelated affidavits containing false statements. (Std. 1.5(b).)

    We reject OCTC's argument that Palmer's failure to act promptly to amend the affidavits

in the *Sallie Mae* and *Dannon* cases warrants additional aggravation as we considered this

conduct already with respect to Palmer's culpability. We also disagree with OCTC's

characterization of Palmer's testimony as blaming others. His explanations of the circumstances

surrounding his misconduct did not demonstrate lack of recognition of his own responsibility.

    Like the hearing judge, we find Palmer deserves some mitigation for his prompt steps in

conducting an audit of his *pro hac vice* applications in August 2012, once he learned of the

misstatements, and for overhauling his internal case management practices to track the status of

his pending cases and the documents filed therein. These acts show remorse and recognition of

---

[8] OCTC argues, without citation to authority, that the prior record is not remote in time from the present misconduct because Palmer filed a 2006 affidavit in the *Holland America* case that contained a misrepresentation similar to those charged. We reject this argument because Palmer was not charged with or found culpable of misconduct relating to the 2006 affidavit. We also reject OCTC's argument that a reduction of aggravating weight for a prior record that is remote in time is "not consistent with standard 1.5(a)." Standard 1.5(a) is silent as to the weight of aggravation, and our case law provides for such a reduction.

wrongdoing.  (Std. 1.6(g) [mitigation for "prompt objective steps, demonstrating spontaneous remorse and recognition of the wrongdoing and timely atonement"].)[9]

The hearing judge assigned Palmer limited mitigation based on the "very credible" testimony of three attorney witnesses as to Palmer's honesty and integrity.  (Std. 1.6(f) [mitigation for "extraordinary good character attested to by a wide range of references in the legal and general communities"].)  We adopt this finding, which is uncontested on appeal and supported by our case law.  (*In the Matter of Riordan* (Review Dept. 2007) 5 Cal. State Bar Ct. Rptr. 41, 50 [assigning slightly diminished mitigation to evidence of good character from four attorney character witnesses who did not constitute wide range of references in legal and general communities]; *In the Matter of Brown* (Review Dept. 1993) 2 Cal. State Bar Ct. Rptr. 309, 319 [character testimony from attorneys is particularly valuable because they "have a strong interest in maintaining the honest administration of justice"].)

## V.  DISCIPLINE[10]

The hearing judge recommended discipline including a 90-day actual suspension.  OCTC asks us to affirm the recommendation; Palmer claims it is excessive and asserts that, if he is found culpable, a public reproval is appropriate.

Our discipline analysis begins with the standards, which promote the consistent and uniform application of disciplinary measures and are entitled to great weight.  (*In re Silverton* (2005) 36 Cal.4th 81, 91 [Supreme Court will not reject recommendation arising from standards

---

[9] OCTC asserts Palmer's actions were not "spontaneous" because he took them only after the district court in the *Crayola* proceeding threatened sanctions for his false statement.  The fact that the misstatements came to light during a court proceeding does not preclude Palmer from receiving mitigating credit for *independently* conducting an internal audit and revamping his case management procedures.  In contrast, we do not credit Palmer mitigation for amending his affidavits under threat of sanctions and other potential consequences in the district court.

[10] The purpose of attorney discipline is not to punish the attorney, but to protect the public, the courts, and the legal profession; to preserve public confidence in the profession; and to maintain high professional standards for attorneys.  (Std. 1.1.)

unless grave doubts as to propriety of recommended discipline].)  Here, standard 2.11 is most apt and provides that, "[d]isbarment or actual suspension is the presumed sanction for an act of moral turpitude . . . or grossly negligent misrepresentation . . . .  The degree of sanction depends on the magnitude of the misconduct; the extent to which the misconduct harmed or misled the victim, which may include the adjudicator; the impact on the administration of justice, if any; and the extent to which the misconduct related to the member's practice of law."[11]  To determine the appropriate level of discipline within the range provided, we also consider comparable case law.  (*In the Matter of Elkins* (Review Dept. 2009) 5 Cal. State Bar Ct. Rptr. 160, 168.)

Palmer claims that a downward departure from the presumed discipline range in standard 2.11 is warranted because his misconduct is comparable to that in *In the Matter of Yee*, *supra*, 5 Cal. State Bar Ct. Rptr. 330.  We disagree with Palmer's analysis.  Yee's misconduct was much less serious than Palmer's.  Unlike Palmer, Yee made only one misrepresentation, which was not under oath nor in a court-filed document.  Yee's misconduct was at the lower level of severity for which we have found moral turpitude.  Also, unlike Palmer, Yee had no history of discipline, her misconduct involved no aggravating circumstances, and she proved compelling mitigation.  In *Yee*, the net effect of mitigation and aggravation demonstrated that a sanction less than actual suspension would fulfill the purposes of discipline.  (Std. 1.7(c).)  Here, it does not, and we find no basis to deviate from the applicable standard.  (*Blair v. State Bar* (1989) 49 Cal.3d 762, 776, fn. 5 [clear reasons for departure from standards should be shown].)

Instead, we find Palmer's case comparable to *In the Matter of Downey, supra*, 5 Cal. State Bar Ct. Rptr. 151.  Downey was culpable of moral turpitude for his grossly negligent

---

[11] Standard 1.8(a) also applies and provides that, "[i]f a member has a single prior record of discipline, the sanction must be greater than the previously imposed sanction unless the prior discipline was so remote in time and the previous misconduct not serious enough that imposing greater discipline would be manifestly unjust."

execution and filing of a false verification.  He received a 150-day actual suspension.[12]  Palmer attempts unsuccessfully to distinguish *Downey*.  He claims Downey's mens rea was more culpable than his in that Downey made "two very deliberate *choices*: (1) to not further investigate the [facts relating to the verification]; (2) to execute the verification."  In fact, Palmer too acted deliberately in choosing not to review his affidavits thoroughly before signing and filing them under penalty of perjury.  Also, he exercised this level of gross neglect on three separate occasions, as compared to Downey's single instance.

Still, Palmer's misconduct warrants a less severe sanction than Downey's due to two important differences: first, Downey's prior misconduct, involving moral turpitude and resulting in a four-month actual suspension, was more serious than Palmer's prior misconduct, which did not involve moral turpitude and was resolved by public reproval.  Second, Downey's misconduct was followed by dishonesty and concealment, whereas Palmer has admitted his false statements and demonstrated remorse.

Like the hearing judge, we also find guidance in *Bach v. State Bar* (1987) 43 Cal.3d 848. Bach received a 60-day actual suspension for making intentional false statements to a judge regarding the issuance and service of a prior order.  His misconduct was aggravated by a prior public reproval and failure to appreciate the gravity of his wrongdoing.  Palmer asserts that Bach's misconduct was "far worse" than his.  We disagree.  Bach's single instance of moral turpitude was not more serious, given Palmer's multiple and separate acts of wrongdoing over a span of roughly two years, and the fact that Palmer, unlike Bach, made his false statements in declarations executed under oath.

Considering the comparable case law, in sum, and looking in particular to *Downey* and *Bach* as guideposts, we conclude that the hearing judge's recommended 90-day actual

---

[12] Downey was also culpable of failing to update his address of record with the State Bar, but that minor additional violation did not materially impact the discipline recommendation.

suspension, which is within the range provided in standard 2.11, is appropriate and will protect

the public, the courts, and the profession.

## VI. RECOMMENDATION

For the foregoing reasons, we recommend that Joseph Darrell Palmer be suspended from

the practice of law for two years, that execution of that suspension be stayed, and that Palmer be

placed on probation for two years on the following conditions:

1. He must be suspended from the practice of law for the first 90 days of the period of his probation.

2. He must comply with the provisions of the State Bar Act, the Rules of Professional Conduct, and all of the conditions of his probation.

3. Within 10 days of any change in the information required to be maintained on the membership records of the State Bar pursuant to Business and Professions Code section 6002.1, subdivision (a), including his current office address and telephone number, or if no office is maintained, the address to be used for State Bar purposes, he must report such change in writing to the Membership Records Office and the State Bar Office of Probation.

4. Within 30 days after the effective date of discipline, he must contact the Office of Probation and schedule a meeting with his assigned probation deputy to discuss the terms and conditions of probation. Upon the direction of the Office of Probation, he must meet with the probation deputy either in person or by telephone. During the period of probation, he must promptly meet with the probation deputy as directed and upon request

5. He must submit written quarterly reports to the Office of Probation on each January 10, April 10, July 10, and October 10 of the period of probation. Under penalty of perjury, he must state whether he has complied with the State Bar Act, the Rules of Professional Conduct, and all of the conditions of his probation during the preceding calendar quarter. In addition to all quarterly reports, a final report, containing the same information, is due no earlier than 20 days before the last day of the probation period and no later than the last day of the probation period.

6. Subject to the assertion of applicable privileges, he must answer fully, promptly, and truthfully, any inquiries of the Office of Probation that are directed to him personally or in writing, relating to whether he is complying or has complied with the conditions contained herein.

7. Within one year after the effective date of the discipline herein, he must submit to the Office of Probation satisfactory evidence of completion of the State Bar's Ethics School and passage of the test given at the end of that session. This requirement is separate from any Minimum Continuing Legal Education (MCLE) requirement, and he shall not receive MCLE credit for attending Ethics School. (Rules Proc. of State Bar, rule 3201.)

8. The period of probation will commence on the effective date of the Supreme Court order imposing discipline in this matter.  At the expiration of the period of probation, if he has complied with all conditions of probation, the period of stayed suspension will be satisfied and that suspension will be terminated.

## VII.  PROFESSIONAL RESPONSIBILITY EXAMINATION

We further recommend that Palmer be ordered to take and pass the Multistate Professional Responsibility Examination administered by the National Conference of Bar Examiners within one year of the effective date of the Supreme Court order in this matter and to provide satisfactory proof of such passage to the Office of Probation within the same period. Failure to do so may result in an automatic suspension.  (Cal. Rules of Court, rule 9.10(b).)

## VIII.  RULE 9.20

We further recommend that Palmer be ordered to comply with the requirements of rule 9.20 of the California Rules of Court, and to perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of the Supreme Court order in this proceeding.  Failure to do so may result in disbarment or suspension.

## IX.  COSTS

We further recommend that costs be awarded to the State Bar in accordance with Business and Professions Code section 6086.10, such costs being enforceable both as provided in section 6140.7 and as a money judgment.

HONN, J.

WE CONCUR:

EPSTEIN, J.

STOVITZ, J.[*]

---

[*] Retired Presiding Judge of the State Bar Court, serving as Review Judge Pro Tem by appointment of the California Supreme Court.

-15-

# CERTIFICATE OF SERVICE

[Rules Proc. of State Bar; Rule 5.27(B); Code Civ. Proc., § 1013a(4)]

I am a Case Administrator of the State Bar Court.   I am over the age of eighteen and not a party to the within proceeding.   Pursuant to standard court practice, in the City and County of Los Angeles, on January 6, 2016, I deposited a true copy of the following document(s):

## OPINION FILED JANUARY 6, 2016

in a sealed envelope for collection and mailing on that date as follows:

[X]    by first-class mail, with postage thereon fully prepaid, through the United States Postal Service at Los Angeles, California, addressed as follows:

**DAVID C. CARR**
**LAW OFFICE OF DAVID C. CARR PLC**
**525 B ST STE 1500**
**SAN DIEGO, CA    92101**

[X]    by interoffice mail through a facility regularly maintained by the State Bar of California addressed as follows:

**BRANDON K. TADY, Enforcement, Los Angeles**

I hereby certify that the foregoing is true and correct.   Executed in Los Angeles, California, on January 6, 2016.

**Jasmine Guladzhyan**
Case Administrator
State Bar Court

Certificate of Service.wpt

# EXHIBIT C

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | WESTERN DISTRICT OF WASHINGTON AT SEATTLE |

```
 3
      MARK A. ARTHUR, CIRILO        )
 4    MARTINEZ, PARI NAJAFI and     )
      HEATHER MCCUE on behalf of    )
 5    themselves and all others     )   NO. C10-198JLR
      similarly situated,           )
 6                                   )   SEATTLE, WASHINGTON
              Plaintiffs,            )   SEPTEMBER 14, 2012
 7                                   )
      v.                             )
 8                                   )
      SALLIE MAE, INC.,              )   MOTION HEARING
 9                                   )
              Defendant.             )
10
11              VERBATIM REPORT OF PROCEEDINGS
           BEFORE THE HONORABLE JAMES L. ROBART
12            UNITED STATES DISTRICT JUDGE

13    APPEARANCES:

14     For Plaintiffs:        MR. JONATHAN D. SELBIN
                              MS. BETH E. TERRELL
15                            MS. ALISON STOCKING
                              MR. MATTHEW R. WILSON
16

17     For Defendant:        MS. JULIA B. STRICKLAND
                              MS. LISA M. SIMONETTI
18                            MR. ERIC D. REICIN

19     For Intervenor        MR. DARRELL PALMER
       Judith Harper and     MR. BRIAN J. TRENZ
20     Objectors Sweeney
       and McBean:
21

22
       Reported by:          Kari McGrath, CCR, RMR, CRR
23                           Federal Court Reporter
                             206.370.8509
24                           kari_mcgrath@wawd.uscourts.gov

25
```

```
 1                     PROCEEDINGS
 2     _____
 3              THE COURT:  Please be seated.  The clerk will call
 4     this matter.
 5              THE CLERK:  Case C10-198, Mark Arthur versus Sallie
 6     Mae.
 7         Counsel, please make your appearances.
 8              MR. SELBIN:  Good afternoon, Your Honor.  Jonathan
 9     Selbin from Lieff Cabraser Heimann & Bernstein on behalf of
10     plaintiffs and the proposed class.
11              THE COURT:  Thank you.
12              MS. TERRELL:  Good afternoon.  Beth Terrell from
13     Marshall Daudt & Willie on behalf of plaintiffs and the
14     proposed class.
15              MS. STOCKING:  Good afternoon.  Alison Stockins,
16     Lieff Cabraser Heimann & Bernstein on behalf of the
17     plaintiffs and proposed class.
18              MR. WILSON:  Good afternoon, Your Honor.  Matt Wilson
19     from Meyer Wilson on behalf of plaintiffs and the proposed
20     class.
21              MS. STRICKLAND:  Good afternoon, Your Honor.  Julia
22     Strickland from Stroock & Stroock & Lavan on behalf of
23     defendant Sallie Mae.
24              THE COURT:  Thank you.
25              MS. SIMONETTI:  Good afternoon, Your Honor.  Lisa
```

1    Simonetti, Stroock & Stroock & Lavan, on behalf of defendant

2    Sallie Mae.

3            MR. REICIN:  Good afternoon.  Eric Reicin, deputy

4    general counsel for Sallie Mae.

5            MR. PALMER:  Good afternoon, Your Honor.  Darrell

6    Palmer on behalf intervenor Judith Harper and objectors

7    Sweeney and McBean.

8            MR. TRENZ:  Good morning, Your Honor.  Brian Trenz on

9    behalf of intervenor Judith Harper.

10           THE COURT:  Counsel, there are four matters before me

11   today, and I'm going to take them in the order that makes

12   sense to me, which will be, first, to take up Docket 251,

13   which is the motion for revocation of court's order granting

14   admission pro hac vice to Darrell Palmer.  That will be

15   followed by Docket 232, motion for attorneys' fees filed by

16   intervenor Judith Harper.  Third will be Docket 219, motion

17   for final approval of amended class action settlement.  And

18   then last will be the motion for attorneys' fees and costs

19   and service awards in connection with the amended class

20   action settlement.

21       I will tell you that I will definitively rule on the

22   motion for revocation.  I will definitively rule on

23   Ms. Harper's motion for attorneys' fees.  I will give you my

24   oral indication of granting or denying the motion for final

25   approval of class action settlement, and the motion for

1   attorneys' fees and costs.  Those will be confirmed by a

2   written order which will have further detail to it.  So that

3   will be our schedule for the day.

4       Mr. Palmer, why don't you go to the podium, since I would

5   like to hear from you.  Mr. Palmer, you filed in connection

6   with this matter a declaration of Darrell Palmer in support

7   of Ms. Harper's motion for award of attorneys' fees and

8   costs, and it's in the form of a declaration of some six

9   pages, signed under penalty of perjury.

10      Is there anything in that declaration that you want to

11  change before I rule on the motion?

12          MR. PALMER:  This is the declaration in connection

13  with the application for attorneys' fees, Your Honor?

14          THE COURT:  Yes.

15          MR. PALMER:  I don't have that in front of me.  I

16  couldn't answer that question at this time.

17          THE COURT:  Well, you signed it under penalty of

18  perjury.

19          MR. PALMER:  Yes.

20          THE COURT:  And you reviewed it before you signed it?

21          MR. PALMER:  Yes.

22          THE COURT:  You believed everything in it was true at

23  that time?

24          MR. PALMER:  I believe so.

25          THE COURT:  All right.  Well, this is my issue then:

1  Paragraph 5, quote, "I notified the court of the foregoing

2  deficiencies during the December 17, 2010, conference call

3  between the court and all counsel.  As a result, the court

4  ordered that class and defense counsel look into the

5  'missing' class members and report back to the court

6  immediately.  The district court also extended all deadlines

7  for the settlement."

8      Do you have any reason to believe that that isn't your

9  account of what happened?

10          MR. PALMER:  This was for December of 2010?

11          THE COURT:  December 17, 2010.

12          MR. PALMER:  I don't think I was -- I don't think I

13  participated in that call, Your Honor.

14          THE COURT:  I don't think you did either.  First off,

15  there was no call.

16          MR. PALMER:  Right.

17          THE COURT:  It was a court hearing.

18          MR. PALMER:  Right.

19          THE COURT:  You didn't show up.  You didn't speak.

20          MR. PALMER:  Correct.

21          THE COURT:  How can you tell me, "I notified the

22  court of the foregoing deficiencies during the December 17,

23  2010, conference call"?

24          MR. PALMER:  Well, I think it's either an error in

25  the date, or it's referring to the objections that we filed.

1   THE COURT: "I notified the court of the foregoing

2   deficiencies during the December 17, 2010, conference call."

3   That is a flat-out statement, sir.

4   MR. PALMER: Yes.

5   THE COURT: Is it true?

6   MR. PALMER: There was no call, that I recall.

7   THE COURT: In your declaration, you state, "I am the

8   lead partner at the Law Offices of Darrell Palmer." That

9   could be good, since it's named after you. And apparently

10  you have a Kira Rubel, senior associate, who is mentioned on

11  page 4 --

12  MR. PALMER: Correct.

13  THE COURT: -- as having worked 272 hours in this

14  matter.

15  MR. PALMER: That's right.

16  THE COURT: And in pleadings which she has filed with

17  this court, it lists her as having applied for and been

18  granted pro hac vice status.

19  MR. PALMER: That would be incorrect. She has not

20  yet applied for pro hac vice status in this court.

21  THE COURT: Then why is she signing pleadings

22  submitted to this court?

23  MR. PALMER: I think the one pleading that she

24  signed, as I recall, was done at a time when I was

25  unavailable to sign it.

1    THE COURT:  Is it a regular practice in your law firm

2    to have someone engage in unauthorized practice of law by

3    signing pleadings in courts where they are not admitted?

4    MR. PALMER:  No, sir.

5    THE COURT:  All right.  You may be seated.  Thank

6    you.

7        The ruling of this court will be as follows:  Plaintiffs

8    move the court to revoke Darrell Palmer's pro hac vice

9    admission on the grounds that he made a false statement in

10   his pro hac vice application.

11       My colleague, Judge Coughenour, on August 17, 2012, denied

12   Mr. Palmer's pro hac vice application for the reason of

13   containing the same false statement and, secondly, because,

14   in part, Mr. Palmer blamed his assistant for the error.

15   Those of us who know Judge Coughenour well know that that

16   would never be a good idea.

17       Mr. Palmer represents that it was an innocent mistake on

18   his part in connection with his application in this matter,

19   and has submitted an amended application that corrects the

20   false statement.  He also takes full responsibility for the

21   error, while stating, quote, "Mr. Palmer's office made an

22   inadvertent error."

23       It is undisputed that Mr. Palmer made a false statement in

24   his pro hac vice application.  He declared under penalty of

25   perjury that he had, quote, "not been disbarred or formally

1  censured by a court of record or by a state bar association;

2  and there are no disciplinary proceedings against me," in the

3  record at Docket 97.

4      In fact, Mr. Palmer was temporarily suspended from the

5  Colorado Bar Association, the State Bar of Arizona, and the

6  State Bar of California as a result of a Colorado felony

7  conviction in the 1990s.

8      Pursuant to Western District of Washington Local

9  Rule 2(f)(3), an attorney may be subject to disciplinary

10  action for violation of the Standards of Professional

11  Conduct, including the Federal Rules of Civil Procedure.

12      Under Federal Rule of Civil Procedure 11, an attorney's

13  signature on a court filing certifies that to the best of the

14  person's knowledge, the facts presented in the documents have

15  evidentiary support, Federal Rule of Civil Procedure

16  11(b)(3).

17      Here, Mr. Palmer improperly certified and declared under

18  penalty of perjury that he did not have a disciplinary

19  history.  As such, he violated the Standards of Professional

20  Conduct set forth in the local rules and is subject to

21  disciplinary action.

22      Mr. Palmer attempts to mitigate his error by

23  distinguishing the cases cited by plaintiff, explaining that

24  he was temporarily disbarred for conduct unrelated to the

25  practice of law, asserting that he meets the standards for

1    pro hac vice application in this district, taking

2    responsibility for his error, contending that his work

3    substantially benefitted the class, and maintaining that

4    plaintiffs have bad motives for bringing this action.

5        I have not conducted an independent investigation into the

6    Colorado Bar Association action, or Colorado conviction, and

7    I don't know if it was a disbarment or a suspension.  But

8    everyone seems to describe it as either one or the other of

9    those.

10            MR. PALMER:  So the record is clear, it was a

11   suspension, Your Honor.

12            THE COURT:  Please don't interrupt me, sir.  You are

13   in enough trouble already.

14       This misses the point that it is a civil rule violation

15   under Rule 11, not Mr. Palmer's suspension, that is at issue

16   in this matter.  I really don't want to know about the facts

17   of the underlying proceeding.  We will assume, since

18   Mr. Palmer is an officer of the court, that it was an

19   inadvertent problem.

20       However, in this matter, the conduct is unacceptable.

21   Mr. Palmer was alerted to the problem when his pro hac vice

22   application in Judge Coughenour's case was challenged.  That

23   was on October 10, 2012 (sic).  Mr. Palmer did not

24   immediately raise and seek to correct the same mistake in

25   this case.  In fact, plaintiffs waited ten days before filing

1   their motion to give Mr. Palmer time to raise and correct the

2   issue.

3       Mr. Palmer did not file an amended pro hac vice

4   application until August 27, 2012, a full 17 days after being

5   notified of the problem.  This does not demonstrate candor

6   with the court or that he took seriously the fact that he

7   made a false statement under oath.

8       Additionally, Mr. Palmer has apparently submitted false

9   pro hac vice applications in at least three other cases.  As

10  a final note, the false statement in the pro hac vice

11  application is not the only misrepresentation Mr. Palmer has

12  made to this court.  It is impossible to reconcile a

13  declaration submitted to this court under penalty of perjury,

14  dated May 17, 2012, with the court record.  And Mr. Palmer

15  has now acknowledged that it is incorrect.  That serves as

16  the basis for his fee application in this matter.

17      As will be further discussed today, Mr. Palmer made

18  several other misrepresentations in his motions for

19  attorneys' fees.  These misrepresentations confirm my

20  conclusion that the court sanction Mr. Palmer by revoking his

21  admission in this case.  Therefore, Docket 251 is granted,

22  and Mr. Palmer's pro hac vice is revoked.

23      Let me then take up next the question of the motion for

24  attorneys' fees by Judith Harper.

25      I'm not having argument, counsel.  I'm ruling from the

```
 1    bench.
 2              MR. TRENZ:  I apologize.
 3              THE COURT:  Are you admitted?
 4              MR. TRENZ:  Yes, Your Honor, I am.
 5              THE COURT:  Good.  I'm glad to hear we got one right.
 6         Under certain circumstances, attorneys for objectors may
 7    be entitled to attorneys' fees from the common fund.
 8    Objectors may claim the entitlement to fees on the same
 9    equitable principle as class counsel when their objections
10    result in an increase to the common fund or otherwise
11    substantially benefit the class.
12         Where objectors do not add any new legal argument or
13    expertise and they do not participate constructively in the
14    litigation or confer a benefit on the class, they are not
15    entitled to an award premised on equitable principles, the
16    Rodriguez versus Disner case, 688 F.3d 645-658, Ninth
17    Circuit, 2012.
18         Ms. Harper seeks an award of $1,116,250 in attorneys'
19    fees, $7,805.04 in costs, and a $3,000 service award.
20    Ms. Harper arrives at the approximately $1.1 million fee
21    award by taking 25 percent of $4.65 million, representing the
22    increase in the value of the fund after the additional class
23    members were discovered.  Under the lodestar cross-check, she
24    requests a multiplier of 4.51.  She maintains that the
25    requested fees are warranted because her actions directly
```

1   resulted in this benefit to the class.

2       Ms. Harper's counsel asserts that their actions resulted

3   in the following benefits to the class:  Number one, during a

4   December 17, 2010, conference call, they notified the court

5   of their fear that the parties had effectively left out a

6   portion of eligible class members from the original notice.

7   That is found in the Harper fee motion at page 2.

8       Mr. Palmer specifically states in his declaration, "I

9   notified the court of the foregoing deficiencies during the

10  December 17, 2010, conference call between the court and all

11  counsel.  As a result, the court ordered that class and

12  defense counsel look into the 'missing' class members and

13  report back to the court immediately."  Palmer declaration,

14  which is found in the docket at 232-1, paragraph 5.

15      Ms. Harper's counsel does assert that their observation

16  directly resulted in over 3 million additional class members

17  being discovered.  We now know, as has been admitted by

18  counsel today, that those statements are false.

19      Second, they identify the fact that the original

20  settlement agreement did not provide monetary benefit to

21  class members who were 180 days or more delinquent but who

22  had since paid off their debt, in the Palmer declaration at

23  paragraph 4.  They identified the fact that "charged-off"

24  class members were not provided monetary relief, Palmer

25  declaration at paragraph 4.

1    They identified the issue in the original settlement that,

2    although the lawsuit complained only of the statutory

3    violations committed by Sallie Mae, the settlement included

4    all released parties, Palmer declaration at paragraph 4.

5    The settlement agreement addressed the following

6    deficiencies identified by Ms. Harper's counsel:  Clearly

7    identifying the fact that the settling defendants included

8    all released parties; permitting monetary recovery to those

9    who were over 180 days late in making payments but who have

10   since paid off their debt; three, ensuring that all class

11   members received adequate notice of the settlement; and,

12   four, increasing the common fund to reflect the increase in

13   class membership.

14   Finally, they claim the court instructed the parties to

15   revise the revocation form in accordance with Ms. Harper's

16   counsels' suggestion prior to making it available to the

17   class.

18   Despite Ms. Harper's counsels' contention, they did not

19   directly add to the discovery of additional class members.

20   Sallie Mae's Rule 30(b)(6) deponent, Michael Walter,

21   testified that Sallie Mae realized its error after internal

22   counsel asked Mr. Walter to research a Sallie Mae borrower's

23   account and see if they were on the original notice list and

24   found that they were not on that list.

25   Mr. Walter further testified that Sallie Mae discovered

1   additional class members who were omitted from the original

2   notice when internal counsel asked Mr. Walter to research a

3   borrower that had a potential lawsuit with Sallie Mae.

4   Plaintiffs have submitted persuasive evidence that neither

5   Ms. Harper nor her counsel had anything to do with the

6   discovery of the additional class members.

7        As we have already discussed, Mr. Palmer makes the bald

8   assertion, in fact, a statement, in his declaration that he

9   notified the court of the deficiencies during a nonexistent

10  December conference call.  As a result, the court was

11  supposed to have ordered the class and defense counsel look

12  into class members.

13       The transcript of the December 17, 2010, in-court hearing

14  indicates that Mr. Palmer did not speak at all during the

15  hearing, and the court did not order the parties to

16  investigate any, quote, "missing," unquote class members.

17       Instead, it shows Mr. Dashiak, not Mr. Palmer, on behalf

18  of objectors McSweeney, Heath, and McBean, asserted that no

19  notice had been sent to class members in relationship with

20  affiliates or subsidiaries of Student Loan Marketing,

21  including Arrow Financial.

22       Counsel for Sallie Mae responded that notice had been sent

23  to these class members.  Counsel did not at that time know of

24  the additional class members.  In short, Ms. Harper's counsel

25  did nothing that resulted in the discovery of the additional

1   class members.  Furthermore, class counsel, not Ms. Harper's
2   counsel, negotiated the additional $4.65 million in the fund,
3   and are therefore responsible for that added benefit.
4        Ms. Harper's counsels' contention that they added a
5   substantial benefit to the class by identifying the fact that
6   "charged-off" members are not provided monetary relief and
7   identifying the issue that the settlement included all
8   released parties is unavailing.  The court rejected
9   Ms. Harper's objection regarding the "charged-off" class
10  members, and there is no indication that any change between
11  the original settlement and the amended settlement relating
12  to the released parties added any benefit to the class.
13       Further, Ms. Harper's counsel makes yet another
14  misrepresentation when they asserted that the court
15  instructed the parties to revise the revocation request form
16  in accordance with counsel's suggestion.  The court did no
17  such thing.  See the court's order of January 10, 2012, at
18  page 20.
19       The only benefit that Ms. Harper's counsel provided to the
20  class was pointing out that the original settlement did not
21  provide a monetary benefit to class members who were 180 days
22  or more delinquent but who had since paid off their debt.
23  This was a suggestion adopted by the parties in the amended
24  settlement, and it has provided a benefit to those class
25  members who are now able to receive a cash award.

1  Nevertheless, there is insufficient evidence in the record

2  for the court to conclude that this suggestion resulted in a

3  substantial benefit to the class so as to warrant attorneys'

4  fees.  For example, there is no evidence regarding how many

5  class members will benefit from this change.  As such, it

6  does not warrant any award of attorneys' fees and costs.

7      There are additional factors, counsel, against awarding

8  attorneys' fees and costs to Ms. Harper's counsel.  First of

9  all, many of their motions since the motion to intervene have

10  been rejected by the court, suggesting that the actions were

11  to disrupt and delay, which is consistent with the fact that

12  Mr. Palmer is a, and I'll use the phrase "professional" not

13  in any favorable sense, objector.  I believe that he has

14  previously been labeled that by one of my colleagues.

15      Second, counsel has made at least three misrepresentations

16  to the court in their motions for attorneys' fees, in

17  addition to the false statement on the pro hac vice

18  application.

19      Finally, the motion for attorneys' fees, a very

20  significant document, is signed by Kira Rubel, who represents

21  to the court that she is admitted pro hac vice, in addition

22  to Mr. Palmer, who now says that he wasn't there.  Ms. Ruble

23  has not been admitted pro hac vice.  Therefore this is

24  another misrepresentation.

25      Finally, even if the court deems it appropriate to make

1    some award of attorneys' fees here, Ms. Harper's counsel

2    bears the burden of documenting the appropriate hours and

3    providing support for those hours and the hourly rate.  And

4    her support is far too bare-boned and inadequate to satisfy

5    this burden.

6         Finally, it is highly questionable whether Ms. Harper even

7    has standing in this action.  Although Ms. Harper has

8    testified and presented declarations that she received 40 to

9    50 calls from Arrow Financial on her cell phone in violation

10   of the TCPA, Sallie Mae has presented a declaration that

11   Arrow Financial only has records of calling Ms. Harper's home

12   and fax lines.

13        Consistent with the findings in other judicial districts,

14   based on the submissions of the parties, the court finds

15   Sallie Mae's declaration has more credibility than Ms. Harper

16   for the following reasons:

17        Ms. Harper has not produced phone bills establishing the

18   alleged calls, even though Sallie Mae has requested them and

19   that would definitively resolve the matter in her favor; two,

20   Ms. Harper has made a false statement in a declaration that

21   she received a voicemail on December 3, 2010, when in fact

22   she received that voicemail in December 2008, paren, she now

23   claims this was simply a mistake, but it was once again in a

24   declaration submitted to the court; and, finally, Arrow

25   Financial has records that indicate it made a call to

1   Ms. Harper's home number on December 3, 2008, at the precise

2   time of the voice message Ms. Harper contends was left on her

3   cell phone.

4      For these reasons, I would resolve any factual disputes

5   regarding Ms. Harper's standing in favor of Sallie Mae, and

6   do not believe that she has standing in this matter.

7      Because Ms. Harper's counsel has not established their

8   entitlement to an attorneys' fee award, there is no reason to

9   award Ms. Harper a service award of $3,000.

10      In sum, the court denies Ms. Harper's motion for

11   attorneys' fees, costs, and a service award.

12      We will now turn to the third motion, which is the motion

13   for final approval of the amended class action settlement.  I

14   will hear from the plaintiffs first.

15         MR. SELBIN:  Thank you, Your Honor.  May it please

16   the court.  Jonathan Selbin, Lieff Cabraser Heimann &

17   Bernstein, on behalf of plaintiffs in the proposed class.

18      I know the court knows the history of this case

19   intimately.  I'm not going to walk through that history or

20   all of the aspects of the settlement.  I'm going to very

21   briefly summarize a few points, and then I'm happy to answer

22   any questions the court may have, if that's acceptable.

23         THE COURT:  Do your summary.  I would like to hear

24   you address by category the objectors.

25         MR. SELBIN:  Okay.  I can do that, Your Honor.  Very

1   briefly, to focus on the summary for a moment, we think this

2   is an outstanding settlement.  We recognize it's been

3   somewhat of a long road to get from there to here.  But we're

4   here, and we think it's time to bring this case to an end.

5       We are proud to present this settlement to the court for

6   its final approval.  It provides core relief to all 8 million

7   class members, all of whom had the right -- many of whom

8   exercised the right to stop the phone calls that were at

9   issue here and to do so by the submission of a very simple

10  form.  Some 100,000 -- just shy of 100,000 individuals

11  elected that remedy.

12      In a case about statutory damages, in other words, no

13  actual injury, no personal injury, no property damage, no

14  economic loss even, a case about statutory damages, Sallie

15  Mae is paying $24.15 million.

16      There is a declaration in front of Your Honor from the

17  claims administrator, Jennifer Keough, with all of the final

18  claims data in it.  And it provides that, based on the claims

19  that they've processed and all the information they have,

20  they estimate that the class members will receive somewhere

21  between $110 and $120 each.  The best bet is something like

22  $116 each.  I know that was an issue of concern for Your

23  Honor back in December of 2010, what those numbers would look

24  like.  We noticed the class at $20 to $40, to be on the

25  conservative side.  In fact, the payoff is going to be about

1    $116 each.

2         Direct notice -- individual direct notice was provided to

3    almost 95 percent of the class.  This isn't a case where we

4    have to worry that class members didn't get notice.  This

5    wasn't a publication notice case.  This was a case where we

6    knew the names and addresses and e-mail addresses of just shy

7    of 95 percent of the class.  Most of those people got notice

8    twice as a result of the original settlement and the amended

9    settlement.

10        The overwhelming class member response has been positive.

11   The numbers are in front of Your Honor.  But just to walk

12   briefly through them, we've had 163,250 individual, unique

13   claims filed.  We've had 99,860 revocation requests

14   submitted.  A total of 171,263 unique individuals have chosen

15   to participate in one form or the other.  So there's a lot of

16   overlap in those numbers.  But it's a total of 171,263

17   individuals.  We've had 35 objectors that were set out in 28

18   total objections.  But there were 35 individual class members

19   who objected.  We've had 395 opt-outs.

20        We've had no state Attorney General objections, as Your

21   Honor may be familiar with these days, under CAFA, because we

22   send out a notice to all the state AGs.  And I think that was

23   accomplished here on three occasions as a result of various

24   changes that took place.  And many of those state AGs are

25   typically very active these days.  They are heard from in

1    cases where they see a problem.  We have had no objections or

2    even calls or concerns from any state's Attorney General

3    about this settlement.

4        Most of the objections, Your Honor -- I can walk through

5    them more specifically, but the overwhelming majority of them

6    are of the "The settlement could have been more money"

7    nature.  We think the case law is pretty clear as to why

8    that's not a valid generic objection to make.

9        Your Honor asked us to brief, and we did brief, on

10    preliminary approval, after the initial denial of preliminary

11    approval, the comparison of the value of the settlement to

12    the potential damages.

13        And as we walk through there, Your Honor, it's hard to

14    come up with numbers here that's less than billions and

15    billions of dollars, if we were to win the case at the end of

16    the day and maintain it on appeal and go all the way up.

17        That's part of the problem with these cases, frankly, is

18    that they are statutory damages cases, where the numbers get

19    very large very quickly, to the point that they would be

20    annihilating damages for many of these defendants, which of

21    course would give the defendant every incentive to litigate

22    all the way up as far as they could for as many years as they

23    could.  And I think they would tell you it raises due process

24    issues for them.

25        So it's not a case where we can say the class has suffered

1    X million dollars in actual damages, and we recovered some

2    percentage of that.  To some degree, the dollars recovered

3    have to be looked at as whether it's a reasonable amount of

4    money to pay to this class based on how much each class

5    member is getting.

6        And as I indicated, for a case involving statutory damages

7    only, the $115, $116 class members will get, in conjunction

8    with the core prospective relief, we think is more than

9    adequate and reasonable.

10       A few of the specific objections, Your Honor, you've

11   addressed many of them in your preliminary approval order,

12   actually, it's Docket 206, in which you denied preliminary

13   approval, but you analyzed many of the objections and

14   overruled them at that time and ordered us to go back and fix

15   a couple of notice issues.

16       The issue of the allocation regarding "charged-off" class

17   members, the fact that no money is allocated to "charged-off"

18   class members, Your Honor addressed that at length in

19   Docket 206, at pages 21 through 23.

20       The short answer is, as the Ninth Circuit said in the *Mego*

21   litigation, it is appropriate to allocate no damages to class

22   members who have significantly weaker claims, so long as

23   there is a principled basis for doing so.  We explained those

24   principled bases, and the court has already adopted those in

25   its previous findings.

1    We've briefed the various issues relating to the

2  revocation form.  I'm not sure Your Honor needs to hear about

3  those again.  There is talk about the prospective relief and

4  whether it's meaningful.  Obviously, that's the central issue

5  in this entire case, is whether Sallie Mae is entitled to

6  make these phone calls or not.

7    To suggest that requiring people to go and check a form

8  and say, "Stop calling me," is somehow an illusionary relief

9  is just not accurate.  And the court made that finding

10 already as well.

11   So I don't know if Your Honor needs to hear about any

12 other specific objections.  I'm prepared to address them if

13 you need to.

14        THE COURT:  No, that's fine.  Thank you.

15        MR. SELBIN:  Thank you, Your Honor.

16        THE COURT:  Ms. Strickland, are you speaking on your

17 side?

18        MS. STRICKLAND:  Your Honor, I am speaking on our

19 side.  But, candidly, I have very little to add, unless Your

20 Honor has specific questions.

21        THE COURT:  I don't.

22        MS. STRICKLAND:  Thank you.

23        THE COURT:  All right.  As I indicated, I am taking

24 that one under advisement.  Counsel, you should be aware

25 that, unless I see something in the final order that changes

1  my mind, I will be approving the settlement.

2      Let's go then to the motion for attorneys' fees, costs,

3  and service award.

4          MR. SELBIN:  Thank you, Your Honor.  Jonathan Selbin

5  again.  Very briefly here, Your Honor is aware that we are

6  seeking a fee out of the common fund here.  This is not a

7  lodestar multiplier fee situation.  Although, of course Your

8  Honor is required to engage in that as a cross-check on the

9  common fund.

10     I know Your Honor knows the benchmark of the Ninth Circuit

11 is 25 percent.  We are seeking below the benchmark in this

12 case.  By one measure, we're seeking 20 percent of the

13 24.15 million.  It actually is about 19 percent, because

14 we're not seeking the 20 percent plus costs; we're seeking

15 the 20 percent with the costs included.  So if you walk

16 through the math, it ends up being 19 percent, approximately,

17 of the total fund.

18     In terms of the lodestar cross-check, the multiplier,

19 we're seeking -- and this is on time just through April 30,

20 2012, which is the cutoff date we used.  There's obviously

21 been substantial additional time, and will be substantial

22 additional time as we oversee the mailing of the claims --

23 the claims processing and the mailing of the checks.

24          THE COURT:  What do you estimate that substantial

25 time will be?

 1              MR. SELBIN:  Over time?  You know, Your Honor, it's

 2     been --

 3              THE COURT:  Since the application was filed.

 4              MR. SELBIN:  Oh, since the application.  You know,

 5     Your Honor, we could run those numbers for you, if you would

 6     like them.  I don't even have a ballpark sense.  It's all

 7     been surrounding the final approval papers and responding to

 8     the various motions from the Harper counsel and those sort of

 9     things.  I don't -- I can't represent to the court what that

10     number is.

11              THE COURT:  Would you say that it's under 400 hours?

12              MR. SELBIN:  Oh, I think it's probably under

13     400 hours.  I think that's probably right, Your Honor.  In

14     terms of how much more time we will have to devote, I do know

15     from experience that there will be many additional hours in

16     overseeing the work of the Garden City Group, who is

17     administering the claims program, assisting class members.

18     We get class member calls all the time, and we work very

19     closely with class members to help them through the process.

20         So there will be additional time.  Again, it's not

21     possible to really quantify that, other than to say that that

22     amount of time as well will further reduce the lodestar

23     multiplier.

24         But as of April 30, 2012, the multiplier was 2.59.  In

25     terms of a cross-check multiplier, that's a very reasonable

1   multiplier.  If we were seeking an award just on our lodestar

2   under that method, we think that would be a reasonable

3   multiplier.  But certainly as a cross-check, it's well within

4   the range of 1 to 4, which the Ninth Circuit has said is the

5   typical multiplier in these sorts of situations.  And we

6   think it's justified.

7       In terms of -- and I can walk through the additional

8   factors, but it's all in our briefs, so I --

9           THE COURT:  Well, let me ask you my question.

10          MR. SELBIN:  Sure.

11          THE COURT:  If I were to ask you to give yourself a

12  grade on your handling of this litigation, what grade would

13  you give?

14          MR. SELBIN:  That's a fair question, Your Honor.  And

15  I've actually thought quite a bit about that and gone back

16  and looked over the history of this case.  And as I look back

17  over the history of this case, we made one mistake very early

18  on, which was that we put the wrong date on the notice, the

19  date by which we were going to post our fee application on

20  the settlement website.  And that, Your Honor, found under

21  *Mercury Interactive*, required a re-noticing, for which we

22  took responsibility.

23      And so that mistake was an initial hiccup that was

24  resolved very quickly.  And so I think that, looking over the

25  whole case, I would give us probably an A minus.  I think our

1  one mistake was that initial mistake.  And other than that,

2  there have been hiccups in the litigation, but they haven't

3  been of our making.

4    So Sallie Mae found additional class members on two

5  different occasions, and that required us to go back and

6  negotiate a new settlement on two different occasions.

7      THE COURT:  Well, let me stop you, because I can't

8  accept the A minus.  Mr. Palmer was responsible for me having

9  to go read that December court transcript.  And I found you

10 standing at that very podium -- I think you were wearing a

11 different tie -- saying, "Judge, this is all just fine.

12 We're working through a couple loose details here, but sign

13 the settlement.  Give approval."  And what I hear, counsel,

14 is, "We've invested enough in this case.  Get us paid."  And

15 if I had done so at that time, we would have missed a

16 substantial portion of this class.

17    And, frankly, I don't think the lawyering has been very

18 good in this case.  So, I mean, help me understand why you

19 give yourself an A minus, when we have had what you describe

20 as hiccups, but what I would describe as falling off the

21 cliff.

22      MR. SELBIN:  Your Honor, if I may, I --

23      THE COURT:  I mean, you can't blame Sallie Mae for

24 knowing who is in your class.  That's not going to fly around

25 here.

1          MR. SELBIN:  The problem with that, Your Honor, is

2     that they are the ones who had the information.  It was

3     solely in their possession.  And they presented us the

4     information in interrogatory responses.  We did the work you

5     would expect lawyers to do to get that information.

6          So, in other words, we served interrogatories that asked

7     Sallie Mae to tell us how many people were in the class and

8     how many people fell into different categories, and they

9     answered those interrogatories.  And so based on that

10    information, we thought we had all the information.  And I'm

11    not sure what a reasonable lawyer would do in those

12    circumstances, beyond accepting the sworn discovery responses

13    of the defendant.

14         Now, as it turned out, they came to us and discovered that

15    they had missed some things.  We came forward immediately to

16    the court and said, Your Honor, we need time to figure out

17    what's going on here.  We took the deposition of Mr. Walter

18    on two occasions in order to ascertain what happened.  We

19    served additional interrogatories.  They answered additional

20    interrogatories.

21         So I really do believe, Your Honor, what I am fully

22    cognizant of and take responsibility for is our error on the

23    *Mercury Interactive* piece of this.  We actually, as you will

24    recall, did post our -- we did post our fee application on

25    the website.  We just put the wrong date in the notice as to

1    when we were going to do it.

2         Unquestionably, that was a mistake.  Was it a big mistake?

3    I don't think that was a big mistake.  It required us to then

4    put everything over.  And I don't recall, Your Honor, saying

5    everything is fine, just fine, we want you to go ahead and

6    approve the settlement.  You indicated pretty quickly at that

7    hearing that you were inclined to put things over, given all

8    of the loose ends that were out there.

9         But I believe, Your Honor, that we have done our job as

10   class counsel.  We've worked hard in this case.  We waived

11   any fees out of that additional money that was generated,

12   because we didn't feel like the Palmer folks could take

13   responsibility, equally.  Frankly, we felt like that was

14   something that came about not because of us but because of

15   Sallie Mae.

16        So I stand by -- I hear Your Honor, but I stand by my A

17   minus.  And I say that we made one mistake.  The finding of

18   the additional class members was not something any reasonable

19   lawyer working diligently could have uncovered.  It wasn't

20   information that we had access to.  It was information that

21   we sought discovery on, and they provided us responses.

22             THE COURT:  All right.  Thank you.

23             MR. SELBIN:  Very good, Your Honor.  Thank you.

24             THE COURT:  Ms. Strickland, Sallie Mae, do you wish

25   to be heard?

1          MS. STRICKLAND:  No, Your Honor.

2          THE COURT:  All right.  Counsel, as I indicated, in

3   regards to the prior motion for approval, I do intend to

4   award some attorneys' fees.  I wanted to have the advantage

5   of hearing what counsel had to say.

6      This case has not gone smoothly.  And I would have

7   expected more from the quality of counsel that we have in the

8   room.  I will grant you that the Ninth Circuit has some

9   unusual rules in regards to administration of class actions.

10  And the question in my mind at this time is, somewhere

11  between actual attorneys' fees and a lodestar factor,

12  particularly the lodestar factor recommended by the

13  plaintiffs in this matter, what is the appropriate amount?

14  So that is the question that I will answer, but know that you

15  will get paid.  The question is:  How much?

16     Counsel, anything further at this time?

17          MS. TERRELL:  No, Your Honor.

18          MR. SELBIN:  Nothing further here, Your Honor.

19          MS. STRICKLAND:  Nothing, Your Honor.

20          THE COURT:  All right.  Then we'll be in recess.

21  Thank you.

22          MR. SELBIN:  Thank you, Your Honor.

23          MR. PALMER:  Thank you, Your Honor.

24          (Proceedings adjourned.)

25

```
 1                    C E R T I F I C A T E

 2

 3

 4            I, Kari McGrath, CCR, CRR, RMR, Official Court

 5   Reporter for the United States District Court in the Western

 6   District of Washington at Seattle, do hereby certify that I

 7   was present in court during the foregoing matter and reported

 8   said proceedings stenographically.

 9            I further certify that thereafter, I have caused

10   said stenographic notes to be transcribed under my direction

11   and that the foregoing pages are a true and accurate

12   transcription to the best of my ability.

13

14

15                         /S/  KARI McGRATH

16                         Kari McGrath, CCR, CRR, RMR

17                         Official Court Reporter

18

19

20

21

22

23

24

25
```

# EXHIBIT D

1  ELIZABETH C. PRITZKER (SBN: 146267)
   PRITZKER | LAW
2  633 Battery Street, Suite 110
   San Francisco, CA 94111
3  Telephone: (415) 692-0772
   Facsimile: (415) 366-6110
4  Email: ecp@pritzker-law.com

5
   LAURA J. BAUGHMAN (SBN: 263944)
6  BARON & BUDD, P.C.
   3102 Oak Lawn Avenue, Suite 1100
7  Dallas, TX 75219
   Phone: (214) 521-3605
8  Fax: (214) 520-1181
   Email: lbaughman@baronbudd.com
9
   Co-Lead Class Counsel
10

11
                    SUPERIOR COURT OF CALIFORNIA
12
                      COUNTY OF LOS ANGELES
13

14 | Coordination Proceeding          ) CASE NO. J.C.C.P. 4657
   | Special Title (Rule 3.550)       )
15 |                                   ) **CLASS ACTION**
   |                                   )
   | IN RE GIB, LLC CASES             ) **SUPPLEMENTAL DECLARATION OF**
16 |                                   ) **BETHANY CARACUZZO IN SUPPORT**
   |                                   ) **OF PLAINTIFF'S REPLY IN SUPPORT**
17 |                                   ) **OF UNOPPOSED MOTION FOR FINAL**
   |                                   ) **APPROVAL OF CLASS SETTLEMENT**
18 |_____ )
   |                                   ) Date:    October 24, 2013
19 | All included actions.             ) Time:    9:00 a.m.
   |                                   ) Dept.:   323
20 |                                   ) Judge:   Hon. Elihu M. Berle
   |                                   )
21 |_____ )

22
   I, Bethany Caracuzzo, declare:
23
         1.    I am an attorney in good standing licensed to practice in the State of California.
24
         2.    I am an associate with the law firm of PRITZKER | LAW, which serves as Class
25
   Counsel and counsel of record for Plaintiffs Jennifer Anderson and Melise D'Angiolillo in the
26
   following action that has been made part of Judicial Council Coordinated Proceeding No. 4657
27
   (hereafter "JCCP Action"): *Anderson et al. v Brazilian Blowout et al.*, Los Angeles County
28
                                          - 1 -

1  Superior Court, No. BC448687.

2      3.    I have personal knowledge of the facts set forth in this declaration and could

3  competently testify to them if called as a witness.

4      4.    Attached as **Exhibit A** hereto please find a true and correct copy correspondence

5  PRITZKER │ LAW received from Class Member Donna Armani Pineda, withdrawing her

6  objection to the Settlement. This correspondence was received via facsimile and email to my

7  email address at PRITZKER │ LAW.

8      I declare under penalty of perjury under the laws of the State of California that the

9  foregoing is true and correct.

10     Executed on October 22, 2013, at San Francisco, California.

11

12

13                                              Bethany Caracuzzo

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

SUPPLEMENTAL DECLARATION OF BETHANY CARACUZZO IN SUPPORT OF PLAINTIFFS' MOTION
FOR FINAL APPROVAL OF CLASS SETTLEMENT

EXHIBIT A

Donna Armani Pineda

October 21, 2013
Page 1 of 2

Dear Clerk of Court,

Today I spoke with Bethany Caracuzzo, an attorney a Peitzker Law. I understand that her firm represents class members in this case.

I do not want to object to the Class Action Settlement. I did not realize that an earlier letter that was sent to the court with name on it was an objection to the settlement. I do wish to submit a claim for settlement benefits.

On September 23, 2013, I received a phone call from someone named Darrell Palmer. Mr. Palmer told me he needed to find someone who used Brazilian Blowout or Brazilian Blowout Acai products and that a mutual friend, Christy, had given him my name. He said he was calling me from his boat on Catalina Island. Although he told me he was an attorney, I did not ask him to be my attorney or to represent me. I do not believe Mr. Palmer and I have ever had an attorney-client relationship.

In the call, Mr. Palmer said he wanted me to review and sign a letter about the settlement to send with my claim form for settlement benefits. He told me he does this "all the time" and that I had to decide and send the letter immediately, the same day. Mr. Palmer told me that the company who made the Brazilian Blowout products was claiming that they did not cause anybody harm and that the products were safe, and that he needed me to submit an objection so that company could no longer make these claims. He said he would write a letter that he put my name on, and email it to me to sign and return.

HE TOOK MY NAME AND ADDRESS, AND MY HAIRDRESSER'S
NAME AND ADDRESS, TO PUT IN THE LETTER AND IN MY CLAIM FORM.
EXCEPT FOR THE FIRST CALL, ALL OF MY DISCUSSIONS WITH
MR. PALMER WERE BY EMAIL. I AM ATTACHING COPIES OF
THOSE EMAILS TO THIS LETTER. I HAVE NOT SPOKEN OR
EMAILED WITH MR. PALMER SINCE SEPTEMBER 23.

I DID NOT UNDERSTAND THAT THE LETTER MR. PALMER
WROTE FOR ME WAS AN OBJECTION TO THE SETTLEMENT. I
ACTUALLY THINK THE SETTLEMENT IS A GOOD THING. I WANT
PEOPLE, ESPECIALLY HAIRDRESSERS LIKE MY OWN HAIRDRESSER,
JEN ACITELLI, TO BE ABLE TO RECOVER MONEY AS A RESULT
OF THE SETTLEMENT, AS I THINK THE PRODUCTS WERE
REALLY HARMFUL. I AM VERY UPSET AND ANGRY THAT
MR. PALMER TOLD ME I WAS OBJECTING TO THE COMPANY'S
CLAIMS IT SOLD A SAFE PRODUCT, AND THAT HE DIDN'T TELL
ME I WAS OBJECTING TO THE ENTIRE SETTLEMENT. THAT IS
NOT WHAT I WANT TO DO.
I APOLOGIZE IF I WAS CONFUSED, BUT I DO NOT WANT TO OBJECT
TO THIS SETTLEMENT. TO BE ABSOLUTELY CLEAR, I WITHDRAW ANY
OBJECTION TO THE SETTLEMENT. I WISH AND HOPE TO RECOVER
A SETTLEMENT PAYMENT UNDER THE CLAIM FORMS I SUBMITTED.

THANK YOU, Donna Armani Pineda
DONNA ARMANI PINEDA
HOME 858-756-5007
FAX 858-756-5990
DONNAARMANI@Gmail.Com

'S. I REALIZED I JUST FOUND A BRIEF EMAIL EXCHANGE ON 9/26/2013 AND I HAVE
ATTACHED -

From: "Darrell Palmer" <darrell.palmer@palmerlegalteam.com>
Subject: RE: Brazilian Blowout Settlement
Date: September 23, 2013 12:10:18 PM PDT
To: <donnaarmani@gmail.com>

2 Attachments, 88 KB

One is for Stylist = one is for consumers

**From:** Darrell Palmer
**Sent:** Monday, September 23, 2013 12:07 PM
**To:** 'donnaarmani@gmail.com'
**Subject:** FW: Brazilian Blowout Settlement

Donna,

Nice chatting with you.

Donna Armani
15945 Ave Calma
Rancho Santa Fe CA 92091

Jen Acitelli
Synergy Hair Salon
401 W Grand
Escon 92025

Please feel out the attached claim form and email it back to me asap.

Let me know if you talk to Jen – I'd love to have her as a client too.  Always call my cell

Thanks

Darrell

Darrell Palmer, LL..M.
Law Offices of Darrell Palmer
2244 Faraday Ave
Carlsbad, CA 92008
(858) 215-4064 Ph
(866) 583-8115 Fax
(619) 985-1099 Cell
darrell.palmer1 Skype

**From:** christy stevenson [mailto:christystevenson919@gmail.com]
**Sent:** Monday, September 23, 2013 11:10 AM
**To:** Darrell Palmer
**Subject:** Re: Brazilian Blowout

Hi Darrel,

I know someone who gets brazillian blowouts at a salon  her name is Donna Armani,  858 7565007
On Sep 23, 2013, at 10:23 AM, Darrell Palmer wrote:

I need a client who used  hair smoothing - products known as Brazilian Blowout Solution and Brazilian Blowout Acai Professional Smoothing Solution

You may be covered by the Proposed Settlement if (1) you a person in the United States who purchased Brazilian Blowout Products directly from GIB, LLC or one of its authorized distributors on or before June 6, 2012 ("Stylist" Class member), or (2) you are a person in the United States who underwent a treatment using Brazilian Blowout Products on or before June 6, 2012 ("Consumer" Class member).

If you know of anyone please call me asap in the next couple hours.........

Darrell Palmer, LL..M.
Law Offices of Darrell Palmer
2244 Faraday Ave
Carlsbad, CA 92008
(858) 215-4064 Ph
(866) 583-8115 Fax
(619) 985-1099 Cell
darrell.palmer1 Skype

stylist-claim....pdf (52 KB)   consumer-c...pdf (35 KB)

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES
### *In re GIB LLC Cases* – JCCP No. 4657

## STYLIST/SALON PURCHASER REIMBURSEMENT CLAIM FORM

### FOR PURCHASES OF BRAZILIAN BLOWOUT SOLUTION OR BRAZILIAN BLOWOUT ACAI PROFESSIONAL SMOOTHING SOLUTION

## YOU MUST SUBMIT YOUR CLAIM FORM NO LATER THAN SEPTEMBER 23, 2013

### CONTACT AND PURCHASE INFORMATION

**(Please type or print the following information):** Fill in the following blanks with complete information. **Please print clearly.**

Name:_____

Name of Salon: _____

Mailing Address: _____

Apartment/Unit Number: _____

City: _____ State: _____ Zip Code: _____

Daytime Telephone (_____) _____ Evening Telephone(_____) _____

EmailAddress:_____

** If you move or your name changes, please send your new contact information to the Claims Administrator via the settlement website or First-Class U.S. Mail, at the address listed below.

### PURCHASES OF BRAZILIAN BLOWOUT SOLUTION OR BRAZILIAN BLOWOUT ACAI PROFESSIONAL SMOOTHING SOLUTION:

A.  **Brazilian Blowout Solution:** _____ x $75 = $ _____

B.  **Brazilian Blowout Acai Professional Smoothing Solution:** _____ x $75 = $ _____

Total Amount Requested: $ _____.

C.  Date(s) of Purchase(s): _____

D.  From Whom Purchased: _____

### TO APPLY FOR REIMBURSEMENT

- Complete the Contact and Purchase information above.
- Sign and date the Claim Form.
- Submit this completed form to:

Brazilian Blowout Settlement
Claims Administrator
c/o Heffler Claims Group
P.O. Box 58580
Philadelphia, PA 19102-8580

## TO EXCHANGE UNOPENED BOTTLES OF BRAZILIAN BLOWOUT PRODUCT

If you have **sealed and unopened** bottles of Brazilian Blowout Solution or Brazilian Blowout Acai Professional Smoothing Solution (Brazilian Blowout Product), you may choose to exchange your unopened bottles for bottles of new Brazilian Blowout Zero. **You are not required to make exchanges of unopened bottles. If you choose to exchange your unopened bottles, you forfeit your right to receive $75 reimbursement for each of those purchases.**

Even if you choose to make exchange(s) for Brazilian Blowout Zero, you may still receive your $75 reimbursement for each qualifying purchase that you do not exchange for Brazilian Blowout Zero.

Exchanges should be sent to:

GIB, LLC
10615 Vanowen Street
Burbank, CA 91502

## CERTIFICATION (SIGNATURE REQUIRED):

I certify under penalty of perjury that the information on this form is true and correct to the best of my knowledge and belief.

_____

Signature

_____

Date

CLAIM PROCESSING TAKES A SIGNIFICANT AMOUNT OF TIME.

THANK YOU FOR YOUR PATIENCE.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

*In re GIB LLC Cases* – JCCP No. 4657

## CONSUMER REIMBURSEMENT CLAIM FORM

FOR TREATMENT WITH BRAZILIAN BLOWOUT SOLUTION OR
BRAZILIAN BLOWOUT ACAI PROFESSIONAL SMOOTHING SOLUTION

### YOU MUST SUBMIT YOUR CLAIM FORM NO LATER THAN SEPTEMBER 23, 2013

## CONTACT AND TREATMENT INFORMATION

**(Please type or print the following information):** Fill in the following blanks with complete information.
**Please print clearly.**

Name: _____

Mailing Address: _____

Apartment/Unit Number: _____

City: _____ State: _____ Zip Code: _____

Daytime Telephone ( _____ ) _____ Evening Telephone ( _____ ) _____

Email Address: _____

\*\* If you move or your name changes, please send your new contact information to the Claims Administrator via the settlement website or First-Class U.S. Mail, at the address listed below.

**Treatments:**

Name(s) of Salon(s): _____

Name(s) of Stylist(s): _____

Date(s) of Treatment(s): _____

**Number of Treatments with Brazilian Blowout Solution or Brazilian Blowout Acai Professional Smoothing Solution:**

_____ x $35 = $ _____

Claim Maximum is $105 (maximum of three treatments can be claimed).

Total Amount Requested: $ _____.

## TO APPLY FOR REIMBURSEMENT

- Complete the Contact and Treatment information above.
- Sign and date the Claim Form.
- **If you are submitting a claim for reimbursement for more than one treatment,** attach a receipt, invoice, canceled check or a signed statement from your treatment provider, signed under penalty of perjury, that a Brazilian Blowout Product was used in each additional treatment.
- Submit this completed form and copies of your documentation (described above) to:

Brazilian Blowout Settlement
Claims Administrator
c/o Heffler Claims Group
P.O. Box 58580
Philadelphia, PA 19102-8580

<u>CERTIFICATION (SIGNATURE REQUIRED):</u>

I certify under penalty of perjury that the information on this form is true and correct to the best of my knowledge and belief.

Signature

Date

CLAIM PROCESSING TAKES A SIGNIFICANT AMOUNT OF TIME.

THANK YOU FOR YOUR PATIENCE.

From: "Darrell Palmer" <darrell.palmer@palmerlegalteam.com>
Subject: Letter for your signature
Date: September 23, 2013 1:48:37 PM PDT
To: <donnaarmani@gmail.com>

Please review..........

Sign and fax back to me asap.

Thanks,

Darrell

Darrell Palmer, LL.M.
Law Offices of Darrell Palmer
2244 Faraday Ave
Carlsbad, CA 92008
(858) 215-4064 Ph
(866) 583-8115 Fax
(619) 985-1099 Cell
darrell.palmer1 Skype

1 Attachment, 235 KB

**From:** Darrell Palmer
**Sent:** Monday, September 23, 2013 1:49 PM
**To:** donnaarmani@gmail.com
**Subject:** Letter for your signature

Please review...........

Sign and fax back to me asap.

Thanks,

Darrell

Darrell Palmer, LL.M.
Law Offices of Darrell Palmer
2244 Faraday Ave
Carlsbad, CA 92008
(858) 215-4064 Ph
(866) 583-8115 Fax
(619) 985-1099 Cell
darrell.palmer | Skype


Armani Obj....pdf (235 KB)

*Donna Armani*
*15945 Ave Calma*
*Rancho Santa Fe CA 92091*
*donnaarmani@gmail.com*
*858-756-5007*

September 23, 2013

***Via USPS First Class Mail***
Clerk of the Court
Superior Court of the State of California
County of Los Angeles
Central Civil West Courthouse
600 S. Commonwealth Avenue
Los Angeles, CA 90005

Re: ***In re GIB LLC Cases*** – JCCP No. 4657

OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

Dear Clerk of Court and Honorable Court:

Please accept this letter as my objection to the proposed class action settlement, the award of excessive attorneys' fees to class counsel, and the Court's approval of the settlement in the above referenced class action lawsuit. The proponents of this settlement have not met their burden to show that the settlement is fair, reasonable, and adequate.

I am a Brazilian Blowout customer in the United States who has purchased Brazilian Blowout treatments using the specified products on numerous occasions prior to June 6, 2012 and I am a class member. I've attached a copy of my claim form which I am also mailing today.

I object to the unfairness of this settlement. The class receives very little benefit. A class action is intended to convey a benefit to an injured class and a settlement cannot be found to be fair, reasonable and adequate if the benefit delivered to the class is inadequate.

Objection is made based on the proposed award of attorneys' fees, which is excessive under both a lodestar and a percentage of recovery methodologies. Additional objection is made to the extent of the failure of class counsel to make a detailed attorneys' fee and expense application within a reasonable and adequate amount of time for objectors to evaluate the fee and expense application. Of the $1.9 million dollar settlement fund, $1.63 million has been reserved for attorneys' fees.

Specific objection is made that the proponents of this settlement have not met their burden to show that the settlement is fair, reasonable, and adequate.

OBJECTION TO PROPOSED SETTLEMENT
In re GIB LLC Cases, JCCP No. 4657

Objection is made to the overly broad release, specifically but not limited to the "known and unknown" claims "of any nature whatsoever" and "relating to any of the acts" related to the false labeling.

I also object to the proponents of the settlement not sustaining their burden of proof on commonality, predominance, superiority and adequacy of class counsel and class representatives under Federal Rule of Civil Procedure 23.

Objection is made to any procedures or requirements to object that require information or documents other than those that are contained herein to the extent that such requirements are unnecessary, unduly burdensome, are calculated to drive down the number and quality of objections to the settlement and violate objectors' due process rights and Rule 23(e)(5).

I also join in and incorporate herein by reference any and all objections filed by other objectors as though set forth in full, to the extent not inconsistent with the specific objections made herein.

I will not attend the fairness hearing.

I am mailing my objections, as indicated above and below, to the court and to the attorneys identified in the notice as required recipients. Please serve me with copies of all future filings via email. Please only communicate with me via email.

Sincerely,

_____
Donna Armani

cc: *Via USPS First Class Mail*

Laura J. Baughman
Baron & Budd P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219

Elizabeth Pritzker
Pritzker | Law
633 Battery Street, Suite 110
San Francisco, CA 94111

Thomas H. Clarke
Ropers Majeski Kohn Bentley, PC
1001 Marshall Street
Suite 500
Redwood City, CA 94063

2

From: "Darrell Palmer" <darrell.palmer@palmerlegalteam.com> 🖉 📄
Subject: Armani Pineda Letter
Date: September 23, 2013 1:59:02 PM PDT
To: <donnaarmani@gmail.com>

Darrell Palmer, LL.M.
Law Offices of Darrell Palmer
2244 Faraday Ave
Carlsbad, CA 92008
(858) 215-4064 Ph
(866) 583-8115 Fax
(619) 985-1099 Cell
darrell.palmer1 Skype


Armani Pine...pdf (235 KB)

*Donna Armani Pineda*
*15945 Ave Calma*
*Rancho Santa Fe CA 92091*
*donnaarmani@gmail.com*
*858-756-5007*

September 23, 2013

*Via USPS First Class Mail*
Clerk of the Court
Superior Court of the State of California
County of Los Angeles
Central Civil West Courthouse
600 S. Commonwealth Avenue
Los Angeles, CA 90005

Re: *In re GIB LLC Cases* – JCCP No. 4657

## OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

Dear Clerk of Court and Honorable Court:

Please accept this letter as my objection to the proposed class action settlement, the award of excessive attorneys' fees to class counsel, and the Court's approval of the settlement in the above referenced class action lawsuit. The proponents of this settlement have not met their burden to show that the settlement is fair, reasonable, and adequate.

I am a Brazilian Blowout customer in the United States who has purchased Brazilian Blowout treatments using the specified products on numerous occasions prior to June 6, 2012 and I am a class member. I've attached a copy of my claim form which I am also mailing today.

I object to the unfairness of this settlement. The class receives very little benefit. A class action is intended to convey a benefit to an injured class and a settlement cannot be found to be fair, reasonable and adequate if the benefit delivered to the class is inadequate.

Objection is made based on the proposed award of attorneys' fees, which is excessive under both a lodestar and a percentage of recovery methodologies. Additional objection is made to the extent of the failure of class counsel to make a detailed attorneys' fee and expense application within a reasonable and adequate amount of time for objectors to evaluate the fee and expense application. Of the $1.9 million dollar settlement fund, $1.63 million has been reserved for attorneys' fees.

Specific objection is made that the proponents of this settlement have not met their burden to show that the settlement is fair, reasonable, and adequate.

OBJECTION TO PROPOSED SETTLEMENT
In re GIB LLC Cases, JCCP No. 4657

Objection is made to the overly broad release, specifically but not limited to the "known and unknown" claims "of any nature whatsoever" and "relating to any of the acts" related to the false labeling.

I also object to the proponents of the settlement not sustaining their burden of proof on commonality, predominance, superiority and adequacy of class counsel and class representatives under Federal Rule of Civil Procedure 23.

Objection is made to any procedures or requirements to object that require information or documents other than those that are contained herein to the extent that such requirements are unnecessary, unduly burdensome, are calculated to drive down the number and quality of objections to the settlement and violate objectors' due process rights and Rule 23(e)(5).

I also join in and incorporate herein by reference any and all objections filed by other objectors as though set forth in full, to the extent not inconsistent with the specific objections made herein.

I will not attend the fairness hearing.

I am mailing my objections, as indicated above and below, to the court and to the attorneys identified in the notice as required recipients. Please serve me with copies of all future filings via email. Please only communicate with me via email.

Sincerely,

Donna Armani Pineda

cc: *Via USPS First Class Mail*

Laura J. Baughman
Baron & Budd P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219

Elizabeth Pritzker
Pritzker | Law
633 Battery Street, Suite 110
San Francisco, CA 94111

Thomas H. Clarke
Ropers Majeski Kohn Bentley, PC
1001 Marshall Street
Suite 500
Redwood City, CA 94063

2



From: Donna Armani Pineda <donnaarmani@gmail.com>
Subject: Re: Brazilian Blowout Settlement
Date: September 23, 2013 2:09:04 PM PDT
To: Darrell Palmer <darrell.palmer@palmerlegalteam.com>
Reply-To: Donna Armani Pineda <DonnaArmani@gmail.com>

1 Attachment, 942 KB

Hi Darrell,

It has been very nice talking with you.
I have attached the first forms you sent me.

Thank you very much!

Sincerest regards,
Donna


Donna Armani Pineda
Home: 858.756.5007
Mobile: 619.977.9699


Scan 13266....pdf (942 KB)

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES
*In re GIB LLC Cases* – JCCP No. 4657

CONSUMER REIMBURSEMENT CLAIM FORM

FOR TREATMENT WITH BRAZILIAN BLOWOUT SOLUTION OR
BRAZILIAN BLOWOUT ACAI PROFESSIONAL SMOOTHING SOLUTION
YOU MUST SUBMIT YOUR CLAIM FORM NO LATER THAN SEPTEMBER 23, 2013

CONTACT AND TREATMENT INFORMATION

(Please type or print the following information): Fill in the following blanks with complete information.
Please print clearly.

Name: DONNA ARMANI PINEDA

Mailing Address: 15945 AVENIDA CALMA

Apartment/Unit Number: _____

City: RANCHO SANTA FE  State: CA  Zip Code: 92091-4163

Daytime Telephone (619) 977 9699  Evening Telephone (858) 756-5007

Email Address: DONNAARMANI@GMAIL.COM

** If you move or your name changes, please send your new contact information to the Claims Administrator via the settlement website or First-Class U.S. Mail, at the address listed below.

Treatments:

Name(s) of Salon(s): SYNERGY HAIR STUDIO

Name(s) of Stylist(s): JEN ACITELLI

Date(s) of Treatment(s): BETWEEN 2010 - 2011 I HAD AT LEAST SIX TREATMENTS

Number of Treatments with Brazilian Blowout Solution or Brazilian Blowout Acai Professional
Smoothing Solution:

3 x $35 = $ 105.00

Claim Maximum is $105 (maximum of three treatments can be claimed).

Total Amount Requested: $ 105.00

TO APPLY FOR REIMBURSEMENT
- Complete the Contact and Treatment Information above.
- Sign and date the Claim Form.
- **If you are submitting a claim for reimbursement for more than one treatment,** attach a receipt, invoice, canceled check or a signed statement from your treatment provider, signed under penalty of perjury, that a Brazilian Blowout Product was used in each additional treatment.
- Submit this completed form and copies of your documentation (described above) to:
Brazilian Blowout Settlement
Claims Administrator
c/o Heffler Claims Group
P.O. Box 58580
Philadelphia, PA 19102-8580

CERTIFICATION (SIGNATURE REQUIRED):

I certify under penalty of perjury that the information on this form is true and correct to the best of my knowledge and belief.

Signature                                        Date    SEPTEMBER 23, 2013

CLAIM PROCESSING TAKES A SIGNIFICANT AMOUNT OF TIME.

THANK YOU FOR YOUR PATIENCE.

From: Donna Armani Pineda <donnaarmani@gmail.com>
Subject: Re: Brazilian Blowout Settlement
Date: September 23, 2013 2:22:46 PM PDT
To: Darrell Palmer <darrell.palmer@palmerlegalteam.com>
Reply-To: Donna Armani Pineda <DonnaArmani@gmail.com>



1 Attachment, 1.2 MB

Darrell,

I do want to make sure I am in no way liable for attorney fees or any other expenses, etc. by signing this letter or being a part of this Proposed Class Action Settlement.

I hope you understand my concerns.

I have called Jen and given her your phone number. I hope she gets my message in time to participate.

Christy called me and she wanted to make sure we connected.

Thank you for doing this! Have fun in one of my very favorite places!!! Enjoy!!!

Sincerest regards,
Donna

Donna Armani Pineda
Home: 858.756.5007
Mobile: 619.977.9699

Scan 13266....pdf (1.2 MB)

*Donna Armani Pineda*
*15945 Ave Calma*
*Rancho Santa Fe CA 92091*
*donnaarmani@gmail.com*
*858-756-5007*

September 23, 2013

*Via USPS First Class Mail*
Clerk of the Court
Superior Court of the State of California
County of Los Angeles
Central Civil West Courthouse
600 S. Commonwealth Avenue
Los Angeles, CA 90005

Re: *In re GIB LLC Cases* – **JCCP No. 4657**

## OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

Dear Clerk of Court and Honorable Court:

Please accept this letter as my objection to the proposed class action settlement, the award of excessive attorneys' fees to class counsel, and the Court's approval of the settlement in the above referenced class action lawsuit. The proponents of this settlement have not met their burden to show that the settlement is fair, reasonable, and adequate.

I am a Brazilian Blowout customer in the United States who has purchased Brazilian Blowout treatments using the specified products on numerous occasions prior to June 6, 2012 and I am a class member. I've attached a copy of my claim form which I am also mailing today.

I object to the unfairness of this settlement. The class receives very little benefit. A class action is intended to convey a benefit to an injured class and a settlement cannot be found to be fair, reasonable and adequate if the benefit delivered to the class is inadequate.

Objection is made based on the proposed award of attorneys' fees, which is excessive under both a lodestar and a percentage of recovery methodologies. Additional objection is made to the extent of the failure of class counsel to make a detailed attorneys' fee and expense application within a reasonable and adequate amount of time for objectors to evaluate the fee and expense application. Of the $1.9 million dollar settlement fund, $1.63 million has been reserved for attorneys' fees.

Specific objection is made that the proponents of this settlement have not met their burden to show that the settlement is fair, reasonable, and adequate.

OBJECTION TO PROPOSED SETTLEMENT
In re GIB LLC Cases, JCCP No. 4657

Objection is made to the overly broad release, specifically but not limited to the "known
and unknown" claims "of any nature whatsoever" and "relating to any of the acts" related to the
false labeling.

I also object to the proponents of the settlement not sustaining their burden of proof on
commonality, predominance, superiority and adequacy of class counsel and class representatives
under Federal Rule of Civil Procedure 23.

Objection is made to any procedures or requirements to object that require information or
documents other than those that are contained herein to the extent that such requirements are
unnecessary, unduly burdensome, are calculated to drive down the number and quality of
objections to the settlement and violate objectors' due process rights and Rule 23(e)(5).

I also join in and incorporate herein by reference any and all objections filed by other
objectors as though set forth in full, to the extent not inconsistent with the specific objections
made herein.

I will not attend the fairness hearing.

I am mailing my objections, as indicated above and below, to the court and to the
attorneys identified in the notice as required recipients. Please serve me with copies of all future
filings via email. Please only communicate with me via email.

Sincerely,

Donna Armani Pineda

cc: *Via USPS First Class Mail*

Laura J. Baughman
Baron & Budd P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219

Elizabeth Pritzker
Pritzker | Law
633 Battery Street, Suite 110
San Francisco, CA 94111

Thomas H. Clarke
Ropers Majeski Kohn Bentley, PC
1001 Marshall Street
Suite 500
Redwood City, CA 94063

2

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

*In re GIB LLC Cases* – JCCP No. 4657

## CONSUMER REIMBURSEMENT CLAIM FORM

FOR TREATMENT WITH BRAZILIAN BLOWOUT SOLUTION OR
BRAZILIAN BLOWOUT ACAI PROFESSIONAL SMOOTHING SOLUTION

YOU MUST SUBMIT YOUR CLAIM FORM NO LATER THAN SEPTEMBER 23, 2013

## CONTACT AND TREATMENT INFORMATION

**(Please type or print the following information):** Fill in the following blanks with complete information.
**Please print clearly.**

Name: DONNA ARMANI PINEDA

Mailing Address: 15945 AVENIDA CALMA

Apartment/Unit Number: _____

City: RANCHO SANTA FE          State: CA     Zip Code: 92091-4163

Daytime Telephone (619) 977 9699    Evening Telephone (858) 756-5007

Email Address: DONNAARMANI @ GMAIL.COM

** If you move or your name changes, please send your new contact information to the Claims Administrator via the settlement website or First-Class U.S. Mail, at the address listed below.

## Treatments:

Name(s) of Salon(s): SYNERGY HAIR STUDIO

Name(s) of Stylist(s): JEN ACITELLI

Date(s) of Treatment(s): BETWEEN 2010 - 2011 I HAD AT LEAST SIX TREATMENTS

**Number of Treatments with Brazilian Blowout Solution or Brazilian Blowout Acai Professional**
**Smoothing Solution:**

3 x $35 = $ 105.00

Claim Maximum is $105 (maximum of three treatments can be claimed).

Total Amount Requested: $ 105.00 .

## TO APPLY FOR REIMBURSEMENT

- Complete the Contact and Treatment information above.
- Sign and date the Claim Form.
- **If you are submitting a claim for reimbursement for more than one treatment,** attach a receipt, invoice, canceled check or a signed statement from your treatment provider, signed under penalty of perjury, that a Brazilian Blowout Product was used in each additional treatment.
- Submit this completed form and copies of your documentation (described above) to:

Brazilian Blowout Settlement
Claims Administrator
c/o Heffler Claims Group
P.O. Box 58580
Philadelphia, PA 19102-8580

## CERTIFICATION (SIGNATURE REQUIRED):

I certify under penalty of perjury that the information on this form is true and correct to the best of my knowledge and belief.

Signature

Date SEPTEMBER 23, 2013

CLAIM PROCESSING TAKES A SIGNIFICANT AMOUNT OF TIME.

THANK YOU FOR YOUR PATIENCE.

From: "Darrell Palmer" <darrell.palmer@palmerlegalteam.com>
Subject: RE: Brazillan Blowout Settlement
Date: September 26, 2013 9:55:29 AM PDT
To: "Donna Armani Pineda" <donnaarmani@gmail.com>

1 Attachment 10 KB

thanks

**From:** Donna Armani Pineda [mailto:donnaarmani@gmail.com]
**Sent:** Thursday, September 26, 2013 9:53 AM
**To:** Darrell Palmer
**Subject:** Re: Brazillan Blowout Settlement

Hi Darrell,

Understood!

Thank you and I hope you have a great day and up coming weekend.

Sincerely,
Donna

On Sep 26, 2013 8:26 AM, "Darrell Palmer" <darrell.palmer@palmerlegalteam.com> wrote:
GM,

Just a reminder if you get any phone calls about your objection; just take a name and number – do not ans questions or discuss
the case.

If you receive any emails, please forward them to me.

Thanks,

Darrell


Darrell Palmer, LL.M.
Law Offices of Darrell Palmer
2244 Faraday Ave
Carlsbad, CA 92008
(858) 215-4064 Ph
(866) 583-8115 Fax
(619) 985-1099 Cell
darrell.palmer1 Skype


**From:** Donna Armani Pineda [mailto:donnaarmani@gmail.com]
**Sent:** Monday, September 23, 2013 3:36 PM
**To:** Darrell Palmer
**Subject:** Fwd: Floating office
**Importance:** High

Oh boy, do you ever know how to make a person feel like they are doing something wrong!!!
You should see my office, but than again that is a very scary place at this time...

How fortunate you are to be there. This photo is really taking me down memory lane. When I was a young girl, my friends and I would take off for a night of dancing and so much fun at the old Avalon Ballroom. We would take the boat across and back again the same night and still get home by curfew, we all lived in Arcadia. What a time!!!

I live vicariously through all my friends photos of places around the world, so please snap more for me, if you have a chance...
I work entirely too much or definitely working in the wrong place. I am not sure what I am doing wrong!
I know, I have to go buy a Lotto ticket or Mega Lotto ticket, whatever!

Thank you so much for sharing!
A perfect setting and It looks like it is a perfect day over there.

Enjoy!!

Donna

Begin forwarded message:

**From:** "Darrell Palmer" <darrell.palmer@palmerlegalteam.com>
**Subject: Floating office**
**Date:** September 23, 2013 3:06:19 PM PDT
**To:** <donnaarmani@gmail.com>



Sent from my iPhone

1  DANIEL C. GIRARD (SBN: 114826)
2  GIRARD GIBBS LLP
3  601 California Street, 14th Floor
   San Francisco, CA 94108
   Telephone: 415.981.4800
4  Facsimile: 415.981.4846
5  Email: dcg@girardgibbs.com

6  ELIZABETH C. PRITZKER (SBN: 146267)
7  PRITZKER | LAW
   633 Battery Street, Suite 110
8  San Francisco, CA 94111
   Telephone: 415.692.0772
9  Facsimile: 415.366.6110
10 Email: ecp@pritzker-law.com

11 Attorneys for Plaintiffs
   Jessica Anderson and Melise D'Angiolillo
12

13

14              SUPERIOR COURT OF THE STATE OF CALIFORNIA

15                   FOR THE COUNTY OF LOS ANGELES

16
17 Coordination Proceeding          )  CASE NO.  JCCP 4657
   Special Title (Rule 3.550)       )
18                                   )  Assigned for All Purposes:
                                     )  Hon. Elihu M. Berle
19 IN RE GIB, LLC CASES             )  Dept. 323
                                     )
20                                   )    **PROOF OF SERVICE**
21                                   )
                                     )
22                                   )
                                     )
23 _____ )

24

25

26

27

28

PROOF OF SERVICE

I, Anne von Goetz, hereby declare as follows:

I am employed by Girard Gibbs, A Limited Liability Partnership, 601 California Street, Suite 1400, San Francisco, California 94108.  I am over the age of eighteen years and am not a party to this action.  On October 22, 2013, I served the within documents:

    **1. SUPPLEMENTAL DECLARATION OF BETHANY CARACUZZO IN SUPPORT OF PLAINTIFF'S REPLY IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT;**

__XX__    by **ELECTRONIC SERVICE VIA CASE HOME PAGE:** By transmitting the above documents(s) electronically through Case Home Page Service by 5:00 p.m. on this day to the e-mail address(s) set forth below and maintained on the Service List of Case Home Page's website for this case, pursuant to March 16, 2011 Order.  Service completed by 5:00 p.m. shall be deemed served on same day

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.  Executed on October 22, 2013 at San Francisco, California.

_____
Anne von Goetz

# EXHIBIT E

                    INTRODUCTION


          Welcome to the National Institute

on Class Actions, presented by the

American Bar Association, Center For

Continuing Legal Education in the section

of litigation, held on October 14th,

2011.  We now join this session:  Melee

in Manhattan, Class Action Objectors.

Are they protectors of absent class

action members or merely gadflies?

Recorded live from New York.

Page 2

```
 1              MR. ESADES:  Good afternoon.
 2         My name is Vincent Esades.  I'm a
 3         lawyer in Minneapolois at Heins,
 4         Mills & Olson and I'm a
 5         plaintiff's class action side
 6         lawyer, typically antitrust.  I do
 7         a little bit of consumer as well.
 8              I wanted to note before we
 9         get started with the panel that
10         we're going to leave about 15, 20
11         minutes for questions from the
12         audience.  So rather than shouting
13         something out or having a
14         reaction, just wait until the end.
15         Dan will be running around with a
16         microphone.  So we'll just hold
17         comments and questions to the end.
18              I wanted to mention that I
19         was a class action lawyer because
20         I come at this -- as the panel
21         moderator, I'm going to try and
22         come at this to elicit comments
23         from the panel that we've
24         assembled, because I really want
```

Page 3

```
 1          to hear from them, but I want to
 2          disclose that I obviously come to
 3          the table with a bias and --
 4          because I would typically be on
 5          the other side always from
 6          objectors.  But I thought it would
 7          be important to have them have a
 8          forum to talk and we could have a
 9          back and forth.
10              What we hope to cover today
11          are sort of three broad areas.
12          The first is, you know, what are
13          professional objectors and what
14          are their roles in litigation.
15              The second area would be
16          what can the court do to sort
17          through objections that are
18          helpful and objections that are
19          not very helpful.
20              And finally, what are the
21          strategies that plaintiffs and
22          defendants can use to avoid making
23          objectionable settlements, or if
24          they have to deal with objectors,
```

 1        how to deal with objectors.

 2             I'll introduce the panel

 3        right now.  I would note that I

 4        found a quotation in a law review

 5        that was sent to me.  There's been

 6        several law reviews written, and

 7        the quotation that jumped out at

 8        me from this law review was,

 9        quote:  "Objectors may be the

10        least popular litigation

11        participants in the history of

12        civil procedure."

13             And with that, I'll

14        introduce the panel.

15             We have Ted Frank from

16        Washington, D.C. for the Center

17        For Class Action Fairness.  Next

18        to him is Larry Schoenbrun from

19        Berkeley, California.  And finally

20        on the end, Darrell Palmer, from

21        Solano Beach, California, as well.

22             And right next to me, Judge

23        Nancy Atlas from the US District

24        Court for the Southern District of

Page 5

```
 1          Texas in Houston.
 2                 Before we get into -- before
 3          I get into the questions for the
 4          panel and topics, I want to just
 5          by a show of hands, because I
 6          don't really know the makeup of
 7          the audience, how many people have
 8          had a case where they've dealt
 9          with what they would term to be a
10          professional objector, just by a
11          show of hands.  So maybe a third
12          -- maybe a third of the room.
13                 I want to go through the
14          basic process of just the
15          settlement in a class action case,
16          just in case there's people out
17          there that need a little bit of
18          the background.
19                 Most class action, civil
20          class actions, obviously, are
21          resolved by other civil cases,
22          usually through settlement.  The
23          settlement process is going to
24          require a notice, a preliminary
```

Page 6

```
 1        approval hearing and a final
 2        hearing.
 3              Now, because the settlements
 4        are made without the participants
 5        of the absent class members,
 6        they're not participating in the
 7        settlement discussions, there's a
 8        process by which notice goes out
 9        and then a hearing is set for a
10        fairness hearing where absent
11        class members can come in and
12        weigh in on the fairness of the
13        settlement, whether it's
14        reasonable and adequate.  In this
15        context is where objectors come
16        in.
17              Now, there are many
18        objections that are not interposed
19        by what I'll term professional
20        objector -- and when I use the
21        term professional objector, how
22        I've used it and I think how Larry
23        had used it earlier, I'm talking
24        about the lawyers --
```

October 14, 2011

Page 7

```
 1              MR. SCHOENBRUN:  I did it
 2         tongue in cheek.
 3              MR. ESADES:  Tongue in
 4         cheek.
 5              But we're referring to the
 6         lawyers; at least I am when I say
 7         it.  So if there's any confusion
 8         as to whether we're talking about
 9         the plaintiff absent class
10         representative who is represented
11         by the lawyer, when I'm saying
12         professional objector, I'm
13         referring to the lawyer.  Others
14         may have a different take they
15         want to have, and they'll have
16         their opportunity to speak to
17         that.  But I didn't want there to
18         be any confusion.
19              So in this context, at a
20         final approval hearing, is when
21         you will typically hear from all
22         the objectors.  And leading into
23         that first question, I want to
24         hear from the panel what they
```

October 14, 2011

Page 8

1          consider to be a professional

2          objector.

3               MR. FRANK:  Well, I think

4          Edward Bernay's law review article

5          said it for that somebody who

6          comes in often to object at the

7          settlement stage for profit.  And

8          Bernay excludes public interest

9          objectors and nonprofit objectors

10         from that category.

11              The theory is that by a

12         volume of objections, an objector

13         can hold up a settlement and sort

14         of create an incentive for the

15         plaintiff's attorneys to pay off

16         the objector to go away.  And, in

17         fact, I've had plaintiff's

18         attorneys try to buy off my

19         clients from time to time for

20         precisely that reason.

21              And if the incentives are

22         structured improperly, an objector

23         can come in and actually make more

24         money from a bad objection than a

October 14, 2011

Page 9

1          good objection.
2                    MR. SCHOENBRUN:  My feeling
3          is that the term professional
4          objector was created by
5          plaintiff's class action lawyers
6          to delegitimize people who object
7          to class actions who are lawyers
8          who understand the process and
9          know what they're doing and not
10          just class members writing
11          letters.
12                    The plaintiff's lawyers
13          don't want to hear any objections
14          to the settlement good or bad, in
15          my opinion.  The defendants don't
16          want to hear any objections about
17          the settlement good or bad in my
18          opinion.  And the judges don't
19          want to hear any opinions about
20          the settlement good or bad.
21                    To the court, a helpful
22          objection is an objection that --
23          that doesn't put stops on the
24          settlement; that doesn't raise

October 14, 2011

Page 10

```
 1        questions, legitimate questions in
 2        the judge's mind about whether
 3        this settlement is, indeed, fair,
 4        adequate and reasonable.
 5             And I would just like to, if
 6        I could, at this point, thank
 7        Vince and Dan for having what I'll
 8        call so-called professional
 9        objectors at this conference
10        because part of the reason and
11        adjunct to the way we're
12        delegitimized is that we're not
13        permitted a seat at the table.
14        We're not invited to these
15        conferences.  We are the -- the
16        class action lawyers create the
17        heros and they create the
18        villains, and they have created a
19        villain to make this process work
20        for them, and that villain is the
21        so-called professional objector.
22             MR. FRANK:  There's a
23        prominent judge on the San
24        Francisco Superior Court bench,
```

Page 11

```
 1        and I like to quote him all the
 2        time where he said:  "I've never
 3        really understood the term
 4        "professional objector."  He said,
 5        "What would scare me more is if I
 6        had to deal with unprofessional
 7        objectors all the time."
 8             MR. SCHOENBRUN:  And that's
 9        just the power of the class action
10        bar.  They can take a word
11        "professional," which in every
12        instance means something positive,
13        not negative.  In the class action
14        field they turn it upside down and
15        make what is otherwise a positive
16        word a negative.  That's their
17        power, and they've had the ability
18        to have the judiciary come in on
19        this and adopt the same
20        terminology.
21             JUDGE ATLAS:  Okay.  It's my
22        turn.  I can't speak for all one
23        thousand federal judges or even
24        the 680 district judges, but it is
```

October 14, 2011

Page 12

```
 1          important, I think, to note that I
 2          would venture to say most federal
 3          district judges care enormously
 4          about the absent class members,
 5          and care about the -- protecting
 6          the process.
 7              Judges often dislike class
 8          actions because they seem
 9          frivolous on their face or they
10          involve so little of interest that
11          we wonder whether, in fact, this
12          is worth all the work that is
13          inevitably going to be entailed in
14          a class action case.
15              On the other hand, judges
16          who see a complaint where it does
17          look like there's a real issue
18          there, a wrong to be righted, the
19          class action vehicle gets the
20          judge's attention.
21              The issue for judges is how
22          to be sure in the cases that get
23          that far where a settlement is
24          being proposed that it's not
```

October 14, 2011

Page 13

```
1          collusive, and the fact of the
2          matter is that judges have
3          hundreds of cases pending at any
4          one time, civil and often criminal
5          as well, and the judge, as Judge
6          Weinstein said, has an elbow clerk
7          working on the case and a few
8          books.  But the reality is, we
9          don't have anywhere near the staff
10         or the resources to investigate
11         the propriety of a settlement the
12         way the parties have.
13              So the rules set up the
14         notice, the preliminary hearing,
15         the final hearing, all for the
16         purpose of educating the court to
17         make the determinations the rules
18         require, but it is very important
19         to the judges that the truth be
20         known that we do get to the bottom
21         of whether this is a fair and
22         adequate settlement.  And frankly,
23         whether the fees are reasonable
24         and were necessary and are
```

October 14, 2011

Page 14

```
 1        appropriate in light of the
 2        settlement.
 3             So with due respect to my
 4        panel members, I don't think --
 5        and frankly, others in the room
 6        and some of the articles that have
 7        been cited in the papers, I think
 8        that good objections, objections
 9        tuned to the case, that point out
10        substantive deficiencies are
11        valuable and are valued by most
12        judges.
13             Now, sure, there are judges
14        who just want to close their
15        docket or cases on the docket, but
16        most judges think class action
17        cases are of some interest and are
18        important, particularly ones that
19        look like there's a wrong to be
20        righted.  And so it would be
21        unfair, in my view, to paint all
22        judges with brush as not caring
23        about the merits or protecting the
24        process or the parties.
```

Page 15

```
 1              MR. ESADES:  I wanted to
 2         focus in on the comment you made,
 3         Larry, that the term professional
 4         has been used by plaintiffs and
 5         has caused a delegitimate -- I
 6         think you used the term
 7         delegitimized the role of
 8         professional objectors, and I want
 9         to raise that because, you know,
10         in an article, and I know you're
11         familiar with the 2003 article
12         from the St. Louis Dispatch --
13              MR. SCHOENBRUN:  I'm quoted
14         as saying...
15              MR. ESADES:  You're quoted
16         as saying -- you're quoted as
17         saying -- admitted that objectors
18         earning a living by objecting to
19         class action settlements, quote,
20         "is a niche where a certain
21         limited number of lawyers who are
22         crazy and have nothing better to
23         do can make some money."  And I --
24         and that goes to the -- that goes
```

Page 16

```
 1            to the issue of delegitimization.
 2            This is not a quote from a
 3            plaintiff's lawyer.
 4                    MR. SCHOENBRUN:  I feel like
 5            I'm in court, like I'm back in
 6            court, as an objector.  Okay.  My
 7            comment is this.  If you want to
 8            make real money, you become a
 9            plaintiff's class action lawyer.
10            You can make a lot more money with
11            a lot less aggravation by being
12            one of dozens or hundreds of class
13            action law firms that get into
14            these cases.
15                    MR. ESADES:  Let me -- let
16            me interrupt there.  How many
17            cases have you done that have been
18            a class action as the lead counsel
19            that you litigated?
20                    MR. SCHOENBRUN:  One.  It
21            only took me one.  I've been an
22            objector in 150 over 20 years and
23            I think I know what is going on
24            here.  The lawyers get too much,
```

October 14, 2011

```
 1          the class members get too little,

 2          it's not an accident the way the

 3          process is structured.  The

 4          incentives that each of the

 5          participants guarantee this

 6          outcome is going to happen, and

 7          the society and class members in

 8          general are paying for all of

 9          this.  And I'm unhappy about it,

10          and that's why I object.  And

11          judges, plaintiff's lawyers,

12          defendant's lawyers don't want to

13          hear this.

14               MR. ESADES:  What -- I mean,

15          what --

16               MR. PALMER:  I can give you

17          an example of judges that do want

18          to hear it, and in fact, I think

19          there are lots of judges that want

20          to hear well-thought objections.

21               JUDGE ATLAS:  Yes.

22               MR. PALMER:  And a prime

23          example -- I don't know, anybody

24          here in the Enron case, but in
```

October 14, 2011

Page 18

```
 1        your very own court, I had the
 2        pleasure of addressing the court
 3        on what I thought were very
 4        substantial issues in that mega
 5        settlement and the court was very
 6        receptive.  So was Patrick
 7        Coughlin, by the way.  In fact, he
 8        -- he was quite a gentleman.  He
 9        said:  I don't disagree with
10        anything Mr. Palmer said until he
11        got to that last part about our
12        attorney's fees being too much.
13             But in that case, my clients
14        were a couple of the
15        disenfranchised Enron employees
16        and I will tell you there were
17        thousands of them who simply had
18        all of their life savings in that
19        stock and really lost everything.
20             And I got lots of letters
21        from them saying thank you,
22        because what happened was they
23        created a whole new process to
24        educate that particular group of
```

October 14, 2011

Page 19

```
 1        about 20,000 people and it really
 2        made a difference in these people
 3        being able to file claims and get,
 4        you know, their seven cents on the
 5        dollar.  And I was very proud of
 6        my efforts in that.
 7             MR. ESADES:  Now, Darrell,
 8        on the Enron settlement, I don't
 9        know if there's anyone in the room
10        that actually worked on that, but
11        going back and looking at the two
12        plaintiffs you represented in that
13        case, you can continued with
14        objections and have continued to
15        object on appeal.  Your objections
16        all across the board were
17        rejected.  So I'm wondering at
18        what point -- at what point,
19        because when we're talking about
20        -- because on the issue that the
21        class action bar is
22        delegitimizing, is there not -- is
23        there not some blame to be put
24        also on professional objectors by
```

Page 20

```
 1        the way they address some of the
 2        issues?  And you come in and maybe
 3        improve a settlement, but you
 4        continue to object -- I can't
 5        remember if there were seven
 6        grounds or so, and then continue
 7        to appeal those.
 8            MR. PALMER:  Well, there was
 9        -- there's -- in the Fifth
10        Circuit, there's a very serious
11        question about attorney's fees.
12        And in that case, the largest fee
13        ever awarded in any civil case,
14        you know, that was a legitimate
15        issue to bring before the court.
16            So, I mean, look, it -- I've
17        gotten more sophisticated, I
18        think, over the years of
19        objecting.  I have two very smart
20        lawyers who work for me and
21        generally do the research.  They
22        both came from very large class
23        firms.  And, frankly, on the other
24        side, and I would encourage my
```

Page 21

```
 1        colleagues to do this, if you look
 2        carefully you will find that I
 3        often file statements in support
 4        of settlements.  In other words,
 5        people have sent -- and I don't
 6        have a website, I'm not even in
 7        the phone book.  There's no sign
 8        on my door.  People just send me
 9        these things.  And when we see a
10        settlement that we think is a
11        great job, we will tell the court
12        we think this is a great job and
13        here is why.  And we'll -- we'll
14        cite case law as to why it's a
15        good settlement.
16              MR. SCHOENBRUN:  I would
17        just say that professional
18        objectors basically do what
19        plaintiff's class action lawyers
20        do.  Plaintiff class action
21        lawyers file a lawsuit, the
22        objector files an objection.  The
23        plaintiff's class action lawyer
24        wants to get paid to settle the
```

Page 22

```
 1            suit; these professional objectors
 2            want to get paid to drop their
 3            objection, or drop their -- their,
 4            their --
 5                 MR. PALMER:  Well,
 6            sometimes.
 7                 MR. ESADES:  Right.  And let
 8            me touch on that, because when I
 9            settle a case, I'm settling it on
10            behalf -- and the money is
11            earmarked for the benefit of the
12            class, and the judge decides what
13            portion of that I get paid.
14                 When you dismiss an appeal
15            or dismiss an objection for money,
16            how much of that goes to the
17            absent class?
18                 MR. SCHOENBRUN:  Yes, that's
19            true.  That's true, but these
20            judges in my opinion --
21                 MR. ESADES:  When you say
22            that's true, you mean none goes to
23            the absent class.
24                 MR. SCHOENBRUN:  No, what I
```

October 14, 2011

```
 1        mean is that the judge approves

 2        the fee to the plaintiff's lawyer.

 3        The judge typically doesn't

 4        approve the money that a

 5        professional objector is going to

 6        get.

 7             But I would say the judges

 8        basically do a miserable job when

 9        it comes to approving these

10        attorneys fees in this class

11        action.  They basically don't

12        care.  The defendant's -- the

13        plaintiff's lawyers, improperly in

14        my opinion, negotiate with the --

15        with the defendants about what the

16        fee is going to be, and then the

17        judge basically approves it.

18             What is it, the statistics

19        in the Ninth Circuit case, nine

20        out of ten times the fee is

21        approved as awarded.  If you read

22        through these fee petitions about

23        the lack of detail, the number of

24        lawyers --
```

October 14, 2011

Page 24

```
 1              JUDGE ATLAS:  Well, you
 2       know, but the Ninth Circuit is not
 3       the country.  I mean, in Texas,
 4       they call the Ninth Circuit --
 5       sorry, Jocelyn -- the left coast.
 6       I don't think that California or
 7       the Ninth Circuit is necessarily
 8       the guide, and I'm not going to
 9       speak to them.  But shouldn't
10       objector fees be subject to public
11       scrutiny?
12              MR. SCHOENBRUN:  I think
13       they should.
14              MR. FRANK:  I think they
15       should, too, and I --
16              MR. SCHOENBRUN:  I think
17       they should.
18              MR. FRANK:  Right now, Rule
19       23 requires any objector
20       settlement be before the district
21       court and have district court
22       approval, but there's a gap in the
23       rules.  There's no corresponding
24       rule in the federal rules of
```

Page 25

1           appellate procedure.

2                JUDGE ATLAS:  Right.

3                MR. FRANK:  And, in fact,

4           appellate mediators will try to

5           encourage exactly the sort of

6           improper payouts --

7                MR. SCHOENBRUN:  That's

8           quite true.

9                MR. FRANK:  -- that benefit

10          the objector attorneys without any

11          concognizant benefits to the

12          class.

13               MR. PALMER:  I don't know

14          who pays your salary, Ted, but

15          calling all these pay-outs

16          improper I think is unfair.

17               MR. FRANK:  I didn't call

18          all of them improper.  I said

19          there are some improper pay-outs

20          that are made.

21               MR. PALMER:  The trouble is

22          that what we proceed or what I

23          provide are well-thought,

24          well-written objections, and my

October 14, 2011

Page 26

1          goal is to provide, you know, an

2          alert, if not assistance, to the

3          court in bringing these things to

4          the court's issue -- or to the

5          court's attention.

6                  Do I deserve to be paid for

7          that?  I do.  Do I always get

8          paid?  Absolutely not.  I think

9          currently I have something in the

10         neighborhood of 14 or 15 cases on

11         appeal and we're going to see them

12         through to the end.

13                 So when we file one, we are

14         prepared to go to the distance.

15                 MR. ESADES:  So -- can I

16         just --

17                 MR. PALMER:  Of course --

18                 MR. ESADES:  Because you

19         raise it on -- how often are you

20         being paid by courts for

21         objections?

22                 MR. SCHOENBRUN:  That's the

23         biggest problem.  Courts won't

24         give you anything.  The courts

October 14, 2011

Page 27

1          will not award you fees.  These

2          judges -- you know, look, they

3          don't -- the last thing they want

4          to do is encourage lawyer

5          objectors to come into court by

6          the dozens to oppose these

7          settlements and they're all

8          opposable.  The judges will not

9          give you any money.  They will

10         give you $2000 or $3000 and expect

11         you to live on that.

12              JUDGE ATLAS:  Why do they --

13         why do you say all the settlements

14         are opposable?  That's part of the

15         problem.

16              MR. SCHOENBRUN:  Because

17         they're all -- because the lawyers

18         get too much, the class members

19         get too little.  Let me read you

20         what I --

21              MR. PALMER:  Well, I

22         disagree.

23              MR. SCHOENBRUN:  If I can

24         tell you -- let me read you what I

October 14, 2011

Page 28

```
 1              -- if I can tell you --
 2                  MR. PALMER:  Just for the
 3         record.
 4                  MR. SCHOENBRUN:  This is --
 5         I'm reading to you from -- you
 6         know Susan Koniak, a democrat,
 7         likes class actions:  It is in the
 8         interest of all the participants
 9         in the class action, save the
10         absent class, to settle class
11         actions by collusively
12         transferring money from the class
13         to counsel.  As long as some
14         plaintiff's lawyers are willing to
15         act in a self-interested way, they
16         will be rewarded by the defendants
17         will extraordinary fees funded at
18         the expense of the class.  Courts
19         will not effectively monitor the
20         abuse because of their interest in
21         seeing cases settled.  Our
22         experience and the available
23         evidence of class action practice,
24         our understanding of the
```

October 14, 2011

Page 29

```
 1        incentives built into the present
 2        systems sustains our conviction
 3        that collusion and inadequate
 4        representation are everyday
 5        features of the class action
 6        world, a scandalous state of
 7        affairs.
 8             That's not me.  That's, I
 9        think, a plaintiff's oriented law
10        professor.  And the court system
11        doesn't want to hear this.  They
12        don't want to be reminded about
13        this.
14             MR. FRANK:  We've asked for
15        attorney's fees twice.  We've got
16        them both time.
17             JUDGE ATLAS:  It seems to me
18        that the real issue -- sorry about
19        this -- the real issue is whether
20        objections are boilerplate sort of
21        nicking at the margin, in which
22        case, frankly, the value is
23        negligible or negative, versus a
24        structural defect in the
```

October 14, 2011

Page 30

```
 1        settlement that the objector is

 2        pointing out, or a major factor

 3        issue that has been ignored by the

 4        parties.

 5             In one case, it was not

 6        before me, but it was a case

 7        involving derivatives, and an

 8        entire class of people who had

 9        purchased the derivatives were

10        ignored.  They were hedge fund

11        traders.

12             But the point is that they

13        had large percentages of the

14        derivative and the securities, and

15        they had not been considered at

16        all.  And so that, in that case,

17        there was an objection and

18        apparently millions of dollars

19        were allocated through the court

20        process to that subclass that had

21        been virtually ignored and not

22        even been given notice of the

23        settlement or of the case.

24             So, I mean, there are values
```

October 14, 2011

Page 31

```
 1          to objectors.  The question is
 2          whether there are routine
 3          boilerplate objections being filed
 4          that frankly don't bring value
 5          added.
 6               MR. FRANK:  And I've been
 7          frustrated in a number of cases
 8          where we've brought out some very
 9          well-thought out objections and
10          when we pick and choose the cases
11          we take, we have limited
12          resources, we're public interest,
13          and we're only going after the
14          worst settlements.  And in some of
15          these cases, and I'm not going to
16          name any names and it's no one at
17          this table, but there are
18          boilerplate objections filed that
19          have no thought put into them,
20          they are two or three pages long,
21          and the plaintiff's attorneys and
22          defense counsel take advantage of
23          that and just -- and indicate all
24          of these objections are chafe and
```

October 14, 2011

Page 32

```
 1        noise and you should ignore them
 2        to the courts, and the court ends
 3        up ignoring the good objections as
 4        well as the bad objections.
 5             MR. PALMER:  The trouble is,
 6        in many of the settlements, there
 7        is boilerplate, and it's quite
 8        applicable.  And because you see
 9        the same thing over and over, and
10        it's really ridiculous.  And if
11        you want to talk about
12        boilerplate, look at the
13        boilerplate language that is used
14        in fee applications.  I mean, that
15        is some serious boilerplate.  So
16        it's just hilarious.
17             And, further, you know what
18        is even funnier is when you get
19        class lawyers who don't even know
20        federal civil procedure.
21             JUDGE ATLAS:  Yeah.
22             MR. PALMER:  And then they
23        come in kicking and screaming, and
24        you go:  Well, Judge, that was a
```

October 14, 2011

Page 33

```
 1              great motion and a good order.

 2              Unfortunately, you didn't have

 3              jurisdiction over my client in

 4              Texas, you know, when you're

 5              sitting in Oaklyn.  And then at

 6              the end they go:  Wow, I guess

 7              you're write.

 8                   MR. ESADES:  I want to touch

 9              on the issue of the structural

10              problems.  And, again, Larry, it's

11              another point that you had raised

12              in the quotation that you had

13              read.

14                   One of the -- another one of

15              the courts that you had objected

16              and took note of the fact that

17              your sort of stated desire to do

18              away with class actions all

19              together, and I don't know whether

20              that's currently your thinking or

21              not, or whether that ever was or

22              -- but do you consider that to be

23              a relevant factor and --

24                   MR. SCHOENBRUN:  To me, it's
```

October 14, 2011

Page 34

```
1          ridiculous.  It's like castigating
2          objectors because they want to
3          make a profit, because they do it
4          -- because they want to make a
5          profit.
6              I think if you look at the
7          benefits and the burdens, the
8          merits and the demerits, has the
9          -- as Mr. Kaplan who changed the
10         class action rules in '66 -- in
11         '66, the vices and the virtues.
12         The vices outcome overdue the
13         virtues.  The idea of it, like the
14         communist manifesto, in my
15         opinion, is fine.  Going to get
16         all these small cases, people only
17         getting at a dollar, they can't
18         sue, let's put them all together,
19         we'll get a lawyer to make it a
20         case that's valuable.
21              That's great, that idea.
22         The problem is that I think it
23         winds up costing the consumer
24         $1.50.  Now instead of being out a
```

Page 35

```
1          dollar for this whole new process,

2          now they're out $1.50.  So I think

3          that we're soft.  The system, it

4          sounds great.  I'm not a latke for

5          these companies.  I think these

6          companies do horrible things, no

7          question about it.  This system, I

8          think, is not the answer.

9               JUDGE ATLAS:  What do you

10         think the answer is?

11              MR. SCHOENBRUN:  I --

12              MR. PALMER:  Let me follow

13         up on Larry's comment, because I

14         think where the system falls short

15         and consumers lose out,

16         particularly in consumer cases, is

17         that once the settlement's

18         approved, the class counsel do not

19         undertake the burden of making

20         sure that that settlement is

21         properly distributed and the class

22         really knows what's going on.

23              And I think a great example

24         is the Wal-Mart cases, employment
```

October 14, 2011

Page 36

1       cases that swept the country in

2       the last three or four years.  And

3       by and large, I think the lawyers

4       got something in the neighborhood

5       of $500 million and the class

6       members got a lot less than that.

7               And the one case I was

8       involved in, I volunteered myself

9       and my staff to -- and it was just

10      as much Wal-Mart's fault as

11      anybody -- to go to Wal-Marts and

12      help people fill out the

13      application so they could get

14      their $100 or $500 check, and

15      Wal-Mart wanted to have nothing to

16      do with it and didn't want anybody

17      talking to their people, and there

18      wasn't really a website.  I mean,

19      and there was this thing where

20      they had to put in their -- they

21      had to choose what kind of tax

22      reporting they wanted for this

23      distribution.

24              And I went to some Wal-Marts

October 14, 2011

Page 37

```
 1        and asked "Have you filled out
 2        your form?" and I did this before
 3        the hearing, and three or four of
 4        them said, "Well, I just don't
 5        understand how to do it."  You
 6        know, I mean, they just didn't --
 7        they didn't really know how to do
 8        it.
 9             And that's where I think the
10        class counsel was falling short
11        because why didn't they hire an
12        army of paralegals?  I mean, how
13        much would it have cost, a hundred
14        grand maybe, and get Wal-Mart's
15        permission to go out and help
16        these people -- get a trailer or
17        something and help these people
18        fill out their forms.  It just
19        didn't happen.
20             MR. FRANK:  If I could
21        respond to that.  I think that is
22        one area where judges are falling
23        short, because if you look at Rule
24        23H and the advisory committee
```

October 14, 2011

Page 38

```
 1          notes there and you look at the
 2          ALI principles of the law of
 3          aggregate litigation, the
 4          attorney's fees are supposed to be
 5          based on the amount that the class
 6          is actually paid.  And the
 7          attorney's fees are frequently
 8          awarded before the class gets
 9          paid, and nobody has -- is having
10          any oversight whether the claims
11          process is overly burdensome,
12          whether the claims process is
13          being followed, even whether what
14          the class was being promised in
15          the notice is actually being
16          delivered in the class, because
17          the plaintiff's attorneys get
18          their check and all further work
19          stops.
20               MR. ESADES:  Now, I'm
21          hearing what's been identified as
22          some of the problems, and here is
23          where I think the disconnect is
24          from plaintiff's lawyer.
```

October 14, 2011

Page 39

```
 1              The objections come in,
 2        judge takes objections, does
 3        whatever they're going to do with
 4        them, looks at some, changes some.
 5        Objections get denied.  Appeal
 6        gets taken, appeal gets sold.
 7              How does the selling of the
 8        appeal by a professional objector
 9        advance any of the goals that you
10        say are the infirmities of the
11        current system?
12              MR. SCHOENBRUN:  It doesn't
13        and that's the problem.  That's
14        why they should.  These fees --
15        but you could be sure, when it
16        comes to fees that objectors are
17        getting, the judge is going to go
18        over them with a fine-tooth comb.
19        But when it comes to the fees the
20        plaintiff class action lawyers
21        get, anything is submit --
22              MR. ESADES:  No, no, but
23        isn't --
24              MR. FRANK:  Isn't that the
```

Page 40

1          non-sequitur?

2               MR. ESADES:  Yeah, aren't

3          you raising -- yeah, aren't you

4          raising the -- I mean if you have

5          a problem with the system and you

6          have an actual objection, why

7          isn't it serving -- what you're

8          stating to be the problem, why

9          isn't it served more by pursuing

10         that objection versus selling that

11         objection on appeal?

12              MR. SCHOENBRUN:  I agree.

13              MR. ESADES:  And the

14         follow-on to that is, then isn't

15         it relevant to a federal judge to

16         know whether you are a person that

17         comes in, objects to settlements,

18         gets something or not, that

19         settlement goes on appeal and you

20         routinely dismiss that appeal

21         after settling it?

22              MR. SCHOENBRUN:  I would say

23         no.  It's the merit of the

24         objection.  What does the motive

```
 1          have to do with it?
 2                 MR. ESADES:  But once the
 3          merit has been determined and you
 4          appeal it.
 5                 MR. SCHOENBRUN:  That's
 6          the --
 7                 MR. ESADES:  But you do not
 8          choose to pursue that appeal of
 9          the meritorious objection, well,
10          how does it serve your end to sell
11          that appeal?
12                 MR. SCHOENBRUN:  It doesn't.
13          I'm saying, but the merit is -- it
14          -- I don't agree with this
15          practice of filing the objection
16          and then selling.  I don't believe
17          it's -- I don't believe in it.
18                 JUDGE ATLAS:  Do you agree
19          that inalienability would be
20          appropriate?  In other words, once
21          an objection is filed, it cannot
22          be settled either at the district
23          court or on appeal without court
24          approval?
```

October 14, 2011

Page 42

```
 1              MR. SCHOENBRUN:  Yes.
 2              MR. FRANK:  And here's the
 3         interesting thing.  In almost
 4         every case where somebody accuses
 5         me of being a professional
 6         objector, I volunteer:  Judge,
 7         enjoin me.  Enjoin me from
 8         settling this objection if you
 9         think I'm doing this for any
10         improper motive.  And no
11         plaintiff's attorney ever takes me
12         up on it.
13              MR. SCHOENBRUN:  Right. And
14         every judge --
15              JUDGE ATLAS:  The
16         plaintiff's attorney or --
17              MR. ESADES:  Well, the
18         trouble is though --
19              JUDGE ATLAS:  The
20         plaintiff's attorney or a judge?
21              MR. PALMER:  Why is it --
22              MR. FRANK:  No judge, no
23         plaintiffs attorney.
24              MR. PALMER:  -- to pay my
```

October 14, 2011

Page 43

```
 1          overhead, you know, that's the
 2          question.  Why is it an improper
 3          motive to pay my staff to write
 4          these objections?
 5               MR. ESADES:  I'm not saying
 6          profit is an improper motive.  But
 7          as I said and listened to the
 8          infirmities that supposedly exist
 9          that are widespread with
10          plaintiffs' lawyers running off
11          with millions of dollars and
12          filing boilerplate fee objections
13          because they can't figure out
14          better ways to save 20 percent in
15          different ways.  How is it -- how
16          is selling of the appeal not
17          relevant to a federal judge when
18          assessing, for instance, a Rule 7
19          bond, if they know that your
20          practice is to sell that out and
21          not pursue it.  Shouldn't it be
22          relevant to the judge to say:
23          Hey, if you're going to take an
24          appeal on this, I'm going to make
```

Page 44

```
 1          you put up a bond.  If your
 2          practice is to simply sell the
 3          appeal not to pursue it.
 4              MR. FRANK:  Well, the answer
 5          to that is that Rule 7 just
 6          doesn't permit that, but...
 7              MR. ESADES:  Well, it
 8          doesn't permit it, but some judges
 9          have taken it upon themselves when
10          faced with this problem, and have
11          -- you know, I know you guys are
12          familiar with that.
13              MR. FRANK:  And most
14          appellate courts have thankfully
15          reversed that practice.  And it's
16          not like plaintiff's attorneys are
17          only doing it to the objectors who
18          are bringing, who are going to
19          dismiss their appeals if they get
20          paid off.  I faced it four times.
21          I have it in a pending case now
22          and we're going to file our
23          opposition brief on the 19th.
24              This is done
```

October 14, 2011

Page 45

```
 1        indiscriminately to prevent
 2        meritorious objections as well as
 3        bad objections.
 4             MR. ESADES:  Let me jump to
 5        -- I know we're jumping around
 6        quite a bit from my three main
 7        areas I wanted to cover.  But
 8        let's go to the strategies for
 9        inoculating a settlement from
10        objection.
11             From a plaintiff's and
12        defendant's standpoint, it seems
13        like there's no such thing as an
14        unobjectionable settlement when
15        faced with a professional
16        objector.  Is that -- is that
17        true?
18             MR. SCHOENBRUN:  Yeah.  I
19        mean, I think you can find reasons
20        to object in every one of these
21        settlements.  The structure of the
22        settlement, the content of the
23        notice, there are valid objections
24        to, I would say, 95 or 99 percent
```

October 14, 2011

Page 46

```
1        of these because the incentives
2        that shape these settlements are
3        reflected in the settlement.  So I
4        think you can always find
5        something to tell a judge about
6        that's legitimate; that if the
7        judge corrected it, it would make
8        this process work better for class
9        members.
10             MR. PALMER:  I don't think
11       so.  I don't think that there are
12       -- that 95 percent of the cases
13       are objectionable.  That's -- if
14       you follow the rules and you have
15       some consideration for the actual
16       class -- listen, I'm happy that
17       some of my friends make millions
18       of dollars on these cases.  That's
19       great.
20             JUDGE ATLAS:  They take you
21       on their yachts.
22             MR. PALMER:  I have my own
23       yacht.
24             MR. ESADES:  So what
```

October 14, 2011

Page 47

1          about...

2                  MR. PALMER:  And by the way,

3          this isn't my day job, in case

4          anybody wondered.  Objecting is

5          not what I principally do, but I'm

6          not going to tell you what I do,

7          because God knows what would

8          happen then, but... yeah, it's

9          just like a hobby for me.

10                 MR. ESADES:  So -- I'm

11         sorry.  Go ahead.

12                 MR. FRANK:  That was

13         mysterious.

14                 JUDGE ATLAS:  Yeah, really.

15         I'll make one sort of comment as a

16         footnote, since there's so many

17         class action lawyers in the room.

18                 It -- I understand there are

19         a lot of requirements for notice,

20         but there is no reason that

21         notices cannot be drafted in ways

22         that are both legible and

23         comprehensible to the lay person.

24         This was mentioned earlier, but

October 14, 2011

Page 48

```
 1          since I wear the hat I do on this
 2          program, I cannot resist seconding
 3          the earlier point.
 4              Lots of headings, plain
 5          English, put the big points up
 6          front with the email and the
 7          question, the phone numbers.  I
 8          think that would get plaintiff's
 9          lawyers and class action parties a
10          lot closer to together.  The
11          courts would very much appreciate
12          it.
13              MR. SCHOENBRUN:  And my
14          feeling is it's not an accident.
15          We've been how many -- 20 or 30
16          years?  For 20 years I have been
17          hearing why can't we get the
18          settlement notices to be in plain
19          English.  I don't think it's an
20          accident.
21              MR. PALMER:  And make sure
22          you put in there if you object
23          we're going to try to take your
24          deposition because that's sort of
```

October 14, 2011

Page 49

```
1          the -- nobody's covered that
2          today.  That's -- that's the
3          latest tactic, and frankly, it is
4          so hilarious when class action
5          lawyers who probably never tried a
6          real case in their life try to
7          take depositions or -- they don't
8          even know the rules about how to
9          get an order to take a deposition.
10         It's just funny.
11              MR. ESADES:  So let me get
12         into the tactics used by parties
13         against professional objectors and
14         get your reactions to them.  We
15         already covered the Rule 7
16         appellate bond.  Some of the other
17         tactics that I know that are used
18         are obviously taking the
19         objector's deposition, taking the
20         objection -- or taking the
21         deposition of the class member to
22         require proof of standing,
23         informing the court of the history
24         of the objector counsel, or
```

Page 50

```
 1          putting in quick paper visions in
 2          settlements.  Did any of those in
 3          particular --
 4              MR. SCHOENBRUN:  I -- again,
 5          from my perspectives, objectors in
 6          terms of the whole class action
 7          system, they're a minor problem.
 8          They're an irritant.  You'd do
 9          much better off trying to
10          legitimize these cases to make
11          these fees fees that are
12          reasonable and not transposing
13          generational wealth, wealth of
14          yachts and God knows what, Picasso
15          art collections on these plaintiff
16          class action lawyers, and make
17          this system more honest.
18              If you read the jury -- the
19          verdicts on how many objectors
20          appear in these class actions, I
21          mean, I think one in ten with
22          thousands of class actions.  One
23          in ten.  This is just a particular
24          irritant to plaintiff's lawyers.
```

October 14, 2011

Page 51

```
 1          You would do much better off
 2          trying to look upon yourselves,
 3          figure you know what's going on,
 4          and try to improve this system.
 5          Less excessive fees to the
 6          lawyers, more benefits to the
 7          class members, and you'll --
 8          you'll be much better off -- we
 9          all -- all society will be much
10          better off.
11               MR. ESADES:  You know, I
12          wanted to leave some time for
13          questions, and we have about, I'd
14          say, about 19 minutes left by my
15          count.
16               So, Dan, do you have the
17          microphone, if there's anybody, I
18          want to leave plenty of time.
19               DAN:  Anybody who wants it,
20          anybody interested?  Oh, imagine
21          that.  Derrick.
22               DERRICK:  I only have
23          several hundred questions, but
24          seriously, I'd like to ask this
```

October 14, 2011

Page 52

```
1          question of Mr. Frank, because I
2          saw some of his materials on Cy
3          Pres in the book, and I was hoping
4          you could share with us your
5          philosophical or your, you know,
6          kind of intellectual take on why
7          Cy Pres is a bad thing.  And you
8          seem opposed to it, and I think
9          that from the perspective of the
10         plaintiff's bar, Cy Pres has a
11         number of -- number of really
12         positive attributes, and that no
13         matter how much money you spend or
14         how much time you spend in trying
15         to put money into the hands of the
16         class members, you simply can't
17         get it there.
18               So I was wondering whether
19         or not your position is if you
20         can't get money into the hands of
21         the class members, where does it
22         go and why is Cy Pres not a good
23         thing.
24               CLE participation code
```

Page 53

```
 1        JN11CAC4MU).

 2                MR. FRANK:  Certainly.

 3                Cy Pres has its uses, but it

 4        should be a last resort rather

 5        than a first resort.  And what I'm

 6        seeing is cases where the parties

 7        immediately negotiate for Cy Pres

 8        without any effort to get money

 9        into the hands of the class, or

10        the -- a case where I recently had

11        some success, the parties

12        negotiated a settlement fund for

13        the class and then a Cy Pres fund

14        to go to schools associated with

15        the plaintiff's attorney.

16                And why isn't that money

17        going to the class in the first

18        place?  The plaintiff's attorney's

19        initial obligation is to the

20        class.  And if there is already a

21        settlement fund set up and there

22        is already a way to distribute

23        money to the class, there's no

24        reason that there shouldn't be a
```

Page 54

```
 1          single fund where all of the money
 2          goes to the class, especially in
 3          the typical class action
 4          settlement where the class is not
 5          going to be fully compensated.  At
 6          least you can pro rata, upgrade
 7          the distribution.
 8               And that's just not --
 9          that's not just me being
10          ideologically crazy.  That --
11          that's the ALI principles of the
12          law of aggregate litigation.  It's
13          from the left to the right.
14          Anybody who's commented on this
15          says why -- why aren't the
16          attorneys negotiating on behalf of
17          their class -- of their clients.
18               And too often we see
19          plaintiff's attorneys negotiating
20          Cy Pres for some charity that
21          they're affiliated with and then
22          showing up with a big check,
23          saying, "look what I won for this
24          charity," and then sort of
```

October 14, 2011

Page 55

```
 1        capturing two benefits there.  Not
 2        only their attorneys fees, but --
 3        they are -- they are getting some
 4        good publicity for doing good -- a
 5        good cause.  And, you know, do the
 6        good cause on your own time, not
 7        on the class's dime.
 8             MR. PALMER:  What I saw the
 9        other day, Ted, was Citibank
10        contributing to a Cy Pres fund,
11        and the money was going to
12        somebody they were already making
13        contributions to.  It was -- it
14        had nothing to do with the case.
15             MR. FRANK:  We see that,
16        too.  For example, there's a
17        settlement against Larry Ellison,
18        and initially it was going to be
19        -- Sun was going to donate $100
20        million to some charity, and --
21        and wait, why are the shareholders
22        paying for the charity?  And
23        eventually it was Ellison was
24        going to pay the money to charity
```

Page 56

1          instead.  But Ellison is already

2          giving his fortune to charity, so

3          it -- it -- it's not even a

4          penalty there.  It's just

5          attorneys taking credit for

6          something that's already

7          happening.

8               And then we see some really

9          problematic things when it's just

10         basically the parties established

11         a Cy Pres fund and say, "Judge,

12         you get to choose where it goes

13         to."

14              I think that's just utterly

15         improper.  If I had a motion to

16         dismiss pending, I couldn't go to

17         the judge and say, "Judge, it's

18         really important you grant this

19         motion to dismiss, so if you grant

20         it I'm going to give $500,000 for

21         you to give to any charity you

22         want."  I would get arrested.  But

23         for some reason in a class action

24         settlement context that's

```
                                        Page 57
     1          considered appropriate.

     2                  And we recently had a

     3          settlement in the Northern

     4          District of California, we didn't

     5          object, and now I'm kind of

     6          regretting that we didn't object.

     7          But without any notice to the

     8          class, the judge decided $250,000

     9          is going to go to a school where

    10          I'm teaching as an adjunct.  The

    11          class had no notice that the judge

    12          was going to move the proposed Cy

    13          Pres around.

    14                  I think that's a problem.

    15          There are all these conflicts of

    16          interest there, potentially

    17          between the plaintiffs' attorneys

    18          and the class, between money that

    19          is being attributed to Cy Pres,

    20          but it's really going to friends

    21          of the defendants or nonprofit

    22          organizations that lobby for the

    23          defendant, or cases where it's

    24          essentially a slush fund for the
```

October 14, 2011

Page 58

```
 1          judge and creates some weird
 2          conflicts of interest there.
 3               MR. PALMER:  I don't know if
 4          it's all that sinister, Ted, but
 5          what I've seen is that Cy Pres is
 6          a fairly complex concept, and I
 7          don't think many class lawyers and
 8          that too many judges really
 9          understand its history and its
10          origin and how it's supposed to
11          work.  Because what I see very
12          often is Cy Pres funds going to a
13          group or a charity that has
14          absolutely nothing to do with the
15          absent class members, the
16          non-claimant class members, and
17          that's really whose supposed
18          benefit, is the non-claimant class
19          members, and -- and it -- I agree,
20          it's -- it's an abused concept.
21          That's the problem.
22               MR. ESADES:  All right, Dan,
23          do you have -- oh, there you are.
24               COMMENTER:  I don't need
```

October 14, 2011

Page 59

1    that.  I think I can speak loudly

2    enough.

3         So going to something that

4    Vince touched upon earlier, this

5    notion of professional objectors

6    essentially selling their appeal.

7    Maybe the preview (inaudible) are

8    not type of professional objector,

9    but going to something in

10   Mr. Schoenbrun mentioned, who

11   complained bitterly about the

12   excessive fees that counsel

13   receive.  I'm curious how much

14   each of you has accepted to sell

15   appeals of class action

16   settlements over the last decade.

17        MR. FRANK:  Zero.

18        COMMENTER:  Fair enough.

19        MR. SCHOENBRUN:  I'm not

20   going to answer the question, but

21   what I would say to you is this:

22   I don't mind disclosure.  What I

23   would like to see is plaintiff

24   class action lawyers disclose

Page 60

```
1         every case in which they received

2         a fee, how much they got, and how

3         much the class members got.

4         Because the incident that he

5         talked about, two million for the

6         -- I don't know what the static

7         was -- there's a famous case in

8         California, 25 million for the

9         lawyers and $75,000 for the class.

10        And so that's the kind of static

11        that I think should be disclosed.

12        I don't have a problem with

13        disclosure if it goes both ways.

14             COMMENTER:  You realized

15        that information is disclosed in

16        the final approval.

17             MR. SCHOENBRUN:  No, it

18        isn't.  It's typically kept

19        hidden.

20             COMMENTER:  It absolutely

21        is.

22             MR. SCHOENBRUN:  It is

23        typically kept hidden.

24
```

October 14, 2011

Page 61

```
 1              MR. ESADES:  Let me just --
 2              MR. FRANK:  It varies from
 3         judge to judge, but there are
 4         many, many settlements out there
 5         where you never know how much is
 6         disclosed -- how much is
 7         distributed to the class, and it
 8         -- there's a settlement fund set
 9         up.  The class takes a tiny little
10         portion of it, the rest reverts to
11         the defendants, or in coupon
12         cases, especially in coupon cases,
13         you don't find that out.  And I've
14         tried to find that out and the
15         claims administrator will hang up
16         on you.
17              MR. ESADES:  Darrell, I
18         don't want to rob you of the
19         opportunity to answer this
20         question.
21              MR. PALMER:  A lot.
22              UNIDENTIFIED: He said a lot.
23              MR. ESADES:  I want to touch
24         on an opinion and I meant to touch
```

```
                                              Page 62

 1          on this earlier.

 2                  Judge Scheindlin in the IPO

 3          securities litigation in a -- in

 4          an appeal bond hearing ordered the

 5          objectors to answer that exact

 6          question, to identify the amounts

 7          that they've been paid in

 8          connection with withdrawal of

 9          objections, and none of the

10          objectors -- none of the

11          professional objectors in that

12          case -- they refused to answer and

13          she used that as an adverse

14          inference?

15              JUDGE ATLAS:  Several did,

16          actually.

17              MR. ESADES:  Two of the

18          nonprofessionals did respond with

19          basically none.  Anyway, I just

20          wanted to throw that citation out

21          because it's not in any of the

22          materials.

23                  MR. PALMER:  That's a great

24          appeal.
```

Page 63

```
 1

 2              MR. ESADES:  Any other

 3         questions?

 4              COMMENTER:  I have a

 5         question, yeah.  First of all, I

 6         think that the notion that the

 7         class members aren't getting

 8         anything because a fund is created

 9         and no one gets anything, and the

10         money goes back to the defendant,

11         I mean, that is an antiquated view

12         of class actions.  It's very rare

13         that unclaimed funds go back to

14         the defendant anymore.

15              And most of -- the vast

16         majority, the vast majority of

17         class action settlement money

18         that's approved every year in

19         federal court is distributed pro

20         rata in securities cases, and so

21         all that money is going somewhere.

22         And so I think this notion that we

23         -- we have the approval of

24         settlement and five years later
```

October 14, 2011

Page 64

```
 1          nothing ever got paid out to

 2          anybody, I just think that's

 3          antiquated.  That was a problem in

 4          the past.  I don't think it's much

 5          of a problem anymore.

 6                But on objectors, I don't

 7          think anyone believes that

 8          objectors should never get paid

 9          for the service that they provide.

10          But the point is that you should

11          only get paid if you're actually

12          providing a service, that you're

13          actually doing something that is

14          positive, creating a benefit.

15          That's why class action lawyers

16          get paid, because they're

17          providing a benefit.

18                If you file an objection and

19          you settle your objection without

20          making any changes to the

21          settlement agreement, you have

22          benefitted no one but yourself.

23                MR. PALMER:  That's not

24          true.
```

October 14, 2011

Page 65

```
 1              MR. SCHOENBRUN:  I can
 2         answer that.  And it used to be
 3         the law.  At the class action
 4         fairness hearing, there's no one
 5         standing up for the class.  And
 6         the fact that it used to be the
 7         law that the very benefit that an
 8         objector provided counsel by
 9         getting up to the judge and
10         saying, Judge, I've read this
11         notice, this is not here, this is
12         what should be here, that that was
13         a benefit.  It was understood to
14         be a benefit.
15              But what happened was, you
16         know, too many lawyers came in and
17         started doing that, so they've
18         changed the rule to now it should
19         be like what you're suggesting.
20              The fact of the matter is,
21         we add a voice, a voice that's an
22         unwelcome voice, and I think
23         adding the voice is sufficient.
24              Again, this idea that
```

October 14, 2011

Page 66

```
 1          they're frivolous, I just don't

 2          see it.  I've never -- I've never

 3          seen them say this is an objection

 4          that is frivolous.  Are they

 5          boilerplate?  Yes.  Are there

 6          people in it doing it for money?

 7          Yes.  But I find these objections

 8          are valid.  They're sensible,

 9          they're valid.

10              Now, the court may have

11          rejected them for the last ten

12          years and they're not about to

13          change it now, like plain English.

14          Your Honor, this notice is not in

15          plain English.  No one can

16          understand it.  Is that an invalid

17          objection because it hasn't

18          changed for 20 years?  Is it good

19          to remind the judge that no one

20          can understand this?

21              COMMENTER:  I mean, it's

22          just a strange world of

23          contingency fees, because, you

24          know, in the normal world, you
```

Page 67

```
 1          take a risk, you file a case, if
 2          you lose you get nothing, if you
 3          within you get something.  In your
 4          world, even if you lose you get
 5          something.
 6               MR. SCHOENBRUN:  Well, it
 7          depends.  There are two kinds of
 8          objectors.  But basically, you
 9          look at the study.  It wasn't a
10          study of the Ninth Circuit.  The
11          federal study of four circuits,
12          Philadelphia one, California and
13          two others.  They looked at the
14          number of objections that were
15          filed that were successful, and it
16          was one in ten.  So an objector
17          who goes into a case has a nine
18          out of ten chance that he's not
19          going to change anything.
20               MR. FRANK:  If that's the
21          case, then you're objecting too
22          much.  We win the majority of our
23          objections.
24               MR. SCHOENBRUN:  Well,
```

October 14, 2011

Page 68

```
 1        that's not me.  I'm talking about
 2        a study.  It was a study done of
 3        objectors.  It's not me.
 4              MR. PALMER:  And by the way,
 5        the way to end that is to stop
 6        paying off objectors.
 7              JUDGE ATLAS:  Right.
 8              MR. PALMER:  That's the
 9        thought of mine.  I mean, there's
10        a couple of class counsel and I
11        know that if I object and appeal,
12        we are going the distance, and
13        that's fine.
14              MR. FRANK:  In the article
15        that I wrote on this, I favored
16        the inalienability rule that
17        basically prohibited you from
18        settling or at least getting court
19        approval for settlement.  I think
20        that's exactly right.
21              The problem is you've got
22        the class counsel in a big bind
23        where you're holding up millions
24        of dollars of fees for a long
```

October 14, 2011

Page 69

```
 1          time.
 2                  MR. PALMER:  Well, you
 3          should put me -- you should put
 4          me -- there's three firms I'm now
 5          on retainer with to look at their
 6          settlements because I see the same
 7          stupid mistakes over and over.
 8          And so rather than objecting, we
 9          just did a deal where I
10          participate in helping them
11          structure their settlements to
12          avoid stupid mistakes.
13                  MR. FRANK:  If you ever want
14          to make a pitch to the federal
15          rules committee, I'm happy to
16          change the federal rules of
17          appellate procedure on that.  And
18          a public citizen has expressed
19          interest in that, too.
20                  MR. ESADES:  For those who
21          don't know the inalienability
22          rule, it's in the -- it's proposed
23          in Fitzpatrick's law review
24          article which talks about
```

October 14, 2011

Page 70

```
 1          borrowing from property law the
 2          concept that if you bring an
 3          appeal you can't dismiss the
 4          appeal for money, you have to
 5          follow it all the way through.
 6          And thereby creating the rule
 7          itself, you disincentivize people
 8          from bringing in appeals simply
 9          for the purpose of selling it.
10          And then legitimate appeals would
11          then go forward with people who
12          wanted to pursue them to get
13          actual change done as opposed to
14          using it as a profit center.
15               COMMENTER:  The questions is
16          for Mr. Palmer.  Other than the
17          basic premise that the plaintiffs
18          aren't getting, I guess, a fair
19          share of the settlement, what do
20          you find are the most, the two or
21          three most common reasons to
22          object?
23               MR. PALMER:  The biggest one
24          is probably unsubstantiated fee
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 71

```
 1          claims, where there is not full
 2          disclosure of your load star, and
 3          what work was really done on the
 4          case.  So you get kind of this,
 5          you know, this declaration
 6          application where, yeah, we spent
 7          8700 hours and our average fee is
 8          795 an hour.  That's probably the
 9          biggest one.
10              The second one is a notice,
11          like Larry was saying, the poorly
12          written notices.  I'll give you a
13          perfect example.  The other day in
14          -- in a case, the notice was very
15          specific about what you had to do.
16          Write a letter to the judge, tell
17          the judge -- and here's the
18          judge's name and address, and tell
19          the judge what you don't like.
20              And we followed these things
21          to the letter.  And I didn't do
22          this, but a friend of mine wrote a
23          letter to the judge, his brother
24          wrote the letter to the judge.
```

Page 72

```
 1          The judge got the letter and sent

 2          it back and said that it was an

 3          improper exparte communication to

 4          the court and it wasn't going to

 5          consider it.  It's just hilarious.

 6               MR. ESADES:  I would jump in

 7          on the fee disclosure only for

 8          this point.  When -- when certain

 9          professional objectors have the

10          reputation of bringing objections

11          and simply selling them on appeal,

12          your incentive as class counsel to

13          provide them with all your

14          detailed billing records, not real

15          great, because it's not going to

16          move the ball.

17               I've -- I've rarely seen and

18          I think this is why you see a lack

19          of cooperation with certain

20          professional objectors is that it

21          doesn't matter.  The end game will

22          be the same.  And that's why I

23          think you're seeing a resistance

24          to some -- when people ask for all
```

October 14, 2011

1       my detailed billing records, I'm

2       happy to provide it to the court

3       en camera, but it's very -- I'm

4       not going to just start serving

5       this on other parties and waiving

6       privilege of what I've done

7       through seven or eight years of

8       litigation so it can be picked

9       over and used to create new

10      objections that will then be

11      offered for sale on appeal.

12              MR. PALMER:  In the

13      [Enfield] case, Larry and I both

14      got seven banker's boxes

15      completely full of billing records

16      from the LaRock firm -- or the

17      Coughlin firm, I should say.  They

18      made full disclosure of every hour

19      they spent.

20              MR. SCHOENBRUN:  Yes, and

21      Mr. LaRock had next to -- you

22      know, hundreds of hours

23      settlement.  Description of work

24      done, settlement.  Description of

October 14, 2011

Page 74

```
1          work done, settlement.
2          Description of work done.  Pages
3          and pages.  That was his
4          description.  Settlement,
5          settlement, settlement.
6                  COMMENTER:  So is that
7          supposed to encourage us to
8          provide you with the information
9          that you requested?
10                 MR. SCHOENBRUN:  I think --
11         it's not me.  I think the court
12         system should require it, just
13         like you hire experts to come in
14         and to talk about how fair your
15         fees are.  The system should allow
16         for experts on behalf of the class
17         from whom you're taking the fee
18         for the experts to go over those
19         records and see whether or not
20         they're valid or not.  It's not
21         for me.  I don't care for myself.
22         I'm talking about this process,
23         which I feel is horribly unfair to
24         class members, and I would like to
```

Page 75

```
 1          improve it.

 2                  COMMENTER:  It seems to me

 3          you're attacking federal judges

 4          who you -- who, according to your

 5          theory of the way things work, are

 6          failing to do --

 7                  MR. SCHOENBRUN:  That's

 8          right.  It's not just me.  Look,

 9          what was -- the Congress said the

10          judges aren't doing their job.

11          What was the big conclusion of the

12          Rand Corporation study ten years

13          ago?  Judges aren't doing their

14          job.  The judges admit it

15          themselves.  The judges -- the

16          judge in Maine who said, oh, being

17          a fiduciary for the class, that

18          sounds very good.  That's not what

19          we do.

20                  It's not me.  They're

21          admitting it themselves.  This

22          process is too big for them.  The

23          cases are too big for them.

24          They've got too much time -- they
```

Page 76

```
 1          have not enough time to give these

 2          cases the proper attention they

 3          deserve.

 4               MR. FRANK:  Two things that

 5          would fit what Larry is

 6          complaining about, though.  One

 7          is, first of all, take this load

 8          star out of it.  Base the

 9          attorney's fees on what the class

10          receives.  23H says go with that

11          approach, a lot of circuits say go

12          with that approach now.  And then

13          you don't have to worry about this

14          sort of gimlet-eyed review of the

15          load star.

16               And, in any event, everybody

17          knows, you know, even if the

18          judges start demanding more

19          scrutiny and waste everybody's

20          time in this collateral

21          litigation, then -- then LaRock

22          will spend a few extra, you know,

23          hours writing something longer

24          than settlements on his attorney
```

October 14, 2011

Page 77

```
 1         fee reports.
 2              I don't think it's worth
 3         anybody's time to sit down and
 4         figure out whether or not the
 5         attorneys are churning hours,
 6         because if you give them the
 7         incentive to churn the hours, they
 8         will churn the hours.
 9              So base it on what the class
10         is recovering and you take that
11         away and you're aligning the
12         incentives properly.
13              Second, the reason the
14         judges have very little incentive
15         to scrutinize the settlements is
16         because if there's a valid appeal,
17         it will get bought off.  So make
18         the appeals inalienable just so
19         that the objectors can't sell a
20         good appeal, and then appeals
21         courts will actually see bad
22         settlements and start reversing
23         them, and then judges will have
24         the incentive to pay attention the
```

Page 78

```
 1        first time so that they don't get

 2        reversed.

 3             MR. SCHOENBRUN:  I don't

 4        believe that's true.

 5             MR. PALMER:  I have a

 6        question for --

 7             MR. SCHOENBRUN:  I don't

 8        believe that's true.

 9             MR. ESADES:  We're actually

10        at our time and I'm given the evil

11        eye from Dan, so we have to wrap

12        it up.

13             I want to thank my panel for

14        coming and everyone who asked

15        questions.

16

17             This concludes the recording

18        of this session.  Thank you for

19        listening.

20

21

22

23

24
```

```
 1                    CERTIFICATE

 2

 3              I, CONSTANCE E. PERKS, a

 4         Notary Public and Certified Court

 5         Reporter of the State of New

 6         Jersey, do hereby certify that

 7         that the foregoing audio recording

 8         was transcribed by me to the best

 9         of my ability.

10              I DO FURTHER CERTIFY that I

11         am neither a relative nor employee

12         nor attorney nor counsel of any of

13         the parties to this matter, and

14         that I am neither a relative nor

15         employee of such attorney or

16         counsel, and that I am not

17         financially interested in the

18         matter.

19

20

21         _____

22         CONSTANCE E. PERKS, CRR, CCP, CLR, CCR
           Notary License #2381708

23         Notary Expiration: January 21, 2014
           CCR License #30XI00142900

24         Dated:  October 31, 2011
```