Galen D. Bellamy (SBN 231792)
Email: bellamy@wtotrial.com
Michael T. Williams (*pro hac vice*)
Email: williams@wtotrial.com
Andrew M. Unthank (*pro hac vice*)
Email: unthank@wtotrial.com
N. Reid Neureiter (*pro hac vice*)
Email: neureiter@wtotrial.com
Cedric D. Logan (*pro hac vice*)
Email: logan@wtotrial.com
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202
Telephone:   (303) 244-1800
Facsimile:    (303) 244-1879

Dean J. Zipser (SBN 94680)
Email: dzipser@umbergzipser.com
Carole E. Reagan (SBN 162674)
Email: creagan@umbergzipser.com
Umberg Zipser LLP
1920 Main Street, Suite 200
Irvine, California 92614
Telephone:   (949) 679-0052
Facsimile:    (949) 679-0461

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE CHAMBERS, *et al.*, all of whom sue in their individual capacities and for all others similarly situated,<br><br>      Plaintiff,<br><br>    vs.<br><br>WHIRLPOOL CORPORATION, *et al.*,<br><br>      Defendants. | Case No:  8:11-cv-01733-FMO (ANx)<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS**<br><br>The Honorable Fernando M. Olguin |

# **TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................. 1

STATEMENT OF FACTS AND RELEVANT BACKGROUND .............................. 4

I.   PLAINTIFFS ALLEGED THAT THE DISHWASHERS WERE
     DANGEROUSLY DEFECTIVE AND SHOULD BE RECALLED ................. 4

II.  THE EVIDENCE SHOWED THAT OVERHEATING EVENTS ARE
     EXTRAORDINARILY RARE ....................................................... 7

III. THE SETTLEMENT TERMS REFLECT PLAINTIFFS' WEAK
     CASE ....................................................................................... 9

     A.   Summary of Key Settlement Terms and Valuation ................... 9

     B.   Details of the Key Terms of the Settlement Agreement ........... 11

IV.  THE VALUE OF THE SETTLEMENT TO DISHWASHER
     OWNERS ............................................................................... 15

     A.   Actual Value of the New Dishwasher Rebates (Coupons) ....... 15

     B.   The Value of Prequalified Claims for Past Overheating Events ............. 16

     C.   The Value of Non-prequalified Claims for Past Overheating Events ..... 17

     D.   The Value of Future Overheating Event Claims ..................... 18

     E.   The Value of the Edits to Whirlpool's Service Pointers .......... 20

     F.   The Total Estimated Value of the Settlement Benefits ............ 21

ARGUMENT ........................................................................... 22

I.   THE CLASS ACTION FAIRNESS ACT'S PROVISIONS
     REGARDING COUPON SETTLEMENTS GOVERN THIS
     SETTLEMENT ........................................................................... 22

II.  THE COURT SHOULD AWARD FEES USING THE
     PERCENTAGE-OF-RECOVERY APPROACH UNDER 28 U.S.C. §
     1712(a) ........................................................................... 25

i

A.   The New Dishwasher Rebates Are "Coupons" Under CAFA.................25

B.   The Settlement Provides <u>Only</u> Coupons to 99.8% of the Class.............25

C.   The Court Should Award Fees Under Section 1712(a) Using the
     Percentage Approach Based on the Value of Redeemed Coupons .........26

     1.   Under 28 U.S.C. § 1712(a), the Court should wait until the
          rebate redemption deadline to award the final fee........................27

     2.   The rebate benefits are worth no more than $4,500,000 ..............27

D.   The Court Has Discretion to Award a Lodestar-Based Fee for the
     Limited Cash Relief, Thus Treating the Settlement as "Mixed" .............29

     1.   The Court should consider the actual recovery, not the
          unsupported theoretical values suggested by Plaintiffs.................30

     2.   The Court should assign no value to, and thus award no
          additional lodestar-based fee for, the injunctive relief .................32

III.   THE LODESTAR METHOD YIELDS A FEE NO GREATER THAN
       $3,170,000, NOT THE REQUESTED WINDFALL.........................................34

A.   The Court Should Substantially Reduce the Base Lodestar ...................35

     1.   The Court should reduce the base lodestar because several
          firms seek to charge excessive rates for document review...........35

     2.   The Court should reduce the base lodestar for claimed
          hourly rates that are unreasonably high........................................38

          a.   Class Counsel bear the burden of proving the market
               rate for their services in this case .........................................39

          b.   Counsel failed to support their claimed hourly rates..........39

          c.   Class Counsel's claimed hourly rates are excessive ..........42

     3.   The Court should reduce the lodestar for unsupported rates.........47

     4.   The Court should reduce the lodestar for improper billing
          entries in quarter-hour increments ................................................47

B.   The Court Should Apply a 0.5 Fractional Multiplier..............................49

ii

1.   Class Counsel achieved modest results compared to their
goals .................................................................................................49

2.   The modest results obtained outweigh the other *Kerr* factors.......51

3.   The Court should apply a negative multiplier of 0.5.....................52

IV.   CLASS COUNSEL FAILED TO PROVE THAT CERTAIN COSTS
ARE RECOVERABLE.......................................................................54

CONCLUSION............................................................................................55

## <u>TABLE OF AUTHORITIES</u>

Page

<u>Cases</u>

*Allen v. Bedolla*,
787 F.3d 1218 (9th Cir. 2015) ................................................................24

*Banas v. Volcano Corp.*,
47 F. Supp. 3d 957 (N.D. Cal. 2014) ...............................................37, 38

*Beck-Ellman v. Kaz USA, Inc.*,
No. 3:10-CV-12134-H-DHB, 2013 WL 10102326 (S.D. Cal. June 11, 2013)...........33

*Blum v. Stenson*,
465 U.S. 886 (1984)...................................................................39, 47

*Bohannon v. Facebook, Inc.*,
No. 12-cv-01894-BLF, 2016 WL 2962109 (N.D. Cal. May 23, 2016) ....................35

*Botosan v. Vanags Indus., Inc.*,
No. SACV991192AHSANX, 2001 WL 34884759 (C.D. Cal. Jan. 12, 2011) ...........47

*Clayton v. Knight Transp.*,
No. 1:11-cv-00735-SAB, 2014 WL 1154098 (E.D. Cal. Mar. 21, 2014) ..................53

*Create-a-Card, Inc. v. Intuit, Inc.*,
No. C-07-06452 WHA, 2009 WL 3073920 (N.D. Cal. Sept. 22, 2009)...............32, 53

*Dardarian v. OfficeMax N. Am.*,
No. 11-cv-00947-YGR, 2014 WL 7463317 (N.D. Cal. Dec. 30, 2014) ....................24

*Davis v. Cole Haan, Inc.*,
No. C 11-01826 JSW, 2013 WL 5718452 (N.D. Cal. Oct. 21, 2013)...................26, 27

*Dugan v. Lloyds TSB Bank, PLC*,
Nos. C 12-02549 WHA, C 12-02537 WHA,
2014 WL 1647652 (N.D. Cal. Apr. 24, 2014)............................................53

*Fernandez v. Victoria Secret Stores, LLC*,
No. CV 06-04149 MMM (SHx), 2008 WL 8150856 (C.D. Cal. July 21, 2008).........43

*Fleury v. Richemont N.A., Inc.*,
No. C-05-4525 EMC, 2008 WL 3287154 (N.D. Cal. Aug. 6, 2008)..........................25

iv

*Gates v. Deukmejian*,
987 F.2d 1392 (9th Cir. 1993) ...................................................................45

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ...................................................................28

*Hensley v. Eckerhart*,
461 U.S. 424 (1983).............................................................................passim

*Il Fornaio (Am.) Corp. v. Lazzari Fuel Co., LLC*,
No. C 13-05197 WHA, 2015 WL 2406966 (N.D. Cal.May 20, 2015) ......................38

*In re Beacon Assocs. Litig.*,
No. 09 Civ. 777 (CM), 2013 WL 2450960 (S.D.N.Y. May 9, 2013) .........................37

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) .............................................................passim

*In re Bluetooth Headset Prods. Liab. Litig.*,
No. 07-ML-1822 DSF (Ex), 2012 WL 6869641 (C.D. Cal. July 31, 2012) ...............52

*In re HP Inkjet Printer Litig.*,
716 F.3d 1173 (9th Circ. 2013) ...........................................................passim

*In re HP Inkjet Printer Litig.*,
No. 5:05-cv-03580-JF, 2014 WL 4949584 (N.D. Cal. Sept. 30, 2014) ......................30

*In re Toys "R" US-Delaware, Inc. FACTA Litig.*,
295 F.R.D. 438 (C.D. Cal. 2014)..............................................35, 39, 42, 54

*Jordan v. Multnomah Cty.*,
815 F.2d 1258 (9th Cir. 1987) ...................................................................45

*Kearney v. Hyundai Motor America*,
No. SACV 09-1298-JST (MLGx), 2013 WL 3287996 (C.D. Cal. June 28, 2013)......41

*Kerkeles v. City of San Jose*,
243 Cal. App. 4th 88 (2015) .......................................................................49

*LaGarde v. Support.com*,
No. C 12-0609 JSC, 2013 WL 1283325 (N.D. Cal. Mar. 26, 2013)..........................32

*Lakim Indus., Inc. v. Linzer Prods. Corp.*,
No. 2:12-cv-04976-ODW(JEMx), 2013 WL 1767799 (C.D. Cal. Apr. 24, 2013) ......42

v

*Lakim Indus., Inc. v. Linzer Prods. Corp.*,
552 F. A'ppx 989 (Fed. Cir. 2014) ............................................................................42

*LaToya A. v. S. F. Unified Sch. Dist.*,
No. 3:15-cv-04311-LB, 2016 WL 344558 (N.D. Cal. Jan. 28, 2016)..........................40

*Masimo Corp. v. Tyco Health Care Grp., L.P.*,
No. CV 02-4770 MRP (AJWx), 2007 WL 5279897 (C.D. Cal. Nov. 5, 2007)..........45

*McCown v. City of Fontana*,
565 F.3d 1097 (9th Cir. 2009) .................................................................................49

*Miller v. Ghirardelli Chocolate Co.*,
No. 12-cv-04936-LB, 2015 WL 758094 (N.D. Cal. Feb. 20, 2015) ..........................33

*Morganstein v. Esber*,
768 F. Supp. 725 (C.D. Cal. 1991) ..........................................................................55

*Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*,
776 F.2d 646 (7th Cir. 1986) ...................................................................................45

*Parkinson v. Hyundai Motor Am.*,
796 F. Supp. 2d 1160 (C.D. Cal. 2010) ........................................................39, 40, 41

*Pearson v. NBTY, Inc.*,
772 F.3d 778 (7th Cir. 2014) ...........................................................................1, 4, 31

*Purdue v. Kenny A. ex. rel. Winn*,
559 U.S. 542 (2010).........................................................................................49, 52

*Schwarz v. Sec'y of Health and Human Servs.*,
73 F.3d 895 (9th Cir. 1995) ...............................................................................39, 47

*Sealy, Inc. v. Easy Living, Inc.*,
743 F.2d 1378 (9th Cir. 1984) .................................................................................35

*Standard Fire Ins. Co. v. Knowles*,
133 S.Ct. 1345 (2013).............................................................................................24

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
463 F.3d 646 (7th Cir. 2006) ...................................................................................25

*Tait v. BSH Home Appliances Corp.*,
No.: SACV 10-0711-DOC(ANx),

vi

2015 WL 4537463 (C.D. Cal. July 27, 2015)............................................31, 48, 53, 54

*Tanoh v. Dow Chem. Co.*,
561 F.3d 945 (9th Cir. 2009) ........................................................................22

*Tarlecki v. Bebe Stores*,
No. C 05-1777 MHP, 2009 WL 3720872 (N.D. Cal. Nov. 3, 2009) ...........31

*Theme Promotions, Inc. v. News Am. Mktg. FSI, Inc.*,
731 F. Supp. 2d 937 (N.D. Cal. 2010)..........................................................42

*True v. Am. Honda Motor Co.*,
749 F. Supp. 2d 1052 (C.D. Cal. 2010) ....................................25, 26, 28, 53

*Weeks v. Kellogg Co.*,
No. CV 09-08102(MMM)(RZx), 2013 WL 6531177 (C.D. Cal. Nov. 23, 2013) .......49

*Welch v. Metro. Life Ins. Co.*,
480 F.3d 942 (9th Cir. 2007) ........................................................................48

*Williams v. MGM-Pathe Commc'ns Co.*,
129 F.3d 1026 (9th Cir. 1997) ......................................................................31

*Yeagley v. Wells Fargo & Co.*,
No. C 05-03403 CRB, 2008 WL 171083 (N.D.Cal. Jan. 18, 2008)............31

**Statutes**

28 U.S.C. § 1712.................................................................................3, 16, 25

28 U.S.C. § 1712(a) ................................................................................25, 27

28 U.S.C. § 1712(b) ......................................................................................29

28 U.S.C. § 1712(c) ......................................................................................29

## __INTRODUCTION__

Five years ago Plaintiffs and Class Counsel set out to achieve two main goals—a nationwide safety recall of 18,400,000 Whirlpool-manufactured dishwashers and billions of dollars in money damages for __all__ Dishwasher[1] buyers. Class Counsel achieved neither goal. By late 2014, Class Counsel had learned that there would be no safety recall because the U.S. Consumer Product Safety Commission ("Safety Commission") had closed its investigation without requiring Whirlpool to take action. And, in October 2014, the jury in *Glazer v. Whirlpool* unanimously rejected similar claims made by a class of similarly uninjured consumers. Class Counsel recognized their predicament—years of additional litigation with a substantial risk of recovering nothing. So they agreed to a settlement that provided their clients with modest relief rather than risk an adverse verdict on a weak case. So far, so good.

Now, however, as a number of objectors have noted, Class Counsel and their forensic accountant seek to achieve for themselves what they could not achieve for their clients by creating a fantasy valuation of the class benefits. While these arguments would be found in the "Fiction" section at any bookstore, the determination of a reasonable fee calls for realism, and "realism requires recognition that probably all that class counsel really care about is their fees." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 783 (7th Cir. 2014). The truth here is that the claims-made coupon settlement is worth between **$2,570,000** and **$5,155,000** in benefits payable to the Dishwasher owners (excluding notice and fees), or less than 0.5% of the aggregate damages Class Counsel had originally sought to recover in the case.

Despite this modest outcome, which unquestionably benefits a class that likely would have walked away with nothing, Class Counsel seek a windfall fee of $15,000,000, or more than 2.8 times and up to 5.9 times the total sum of coupons and cash payable to the Dishwasher owners.

---

[1] The capitalized terms in this brief are defined terms in the Settlement Agreement.

Given the results achieved, Class Counsel's fee request is unreasonable. Many Class Members have objected to the fee motion to say exactly that (*e.g.*, ECF Nos. 202-03, 213, 226, 229, 231, 234-36), and governing Ninth Circuit law confirms it. As the Ninth Circuit has said, "Plaintiffs attorneys don't get paid simply for working; they get paid for obtaining results." *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1182 (9th Circ. 2013). While the results achieved for the settlement class are better than a defense verdict, the Court should reject the invitation to subject a reasonable settlement to criticism and ridicule by awarding Class Counsel a fee that is several times larger than what they were able to recover for the Class.

As explained more fully below, the results simply do not justify the fee request. The following chart summarizes the value of the settlement to class members, which totals approximately $4,200,000 on the low end and $6,800,000 on the high end.

| Settlement Benefit Type | Est. Low Value | Est. High Value |
|---|---|---|
| **New Dishwasher Rebates** ($69.19 average per claim) | $2,086,909 (30,162 claims) | $4,504,407 (65,102 claims) |
| **Prequalified Cash Payments for Past Overheating Events** ($193.71 average per claim) | $102,666 (530 claims) | $113,708 (587 claims) |
| **Non-prequalified Cash Payments for Past Overheating Events** ($225 average per claim) | $359,100 (1,596 claims) | $405,450 (1,802 claims) |
| **$100 Cash or 30% Rebate for Future Overheating Events** ($189 Average Value) | $23,625 (125 claims) | $131,355 (695 claims[2]) |
| **Revisions to Service Pointers** | $0 | $0 |
| **Benefits Payable to Owners** | **$2,572,300** | **$5,154,920** |

---

[2] This estimate assumes 100% of eligible Dishwasher owners actually make a Valid Claim.

2

| Settlement Benefit Type | Est. Low Value | Est. High Value |
|---|---|---|
| **Class Notice Costs** | $1,648,340 | $1,648,340 |
| **Total Class Benefits** | **$4,220,640** | **$6,803,260** |

The Settlement provides only <u>coupon</u> relief to 99.9% of Dishwasher owners, and 90% of the total benefits payable to owners are coupons. Thus, the Class Action Fairness Act's fee provisions for coupon settlements govern here. *See* 28 U.S.C. § 1712. The statute's fee provisions are intended to end the "inequities" that arise when class counsel receive fees disproportionate to the actual value of coupon relief obtained by the class. *In re HP Inkjet*, 716 F.3d at 1179. The Court can and should use the percentage-of-recovery method to tie Class Counsel's fees to the results they achieved for the Class. Given the amount of their recovery for Dishwasher owners, the Court should award a modest fee in the range between **$1,760,000** and **$2,830,000**. The Court also should award $477,663 in cost reimbursements, which brings the total award to between $2,220,000 and $3,330,000.

Even if the Court were to apply the lodestar method (either as a cross-check on the percentage method or in the first instance), the lodestar method does not support Class Counsel's $15,000,000 fee request. Under the lodestar method, the Court should make several adjustments to reduce Class Counsel's <u>claimed</u> lodestar of $8,948,488 to a reasonable lodestar of $6,340,493. Class Counsel's claimed lodestar is inflated by several Plaintiffs' firms' improper billing practices, such as seeking to charge more than 8,200 hours of routine document review work at excessively high hourly rates. In fact, if all of Plaintiffs' law firms charged reasonable rates like Plaintiffs' lead counsel Charles S. Fax and his firm, Rifkind Weiner Livingston LLC, that alone would reduce their claimed lodestar by $1,750,000, or 19.5%, to $7,200,000.[3]

---

[3] Mr. Fax seeks to charge a $303 blended rate for his billers, while Plaintiffs' other law firms (except Cohon & Pollak, LLP) seek to charge blended rates between $405 and $527, and their records show other problems. Mr. Fax and his firm handle a wide

Under the lodestar approach, the Court should ask whether Plaintiffs achieved "a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S. Ct. 1933, 1940 (1983). The answer here is an easy "no." Ninth Circuit law requires attorney fees to be proportionate to, and a <u>fraction</u> of, the results achieved for the class – not multiples of what the class will receive. Thus, after reducing Class Counsel's base lodestar, the Court should apply a negative multiplier of 0.5 to reduce the fee to **$3,170,247** for lack of success. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 945 (9th Cir. 2011) (reversing lodestar-based fee and noting that "[i]f the lodestar amount overcompensates the attorneys according to the 25% benchmark standard then [the court should take] a second look to evaluate the reasonableness of the hours worked and rates claimed" (citation omitted)).

A fee award of $15,000,000, on the other hand, would over-compensate Class Counsel for their mediocre result and would unnecessarily subject a reasonable settlement to substantial criticism. It also would dwarf the benefits payable directly to Dishwasher owners. If the Court were to award Class Counsel the requested sum, their fee would be an impermissible <u>68.4%</u> to <u>78%</u> of the total settlement value[4], well in excess of the Ninth Circuit's 25% benchmark.

## STATEMENT OF FACTS AND RELEVANT BACKGROUND

### I.   PLAINTIFFS ALLEGED THAT THE DISHWASHERS WERE DANGEROUSLY DEFECTIVE AND SHOULD BE RECALLED

Plaintiffs filed this action in November 2011. (*See* ECF No. 1.) In each iteration of their Complaint, Plaintiffs alleged that the Dishwashers contained defective electronic control boards ("ECBs") that can overheat and cause the Dishwasher to

---

variety of litigation matters for fee-paying clients, unlike most other Class Counsel.

[4] That is, $15,000,000 ÷ ($15,000,000 + $6,803,000 high estimate) = 68.4%, and $15,000,000 ÷ ($15,000,000 + $4,220,000 low estimate) = 78%. *See Pearson*, 772 F.3d at 781 ("the ratio that is relevant . . . is the ratio of (1) the fee to (2) the fee plus what the class members received").

emit smoke and fumes and erupt in flames. (*Id.* ¶ 1; *see also* ECF Nos. 44, 70, & 98.) They alleged the defect involved the terminal connection where the wire harness meets the ECB. (ECF No. 70 ¶ 4.) Plaintiffs claimed that the connection overheats in normal use and can set fire to the ECB or other parts. (*Id.*)

From the first Complaint, Plaintiffs' case was always premised on the claim that the Dishwashers posed a safety risk to consumers. (*See, e.g.*, ECF No. 1 ¶ 3 (alleged defect "creates a substantial and unreasonable risk of property damage, personal injury and death").) Plaintiffs sought substantial relief based on the alleged safety risks, including that the Dishwashers be recalled (*id.* at Prayer for Relief ¶ 2 ("order Defendants to engage in a corrective notice campaign")) and repaired or replaced in the field (*id.* at Prayer for Relief ¶ 3 ("permanent injunction mandating that Defendants pay, in part or in whole, for the repair and/or replacement of the Dishwashers").[5] Further, Plaintiff Steve Chambers personally contacted the Safety Commission and argued that the Dishwashers are dangerous and should be recalled. After years of investigation, the Safety Commission declined to require any recall or corrective action program.[6]

On these claims, Plaintiffs' alleged a nationwide class of all buyers of Whirlpool-manufactured Whirlpool, Kenmore, and KitchenAid brand dishwashers, with various subclasses and alternative statewide classes. (*See* ECF No. 70 ¶¶ 153-158.) These allegations encompassed every dishwasher with fully electronic controls (as opposed to electromechanical controls) manufactured by Whirlpool over a 17-year period—more than 18,400,000 units[7]—and contained no limitations as to model

---

[5] Lead Plaintiff Steve Chambers repeatedly told the media that his goal was to obtain a recall of the dishwashers. *See, e.g.*, Fox News 45 Baltimore story at 2:10 mark, *available at* https://www.youtube.com/watch?v=h-sCq7Jy7co.

[6] The Safety Commission's June 2014 decision not to require a recall caused Plaintiffs to give up on their primary litigation goal. (*See* Letter from Kadambi to Latack, June 4, 2014, Ex. 1.)

[7] Class Counsel claim that there are nearly 24,000,000 dishwashers subject to the Settlement, but the data on which they rely contains duplicate model and serial numbers and includes models without electronic controls as well as models with

1   number, model grouping, model year, or relevant ECB or wire harness connector

2   design differences. Further, by the Second Amended Complaint, Plaintiffs sought

3   certification of a class of all dishwasher buyers without regard to whether the buyer's

4   own dishwasher had experienced a malfunction. (*Compare* ECF No. 1 ¶ 100(c), *with*

5   ECF No. 44 ¶ 113.) That is, Plaintiffs claimed that even those dishwashers that had

6   worked perfectly throughout their useful life, and never manifested the alleged defect,

7   caused the buyers to suffer economic loss. (*See, e.g.*, ECF No. 70 ¶ 198.)

8         Contrary to Class Counsel's claim that any class-action trial in this case would

9   have been limited to liability issues, not damages (Mot. at 10), Class Counsel pled and

10   prepared this case for certification of both liability <u>and</u> damages issues, and they

11   pursued classwide, aggregate damages.[8] To go along with their theory that every

12   Dishwasher was defective, Plaintiffs alleged that the common questions in the case,

13   subject to classwide proof, included both the fact and <u>amount</u> of damages:

14       •     Whether Plaintiffs and the members of the Class are entitled to damages,

15               including compensatory, exemplary, and statutory damages, <u>and the</u>

16               <u>amount of such damages</u> (ECF No. 1 ¶ 105(P));

17       •     Whether Whirlpool or Sears should be ordered to disgorge all or a part of

18               the ill-gotten profits they received from the sale of the subject defective

19               Dishwashers (*id.* ¶ 105(O)); and

20

21   controls that are not subject to the Settlement (i.e., those not built on Rushmore, Rush,

22   NewGen, or Raptor control board platforms). Defendants' expert has filtered the shipments data to eliminate irrelevant dishwashers. (*See* Expert Rep. of Dr. Rose Ray,

23   June 23, 2016, at 7–8, attached as Ex. 2.) The accurate count of Class Dishwashers is approximately 5,800,000 and the accurate count of NewGen and Raptor Dishwashers

24   is approximately 12,600,000. (*Id.* at Tbl. 4 & Appx. C.)

25   [8] If the Court had certified any trial class but limited the certified questions to liability issues, so goes Class Counsel's argument (Mot. at 10), then this claims-made

26   settlement accomplishes the same result as the prospective class-action trial. But a claims-made <u>coupon</u> settlement is a dramatic loss compared to a nationwide safety

27   recall or even aggregate damages based on claimed premium-price, diminution-in-value, and unjust enrichment theories. Class Counsel sought to be able to argue to a

28   jury for aggregate damages and injunctive relief worth billions of dollars, but now that they have settled for coupons, they erroneously claim "full recovery" for the Class.

6

1
2
3

- Whether Plaintiffs and the putative class members are entitled to replacement of their allegedly defective Dishwashers with non-defective dishwashers (*id.* ¶ 105(Q)).

4
5
6
7
8
9

In 2014, Plaintiffs buttressed their pleadings by disclosing a damages expert, Peter Salomon, who opined that damages in this case could be measured on a classwide basis. (*See* Expert Rep. of Peter A. Salomon, Sept. 22, 2014, at 3-4, excerpts attached as Ex. 3.) More specifically, Mr. Salomon[9] opined that classwide damages could be calculated on a replacement-cost basis or their allegedly depreciated market value (i.e., diminution-in-value theory). (Ex. 3 at 3, 6.)

10
11
12
13

In short, Plaintiffs proposed an enormously broad class action alleging that 18,400,000 Dishwashers manufactured during a 17-year period were defective in design, posed an unreasonable risk to consumer safety, and should be recalled. They also alleged that every Dishwasher buyer should recover hundreds of dollars.

14
15

## II.    THE EVIDENCE SHOWED THAT OVERHEATING EVENTS ARE EXTRAORDINARILY RARE

16
17
18
19
20
21
22
23
24

Whirlpool and Sears deny that the Dishwashers[10] are defective in design or that they pose an unreasonable risk to consumer safety. To the contrary, the evidence Whirlpool and Sears produced in the litigation showed that Overheating Events are rare and virtually never result in fire outside the Dishwasher. (Tr. of Dep. of Ryan Roth, May 20, 2014, at 138:10-20, attached as Ex. 4.) Including alleged and unconfirmed events, as of the end of 2014, Overheating Events had been reported in less than 0.09% of all Dishwashers sold. (Ex. 2 at Tbl. 4.) The scattered and isolated Overheating Events over 20 years that resulted in some flames escaping the product in

25

[9] Mr. Salomon is the same forensic account who now purports to value this class settlement as worth more than $50,000,000 to the Class. (*See* Mot. Ex. 8 ¶ 24.)

26
27
28

[10] The Agreement defines "Dishwashers" to include KitchenAid, Kenmore, and Whirlpool brand dishwashers manufactured during the 15-year period from February 1998 through March 2012 with full electronic controls and a Rushmore, Rush, NewGen, or Raptor ECB. (Settlement Agreement ("Agreement"), ECF No. 218-12, ¶ I.O.)

7

1   a handful of incidents typically occurred when someone had disabled the

2   Dishwasher's thermal cut-off device or "TCO" or other safety features post-sale. (Ex.

3   4 (Roth Dep.) at 138:24-139:18.) Moreover, there were no confirmed injuries

4   associated with the reported Overheating Events. Still further, Whirlpool routinely

5   provided free repairs, free or discounted replacement dishwashers, and other benefits

6   to Dishwasher owners who reported Overheating Events to the company. (Expert Rep.

7   of David Hall, June 24, 2016, at ¶ 26, attached as Ex. 5.)

8        The individual Plaintiffs were no different than other customers who

9   experienced an Overheating Event that caused no kitchen fire, property damage, or

10  injury. Plaintiffs alleged that 18 of their Dishwashers experienced 22 separate

11  Overheating Events. Of these 22 events, 11 Dishwashers were repaired and restored to

12  service, showing that many Plaintiffs trusted the safety of their Dishwashers enough to

13  continue using them even after the Overheating Event. (*See, e.g.*, ECF No. 98 ¶¶ 110,

14  124.) Also, Plaintiffs testified that their Overheating Events did not allow flames to

15  escape the product enclosure or cause heat damage to their home. (*See, e.g.*, Tr. of

16  Dep. of Kevin O'Donnell, Oct. 11, 2013, at 162:11-163:1; Tr. of Dep. of George

17  Bliss, June 21, 2013, at 62:4-63:14, attached as Ex. 6.) Their Dishwashers' safety

18  features performed as designed and intended. Thus, Plaintiffs' testimony, evidence,

19  repair records, and the fact that some of their Dishwashers remain in use, showed that

20  the Dishwashers overheated safely, with only minimal damage to the Dishwasher

21  itself.

22       This and other evidence led the Safety Commission, after years of thorough

23  investigation, to close its engineering investigation in June 2014 without requiring

24  Whirlpool to take any corrective action. (*See* Ex. 1.) Whirlpool fully cooperated with

25  the Safety Commission, providing large amounts of information, as well as exemplar

26  ECBs, forced-failure test data and videos, and field-returned Dishwashers. The Safety

27  Commission's no-action determination dealt a death blow to Plaintiffs' hopes for a

28  safety recall or a favorable classwide jury verdict here. With that determination,

1  Plaintiffs faced an uphill battle in convincing a jury that both the Safety Commission's
2  and Whirlpool's engineering experts were wrong.

3  Further, given the extremely low rate of Overheating Events among
4  Dishwashers and other factors, it was by no means certain that the Court would have
5  certified any class for trial purposes. Plaintiffs' broad class allegations covered
6  18,400,000 Dishwashers that had many relevant design differences, including
7  differences in the ECB designs as well as differences in the TCOs and other safety
8  features built into the Dishwashers' control systems. Design and installation
9  differences, post-sale modifications of the appliance, different written warranties,
10  improper post-sale service, individualized questions of injury and damages, and
11  material differences in state laws all made a trial class certification far from certain.

12  **III.   THE SETTLEMENT TERMS REFLECT PLAINTIFFS' WEAK CASE**

13  In an attempt to justify their unreasonable $15,000,000 fee request, Class
14  Counsel tell the Court that the coupon settlement "is likely a better result for
15  Dishwasher Owners than could have been obtained *even if* Class Counsel had . . .
16  won jury verdicts." (Mot. at 9-10.) In truth, the Settlement terms show that Plaintiffs
17  were forced to entirely abandon their primary litigation goals; it is no "victory" for
18  Class Counsel and provides only modest benefits to the Class.

19  **A.   Summary of Key Settlement Terms and Valuation**

20  The Settlement before the Court has the following key terms and benefits:

21  (1) <u>10% - 20% New Dishwasher Rebate Offer</u>. The Settlement includes an offer
22  to Class Members to claim a rebate worth 10% to 20% off the purchase price of a new
23  Whirlpool-manufactured dishwasher. This coupon relief likely is worth between
24  **$2,100,000** and **$4,500,000** in redeemed coupons for the less than 1.7% of Class
25  Members who claimed the rebate form.

26  (2) <u>No Rebate Offer for Non-class Dishwasher Owners</u>. The Settlement does
27  not extend the coupon offer to approximately 12,600,000 Dishwasher owners who
28  were members of the putative nationwide class pled in Plaintiffs' complaints, but

9

1    whom are excluded from the Settlement Class.

2        (3) <u>Prequalified Cash Reimbursement Offer</u>. Approximately 2,592 Dishwasher

3    owners were identified in Defendants' or the Safety Commission's databases as

4    having paid some amount for a qualifying repair, replacement, or service contract

5    related to a Dishwasher Overheating Event[11] that occurred before the February 25,

6    2016, Notice Date. This cash offer is worth about **$100,000** to the fewer than 600

7    claimants who accepted the offer.

8        (4) <u>Non-prequalified Cash Reimbursement Offer</u>. The Settlement includes an

9    offer to the miniscule fraction of Dishwasher owners who experienced an Overheating

10   Event before February 25, 2016, but who have not been identified as having paid

11   some amount for a qualifying repair or replacement. This cash benefit is worth

12   between **$360,000** and **$400,000** to the fewer than 2,000 Dishwasher owners who will

13   file a Valid Claim for reimbursement.

14       (5) <u>30% Rebate or $100 Cash Offer</u>. The Settlement includes an offer of $100

15   cash or a 30% rebate off the purchase of a new Whirlpool-built dishwasher to those

16   owners who experience an Overheating Event after February 25, 2016 ("Future

17   Overheating Event") and who file a timely claim. This benefit is worth between

18   **$20,000** and **$130,000** to fewer than 700 owners who will be eligible to claim it.

19       (6) <u>Revisions to Service Pointers</u>. The Settlement requires Whirlpool to make

20   minor revisions to Whirlpool's control board-related <u>service pointers</u> and training

21   bulletins for service technicians. The revisions will inform technicians what they

22   already know from their training and experience. Also, the service pointers and

23

24   _____

25   [11] The Settlement Agreement defines "Overheating Event" to mean "the overheating of the Dishwasher's Electronic Control Board such that the class member or another person observed or experienced smoke, flames, fumes, sparks, or electrical arcing from the control console area of their Dishwasher." (Agreement ¶ I.BB.) All available data show that less than 0.1% of all Dishwashers (defined as those built with a "Rushmore", "Rush", "NewGen", or "Raptor" control board (*id.* ¶ I.O)) have experienced an Overheating Event and that the risk of overheating is declining. (*See* Ex. 2 at 13-14.)

1  bulletins will <u>not</u> be disseminated to Dishwasher owners, will have negligible or no

2  impact on consumer safety, and add $0 in quantifiable settlement value.

3      (7) <u>Notice Costs</u>. Whirlpool agreed to pay the costs of providing notice to the

4  Class. Whirlpool has paid the Administrator approximately $1,650,000 in notice costs.

5      (8) <u>Attorneys' Fees</u>. Whirlpool also agreed to pay Class Counsel "<u>reasonable</u>

6  attorneys' fees and costs" to be awarded by the Court. (Agreement ¶ IX.A.)

7      Altogether, these benefits are worth between $4,200,000 and $6,800,000 to the

8  Dishwasher owners themselves. Thus, the claims-made coupon settlement that Class

9  Counsel obtained here looks nothing like the classwide damages or nationwide recall

10  Plaintiffs sought at the outset.

11  **B.    Details of the Key Terms of the Settlement Agreement**

12      First, the Settlement Agreement provides a class settlement for only

13  approximately 5,800,000 of the 18,400,000 putative class members (i.e., all

14  Dishwasher buyers) whom were included in the trial class pled in Plaintiffs' original

15  Complaint.[12] (Settlement Agreement ("Agreement"), ECF No. 192-4, ¶ I.I (defining

16  "Class Dishwashers" to include Rush and Rushmore platform models and to exclude

17  NewGen and Raptor platform models).) Stated another way, Plaintiffs achieved a

18  class recovery for less than half of the putative class members pled in their Complaint.

19      Second, more than 99.9% of the 12,600,000 Dishwasher owners whom are

20  excluded from the Class—i.e., the NewGen/Raptor Owners—are <u>not</u> eligible to make

21  <u>any</u> claim in this Settlement. (Ex. 2 at 13.) That is because NewGen/Raptor Owners

22  can make a claim if, and only if, they actually experienced a Past Overheating

23  Event—fewer than 7,000 reportedly did (*id.* at Tbl. 4)—or they experience a Future

24  Overheating Event. (Agreement ¶ IV.D.) The available evidence and claim forms

25  received by the Administrator show that approximately 453 NewGen/Raptor Owners

26

27  [12] In response to Defendants' motion to dismiss the Third Amended Complaint,
    Plaintiffs eliminated the putative nationwide class and pled 11 statewide classes. (ECF
28  No. 98 ¶ 195.)

11

will be eligible to make a claim for a Future Overheating Event. (Ex. 2 at 18.) And the number of NewGen/Raptor Owners who actually make a claim will be <u>less</u> than the maximum number who would be eligible to make a claim. (*Id.* at 18-19.) Accordingly, more than 99.99% of NewGen/Raptor Owners will receive <u>no</u> benefit.[13]

Class Counsel argue, based on their expert's erroneous opinion (Mot. at 40 & Ex. 8 ¶¶ 23-24), that all Class Members and NewGen/Raptor Owners who still own their Dishwasher will receive "*at least* $6 per dishwasher" in the form of hypothetical benefit that "is like an extended warranty (or insurance policy)," but their argument ignores that the Settlement Agreement itself states that "Whirlpool and Sears have not agreed to any extension of their written warranties for the Class Dishwashers or other Dishwashers" and that the "only settlement benefits are those payments or rebates to eligible Dishwasher owners described in this Agreement." (Agreement ¶ XV.K.) It also ignores the record evidence that fewer than 17,000 Dishwashers reportedly experienced any Past Overheating Event, that only an estimated 654 Dishwasher owners are likely to experience a Future Overheating Event, and that as few as 125 of those owners will make a Valid Claim. (Ex. 2 at 13, 18-19.)

Even if the Future Overheating Event benefit could be likened to some form of insurance, it would be nearly worthless. First, the risk that is "insured" as a result of the settlement—a less than 0.02% chance that each of the 13,500,000 Dishwashers still in service will overheat—is less likely to occur with respect to any individual Settlement Class member than is a lighting strike. Second, in addition to insuring against an essentially non-existent risk, the "insurance" benefit is worth less than $0.002 per Dishwasher owner whose unit remained in service, considering the less than 0.02% chance of overheating, together with the roughly 5% chance that the Dishwasher owner will file a Future Overheating Event claim, which would entitle the

---

[13] The classwide release does not include the NewGen/Raptor Owners. (Agreement ¶ IV.D.2.)

owner to a rebate benefit of 30% off the price of a new Whirlpool-brand dishwasher that is worth, according to Plaintiffs, $189 (Mot. at 38). A 0.0002 rate of Future Overheating Events multiplied by 13,500,000 Dishwashers multiplied by 0.05 chance of filing a Valid Claim multiplied by $189 rebate benefit equals $25,515 in future benefits, or $0.002 per Dishwasher. (*See* Ex. 5 ¶ 44.)

Third, for Past Overheating Events, Class Members and NewGen/Raptor owners who submit sufficient documentary proof will receive reimbursement of the out-of-pocket costs they incurred to repair their Dishwasher or a portion of their costs to replace their Dishwasher, but only if Whirlpool or Sears did not already pay for the repair or replacement.[14] (*Id.* ¶¶ IV.B.6, IV.B.7.) Also, if the claimant previously has received from Sears or Whirlpool any form of compensation for an Overheating Event (e.g., a cash payment, a partial refund, a discount off the regular price of a new dishwasher, etc.), the amount of the claimant's reimbursement benefit shall be reduced by the amount of compensation Sears or Whirlpool already provided. (*Id.* ¶ IV.B.7.d.) Class Counsel's valuation of the Past Overheating Event benefits ignores not only those terms of the Settlement Agreement, but also the documentation requirements for proving eligibility for the cash benefit. (*Compare* Mot. at 37, *with* Agreement ¶¶ IV.B.2–IV.B.7.) For Dishwasher owners who chose to replace their Class Dishwasher after a Past Overheating Event, the Settlement provides up to $200 reimbursement of the price paid for a non-Whirlpool-manufactured replacement dishwasher and up to $300 for a Whirlpool-manufactured dishwasher. (*Id.*) The rate of overheating among Dishwashers is extremely low—about 0.09%. (Ex. 2 at Tbl. 4.) That means more than 99.9% of Dishwasher owners are <u>not</u> eligible for the cash reimbursement benefit.

---

[14] Defendants' records showed only 2,591 Dishwasher owners had incurred out-of-pocket repair or replacement expenses due to a past Overheating Event. (Mot. at 8.) The average amount of their expenses was $161. (*Id.*) The Settlement Agreement prequalifies those Dishwasher owners to receive a cash payment by filing a claim form but no documentary proof is required. (Agreement ¶¶ IV.B.4.) All other Class Members and NewGen/Raptor Owners who make a cash reimbursement claim must submit sufficient proof of their overheating-related Dishwasher repair or replacement and their out-of-pocket expenses. (*Id.* ¶¶ IV.B.1 & IV.D.4.)

Fourth, all Class Members who have <u>not</u> experienced an Overheating Event are eligible to make a claim for either a 10% rebate off the purchase of a new Whirlpool or Kenmore-brand dishwasher or a 15% rebate off the purchase of a new KitchenAid-brand dishwasher. (Agreement ¶ IV.A.1.) Further, Class Members whose Dishwashers required a repair of their Dishwasher's TCO will receive an enhanced rebate offer of 15% off the price of a new Whirlpool-brand dishwasher or 20% off the price of a new KitchenAid-brand dishwasher. (*Id.* ¶ IV.A.1.a.) But only approximately 69,000 Class Members received the enhanced rebate offer, only a tiny fraction (less than 2.3%) will claim any rebate form, and even fewer will redeem the rebate.

Because cash benefits are available only to those Class Members who already have experienced, or who will in the future experience[15], an Overheating Event, and because all available data shows that far less than 0.2% of all Class Members will experience an Overheating Event, more than 99.8% of Class Members are entitled to make a claim only for a rebate (i.e., a coupon). And because the Settlement does not provide any rebate offer to the approximately 12,600,000 NewGen/Raptor Owners who never have experienced, and never will experience, an Overheating Event, more than 99.99% of those Owners get nothing from the Settlement.

Fifth, the only part of the Settlement arguably related to Plaintiffs' safety defect allegations is the requirement that Whirlpool revise its ECB service pointers and training bulletins, to the extent applicable, to emphasize the safety function of the dishwashers' thermal cutoff devices ("TCO"), to instruct technicians not to bypass the TCO, and to inspect the TCO when servicing the ECB to ensure that the TCO is

---

[15] Class Members have two years from the February 2016 notice date, or through February 2018, to claim a future overheating event benefit (either a 30% rebate off a new Whirlpool dishwasher or $100 cash) if they experience an Overheating Event during that time. (Agreement ¶ IV.C.1.) NewGen/Raptor Owners have until the later of February 2018 or 10 years from the date of purchase of their Dishwasher to make a claim for a Future Overheating Event. (*Id.* ¶ IV.E.) The last year of manufacture of NewGen/Raptor Dishwashers was 2012, meaning that 2022 is the latest deadline for any Dishwasher eligible for this benefit. (Ex. 2 at Tbl. 4.)

14

properly installed. (*Id.* ¶ V.A.) The service pointers and bulletins already instructed technicians to inspect the TCO and not to bypass it, so the only change would be to emphasize to the technicians what they already know from their experience and training—that the TCO is a safety feature that should not be disabled. Such limited edits to the service pointers and bulletins is a far cry from Plaintiffs' goal to achieve a nationwide recall and retrofit program. In fact, such literature changes merely restate what technicians already know and add little, if anything, to the information Whirlpool already provided to its authorized service technicians.

In the end, Plaintiffs and Class Counsel agreed to a Settlement that reflects exactly what their case is—a weak case about a product <u>quality</u> issue, not a safety issue, that affects a miniscule fraction of all Dishwashers. A quality issue that does not affect 99.9% of putative class members did <u>not</u> justify Class Counsel's claimed investment of $8,950,000 in attorney time.

## IV.   THE VALUE OF THE SETTLEMENT TO DISHWASHER OWNERS

Class Counsel argue that the value of the Settlement to the Class is between $55,675,000 and $116,725,000. (Mot. at 44.) These figures have no relationship to the Settlement's actual value. The actual value of the Settlement's benefits payable directly to Dishwasher owners is estimated to be between $2,570,000 and $5,155,000. The Administrator's notice costs of $1,650,000 bring the settlement value up to between $4,200,000 and $6,800,000.

### A.   Actual Value of the New Dishwasher Rebates (Coupons)

The claims process is nearly complete; the filing deadline is June 27, 2016. As of June 10, 2016, the Settlement Administrator had received 129,855 claims, which is a 2.2% take rate for Class Members. (Case Status Rep., June 16, 2016, attached as Ex. 7.) Of those claims, 117,232, or 90.3%, have requested a rebate form. (*Id.*) By June 27, 2016, the total number of all claims should reach between 133,607 and 144,190 (Ex. 2 at Tbl. 2), resulting in an estimated 120,647 to 130,204 rebate claims. Even if the Settlement Administrator were to deem <u>all</u> rebate claims to be Valid Claims, that

15

would mean that 2.1% to 2.3% of Class Members will have requested a rebate form. After they receive a rebate form, however, they would have to buy a new rebate-eligible dishwasher and then submit the properly completed rebate form, along with proof of purchase, to actually redeem the rebate and receive any benefit. (Agreement ¶ IV.A.3.) The percentage of rebate claimants who will redeem their rebates likely will be between 25% and 50%, meaning that the number of redeemed rebates will be approximately 30,162 on the low side and 65,102 on the high side. The exact number will not be known until sometime in 2017. At this time, the Court cannot determine the actual value of the rebates that will be redeemed.

Under 28 U.S.C. § 1712, and *In re HP Inkjet*, 716 F.3d at 1186, the Court must base its valuation of the coupon relief here on the value of the coupons actually redeemed by Class Members. If the Court makes a very conservative assumption that between 30,162 and 65,102 claimants will redeem their rebates, and if the Court also were to conservatively assume that Class Counsel's estimated average purchase price of $629 for the rebate-eligible dishwashers is valid (with an average rebate of 11% or $69.19 off the purchase price), then total estimated value of the redeemed rebates would be approximately **$2,086,909** to **$4,504,407.** Class Counsel's estimated value of the redeemed rebates at between $7,500,000 and $33,000,000 is contradicted by all of the available data and is demonstrably unrealistic. (Mot. at 43.)

## B. The Value of Prequalified Claims for Past Overheating Events

The parties determined that approximately 2,591 Dishwasher owners are prequalified (including both Prequalified Class Members and Prequalified Owners) to make a claim for a cash reimbursement based on a reported Past Overheating Event that caused the Dishwasher owner to incur an out-of-pocket repair or replacement expense. (Mot. at 36; Agreement ¶¶ IV.B, IV.D.) Of the 2,591 prequalified Dishwasher owners, 505 owners have timely filed claims for reimbursement as of June 10, 2016. (Ex. 7.) Based on the claims filing rate to date, the total number of prequalified claims will be between 530 and 587. (Ex. 2 at Tbl. 3.) Those claims have

16

an average value of $193.71. (*Id.* at 5; Ex. 7.) Thus, the cash benefits that will be paid to Prequalified Class Members and Prequalified Owners will be **$102,290** to **$113,291**.

### C. The Value of Non-prequalified Claims for Past Overheating Events

As of June 10, 2016, approximately 25,204 non-prequalified claimants filed claims for cash reimbursement for an alleged Overheating Event, or both a cash reimbursement and a rebate form. (Ex. 2 at 6; Ex. 7.) An additional 747 to 4,187 non-prequalified claims for reimbursement could be filed by the claims deadline, which would yield a total of between 26,606 and 30,036 such claims. (*See* Ex. 2 at Tbl. 3.) Of the 25,204 claims for a cash reimbursement filed to date, however, only 10,204 claimants, or 40%, included <u>any</u> supporting documentation with their claim form. (Ex. 7.) That means that 15,000, or 60%, of the reimbursement claimants have not satisfied the threshold documentary proof requirements to claim a cash benefit. (*See* Ex. 2 at 13; Agreement ¶¶ IV.B.1, IV.B.3, IV.D.1, IV.D.4 (describing documentary proof requirements).)

Further, most of the reimbursement claims that included one or more supporting documents are <u>not</u> valid. Defendants' expert performed an analysis of a statistically representative sample of 400 of the non-prequalified reimbursement claims that included some supporting documentation. (Ex. 2 at 12-13.) The results of that analysis show that 86% of documented reimbursement claims are <u>invalid</u> because the claimant failed to submit documentary proof sufficient to satisfy the Settlement Agreement's requirements. (*Id.*) That means that if between 26,606 and 30,036 non-prequalified claims are filed, only approximately 6%, or 1,596 to 1,802, will be valid. (*Id.* at 13.)

Even assuming the Valid Claims with an average value of $225—i.e., the average value suggested by Class Counsel (Mot. at 37)—the total cash payments to non-prequalified claimants would be between **$359,100** and **$405,450**. Together, the prequalified and non-prequalified cash payments will total only about 10% of all benefits payable directly to Dishwasher owners.

17

### D.    The Value of Future Overheating Event Claims

Class Counsel offered the Court a misleading estimate of the value of the Future Overheating Event benefits. With the aid of their forensic accountant, Mr. Salomon (who also served as their damages expert in this case) (Mot. Ex. 8), Class Counsel estimated the value of the Future Overheating Event benefits at between $26,000,000 and $50,000,000. (Mot. at 41-42, 44 & Ex. 8 ¶ 24.) Their valuation rests on false allegations that there could be "28,000 Overheating Events per year [] result[ing] in 140,000 covered Overheating Events between now and the end of the coverage period in 2021." (Mot. at 42.) But Class Counsel's and their expert's estimate of 28,000 Overheating Events per year is based on three false assumptions:

First, they claim that at least 21,000 of the Past Overheating Event claims are valid. (*Id*. at 41; *id.* Ex. 8 ¶ 20.) But the claim forms and supporting documentation submitted to date show that 94% of those claims are invalid. (Ex. 2 at 13).

Second, they claim that the 21,000 Past Overheating Event claims represent 5% of all Past Overheating Events and that there have been 420,000 Past Overheating Events. (Mot. Ex. 8 ¶ 20.) But the available empirical data from Whirlpool, Sears, the Safety Commission, and other sources all conclusively show that there have not been that many reported Overheating Events for all Dishwashers since 1995 according to the methodology the Parties agreed to for identifying Overheating Events. (*See* Ex. 2 at 21-22; Agreement ¶ I.KK ("The search methodology to identify Prequalified Settlement Class Members will be consistent with the methodology used in the 2007-2008 PHM by Whirlpool," which requires both a thermal key word and the replacement of the ECB and the wire harness connector).)

Third, they claim that the vast majority of all ECB repairs/replacements per year are due to an Overheating Event (i.e., 28,000 of the 29,850 ECB repairs per year are attributable to Overheating Events). (Mot. Ex. 8 ¶ 21.) But ECBs malfunction and are replaced in the field for many different reasons that have nothing to do with overheating. (Ex. 2 at 21-22.) The available empirical data confirm that only a tiny

18

1 percentage of ECB repairs per year—1,000, or 3%—are reportedly due to

2 overheating. (*Id.*) Based on the real-world data, the actual number of Future

3 Overheating Events for all remaining Dishwashers during the claims period is

4 between 613 and 695, not the 100,000 estimated by Plaintiffs' expert. (*Id.* at Tbl. 5.)

5        Class Counsel's valuation of the Future Overheating Event benefits also is

6 based on an unsupported comparison of that 30% coupon or $100 cash benefit <u>if the</u>

7 <u>owner timely files a Valid Claim</u> to a 10-year written warranty for the Electronic

8 Control Board. (Mot. at 40-42.) But Plaintiffs expressly agreed in the Settlement

9 Agreement that the Settlement does <u>not</u> include any extended or written warranty.

10 (Agreement ¶ XV.K.) And Class Counsel admit that the Future Overheating benefit

11 does not have features like a written warranty. (Mot. at 40.)

12        Further, the term of the Future Overheating Events benefit, which began in

13 February 2016, will be no longer than five years for any Dishwasher owner and no

14 more than two years for more than two-thirds of them.[16] Class Counsel and Mr.

15 Salomon apparently conclude that because some Dishwashers are 10 years old as of

16 February 2016, the future overheating benefit is like a <u>10-year</u> warranty for <u>all</u> of the

17 Dishwashers that remain in service. But the Future Overheating Event benefit does <u>not</u>

18 extend backwards in time, that is, it provides nothing for any Class Member or

19 NewGen/Raptor Owner who experiences an Overheating Event before February 2016,

20 and it does not apply forward in time for 10 years for <u>any</u> Dishwasher that remains in

21 service. Indeed, the period before February 2016 is covered only by the Settlement

22 Agreement's <u>Past</u> Overheating Event benefits, which Class Counsel separately value.

23 Thus, their Future Overheating Event valuation double counts the Past Overheating

24 Event benefits as part of the Future Overheating Event calculation.

25

---

26 [16] The future event term for all dishwashers manufactured before February 2008 will
expire in February 2018. This leaves a maximum theoretical number of 5,800,000
27 NewGen/Raptor units in the field, with a historical Overheating Event incident rate of
less than 0.06% (i.e., 600 events per 1,000,000 units), eligible for benefits beyond
28 February 2018. (Ex. 2 at Tbl. 4.)

In short, Mr. Salomon (1) incorrectly estimates and grossly exaggerates the number of Dishwashers that, in theory, could be eligible for the Future Overheating Event benefit, without accounting for the fact that the remaining Dishwasher population is shrinking as units are retired from service every year (Ex. 2 at 19-20); (2) fails to recognize that the Settlement Agreement and its Future Overheating Event benefit does not provide for free parts and service like a warranty, but only provides a lesser, pre-defined benefit choice between a 30% rebate on a new Whirlpool dishwasher or $100 cash if the owner files a Valid Claim, which he admits 5% or less will do (Mot. Ex. 8 ¶ 20); (3) fails to account for available data showing the known, and declining, rate of Overheating Events over time (Ex. 2 at 14); (4) incorrectly assumes that the risk of an Overheating Event is the same for both Class Dishwashers and NewGen/Raptor Dishwashers (*id.* at 21); and (5) incorrectly assumes that virtually all (28,000 out of his estimated 29,850) ECB malfunctions each year are due to Overheating Events, even though the Settlement Agreement itself narrowly defines what qualifies as an Overheating Event (Agreement ¶ I.BB), and even though only 17,000 Dishwashers were reported to have Overheating Events in the entire period from 1998 through the end of 2014 (Ex. 2 at Tbl. 4).

The likely number of Future Overheating Events is less than 695 and expected to be about 654. (Ex. 2 at Tbl. 5.) Depending on the claim participation rate and the type of benefit selected, the actual value of the Future Overheating Event benefit would be between **$23,625** and **$131,355** using Plaintiffs' $189 midpoint for the range of individual benefit values from $100 cash to $370 rebate off a new KitchenAid dishwasher. The actual value is nowhere near Plaintiffs' overestimated value of $26,000,000 to $50,000,000.

### E.    The Value of the Edits to Whirlpool's Service Pointers

Finally, Class Counsel offer the Court an even more speculative and erroneous $10,000,000 estimated value for the TCO-related revisions to Whirlpool's service literature. (Mot. at 44.) But Class Counsel failed to provide the Court with any

20

1  evidentiary basis, much less through expert testimony, for that component of their

2  valuation of the Settlement's benefits. They make no attempt to (i) show what, if any,

3  new knowledge service technicians would gain from the edits; (ii) estimate how many

4  service technicians (or consumers) actually might read the revised literature; (iii)

5  estimate how many service technicians (or consumers) may decide not to bypass or

6  disable a TCO as a result of reading the revised literature; or (v) to calculate through

7  expert testimony the value of that information to Class Members. Given the complete

8  dearth of evidence, the Court must value the literature changes at $0.[17]

9  **F.     The Total Estimated Value of the Settlement Benefits**

10  The total value of the Settlement to all Dishwasher owners is as follows:

| Settlement Benefit Type | Est. Low Value | Est. High Value |
|---|---|---|
| **New Dishwasher Rebates** ($69.19 average per claim) | $2,086,909 (30,162 claims) | $4,504,407 (65,102 claims) |
| **Prequalified Cash Payments for Past Overheating Events** ($193.71 average per claim) | $102,666 (530 claims) | $113,708 (587 claims) |
| **Non-prequalified Cash Payments for Past Overheating Events** ($225 average per claim) | $359,100 (1,596 claims) | $405,450 (1,802 claims) |
| **$100 Cash or 30% Rebate for Future Overheating Events** ($189 Average Value) | $23,625 (125 claims) | $131,355 (695 claims[18]) |
| **Revisions to Service Pointers** | $0 | $0 |
| **Benefits Payable to Owners** | **$2,572,300** | **$5,154,920** |

[17] Unlike the *Roberts v. Electrolux* settlement cited by Class Counsel, this Settlement does <u>not</u> provide for free appliance repairs and also does <u>not</u> provide for safety notice and instructional letters to be mailed to the appliance owners. The *Electrolux* settlement involved both a free repair program <u>and</u> individual safety notices be provided to class members.

[18] This estimate assumes 100% of eligible Dishwasher owners make a Valid Claim.

| Settlement Benefit Type | Est. Low Value | Est. High Value |
|---|---|---|
| **Class Notice Costs** | $1,648,340 | $1,648,340 |
| **Total Class Benefits** | **$4,220,640** | **$6,803,260** |

## ARGUMENT

Rather than grant Class Counsel a fee that is disproportionate to, and a multiple of, the coupon-based class recovery between $4,200,000 and $6,800,000, the Court should award a <u>reasonable</u> fee between $1,758,000 and $2,834,000 under CAFA's provisions regarding coupon settlements.[19] The percentage-of-recovery method is appropriate here for three reasons: (1) 99.9% of Class Members received only a coupon offer; (2) 90% or more of benefits paid to Dishwasher owners are coupons; and (3) the claims-made settlement value can be reasonably estimated now and also can be determined with certainty in 2017.

If the Court were to use the lodestar method instead of the percentage method, the Court should reduce Class Counsel's base lodestar to $6,340,493. Then, the Court should apply a 0.5 negative lodestar multiplier based on the limited results achieved.

## I.   THE CLASS ACTION FAIRNESS ACT'S PROVISIONS REGARDING COUPON SETTLEMENTS GOVERN THIS SETTLEMENT

CAFA governs this Settlement and Class Counsel's Motion. Congress enacted CAFA "primarily to curb perceived abuses of the class action device." *Tanoh v. Dow Chem. Co.*, 561 F.3d 945, 952 (9th Cir. 2009). Coupon settlements in which class members receive coupons or vouchers but class counsel receive a large cash attorney fee were some of the abuses Congress sought to curb with CAFA's passage in 2005. *In re HP Inkjet*, 716 F.3d at 1177. "Congress was rightfully concerned with such settlements: by decoupling the interests of the class and its counsel, coupon

---

[19] The Court also should award the requested $508,292 in costs reimbursements, less approximately $30,000 claimed for what appear to be general overhead expenses. (*See* Argument § IV, *supra*.

settlements may incentivize lawyers to 'negotiate settlements under which class members receive nothing but essentially valueless coupons, while the class counsel receive substantial attorney's fees.'" *Id.* at 1177-78 (quoting S. Rep. No. 109-14, at 29-30 (2005)).

Because "the interests of class members and class counsel nearly always diverge," courts can "ensure faithful representation by tying together the interests of class members and class counsel." *Id.* at 1178. One way to align interests is to "tether the value of an attorneys' fees award to the value of the class recovery." *Id.* CAFA's legislative history shows that "the attorneys' fees provisions of § 1712 are intended to put an end to the 'inequities' that arise when class counsel receive attorneys' fees that are grossly disproportionate to the actual value of the coupon relief obtained for the class." *Id.* at 1179 (citing S. Rep. No. 109-14, at 29-32).

Class Counsel propose that the Court use the lodestar method, arguing that California state law controls the fee dispute because the Parties chose California substantive law in the Settlement Agreement's choice-of-law clause. (Mot. at 10-15.) This argument fails.

Class Counsel ignore that CAFA's provisions regarding attorneys' fees govern this Settlement and their Motion. Agreeing that disputes about the meaning of the Parties' settlement contract will be resolved under California contract principles is <u>not</u> the same as agreeing that California state-law principles control the method for determining the attorney fee, and it certainly is not the same as agreeing that the federal statute that gives the Court jurisdiction no longer applies to the case (which is not to suggest that such an agreement would be enforceable). In fact, the Agreement contains no provision suggesting, much less stating, that CAFA no longer applies to this case or to the fee dispute, nor is there any plausible reason why the Parties would have agreed to forgo CAFA's protections for absent class members. (*See* Agreement § IX.) Plaintiffs invoked CAFA jurisdiction when they filed their case (ECF No. 98 ¶ 156), and they have cited no authority suggesting that Class Counsel can contract

23

themselves outside of CAFA's requirements whenever they believe that it is advantageous for them to do so.

Nor can Class Counsel legally bind the absent Class Members to an agreement that federal statutory law will not apply to a class settlement, especially before any class had been certified, as here. *See Standard Fire Ins. Co. v. Knowles*, 133 S.Ct. 1345, 1348-49 (2013) (class representative's pre-certification stipulation intended to avoid CAFA jurisdiction was not binding on absent class members). If such an agreement to "opt out" of CAFA were enforceable, class counsel and defendants could collude to create class settlements that provide coupons for the class with a generous cash fee award for the plaintiffs' lawyers while also ensuring that the settlement remains free from judicial oversight under section 1712. *Cf. In re Bluetooth*, 654 F.3d at 946 ("One inherent risk is that class counsel may collude with the defendants, tacitly reducing the overall settlement in return for a higher attorney's fee." (citation omitted)). Such an agreement by Class Counsel would violate both public policy and their duties to absent Class Members.[20] It also would interfere with the Court's fiduciary duty to safeguard the interests of absent class members. *See Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015).

Still further, to the extent the law of any particular state applies and runs counter to CAFA, CAFA controls. *See Dardarian v. OfficeMax N. Am.*, No. 11-cv-00947-YGR, 2014 WL 7463317, at *3 (N.D. Cal. Dec. 30, 2014) (rejecting argument that California's fee shifting statute applies to a coupon settlement subject to CAFA). Thus, the Court should not apply California state law regarding attorneys' fees to the

---

[20] This concern is not academic. Seven objectors contend that fees should be calculated under section 1712. (*See* Kress, Knott, Smith, Whaley, Hightower, Liacopulos, and McDonald Objections, ECF Nos. 226, 229, 231, 235, and 236.) Even unrepresented objectors, who do not know to cite section 1712, raise some of the same concerns that animated the statute's enactment. (*See, e.g.*, Kurzun Objection, ECF No. 202 (suggesting that Class Members would be better off if they were to trade places with Class Counsel and receive the requested fee amount while Class Counsel received the rebates and other class benefits).)

1    extent there is a conflict with section 1712's provisions.

2    **II.    THE COURT SHOULD AWARD FEES USING THE PERCENTAGE-**

3    **OF-RECOVERY APPROACH UNDER 28 U.S.C. § 1712(a)**

4    **A.    The New Dishwasher Rebates Are "Coupons" Under CAFA**

5    Section 1712(a) of CAFA states:

6    Contingent Fees in Coupon Settlements. –

7    If a proposed settlement in a class action provides for a recovery of

8    coupons to a class member, the portion of any attorney's fee award to

9    class counsel that is attributable to the award of the coupons shall be

10   based on the value to class members of the coupons that are

11   redeemed.

12   Under section 1712, a coupon is "a discount on another product or service offered by

13   the defendant in the lawsuit." *Fleury v. Richemont N.A., Inc.*, No. C-05-4525 EMC,

14   2008 WL 3287154, at *2 (N.D. Cal. Aug. 6, 2008) (deeming $100 credits to Cartier a

15   coupon due to the limited merchandise available for less than the credit amount).

16   Settlement coupons, like the new dishwasher rebates here, usually require class

17   members to do future business with the defendant. *See Synfuel Techs., Inc. v. DHL*

18   *Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006).

19   Here, the Settlement's New Dishwasher Rebate benefit offered to the 5,800,000

20   Class Members is a coupon within the meaning of section 1712. *See True v. Am.*

21   *Honda Motor Co.*, 749 F. Supp. 2d 1052, 1069 (C.D. Cal. 2010) (relief of $500 or

22   $1,000 rebate off the purchase of a Honda or Acura within 19 months is a coupon).

23   The rebates require Class Members to buy a new dishwasher manufactured by

24   Whirlpool and to spend money out of pocket to do so. (Agreement ¶ IV.A.)

25   **B.    The Settlement Provides <u>Only</u> Coupons to 99.8% of the Class**

26   Coupon relief dominates this Settlement. Given the miniscule 0.17% rate of

27   Overheating Events among Class Dishwashers (Ex. 2 at Tbl. 4 (9,700 Overheating

28   Events ÷ 5,800,000 Class Dishwashers = 0.0017), more than 99.8% of Class Members

25

1  are eligible for <u>only</u> coupon relief, not cash relief.

2       Further, the Settlement claims data to date confirm that the coupons dominate

3  Class Members' claims. Of the 129,855 claims made as of June 10, 117,232 (90%)

4  seek coupon relief. As of June 10, Dishwasher owners had filed 25,204 non-

5  prequalified claims for cash reimbursement, of which fewer than 2,000 will be

6  deemed Valid Claims. (Ex. 2 at 12-13) (estimating that less than 6% of non-

7  prequalified reimbursement claims meet the eligibility requirements).) Thus, coupon

8  relief will account for about 98% of all Valid Claims filed.

9       **C.   The Court Should Award Fees Under Section 1712(a) Using the**

10            **Percentage Approach Based on the Value of Redeemed Coupons**

11       In a settlement in which coupons are the "primary" benefit, a court should

12  calculate attorney fees under section 1712(a). *See True*, 749 F. Supp. 2d at 1069. In

13  *True*, a small subset of the settlement class was entitled to receive a cash payment

14  ($100). *Id.* at 1061. Like here, eligibility for the cash relief depended on the existence

15  of a documented complaint regarding the alleged defect. *Id.* Also, like here, the

16  settlement provided rebate relief to all class members—a $500 or $1,000 rebate off the

17  purchase of a new car. *Id.* at 1060. The court determined that the "primary relief"

18  offered was the rebate, and thus "the settlement is largely a coupon settlement." *Id.* at

19  1069. The court determined that CAFA controlled the fee award, and the court

20  analyzed approval of the settlement under section 1712(e). *Id.* Although the court did

21  not resolve the fee issue, the court explained that when it came time to do so it would

22  be "particularly wary of using the lodestar method." *Id.* at 1077.

23       Similarly, in *Davis v. Cole Haan, Inc.*, No. C 11-01826 JSW, 2013 WL

24  5718452 (N.D. Cal. Oct. 21, 2013), the class members had the option of receiving a

25  voucher for $20 or 30% off new merchandise. *Id.* at *2. There, class counsel argued

26  that the settlement was not governed by section 1712. The court disagreed and

27  concluded that even if the $20 option were not a coupon, less than 1% of the class

28  would actually receive that relief. *Id.* at *3. Due to that "practical reality . . . that

26

almost the entire class will be receiving an undisputed coupon (the 30 percent off voucher)," the court determined that the settlement was a "coupon settlement" and, thus, the court could not award fees using the lodestar method. *Id.*

Similarly here, the "practical reality" is that the overwhelming majority of Class Members making a claim will receive only a coupon. Also, more than 99.8% of the Class is eligible to make a claim for <u>only</u> a coupon. Accordingly, the Court should calculate Class Counsel's fees under section 1712(a) using the percentage method.

## 1.    Under 28 U.S.C. § 1712(a), the Court should wait until the rebate redemption deadline to award the final fee

In the Ninth Circuit, the law is clear that, under section 1712(a), "the court must determine a reasonable contingency fee based on the actual redemption value of the coupons awarded." *In re HP Inkjet*, 716 F.3d at 1184. It is an abuse of discretion for a district court to estimate or predict the value of the coupons that will be redeemed; the award must be based on the value of coupons redeemed. *Id.* at 1187 ("Under § 1712 of CAFA, a district court may not award attorneys' fees to class counsel that are 'attributable to' an award of coupons without first considering the redemption value of the coupons.").

The rebate redemption rate, and the total value of the redeemed rebates, is not yet known in this case. The Parties have agreed that Class Members will have at least eight months to buy a rebate-eligible dishwasher and to submit the completed rebate form and proof of purchase to the Settlement Administrator. (Agreement ¶ IV.A.3.) Under *HP Inkjet*, the Court should wait to make its final award fees until after the deadline to redeem rebates has expired and the actual value of the rebates redeemed has been reported. 716 F.3d at 1186 n.19 ("a fees award can be bifurcated or staggered to take into account the speculative nature of at least a portion of a class recovery").

## 2.    The rebate benefits are worth no more than $4,500,000

Class Counsel's valuation of the rebate benefits (Mot. at 37-38) incorrectly assumes that each of the Class Members who claimed a rebate form in fact will buy a

27

rebate-eligible dishwasher and redeem the rebate. That is wrong. Redemption rates in coupon cases in general are typically low. *See True*, 749 F. Supp. 2d at 1074-75 (noting the court's experience that less than 2% of class members redeem new car rebates). But even if a generous 50% (or, 65,102) of the maximum number of 130,204 rebate claimants in fact redeem them, and using Class Counsel's estimate for the average new dishwasher price ($629) and average rebate percentage (11%) (Mot. at 38), the total value of the rebates redeemed would be no more than **$4,500,000**—far from Class Counsel's $7,600,000 to $33,000,000 estimates.

The Ninth Circuit's benchmark for a percentage-of-recovery fee is 25% of the class benefit. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998). Under Ninth Circuit law, the Court is permitted to consider the class notice costs and the attorney fees as part of the benefits to the Class. Here, the value of the rebates redeemed likely will be between $2,100,000 and $4,500,000, the cash relief will total between $485,000 and $650,000, and the notices costs are known to be about $1,650,000, for a total settlement value, excluding fees, between $4,220,000 and $6,803,000. Using the Ninth Circuit's 25% benchmark, the presumptively reasonable attorney fee would be up to a maximum of $1,700,750 (i.e., $6,803,000 x 0.25 = $1,700,750).

Because Whirlpool has agreed to pay the attorney fee on top of the benefits payable to Dishwasher owners, however, the presumptive fee can be added to the base settlement value to yield a gross settlement value of between $5,275,800 and $8,504,075. That effectively allows Class Counsel to claim fees on a portion of the value of their fees. The Court then can use that adjusted gross settlement value to calculate the reasonable fee using a percentage recovery of between 25% and 33%. Using 33% here, the total reasonable fee for this coupon settlement would be between **$1,758,000** and **$2,877,000** using the percentage method.

**D.      The Court Has Discretion to Award a Lodestar-Based Fee for the Limited Cash Relief, Thus Treating the Settlement as "Mixed"**

In the alternative to a straight percentage approach, the Court has the discretion to treat the Settlement as "mixed" and award a percentage-based fee for the coupon relief and a lodestar-based fee for the cash relief, subject to the limitations applicable to both. *In re HP Inkjet*, 716 F.3d at 1187 ("A district court may, however, award lodestar fees to compensate class counsel for any non-coupon relief they obtain, such as injunctive relief."); 28 U.S.C. §§ 1712(b)-(c). Section 1712(c) states:

> Attorney's fee awards calculated on a mixed basis in coupon settlements.— If a proposed settlement in a class action provides for an award of coupons to class members and also provides for equitable relief, including injunctive relief—
>
> (1) that portion of the attorney's fee to be paid to class counsel that is based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (a); and
>
> (2) that portion of the attorney's fee to be paid to class counsel that is not based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (b) [i.e., the lodestar method].

If the Court determines that the Settlement is "mixed", the Court should calculate fees under section 1712(a) (percentage of recovery) for the coupon benefits and under 1712(b) (lodestar method) for the non-coupon benefits. 28 U.S.C. § 1712(c); *cf. In Re HP Inkjet*, 716 F.3d at 1184-85.

As shown above, the coupon relief plus notice costs yield a 33% fee recovery of between $1,758,000 and $2,834,000, depending on the coupon redemptions. For the cash portion of the Settlement, Defendants' lodestar arguments (Argument, Part III.A, *infra*) would apply under § 1712(c). Because most of the benefits are coupons here for which fees would be awarded under § 1712(a), however, the lodestar awarded for the non-coupon portion must be capped by the percentage of total benefits attributable to

non-coupon relief. *See, e.g.*, *In re HP Inkjet Printer Litig.*, No. 5:05-cv-03580-JF, 2014 WL 4949584, at *3-4 (N.D. Cal. Sept. 30, 2014) (on remand, the court recognized that the lodestar portion must be something less than the full lodestar because "some portion of those fees must be attributable to obtaining the coupon portion of the settlement," and further reducing the fee so that "the attorneys' fees award does not exceed the value" of the non-coupon relief, resulting in a fee of $1,350,000 against a claimed $7,400,000 lodestar, an 82% reduction). "[T]he total amount of fees awarded under subsection (c) will be the sum of the amounts calculated under subsections (a) and (b)." *In re HP Inkjet*, 716 F.3d at 1185.

In other words, before applying the fee cap required by § 1712(c), a lodestar recovery of $3,170,000 would be permissible based on the results achieved here. (Argument, Part III.B.7, *infra*.) Because coupon relief dominates the Settlement, and because § 1712(a) already provides for a reasonable percentage-based fee, the Court would have to reduce the adjusted lodestar further. Here, 90% of fees are attributable to coupon relief, and 10% of fees are attributable to cash relief, which are the proportions of coupon and cash relief out of the total relief. Under § 1712(c), the Court should reduce the lodestar for the cash relief by 90% (i.e., apply a 0.1 fractional multiplier) to yield an additional fee of **$317,000** under section 1712(b). Thus, the total fee would be between **$2,075,000** and **$3,151,000** using section 1712(c)'s "mixed" approach.

### 1. The Court should consider the actual recovery, not the unsupported theoretical values suggested by Plaintiffs

Class Counsel's valuation of the class benefits at between $55,675,000 and $126,725,000 are speculative, unreliable, and contradicted by both the claims submitted to the Administrator as of June 10 and all other empirical data. (*Compare* Mot. at 43-44, *with* Ex. 2 at 10-22.) Their overestimates rest, in part, on their incorrect assertion that the Court should award a percentage of the maximum <u>theoretical</u> class recovery, not the value of claims actually made by the Dishwasher owners. (Mot. at

35.) But CAFA dispatched that outdated mode of thinking about fees, and federal case law no longer tolerates it. *See, e.g.*, *In re Bluetooth*, 654 F.3d at 945; *Pearson*, 772 F.3d at 781. Indeed, in *Yeagley v. Wells Fargo & Co.*, No. C 05-03403 CRB, 2008 WL 171083 (N.D. Cal. Jan. 18, 2008), Judge Breyer aptly noted:

> To award class counsel the same fee regardless of the claim participation rate, that is, regardless of the enthusiasm of the class for the benefits purportedly negotiated on their behalf, would reduce the incentive in future cases for class counsel to create a settlement which actually addresses the needs of the class. . . . Common sense dictates that a reasonable fee in a class action settlement is a fee that takes into account the actual results obtained.

2008 WL 171083, at *9.

Plaintiffs rely on a pre-CAFA case, *Williams v. MGM-Pathe Communications Co.*, 129 F.3d 1026 (9th Cir. 1997) (per curiam) (Mot. at 35-36), but that case is easily distinguishable. In *Williams*, the Ninth Circuit explained that the parties had <u>agreed</u> that class counsel would seek to recover fees based on the entire $4,500,000 fund, rather than the amounts actually claimed. 129 F.3d at 1027; *see also Yeagley*, 2008 WL 171083, at *7-8 (distinguishing *Williams* on that basis; "Class counsel's $114 million figure is pure fantasy. Counsel does not offer a shred of evidence that suggests that the parties reasonably believed that Wells Fargo would actually pay anything near that amount, and the Court finds that they did not.").

Because the parties here did not agree that fees would be based on the maximum theoretical class recovery (Agreement § IX), and because this is not a traditional common fund case, the Court should base its award on the value of the claims actually made. *See, e.g.*, *Tait v. BSH Home Appliances Corp.*, No.: SACV 10-0711-DOC(ANx), 2015 WL 4537463, at *5-6 (C.D. Cal. July 27, 2015) (taking into account the "practical reality" of only $1,000,000 in claims made on a settlement theoretically worth $35,000,000); *Tarlecki v. Bebe Stores*, No. C 05-1777 MHP, 2009 WL 3720872, at *4 (N.D. Cal. Nov. 3, 2009) (calculating the fee as a percentage of

31

1   the actual, rather than theoretical, class recovery where the recovery was small

2   "relative to potential class recovery"); *LaGarde v. Support.com*, No. C 12-0609 JSC,

3   2013 WL 1283325, at *12 (N.D. Cal. Mar. 26, 2013) (refusing to award percentage of

4   maximum theoretical recovery where "the tangible benefits offered to the class have

5   not reached the vast majority of class members"); *Create-a-Card, Inc. v. Intuit, Inc.*,

6   No. C-07-06452 WHA, 2009 WL 3073920, at *3 (N.D. Cal. Sept. 22, 2009) (key

7   consideration in determining a fee award is "reasonableness in light of the benefits

8   *actually conferred*").

9          Further, Class Counsel's valuation of the past and future overheating benefits is

10  pure fantasy. (Mot. at 44.) The opinions of their expert about both the number of Past

11  Overheating Events and the expected number of Future Overheating Events are fatally

12  flawed and unreliable. (*Compare* Mot. Ex. 8 ¶¶ 20-24, *with* Ex. 2 at 19-22.)

13         Due to the miniscule rate (0.09%) of Overheating Events in both Class

14  Dishwashers and NewGen/Raptor Dishwashers (*Id.* at 13), only a small number of

15  Class Members and NewGen/Raptor Owners with Dishwashers still in service will

16  become eligible to make a claim (*id.* at Tbl. 5 (less than 695 total); Ex. 5 ¶ 37). The

17  actual recovery for the $100 cash or 30% rebate option, even using Class Counsel's

18  average rebate benefit amount of $189 (Mot. at 38) will be small, perhaps as high as

19  $131,355. Further, the present value of the miniscule probability of becoming eligible

20  (.0001) to make a future claim for $100 cash or a 30% rebate is worth almost nothing

21  (less than $0.01) to each Dishwasher owner who is still using his or her machine. (Ex.

22  5 at Tbls. 2-3.) And an estimated 94% of the Past Overheating Event claims will be

23  denied as invalid due to lack of sufficient documentary proof. (*Id.* at 13.)

**2.      The Court should assign no value to, and thus award no additional lodestar-based fee for, the injunctive relief**

26         Class Counsel urge the Court to assign a wildly speculative value of

27  $10,000,000 to the non-monetary, injunctive relief. (Mot. at 43.) The Court should

28  instead value that relief at $0 because Class Counsel have not satisfied their burden to

prove that speculative value. The truth is, the minor revisions to several Whirlpool
service pointers and training bulletins for service technicians merely inform
technicians what they already know from their training and experience. The
Settlement Agreement does not require Whirlpool to disseminate the service pointers
and bulletins to Class Members or other Dishwasher owners and virtually no
Dishwasher owner will ever read the service literature. And the revisions will have
negligible or no impact on consumer safety, and therefore have no quantifiable
settlement value.

Rather than making any attempt to prove the claimed value to the Class, Class
Counsel cite to three cases in which courts valued injunctive relief settlement
components, each of which is easily distinguishable from this case. (*Id.*) All those
cases say of relevance is that injunctive relief can be valued in some cases, not that the
injunctive relief here has any value. Class Counsel have done nothing to value the
injunctive relief here, and to do so would require expert testimony. (*Compare* Mot.
Ex. 8, *with Miller v. Ghirardelli Chocolate Co.*, No. 12-cv-04936-LB, 2015 WL
758094, at *5 (N.D. Cal. Feb. 20, 2015) (relying on expert testimony of value of
relabeling to consumers); *Beck-Ellman v. Kaz USA, Inc.*, No. 3:10-CV-12134-H-
DHB, 2013 WL 10102326, at *10 n.2 (S.D. Cal. June 11, 2013) (referring to valuation
of injunctive relief by expert economics professor); *and Roberts v. Electrolux Home
Prods., Inc.*, Master File Nos. SACV12-1644-CAS (VBKx), CV13-2339-CAS
(VBKx), 2014 WL 4568632, at *6 (C.D. Cal. Sept. 11, 2014) (expert witness "Dr.
Bernatowicz determined that the benefit to the Class members under this portion of
the Settlement is approximately $11.9 million.").[21]

Here, Whirlpool agreed only to revise its service pointers and bulletins, where
applicable, to emphasize the safety function of the TCO, to instruct technicians not to

---

[21] This Settlement shares none of the key features of the *Roberts v. Electrolux*
settlement, which provided free dryer service visits and required the defendant to
disseminate a dryer fire safety notice to all identifiable class members.

bypass the TCO during a repair, and to inspect the TCO when servicing the ECB to ensure that the TCO is properly installed. These are basic matters of common sense that Whirlpool already communicated to its technicians over the years. For example, a 2009 Whirlpool service bulletin explains that its purpose is "to make sure that you understand that the thermal cutoff (TCO) is a temperature sensitive control used for upper temperature limit protection" and is "intended to open in the event that the control temperatures exceed the temperature setting of the TCO." (Service Update, Second Half—2009, at 3, attached as Ex. 8.) Similarly, a 2010 bulletin describes the TCO as a "safety device" used to "protect each of the four specific dishwasher platforms." (Service Update, First Half—2010, at 2, attached as Ex. 9.) The Court should place no value on, and award no additional fee for, the injunctive relief because any estimate greater than $0 is speculative and unreliable.

For all these reasons, the Court should aware a percentage-based fee of between **$1,758,000** and **$2,834,000** under § 1712(a). In the alternative, if the Court were to treat the settlement as a "mixed" coupon settlement, the Court should award a fee of between **$2,075,000** and **$3,151,000** under § 1712(c).

## III.   THE LODESTAR METHOD YIELDS A FEE NO GREATER THAN $3,170,000, NOT THE REQUESTED WINDFALL

As shown above, the use of the lodestar approach in coupon settlements like this one is disfavored by CAFA, the Ninth Circuit, and district courts in this Circuit. If the Court were to apply the lodestar method as a crosscheck on the percentage-based fee or in the first instance, the Court still should reject Class Counsel's fee request.

Calculating fees using the lodestar method is a two-step process. First, the Court should multiply "the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941. The Court "should exclude from this initial fee calculation hours that were not reasonably expended," (citation omitted) including "hours that are excessive,

34

1    redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434. Second, the Court

2    may adjust the lodestar upward or downward by an appropriate positive or negative

3    multiplier reflecting a host of reasonableness factors, the most "critical" of which is

4    "the degree of success obtained." *Id.* at 436; *In re Bluetooth*, 654 F.3d at 942-43

5    (foremost among the reasonableness factors is the benefit obtained for the class).

6         Here, the Court should reduce the base lodestar by $2,607,995, to no more than

7    $6,340,493. Then, the Court should apply a 0.5, or 50%, negative multiplier based on

8    Class Counsel's relative lack of success and the modest recovery totaling less than 1%

9    of the damages pled in Plaintiffs' Complaint. In similar circumstances, courts have

10   applied fractional multipliers of 0.25 to 0.5 based on class counsel's lack of success.

11   ### A.    The Court Should Substantially Reduce the Base Lodestar

12        A court "cannot 'uncritically' accept the plaintiff's representations of hours

13   expended; rather, the Court must assess the reasonableness of the hours requested."

14   *Bohannon v. Facebook, Inc.*, No. 12-cv-01894-BLF, 2016 WL 2962109, at *6 (N.D.

15   Cal. May 23, 2016) (citing *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th

16   Cir. 1984)). As the party seeking fees, Class Counsel bear the burden of justifying the

17   fees requested in their Motion. *See In re Toys "R" US-Delaware, Inc. FACTA Litig.*,

18   295 F.R.D. 438, 463 (C.D. Cal. 2014). Class Counsel's billing records reveal that

19   Class Counsel have failed to satisfy their burden.

20   ### 1.    The Court should reduce the base lodestar because several

21   ###        firms seek to charge excessive rates for document review

22        Class Counsel's records show that they performed over 8,200 hours[22] of routine

23   document review in this case, which equals about four years of 40-hour weeks.

---

[22] This total is conservative on the low side in Class Counsel's favor because it excludes more than 500 hours of document review time by more senior attorneys who devoted less time to review: Charles Fax, Leslie Schopler, Steve Schwartz, Tim Mathews, Howard Pollak, Robert Kitchenoff, Kristin Sagafi, and Nicole Sugnet. The 8,200 estimate includes time for only those lawyers who devoted all or a large fraction of their time to document review. The total also excludes approximately 400 hours of Anthony Geyelin's time that was spent on higher-level analytical tasks, like selecting documents for experts and depositions and analyzing databases.

35

**Table 1:**    **Routine Document Review Hours Billed by Class Counsel Firms**

| Biller's Last Name | Hours Claimed | Claimed Lodestar |
|---|---|---|
| Geyelin | 2,442 | $1,123,320 |
| Saler | 143.5 | $71,750 |
| Gushue | 49.75 | $22,388 |
| Scott | 43.75 | $21,875 |
| Wolfson | 2,055 | $298,048 |
| Liberati | 945.7 | $130,507 |
| Eckart | 217.2 | $86,880 |
| Ely | 196.1 | $76,479 |
| Jordan | 205.5 | $77,063 |
| Lawler | 605.2 | $226,950 |
| Winston | 1321.8 | $495,675 |
| **Total** | **8,223.5** | **$2,630,935** |

Three Plaintiffs' firms—Chimicles & Tikellis, Lieff Cabraser, and Weinstein Kitchenoff—seek $2,200,000 in fees for 5,224 hours of routine document review—a blended rate of **$421.60** per hour, or a whopping $708 per hour factoring in their claimed lodestar multiplier.[23] Having settled the case and with an opportunity to recover fees, some (but not all) of Plaintiffs' lawyers improperly treat the document review work as an opportunity to reap windfall profits that having nothing to do with the value of the routine work performed. Class Counsel's attempt to recover hourly rates for thousands of hours of document review that no fee-paying client would agree to pay is improper and should be rejected. *Cf. Hensley*, 461 U.S. at 434 ("Hours that

---

[23] Rifkin Weiner billed 3,000 hours of document review at rates between $138 and $145 per hour, for an additional $428,555 in fees. The billers of this time were Reuben Wolfson, a 2012 law school graduate and Ernesto Liberati, a paralegal. The Court should note that Rifkin Weiner is the only Class Counsel firm that regularly bills clients on an hourly basis, and thus has current experience with what hourly-fee-paying clients will pay for in complex litigation.

1  are not properly billed to one's client also are not properly billed to one's *adversary*."

2  (citation omitted)).

3       In comparison, Defendants conducted their document review in this case at a

4  blended rate of $97 per hour. (Decl. of Michael T. Williams ¶ 9, attached as Ex. 10.)

5  Defendants used outside contract attorneys at a rate of $51.20 per hour for "first level"

6  review, which amounted to 71% of the total document review hours. (*Id.* ¶¶ 5, 9.)

7  Wheeler Trigg O'Donnell's Staff Counsel billed the remaining document review work

8  at a blended rate of $209 per hour. (*Id.* ¶ 9.) Staff Counsel performed "second level"

9  review, quality control of the contract attorneys' work, identified potential trial and

10  deposition exhibits, and selected documents for use by Defendants' experts. (*Id.* ¶ 5.)

11       Fee-paying clients dictate that document review projects like this be efficiently

12  staffed, with a combination of lower-cost contract lawyers, paralegals, and younger

13  associates. For example, *Banas v. Volcano Corp.,* 47 F. Supp. 3d 957 (N.D. Cal.

14  2014), provides an appropriate model for staffing, and the rates at which such work

15  should be billed. *See id.* at 970. There, the court noted that the defendants paid rates of

16  $47 and $59 per hour for 15 contract attorneys to spend 5,682 hours reviewing

17  documents, for a total cost of $282,997. *Id.* Additionally, the defendants properly used

18  first-year associates for additional review and more senior lawyers for quality

19  assurance and limited high-level review. *Id.* (explaining that a party "appropriately

20  elected to use contract attorneys for most of the review."); *see also In re Beacon

21  Assocs. Litig.*, No. 09 Civ. 777 (CM), 2013 WL 2450960, at *18 (S.D.N.Y. May 9,

22  2013) ("There is little excuse in this day and age for delegating document review

23  (particularly primary review or first pass review) to anyone other than extremely low-

24  cost, low-overhead temporary employees (read, contract attorneys).").[24]

25
           ————————————

26  [24] Three of the Lieff Cabraser document reviewers, Aya Winston, Christopher Jordan, and Christen Lawler, are in fact contract attorneys. (*See* Mot. Ex. 4 at 12.) Lieff

27  Cabraser identifies Ms. Winston as a "Staff Attorney" here, but her LinkedIn profile from 2014 states that she was a contract attorney there. (*See* Aya Winston LinkedIn

28  Profile, attached as Ex. 11.) Yet Lieff Cabraser inexcusably seeks to bill their time to Whirlpool at an excessive $375 per hour. (Mot. Ex. 4 at 12.)

If Plaintiffs' law firms elect to use more experienced lawyers for entry-level work, the market dictates that those lawyers' rates be reduced to the market rate. The Court should disapprove partner rates for work that can be accomplished by first-year associates or contract attorneys at a lower rate. *Il Fornaio (America) Corp. v. Lazzari Fuel Co., LLC*, No. C 13-05197 WHA, 2015 WL 2406966, at *5 (N.D. Cal.May 20, 2015) ("It would be unjustified to charge the class senior-associate or partner-level rates for routine tasks like document review . . . ."); *Banas*, 47 F. Supp. 3d at 970 (excessive for senior attorney to perform first level review at normal hourly rate).

For these reasons, the Court should adjust the rates applicable to 75% of Class Counsel's document review time down to a contract attorney rate of $60 per hour. The Court should award the remaining document review time at a young associate rate of $275 per hour, for a blended hourly rate of $113.75. Because Defendants have not challenged over 500 hours of more senior lawyers' document review time (at hourly rates in the $400 to $600 range) or 400 hours of Anthony Geyelin's time (at $460 per hour), Class Counsel still will be compensated for nearly 1,000 hours of quality control, management, and high-level review time at senior associate and partner rates.

The calculation for reducing the rates for document review time is as follows:

| Total Hours | 75% of Hours at $60 | 25% of Hours at $275 | Adjusted Fees Total | Claimed Fees | Lodestar Reduction |
|---|---|---|---|---|---|
| 8,223.5 | 6,168 x $60 = $370,080 | 2,056 x $275 = $565,400 | $935,480 | $2,630,935 | **-$1,695,455** |

Accordingly, the Court should reduce the base lodestar by $1,695,455:

| | |
|---|---|
| Claimed Lodestar Before Reduction | $8,948,487.98 |
| Base Lodestar Reduction | -$1,695,455 |
| **Remaining Lodestar After Reduction** | **$7,253,033** |

## 2. The Court should reduce the base lodestar for claimed hourly rates that are unreasonably high

38

### a. Class Counsel bear the burden of proving the market rate for their services in this case

After determining the number of hours "reasonably expended," the court must determine a "reasonable hourly rate." *Hensley*, 461 U.S. at 433. Attorneys seeking a lodestar recovery have the burden to submit "satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11, 104 S. Ct. 1541, 1547 (1984) (emphasis added); *see also Schwarz v. Sec'y of Health and Human Servs.*, 73 F.3d 895, 908 (9th Cir. 1995) (same). Thus, the showing requires "expert opinion, by the applicant and other lawyers, as to what would be a reasonable fee for such services." *Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1169 (C.D. Cal. 2010) (citation omitted). The district in which the court sits is the relevant community. *Schwarz*, 73 F.3d at 906.

When a party fails to meet its burden to show that the requested hourly rates are reasonable, "the court may exercise its discretion to determine reasonable hourly rates based on its experience and knowledge of prevailing rates in the community." *In re Toys "R" US*, 295 F.R.D. at 463-64. If the fee applicant cannot prove his rate, the Court should look to rates that similarly skilled and experienced lawyers in the community (the Central District) charge paying clients for similar work.

### b. Counsel failed to support their claimed hourly rates

Several Class Counsel firms have not proven that their claimed hourly rates are in line with those prevailing in the community for similar legal services by lawyers of reasonably comparable skill, experience, and reputation.[25] First, the Motion provides

---

[25] The hourly rates of Class Counsel firms Rifkin Weiner and Cohon & Pollak are reasonable and in line with market rates. Unlike the other Plaintiffs' firms, Rifkin Weiner is not attempting to improperly recover its 2016 rates for all work performed from 2011 through 2016. Further, Rifkin Weiner's blended hourly rate for all work is $303 per hour, showing an appropriate allocation of work between partners, associates, and paralegals. In sharp contrast, Chimicles & Tikellis's claimed blended

39

no declaration of a third-party attorney in the Central District, only the self-serving declarations of the lawyers claiming fees. (Mot. Exs. 2-6.) Although some (but not all) of those declarations state that the claimed rates are the market rates for lawyers of equivalent skill and experience (*e.g.*, *id.* Ex. 3 ¶ 66), more than the declaration of the fee applicant is required. *See Parkinson*, 796 F. Supp. 2d at 1169. Moreover, each declaration is missing a key piece of the required showing: that the claimed rate is the market rate for similar work in the Central District.

The Lieff Cabraser billers, for example, are all located in San Francisco. The price of legal services in San Francisco is higher than in the Central District. *See LaToya A. v. S. F. Unified Sch. Dist.*, No. 3:15-cv-04311-LB, 2016 WL 344558, at *12 (N.D. Cal. Jan. 28, 2016) ("attorney hourly rates are often higher [in San Francisco] than in Los Angeles." (alteration in original)) . In fact, the rate claimed by the only Plaintiffs' firm that actually practices in the Central District, Cohon & Pollak, is $450 per hour for four lawyers who have a minimum of 23 years of experience each—substantially less than the partner and, in some cases, associate rates claimed by the other Class Counsel firms. (Mot. Ex. 6 at Ex. 1.)

Second, two Class Counsel firms, Lieff Cabraser and Chimicles & Tikellis, attempt to make the required showing by stating that their claimed rates have "been approved by many courts." (Mot. at 17.) But their cited cases do <u>not</u> show that any court has approved the <u>particular</u> rates claimed by the <u>particular</u> lawyers here. Chimicles & Tikellis, for example, cites no decision awarding Mr. Schwartz's claimed rate of $750 per hour, Mr. Mathews's claimed rate of $600 per hour, or the rates

---

hourly rate is $483 per hour. (Mot. Ex. 1.) For document review work alone, 2,679 of its 5,993 total hours, Chimicles & Tikellis's blended hourly rate is $463. (*See* Document Review Hours Summary, attached as Ex. 12.) Similarly, Lieff Cabraser's claimed blended rate is $403 per hour (Mot. Ex. 1), with a blended rate for document review (2,133 of the Lieff Cabraser's 2,622 total hours) of $375 per hour. (*See* Ex. 12.) Weinstein Kitchenoff's claimed blended rate is $507, even though 25% of its 1,218 hours were spent on document review. (Mot. Ex. 1.) Cohon & Pollak's blended rate is $450 per hour, but its two partners accounting for 99% of the firm's time have 25 or more years of experience, and Cohon & Pollak did little document review.

40

claimed by any other Chimicles & Tikellis timekeeper. The citations they provide are generic and, when scrutinized, do not show that Mr. Schwartz or Mr. Mathews was involved in the cases. Likewise, the decisions cited by Lieff Cabraser do not show that any court has approved Ms. Sagafi's claimed rate of $625, Ms. Sugnet's claimed rate of $485, or the rates claimed for its associates and contract attorneys. (*Id.*)

Third, Lieff Cabraser and Chimicles & Tikellis argue that the rates they claim are paid by their hourly-fee-paying clients. (*Id.* at 16-17). But they failed to submit any evidence supporting their blanket assertions. *See Parkinson*, 796 F. Supp. 2d at 1174  (requiring evidence beyond blanket assertion by counsel). Moreover, Chimicles & Tikellis provides no evidence that an hourly client has ever paid Mr. Schwartz's claimed $750 rate in consumer products or any other litigation; that an hourly client has ever paid Mr. Mathews's $600 rate; or that an hourly-fee-paying client has ever paid Mr. Geyelin's $460 rate for nearly 3,000 hours of document review in a single case (no paying client ever would do that). And Lieff Cabraser provides only vague claims of hourly clients paying their rates, but no proof that these particular lawyers have ever been paid the particular rates they claim on an hourly-fee basis. Thus, the claimed rates should be rejected. *See Hensley*, 461 U.S. at 434.

Third, Class Counsel's reference to the cases collected in the *In re Toys "R" Us-Delaware FACTA Litigation*, and the rates charged by five prestigious mega firms in Los Angeles (Mot. at 18-19), are insufficient proof. Class Counsel fail to show that their skills, reputations, and levels of experience are comparable with those lawyers in the cases cited or to the national law firms surveyed. The lawyers in the first case referenced by the *In re Toys "R" Us* court, *Kearney v. Hyundai Motor America*, No. SACV 09-1298-JST (MLGx), 2013 WL 3287996 (C.D. Cal. June 28, 2013), are nationally-renowned class action attorneys Steve Berman and Robert Carey of the Hagens Berman firm. Just because a court approved Steve Berman's $800 rate in a particular case does not make Steve Schwartz's claimed rate of $750 reasonable. Nor is Mr. Schwartz's claimed $750 rate reasonable because five of the top national firms

1    based in Los Angeles charge partner rates as high as $975. That information has no

2    bearing on the skill, reputation, and experience of the lawyers in this case.[26] *See In re*

3    *Toys "R" Us*, 295 F.R.D. at 463 (finding failure of proof where lawyers did not

4    provide survey or declaration evidence of the rates charged by comparable attorneys

5    with similar experience or law firms of similar size).

6               **c.    Class Counsel's claimed hourly rates are excessive**

7               The Court is free to make an independent determination of the rates that are

8    reasonable because Class Counsel has not proved the reasonableness of their claimed

9    rates. Courts in the Ninth Circuit have used the official version of the U.S. Attorney's

10   Office for the District of Columbia's table of hourly rates for attorneys and paralegals,

11   known as the Laffey Matrix, to determine the reasonableness of rates sought. *See*

12   *Lakim Indus., Inc. v. Linzer Prods. Corp.*, No. 2:12-cv-04976-ODW(JEMx), 2013 WL

13   1767799, at *8 (C.D. Cal. Apr. 24, 2013) (referring to the Laffey Matrix as "additional

14   guidance" on the reasonableness of the proposed hourly rates and noting that the

15   Laffey Matrix "has been cited with approval by other courts in this Circuit"), *aff'd*,

16   552 F. A'ppx 989 (Fed. Cir. 2014). Courts typically adjust the rates in the Laffey

17   Matrix upward to account for the higher cost of living and price of legal services in

18   California. *See Theme Promotions, Inc. v. News Am. Mktg. FSI, Inc.*, 731 F. Supp. 2d

19   937, 949-50 (N.D. Cal. 2010) (adjusting Laffey Matrix upward by 10% due to pay

20   differential between San Francisco and District of Columbia markets); *Fernandez v.*

21

22   [26] No Class Counsel firm has shown that they have the ability to charge and collect the
     hourly rates billed by the top 350 firms comprising *The National Law Journal* survey,
23   so that source is irrelevant. Even so, Class Counsel failed to include data from this
     source for several lower-billing top 350 firms that are based in this District. They
24   failed to include any information about the Knobbe Martens firm in Los Angeles, with
     an average partner rate of $555 and an average associate rate of $345; the Rutan &
25   Tucker firm in Costa Mesa, which has an average partner rate of $490 and an average
     associate rate of $320; the Best Best & Krieger firm in Los Angeles, with an average
26   partner rate of $455 and an average associate rate of $280; or the Jackson Lewis firm
     in Los Angeles, with an average partner rate of $380 and an average associate rate of
27   $290. Class Counsel has done nothing to show that their skills, reputations, and levels
     of experience are comparable only to the largest, most prestigious Los Angeles-based
28   firms that bill at some of the highest rates in the country.

*Victoria Secret Stores, LLC*, No. CV 06-04149 MMM (SHx), 2008 WL 8150856, at *15 (C.D. Cal. July 21, 2008) (adjusting Laffey Matrix upward by 4.37% due to cost of living differential between Los Angeles and District of Columbia). Applying the *Fernandez* court's 4.37% upward adjustment to account for the cost of living in Los Angeles would yield the following reasonable hourly rates for this case[27]:

**Table 2: 2015-2016 Laffey Matrix Hourly Rates Adjusted for Los Angeles**

| Years of Experience | *Laffey* Matrix Rate | *Laffey* Rates Adjusted |
|:---:|:---:|:---:|
| Less than 2 | $284 | $296 |
| 2 – 3 | $315 | $329 |
| 4 – 5 | $325 | $339 |
| 6 – 7 | $332 | $347 |
| 8 – 10 | $386 | $403 |
| 11 – 15 | $455 | $475 |
| 16 – 20 | $504 | $526 |
| 21 - 30 | $530 | $553 |
| 31+ | $568 | $593 |

**Table 3: 2014-2015 Laffey Matrix Hourly Rates Adjusted for Los Angeles**

| Years of Experience | *Laffey* Matrix Rate | *Laffey* Rates Adjusted |
|:---:|:---:|:---:|
| 1 – 3 | $255 | $266 |
| 4 – 7 | $300 | $313 |
| 8 – 10 | $370 | $386 |
| 11 – 19 | $460 | $480 |
| 20+ | $520 | $543 |

---

[27] Copies of the Laffey Matrix for the relevant years are attached as Ex. 13.

43

**Table 4: 2013-2014 Laffey Matrix Hourly Rates Adjusted for Los Angeles**

| Years of Experience | *Laffey* Matrix Rate | *Laffey* Rates Adjusted |
|---|---|---|
| 1 – 3 | $250 | $261 |
| 4 – 7 | $295 | $308 |
| 8 – 10 | $360 | $376 |
| 11 – 19 | $450 | $470 |
| 20+ | $510 | $532 |

**Table 5: 2012-2013 Laffey Matrix Hourly Rates Adjusted for Los Angeles**

| Years of Experience | *Laffey* Matrix Rate | *Laffey* Rates Adjusted |
|---|---|---|
| 1 – 3 | $245 | $256 |
| 4 – 7 | $290 | $303 |
| 8 – 10 | $355 | $371 |
| 11 – 19 | $445 | $464 |
| 20+ | $505 | $527 |

**Table 6: 2011-2012 Laffey Matrix Hourly Rates Adjusted for Los Angeles**

| Years of Experience | *Laffey* Matrix Rate | *Laffey* Rates Adjusted |
|---|---|---|
| 1 – 3 | $240 | $250 |
| 4 – 7 | $285 | $297 |
| 8 – 10 | $350 | $365 |
| 11 – 19 | $435 | $454 |
| 20+ | $495 | $517 |

The rates above are reasonable for the Central District market and are in fact above the rates claimed by the only Los Angeles-based Class Counsel firm, Cohon & Pollak. They are also are consistent with reasonable rates charged by Rifkin Weiner. Plaintiffs' lead counsel Charles Fax billed substantial hours in this case at a higher

1   rate, but that rate is justified by Mr. Fax's 42 years of experience and because Mr.

2   Fax, unlike other of Plaintiffs' lawyers, regularly bills his time to hourly-fee clients.

3        Further, the Court should apply <u>historical</u> rates, not 2016 rates, to all Class

4   Counsel firms. Other than Rifkin Weiner, Plaintiffs' firms all claim fees at their 2016

5   rates, supposedly to compensate them for the delay in payment of those fees. But

6   Class Counsel are not guaranteed their current claimed rates, and the Court has the

7   discretion to award historical rates, as the Rifkin Weiner firm appropriately suggests.

8   *See Masimo Corp. v. Tyco Health Care Grp., L.P.*, No. CV 02-4770 MRP (AJWx),

9   2007 WL 5279897, at * 2 (C.D. Cal. Nov. 5, 2007). Current rates should be awarded

10  only "where appropriate." *Gates v. Deukmejian*, 987 F.2d 1392, 1406 (9th Cir. 1993).

11  And such rates are appropriate "if the fee amount would otherwise be unreasonable in

12  light of the 'totality of the circumstances.'" *Masimo*, 2007 WL 5279897, *2 (quoting

13  *Jordan v. Multnomah Cty.*, 815 F.2d 1258, 1263 n. 7 (9th Cir. 1987)). Courts should

14  be wary of granting class counsel a "windfall" because increases in hourly rates

15  "reflect not only inflation but also an attorney's increased experience and skill." *Id.*

16  (quoting *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 776 F.2d 646, 663 (7th Cir.

17  1986)).

18       The Class Counsel firms seeking current rates have done nothing to show that

19  historical rates would render their fee unreasonably low. Co-Lead Counsel Rifkin

20  Weiner—a firm that has billed over 13,000 hours in this case—seeks recovery using

21  its historical rates. The other Class Counsel firms fail to show they are differently

22  positioned, and the only relevant difference appears to be that Rifkin Weiner has many

23  hourly-fee-paying clients, where the other firms are more contingent-fee dependent.

24  Recent Ninth Circuit authority makes clear that class-action lawyers should earn their

25  fee based on the results they obtain for the class, not the hours worked in the case. *In*

26  *re HP Inkjet*, 716 F.3d at 1182 ("Attorney's fees are *never* 'attributable to' an

27  attorney's work on the action. They are 'attributable to' the relief obtained for the

28  class."). Under *HP Inkjet*, Class Counsel did not earn a fee before they negotiated the

45

Settlement in 2015, so they are wrong to suggest that the payment of their fee has been "delayed."

Applying the adjusted rates on a historical basis yields the substantial lodestar reductions. Table 7 below identifies the billers[28] whose rates should be reduced based on (1) years of experience; (2) their claimed hours, rates, and lodestar; (3) the market hourly rate for each biller; and (4) the adjusted lodestar based on that market rate:

**Table 7: Lodestar Reductions Based on Market-Adjusted Hourly Rates**[29]

| Biller | Years | Hours | Claimed Rate | Claimed Lodestar | Adj. Rate | Adjusted Lodestar | Lodestar Reduction |
|--------|-------|-------|--------------|------------------|-----------|-------------------|--------------------|
| Schwartz | 25-29 | 446.25 | $750 | $334,688 | $517-$553 | $238,697 | -$96,010 |
| Mathews | 9-13 | 1609.5 | $600 | $965,700 | $365 - $480 | $729,825 | -$235,875 |
| Sagafi | 10-14 | 228.2 | $625 | $143,625 | $365 - $480 | $107,027 | -$35,600 |
| Sugnet | 6-10 | 253.2 | $435 - $485 | $111,452 | $303 - $403 | $89,297 | -$22,156 |
| Kitchenoff | 26-30 | 401.3 | $650 | $263,350 | $517 - $553 | $210,964 | -$49,881 |
| Weinstein | 44-48 | 136.7 | $675 | $91,731 | $517 - $593 | $70,843 | -$20,888 |
| **Total** | | **3,075.15** | | **$1,910,546** | | **$1,446,653** | **-$463,893** |

Accordingly, the Court should reduce the base lodestar by $463,893:

| Remaining Lodestar Before Reduction | $7,253,033 |
|-------------------------------------|------------|

---

[28] Defendants have analyzed and applied reductions only to those timekeepers who billed more than a minimal amount of time to the case. This analysis also excludes billers whose time or rates should be reduced or disallowed as the result of Defendants' other objections, including those billers whose biographical information Class Counsel failed to provide, and billers such as Anthony Geyelin and many others who are claiming partner-level rates for document review.

[29] This is a summary of the year-by-year lodestar reduction calculations set forth in Exhibit 14.

| Base Lodestar Reduction | -$463,893 |
|---|---|
| **Remaining Lodestar After Reduction** | **$6,789,140** |

### 3. The Court should reduce the lodestar for unsupported rates

Class Counsel are entitled to be compensated at rates "in line with those
prevailing in the community for similar legal services by lawyers of reasonably
comparable skill, experience, and reputation." *Blum*, 465 U.S. at 895 n. 11 ; *see also
Schwarz*, 73 F.3d at 908 (same). The Motion, however, fails to provide biographical
or supporting information for several billers and thus does not permit the Court to
determine whether the hourly rate claimed by those billers given his or her individual
ability and experience. Specifically, the materials submitted by Weinstein Kitchenoff
(Mot. Ex. 5) contain no biographical information for billers Eckart (claimed $400 per
hour), Ely (claimed $375 per hour), Quarembo (claimed $200 per hour), or Spiegel
(claimed $380 per hour). Without even the most basic of information for the claimed
billers, the Court has no basis to award fees at the claimed rates.

Thus, the Court should disallow this time, which results in an additional
lodestar reduction of $254,942.5 (i.e., $87,680 for Eckart's time; $167,050.50 for
Ely's time; $60 for Quarembo's time; and $152 for Spiegel't time). *See Botosan v.
Vanags Indus., Inc.*, No. SACV991192AHSANX, 2001 WL 34884759, at * 3 (C.D.
Cal. Jan. 12, 2011) (disallowing biller's rate for failure to provide supporting
information).

| Remaining Lodestar Before Reduction | $6,789,140 |
|---|---|
| Base Lodestar Reduction | -$254,943 |
| **Remaining Lodestar After Reduction** | **$6,534,197** |

### 4. The Court should reduce the lodestar for improper billing entries in quarter-hour increments

One Class Counsel firm, Chimicles & Tikellis, billed all of its time in this
case—a total of 5,993 hours—in quarter-hour increments, rather than the tenth-of-an-
hour increments billed by the other Class Counsel firms. Quarter-hour billing is not

47

1   necessarily unreasonable, but where it results in billing for time not reasonably

2   expended, courts are within their discretion to apply an across-the-board reduction.

3   *See Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948-49 (9th Cir. 2007) (affirming

4   district court's 20% across the board reduction to a timekeeper's hours for quarter-

5   hour entries that resulted in excessive billing). Quarter-hour billing results in a request

6   for excessive hours where a biller's time entries contain many quarter or half-hour

7   entries for tasks such as emails, telephone calls, or intra-office conferences that likely

8   took a fraction of the recorded time. *Id.* (finding excessive billing where time entries

9   were replete with quarter-hour or half-hour charges); *see also Tait*, 2015 WL

10  4537463, at *13  (applying 20% across the board reduction to biller's hours where

11  quarter and half-hour entries accounted for the majority of all entries).

12      Chimicles & Tikellis's time records for two lawyers, Messrs. Schwartz and

13  Mathews, contain 857 quarter-hour and half-hour entries for emails, phone calls, and

14  intra-office conferences that "likely took a fraction of the time" recorded. *Welch*, 480

15  F.3d at 949. Over half of Mr. Schwartz's entries (276 out of 514, or 53.4%) and Mr.

16  Mathews's entries (581 out of 1125, or 51.6%) are quarter or half-hour increments.[30]

17  These are just the type of entries that the Ninth Circuit in *Welch* disapproved.

18      Because Mr. Schwartz's and Mr. Mathews's quarter-hour billing has led to

19  excessive hours claimed, the Court should apply an across-the-board reduction of 20%

20  to each of their total time, equaling a $47,739 reduction for Mr. Schwartz's fees and a

21  $145,965 reduction of Mr. Mathews's fees, for a total reduction of $193,704.[31]

| Remaining Lodestar Before Reduction | $6,534,197 |
|---|---|
| Base Lodestar Reduction | -$193,704 |

---

[30] The time entries subject to this objection are highlighted in the copies of Class
Counsel's time records attached as Exhibit 15. The records are duplicates, but with the
addition of highlighting, of the time records Class Counsel filed under seal pursuant
to the Court's Order dated May 11, 2016 (ECF No. 221). Defendants are submitting the
highlighted time records under seal pursuant to the Court's May 11, 2016 Order.

[31] These are reductions to Mr. Schwartz's and Mr. Mathews' time as already adjusted
for reasonable hourly rates so as not to double count reductions.

48

| Remaining Lodestar After Reduction | $6,340,493 |
|---|---|

### B.     The Court Should Apply a 0.5 Fractional Multiplier

After calculating the base lodestar figure, the Court may adjust it upward or downward to reflect a host of reasonableness factors, commonly known as the *Kerr* factors. *In re Bluetooth*, 654 F.3d at 941-42. "Foremost among" the *Kerr* factors is "the benefit obtained for the class." *Id.* at 942; *see also McCown v. City of Fontana*, 565 F.3d 1097, 1101-02 (9th Cir. 2009) (ultimate reasonableness of the fee "is determined primarily by reference to the level of success achieved by the plaintiff"). "[W]here the plaintiff has achieved 'only limited success,' counting *all* hours expended on the litigation—even those reasonably spent—may produce an 'excessive amount,' and the Supreme Court has instructed district courts to instead 'award only that amount of fees that is reasonable in relation to the results obtained.'" *In re Bluetooth*, 654 F.3d at 942 (quoting *Hensley*, 461 U.S. at 440).

Many of the *Kerr* factors are subsumed within the base lodestar calculation, *id.* at 942 n.7, and an upward multiplier should not be based on a factor included in the lodestar. *See Purdue v. Kenny A. ex. rel. Winn*, 559 U.S. 542, 553, 130 S. Ct. 1662, 1673 (2010). Significantly, "the contingent nature of the fee is no longer a basis for modifying the lodestar." *Weeks v. Kellogg Co.*, No. CV 09-08102(MMM)(RZx), 2013 WL 6531177, at *34 n.157 (C.D. Cal. Nov. 23, 2013) (citing *In re Bluetooth*, 654 F.3d at 942 n. 7 ("At least one factor is no longer valid—whether the fee was fixed or contingent.")); *Kerkeles v. City of San Jose*, 243 Cal. App. 4th 88, 106 (2015) (same).

Given Class Counsel's relative lack of success on behalf of the Class compared to their goals, the Court should make a <u>downward</u> adjustment to the base lodestar.

### 1.     Class Counsel achieved modest results compared to their goals

In two major ways, the Settlement did not achieve Class Counsel's litigation goals. First, there is no question that the impetus for bringing this suit was Plaintiff Steve Chambers' misguided belief that the Dishwashers pose a safety hazard and

49

should be removed from consumers' homes. Accordingly, the primary relief sought was a recall and repair or replacement program for the allegedly dangerous Dishwashers. (ECF No. 1 ¶ 3; *id.* at Prayer for Relief ¶¶ 2-3.) But the tiny rate of Overheating Events, the infinitesimally small rate of kitchen fires, the total absence of injuries, and the Safety Commission's closure of its years-long review, showed that this case never should have been pled as a safety case.

Second, Plaintiffs alleged, and issued expert reports opining, that they were entitled to classwide money damages on diminution-in-value and premium-price theories. That is, they claimed that every Dishwasher owner suffered an economic injury and was entitled to damages. (Ex. 3 at 3 & 6.) Plaintiffs' theory was not that only malfunctioning Dishwashers were defective.

As the terms of the Settlement Agreement bear out, Plaintiffs were forced to acknowledge that this was an extremely weak safety case—indeed, it was settled on a quality basis—and that not every Dishwasher owner suffered damages. The Settlement does not provide for the implementation of any recall, nor does it include any injunctive relief to "warn" consumers of the alleged danger posed by the Dishwashers. Instead, it provides a modest coupon offer, which would likely impact only the decisions of owners who already are planning to buy a new dishwasher this year or next. The coupon relief is available to only the 5,800,000 Rush/Rushmore model owners, not the 12,600,000 NewGen/Raptor Owners whom are excluded from the Settlement Class. Further, the 99.9% of NewGen/Raptor Owners who did not, and who will not, experience an Overheating Event receive nothing from the Settlement.

The Settlement's non-coupon, cash relief is limited, comprising only about 10% of the Settlement's value. With 17 days remaining in the claims period for Past Overheating Events, fewer than 2,000 claimants are expected to file Valid Claims for the cash benefit. (Ex. 2 at 10-13.) The Future Overheating Event claims data are not yet known, but the available data shows that the rate of such events, and thus the value of that 30% rebate or $100 cash offer, will be miniscule. (Ex. 2 at 18-19;

50

Ex. 5 at Tbls. 1-3.)

Finally, the injunctive relief that requires Whirlpool to revise its service pointers has no value to Dishwasher owners because Whirlpool's existing service bulletins already provided much of that common sense information. Further, that information already is known to service technicians through their experience and training. (Argument § II.E.)

> **2.     The modest results obtained outweigh the other *Kerr* factors**

Class Counsel argue that they are entitled to a positive multiplier in this case because they took risk in bringing this case on a contingency basis, the lawsuit involved complex, novel questions, and they exhibited skill in litigating the action. (Mot. at 31-34.) None of these factors merits a positive multiplier, much less a 1.68 multiplier. In fact, each is subsumed in the base lodestar calculation and may not be considered in favor of an enhancement.

First, as noted above, contingent risk is "no longer" a factor that may be considered in adjusting the lodestar. *See In re Bluetooth*, 654 F.3d at 942 n.7. Even if risk could be considered, it would not warrant a positive multiplier given the mediocre result. Plaintiffs knew from the evidence produced in this case that only a miniscule fraction of Dishwasher owners experienced any sort of Overheating Event or repair. Yet Class Counsel continued to litigate this case for five years, never moving the case past the motion-to-dismiss and class discovery stage, in the hope that Defendants would be intimidated into a large class settlement that paid damages to all 18,400,000 Dishwasher owners encompassed by the putative nationwide class. Class Counsel failed to achieve that goal, accomplishing a small settlement. To reward gratuitous risk that fails to pay off for the Class would penalize class-action defendants, like Whirlpool and Sears, who mount a strong defense to weak claims and who negotiate a nuisance-value settlement that favors Defendants' litigation positions, and would encourage class action plaintiffs' attorneys to continue churning cases that have little merit and whose continued prosecution are not likely to provide any meaningful

1    benefit to members of the class.

2        Second, "an attorney's performance" and "novelty and complexity of a case,"

3    are reflected in the attorney's billable hours and "generally may not be used as a

4    ground for enhancement." *Purdue*, 559 U.S. at 553 (2010). Moreover, this case did

5    not involve novel or complex questions of law and fact. Rather, it is, and always was,

6    a run-of-the-mill warranty case pled as an overbroad class action. There is no shortage

7    of similar class actions throughout the country. And Class Counsel's claim of

8    exhibiting extraordinary skill rings hollow given that this case settled in the class

9    discovery stage with no ruling on Defendants' motion to dismiss. Class Counsel did

10   not achieve a contested class certification, did not survive a summary judgment

11   motion, and did not even begin to prepare to try this case.

12            **3.    The Court should apply a negative multiplier of 0.5**

13       The "most critical factor" in determining a reasonable fee is the "degree of

14   success obtained." *Hensley*, 461 U.S. at 436. "If . . . a plaintiff has achieved only

15   partial or limited success, the product of hours reasonably expended on the litigation

16   as a whole times a reasonable hourly rate may be an excessive amount." *Id.* Further,

17   recent decisions in this circuit stress that any fee award must be proportional to the

18   actual class recovery so as to align the interests of class counsel and the class. In *In re*

19   *Bluetooth*, the Ninth Circuit reversed an $800,000 lodestar-based fee award because

20   the award was a disproportionate 83.2% of the total amount the defendants were

21   willing to pay to settle the case. 654 F.3d at 945 (percentage crosscheck should "be

22   used to assure that counsel's fee does not dwarf class recovery" (citation omitted)). On

23   remand, the district court concluded that a lodestar of $931,036 was reasonable, but

24   then awarded only 25% of that amount due to the "limited usefulness of the fees

25   reasonably expended." *In re Bluetooth Headset Prods. Liab. Litig.*, No. 07-ML-1822

26   DSF (Ex), 2012 WL 6869641, at *7 (C.D. Cal. July 31, 2012) ("The actual results

27   certainly fell far short of the original goals of the case both for monetary and

28   injunctive relief."); *see also In re HP Inkjet*, 716 F.3d at 1178 (courts "try to ensure

52

faithful representation" by "tether[ing] the value of an attorneys' fees award to the value of the class recovery"); *Dugan v. Lloyds TSB Bank, PLC*, Nos. C 12-02549 WHA, C 12-02537 WHA, 2014 WL 1647652, at \*4 (N.D. Cal. Apr. 24, 2014) (reducing Plaintiffs counsel's "overreaching request for 113% of the settlement value"); *Clayton v. Knight Transp.*, No. 1:11-cv-00735-SAB, 2014 WL 1154098, at \*5 (E.D. Cal. Mar. 21, 2014) (reducing the claimed lodestar where the class recovery was "significantly less than counsel is requesting in attorney fees"); *True*, 749 F. Supp. 2d at 1077 (lodestar amount inappropriate "where, as here, the benefit achieved for the class is small and the lodestar award large").

Similarly, in *Create-a-Card, Inc. v. Intuit, Inc.*, the plaintiffs sought an award of fees and costs in the amount of $550,000. 2009 WL 3073920, at \*2. Applying California law, the court looked to the class benefits actually claimed—$491,000 on a 1% claim rate—calling the key consideration in determining a fee award "reasonableness in light of the benefits *actually conferred*." *Id.* at 3. Given the class recovery, the court awarded $490,000 in fees, explaining that "[a]lthough the settlement in this action confers substantial benefits to some individual class members, the class' overall recovery does not warrant the requested fee award." *Id.*

Finally, in *Tait v. BSH Home Appliances Corp.*, the plaintiffs brought a case alleging damages on behalf of all buyers of front-loading washing machines and achieved certification of four separate state classes. *See* 2015 WL 4537463, at \*1. The settlement provided each of the 650,000 class members with the right to claim $55 in cash, regardless of whether the class member's washer manifested the alleged defect. *Id.* at \*3. The Court nevertheless refused to characterize that result as "excellent," given that class counsel had argued that each class member's damages were as high as $396. *Id.* at \*7, 9. Although the theoretical value of that relief was over $35,000,000, the class made claims for just over $1,000,000 in benefits, *id.* at \*5-6, which "economic reality" the court determined "should be taken into account when assessing the adequacy of the settlement." *Id.* at \*7. After making substantial cuts to the

1  lodestar, the Court applied a 0.5 fractional multiplier due to the "unadjusted lodestar

2  dwarf[ing] the class's recovery." *Id.* at *14.

3      Here, a crosscheck of the lodestar using the percentage-of-recovery method

4  counsels in favor of a negative multiplier. *In re Toys "R" Us*, 295 F.R.D. at 460 ("[A]

5  court applying the lodestar method to determine attorney's fees may use the

6  percentage-of-the-fund analysis as a cross-check." (citation omitted)). Under the

7  percentage method, a reasonable fee would be between **$1,758,000** and **$2,834,000**.

8  (Argument, Part II.C, *infra*.) Thus, the adjusted base lodestar should be further

9  reduced to yield a reasonable result.

10      The Court should apply a negative multiplier to tie the fee award to the modest

11  benefits that the Settlement provides to Dishwasher owners. As detailed above, the

12  total class benefit, including notice costs but excluding Class Counsel's fee, is

13  between **$4,220,000 and $6,803,000**—for a case in which the amount in controversy

14  was more than $1,000,000,000. Although a small number of Dishwasher owners will

15  receive cash relief, they are, by far, the exception. The remaining relief is in the form

16  of coupons, the coupons have been claimed by only 1.7% of Class Members, and the

17  coupons will go mostly unredeemed.

18      In short, this is a classic case of class-action lawyers seeking fees out of

19  proportion to the benefits they obtained for their clients—precisely the sort of abuse

20  CAFA and *HP Inkjet* aim to prevent. A 0.5 negative multiplier on Class Counsel's

21  real lodestar of $6,340,493 would produce a reasonable fee of **$3,170,247**. That result

22  is more than fair to all interested parties given the results achieved here. If the Court

23  were to award a fee higher than $3,170,000, there would be a substantial risk that the

24  fee will exceed, even by a multiple, the benefits paid to the Dishwasher owners.

25  **IV.   CLASS COUNSEL FAILED TO PROVE THAT CERTAIN COSTS ARE**

26  **RECOVERABLE**

27      Included within Class Counsel's cost detail are $30,629.90 in costs for items

28  that appear to be general overhead:

54

- Monthly and other charges for "hosting services" and other unidentified expenses from US Legal Support, Inc., totaling $22,285.83;

- Two identical charges (which appear to be duplicative) of $2,736.41 from both the Rifkin Weiner and Chimicles & Tikellis firms for Concordance and Ipro Software Maintenance expenses, totaling $5,472.81; and

- Unidentified charges from Tech Solutions, Inc., totaling $2,871.25.

Class Counsel's Declarations fail to describe the nature of these charges, but they appear from their face to be general law firm administrative expenses perhaps related to document review. General firm overhead expenses are not recoverable, as they are properly built into a firm's reasonable hourly rates or contingent fee recovery. *See Morganstein v. Esber*, 768 F. Supp. 725, 727 (C.D. Cal. 1991). The Court should award Class Counsel $477,663 in costs rather than the $508,292.67 requested.

## CONCLUSION

For all these reasons, the Court should grant in part and deny in part Class Counsel's Motion, use the percentage-of-recovery method, and award a fee of between $1,758,424 and $2,834,408, plus costs up to **$477,663**, for a total award of between **$2,236,087** and **$3,312,071**. If the Court chooses to apply the lodestar method without reference to 28 U.S.C. § 1712, however, the Court should award a fee no greater than $3,170,247, plus costs of $477,663, for a total award of **$3,647,910**. The Court also should grant the requested service awards to named Plaintiffs.

Dated:  June 24, 2016              By:  *s/ Michael T. Williams*
                                              Michael T. Williams
                                              Wheeler Trigg O'Donnell LLP
                                              Attorneys for Defendants,
                                              Whirlpool Corporation,
                                              Sears Holdings Corporation,
                                            and Sears, Roebuck and Co.

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I hereby certify that on June 24, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ Michael T. Williams*
Michael T. Williams

DEFENDANTS' OPPOSITION TO MOTION FOR ATTORNEYS' FEES
CASE NO. 8:11-cv-01733-FMO (ANx)