1  Galen D. Bellamy (SBN 231792)
   Email: bellamy@wtotrial.com
2  Michael T. Williams (*pro hac vice*)
   Email: williams@wtotrial.com
3  Andrew M. Unthank (*pro hac vice*)
   Email: unthank@wtotrial.com
4  N. Reid Neureiter (*pro hac vice*)
   Email: neureiter@wtotrial.com
5  Cedric D. Logan (*pro hac vice*)
   Email: logan@wtotrial.com
6  Wheeler Trigg O'Donnell LLP
   370 Seventeenth Street, Suite 4500
7  Denver, Colorado 80202
   Telephone:   (303) 244-1800
8  Facsimile:    (303) 244-1879

9  Dean J. Zipser (SBN 94680)
   Email: dzipser@umbergzipser.com
10 Carole E. Reagan (SBN 162674)
   Email: creagan@umbergzipser.com
11 Umberg Zipser LLP
   1920 Main Street, Suite 200
12 Irvine, California 92614
   Telephone:   (949) 679-0052
13 Facsimile:    (949) 679-0461

14 Attorneys for Defendants

15

16

17              **UNITED STATES DISTRICT COURT**

18              **CENTRAL DISTRICT OF CALIFORNIA**

19

20 STEVE CHAMBERS, *et al.*, all of        Case No:  8:11-cv-01733-FMO (ANx)
   whom sue in their individual capacities
21 and for all others similarly situated,   **DEFENDANTS' MEMORANDUM IN
                                             SUPPORT OF JOINT MOTION FOR
22            Plaintiff,                     FINAL APPROVAL OF CLASS ACTION
                                             SETTLEMENT**
23       vs.
                                             The Honorable Fernando M. Olguin
24 WHIRLPOOL CORPORATION, *et al.*,

25            Defendants.

26

27

28

# **TABLE OF CONTENTS**

Page

INTRODUCTION ....................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

I.   PROCEDURAL HISTORY .............................................................................. 2

II.  THE EVIDENCE UNDERMINED PLAINTIFFS' DESIGN DEFECT
     THEORY AND LIKELY WOULD HAVE PREVENTED PLAINTIFFS
     FROM OBTAINING CLASS CERTIFICATION OR A TRIAL
     VICTORY .......................................................................................................... 3

     A.   Overheating Events Are Rare, and When They Do Occur the
          Control Boards Fail Safely as They Were Designed and Tested to
          Do ............................................................................................................. 4

     B.   After Investigating the Alleged Defects, the Safety Commission
          Required No Corrective Action Program ................................................ 5

     C.   Defendants Provided Voluntary Customer Satisfaction Benefits to
          Dishwasher Owners Who Experienced Overheating Events ................... 5

     D.   Plaintiffs Faced an Uphill Battle at the Class Certification Stage ............ 6

III. DISCOVERY TAKEN IN THIS ACTION ....................................................... 7

IV.  THE SETTLEMENT NEGOTIATIONS AND AGREEMENT ....................... 8

V.   THE COURT'S PRELIMINARY APPROVAL ORDER ............................... 10

VI.  THE PARTIES' COMPLIANCE WITH THE COURT'S ORDERS .............. 11

ARGUMENT ............................................................................................................ 12

I.   THE STANDARD FOR FINAL APPROVAL OF THE SETTLEMENT ........ 12

II.  THE PROPOSED SETTLEMENT CLASS SATISFIES RULE 23's
     CERTIFICATION PREREQUISITES FOR SETTLEMENT PURPOSES ...... 13

     A.   The Numerosity Requirement Is Satisfied .............................................. 14

     B.   There Are Common Questions for Settlement Purposes ......................... 14

     C.   The Typicality Requirement Is Satisfied for Settlement Purposes ......... 14

     D.   Plaintiffs Are Adequate Settlement Class Representatives .................... 15

     E.   Questions of Law and Fact Common to the Class Predominate
          Over Individual Questions for Settlement Purposes ............................... 15

III. THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ............. 15

A.  The Settlement Is Objectively Fair, Reasonable, and Adequate in Light of the Weakness in Plaintiffs' Case.................................................16

B.  Continued Litigation Would Be Risky, Lengthy, and Expensive ...........18

C.  Investigation and Discovery Have Been Sufficient to Allow Class Counsel to Exercise Sound Judgment in Evaluating the Settlement .......19

D.  The Settlement Was Reached Through Good-Faith Bargaining .............20

E.  Except With Respect to Class Counsel's Request for Attorneys' Fees, the Objections to the Settlement Are Without Merit......................21

    1.  The Settlement benefits are reasonable and adequate in light of the weaknesses of Plaintiffs' case .............................................21

    2.  Whirlpool's purchase of the Chambers websites is reasonable .........................................................................................23

    3.  The non-class relief in the Settlement is appropriate here ...........24

CONCLUSION..........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

Page

**<u>Cases</u>**

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997)........................................................................................14, 15

*Carrera v. Bayer Corp.,*
727 F.3d 300 (3d Cir. 2013) ....................................................................................25

*E.E.O.C. v. Pan Am. World Airways, Inc.,*
No. C-81-3636 RFP, 1988 WL 224232 (C.D. Cal. Jun. 17, 1988) ............................11

*Eisen v. Porsche Cars N. Am., Inc.,*
No. 2:11-CV-09405-CAS, 2014 WL 439006 (C.D. Cal. Jan. 30, 2014) .........13, 19, 20

*Gripenstraw v. Blazin' Wings, Inc.,*
No. 1:12-CV-00233-AWI, 2013 WL 6798926 (E.D. Cal. Dec. 20, 2013) .................19

*In re Heritage Bond Litig.,*
No. 02-LC-1475 DT, 2005 WL 1594403 (C.D. Cal. Jun. 10, 2005) ........................20

*In re Syncor ERISA Litig.,*
516 F.3d 1095 (9th Cir. 2008) ..................................................................................12

*Lane v. Facebook, Inc.,*
696 F.3d 811 (9th Cir. 2012) ....................................................................................16

*Linney v. Cellular Alaska P'ship,*
151 F.3d 1234 (9th Cir. 1998) ............................................................................13, 18

*Melong v. Micronesian Claims Comm.,*
643 F.2d 10 (D.C. Cir. 1980) ....................................................................................25

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,*
221 F.R.D. 523 (C.D. Cal. 2004)..............................................................13, 16, 19, 20

*Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.,*
688 F.2d 615 (9th Cir. 1982) ..............................................................................13, 16

*Ortiz v. Fibreboard Corp.,*
527 U.S. 815 (1999)..................................................................................................25

*Ritchie v. Van Ru Credit Corp.,*
No. CV-12-1714-PHX-SMM, 2014 WL 956131 (D. Ariz. Mar. 12, 2014) ...............19

*Sandoval v. Tharaldson Emp't Mgmt., Inc.,*
No. EDCV 08-482-VAP(OP), 2010 WL 2486346 (C.D. Cal. June 15, 2010) ...........16

*Spokeo, Inc. v. Robins,*
136 S.Ct. 1540 (2016)................................................................................................22

*Tait v. BSH Home Appliances Corp.,*
289 F.R.D. 466 (C.D. Cal. 2012)..............................................................................14

**<u>Statutes, Rules, and Regulations</u>**

Fed. R. Civ. P. 23(a) ................................................................................13

Fed. R. Civ. P. 23(a)(1) ...........................................................................14

Fed. R. Civ. P. 23(a)(2) ...........................................................................14

Fed. R. Civ. P. 23(a)(3) ...........................................................................14

Fed. R. Civ. P. 23(a)(4) ...........................................................................15

Fed. R. Civ. P. 23(b) ................................................................................13

Fed. R Civ. P. 23(b)(3) ............................................................................15

Fed. R. Civ. P. 23(b)(3)(D) ......................................................................14

Fed. R. Civ. P. 23(e)(2) ............................................................................12

## INTRODUCTION

After nearly five years of litigation, the parties have settled their dispute over whether certain KitchenAid, Kenmore, and Whirlpool brand dishwashers are defective in design and breached Defendants' warranties. Plaintiffs' complaints alleged that all 18,400,000 Dishwashers with fully electronic controls manufactured by Whirlpool over the course of 17 years contained defective electronic control boards ("ECBs") that can overheat. Discovery in this case showed that only a miniscule fraction of Dishwashers (less than 0.1%) experienced any Overheating Event[1] and that Overheating Events virtually never resulted in fire outside the Dishwasher due to the layers of safety features designed into the Dishwashers. The Settlement Agreement now before the Court resolves this dispute, appropriately providing cash reimbursements to the tiny fraction of Dishwasher owners who have experienced (or who in the future will experience) an Overheating Event and who incurred documented out-of-pocket expenses to repair or replace their Dishwasher. Further, the Settlement offers a rebate of 10% to 20% off the purchase of a new Whirlpool-manufactured dishwasher to Class Members, regardless whether their Class Dishwasher experienced an Overheating Event.[2]

The proposed Settlement is fair, reasonable, and adequate to the Class under the circumstances. The parties agreed to this nationwide settlement after a discovery process that included the production of over 300,000 pages of documents and many electronic databases, depositions of all class representatives and several key Whirlpool employees (including the engineering manager who had designed and tested all four of the relevant control board "platforms" and Whirlpool's Director of Global Product

---

[1] All capitalized terms in this brief are defined terms in the Settlement Agreement.

[2] The Settlement does not provide a coupon offer to approximately 12,600,000 Dishwasher owners who were members of the proposed nationwide class pled in Plaintiffs' complaints, but those non-class Dishwashers were built with different electronic control boards than the Class Dishwashers and also experienced a rate of Overheating Events that was even lower than the Class Dishwasher. Those 12,600,000 Dishwasher owners, however, are not giving Defendants a classwide release.

Safety), expert inspections of Plaintiffs' and other Class Members' Dishwashers, preparation and disclosure of Plaintiffs' experts' reports, and the closure of by the U.S. Consumer Product Safety Commission ("Safety Commission") of its thorough investigation into the alleged safety risk without requiring Whirlpool to take corrective action for the Dishwashers. That discovery showed that Plaintiffs were highly unlikely to prevail on the merits of their design defect theory, even if the case had been certified as a class action and tried to a jury. Further, Plaintiffs faced substantial hurdles to certification of the proposed classes, as well as a motion to dismiss many of their substantive claims. Knowing this, the parties' arms-length settlement discussions, which were supervised by Professor Eric Green, resulted in a proposed Settlement that largely adopts Defendants' litigation positions, settles Plaintiffs' claims on a field quality and reliability basis without any safety recall, and provides Class Members with reasonable relief, thus avoiding a possible outcome in which the putative classes would have received nothing.

Accordingly, the Settlement is "fair, reasonable, and adequate," as required by Federal Rule of Civil Procedure 23(e)(2). The Court should grant the parties' joint motion for final approval of their proposed class-action settlement.

## STATEMENT OF FACTS

## I.   PROCEDURAL HISTORY

Plaintiffs filed this action in November 2011. (ECF No. 1.) In each iteration of their pleading, Plaintiffs alleged that the Dishwashers contained defective electronic control boards ("Control Boards" or "ECBs") that can overheat and cause the Dishwasher to emit smoke and fumes and possibly combust. (*Id.* ¶ 1; *see also* ECF Nos. 44, 70, & 98.) They alleged that the defect involved the Control Board design as well as the terminal connection where the wire harness meets the Control Board. (ECF No. 70 ¶ 4.) Plaintiffs claimed that the power connection could overheat during normal use and cause the Control Board or other parts to arc, spark, or catch fire. (*Id.*)

From their first Complaint, Plaintiffs claimed that the Dishwashers posed an

1   unreasonable risk to consumer safety. (ECF No. 1 ¶ 3 (alleged defect "creates a

2   substantial and unreasonable risk of property damage, personal injury and death").)

3   Plaintiffs sought relief based on the alleged safety risk, including an injunction

4   requiring Whirlpool to recall the Dishwashers (*id.* at Prayer for Relief ¶ 2) and to

5   repair or replace the millions of Dishwashers still installed and regularly used in the

6   field (*id.* at Prayer for Relief ¶ 3). Further, Plaintiff Steve Chambers personally

7   contacted the Safety Commission and argued that the Dishwashers were unreasonably

8   dangerous and should be recalled. After a thorough, years-long investigation, the

9   Safety Commission declined to require any safety recall. (ECF No. 246-1.)

10          On these claims, Plaintiffs' alleged a nationwide class of all buyers of

11   Whirlpool-manufactured KitchenAid, Kenmore, and Whirlpool brand Dishwashers,

12   with various subclasses and alternative statewide classes. (ECF No. 70 ¶¶ 153-158.)

13   These allegations encompassed every dishwasher with fully electronic controls (as

14   opposed to electromechanical controls) manufactured by Whirlpool over a 17-year

15   period—more than 18,400,000 units (i.e., the "Dishwashers"). Further, by the Second

16   Amended Complaint, Plaintiffs sought certification of a class of all Dishwasher

17   buyers without regard to whether the buyer's own Dishwasher had experienced a

18   malfunction. (*Compare* ECF No. 1 ¶ 100(c) *with* ECF No. 44 ¶ 113.) That is,

19   Plaintiffs claimed that even those Dishwashers that had worked perfectly throughout

20   their useful life, never manifesting the alleged defect, caused the buyers to suffer

21   economic loss. (*See, e.g.*, ECF No. 70 ¶ 198.)

22          Defendants moved to dismiss each iteration of Plaintiffs' complaints, which

23   process caused Plaintiffs to voluntarily dismiss some claims and to re-plead others.

24   Defendants' Motion to Dismiss Plaintiffs' Fourth Amended Complaint remains

25   pending. The case did not reach the class certification or summary judgment stage.

26   **II.   THE EVIDENCE UNDERMINED PLAINTIFFS' DESIGN DEFECT**

27          **THEORY AND LIKELY WOULD HAVE PREVENTED PLAINTIFFS**

28          **FROM OBTAINING CLASS CERTIFICATION OR A TRIAL VICTORY**

A.     **Overheating Events Are Rare, and When They Do Occur the Control Boards Fail Safely as They Were Designed and Tested to Do**

Defendants deny that the Dishwashers[3] are defective in design or that they pose an unreasonable risk to consumer safety. The evidence Whirlpool and Sears produced in the litigation showed that Overheating Events are rare and virtually never result in fire outside the Dishwasher. (Defs.' Opp'n to Pls.' Mot. for Attorney Fees ("Fee Opp'n") Ex. 4 at 138:10-20, ECF No. 246-4.) Including alleged and unconfirmed events, as of the end of 2014, Overheating Events had been reported in less than 0.09% of all Dishwashers sold. (ECF No. 246-2 at Tbl. 4.) Class Dishwashers (Dishwashers with Rushmore or Rush ECBs) experienced reported Overheating Events at a rate of .17%, while Non-Class Dishwashers (those with NewGen or Raptor ECBs) experienced reported Overheating Events at an even lower rate of .06%. (*Id.*)

The scattered and isolated Overheating Events over 20 years that resulted in some flames escaping the product in a handful of incidents typically occurred when someone had disabled or bypassed the Dishwasher's built-in safety features, such as the thermal cut-off device or "TCO", after the Dishwasher had been sold. (ECF No. 246-4 at 138:24–139:18.) Moreover, there was <u>no</u> serious injury associated with the reported Overheating Events. Before Plaintiffs filed this case, Whirlpool routinely provided free repairs, free or discounted replacement dishwashers, and other benefits to owners who reported Overheating Events to the company. (ECF No. 246-5 ¶ 26.)

The individual Plaintiffs' experiences were no different than other customers who had an Overheating Event that caused no kitchen fire, no property damage, and no personal injury. Plaintiffs alleged that 18 of their Dishwashers experienced 22

---

[3] The Agreement defines Dishwashers to include KitchenAid, Kenmore, and Whirlpool brand dishwashers manufactured during the 15-year period from February 1998 through March 2012 with fully electronic controls and a Rushmore, Rush, NewGen, or Raptor Control Board. (Settlement Agreement ("Agreement"), ECF No. 218-12, ¶ I.O.) Only Dishwashers with Rush and Rushmore Control Boards are included in the Class, i.e., "Class Dishwashers." (*Id.* ¶ I.I.) The NewGen and Raptor Dishwashers qualify for non-Class relief only. (*Id.* ¶ IV.D.2.)

separate Overheating Events. Of these 22 events, 11 Dishwashers were repaired and safely restored to service, showing that many Plaintiffs trusted their Dishwashers enough to continue using them even after the Overheating Event. (*See, e.g.*, ECF No. 98 ¶¶ 110, 124.) Also, Plaintiffs admitted that their Overheating Events did not cause heat or fire damage to their homes. (*See, e.g.*, ECF No. 246-6 at 162:11–163:1; *id.* at 62:4–63:14.) Their Dishwashers' built-in safety features performed as designed and intended. Thus, Plaintiffs' testimony, evidence, repair records, as well as the fact that some of their Dishwashers remain in use, showed that the Dishwashers overheated safely, with only minimal damage to the Dishwasher's internal parts.

### B.     After Investigating the Alleged Defects, the Safety Commission Required No Corrective Action Program

This and other evidence led the Safety Commission, after years of thorough investigation, to close its engineering investigation in June 2014 without requiring Whirlpool to take any corrective action. (ECF No. 246-1.) Whirlpool fully cooperated with the Safety Commission and provided large amounts of information, including exemplar Control Boards, forced-failure safety testing data and videos, and field-returned Dishwashers. With the government's determination, Plaintiffs were not likely to persuade a jury that both the Safety Commission's and Whirlpool's engineering experts were wrong.

### C.     Defendants Provided Voluntary Customer Satisfaction Benefits to Dishwasher Owners Who Experienced Overheating Events

Before this suit was filed, Whirlpool's customer service center (known as the Customer eXperience Center or "CXC") responded to complaints about Dishwasher Overheating Events in the ordinary course of business by providing voluntary customer satisfaction benefits and by buying back Dishwashers that Whirlpool wanted for engineering inspection and analysis as part of the company's well-established system for monitoring the field safety of its products. (Tr. of Dep. of Larry Latack, May 15-16, 2014, at 91:4–92:6, excerpts attached as Ex. 1.) Whirlpool's call center

1  representatives were (and still are) empowered to provide free repairs, product

2  exchanges, and buy backs (or pro-rated buy backs, depending on the age of the

3  appliance) even for those Dishwashers that are far outside the written warranty period.

4  (*Id.* at 256:21–258:5.) If a customer reported seeing flames outside the Dishwasher,

5  Whirlpool customer service representatives would buy back the Dishwasher and

6  return it to Whirlpool's engineering laboratory for inspection, even if the incident

7  resulted in no property damage. (*Id.* at 245:22–246:4.) Whirlpool's Global Product

8  Safety Director testified that, as of early 2014, Whirlpool already had bought back

9  hundreds of Dishwashers at Whirlpool's expense as part of its continual monitoring

10  and investigation of consumers' allegations regarding the safety of their appliances

11  and had determined that almost none of those units had experienced any fire outside

12  the product enclosure. Thus, the Overheating Events were quality issues, not safety

13  issues, and "[a]s quality issues [go], 300 out of 24 million is probably impeccable

14  compared to our competitors."[4] (*Id.* at 412:22–413:14.)

15      **D.**    **Plaintiffs Faced an Uphill Battle at the Class Certification Stage**

16         Based on the record evidence and the elements of Plaintiffs' claims, it was

17  possible that the Court would not have certified <u>any</u> of the proposed classes for trial.

18  As an initial matter, Plaintiffs' overbroad class allegations covered more than

19  18,400,000 Dishwashers that had many relevant design differences, including

20  differences in Control Board designs and differences among the many different safety

21  features built into the Dishwashers' control systems, which included UL-rated flame-

22  resistant plastic housing assemblies and component enclosures and different TCO

23  devices. In addition to the design differences, differences among consumers'

24  appliance installations, home power supply problems, and post-sale service, repairs,

25  and modifications of the tiny handful of Dishwashers that experienced safety issues

26  tended to show that the putative class claims lacked sufficient cohesiveness and

27  

28  

---

[4] The reference to "24 million" includes millions of dishwashers with fully electronic controls that were not included in Plaintiffs' proposed trial classes.

commonalty. Further, the many different brands and different models of Dishwashers were sold with many different written warranties and extended service contracts, and they were sold in different states with different warranty and consumer protection laws, creating further individualized questions of fact and law. Still further, the extremely low rate of Overheating Events, meant that more than 99.9% of putative class members did not experience the alleged defect. Thus, the proposed classes were filled with uninjured persons, violating the common injury requirement of *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

In response to those individualized issues, Plaintiffs claimed that each Dishwasher owner suffered economic loss at the time of purchase and that all Dishwashers were worth less than advertised. But those are tenuous theories where the alleged defect has manifested in less than 0.1% of Dishwashers, as some of the Class Counsel firms learned in the October 2014 jury trial involving alleged design defects in Whirlpool front-loading washers, *Glazer v. Whirlpool*, No. 1:08-WP-65000 in the Northern District of Ohio.

## III.   DISCOVERY TAKEN IN THIS ACTION

The parties conducted a substantial amount of discovery before they negotiated the proposed Settlement. The following discovery allowed both sides to make fully informed decisions about the strengths and weaknesses of Plaintiffs' claims, Whirlpool's and Sears' defenses, and the parties' class certification arguments: (1) Defendants produced approximately 125,000 documents and many electronic databases totaling over 300,000 pages regarding the Dishwashers' designs, testing, sale, marketing, and field performance and reliability; (2) Plaintiffs and Defendants responded to written discovery; (3) Plaintiffs deposed several key Whirlpool employees in multi-day depositions; (4) Plaintiffs produced their own Dishwasher-related documents; (5) Defendants deposed the named Plaintiffs; (6) Plaintiffs disclosed two liability experts who opined that the Dishwashers were defectively designed and a damages expert who opined that the sale of the Dishwashers caused all

1   purchasers to suffer economic loss; and (7) Defendants' experts inspected Plaintiffs'
2   and other owners' Dishwashers and did substantial data analyses and other work in
3   preparing their own expert reports, which were due to be disclosed shortly after the
4   mediation that resulted in the Settlement.

5   **IV.   THE SETTLEMENT NEGOTIATIONS AND AGREEMENT**

6          The Settlement is the product of substantial, arms-length negotiations. The
7   parties participated in six full-day mediation sessions with Professor Green, beginning
8   in November 2013 and concluding in May 2015. As part of the negotiations, the
9   parties prepared and exchanged multiple opening and reply mediation briefs. In May
10  2015 the parties reached an agreement as to the principal terms of the Settlement and
11  executed a Term Sheet. Over the next four months, the parties negotiated the terms of
12  the complete Settlement Agreement and its exhibits, which is now before the Court.

13         The Settlement provides for the following terms:

14         **Class Member Benefits and Release:** Defendants incorporate by this reference
15  the description of Class Member benefits set forth in their Opposition to Plaintiffs'
16  Motion for Attorney Fees. (*See* ECF No. 246 ¶ III.) In exchange, Class Members will
17  release all claims against Defendants relating to their Dishwashers, except claims for
18  personal injury and damage to property other than to the Dishwasher itself. (*Id.* ¶ X.)

19         **Non-Class Benefits:** Defendants incorporate by this reference the description
20  of non-Class benefits set forth in their Opposition to Plaintiffs' Motion for Attorney
21  Fees. (*See* ECF No. 246 ¶ III.) Only those NewGen and Raptor owners who make a
22  Valid Claim for and receive benefits will be required to provide an individual release
23  to Defendants. (Agreement ¶ IV.D.1.)

24         **Revisions to Service Documents:** The Settlement requires Whirlpool to make
25  minor revisions to Whirlpool's Control Board-related and TCO-related service
26  pointers and training bulletins for service technicians. (Agreement ¶ V.A.) The
27  revisions "emphasize" what technicians already know from their training and
28  experience—that is, that the TCO has a safety function, that technicians should not

bypass or disable the TCO, and that they should inspect the TCO when serving the Control Board to ensure that the TCO is properly installed. (*Id.*) Contrary to what Class Counsel have told the Court, the Agreement does not require Whirlpool to post any "warnings" to consumers or service technicians, and the revised service pointers and bulletins will not be disseminated to Dishwasher owners. (*Compare* Pls.' Mem. in Supp. of Prelim. Approval at 18, ECF No. 192-1, *with* Agreement ¶ V.A.)

**Sticker Program for Control Board Service Parts:** Whirlpool also has agreed to affix a sticker to the individual boxes containing replacement Control Boards advising authorized service technicians that Dishwasher owners who experienced an Overheating Event may be entitled to a rebate or cash payment upon verification of the Overheating Event. (Agreement ¶¶ IV.C.4, V.B.) The service technician will be required to contact Whirlpool for authorization and also take custody of the Control Board part and return it to Whirlpool for confirmation that the owner is eligible. (*Id.*)

**Whirlpool's Purchase of Steve Chambers's Websites:** As a material term of the Agreement, Whirlpool required that Plaintiff Chambers sell to Whirlpool all of his rights, titles, and interests in two of his websites, KitchenAidfire.com and WhirlpoolSafetyDefects.com, for the sum of $100,000. (*Id.* ¶ V.C.) That purchase price was based on the parties' lengthy negotiations, which included Mr. Chambers's investment of time and money into the creation and maintenance of those sites, the consumer traffic they generated, and other factors relevant to the valuation of a website. (*Id.*) This term was material to Whirlpool because Mr. Chambers (and other persons who visited those sites) posted misleading and confusing derogatory information regarding Whirlpool and its products on those sites (e.g., false allegations that certain dishwashers had caused fires where Whirlpool knew from its own investigation that the incidents did not actually involve any fire), inappropriately used Whirlpool's and Sears' brand names, attempted to cause and likely did cause some reputational harm to Whirlpool, and diverted consumer internet traffic, including some new appliance shoppers, away from Whirlpool's own consumer-facing websites.

**Settlement Administration and Notice Expenses:** Whirlpool has paid the Claims Administrator's reasonable Notice and Administration Expenses. (*Id.* ¶ VI.A.)

**Class Counsel's Attorneys' Fees:** Whirlpool agreed to pay Class Counsel's reasonable attorneys' fees and costs to be awarded by the Court. (*Id.* ¶ IX.A.) The parties negotiated in good faith the reasonable amount of attorneys' fees and costs to be paid to Class Counsel, but they failed to reach an agreement. The Agreement provides that the Court will therefore determine the amount Whirlpool should pay. Class Counsel filed their fee motion on May 6, 2015, and Defendants opposed that motion on July 24, 2016. (*See* ECF Nos. 218 & 246.)

## V.   THE COURT'S PRELIMINARY APPROVAL ORDER

On November 12, 2015, the Court entered its Order Certifying Class Action, Preliminarily Approving Class Action Settlement and Class Notice, and Setting Final Fairness Hearing ("Preliminary Approval Order"). (ECF No. 199.) The Order preliminarily certified for settlement purposes the Class defined in the Settlement Agreement. (Prelim. Approval Order at 32.)

The Preliminary Approval Order, together with the Court's Order Granting Joint Stipulation to Amend Class Action Settlement Deadlines and Final Approval Hearing (ECF No. 207), also: (1) appointed the named Plaintiffs as class representatives for settlement purposes (Prelim. Approval Order at 32); (2) appointed Class Counsel for settlement purposes (*id.*); (3) preliminarily approved the terms of the Settlement Agreement as fair, reasonable, and adequate and in compliance with Rule 23(e) of the Federal Rules of Civil Procedure (*id.*); (4) approved the parties' proposed (a) notice plan (*id.*), (b) forms of mailed and emailed settlement notice, the publication notice, and the long-form notice in frequently-asked-questions form ("FAQ") (*id.* at 33), and (c) Claim Form (*id.*); (5) approved the form, substance, and methods of dissemination of the notices and forms for non-class Dishwasher owners (Prelim. Approval Order at 33); (6) appointed KCC to serve as the Claims Administrator (*id.*); (7) ordered Class Member exclusions and objections to be

1    postmarked tno later than May 27, 2016 (ECF No. 207 at 2); and (8) scheduled the

2    Fairness Hearing for August 25, 2016 (*id.* at 3).

3    **VI.    THE PARTIES' COMPLIANCE WITH THE COURT'S ORDERS**

4             After the Court granted preliminary approval of the Settlement, the parties

5    prepared final versions of the mail and email settlement notices and the publication

6    notice (collectively, "Notice Materials") and incorporated into each of them the

7    Fairness Hearing date and deadlines set forth in the Preliminary Approval Order.

8    (Decl. of Michael T. Williams ¶ 2, attached as Ex. 2.) Defendants ensured that within

9    the deadlines set by the Court, the Settlement Administrator mailed, by first-class

10   United States Mail, a copy of the postcard notices, and emailed a copy of the notice, to

11   all Class Members whose addresses reasonably could be identified in Whirlpool's,

12   Sears', or the Safety Commission's records. (*Id.* ¶¶ 3, 4.) The Administrator mailed

13   notices to 4,162,934 Class Members, which count also included the other Dishwasher

14   owners (NewGen and Raptor Dishwasher owners) who reportedly experienced an

15   Overheating Event. The Administrator also emailed notices to 669,669 Class

16   Members and other Dishwasher Owners. (Suppl. Decl. of Patrick M. Passarella re:

17   Notice Procedures and Claims Filing ¶ 3, attached as Ex. 3.) The Notice Materials,

18   including the FAQ, were timely posted on the Administrator's website,

19   www.DishwasherSettlement.com. (Ex. 2 ¶ 6.)

20            Further, the Administrator timely caused the Publication Notice to be published.

21   Half-page ads appeared in *People* magazine, dated January 11, 2016, and in *TV Guide*

22   in the January 4-17, 2016, issue. (Ex. 3 ¶ 7.) The Administrator also bought

23   14,000,000 internet ad impressions on a variety of websites and displayed the ads

24   from January 18 through February 4, 2016. (*Id.*)[5]

25

26   ――――――――――――――――――
     [5] The parties' compliance with the Court's Orders satisfies Rule 23's notice requirements.
27   *See E.E.O.C. v. Pan Am. World Airways, Inc.*, No. C-81-3636 RFP, 1988 WL 224232, at *11
     (C.D. Cal. Jun. 17, 1988) ("First class mail and publication are routinely regarded as
28   sufficient to satisfy the notice requirements of rules 23(d)(2) and 23(e) . . . and the even more
     stringent requirements of Rule 23(c)(2).").

DEFENDANTS' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL
CASE NO. 8:11-cv-01733-FMO-ANx

1    As of the June 27, 2016, claims deadline, the Administrator had received

2    133,040 claims. (*Id.* ¶ 17) Of those, 122,294 claimants requested a rebate (106,331

3    claiming only a rebate and 15,963 claiming both a rebate and cash reimbursement),

4    and 26,380 claimants requested cash reimbursement (10,417 claiming only

5    reimbursement and 14,560 claiming both reimbursement and a rebate). (*Id.*) The

6    Claims Administrator is evaluating the claims filed, including any documentary proof

7    provided by claimants, to determine whether the claims are Valid Claims (*Id.* ¶ 18.)

8    The Administrator also has received 498 timely requests for exclusion. (*Id.* ¶

9    14.) A list of persons who submitted a timely request for exclusion is attached to the

10   Passarella Declaration as Exhibit A. Out of approximately 5,800,000 Class Members,

11   only 17 filed objections to the Settlement, one of which has been withdrawn. (*See*

12   ECF Nos. 202-03, 209, 212-13, 226-27, 231-32, 234-39.)

13                                      **ARGUMENT**

14          Pursuant to Rule 23(e), the parties moved the Court to (1) certify the nationwide

15   Settlement Class of all Class Dishwasher owners to resolve the class claims, (2)

16   finally approve the terms of the Settlement Agreement reached by the parties, (3) enter

17   an order granting final approval of the Settlement, and (iv) enter final judgment in this

18   matter. The proposed Settlement satisfies all requirements of federal law and due

19   process. The proposed Settlement is fair and provides adequate and reasonable relief

20   to Class Members. Accordingly, the Court should grant final approval.

21   **I.    THE STANDARD FOR FINAL APPROVAL OF THE SETTLEMENT**

22          Rule 23(e) requires court approval of any class settlement. A court may approve

23   a class settlement "after hearing and on finding that it is fair, reasonable, and

24   adequate." Fed. R. Civ. P. 23(e)(2). The Ninth Circuit has a strong policy of

25   promoting and encouraging settlements between litigating parties, and this is true for

26   class actions. *See In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008)

27   ("[T]here is a strong judicial policy that favors settlements, particularly where

28   complex class action litigation is concerned."); *Eisen v. Porsche Cars N. Am., Inc.*,

No. 2:11-CV-09405-CAS, 2014 WL 439006, at *3 (C.D. Cal. Jan. 30, 2014)
("'[U]nless the settlement is clearly inadequate, its acceptance and approval are
preferable to lengthy and expensive litigation with uncertain results.' This general rule
applies with special force to class actions." (quoting *Nat'l Rural Telecomms. Coop. v.
DIRECTV, Inc*., 221 F.R.D. 523, 526 (C.D. Cal. 2004))).

       As the Ninth Circuit has explained, "[s]ettlement is the offspring of
compromise; the question we address is not whether the final product could be
prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."
*Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1027 (9th Cir. 1998); *see also Linney v.
Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("The proposed
settlement is not to be judged against a hypothetical or speculative measure of what
*might* have been achieved by the negotiators." (quoting *Officers for Justice v. Civil
Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982))).

## II.    THE PROPOSED SETTLEMENT CLASS SATISFIES RULE 23's CERTIFICATION PREREQUISITES FOR SETTLEMENT PURPOSES

       The parties have agreed to a resolution that provides for a settlement on a
nationwide basis for approximately 5,800,000 purchasers of the KitchenAid,
Kenmore, and Whirlpool brand Class Dishwashers. For the purpose of implementing
the proposed Settlement, and for no other purpose, Defendants have conditionally
withdrawn their objections to class certification and stipulate to certification of the
Class as defined by the Court. (*See* Prelim. Approval Order at 32.)

       The Federal Rules of Civil Procedure allow a case to be certified as a class
action only if the action satisfies all four requirements of Rule 23(a) and at least one of
the three categories in Rule 23(b). A nationwide class could not properly be certified
as a class action for <u>trial</u> purposes in this case. But because the parties are requesting
certification of a <u>settlement</u> class, the proposed Settlement, if approved, means that
there would not be a trial and that the many intractable case-management problems
that would plague a nationwide trial class will not arise in this action. *See Amchem*

*Products, Inc. v. Windsor*, 521 U.S. 591, 619-20 (1997) ("[c]onfronted with a request for settlement-only class certification, a [trial] court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. P. 23(b)(3)(D), for the proposal is that there be no trial.") Here, the proposed Settlement eliminates the manageability problems and individualized issues that would have existed if a nationwide class had been proposed for trial purposes.

### A.   The Numerosity Requirement Is Satisfied

The first prerequisite to certification is that the class be so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). Here, the Settlement Class consists of approximately 5,800,000 Class Dishwasher purchasers, which easily satisfies the "numerosity" required by Rule 23(a)(1). *See, e.g.*, *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 473 (C.D. Cal. 2012) ("A proposed class of at least forty members presumptively satisfies the numerosity requirement.").

### B.   There Are Common Questions for Settlement Purposes

The second certification prerequisite is that there are questions of law or fact common to the Class. Fed. R. Civ. P. 23(a)(2). For purposes of effecting the Settlement, Defendants stipulate to the existence of questions of law and fact common to all Class Members based on Whirlpool's manufacture and Sears' sale of the Class Dishwashers, including (1) whether the Class Dishwashers contain one or more defects that have caused Overheating Events; and (2) whether Plaintiffs and Class Members can recover damages based on those alleged defects.

### C.   The Typicality Requirement Is Satisfied for Settlement Purposes

The third certification prerequisite is that the plaintiff's claims be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). For purposes of the Settlement, Defendants stipulate that Plaintiffs' claims are typical of the claims of the Class. As Class Dishwasher owners, Plaintiffs are members of the Class and allege that they have been damaged by the same conduct that they claim has damaged other Class Members. Moreover, the claims of the named Plaintiffs and other Class Members are

1  based on the same theories, such as breaches of implied and express warranties. For

2  settlement purposes, Plaintiffs' claims are not in conflict with the claims of the Class.

3      **D.    Plaintiffs Are Adequate Settlement Class Representatives**

4      The fourth certification prerequisite is that Plaintiffs and their attorneys be able

5  to fairly and adequately represent the interests of the Class. Fed. R. Civ. P. 23(a)(4).

6  For purposes of Settlement, Defendants stipulate that Plaintiffs will fairly, fully, and

7  adequately protect the interests of the Class and that Plaintiffs and Class Counsel have

8  no interests that conflict with, or are adverse to, those of the Settlement Class. Further,

9  Defendants agree that Class Counsel are experienced in prosecuting class actions.

10     **E.    Questions of Law and Fact Common to the Class Predominate Over**

11          **Individual Questions for Settlement Purposes**

12     Plaintiffs also must prove that questions common to members of the Settlement

13  Class predominate over individual questions and that a class settlement is superior to

14  other available methods for the fair and efficient adjudication of the controversy. Fed.

15  R. Civ. P. 23(b)(3). For purposes of the Settlement, Defendants stipulate that common

16  questions predominate based on Defendants' manufacture and sale of the Class

17  Dishwashers and that a class settlement is superior to continued litigation.

18     Even though the warranty laws may vary from state to state, this does not defeat

19  a finding of predominance among a nationwide settlement class. *See Amchem Prods.*,

20  521 U.S. at 622-23. When a court is evaluating a proposed class settlement, "[t]he

21  Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

22  cohesive to warrant adjudication by representation." *Id.* at 623. Here, the Class is

23  sufficiently cohesive based on purchase of the Class Dishwashers.

24     Although the result would be different in a contested trial class certification

25  motion, Rule 23(b)(3)'s requirements are met for purposes of settling this class action.

26  **III.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE**

27     In determining whether a proposed class settlement is fair, reasonable, and

28  adequate, courts consider the following factors: (1) the strength of the plaintiff's case;

(2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 1026). Not all of these factors apply to every settlement. "Under certain circumstances, one factor alone may prove determinative in finding sufficient grounds for court approval." *Nat'l Rural Telecomms.*, 221 F.R.D. at 525-26. The "relative degree of importance to be attached to any particular factor will depend on the unique circumstances of each case." *Sandoval v. Tharaldson Emp't Mgmt., Inc.*, No. EDCV 08-482-VAP(OP), 2010 WL 2486346, at *5 (C.D. Cal. June 15, 2010) (quoting *Officers for Justice*, 688 F.2d at 625). These factors, and especially the first three factors, show that the proposed Settlement is more than fair, reasonable, and adequate.

## A.    The Settlement Is Objectively Fair, Reasonable, and Adequate in Light of the Weakness in Plaintiffs' Case

Judging the reasonableness of a settlement requires the Court to balance "'the strength of the plaintiffs' case on the merits . . . against the amount offered in the settlement.'" *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 526 (quoting 5 Moore Federal Practice, § 23.85[2][b] (Matthew Bender 3d. ed.). This assessment, however, "is not to be turned into a trial or rehearsal for trial on the merits." *Officers for Justice*, 688 F.2d at 625. To the contrary, the court's consideration of the likelihood of success on the merits is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Id*. (citation and internal quotation marks omitted).

Here, several key facts cast substantial doubt on whether this action is properly maintainable as a class action for trial purposes and also make it unlikely that Plaintiffs would succeed on the merits. Those facts include the following:

- More than 99.9% of all Dishwashers, and more than 99.8% of all Class

Dishwashers, never have experienced and never will experience any Overheating Event. As Whirlpool proved in the front-loading washing machine class actions, juries are unlikely to render a classwide liability or damages verdict for class plaintiffs knowing that only a small fraction of class members experienced the alleged defect and, therefore, can make a credible claim that they were injured. Some of the Class Counsel firms (Lieff Cabraser and Chimicles & Tikellis) learned about this problem in the *Glazer v. Whirlpool* jury trial in October 2014, shortly before this case settled.

• Defendants would present evidence showing that the Safety Commission thoroughly investigated the alleged defect over several years and closed its investigation without requiring Whirlpool to take any corrective action. (ECF No. 246-1.) Thus, Plaintiffs would have to convince a jury that Whirlpool's in-house and external engineering experts and the independent, unbiased engineering experts at the Safety Commission were wrong and that Plaintiffs' paid expert witnesses are right.

• Defendants would present evidence of the miniscule incident rates for Overheating Events in the Dishwashers, as well as evidence showing the nearly nonexistent rate of Overheating Events that caused fire or heat damage outside the Dishwasher itself. Defendants would have been able to point to Whirlpool's industry-leading safety standards and testing criteria, which explain why Overheating Events in the Dishwashers do not pose an unreasonable risk to consumer safety but the same issues in its competitors' dishwashers have led to safety recalls.

• Defendants would present evidence showing that the scattered and isolated Overheating Events over 20 years that resulted in flames escaping the product in a handful of incidents typically occurred when someone had removed, disabled, or bypassed the Dishwasher's TCO or another safety feature inside the control console after the Dishwasher had been sold to the original purchaser. Moreover, there was no serious injury associated with the reported Overheating Events.

• To achieve a contested trial class certification, Plaintiffs would have had to overcome the substantial obstacles created by their proposing an enormously

overbroad class of every electronically controlled dishwasher built by Whirlpool over 17 years—more than 18,400,000 Dishwashers—with many relevant differences in design, installation, use, care, service, marketing, warranties, and manifestations of any alleged defects. Plaintiffs' allegations also raise individualized questions of injury, damages, pre-suit notice to Whirlpool or Sears of the alleged breach of warranty, Defendants' opportunity to cure, and material differences among applicable state laws.

   •   Defendants would present evidence from Whirlpool's laboratory testing and from their experts' analyses that contradicts Plaintiffs' defect theory.

   •   If this case did not settle, the Court would have to resolve Defendants' pending motion to dismiss Plaintiffs' Fourth Amended Complaint, which could result in Plaintiffs' losing some or all of their challenged claims. Further, Defendants would file motions for summary judgment based on the discovery they have taken.

   •   Defendants would present evidence showing that Defendants have honored their written warranties and provided free repairs and customer satisfaction benefits under the terms of those warranties, and that they provided many customer satisfaction benefits to customers whose Dishwashers were out of warranty.

   Contrary to these many obstacles to <u>any</u> recovery, the proposed Settlement provides Class Members with certain, immediate compensation. Although the Settlement's benefits are limited, the Class Members are not likely to achieve any classwide recovery without the Settlement. Given the substantial uncertainties of the Rule 23 certification phase, the inherent complexities of any class-action trial, the substantial risk of a judgment unfavorable to Plaintiffs and the Class at trial, and the difficulty in proving classwide damages even if a jury found classwide liability, the proposed Settlement is objectively fair, reasonable, and adequate for the Class.

## B.   Continued Litigation Would Be Risky, Lengthy, and Expensive

   The complexity and expense of class-action litigation is well recognized. *See Linney*, 151 F.3d at 1242 ("[I]t is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements."

(internal quotation mark omitted)). This case is no exception. This litigation would be expected to include resolution of the pending motion to dismiss, further expert discovery, class certification proceedings (with a potential interlocutory appeal under Rule 23(f) by the disappointed parties), summary judgment proceedings, one or more class trials, and one or more post-trial appeals. All of that would require significant time and resources from the parties and the Court. Resolving the putative class claims for <u>all</u> putative class members in all states easily could take five additional <u>years</u>.

The settlement will relieve the parties and the Court of the costs of continuing to litigate this complex case. This factor supports final settlement approval. *See, e.g.*, *Eisen*, 2014 WL 439006, at *4 ("Settlement avoids all possible risks of continued litigation, including the possibility that plaintiffs would not succeed at trial."); *Ritchie v. Van Ru Credit Corp.*, No. CV-12-1714-PHX-SMM, 2014 WL 956131, at *4 (D. Ariz. Mar. 12, 2014) ("Further litigation would not only be contentious, but would likely result in appeals. Settlement curtails further expense, as well as shortens and simplifies the proceedings."); *Gripenstraw v. Blazin' Wings, Inc.*, No. 1:12-CV-00233-AWI, 2013 WL 6798926, at *12 (E.D. Cal. Dec. 20, 2013) (same).

## C.     Investigation and Discovery Have Been Sufficient to Allow Class Counsel to Exercise Sound Judgment in Evaluating the Settlement

"A court is more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." *Nat'l Rural Telecomms.*, 221 F.R.D. at 527 (internal quotation marks omitted); *id.* ("[a] settlement following sufficient discovery and genuine arms-length negotiation is presumed fair.").

Here, the litigation has lasted nearly five years. The parties reached the Settlement only after formal and informal discovery that enabled Class Counsel to evaluate on an informed basis the parties' claims and defenses, including their class certification arguments. As discussed above, Defendants produced many documents

1  and databases, which showed that Plaintiffs could not reasonably hope to recover

2  damages for all Dishwasher purchasers or to persuade Whirlpool to conduct a safety

3  recall. Defendants also produced multiple witnesses for depositions and took the

4  depositions of Plaintiffs. Further, in the months leading up to the Settlement, Plaintiffs

5  disclosed their liability and damages experts' reports. Defendants were preparing their

6  own expert reports when the parties reached a Settlement after six days of mediation.

7      In short, the parties' investigation, discovery, and analyses to date are more than

8  sufficient for Plaintiffs, Class Counsel, and the Court to make informed decisions

9  about the proposed Settlement. Under the circumstances, the judgment of the parties

10  and their respective counsel is entitled to deference. *Id.*

11      **D.    The Settlement Was Reached Through Good-Faith Bargaining**

12      A key factor is whether the class settlement was reached through non-collusive,

13  good-faith bargaining among experienced counsel. *See Eisen*, 2014 WL 439006, at *5

14  ("The Court places a great deal of reliance on the decision by sophisticated parties to

15  agree to settle their dispute."); *In re Heritage Bond Litig.*, No. 02-LC-1475 DT, 2005

16  WL 1594403, at *9 (C.D. Cal. Jun. 10, 2005) (a presumption of correctness is said to

17  attach to a class settlement reached in arm's-length negotiations between experienced

18  capable counsel after meaningful discovery).

19      Here, the Settlement was the product of six days of in-person mediation before

20  a professional mediator, along with many follow-up negotiations by telephone and

21  email over the course of 18 months. After the essential terms of the Settlement were

22  reached, the parties negotiated, but never came to an agreement on, the reasonable

23  amount of attorneys' fees and costs to be paid to Class Counsel. The Court will

24  resolve the parties' dispute regarding the reasonable amount of attorneys' fees and

25  costs. (*See* Prelim. Approval Order at 34; ECF Nos. 218 & 246.) Any order making an

26  award of fees and cost will have no effect on the validity or finality of any order

27  granting final Settlement approval. (Agreement ¶ IX.G.) That is, either side or an

28  objector could appeal solely the Court's award of fees and costs to Class Counsel

1    without affecting the timely delivery of settlement benefits to Class Members.

2         Neither the substantive terms of the proposed Settlement nor its provisions

3    regarding attorneys' fees and costs show that the Settlement Agreement is the product

4    of fraud, collusion, or Plaintiffs' or their attorneys' abandonment of the Settlement

5    Class's interests. Thus, this factor favors final approval of the Settlement.

6    **E.    Except With Respect to Class Counsel's Request for Attorneys' Fees,**

7    **the Objections to the Settlement Are Without Merit**

8         Out of approximately 5,800,000 Class Members, 17 Class Members objected to

9    the Settlement, though one later withdrew an objection. The majority of those

10   objections understandably challenge the Class Counsel's unreasonable request for an

11   excessive amount of attorneys' fees ($15,000,000), which is grossly disproportionate

12   to the actual recovery by Class Counsel's own clients, the Dishwasher owenrs. (*See*

13   ECF Nos. 202-03, 213, 229, 231, 234-36.) Defendants agree with the Class Members'

14   objections to the limited extent those objections challenge Class Counsel's

15   unreasonable and excessive fee request. (*See generally* ECF No. 246.)

16        The remaining objections make one or more of these arguments: (1) that the

17   Settlement provides inadequate relief to the Class Members; (2) that the $100,000

18   payment by Whirlpool to Plaintiff Steve Chambers for the purchase of the Chambers

19   Websites is improper and creates a conflict of interest between Mr. Chambers and the

20   Class; and (3) the contention that Settlement's benefits for non-class Dishwasher

21   owners prejudice the Class Members. The Court should reject each argument.

22   **1.    The Settlement benefits are reasonable and adequate in light of**

23   **the weaknesses of Plaintiffs' case**

24        The objectors are not wrong to think that the Settlement provides only modest

25   benefits to the Class. In fact, rebates (i.e., coupons) dominate the Class relief. (*See*

26   ECF No. 246 at 25-26.) But the Settlement's benefits are not illusory, contrary to one

27   objector's argument. (ECF No. 231 at 5.) The Settlement properly offers cash

28   reimbursement to the tiny fraction of Class Members who actually experience an

Overheating Event and who incurred some out-of-pocket expenses as a result. (Agreement ¶ IV.B.) The Settlement also provides benefits, including a cash option, to the tiny number of Class Members who will experience an Overheating Event in the next few years. (*Id.* ¶ IV.C.) In other words, the benefits are commensurate with the merits of Plaintiffs' case and appropriately reflect that Plaintiffs faced huge risk.

Although the objectors may want more relief, they were not directly involved in the litigation of the case, did not go through Class Counsel's direct experience in the *Glazer v. Whirlpool* class action trial, and fail to fully appreciate the risks and expenses of continued litigation. Even if Plaintiffs had achieved certification of one or more <u>statewide</u> classes, one class-action trial—in which Defendants would prove, among other things, that (1) more than 99.9% of Dishwasher owners never experienced an Overheating Event and thus received exactly what they bargained for and (2) that the Safety Commission thoroughly investigated the alleged defect and required no corrective action of Whirlpool—would have cost Plaintiffs and Class Counsel millions of dollars in litigation expenses and likely was a losing proposition.

The objectors primarily take issue with the fact that the Settlement provides only rebate relief to more than 99.8% of Class Dishwasher owners (ECF Nos. 202, 203, 226 at 2), but rebate, or coupon, relief is not per se prohibited. Here, Class Members who are eligible for only rebate relief <u>are in all likelihood satisfied Dishwasher buyers</u> with no Overheating Event. That is, the rebates in <u>this</u> Settlement are not being used to satisfy claims for hard economic losses; the rebates compensate for speculative claims by uninjured Class Members. *Cf. Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1548 (2016). Thus, it is not unreasonable under the circumstances that the redeemed rebates may have some mutual benefit to Defendants (ECF No. 226 at 2) or that Class Members will have to spend money to receive them (ECF No. 231 at 6).

A few objectors argue that the documentary proof requirement for non-Prequalified Class Members should be removed. (*E.g.*, ECF No. 226 at 12.) The proof requirement is necessary, however, to prevent fraudulent claims, to meet minimum

standards for protecting Defendants' due process rights, and to ensure that Dishwasher owners actually experienced the particular problem this Settlement concerns. Consumers are often unable or unwilling to accurately diagnose whether their appliance suffered the particular problem at issue. Here, the Settlement concerns overheating at the power connection between the electrical wire harness and the Control Board. This can and actually has led to <u>thousands</u> of claims for reimbursement for problems that did not involve the defect the Settlement concerns.

Moreover, the Settlement provides for a set payment of $200 to Class Members who can provide documentary proof of the fact that an Overheating Event occurred and that they experienced an out-of-pocket expense as a result, but not the exact amount of that expense. (Agreement ¶ IV.B.7.a.) That provision, combined with the parties' prequalification of Class Members whom can be identified in Defendants' or the Safety Commission's databases as having incurred some expense for an Overheating Event (which eliminates the documentation requirements for the Prequalified Class Members), is a fair and reasonable compromise.

Finally, inescapably woven into these objections, and likely driving the objections, is the notion that the Settlement's benefits are modest when <u>compared to</u> Class Counsel's requested $15,000,000 fee. (*See* ECF No. 202 ("My objection is that this settlement does nothing for the consumers and is only a way of generating cash payments for the lawyers."); ECF No. 229 ("It appears class counsel structured the settlement so that it advances Whirlpool's business interests by requiring consumers to purchase additional Whirlpool products, at the expense of the class, presumably in exchange for little resistance to requested $15 million in attorneys' fees.").) These legitimate concerns are more appropriately resolved by awarding Class Counsel a fee that is less than their claimed, inflated lodestar, not by rejecting the Settlement that otherwise provides for a fair and reasonable recovery for weak class claims.

**2.      Whirlpool's purchase of the Chambers websites is reasonable**

Whirlpool's purchase of the Chambers Websites, KitchenAidfire.com and

WhirlpoolSafetyDefects.com, is reasonable under the circumstances. As a material term of the Agreement, Whirlpool <u>required</u> that Plaintiff Chambers sell to Whirlpool all of his rights, titles, and interests in those two websites, which Mr. Chambers valued at a much higher amount that the amount Whirlpool agreed to pay. (Agreement ¶ V.C.) That purchase price was based on the parties' lengthy negotiations, which factored in Mr. Chambers's investment of time and money into the creation and maintenance of those sites, the consumer traffic they generated, and other factors relevant to the valuation of a website. (*Id.*) This term was material to Whirlpool because Mr. Chambers (and other persons who visited those sites) posted misleading and confusing derogatory information regarding Whirlpool and its products on those sites (e.g., false allegations that certain dishwashers had caused fires where Whirlpool knew from its own investigation that the incidents did not), inappropriately used Whirlpool's and Sears' brand names, attempted to cause and likely did cause reputational harm to Whirlpool, and diverted consumer internet traffic, including some shoppers, away from Whirlpool's own consumer-facing websites.

### 3. The non-class relief in the Settlement is appropriate here

Three objectors argue that the inclusion of non-class benefits in the Settlement unfairly prejudices the Class Members. (ECF No. 231 at 8; ECF No. 235 at 5-8; ECF No. 236 at 3.) The objectors contend that the inclusion of benefits to non-class Dishwasher owners "improperly dilutes the value of the claims by Class Members" (ECF No. 236 at 3), "substantially dilute[s] the settlement" (*id.*), and "improperly utilize[s] Class monies" (ECF No. 231 at 9). None of that is true.

This is a claims-made settlement with no cap on the payouts. (Prelim. Approval Order at 5.) Thus, the money used to pay non-class Dishwasher owners' claims—i.e., the tiny number who can prove out-of-pocket expenses caused by a documented Overheating Event—will not dilute or reduce payments to Class Members. These dollars are not "Class monies" because they will not reduce any Class funds.

Further, the non-capped, claims-made structure distinguishes this case from

1  those relied on by Mr. Liacopoulos. (*See* ECF No. at 6-7.) Those cases concerned

2  common funds, where the addition of a subclass or non-class group to a settlement

3  truly diluted the funds available for all class members. *See Ortiz v. Fibreboard Corp.*,

4  527 U.S. 815, 824-26, 829 (1999) (discussing the amount of the common fund

5  available for claims and use of a "limited fund" concept); *Melong v. Micronesian*

6  *Claims Comm.*, 643 F.2d 10, 13 (D.C. Cir. 1980) ("Upon the resolution of all claims,

7  payment was to be made from a fixed fund established by Congress."); *Carrera v.*

8  *Bayer Corp.*, 727 F.3d 300, 310 (3d Cir. 2013) (discussing claims against a $14

9  million common fund).

10      Still further, to the extent the objectors' argument is that dropping the non-class

11  relief from the Settlement would create a larger recovery for the Class, they

12  misapprehend Defendants' real-world options. The NewGen and Raptor Dishwasher

13  owners were part of the putative class alleged by Plaintiffs. Thus, the option faced by

14  Defendants was not between <u>no</u> relief to NewGen and Raptor owners or the non-class

15  relief Defendants actually agreed to provide. Defendants' alternative to the Settlement

16  Agreement was to offer to provide those non-class Dishwasher owners with <u>class</u>

17  benefits in exchange for a classwide release by the owners, and that would have

18  caused Defendants to <u>reduce</u> the rebate and other benefits to Class Members.

19      The Settlement's non-class benefits are nothing more than individual offers of

20  settlement to the NewGen and Raptor Dishwasher owners who have experienced, or

21  who will in the future experience, an Overheating Event. Each participating owner

22  will be required to individually release his or her claim against Defendants as a

23  condition of making a claim. (Agreement ¶ IV.D.1.) These individual offers are

24  proper either apart from or in conjunction with the Class Settlement, and they do not

25  dilute the uncapped funds available for Class Members.

## CONCLUSION

27      For all these reasons, Defendants respectfully request that the Court grant the

28  parties' joint motion for final approval to the proposed Settlement.

DEFENDANTS' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL
CASE NO. 8:11-cv-01733-FMO-ANx

1    Dated: July 8, 2016                  WHEELER TRIGG O'DONNELL LLP

2
                                     By:  *s/ Michael T. Williams*
3                                         Michael T. Williams

4                                         Attorneys for Defendants,
                                          Whirlpool Corporation,
5                                         Sears Holdings Corporation,
                                          and Sears, Roebuck and Co.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL
CASE NO. 8:11-cv-01733-FMO-ANx