# EXHIBIT C
# (Redacted Version)

```
1                 IN THE UNITED STATES DISTRICT COURT

2                FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4     _____
                                     )
5     STEVE CHAMBERS, et al.,        )
                                     )
6                    Plaintiffs,     )
                                     )
7          vs.                       )   8:11-cv-01733-FMO (ANx)
                                     )
8     WHIRLPOOL CORPORATION, et al., )
                                     )
9                    Defendants.     )
      _____)
10

11

12

13                 DEPOSITION OF CHRISTINE KNOTT

14                Taken on Behalf of Plaintiffs

15                       June 30, 2016

16

17

18          BE IT REMEMBERED that, pursuant to the Federal

19    Rules of Civil Procedure, the deposition of CHRISTINE KNOTT

20    was taken before SUSAN G. WALKER, a Registered Professional

21    Reporter for Maryland, on Thursday, the 30th day of June,

22    2016, in the offices of Rifkin, Weiner, Livingston, Levitan

23    & Silver, 7979 Old Georgetown Road, Suite 400, Bethesda,

24    Maryland, commencing at the hour of 10:00 a.m.

25
```

```
 1                     CHRISTINE KNOTT

 2   was thereupon produced as a witness and, having been first

 3   duly sworn on oath, was examined and testified as follows:

 4

 5            MR. SCHWARTZ:  I'm Steve Schwartz from Chimicles &

 6   Tikellis.  I've been appointed class counsel by the Court.

 7   I represent the plaintiffs in this litigation.

 8            MR. HOWARD:  Wade Howard, here for purposes of

 9   presenting Ms. Knott for her deposition.

10            MR. WILLIAMS:  Mike Williams, Wheeler Trigg

11   O'Donnell, representing Whirlpool Corporation, Sears Holding

12   Corp., and Sears Roebuck & Company, and my colleague, Andrew

13   Myers, also representing the Sears entities and Whirlpool.

14            MR. SCHWARTZ:  And Mr. Williams and Mr. Myers are

15   participating by telephone today.

16

17                     EXAMINATION

18   BY MR. SCHWARTZ:

19       Q   Ms. Knott, could you spell your full name, please.

20       A   Christine, C-H-R-I-S-T-I-N-E.  Last name Knott,

21   K-N-O-T-T.

22       Q   Is Knott the name you were born with?

23       A   No, it was not.

24       Q   What name were you born where?

25       A   I was born with Christine Ann Cory, C-O-R-Y.
```

```
 1        Q     Any other reason that you know of?

 2        A     No.

 3        Q     How many times have you spoken to Mr. Bandas, if

 4   any?

 5        A     I haven't.

 6        Q     Have you spoken with any lawyers at Mr. Bandas'

 7   firm, or did you only speak with the paralegal, Ms. Lopez?

 8        A     I spoke with Donna about it.

 9        Q     So you haven't spoken with any lawyers at Mr.

10   Bandas' firm.  Is that correct?

11        A     Correct.

12        Q     About how many times total have you spoken with

13   Ms. Lopez about this case?

14        A     Every day.

15        Q     You speak with her almost every day about this

16   case?

17        A     Well, every day we speak.  In general, we go over

18   items that she's sent me, texted me, I've sent back.

19        Q     About how many times a week do you speak with Ms.

20   Lopez?

21        A     I speak to her every day.

22        Q     Because she's a good friend?

23        A     Yes.

24        Q     So tell me if I'm wrong.  You speak with her about

25   what I'll call legal stuff related to this case, plus you
```

1    also speak with her about the other stuff you talk about as

2    friends.

3         A    Correct.

4         Q    Have you ever spoken with Ms. Lopez with someone

5    else on the phone line, like a conference call?

6         A    No.

7         Q    Have you ever spoken with Ms. Lopez while you were

8    on the phone with someone else in the room with you?

9         A    No.

10         Q    Besides Ms. Lopez and your husband, who else have

11   you spoken with regarding this case and your objection?

12         A    No one.

13         Q    Well, you've spoken with Mr. Howard, of course.

14         A    I'm sorry.  Legal counsel.

15         Q    Okay.  Let's talk about lawyers.  You haven't

16   spoken with any lawyer from the Bandas firm.  Right?

17         A    Correct.

18         Q    You've spoken with Mr. Howard, who is a lawyer who

19   says he's representing you just for purposes of this

20   deposition.  Right?

21         A    Correct.

22         Q    How many times have you spoken with Mr. Howard?

23         A    For the past week.

24         Q    I just said how many times.

25         A    Oh.  I don't know.  We spoke quite a bit over the

```
 1   week.

 2        Q    Let me try to break it down.

 3        A    Yeah, I was going to say, it's kind of like, I

 4   don't count my phone calls.

 5             MR. HOWARD:  You can clarify.  We've had probably

 6   eight phone calls between last night and this morning just

 7   on when she's going to pick me up.

 8             THE WITNESS:  Correct.

 9   BY MR. SCHWARTZ:

10        Q    Okay.  So let me try to break it down.  I'm not

11   trying to trip you up or anything.  You spoke with Mr.

12   Howard before the deposition started today.  Correct?

13        A    Correct.

14        Q    Did you also speak with him yesterday?

15        A    Yes.

16        Q    Before yesterday, how many times have you spoken

17   with him?

18        A    Maybe once or twice, approximately.

19        Q    And about how much time do you think you've spent

20   talking with him, not about logistics about picking you up

21   or where you would be, but without telling me what you

22   talked about, about how much time have you spent

23   substantively talking about this deposition?  I'm just

24   asking for a number of minutes or hours or seconds.

25        A    I don't tend to count my minutes.
```

```
 1                    MR. HOWARD:  Oh, that's -- never mind.

 2     BY MR. SCHWARTZ:

 3        Q    Have you spoken with him more than two hours on

 4     substantive issues related to this deposition?

 5        A    No.

 6        Q    Have you spoken with him more than one hour about

 7     substantive issues related to this deposition?

 8        A    No.

 9        Q    Okay.  So something less than an hour?

10                    MR. HOWARD:  Let's clarify.  You can ask her this.

11     We talked on the drive over.  That's the only time we've

12     talked about this deposition.

13                    MR. SCHWARTZ:  About the substance.

14                    MR. HOWARD:  Yes.  Other than that, it's about

15     getting her fee agreement executed.  I know there's

16     attorney/client, but except for the drive over here today,

17     that is the only time we talked about this case.

18     BY MR. SCHWARTZ:

19        Q    Are Mr. Howard's representations accurate from

20     your point of view?

21        A    Correct.

22        Q    Thank you.

23                    MR. HOWARD:  We would have spent a long time

24     talking about nothing.

25     BY MR. SCHWARTZ:
```

1        Q     Have you ever spoken with any other lawyers

2   besides Mr. Howard?

3        A     No.

4        Q     Which lawyers are representing you in this case?

5        A     Mr. Bandas is representing me.  I thought he was

6   the only one, other than, of course, Wade being here for the

7   deposition here today.

8        Q     And Wade being Mr. Howard?

9        A     I'm sorry.  Yes.  I apologize.

10             MR. HOWARD:  That's all right.

11  BY MR. SCHWARTZ:

12       Q     Besides Mr. Howard's firm and Mr. Bandas' firm, is

13  there any other lawyer or any other firm that's representing

14  you?

15       A     Not that I'm aware of.

16             What about -- you asked -- Mr. Howard and Mr.

17  Bandas are representing me.  Wouldn't there be -- well, no.

18  I'm sorry.  You're right.

19             MR. HOWARD:  If you've got something to say, go

20  ahead and say it.

21             THE WITNESS:  I was just wondering -- no.  I'm

22  fine.  That's it.

23  BY MR. SCHWARTZ:

24       Q     If you need to change ----

25       A     No.

```
 1        Q     How was it sent to you?  By email or by FedEx, or

 2   how was it sent to you?

 3        A     Email.

 4        Q     Did you print out a copy or did you read it on

 5   your computer?

 6        A     I printed it.

 7        Q     Did you write any notes on the printed copy?

 8        A     I don't recall.

 9        Q     Do you still have the printed copy?

10        A     I do.

11        Q     And then did you sign the objection or some

12   paperwork in connection with the objection?

13        A     Yes.

14        Q     And how did you send that back to Mr. Bandas?

15        A     I sent it back via email.

16        Q     So did you scan your signed page and then send a

17   PDF of the scan back?

18        A     Correct.

19        Q     Was that sent to Mr. Bandas or to Ms. Lopez or

20   someone else?

21        A     It was sent to Donna Lopez.

22        Q     Was Ms. Lopez the person who transmitted to you

23   the objection and any paperwork you had to sign?

24        A     Correct.

25        Q     And in terms of emails you received from the
```

```
 1    Bandas firm, were they all from Ms. Lopez, or do you get

 2    some emails from other people within that firm?

 3         A    Primarily her.

 4         Q    Did you get any emails from anyone else in the

 5    firm?

 6         A    Not that I'm aware of.

 7         Q    Have you received any emails from any other

 8    lawyers, such as Mr. Howard?

 9         A    I received Mr. Howard's form; yes.

10         Q    By email?

11         A    Yes.  Via email.

12         Q    Other than Mr. Howard and Ms. Lopez, is there any

13    lawyer who has communicated with you either by phone or by

14    email?

15         A    No.

16         Q    Or in any other way?

17         A    No.

18         Q    Do you know whether you filed one objection or two

19    objections or three objections in this case?

20         A    I'm sorry.  I don't -- why would I ----

21         Q    I'm not asking why.  I'm just asking for a number.

22    Do you know whether you filed just one objection or whether

23    you filed a first objection and then a second or amended

24    objection or a third or supplemental objection?

25         A    It was the one objection.  The initial one.
```

```
 1   is it your testimony that, to the extent the record shows

 2   that ----

 3              MR. HOWARD:  Listen to his question.

 4   BY MR. SCHWARTZ:

 5       Q    To the extent the record shows that, would that

 6   just have been mistaken testimony?

 7       A    I'm sorry.  Repeat what you just said.

 8       Q    Sure.  Are you certain that when you got the

 9   objection and reviewed it, are you certain that you asked

10   questions of Ms. Lopez about the objection before you signed

11   and authorized its filing?

12       A    I know I asked questions.  I don't know exactly --

13   I don't recall exactly what the questions were.

14       Q    I don't want to know what the questions were.

15       A    Right.  I understand.  I had questions for her

16   regarding it.  I mean, I'm not a legal individual, so

17   obviously I had questions regarding the terminology.

18       Q    Did you make any edits or suggest any changes to

19   the objection that was sent to you?

20       A    No.

21       Q    Did you do any independent research on this case

22   or anything else before you authorized your objection to be

23   filed?

24       A    No.

25       Q    Had you ever retained the Bandas Law Firm to do
```

```
 1   any legal work for you before this case?

 2        A    No.

 3        Q    Before you retained the Bandas Law Firm, what, if

 4   anything, did you know about the reputation of the Bandas

 5   Law Firm or Mr. Bandas?

 6        A    I knew nothing.

 7        Q    Do you know whether any courts have criticized him

 8   for unethical behavior?

 9        A    No.

10        Q    Do you know today whether he's been criticized by

11   courts for unethical or improper behavior?

12        A    No.

13        Q    Do you know whether he's been called an

14   extortionist by courts?

15        A    No.

16        Q    Is that something that would concern you if that

17   were true?

18        A    Yes.

19        Q    Why?

20        A    Really?  I mean, there's moral issues obviously

21   there, and my husband is an officer of the court, so I would

22   have to be concerned.

23        Q    Can you explain to me what your objections are to

24   the proposed class action settlement.

25        A    The attorneys fees were quite high.
```

1    reasonable, and person B lives in San Francisco where it's

2    more expensive, and they have to pay $300 for the same

3    repair, you at least understand that it would be rational

4    that people would get the full recovery of what they

5    actually paid, but not more.  You wouldn't have someone from

6    Maryland get paid more simply because someone from San

7    Francisco had to pay more.  Are you with me?

8         A    Correct.  Yes.

9         Q    Okay.  So let's talk about the attorneys fees in

10   this case.  Do you know how the attorneys fees in this case

11   are going to be paid?

12        A    Not exactly.

13        Q    Do you understand that only the judge can approve

14   the class action's lawyers' attorneys fees?

15        A    Yes.

16        Q    Do you understand we have requested 15 million as

17   class counsel to cover our attorneys fees and the

18   out-of-pocket expenses we've incurred?

19        A    Yes.

20        Q    Do you know how much in out-of-pocket expenses

21   we've incurred?

22        A    No.

23        Q    Do you know whether it's more than $100,000?

24        A    No.

25        Q    Do you know whether it's more than $300,000?

```
 1        A    No.
 2        Q    Does it matter to you how much the out-of-pocket
 3   expenses are?
 4        A    Not particularly.
 5        Q    Do you know whether our ability to get paid is
 6   purely contingent on what the court awards?
 7        A    Do I know that personally?
 8        Q    Yes.
 9        A    No.
10        Q    Do you know whether we've been paid anything
11   during the course of this litigation so far?
12        A    No.
13        Q    Do you know that if the litigation was not
14   successful and there was no recovery against Whirlpool that
15   the class action lawyers would have received nothing for
16   their time?
17        A    No.
18        Q    I believe you have a retainer with Mr. Howard
19   where there's a number of hours he works at a billing rate,
20   and that generates what's called the lodestar.  Do you
21   understand that?
22        A    Yes.
23        Q    Do you know whether class actions lodestar, the
24   hourly rates that we charge times the number of hours we put
25   in, do you know whether that's more or less than a million
```

```
 1   case.  But I think you understand the concept.  If a lawyer

 2   and a client have a 40 percent agreement, where the lawyer

 3   gets 40 percent of any recovery, say it's a $1,000,000

 4   recovery, the lawyer is going to get $400,000 in fees, only

 5   spent $100,000 of time, so he's getting what we call

 6   4-multiple on his time.

 7            Do you think that's reasonable that he would get

 8   more than his lodestar in that case because he took risk?

 9       A    Yes.  He negotiated up front in the retainer what

10   he was going to get.  And regardless of whether -- there's

11   no compromise there, as far as I know, in your retainer

12   agreement that you originally sign.  I can't negotiate it,

13   in other words, after.  Or the lawyer can't.

14       Q    I want you to assume that our fees and expenses in

15   this case, our lodestar and expenses are $9,000,000.  Okay?

16   For class counsel.  Okay?

17       A    Okay.  Yes.

18       Q    Do you believe any fee award under that

19   circumstance that was a single penny above that $9,000,000

20   would be unreasonable and objectionable?

21       A    No.

22       Q    Do you know how much more than a $9,000,000 fee

23   award and expense award in that case would be reasonable to

24   the point where you would say, I don't think I should object

25   to it?
```

1         A     No.

2         Q     Do you think if there's $9,000,000 in lodestar and

3    expenses, do you think a fee that's three times that amount,

4    $27,000,000, would that be objectionable?

5         A     Repeat that.  I'm sorry.

6         Q     Sure.  Why don't you assume that class counsel

7    spent about $9,000,000 in lodestar plus expenses.  Okay?

8         A     Yes.

9         Q     I'm trying to get a sense of how much above

10   $9,000,000 gets to the point where you say that's way too

11   much, it should be objectionable.  Okay?

12        A     Yes.

13        Q     So how about a 3-multiple?  Nine times three is

14   27.  Do you believe if a $27,000,000 fee would be awarded on

15   those numbers, that would be unreasonable?

16        A     I'm sorry.  Bear with me.  You're talking --

17   you're acting as the plaintiffs' attorney or Whirlpool's

18   attorney?

19        Q     Not Whirlpool's attorney.  Plaintiffs' class

20   action attorneys.

21        A     Okay.

22        Q     And let's step back.  You understand that

23   Whirlpool's lawyers are getting paid by the hour and get

24   paid during the course of this litigation.  You understand

25   that.  Right?

```
 1       A     I would assume; yes.

 2             MR. WILLIAMS:  Objection to the extent it assumes

 3  facts not in evidence.

 4             Go ahead.

 5  BY MR. SCHWARTZ:

 6       Q     But that's your expectation; that the big

 7  corporations' lawyers would be getting paid during the

 8  course of the litigation.

 9             MR. WILLIAMS:  Objection.

10             MR. HOWARD:  You can answer.  Whatever you know.

11             THE WITNESS:  Again, I don't know for a fact, but

12  I would imagine that the attorneys that are working with or

13  for Whirlpool are getting paid by them.  They wouldn't do it

14  for free.

15  BY MR. SCHWARTZ:

16       Q     So now let's talk about the class action lawyers.

17  I happen to be one of them in this case.  I've been

18  appointed as co-lead counsel.  I want you to also assume we

19  haven't been paid a single dime in this case yet, and the

20  only way we'll ever get paid in this case is contingent on

21  success and only if the judge awards it and that award is

22  not overturned by an appeals court.  Okay?  Are you with me?

23       A     Yes.

24       Q     Assume that class counsel's lodestar and expenses

25  are $9,000,000.  Okay?
```

```
 1        A    Yes.

 2        Q    And what I'm asking is whether you believe that an

 3   award of $27,000,000, which would be a 3-multiple of the

 4   $9,000,000, would that be so high that you believe it would

 5   be objectionable?

 6        A    Is that what the attorneys fees would be?

 7        Q    What the class counsel attorneys are being paid to

 8   compensate them for their time and out-of-pocket expenses.

 9             MR. WILLIAMS:  Objection to the extent that that's

10   an incomplete and unfair hypothetical, and also to the

11   extent that it's calling for a lay opinion.

12             You can answer if you can.

13             MR. SCHWARTZ:  One comment, Mr. Williams.  I don't

14   think you can -- I'm sorry.

15             Go ahead.  You can answer subject to his

16   objection.

17             THE WITNESS:  You're going to have to repeat it

18   now.

19             MR. SCHWARTZ:  Mike, you don't have to repeat your

20   objection.  It will apply to this question, so you don't

21   have to restate it again.

22   BY MR. SCHWARTZ:  (continuing)

23        Q    Assuming that class counsel spent $9,000,000 in

24   time and expenses in this case, do you believe an award for

25   fees and expenses of three times that, or $27,000,000 would
```

1   be so high that you would be objecting to that?

2       A    If it were three times the amount being awarded to

3   you by the judge?

4       Q    Yes.

5       A    Then I wouldn't object to it.

6       Q    So I guess you wouldn't object if it was 18

7   million or two times the 9 million?

8       A    No.

9       Q    How about if the judge awarded five times the nine

10  million and awarded us $45,000,000 for fees and expenses.

11  Would that be too high?

12      A    I don't know.

13          MR. WILLIAMS:  Same objection, to the extent it's

14  an incomplete and unfair hypothetical.

15          You can answer.

16          MR. SCHWARTZ:  Mike, I will give you a continuing

17  objection to this whole line of questioning, so you don't

18  have to repeat it.

19          THE WITNESS:  Okay.  So ----

20  BY MR. SCHWARTZ:

21      Q    Suppose the judge says, because of the contingent

22  risks class counsel take and because of the results they've

23  obtained, I'm going to give them five times their lodestar

24  and expenses, and in this hypothetical it's five times nine

25  million, or 45 million.  Does that get too high for you,

```
1               MR. SCHWARTZ:  We're going to go back on the

2     record.  And so we're back on the record after a short

3     break.  My understanding is -- and I'll let Mr. Myers speak

4     to this -- that Mr. Myers was off the telephone for a while,

5     at least during the morning's testimony.  And I'm not sure

6     whether Mr. Williams is still on.  But why don't Mr. Myers

7     and Mr. Williams just let us know, so we have a clear

8     record.

9               MR. MYERS:  I was off for about two minutes and

10    got back on.

11              MR. SCHWARTZ:  That was Mr. Myers.

12              MR. WILLIAMS:  I'm back on, Steve.

13              MR. SCHWARTZ:  Okay.  We're ready to proceed.

14    BY MR. SCHWARTZ:  (continuing)

15         Q    Ms. Knott, before I get back into the substantive

16    questions, I want just to make sure.  During the break did

17    you have any conversations with your counsel, Mr. Howard,

18    that don't relate to a privilege issue, meaning

19    attorney/client privilege, but related to the substance of

20    your testimony for the first two hours of your deposition?

21         A    No.

22         Q    Okay.  Now, we just looked at the declaration

23    portion of your objection that you had filed, and a couple

24    of the attachments to that.  Why don't we now look at the

25    retainer you signed with Mr. Bandas.
```

```
 1              So we'll mark that as Exhibit 2.

 2                   (Exhibit 2 marked for identification.)

 3   BY MR. SCHWARTZ:

 4       Q     My first question will be whether you can verify

 5   whether this is a true and correct copy of the retainer you

 6   signed with the Bandas Law Firm.

 7       A     Yes.

 8       Q     And is that your signature on the last page?

 9       A     Yes.

10       Q     It says signed and accepted this blank day of

11   February, 2016, but there is no date in the blank.  Do you

12   know whether you signed it in February 2016, or do you know

13   whether it was later?  And since you're looking through

14   papers, if you look at a paper that helps you figure that

15   out, just let me know that.  You can look at the original

16   version, if that helps you.

17       A     That's what I was looking for.

18       Q     Okay.  I think the original might be the very last

19   document in your pile.

20       A     Most likely.

21       Q     Is it blank there, too, on the original?

22       A     Yeah.

23       Q     Can you just look at the original and the actual

24   and just confirm for me that the copy is the actual copy of

25   your original signature?  I just want to make sure we have
```

1    exactly the right copy.

2         A    Yes.

3         Q    And that's the same signature of yours with what

4    I'll call the big C and the big K that you talked about as

5    one of your fraud prevention or forgery prevention

6    techniques.  Right?

7         A    Yes.

8         Q    And it looks like Mr. Bandas has a scribble

9    signature.  Is that fair?

10        A    Yes.

11        Q    And, again, that's the way you sign your name.

12   Right?

13        A    Yes.

14        Q    And right above -- so let's talk about the date.

15   Do you know whether you signed this in February 2016, or was

16   it in May 2016 when the objection was filed?  Why don't you

17   tell us your best recollection when you signed this retainer

18   agreement.

19        A    I signed this retainer agreement at the onset of

20   -- so it would have been -- I'm sorry.  Bear with me,

21   please.  I'm sorry.  Where is the original date on this?

22        Q    This is what you brought as your original, and

23   this is the copy that was produced to us.  So I don't know

24   more than what's on this page.  And you have your original.

25        A    Yeah.  Mine is blank.

```
1        Q    And just so we're clear, we made a copy here in

2   this office of the original you brought with you.

3        A    Yes.  It was February.  Exact date, I don't know.

4   But, yes, it was in February.

5        Q    Do you have a high degree of confidence that it

6   was in February?

7        A    Yes.  Yes.

8        Q    And I see -- so no one filled in the date, and you

9   didn't fill in the date.  Was that just an inadvertent

10  mistake, or was there some reason behind that?

11       A    No.  I overlooked it.

12       Q    So you take responsibility for that mistake?

13       A    Yes.

14       Q    Did you, like you talked about before, read this

15  entire agreement before you signed it?

16       A    Yes.

17       Q    Now, I assume you signed a retainer agreement for

18  your medical malpractice case with your lawyers there.

19  Right?

20       A    Yes.

21       Q    And we know that you've signed some retainer

22  agreements in this case, one with Mr. Howard and one with

23  Mr. Bandas.  Right?

24       A    Yes.

25       Q    Have you ever signed any other legal retainer
```

```
 1   agreement with any lawyer?

 2       A    Pertaining to?

 3       Q    Any legal action.

 4       A    No.

 5       Q    So you read this Bandas retainer agreement cover

 6   to cover?

 7       A    Yes.

 8       Q    Was it important for you to read it to make sure

 9   everything was accurate and that you agreed to everything,

10   because it was a legally binding agreement?

11       A    Yes, it was important to understand the terms.

12       Q    And, in fact, if you see right above your

13   signature, it says, I certify and acknowledge that I have

14   had the opportunity to read this agreement, et cetera.

15   Right?

16       A    Yes.

17       Q    And you took advantage of that opportunity.

18   Right?

19       A    Yes.

20       Q    So let's go on to the first page of this

21   agreement.  And in section 1.2 it talks about that the

22   Bandas firm is a Texas firm located in Texas.

23            Do you see that?

24       A    Yes.

25       Q    It says, however, ██████████████████████
```

1       Q    

13      Q    My question is whether it's important to you

14  whether or not Mr. Bandas has entered his appearance or

15  sought to be admitted to the Central District of California

16  in order to present your objections to that court.

17      A    Yes.

18           MR. HOWARD:  Calls for speculation.

19           You can answer.

20           THE WITNESS:  Yes.

21  BY MR. SCHWARTZ:

22      Q    Tell me why it's important to you.

23      A    He's my representative.  So, therefore, it would

24  be important for me for him to be there to represent me.

25      Q    Okay.  Now, Mr. Howard -- do you understand the

Christine Kiku
June 30, 2016

```
 1        Q    Well, I am telling you that.  But that's what you

 2   expect.  Right?

 3        A    Yes.

 4        Q    Would you also expect that if we just lost this

 5   case and got zero, that we would get zero payment?

 6        A    Yes.

 7        Q    Do you think that's fair, even if we put as much

 8   as $9,000,000 of lodestar and expenses?

 9        A    Well, you signed the agreement.

10        Q    When you say I signed the agreement, I agreed to

11   take the case on a contingent basis.

12        A    Yes.  Correct.  I apologize.

13        Q    And contingent lawyers live with that risk, and

14   that's just part of the fairness when you do something on a

15   contingent basis.  Right?

16        A    Correct.

17        Q    Same thing with respect to your lawyer, Mr.

18   Bandas.  Is it your expectation that if he is not able to

19   get a material improvement to the settlement or win any of

20   his objections, is it your expectation that he will just not

21   get paid, just like another losing contingent lawyer?

22        A    Yes.

23        Q    Have you agreed that Mr. Bandas can be secretly

24   paid without the judge in this case knowing about the

25   payment, in order to make him go away?
```

```
 1       A    No.

 2       Q    Do you think that would be proper, for me to pay,

 3  or some other class counsel to pay, Mr. Bandas money to

 4  withdraw your objection without any benefit to the class?

 5            MR. HOWARD:  Objection.  Calls for speculation.

 6  BY MR. SCHWARTZ:

 7       Q    I'm just asking what you believe.

 8       A    Okay.  No.

 9       Q    Do you think it would be proper for class counsel

10  to come to you and say, if you withdraw your objection and

11  don't get any benefit to the class or anything else you've

12  asked for in your objection, we will pay you $5,000 to go

13  away?  Do you think it would be appropriate for me to make

14  that offer to you?

15            MR. HOWARD:  Objection.  Calls for speculation.

16            THE WITNESS:  No.

17  BY MR. SCHWARTZ:

18       Q    Do you think it would be appropriate for you to

19  accept that?

20       A    No.

21            MR. HOWARD:  Objection.  Calls for speculation.

22  BY MR. SCHWARTZ:

23       Q    If class counsel offered to pay you money to

24  withdraw your objection, and without getting any benefit to

25  the class, would you reject that because you think it's
```

```
 1    improper?

 2              MR. HOWARD:  Objection.  Calls for speculation.

 3              THE WITNESS:  Yes.

 4    BY MR. SCHWARTZ:

 5        Q    And if we made the same offer to both you and Mr.

 6    Bandas, would you instruct your attorney not to accept such

 7    an offer?

 8              MR. HOWARD:  Objection.  Calls for speculation.

 9              THE WITNESS:  Yes.

10    BY MR. SCHWARTZ:

11        Q    And explain why.

12        A    I'm in this as a class action.  And if no one else

13    in the class action is going to get the same reimbursement,

14    then it's not fair for me to get an unfair reimbursement

15    that everybody in the class is not receiving.

16        Q    And is also part of your discomfort about such

17    payments your belief that payments made to people in class

18    actions, including lawyers and including individuals who are

19    class members, that those are payments that should be

20    reviewed and approved by the presiding judge or presiding

21    court?

22              MR. HOWARD:  Objection.  Calls for speculation.

23              THE WITNESS:  Yes.

24    BY MR. SCHWARTZ:

25        Q    ████████████████████████████████████████████
```

1        A     Well, we're in a court of law.  So I believe that

2    anything in the court of law should be followed to the

3    letter of the law, and there should be no exceptions.

4        Q     And would you agree with me that, in terms of

5    following the letter of the law, it's better to stay well

6    within the boundaries, as opposed to seeing how close to the

7    line someone can get?

8              MR. HOWARD:  Objection.  Calls for speculation.

9    BY MR. SCHWARTZ:

10       Q     I'm asking for your understanding.

11       A     Oh, I would expect them to be well within the

12   boundaries; yes.

13       Q     And I'm guessing that your husband, as a police

14   officer, probably has the same view.  Well, I'll withdraw

15   that.  I don't want to get into that.

16             But you would expect people who work within the

17   legal system to stay well within the legal boundaries and

18   not just push ethical lines.  Is that fair?

19             MR. HOWARD:  Objection.  Calls for speculation.

20             THE WITNESS:  Yes.

21   BY MR. SCHWARTZ:

22       Q     █████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████████████████

1      █████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

11             Do you see that?

12        A    Yes.

13        Q    Mr. Wade Howard, who is here today, he is

14   representing you for purposes of this deposition.  Correct?

15        A    Yes.

16        ████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

█████████████████

████████████████████████████████████████████

███████████████████

██████████████████

25        Q    And when you agreed to sign the retainer agreement

 1    with Mr. Howard's firm, Liskow & Lewis, and agreed that Mr.

 2    Howard personally would be the lawyer representing you, you

 3    would not have done that if you did not feel comfortable

 4    that he would appropriately represent you and had the proper

 5    credentials and ethical standards.  Fair?

 6         A    Yes.

 7         Q    I think you mentioned before you have not signed

 8    any retainer agreements with any other lawyers for purposes

 9    of this case.  Just Mr. Bandas and Mr. Howard's firm.

10    Correct?

11         A    Yes.

12         Q    ████████████████████████████████████████████

      ████████████████████████████████████████████████

      ████████████████████████████████████████████████

      ████████████████████████████████████████

      ███████████████████████

17         Q    And you have not authorized as of today any other

18    lawyer or law firm besides Mr. Bandas and his firm and Mr.

19    Howard and his firm to represent you in connection with this

20    objection.  Right?

21         A    Yes.

22         Q    Okay.  Let's put that one down, and just so we

23    have it marked, we'll mark as Exhibit 3 your retainer with

24    the Liskow & Lewis firm, which is Mr. Howard's firm.  And my

25    first question will be if you can just verify that this is

```
 1  them, to disclose what judges have said about Mr. Bandas and

 2  his ethical standards.  Agree?

 3            MR. HOWARD:  Objection.  Calls for speculation.

 4            THE WITNESS:  Yes.

 5  BY MR. SCHWARTZ:

 6      Q     And, as you sit here today, do you know of any

 7  specific criticism that any judge has made of Mr. Bandas or

 8  Mr. Hanigan or their firms?

 9      A     No.

10      Q     As far as you know, they may have never been

11  criticized by a single judge anywhere in the United States.

12  Correct?

13      A     Yes.

14      Q     You don't know that for sure; you're just assuming

15  because no one told you before today.  Right?

16      A     I assume.

17      Q     Because no one has told you before today.

18  Correct?

19      A     Yes.

20      Q     So just going back to this Exhibit 4, is there any

21  additional information you want to tell us that could

22  explain why the amended objection filed later on May 27 has

23  a March 18 date on your signature page and has the signature

24  done differently that would help us understand why the dates

25  don't seem to jibe and the signatures are different?
```

```
 1        Q    And I hope you know that the Court does not have

 2   the option to approve a higher payment than we've asked for.

 3   Is that your understanding?

 4        A    Yes.

 5        Q    Do you know whether or not Whirlpool has agreed or

 6   is going to oppose the 15 million request for fees and

 7   expenses?

 8        A    No.

 9        Q    Do you know whether Whirlpool is going to file

10   something that says that we should get a smaller amount of

11   fees and expenses?

12        A    No.

13        Q    Do you know whether Whirlpool in the settlement

14   agreement agreed that it would not oppose our request?

15        A    No.

16        Q    You don't have any idea what Whirlpool's position

17   is going to be with respect to our fees?

18        A    No.

19        Q    And is it your understanding that whatever fees

20   the judge awards and is ultimately paid in this case, do you

21   understand it is Whirlpool who will have to pay the fees?

22        A    Yes.

23        Q    Would it be fair to say that no one has a bigger

24   incentive to try to get our fees and expenses to be as low

25   as possible as Whirlpool, since Whirlpool is actually making
```

 1    the payment?

 2         A    Yes.

 3         Q    And whatever your interest is in -- first of all,

 4    why do you care about how much Whirlpool pays class counsel

 5    for attorneys fees?

 6         A    I'm sorry?

 7         Q    Do you care how much Whirlpool pays class counsel

 8    for attorneys fees in this case?

 9         A    No.

10         Q    Have you ever visited Ms. Lopez in Texas?

11         A    No.

12         Q    What we're going to do is mark the next --

13    actually, we don't have to mark this exhibit.  We're going

14    to look at the preliminary approval order in this case, and

15    it's filing docket number 199, and we have pages 1 through

16    34 that I've placed in front of the witness.

17              Do you see that?

18         A    Yes.

19         Q    Okay.  Now, you've mentioned that you have not

20    read this order by the judge granting preliminary approval

21    of the settlement and setting up the final approval hearing.

22    Right?

23         A    Yes.

24         Q    I'm just going to show you a few things in this

25    order, just to give you some frame of reference, and ask you

 1    some questions.  Okay?

 2              If you go to page 6 and take a look at footnote 5,

 3    do you see where it says Plaintiff Steve Chambers

 4    experienced an overheating event and then developed and

 5    managed a website, www.kitchenaidfire.com, to collect data

 6    to ascertain the extent of the problem.  He prepared a fire

 7    incident report form for consumers to report and provided

 8    the details of their combusting Whirlpool-manufactured

 9    dishwashers.

10              Do you see that?

11        A    Yes.

12        Q    Then it says, he later created a second site,

13    Whirlpoolsafetydefect.com, to collect additional consumer

14    complaints regarding the subject dishwashers.

15              Do you see that?

16        A    Yes.

17        Q    Then it says, as a material term of the

18    settlement, Whirlpool will purchase these websites from

19    Chambers for $100,000.

20              Do you see that?

21        A    Yes.

22        Q    You understand that this preliminary approval

23    order, this is an order written by the judge.  I can show

24    you on the last page, it's signed by our judge, Judge

25    Olguin, in this case.

```
 1              Do you see that?

 2       A    Yes.

 3       Q    So going back to this footnote on page 6, footnote

 4  5, do you remember we talked before about Mr. Chambers

 5  creating some websites to collect information in order to

 6  gather a dossier of information about these overheating

 7  events in Whirlpool-manufactured washers?

 8       A    Yes.

 9       Q    Is it your understanding that what the judge is

10  talking about in footnote 5 is what we were talking about

11  before in the deposition?

12       A    Yes.

13       Q    And I believe you said it was a good thing, so it

14  could have more information collected so information

15  wouldn't be secretive about what could be a possible safety

16  hazard.  Right?

17       A    Yes.

18       Q    You mentioned you had a confidentiality agreement

19  in your medical malpractice case.  I'm not going to ask you

20  about your particular case, but do you have a concern

21  generally that when there are lawsuits brought about safety

22  defects, that those lawsuits are settled where the

23  information about those safety defects is sealed and filed

24  outside of public view and scrutiny, and therefore that can

25  undermine public safety.
```

1           Are you generally familiar with that issue?

2      A    No.

3      Q    Anyway, with respect to what Mr. Chambers did with

4  his websites, you're happy that he created those websites to

5  get a dossier of information about a safety defect which

6  could not only impose a risk to millions of other people,

7  but to you and your family.  Right?

8      A    Yes.

9           MR. WILLIAMS:  Objection to the form of the

10 question.

11          You can answer.

12 BY MR. SCHWARTZ:

13     Q    And do you understand from -- first of all, before

14 reading footnote 5, did you know that Whirlpool is going to

15 pay Mr. Chambers or is proposing to pay Mr. Chambers

16 $100,000 to purchase his websites as part of the settlement?

17     A    No.

18     Q    So before you stepped into the room for your

19 deposition today, did you have an opinion one way or the

20 other whether it was appropriate for Whirlpool to make that

21 purchase if the settlement is approved?

22     A    No.

23     Q    And you understand any such purchase would be

24 reviewed by the judge to make sure it's fair and reasonable

25 to everyone, including the absent members of the class,

 1   including you.  You understand that.  Right?

 2       A    Yes.

 3       Q    I'd like you to go to page 26 of the preliminary

 4   approval order.  I hate to do this to you, but since you

 5   haven't read this before, I'm just going to ask you to read

 6   beginning on page 26, starting with service awards to

 7   plaintiffs.  This is a section that relates to this $100,000

 8   payment to Mr. Chambers.  And if you could read that section

 9   up through the middle of page 28 to yourself, and let me

10   know when you're done.

11            MR. HOWARD:  Is this really necessary?

12            MR. SCHWARTZ:  I'll let you know what my question

13   is going to be.

14   BY MR. SCHWARTZ:  (continuing)

15       Q    My question for that is going to be whether

16   there's anything that's stated by the judge in those two

17   pages that you either disagree with or take issue with or

18   you believe is inappropriate as to all members of the class.

19       A    All right.

20       Q    And, having read that section, can you identify

21   anything that you disagree with in that section?

22       A    No.

23       Q    Does it make sense to you, what the judge wrote

24   there?

25       A    No.  Well, yes.  It makes sense.  I'm sorry.

1        Q     Now, let's go back to -- do you remember in your

2    retainer agreement with Mr. Bandas there was the language

3    about you could possibly get a service award or possibly

4    $5,000?  Do you remember that?

5        A     Yes.

6        Q     Do you know whether -- well, first of all, in

7    addition to Mr. Chambers, who filed a lawsuit in this case,

8    are you aware that there are approximately 18 total

9    plaintiffs who actually filed a lawsuit and got this lawsuit

10   going?

11       A     No.

12       Q     You don't know that?

13       A     No.

14       Q     Are you aware that as part of the settlement the

15   parties have agreed, subject to court approval, that those

16   18 plaintiffs would each get $4,000 as service awards for

17   the work they did in the lawsuit?  Are you aware of that?

18       A     No.

19       Q     I want you to assume that that's the case.  Okay?

20       A     Yes.

21       Q     And also assume that all those plaintiffs did each

22   of the following things:  They retained counsel, filed a

23   lawsuit, reviewed the complaint before it was filed,

24   answered written questions from Whirlpool, provided

25   documents pursuant to request by Whirlpool, sat for a

```
 1    deposition much longer than your deposition will be today by

 2    Whirlpool lawyers, had their dishwashers inspected by

 3    Whirlpool, where the Whirlpool people would come in and

 4    actually inspect them with experts, and reviewed settlement

 5    documents and authorized the lawyers to approve the

 6    settlement after they got their input.

 7            Assuming all of that, do you think there's

 8    anything wrong with a proposed $4,000 payment to them,

 9    subject to additional approval, given all the work they've

10    done in this case, if the settlement is approved?

11        A    No.

12        Q    Would it be fair to say that you have done less

13    work in connection with your objection than those class

14    representatives did throughout this litigation?

15        A    Yes.

16            MR. HOWARD:  Objection.  Calls for speculation.

17    BY MR. SCHWARTZ:

18        Q    Did you get served with a subpoena in this case?

19        A    Yes.

20        Q    And did you see that there was a document request

21    that was attached to the subpoena?

22        A    Yes.

23        Q    Did you go and look for any documents that might

24    have been responsive to that document request?

25        A    Yes.
```

```
 1        Q    And have you produced to your lawyers all those

 2   documents?  And what was produced to us besides the retainer

 3   agreements was three pictures.  Have you produced all the

 4   documents that were responsive to those requests?

 5        A    Yes.

 6        Q    And are you satisfied that you made a full and

 7   complete search for that?

 8        A    Yes.

 9             (Exhibit 7 marked for identification.)

10   BY MR. SCHWARTZ:

11        Q    I've put in front of you as Exhibit 7 a decision

12   in the In Re Cathode Ray Tube Antitrust Litigation dated

13   April 16, 2012, reported at 281 F.R.D. 531.  It's from the

14   Northern District of California, San Francisco Division.

15   I know you've never seen this document before because you

16   probably haven't read legal case decisions.  Is that fair?

17        A    Yes.

18        Q    This was a class action case where there was a

19   settlement and there were some objections filed.  So I'm

20   going to show you some portions of this, and then I'm going

21   to ask you some questions.  Okay?  I will not ask you to

22   cite law.  Okay?

23        A    Yes.

24        Q    So if you can go to page 17 of 18, and if you see

25   -- and I'll point you just to help you.  You see here it's
```

 1    talking about a Mr. Hull who appeared as an objector to the

 2    class settlement, up at the top.

 3              Do you see that?

 4       A    Yes.

 5       Q    Okay.  So let's go down to the second full

 6    paragraph.  Hull's papers do not list counsel, but IP

 7    plaintiffs showed that Hull previously objected to another

 8    class settlement in which he was assisted by Attorney

 9    Christopher Bandas, a professional or serial objector

10    located in Corpus Christi, Texas.

11              Do you see that?

12       A    Yes.

13       Q    That's your lawyer in this case, Mr. Bandas.

14    Right?

15       A    Yes.

16       Q    Has anyone ever told you Mr. Bandas is a

17    professional or serial objector?

18       A    No.

19       Q    Okay.  So further down in that paragraph it goes,

20    Bandas routinely represents objectors to class action

21    settlements and does not do so to effectuate changes to

22    settlements, but does so for his own personal financial

23    gain.

24              Do you see that?

25       A    Yes.

1          Q     Has anyone told you that before today?

2          A     No.

3          Q     When you agreed to become an objector to this case

4     -- and don't tell me anything any attorneys told you, for

5     all my questions.  I don't want to hear about what attorneys

6     told you.  But when you agreed to become an objector in this

7     case, was it your intention to hire a lawyer who has been

8     called by a federal judge a professional or serial objector?

9               MR. HOWARD:  Objection.  Calls for speculation.

10    BY MR. SCHWARTZ:

11         Q     You can answer.

12              MR. SCHWARTZ:  (Continuing) And I'll give you a

13    continuing calls for speculation for this whole line of

14    questions, so you don't have to say it every time.

15    BY MR. SCHWARTZ:    (Continuing)

16         Q     Was it your intent to hire a lawyer who has been

17    called by a federal judge a professional or serial objector?

18         A     No.

19         Q     Was it your intention to hire a lawyer who

20    routinely represents objectors purporting to challenge class

21    action settlements and does not do so to effectuate changes

22    to settlements, but does so for his own personal financial

23    gain?

24         A     No.

25         Q     And then you'll see the footnote down below that,

```
 1   footnote 3, it says professional objectors can levy what is

 2   effectively a tax on class action settlements, a tax that

 3   has no benefit to anyone other than to the objectors.

 4   Literally nothing is gained from the cost, settlements are

 5   not restructured, and the class on whose benefit the appeal

 6   is purportedly raised gains nothing.

 7           Do you see that?

 8      A    Yes.

 9      Q    Was it your intent to hire a lawyer who did that?

10      A    No.

11      Q    So let's go back to the text.  We're still talking

12   about Mr. Bandas here in this decision by this federal judge

13   in San Francisco.

14           He has been excoriated by courts for this conduct.

15           Do you see that?

16      A    Yes.

17      Q    And before today did you know that Mr. Bandas had

18   been excoriated by courts for his conduct in being a serial

19   objector and routinely representing objectors purporting to

20   challenge class action settlements without effectuating

21   changes to settlements that benefit class members?

22           Did anyone ever tell you that?

23      A    No.

24      Q    Was it your intent to hire a lawyer who has been

25   branded that way by a federal district judge?
```

Case 8:11-cv-01733-FMO-JCG   Document 271-1   Filed 07/28/16   Page 45 of 61   Page ID
#:7676
Chri-t--ne Fierro
June 30, 2016
157

```
1         A     No.

2         Q     Is that information you would have liked to have

3    known before you signed your retainer agreement with Mr.

4    Bandas?

5              MR. HOWARD:  Objection.  Calls for speculation.

6              THE WITNESS:  No.

7    BY MR. SCHWARTZ:

8         Q     So you wouldn't care about knowing about that

9    information; what judges have said about Mr. Bandas' ethical

10   standards?

11        A     No.  That's one judge, if what you're telling me

12   is correct.

13        Q     Does the fact that that was just one judge mean

14   anything to you, as opposed to two judges or five judges or

15   ten judges?

16        A     No.

17             MR. HOWARD:  Objection.  Calls for speculation.

18   BY MR. SCHWARTZ:

19        Q     Would you agree that the more judges who say the

20   same thing, the more it's probably true?

21             MR. HOWARD:  Objection.  Calls for speculation.

22             THE WITNESS:  No.

23             MR. SCHWARTZ:  No.  Okay.  Let's test that.  Let's

24   look at Exhibit 8.

25                  (Exhibit 8 marked for identification.)
```

```
 1   BY MR. SCHWARTZ:

 2        Q    I'll represent to you this is a document that was

 3   filed as document 1089-1 in that Cathode Ray case that I

 4   just provided you, and what it does is lists various cases

 5   and what various judges have said about certain lawyers,

 6   including Mr. Bandas.  So I'd like to go through a few of

 7   those with you.  Okay?

 8        A    Okay.

 9        Q    You've never seen this document before either.

10   Right?

11        A    No.  I certainly haven't, sir.

12        Q    So on the first page, let's look at this Brown vs.

13   Wal-Mart case.  Okay?

14        A    Yes.

15        Q    So we have another judge, this one an Illinois

16   state court judge now.  Do you see where it says Christopher

17   Bandas is a Texas lawyer well known for his practice of

18   routinely filing objections in class action settlements?

19             Do you see that?

20        A    Yes.

21        Q    And then it says the Bandas objection filed on

22   behalf of Mrs. Carlson is a generic boilerplate objection

23   prepared and filed by attorneys working for their own

24   personal benefit and not for the benefit of this class or

25   for those lawyers' clients.
```

```
 1              Do you see that?

 2       A    Yes.

 3       Q    Does that statement by this judge raise any

 4  concerns about the ethical standards of Mr. Bandas?

 5              MR. HOWARD:  Objection.  Calls for speculation.

 6              THE WITNESS:  No.

 7  BY MR. SCHWARTZ:

 8       Q    Then, the record before the Court demonstrates

 9  that Bandas is a professional objector who is improperly

10  attempting to hijack the settlement of this case from

11  deserving class members and dedicated hard-working counsel

12  solely to coerce ill-gotten, inappropriate and unspecified

13  legal fees.

14              Do you see that?

15       A    Yes.

16       Q    If that statement were true, would that raise

17  concerns; if Mr. Bandas was trying to hijack settlements

18  solely to coerce ill-gotten, inappropriate and unspecified

19  legal fees?

20              MR. HOWARD:  Objection.  Calls for speculation.

21              THE WITNESS:  I'm sorry.  Repeat that.

22              MR. SCHWARTZ:  Sure.

23              And I've given you a continuing objection to calls

24  for speculation --

25              MR. HOWARD:  Yeah, I appreciate that, but I'll
```

```
 1    make the objections I feel necessary.
 2              MR. SCHWARTZ:  -- for this entire line of
 3    questions.
 4    BY MR. SCHWARTZ:  (continuing)
 5        Q    So subject to the objection about speculation, do
 6    you believe it would be appropriate for your lawyer in this
 7    case to try to hijack a settlement solely to coerce
 8    ill-gotten, inappropriate and unspecified legal fees?
 9        A    No.
10        Q    Do you see where the Court said Bandas has filed
11    virtually identical frivolous objections in South Carolina,
12    Iowa, Missouri, and Florida in settlements of similar wage
13    and hour class actions against Wal-Mart?
14              Do you see that?
15        A    Yes.
16        Q    Does that raise any concerns about Mr. Bandas to
17    you?
18        A    No.
19        Q    Do you see then it goes, in Missouri Bandas' local
20    counsel appeared at the final fairness hearing, but only to
21    withdraw as counsel due to the fact that he could not in,
22    quote, good conscience continue to work toward the strategic
23    objectives outlined by Mr. Bandas, closed quote.
24              Do you see that?
25        A    Yes.
```

```
 1       Q    Does that trouble you at all?

 2       A    No.

 3       Q    Let's go on to the next page.

 4            MR. HOWARD:  Okay.  Just so you know, I'm going to

 5   let this go on for a little bit, and then we're going to

 6   stop it because it has no relevance to her objection since

 7   she was not aware of any of this information prior to her

 8   objection.

 9            MR. SCHWARTZ:  You can say that, but unless you

10   get a protective order, I will ask ----

11            MR. HOWARD:  I'll stop the deposition as being

12   harassing and argumentative, and that you're abusing this

13   witness in just asking her a bunch of irrelevant stuff that

14   has nothing to do with her objection.  And you can take it

15   up with the Court here, and we'll see if I'm right or if

16   you're right.

17            MR. SCHWARTZ:  Okay.  First of all, you cut me

18   off, so just don't do that.  Second of all, I can't stop you

19   if you walk out.

20            MR. HOWARD:  You're right.

21            MR. SCHWARTZ:  But what I can do, and so let me

22   say my piece, is that I don't believe it's proper -- first

23   of all, I think my line of questioning is 100 percent

24   proper.

25            MR. HOWARD:  Well, how is it relevant?  If you can
```

```
 1   explain how it's relevant that you show her information that
 2   she was completely unaware of before her objection, how
 3   that's relevant to her objection, which is what we're here
 4   about, then maybe I'll reconsider.
 5           MR. SCHWARTZ:  I'm testing her prior testimony.
 6   I'm testing the bona fides of the objection that was filed.
 7           MR. HOWARD:  Not based on information she had no
 8   knowledge of before her objection.  It can't have anything
 9   to do with her objection.
10           MR. SCHWARTZ:  Her bona fides and her obligations
11   under the various rules are going to be continuing, and also
12   goes to the extent to which the objection that was filed was
13   proper.
14           But I'm not going to have this debate on the
15   record.  We can have it in front of a court if we have to.
16   All I'm going to say is it would not be proper for you to
17   walk your client out of this deposition when I'm asking
18   questions that don't relate to privilege issues.
19           MR. HOWARD:  Yes.  If it becomes abusive, it is
20   proper to walk out.
21           MR. SCHWARTZ:  Well, you will do what you will do.
22   And I can't stop you from doing what you will do.
23           MR. HOWARD:  Yeah.
24           MR. SCHWARTZ:  We've said our piece, and now I'm
25   going to continue.
```

```
 1            MR. HOWARD:  Yes.  Move along.

 2            MR. SCHWARTZ:  And you will do what you do.

 3   BY MR. SCHWARTZ:  (continuing)

 4       Q    So we're now on page 2 of Exhibit 8.  Do you see

 5   at the top, the bottom of the first paragraph, the content

 6   of the Bandas objection demonstrate that neither Ms. Carlson

 7   nor her counsel has ever visited the settlement website or

 8   read the stipulation of settlement in this case.

 9            Do you see that?

10       A    Yes.

11       Q    Now, in this case you've testified under oath that

12   you did not read the stipulation of settlement in this case.

13   Right?

14       A    Yes.

15       Q    Then there's a discussion about the In Re Dynamic

16   Random Access Memory Antitrust Litigation filed in federal

17   court.  Do you see that?

18       A    Yes.

19       Q    And Mr. Bandas withdrew his objection after

20   further investigation which revealed that Bandas had wholly

21   failed to adhere to his rule 11 obligations to thoroughly

22   investigate his client's claims.

23            Do you see that?

24       A    Yes.

25       Q    Does that raise any troubling concerns on your
```

```
 1    part about the ethical standards Mr. Bandas applied in your

 2    case?

 3              MR. HOWARD:  Objection.  Calls for speculation.

 4              THE WITNESS:  No.

 5    BY MR. SCHWARTZ:

 6       Q    Okay.  Let's go to page 4.  The second case is the

 7    Conroy vs. 3M case.  That's another federal judge.

 8       A    Uh-huh.

 9       Q    In the middle we're talking about a Mr. Bandas

10    client, Mr. [sic] Rogers.  Mr. [sic] Rogers' objections were

11    patently frivolous.  Her cookie-cutter written objection

12    bore no particular relationship to the circumstances of the

13    settlement here, and at the hearing her counsel erroneously

14    referred to this case as involving defective tape.

15              Do you see that?

16       A    Yes.

17       Q    Does that raise any concerns on your part about

18    the lawyer you chose?

19              MR. HOWARD:  Objection.  Calls for speculation.

20              THE WITNESS:  No.

21    BY MR. SCHWARTZ:

22       Q    Let's go to page 5.  There's the Mussmann case.

23              Do you see that?

24       A    Yes.

25       Q    This is a case in Iowa.
```

```
 1        A    Yes.

 2        Q    So we're traversing the country.  Right?

 3        A    Yes.

 4        Q    If you go on to page 6, you see where the judge in

 5   that case said, in the second paragraph, neither Attorney

 6   Bandas nor Attorney Roth advised Mr. Healy that Attorney

 7   Bandas had been found by a Florida court in the Ouellette,

 8   O-U-E-L-L-E-T-T-E, order to be engaging in a conspiracy with

 9   his clients and co-counsel to extort money from class

10   members and class counsel through a similar practice of

11   objecting to the proposed settlement in the flood of

12   Wal-Mart lawsuits.

13             Do you see that?

14        A    Yes.

15        Q    Does that additional statement by a judge -- this

16   time a state court judge -- raise any concerns about the

17   lawyer you chose in this case?

18             MR. HOWARD:  Objection.  Calls for speculation.

19             THE WITNESS:  No.

20   BY MR. SCHWARTZ:

21        Q    Do you see the last paragraph on that page 6 about

22   the attorneys, including Mr. Bandas, spending minimal time

23   and resources?

24             Do you see that paragraph?  Page 6, bottom

25   paragraph.
```

```
 1        A    Yes.

 2        Q    Okay.  Then the last sentence, upon the filing of

 3   the notice of appeal, the professional objector simply waits

 4   for class counsel to succumb to the pressure to pay the

 5   extorted fees in return for dismissing the appeal and

 6   releasing the settlement funds.

 7             Do you see that?

 8        A    Yes.

 9        Q    I think you testified earlier in this deposition

10   that it would be inappropriate for an appeal to be filed in

11   this case where there's a payment to you and Mr. Bandas,

12   with no benefit to the class, to dismiss the appeal.

13             Do you remember that testimony?

14        A    Yes.

15        Q    You're not going to allow that to happen in this

16   case.  Right?

17             MR. HOWARD:  Objection.  Calls for speculation.

18             THE WITNESS:  No.

19   BY MR. SCHWARTZ:

20        Q    Do you have any concern that this judge in Iowa

21   thinks that's exactly what Mr. Bandas does in these cases?

22             MR. HOWARD:  Objection.  What was the question?

23   I'm sorry.

24   BY MR. SCHWARTZ:

25        Q    Do you have any concern that this judge in Iowa in
```

```
 1    the Mussmann case said that that's what Mr. Bandas does;

 2    files appeals to extort payments for dismissals where

 3    there's no responding benefits to the class?

 4         A    No.

 5              MR. HOWARD:  Objection.  Assumes facts not in

 6    evidence.

 7    BY MR. SCHWARTZ:

 8         Q    Let's go on to page 7.  I'll read you another

 9    sentence from that decision from this Iowa judge.

10              This Court concludes that Christopher A. Bandas is

11    a professional objector.  The Court is concerned that

12    Attorney Bandas is seeking to wrongfully use the class

13    action settlement and objection process for personal gain

14    and without any corresponding benefit to any individual

15    objector or to the settlement class as a whole.

16              Do you see that?

17         A    Yes.

18         Q    Right below that, one court describes these

19    efforts by Attorney Bandas and other professional objectors

20    as extortion.

21              Do you see that?

22         A    Yes.

23         Q    But you're still not concerned about your lawyer,

24    Mr. Bandas, and the bona fides he brings to this case.

25    Right?
```

 1              MR. HOWARD:  Objection.  Calls for speculation.

 2              THE WITNESS:  No.

 3    BY MR. SCHWARTZ:

 4       Q    And if we could go to page 8, we're almost done

 5    with this document, there is the In Re Wal-Mart Wage and

 6    Hour Employment Practices Litigation.  It's a multi-district

 7    litigation in federal court in Nevada now.

 8              Do you see that at the bottom of page 8?

 9       A    Yes.

10       Q    So let's go to page 9 in that case.  The Nevada

11    judge wrote, objectors' counsel have a documented history of

12    filing notices of appeal from orders approving other class

13    action settlements and thereafter dismissing said appeals

14    when they and their clients were compensated by the

15    settlement class or counsel for the settlement class.

16              Do you see that?

17       A    Yes.

18       Q    And, again, that's the process that we talked

19    about that you're not going to countenance.  Right?

20              MR. HOWARD:  Objection.  Calls for speculation.

21              THE WITNESS:  Pardon me?

22    BY MR. SCHWARTZ:

23       Q    That's the process that we talked about that

24    you're not going to agree to in this case.  Right?

25              MR. HOWARD:  Objection.  Calls for speculation.

```
 1              THE WITNESS:  Yes.
 2   BY MR. SCHWARTZ:
 3      Q    But you're not concerned that that judge said that
 4   Mr. Bandas had a documented history of doing that?  That
 5   doesn't concern you, does it?
 6      A    No.
 7              MR. SCHWARTZ:  Why don't we take a quick break
 8   because I want to get to my next topic and be organized.
 9                  (Brief recess was taken.)
10   BY MR. SCHWARTZ:
11      Q    Just a few more, and then we'll be done with these
12   cases.  I'm just going to ask you some questions.
13              Are you aware that in the Dennings vs. Clearwire
14   case, which is a case at 924 [sic] F.Supp. 2d, 1270, a
15   federal judge in the Western District of Washington in 2013
16   revoked Mr. Bandas' authorization to practice in the Western
17   District of Washington after he failed to post a bond that
18   was ordered by the Court?
19              Are you aware of that?
20      A    No.
21      Q    Does that raise any concerns with you about
22   whether you've chosen the right lawyer?
23      A    I don't know.  No.
24      Q    How about, does the In Re Hydroxycut Marketing and
25   Sales Practices Litigation, 2013 WL 5275618, that's from the
```

```
 1    Southern District of California in September of 2013, and

 2    there that federal judge found that Mr. Bandas sought

 3    $400,000 to make his objection go away; otherwise, he could

 4    hold the settlement process up.

 5            Does that raise any concerns?

 6            MR. HOWARD:  Objection.  Calls for speculation.

 7    BY MR. SCHWARTZ:

 8        Q    I need an audible response.

 9        A    No.

10        Q    Let's talk about Mr. Hanigan very briefly.  Are

11    you aware in the Roberts vs. Electrolux case that the judge

12    found that objections filed by Mr. Hanigan on behalf of his

13    client misunderstand or misread the settlement agreement or

14    provide no evidence or support?

15            Are you aware that the judge in that case said

16    that?

17        A    No.  I don't know.

18        Q    Are you aware in the Adams vs. AllianceOne

19    Receivables Management case, which is a case from the

20    Southern District of California, docket number 8-248, an

21    objection that was brought by Mr. Hanigan was voluntarily

22    withdrawn after it was revealed that the objector's

23    signature was forged by his attorneys and the objector had

24    no knowledge of the substance of the objection?

25            Were you aware of that?
```

```
 1        A    I don't know.  No.  I don't know.

 2        Q    Would that, if true, raise a concern with you

 3   about whether Mr. Bandas made a wise choice to use Mr.

 4   Hanigan to file your objection in this court?

 5             MR. HOWARD:  Objection.  Calls for speculation.

 6             THE WITNESS:  I don't know.

 7   BY MR. SCHWARTZ:

 8        Q    If you were to learn that any of the attorneys

 9   that are representing you forged a client's signature on a

10   legal document, would you fire those attorneys?

11             MR. HOWARD:  Objection.  Calls for speculation.

12             THE WITNESS:  I don't know.

13   BY MR. SCHWARTZ:

14        Q    Would you consider firing the attorney if you

15   learned that any attorney representing you had forged an

16   objector's signature on a legal document?

17        A    I don't know.

18        Q    Maybe it's something you would consider?

19        A    Possibly.

20        Q    Do you have any understanding as to whether or not

21   you could be personally sanctioned by the Court to pay

22   monetary damages if it's determined that the objections that

23   were filed on your behalf were either frivolous or made for

24   an improper purpose?

25        A    I don't know.
```

```
 1        Q    Do you understand in connection with an ongoing

 2   lawsuit in federal court in New York regarding major league

 3   baseball there's been a motion for sanctions filed against

 4   Mr. Bandas?

 5        A    I don't know.

 6        Q    You don't know that?

 7        A    I do not know that.

 8        Q    No one told you that?

 9        A    No.

10        Q    Is that the kind of information you'd want to know

11   before retaining a lawyer; whether there's pending sanctions

12   motions against that lawyer?

13             MR. HOWARD:  Objection.  Calls for speculation.

14             THE WITNESS:  I don't know.

15   BY MR. SCHWARTZ:

16        Q    Would you want to know before hiring a lawyer

17   whether that lawyer has been accused by a federal judge of

18   forging a signature?

19             MR. HOWARD:  Objection.  Calls for speculation.

20             THE WITNESS:  I don't know.

21   BY MR. SCHWARTZ:

22        Q    Do you believe before you would hire any lawyer

23   you have a responsibility to make sure that lawyer is an

24   ethical lawyer consistent with the standards that you hold

25   yourself up to?
```

```
 1                MR. HOWARD:  Objection, calls for speculation.

 2                THE WITNESS:  I don't know.

 3   BY MR. SCHWARTZ:

 4        Q    Let's take a look at Exhibit 4 again, which was --

 5   this is your first amended objection.

 6             Do you see this is your first amended objection?

 7        A    Yes.

 8        Q    So let's go to page, on this court stamp up top,

 9   page 7 of 16.  I want to look at that first full paragraph.

10   Just read that to yourself quickly.

11        A    Yes.

12        Q    Okay.  So do you see at the bottom of that

13   paragraph where, in the objection that you filed, there's

14   discussion that the settlement will ensure a minimal payout

15   by Whirlpool at the expense of the class in tacit exchange

16   for little resistance to class counsel's request for an

17   exorbitant amount of attorneys fees?

18             Do you see that?

19        A    Yes.

20        Q    Do you know whether or not Whirlpool has tacitly

21   agreed to put up little resistance to class counsel's

22   request for fees?

23        A    I don't know.

24        Q    So when you agreed to file this objection, you

25   agreed to have it filed without knowing whether that
```