# EXHIBIT 4 TO SCHWARTZ DECLARATION

1                    UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF CALIFORNIA
2

3

    STEVE CHAMBERS, et al.,        )
4                                  )
              Plaintiffs,          )
5                                  )
        -vs-                       )   Case No.
6                                  )   8:11-cv-01733-FMO-MJG
    WHIRLPOOL CORPORATION,         )
7   et al.,                        )
                                   )   The Honorable
8         Defendants.             )   Fernando M. Olguin
    _____)
9

10          The deposition of KIMBERLY LEA SMITH, called

11   by the Plaintiffs for examination, pursuant to

12   notice, taken before Erin K. Eckenstahler, Certified

13   Shorthand Reporter and Notary Public within and for

14   the County of Lake and State of Illinois, at

15   403 Grand Avenue, Waukegan, Illinois, commencing at

16   the hour of 9:59 a.m. on the 7th day of July, A.D.,

17   2016.

18

19

20

21

22

23

24

25

```
 1        Q.   Was it the other Waukegan attorney that your
 2   husband spoke with who referred you and your husband
 3   to a different attorney about this case?
 4        A.   Is that a question or a statement?
 5        Q.   It's a question.  I'm trying to find out
 6   what happened after you -- after your husband spoke
 7   with this Waukegan attorney, you mentioned a
 8   referral.  I'm trying to figure out whether it was
 9   this Waukegan attorney who referred you and your
10   husband to some different attorney.
11        A.   Yes.  My understanding is after he spoke
12   with this gentleman, he referred us to Mr. Bandas.
13        Q.   And who had the first conversation with
14   Mr. Bandas in your family?  Was it you?  Was it
15   Mr. -- your husband, Mr. Smith, or was it someone
16   else?
17        A.   Initially, I think it was my husband
18   contacted Mr. Bandas' firm.
19        Q.   Now, I don't want you to tell me any of the
20   substance that was discussed between you and
21   Mr. Bandas, but I want to just get the parameters of
22   things like when there were discussions and how long
23   the discussions were.
24             Your husband -- so as I understand it, your
25   husband had the first communication with Mr. Bandas;
```

```
 1    is that correct?

 2         A.   Yes.

 3         Q.   And then did you ever have direct

 4    discussions with Mr. Bandas?

 5         A.   No, I've never spoke with Mr. Bandas.

 6         Q.   Have you ever spoken with any lawyer in this

 7    case about your objection?

 8         A.   Only through e-mail.  I've worked with

 9    Donna, his paralegal.

10         Q.   Donna Lopez?

11         A.   Yes, I think that is her last name.

12         Q.   Okay.  So you've had some e-mails with

13    Donna Lopez but you've never spoken with her; is that

14    correct?

15         A.   Correct.

16         Q.   You've never spoken with Mr. Bandas?

17         A.   Correct.

18         Q.   And you've never spoken with any other

19    lawyer at Mr. Bandas' firm?

20         A.   Correct.

21         Q.   Now, today for this deposition only, you're

22    being represented by Mr. Wade Howard who is in the

23    room with you; is that correct?

24         A.   That is correct.

25         Q.   And is it your understanding that Mr. Howard
```

```
 1     is not representing you in connection with the

 2     objection.  He's simply representing you for purposes

 3     of this specific deposition?

 4          A.   That is my understanding, yes.

 5          Q.   Okay.  So putting Mr. Howard aside, who

 6     represents you for your objection?  Is that

 7     Mr. Bandas?

 8          A.   Yes.

 9          Q.   Is there any other lawyer who represents you

10     for this objection?

11          A.   Mr. Hanigan.

12          Q.   Okay.  Who is Mr. Hanigan?

13          A.   Mr. Hanigan was the attorney who filed my

14     objection along with Mr. Bandas.

15          Q.   Okay.  So it's your understanding that

16     Mr. Hanigan and Mr. Bandas filed your objection,

17     right?

18          A.   Yes.

19          Q.   And how did you get Mr. Hanigan -- well,

20     first of all, let me ask you, have you ever spoken

21     with Mr. Hanigan?

22          A.   I have not.

23          Q.   Have you ever had a direct communication

24     with Mr. Hanigan through some other means, such as,

25     e-mail or regular mail?
```

1          A.    No.

2          Q.    And same question about any other attorney

3    or representative of Mr. Hanigan's firm, have you

4    spoken with or directly communicated with anyone at

5    Mr. Hanigan's firm?

6          A.    No.

7          Q.    And other than the limited contact you've

8    had with Mr. Howard, is it fair to say that the only

9    communications you've had with anyone at any law firm

10   in connection with this objection is your e-mail

11   communications with Mr. Bandas' paralegal,

12   Donna Lopez?

13         A.    Yes.

14         Q.    Do you understand that there is going to be

15   a final approval hearing where the judge in this case

16   will listen to arguments about whether the settlement

17   should be approved?

18         A.    Yes.

19         Q.    Do you know whether any lawyer, whether it

20   be Mr. Bandas, Mr. Hanigan, or anyone else, is going

21   to make any arguments at that final approval hearing

22   to advance your objection?

23         A.    Do I know?

24         Q.    Yes.

25         A.    No, not personally.

```
 1        Q.   Okay.  Do you have any understanding as to
 2   whether it would be either Mr. Bandas or Mr. Hanigan
 3   or neither of them, whether anyone, would it be your
 4   expectation that someone will argue for your
 5   objection at the final approval hearing?
 6        A.   I don't know.
 7        Q.   You have no idea?
 8        A.   I have no idea.
 9        Q.   Okay.  Does it matter to you whether or not
10   an attorney is representing you at the final approval
11   hearing to explain to the judge why that attorney
12   believes your objection has merit?
13        A.   No.
14        Q.   Why do you not care whether or not there's
15   an attorney at the final approval hearing arguing in
16   favor of your objection?
17        A.   I assume my objection is filed, so I don't
18   know if I need anybody else more to argue for me.
19   What more is there to say?  It's part of the court
20   record.
21        Q.   Okay.  You mentioned your objection is on
22   file.  Have you seen a filed version of the
23   objection?
24        A.   Yes.
25        Q.   And who sent you that filed version of the
```

1      objection?

2           A.   Ms. Lopez.

3           Q.   Did you see the copy of the objection before

4      it was filed?

5           A.   I don't recall.

6           Q.   Do you recall whether you provided any input

7      either in the initial drafting or in editing or

8      suggesting edits to the objection before it was filed

9      on your behalf?

10          A.   No.

11          Q.   Do you know whether your husband

12     participated in either the drafting or the editing or

13     suggesting edits to the objection that was filed on

14     your behalf?

15          A.   No.

16          Q.   Was your husband copied in the e-mails

17     between you and Mr. Bandas' paralegal, Ms. Lopez?

18          A.   Yes.

19          Q.   Do you know whether or not your husband is

20     an objector in this case or is it just you?

21          A.   Just me.

22          Q.   Why is that?

23          A.   I don't know.

24          Q.   Well, who made that decision?  Was that you,

25     your husband, Mr. Bandas, someone else?  Do you have

```
 1        Q.   And do you know how much money you paid to
 2   repair that door?
 3        A.   Off the top of my head, no.  The two
 4   invoices we've submitted are of record.
 5        Q.   And what is your understanding what -- and
 6   why don't we just assume that your problem with that
 7   door was an overheating event covered by the
 8   settlement.  And the reason why I'm saying assume
 9   that, do you understand there's an independent
10   settlement administrator who makes the
11   determinations, process claims?
12        A.   I'm aware now.  Thank you.
13        Q.   Okay.  So let's just assume that you
14   suffered an overheating event.  What is your
15   understanding that someone who suffers an overheating
16   event with one of their past washers, has the
17   documentation showing how much the repairs were, what
18   is your understanding that that person would get
19   under the settlement?
20        A.   I may be wrong, but my understanding is you
21   get par.
22        Q.   What do you mean by par?
23        A.   Equal to what you may have put into the
24   repair work.
25        Q.   Okay.  Your understanding is you get a full
```

1      reimbursement of the repair costs?

2           A.   At this point, yes.

3           Q.   Okay.  And are you objecting to that aspect

4      of the settlement?

5           A.   No.

6           Q.   And why are you not objecting to that aspect

7      of the settlement?

8           A.   Well, if that's the case, I'm recouping my

9      overall overhead cost to repair the machine.

10          Q.   Basically a full recovery, right?

11          A.   Yes.

12          Q.   Now, I understand that you're not a lawyer,

13     but, obviously, you have a husband who is a lawyer,

14     so I guess you have at least some degree of

15     familiarity with lawsuits; is that fair to say?

16               I'm sorry.  I didn't hear an answer.

17          A.   I'm thinking about it.

18          Q.   Okay.

19          A.   That's a broad question to answer.

20          Q.   You know, that's a fair comment.  Let me try

21     to -- I'll ask a better question.

22               And, by the way, I should have given you

23     instruction that if I ask a question where you don't

24     really understand what I'm getting at, just feel free

25     to tell me because I want to make sure we're having

```
 1    effective communication, okay?

 2         A.   Thank you.

 3         Q.   Okay.  So let me ask the question this way.

 4              Would it be fair to say that you have an

 5    understanding that generally when there are

 6    settlements of lawsuits, that both sides generally

 7    have to compromise in order to get settlement?

 8         A.   Yes.

 9         Q.   And there's nothing nefarious in your view

10    about that, that people just have to compromise or,

11    otherwise, they'll just have to go to trial and

12    through appeals to have one ultimate winner and one

13    ultimate loser; is that fair?

14         A.   That's fair.

15         Q.   And in terms of the portion of the

16    settlement that provides a full reimbursement of

17    repair costs for past overheating events, that's

18    actually better than a compromise in your view,

19    that's a full recovery so that's a pretty good

20    recovery for that portion; is that fair?

21         A.   That's fair.

22         Q.   Okay.  So how about for your 2001

23    dishwasher, which portion of the settlement in terms

24    of how much you get from the settlement are you

25    complaining about?
```

1    before about the door melting.

2         A.   This is just the touch pad was flashing.  It

3    wasn't operating at the time.

4         Q.   So this is not what you believe by the

5    overheating event.  This is a different problem with

6    your dishwasher?

7         A.   That's my understanding.  I don't know what

8    was causing the touch pad to flash.

9         Q.   Okay.  And it looks like you paid $121 to

10   get that fixed?

11        A.   Yes.

12        Q.   And that was in 2004?

13        A.   Yes.

14        Q.   And I see that is broken down between SC,

15   which I assume is service call, and labor; is that

16   your understanding?

17        A.   That is my understanding of what SC stands

18   for.

19        Q.   And do you know whether there was any part

20   that was provided as part of this fix?

21        A.   I don't know the answer.

22        Q.   Now, you don't see any charge for a part on

23   this Grand Appliance Service bill, do you?

24        A.   I do not.  No.

25        Q.   Do you know whether it's possible that there

```
 1    was a part that was provided free of charge to you
 2    under warranty as part of this repair?
 3         A.   I do not.  No.
 4         Q.   Maybe it happened, maybe it didn't, you just
 5    don't know; is that fair?
 6         A.   That is fair.
 7         Q.   Let's go to the next page, and it says Grand
 8    Appliance and TV; do you see that?
 9         A.   This is actually the purchase of the
10    replacement machine.
11         Q.   Okay.  And this is -- this is in 2010 for --
12    now, I'm confused about something.  The invoice says
13    10-10-10, so October 10, but the delivery date says
14    November 2011.
15              Do you know what the timing was for when you
16    purchased this replacement dishwasher and when it was
17    actually delivered and installed?
18         A.   I think underneath is the sales receipt of
19    the 740, so it would have been October of 2010
20    because it was installed shortly after.
21         Q.   So is it your best testimony that the
22    delivery date saying it was 2011, that's probably
23    just a mistake?
24         A.   On the appliance company's part, yes.
25         Q.   Okay.  So your best testimony is that you
```

```
1     got your replacement dishwasher and got it installed

2     around October of 2010?

3          A.   Yes.

4          Q.   And you paid $590 for the new dishwasher,

5     and you paid $109 to get it installed?

6          A.   Yes.

7          Q.   Okay.  Besides this March 2004 repair that

8     you had for the touch pad, I don't see any -- and

9     maybe I'm missing it, but I don't see any other bills

10    for repairs for this door melting issue that you were

11    talking about.

12              Did you pay any money or have any other

13    repairs that are not reflected on the second page of

14    Exhibit 9 which is the touch pad issue?

15         A.   No.

16         Q.   So does that mean that the only time you

17    ever called -- well, first of all, did you ever call

18    Whirlpool or Sears -- well, you didn't buy it from

19    Sears.

20              Did you ever call Whirlpool, the

21    manufacturer, or KitchenAid to complain about any

22    malfunction on your dishwasher before you replaced

23    it?

24         A.   No.

25         Q.   And did you have anyone effect any repairs
```

```
 1        A.   None that I know of.

 2        Q.   If you did have an overeating event with

 3   your current dishwasher, would you expect

 4   Whirlpool -- and this is a KitchenAid dishwasher, so

 5   Whirlpool manufactures KitchenAid -- would you expect

 6   Whirlpool to provide some type of compensation for

 7   such an overheating event?

 8        A.   Yes.

 9        Q.   Would there be any benefit to you if you had

10   any type of warranty-type coverage for your current

11   dishwasher as it relates to future overheating

12   events?

13             MR. WILLIAMS:  Objection to the form of the

14   question.

15             The witness can answer.

16             THE WITNESS:  Can you restate the question

17   again, please?

18   BY MR. SCHWARTZ:

19        Q.   Yes, sure.  And just so you know, that was

20   Whirlpool's lawyer, Mike Williams, who is on the

21   phone who made that objection.

22             So my question is this:  Would there be any

23   benefit or value to you if you had some type of what

24   I'll call warranty insurance that would provide

25   compensation in the event that your current
```

```
 1        KitchenAid dishwasher had an overheating event over,
 2        say, the next four or five years?
 3               MR. WILLIAMS:  Same objection.
 4               MR. HOWARD:  You can answer if you can.
 5               THE WITNESS:  Oh, okay.
 6               Yes.
 7        BY MR. SCHWARTZ:
 8          Q.   And why would that be of value to you if you
 9        were able to get compensation for a future
10        overheating event?
11          A.   It would be basically the same issues that
12        are going on now.  I mean, at least we would see some
13        funds back for a machine that could, depending on
14        what the warranty says, replace, hopefully, or
15        reimburse for cost.
16          Q.   And as you sit here today right now, you
17        don't have any type of warranty coverage left for
18        your current machine that you know of, right?
19          A.   That I am aware of, yes.
20          Q.   Because the original warranty that came with
21        the purchase, that expired probably sometime in 2011
22        or 2012, right?
23          A.   That would be my guess, yes.
24          Q.   Now, you mentioned what I'll call the rebate
25        portion of the settlement where you get discounts off
```

 1        A.   I do not, no.

 2        Q.   Do you know whether Mr. Bandas has sought to

 3   be admitted pro hac vice, which means for this

 4   particular case, to practice before the Central

 5   District of California?

 6        A.   No, I do not know.

 7        Q.   Is it your understanding that Mr. Bandas is

 8   representing you in connection with the presentation

 9   of your objection in the Central District of

10   California for this case?

11        A.   That is my understanding.

12        Q.   Do you have any expectation, depending on

13   how the Court rules on your objection, that you might

14   receive any financial compensation as part of your

15   involvement in this case?

16             MR. HOWARD:  If you know.

17             THE WITNESS:  I mean, the expectation is,

18   obviously, what we've just basically discussed;

19   that's my expectation at this point.

20   BY MR. SCHWARTZ:

21        Q.   Okay.  So let's distinguish between

22   compensation to the class members generally including

23   you and special compensation for you as an objector,

24   okay?

25        A.   No.

 1      A.    Yes.

 2      Q.    And you also know that Mr. Bandas and not

 3   you or your husband is paying Mr. Howard's fees on a

 4   noncontingent basis, right?

 5      A.    I'm sorry.  I don't -- repeat that question

 6   again.

 7      Q.    Sure.  Is it -- are you paying Mr. Howard or

 8   is Mr. Bandas paying Mr. Howard?

 9      A.    We are not paying Mr. Howard.  I don't know

10   who is paying Mr. Howard.

11      Q.    Okay.  As you sit here today, you don't know

12   off the top of your head that Mr. Bandas is paying

13   Mr. Howard?

14      A.    Correct.

15      Q.    You just know that you have no

16   responsibility to pay Mr. Howard; is that fair?

17      A.    That is fair.

18   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

████     Q.    Has anyone told you what the reputation is

25   of Mr. Hanigan in connection with prosecuting

1    objections in class action cases?

2         A.   No.

3         Q.   Before you retained Mr. Bandas, did you or

4    your husband get any information regarding

5    Mr. Bandas' reputation with respect to representing

6    objectors in class action settlements?

7         A.   I did not, no.

8         Q.   Did your husband?

9         A.   I have no knowledge of that.

10        Q.   If I wanted to know for sure what your

11   husband knew, if anything, about Mr. Bandas'

12   reputation, would I have to ask him?

13        A.   You would.

14        Q.   Because you don't know, fair?

15        A.   Fair.

16        Q.   Have you ever hired a lawyer before this

17   case?

18        A.   For what purpose?

19        Q.   I'm not talking -- no, for any purpose.  Any

20   purpose, for litigation, for a will.  Have you ever

21   hired a lawyer to represent you?

22        A.   No.

23        Q.   So this was the first time that you

24   personally hired a lawyer then, right?

25        A.   Yes.

1    possible he could be getting paid if there's a

2    resolution of your objection?

3         A.   I have no knowledge.

4         Q.   Maybe he's getting paid, maybe he's not; you

5    just don't know?

6         A.   I do not know.

7         Q.   Okay.  I would like the court reporter to

8    give you the frequently -- or let me ask you a couple

9    other questions first.

10             Besides the time that you went to the

11   website with your husband where your husband filled

12   out the claim form, did you ever visit the settlement

13   website on your own or with anyone else?

14        A.   No, I did not.  I'm assuming my attorneys

15   were taking care of that.

16        Q.   And is it fair to say that other than the

17   postcard that you received in the mail and your

18   objection, that you've never seen any other document

19   in this case, like the complaint or the preliminary

20   approval order or any fee petition or any opposition

21   to fee petition or any other document filed with this

22   case; is that fair to say?

23        A.   That is fair to say, yes.

24        Q.   When your objection was e-mailed to you, did

25   you say that it was e-mailed jointly to you and your

```
 1        Q.   You know, I'll caution you too along with

 2   your lawyer.

 3            Don't tell us something that -- don't tell

 4   us about specific communications that your lawyer

 5   told you.  If the answer is that you learned about it

 6   from your lawyer, you can tell us that specific fact

 7   but nothing about what they said.

 8            I was actually asking a more specific

 9   question, and I think it's probably a different time

10   period.

11            At the time you filed your objection, at the

12   time you authorized it to be filed and at the time it

13   was filed, had you already learned whether or not

14   Whirlpool and Sears would be paying the fee that

15   would be awarded by the Court?

16        A.   No.

17        Q.   And at the time you reviewed and authorized

18   and filed your objection, did you have any idea

19   whether or not Whirlpool and Sears were agreeing to

20   the requested fee or going to be contesting the

21   requested fee?

22        A.   No.

23        Q.   As you sit here today, are you aware that

24   Whirlpool and Sears are contesting the fee?

25        A.   Yes.
```

```
 1    Subclass because I am -- do you see that?

 2         A.   You're on page 2, correct?

 3         Q.   Yes.  I'm on the last page of your

 4    declaration, and on the fourth line it says:  I am

 5    also a member of the Past Overheating Subclass.  Do

 6    you see that?

 7         A.   Now I do.  Okay.  I'm sorry.  I thought you

 8    were literally on page 2.

 9         Q.   Okay.  So it says in your declaration:  I am

10    also a member of the Past Overheating Subclass and

11    then it says that you experienced an overheating

12    event; do you see that?

13         A.   Yes.

14         Q.   Did you make that determination or is that

15    something that your lawyers determined?  I'm trying

16    to figure out who determined you had suffered a past

17    overheating event.

18         A.   The lawyer.

19         Q.   And then a little further down that

20    paragraph it talks about -- it says I filed my claim

21    form online.  Do you see that?

22         A.   Yes.

23         Q.   The reality is that your husband actually

24    mechanically filed your claim form and filled it out

25    online, right?
```

 1          A.    Yes.

 2          Q.    Now, if you go -- if you go past your

 3     declaration, you'll see there's Exhibit 1, which is

 4     the postcard notice that you received, right?

 5          A.    Yes.

 6          Q.    And then on Exhibit 2 this is a copy of the

 7     claim form receipt; do you see that?

 8          A.    I'm getting there.  Hold on.

 9                Yes.

10          Q.    And you see that has the same May 23, 2016

11     date as you signed your declaration?

12          A.    Yes.

13          Q.    Do you know whether it was you or your

14     husband or your lawyers who printed out this claim

15     form receipt?

16          A.    I don't know the answer.

17          Q.    And it says you selected two benefits; do

18     you see that?

19          A.    Yes.

20          Q.    And did you make those selections or did

21     your husband make those selections or did someone

22     else?

23          A.    I don't know the answer.

24          Q.    Did you make those selections?

25                MR. HOWARD:  He asked did you make the

```
 1    selections.
 2              THE WITNESS:  Oh, did I?  No.  Again, I had
 3    asked my husband to assist with this, so I don't know
 4    who made the selections overall.
 5    BY MR. SCHWARTZ:
 6         Q.   Okay.  And you used the word asked my
 7    husband to assist, but is it fair to say that your
 8    husband or someone else made the judgment as to what
 9    selections to make.  You didn't say select this,
10    select that.  Just help me; is that fair?
11         A.   That's fair, yes.
12         Q.   And the selections you have are two
13    different ones.  One is a cash rebate for the
14    purchase of a new KitchenAid, Kenmore, or Whirlpool
15    washer; do you see that?
16         A.   Yes.
17         Q.   And the second is for reimbursement of
18    out-of-pocket expenses, right?
19         A.   Yes.
20         Q.   And then on the second page for the amount
21    of the expenses, the out-of-pocket expenses to
22    repair, replace the dishwasher, you listed $820; do
23    you see that?
24         A.   Yes.
25         Q.   Where did that $820 number come from?
```

1         A.    It would be probably the cost of the machine

2    and the repair.

3         Q.    So is it your understanding that the $820

4    consists of the -- let me get the right one -- the

5    cost of your 2010 dishwasher plus the amount of your

6    fire repair of your old dishwasher?

7         A.    Yes.

8         Q.    And if you received $820 in this case, do

9    you believe that would be a good --

10        A.    I'm sorry.  Your phone is breaking up, sir.

11        Q.    Okay.  I will ask you the question again.

12              Do you believe if you received $820 in this

13   case, that you would have received a fair settlement

14   of your claim?

15        A.    Yes.

16        Q.    Now, below the 820 on number six on this

17   claim form, it says do you have documentation and the

18   answer was yes.

19              Do you know whether your documentation of

20   your new purchase and the documentation of your prior

21   repair was uploaded into the class website?

22        A.    I can't speak to that.  All I can look at is

23   this document saying that the documents were attached

24   as a PDF and that's the description there provided.

25   Whether it actually got into the website, I don't

```
 1    know.
 2        Q.   Okay.  But your understanding is that your
 3    husband or whoever -- you think it was your husband
 4    who filled out this form, right?
 5        A.   Yes.
 6        Q.   Okay.  Did he tell you that it was really
 7    hard or difficult to fill out the form or it took
 8    forever, did he tell you any of that stuff, or did he
 9    just do it for you and not mention any problems with
10    that?
11        A.   He did not mention any problems.  He just
12    said he did it for me.
13        Q.   And in addition to the $820, you also
14    selected the benefit of the cash rebate for the
15    purchase of a new machine; do you see that?
16        A.   Yes.
17        Q.   Is there anything wrong with your current
18    dishwasher that would make you want to possibly
19    replace this in the next year or two?
20        A.   No.
21        Q.   If you decided that for whatever reason you
22    wanted to get a new dishwasher, would you, as part of
23    your evaluation process, consider the impact of a
24    cash rebate that you would have for a
25    Whirlpool-branded washer as part of your analysis to
```

```
 1    decide what washer to get?

 2         A.   It would be part of the consideration, yes.

 3         Q.   And suppose you decide that you were going

 4    to get a different brand of washer than a

 5    Whirlpool-manufactured washer.  Would you still try

 6    to take that rebate form for the Whirlpool washer to

 7    the retailer and try to use that as negotiating

 8    leverage to get a better price for a replacement

 9    washer from some other manufacturer?

10         A.   Without knowing the terms of the rebate and

11    how the coupon works, I cannot answer that question

12    if that's even possible.

13         Q.   And I wasn't -- just so I'm clear.  I wasn't

14    asking you whether you would try to use the rebate

15    form to get paid for the rebate form but whether you

16    would try to use the fact of, hey, I can get a rebate

17    or a discount off of a Whirlpool washer -- Samsung,

18    for example -- give me -- you know, give me the same

19    deal for the Samsung if you want me to buy that, to

20    kind of use this rebate form as leverage or

21    negotiation.  I'm just wondering whether that's

22    something you might consider doing if you decide to

23    buy a different brand.

24         A.   Again, you know, I don't know the answer,

25    because I don't know if it would be applicable at the
```

```
 1              I know he has a billable hourly rate, but I
 2     can't speak to the other as well.  I don't know.
 3          Q.   Okay.  And is it your understanding for
 4     billable hourly rate, if his rate is $500 an hour and
 5     he works ten hours, that's $5,000; do you understand
 6     that concept?
 7          A.   Yes.
 8          Q.   Okay.  Do you have any idea what the rates
 9     of the class action lawyers who work in this case
10     times the number of hours, how much in terms of
11     billable time that is for this case?
12          A.   No.
13          Q.   Do you know whether it's more than
14     $4 million?
15          A.   I have no clue.  I have no idea.
16          Q.   Okay.  Why don't we take -- I'll just pick a
17     number just for hypothetical purposes.
18              Why don't you assume that class counsel have
19     put $5 million worth of time and expenses in this
20     case, using their hourly rates and whatever they paid
21     for their experts and out-of-pocket expenses, okay?
22          A.   Okay.
23          Q.   And I'm just trying to get a sense of
24     exactly where we're coming down on in terms of what
25     the appropriate fee should be.
```

```
 1                        after which the following

 2                        proceedings were had:)

 3                        (Whereupon, Deposition Exhibit

 4                        No. 7 was marked for

 5                        identification, EKE.)

 6              MR. SCHWARTZ:  Back on the record.

 7    BY MR. SCHWARTZ:

 8         Q.   Okay.  So, Ms. Smith, I've put in front of

 9    you Exhibit 7, which is a Court decision in the

10    In re:  Cathode Ray Tube Antitrust Litigation.  Do

11    you have that in front of you?

12         A.   I do.

13         Q.   And so this was one of those law cases that

14    we talked about just a few minutes ago.  I'm sure

15    that you've never seen this before, correct?

16         A.   You are correct.

17         Q.   Okay.  So this is a decision from a federal

18    magistrate judge that was approved by a federal judge

19    in this case.  The court is the Northern District of

20    California, San Francisco.

21              What I would like you to do is turn to

22    page 17 of 18, which is the second to last page.

23         A.   Okay.

24         Q.   And what I want you to do is on the

25    left-hand column, the last full paragraph that speaks
```

1    of Hull's papers, do you see that?

2         A.   Yes.

3         Q.   Okay.  So you see where there's a reference

4    that Mr. Hull, who was an objector in that case, was

5    assisted by Chris Bandas, a professional or serial

6    objector located in Corpus Christi; do you see that?

7         A.   Yes.

8         Q.   Then do you see the statement from the judge

9    a little bit further down where it says:  Bandas

10   routinely represents objectors purporting to do so to

11   effectuate changes to settlements, but does so for

12   his known personal financial gain; he has been

13   excoriated by Courts for this conduct.  Do you see

14   that?

15        A.   Yes.

16        Q.   Prior to today did you know that a federal

17   judge had said that about Mr. Bandas?

18        A.   No.

19        Q.   Now, if you would take a look at footnote

20   three that was referenced there; do you see where

21   that is?

22        A.   Yes.

23        Q.   And do you see where it says:  Professional

24   objectors can levy what is effectively a tax on class

25   action settlements, a tax that has no benefit to

```
 1    anyone other than to the objectors.  Literally
 2    nothing is gained from the cost.  Settlements are not
 3    restructured and the class, on whose benefit the
 4    appeal is purportedly raised, gains nothing.  Do you
 5    see that?
 6         A.   Yes.
 7         Q.   Would you ever agree to a settlement in this
 8    case where you and Mr. Bandas get paid but the class
 9    gets nothing extra?
10              MR. HOWARD:  Objection, calls for
11    speculation.
12              THE WITNESS:  I don't know.
13    BY MR. SCHWARTZ:
14         Q.   Can you commit to us that you will not agree
15    to allow you and your attorney, Mr. Bandas, to be
16    paid money to dismiss your objection or any appeal if
17    there is no corresponding benefit achieved for the
18    other class members?
19              MR. HOWARD:  We're not here to make
20    commitments.  You can ask her questions.
21              MR. SCHWARTZ:  I've asked her the question.
22    She's got to say yes, no, or something else.
23              MR. HOWARD:  Okay.  Objection, calls for
24    speculation.
25              THE WITNESS:  Please repeat the question.
```

 1   BY MR. SCHWARTZ:

 2        Q.   Can you commit here today that you will not

 3   agree to a settlement of your objection in which you

 4   and your attorney, Mr. Bandas, are paid money but

 5   there is no corresponding benefit to the class

 6   members?

 7             MR. HOWARD:  Objection, calls for

 8   speculation.

 9             THE WITNESS:  I can't commit.

10   BY MR. SCHWARTZ:

11        Q.   Can you commit to us today that any payment

12   that you or Mr. Bandas might receive as a result of

13   your objection would be disclosed to the Court?

14             MR. HOWARD:  Objection, calls for

15   speculation.

16             THE WITNESS:  I can't commit.

17             MR. SCHWARTZ:  The next document I'm going

18   to ask the court reporter to get is in folder C as in

19   cat.  Please put an Exhibit 8 sticker on that.  That

20   was the prior marking for that exhibit.

21                       (Whereupon, Deposition Exhibit

22                        No. 8 was marked for

23                        identification, EKE.)

24             THE WITNESS:  I have it in front of me.

25   BY MR. SCHWARTZ:

Kimberly Bandas
July 07, 2016

```
 1        Q.   Okay.  And is it fair to say that you have
 2   never seen Exhibit 8 before today either?
 3        A.   It is fair to say, yes.
 4        Q.   Okay.  And this was an exhibit that was
 5   attached in the Cathode Ray Tube Antitrust case that
 6   we were just talking about, and it relates to various
 7   other cases in which Mr. Bandas was involved in.
 8             So I would just like to go through a few
 9   things with you, and I'll ask you some questions,
10   okay?
11        A.   Okay.
12        Q.   Do you see the first case listed on the
13   first page, the Brown versus Wal-Mart case, that's an
14   Illinois case; do you see that?
15        A.   Yes.
16        Q.   Then from the outcome of objection, there's
17   some quotes from decisions, and what I would like to
18   refer you to is the third paragraph.  And I'll just
19   read it to you.
20             The Bandas Objection filed on behalf of
21   Ms. Carlson is a generic boilerplate objection
22   prepared and filed by attorneys working for their own
23   personal benefit and not for the benefit of this
24   Class or for those lawyers' client.  The record
25   before the Court demonstrate that Bandas is a
```

1    professional objector who is improperly attempting to

2    hijack the settlement of this case from deserving

3    class members and dedicated, hard working counsel,

4    solely to coerce ill-gotten, inappropriate and

5    unspecified legal fees.

6             Do you see that, Ms. Smith?

7        A.   Yes.

8        Q.   Did anyone tell you that a judge said that

9    about Mr. Bandas?

10       A.   No.

11       Q.   Does it raise any concerns in your mind

12   about your choice of lawyer that two different judges

13   have said about Mr. Bandas what you've just seen in

14   two cases?

15       A.   Not at this point because I don't know

16   enough of these cases to even make an opinionated

17   judgment, sorry.

18       Q.   Okay.  And that's because given your lack of

19   expertise on legal issues and you don't know the full

20   picture, you just don't have enough information as

21   you sit here today to evaluate whether this is

22   something you should be worried about; is that fair?

23       A.   That's fair.

24       Q.   And can you commit to me today -- actually,

25   no.  I don't want to ask that question.  I'll

```
 1      withdraw that.
 2              As you sit here today, are you -- is it your
 3      intention to keep an open mind as to whether you
 4      should continue to proceed or not proceed with your
 5      objection based on information as it becomes
 6      available to you?
 7              MR. HOWARD:  If you know.
 8              THE WITNESS:  To keep an open mind, that's
 9      the question?
10      BY MR. SCHWARTZ:
11         Q.   Yes.
12         A.   Based on information -- I'm repeating it to
13      make sure I'm understanding the question.  Bear with
14      me here.
15              To keep an open mind to make sure I
16      understand the information being provided to me as
17      it -- is additionally provided?
18         Q.   Let me ask the question again, but perhaps a
19      little differently because I want to make sure we're
20      communicating.
21              As you sit here today, is it your intention
22      that you will keep an open mind as to whether or not
23      your objection should continue to be prosecuted --
24         A.   Yes.
25         Q.   -- as you learn additional information?
```

 1        A.    Yes.

 2        Q.    And as you sit here today, is it your

 3   intention to keep an open mind as to whether or not

 4   you have the right lawyer representing you for your

 5   objection, again, based on information that you learn

 6   subsequent to today?

 7        A.    Yes.

 8        Q.    Why don't we go to the next document.  Go to

 9   page 5.

10        A.    Of Exhibit 8?

11        Q.    Yes.

12              And do you see at the bottom there's a

13   reference to a Mussmann, M-U-S-S-M-A-N-N, versus

14   Wal-Mart case in Iowa?

15        A.    Yes, I see that.

16        Q.    And do you see in the middle column it says:

17   Attorney Bandas has filed objections in other similar

18   lawsuits filed in other states.  Mr. Bandas is a

19   professional objector counsel.  Do you see that?

20        A.    Yes.

21        Q.    Then if you go to the next page, do you see

22   the second paragraph that says:  Neither

23   attorney Bandas, nor attorney Roth advised Mr. Healy

24   that attorney Bandas had been found by a Florida

25   court in the Ouellette, O-U-E-L-L-E-T-T-E, Order to

1    be engaging in a conspiracy with his clients and

2    co-counsel to extort money from class members and

3    class counsel, through a similar practice of

4    objecting to the proposed settlement in the Florida

5    Wal-Mart lawsuit.  Do you see that?

6         A.   Yes.

7         Q.   Do you see in the next paragraph in the

8    second sentence:  The consistency of attorney Bandas'

9    errors and the similarity between attorney Bandas'

10   objections across different cases demonstrates the

11   canned nature of the objection and reveals attorney

12   Bandas' true motives.  Do you see that?

13        A.   Yes.

14        Q.   And then at the bottom of the next

15   paragraph, you'll see where it says, the judge wrote:

16   Upon filing the notice of appeal, the professional

17   objector simply waits for class counsel to succumb to

18   the pressure pay the extorted fees in return for

19   dismissing the appeal and releasing the settlement

20   funds.  Do you see that?

21        A.   Yes.

22        Q.   And then if you go to the next page, which

23   is page 7, we're still continuing on the same case,

24   the second sentence -- we'll start with the first

25   sentence:  This Court concludes that attorney

1      Christopher A. Bandas is a professional objector.

2      The Court is concerned that attorney Bandas is

3      seeking to wrongfully use the class action settlement

4      and objection process for personal gain, and without

5      any corresponding benefit to any individual objector

6      or the settlement class as a whole; do you see that?

7          A.   Yes.

8          Q.   And then it goes on:  One Court describes

9      these efforts by attorney Bandas and other

10     professional objectors as extortion.  Do you see

11     that?

12         A.   Yes.

13         Q.   Now, again, having read some of those

14     statements from that judge, does that raise any

15     concern that you believe merits further investigation

16     by you regarding whether Mr. Bandas is the right

17     attorney to represent you in this case?

18         A.   Again, without knowing all the facts of the

19     case, it's hard for me to draw an opinion.

20         Q.   Right.  I haven't asked you to draw an

21     opinion.  I just asked whether it raises any concern

22     in your mind that you should do some additional

23     investigation to evaluate whether Mr. Bandas is the

24     right attorney to represent you in this case?

25         A.   Not at this point, no.

1          Q.   Are you aware that in the Dennings versus

2     Clearwire case a federal judge in the Western

3     District of Washington removed Mr. Bandas'

4     authorization to practice in the Western District of

5     Washington; are you aware of that?

6          A.   No.

7          Q.   Do you believe that the Court should reject

8     the settlement as a whole and tell the parties to go

9     back to litigation in this case?

10         A.   I have no opinion on that.

11         Q.   Do you believe that the Court, the judge in

12    this case, should remove class counsel and substitute

13    different class counsel to prosecute the claims in

14    this case?

15         A.   I have no opinion on that.

16         Q.   Do you have any idea whether Mr. Bandas has

17    ever actually successfully prosecuted a class action

18    case?

19         A.   No.

20         Q.   Do you have any idea whether Mr. Hanigan has

21    ever successfully prosecuted a class action case?

22         A.   No.

23         Q.   Going back to your very first dishwasher,

24    the one you bought in 2001, besides the touch pad

25    repairs, I know you mentioned that there was the

1    has to pay attorney's fees?  Are you just generally

2    aware that there are some statutes that provides for

3    shifts of attorney's fees like that?

4         A.   No.

5         Q.   So then you're not familiar that there's

6    some statutes that require a losing party to pay

7    attorneys a lot more money based on the time they've

8    spent even if the monetary recovery is less than the

9    money the lawyers are paid but there's an important

10   civil right principle that was established; you're

11   not aware of that, I guess, right?

12        A.   No.

13        Q.   But you don't have an objection to that in

14   principle, do you, if that's what the statute

15   provides?

16        A.   If that's what that statute provides and

17   that's how it reads, then I cannot disagree with the

18   statute.

19        Q.   You mentioned in response to Mr. Williams'

20   question that you understand that for your current

21   2010 dishwasher if it has an overheating event over

22   the next several years, you can get either $100 or

23   30 percent off a new Whirlpool-manufactured

24   dishwasher; do you remember that?

25        A.   Yes.

Kimberly Redon
July 07, 2016

```
1        Q.   And would you agree with me that you're

2   better off having that opportunity to get either $100

3   or 30 percent off should you have an overheating

4   event than you would be if you did not have that

5   opportunity; is that fair?

6        A.   Yes.

7        Q.   And I'm going to try to see if you can put

8   any value on that.  I'm just going to try to pick

9   numbers to see whether that helps you or not,

10  understanding that you're not an economist or

11  statistician.

12            Do you think that that kind of protection

13  for a dishwasher that might have a risk of suffering

14  an overheating event would be worth at least some

15  nominal amount, like maybe even as much as $10?

16            MR. WILLIAMS:  Objection, calls for

17  speculation, incomplete hypothetical, lack of

18  foundation.

19            THE WITNESS:  I have no knowledge or no

20  ability right now to come to a decision on that.

21  BY MR. SCHWARTZ:

22       Q.   You just can't put what a reasonable price

23  for that kind of benefit would be; is that fair?

24       A.   That's fair.

25       Q.   But would you agree at least there is some
```

Kimberly Smith
July 07, 2016

```
 1      value that would be placed on having that protection

 2      for a dishwasher, particularly a

 3      Whirlpool-manufactured dishwasher, with respect to an

 4      overheating event?

 5           A.   Yes.

 6                MR. SCHWARTZ:  That is all I have.  Thank

 7      you very much.

 8                MR. WILLIAMS:  I have just one follow-up

 9      question.

10                         FURTHER EXAMINATION

11      BY MR. WILLIAMS:

12           Q.   Ms. Smith, if you knew that the risk of an

13      overheating event in your 2010 KitchenAid dishwasher

14      was less than one-tenth of 1 percent, is it fair to

15      say that that -- the value of that offer, settlement

16      offer, in the event you have a future overheating

17      event is worth close to zero to you?

18                MR. SCHWARTZ:  Objection, calls for

19      speculation, assumes facts not in evidence.

20                MR. HOWARD:  You can answer.

21                THE WITNESS:  At this point, I have no

22      opinion at that question.

23                MR. WILLIAMS:  Okay.  Thank you.

24                MR. HOWARD:  Any more questions?

25                MR. SCHWARTZ:  I have nothing further.
```