**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEVE CHAMBERS, et al., | SA<br>Case No. CV 11-1733 FMO (JCGx) |
| Plaintiffs, | |
| v. | **ORDER RE: MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MOTION FOR AWARD OF ATTORNEY'S FEES AND EXPENSES** |
| WHIRLPOOL CORPORATION, et al., | |
| Defendants. | |

Having reviewed and considered all the briefing filed with respect to the parties' Joint Motion for Final Approval of Class Action Settlement (Dkt. 254, "Final Approval Motion") and plaintiffs' Motion for Award of Attorneys' Fees and Expenses and for Service Awards for Plaintiffs (Dkt. 218, "Fees Motion"), as well as the oral argument presented during the final approval hearing on August 25, 2016, the court concludes as follows.

**<u>INTRODUCTION</u>**

On November 9, 2011, plaintiffs filed this class action against Whirlpool Corporation ("Whirlpool"), Sears Holdings Corp., and Sears, Roebuck & Co., Inc. (together with Sears Holdings Corp., "Sears") (collectively, "defendants"). (<u>See</u> Dkt. 1, Complaint). The Fourth Amended Complaint (Dkt. 98, "4AC"), the operative complaint in this matter, alleges 25 causes of action for violations of: the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, <u>et seq.</u>; breach of express and implied warranty; violations of the Song-Beverly Act, Cal. Civ. Code §§ 1792 <u>et seq.</u>; strict

1  product liability; failure to warn; unjust enrichment/restitution; fraudulent

2  concealment/nondisclosure; negligence; violations of the consumer protection statutes of the

3  states of Ohio, California, Georgia, Illinois, Maryland, Massachusetts, Missouri, New Jersey, New

4  York, Utah, and Virginia; and declaratory judgment, 28 U.S.C. § 2201.  (See id. at ¶¶ 216-553).

5  After conducting extensive discovery and engaging in substantial settlement negotiations,

6  the parties reached a settlement and filed a joint motion for preliminary approval on September

7  11, 2015.  (See Dkt. 192, Joint Motion of All Parties for Preliminary Approval of Class Action

8  Settlement).  On November 12, 2015, the court granted preliminary approval of the settlement,

9  (see Dkt. 199, Court's Order of November 12, 2015 ("Preliminary Approval Order" or "PAO") at

10  32), appointed Kurtzman Carson Consultants, LLC ("KCC") as the Claims Administrator, (see id.

11  at 33), directed KCC to provide notice to the class members, (see id.), and scheduled a final

12  approval hearing for June 10, 2016.  (See id. at 34).  At the request of the parties, the court

13  subsequently rescheduled the final approval hearing for August 25, 2016.  (See Dkt. 207, Court's

14  Order of February 23, 2016, at 3).

15  **BACKGROUND**

16  I.    PLAINTIFFS' ALLEGATIONS.

17  This case arises out of plaintiffs' allegations that certain Whirlpool-manufactured

18  dishwashers branded "Whirlpool®," "Kenmore®," and "KitchenAid®" had a design defect that

19  caused overheating in high current connections to the electronic control board ("ECB"), causing

20  the ECB consoles to smoke, emit fumes and sparks, or catch fire, thereby posing a safety risk.

21  (See Dkt. 199, PAO at 2).  Plaintiffs allege that these Overheating Events[1] were caused by a

22  design defect that rendered certain high-current connections to the ECBs insufficiently robust.

23  (See Dkt. 98, 4AC at ¶¶ 163-65).  This defect led to the gradual degradation of the electrical

24  pathways, which caused overheating to extreme temperatures and ignition of surrounding plastics

25

26  [1]  An "Overheating Event" is defined as "the overheating of the Dishwasher's Electronic Control
    Board such that the class member or another person observed or experienced smoke, flames,

27  fumes, sparks, or electrical arcing from the control console area of their Dishwasher." (Dkt. 192-4,
    Class Action Settlement Agreement and Release of All Claims ("Settlement Agreement") at 9-10,

28  ¶ BB).

and wire insulation.  (See id. at ¶¶ 7-8, 50 & 164-65).  According to plaintiffs, defendants failed to disclose, or actively concealed, this defect.  (See id. at ¶¶ 189-91).  The group of plaintiffs, 18 persons from 11 different states, sued on behalf of a class of millions of consumers who have owned the subject Whirlpool-manufactured dishwashers.  (See Dkt. 199, PAO at 2).

II.     SETTLEMENT TERMS.

After "litigating intensively[,]" (Dkt. 192-3, Declaration of Charles S. Fax in Support of Joint Motion for Preliminary Approval [] ("Fax Decl.") at ¶ 12), and "engaging in settlement negotiations in six full days of mediation sessions with one of the nation's most esteemed mediators," (see Dkt. 192-4, Settlement Agreement at 3), the parties reached a settlement that plaintiffs assert "provides substantial relief to the Class, including considerable monetary and injunctive relief that will protect Class Members, Non-Class Members[2] and other consumers going forward." (Dkt. 254-2, Plaintiffs' Memorandum in Support of Joint Motion for Final Approval of Class Action Settlement ("Pls.' Final Approval Brief") at 11).  The Settlement Class[3] is comprised of certain purchasers and owners of Class Dishwashers,[4] (see Dkt. 192-4, Settlement Agreement at 13, ¶ ZZ) (defining the "Settlement Class"), and includes two subclasses: the Past Overheating Subclass, consisting of those who experienced an Overheating Event within 12 years after the purchase date but before the Notice

---

[2]  Non-Class Members include individuals "who own or owned Dishwashers equipped with either a 'NewGen' or a 'Raptor' platform electronic control board." (Dkt. 192-4, Settlement Agreement at 9, ¶ X).  A list of model and serial numbers by which NewGen and Raptor dishwashers can be identified is attached to the Settlement Agreement as Exhibit 5.  (See Dkt. 192-9, Model & Serial No. List for Raptor & NewGen).

[3]  The Settlement Class includes "all residents in the United States and its territories who (a) purchased a new Class Dishwasher, (b) acquired a Class Dishwasher as part of the purchase or remodel of a home, or (c) received as a gift, from a donor meeting those requirements, a new Class Dishwasher not used by the donor or by anyone else after the donor purchased the Class Dishwasher and before the donor gave the Class Dishwasher to the claimant." (Dkt. 199, PAO at 3).

[4]  "Class Dishwashers" are defined as "all KitchenAid, Kenmore, and Whirlpool-brand automatic dishwashers manufactured by Whirlpool between October 2000 and January 2006 that contained either a 'Rushmore' or 'Rush' electronic control board." (Dkt. 192-4, Settlement Agreement at 6, ¶ I).  A list of model and serial numbers for all Class Dishwashers is attached to the Settlement Agreement as Exhibit 2.  (See Dkt. 192-6, Model and Serial No. List for Class Dishwashers).

Date;[5] and the Future Overheating Subclass, consisting of those who experience an Overheating Event within ten years after the purchase date or within two years of the Notice Date, whichever is later.  (See Dkt. 199, PAO at 3-4).

All members of the Settlement Class, including the subclasses, will receive the following benefits under the Settlement Agreement:

> a full recovery of costs spent on repairs; $200 to $300 in cash for Class Members who replaced their Dishwashers; $100 or a 30% rebate on the purchase of a new dishwasher [for] Class Members who experience an Overheating Event in the future; a rebate of 10% to 15% on the purchase of a new dishwasher to all Class Members regardless of whether they ever experience an Overheating Event; and enhanced safety warnings to service personnel about the dangers of bypassing Thermal Cut-Offs ("TCOs") (a safety shut-off device).

(Dkt. 254-2, Pls.' Final Approval Brief at 1; see Dkt. 199, PAO at 4-5 (describing the settlement terms)).  The Settlement Agreement provides similar benefits to Non-Class Members, except that rebates will not be provided to those who have not experienced an Overheating Event.  (See Dkt. 254-2, Pls.' Final Approval Brief at 1).

The settlement amount is uncapped, as defendants have agreed to compensate all eligible class members.  (See Dkt. 199, PAO at 5).  Defendants have also agreed to pay class counsel's attorney's fees, costs, and expenses awarded by the court, in addition to the costs and notice of settlement administration.  (See id.).  Finally, defendants have agreed to pay a $4,000.00 service award to each named plaintiff and to purchase the websites of lead plaintiff Steve Chambers.  (See Dkt. 192-4, Settlement Agreement at 47, ¶ IX.D).

---

[5]  The Notice Date is defined as the date on which the Claims Administrator completes the initial mailing of summary notices to class members, (see Dkt. 192-4, Settlement Agreement at 9, ¶ Y), which was February 4, 2016.  (See Dkt. 254-6, Supplemental Declaration of Patrick M. Passarella Re: Notice Procedures and Claims Filing ("Suppl. Passarella Decl.") at ¶ 3).

III.     RELEASE OF CLAIMS.

Upon final approval, Class Members who have not validly requested exclusion from the settlement will release all claims that they "now have or, absent [the settlement], may in the future have had . . . by reason of any act, omission, harm, matter, cause, or event . . . that relates to any of the defects, malfunctions, or inadequacies of the Class Dishwashers that are alleged or could have been alleged" in this lawsuit.  (Dkt. 192-4, Settlement Agreement at 48-49, § X.A).  The release includes "future injuries, damages, losses, or future consequences or results, excluding any future injury to person or to property other than the Class Dishwasher itself[,]" (id. at 50, § X.E), as well as unknown claims which would otherwise be preserved under California Civil Code § 1542.  (See id. at 50-51, § X.F).  The release does not extinguish "claims for personal injury or for damage to property other than to the Class Dishwasher itself."  (Id. at 49, § X.B).

IV.     NOTICE TO CLASS.

The court-appointed Claims Administrator, KCC, has implemented the multi-pronged notice program previously approved by the court.  (See Dkt. 254-2, Pls.' Final Approval Brief at 7-8; see also Dkt. 199, PAO at 28-32 (approving multi-pronged notice program)).  In accordance with that program, KCC:  mailed and e-mailed summary notices and TCO repair notices to 4,162,934 Class members for whom Whirlpool's and Sears' records contained contact information; published notices in the national editions of certain magazines and on a variety of websites; purchased 14,000,000 internet banner impressions on a variety websites, partially targeted to reach adults 25 and older who were behaviorally categorized as "Dishwashing Machine/Home Appliance/Home Owners" on Facebook; and maintained a settlement website, www.dishwashersettlement.com, which received a total of 249,711 visits.  (See Dkt. 254-6, Suppl. Passarella Decl. at ¶¶ 3-7 & 13). KCC also operated an Interactive Voice Response ("IVR") system via a toll-free telephone number, which received a total of 20,411 calls.  (See id. at ¶ 12).

As of July 7, 2016, KCC had received a total of 133,040 claims, which includes: 106,331 claims for a rebate; 15,963 claims for both a rebate and a reimbursement; 10,417 claims for a reimbursement only; and 329 claims that were received near the claims deadline and had yet to be categorized.  (See Dkt. 254-6, Suppl. Passarella Decl. at ¶ 18).  Of the total 26,380

1  reimbursement claims, KCC was "unable to estimate how many claims will be accepted, deemed

2  deficient with an opportunity to correct, or rejected after the time to correct deficiencies has

3  passed." (Id.). Also, as of July 7, 2016, KCC received 498 timely requests from Class Members

4  to be excluded from the settlement. (See id. at ¶ 15).

5  **LEGAL STANDARD**

6      Federal Rule of Civil Procedure 23 provides that "the claims, issues, or defenses of a

7  certified class may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). "The

8  primary concern of [Rule[6] 23(e)] is the protection of th[e] class members, including the named

9  plaintiffs, whose rights may not have been given due regard by the negotiating parties." Officers

10  for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F., 688 F.2d 615, 624 (9th Cir. 1982), cert.

11  denied, 459 U.S. 1217 (1983). Whether to approve a class action settlement is "committed to the

12  sound discretion of the trial judge[,]" Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th

13  Cir.), cert. denied, 506 U.S. 953 (1992), who must examine the settlement for "overall fairness."

14  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998). Neither district courts nor

15  appellate courts "have the ability to delete, modify or substitute certain provisions. The settlement

16  must stand or fall in its entirety." Id. (internal quotation marks and citation omitted).

17      In order to approve a settlement in a class action, the court must conduct a three-step

18  inquiry. First, it must assess whether defendants have met the notice requirements under the

19  Class Action Fairness Act ("CAFA"). See 28 U.S.C. § 1715(d). Second, it must determine

20  whether the notice requirements of Rule 23(c)(2)(B) have been satisfied. Finally, it must conduct

21  a hearing to determine whether the settlement agreement is "fair, reasonable, and adequate." See

22  Fed. R. Civ. P. 23(e)(2); Staton v. Boeing Co., 327 F.3d 938, 959 (9th Cir. 2003) (discussing the

23  Rule 23(e)(2) standard); Adoma v. Univ. of Phoenix, Inc., 913 F.Supp.2d. 964, 972 (E.D. Cal.

24  2012) (conducting three-step inquiry).

25      In determining whether a settlement agreement is fair, adequate, and reasonable, the court

26  must weigh some or all of the following factors: "(1) the strength of the plaintiff's case; (2) the risk,

27  _____

28      [6] All "Rule" references are to the Federal Rules of Civil Procedure.

expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." In re Bluetooth Headset Prod. Liab. Litig. ("Bluetooth"), 654 F.3d 935, 946 (9th Cir. 2011).

However, when "a settlement agreement is negotiated prior to formal class certification, consideration of these eight . . . factors alone is not enough to survive appellate review." Bluetooth, 654 F.3d at 946 (emphasis in original).  This is because "[p]rior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement." Id.  District courts, therefore, also must determine "that the settlement is not the product of collusion among the negotiating parties." Id. at 947 (internal quotation and alteration marks omitted).  In making that determination, courts should look for signs of collusion, including "(1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded[;]" "(2) when the parties negotiate a clear sailing arrangement providing for the payment of attorneys' fees separate and apart from class funds[;]" and "(3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund[.]" Id. at 947 (internal quotation marks and citations omitted).

## DISCUSSION

I.    FINAL APPROVAL OF CLASS SETTLEMENT.

       A.    Class Action Fairness Act.

CAFA requires that "[n]ot later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve [notice of the proposed settlement] upon the appropriate State official of each State in which a class member resides and the appropriate Federal official[.]" 28 U.S.C. § 1715(b).  The statute provides detailed requirements for the contents of such a notice, which must include, among other things, "any proposed or final notification to class members[,]" and "any proposed or final class action

7

1  settlement[.]"  28 U.S.C. §§ 1715(b)(3) & (4).  The court may not grant final approval of a class

2  action settlement until the CAFA notice requirement is met.  <u>See</u> <u>id.</u> at § 1715(d) ("An order giving

3  final approval of a proposed settlement may not be issued earlier than 90 days after the later of

4  the dates on which the appropriate Federal official and the appropriate State official are served

5  with the notice required under [28 U.S.C. § 1715(b).]").

6        Here, the Settlement Agreement was filed on September 11, 2015.  (<u>See</u> Dkt. 192-4,

7  Settlement Agreement).  Defense counsel provided the required CAFA notice on September 21,

8  2015.  (<u>See</u> Dkt. 198, Defendants' Status Report to Confirm Compliance with CAFA's Notice

9  Requirements at 2).  At the final approval hearing, defense counsel advised the court that no

10  objections had been received in response to the CAFA notice.

11        B.    <u>Class Certification</u>.

12        In its order granting preliminary approval, the court certified the class pursuant to Rule

13  23(b)(3).  (<u>See</u> Dkt. 199, PAO at 10-18 & 32).  Because circumstances have not changed, and for

14  the reasons set forth in its Order of November 12, 2015, the court hereby affirms its order

15  certifying the class for settlement purposes under Rule 23(e).  <u>See</u> <u>In re Apollo Grp. Inc. Sec.</u>

16  <u>Litig.</u>, 2012 WL 1378677, *4 (D. Ariz. 2012) ("The Court has previously certified, pursuant to Rule

17  23 of the Federal Rules of Civil Procedure, and hereby reconfirms its order certifying a class.").

18        C.    <u>Rule 23(c) Notice Requirements</u>.

19        Class actions brought under Rule 23(b)(3) must satisfy the notice provisions of Rule

20  23(c)(2), and upon settlement of a class action, "[t]he court must direct notice in a reasonable

21  manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).

22  Rule 23(c)(2) prescribes the "best notice that is practicable under the circumstances, including

23  individual notice" of particular information.  Fed. R. Civ. P. 23(c)(2)(B) (enumerating notice

24  requirements for classes certified under Rule 23(b)(3)).

25        After undertaking the required examination, the court approved the form of the proposed

26  class notice.  (<u>See</u> Dkt. 199, PAO at 28-33).  As discussed above, the notice program previously

27  approved by the court has been fully implemented by KCC.  (<u>See</u> Dkt. 254-2, Pls.' Final Approval

28  Brief at 7-8; Dkt. 254-6, Suppl. Passarella Decl. at ¶¶ 3-7 & 12-13).  Accordingly, based on its prior

findings and the record before it, the court finds that the Class Notice and the notice process fairly and adequately informed the class members of the nature of the action, the terms of the proposed settlement, the effect of the action and release of claims, their right to exclude themselves from the action, and their right to object to the proposed settlement.  (See Dkt. 199, PAO at 28-33).

        D.     <u>Whether the Settlement is Fair, Adequate, and Reasonable</u>.

              1.    **The Strength of Plaintiffs' Case and the Risk, Expense, Complexity, and Duration of Further Litigation**.

In evaluating the strength of the case, the court should assess "objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach [a settlement]."  <u>Adoma</u>, 913 F.Supp.2d at 975.  "In assessing the risk, expense, complexity, and likely duration of further litigation, the court evaluates the time and cost required."  <u>Id.</u> at 976.

While the merits of plaintiffs' case appear to be fairly strong, plaintiffs have shown that defendants have, and likely would have continued to, vigorously defend the action had the parties not reached a settlement.  For instance, defendants filed a motion to dismiss the 4AC, (<u>see</u> Dkt. 104, Partial Motion to Dismiss Plaintiffs' Fourth Amended Complaint), in which they argued, among other things, that: Whirlpool's limited warranty covering "defects in materials and workmanship" does not extend to the alleged design defect; plaintiffs did not satisfy all conditions precedent to warranty coverage; the defects did not manifest or were not substantially certain to manifest within the warranty period for many Class Dishwashers; the warranties were expired; and most Class Members had already received full value of the useful life of their dishwashers.  (See Dkt. 254-2, Pls.' Final Approval Brief at 9) (describing arguments in motion to dismiss).

If plaintiffs overcame defendants' motion to dismiss, the resolution of the case would have been lengthy, complex, and expensive.  As defendants stated, "[t]his litigation would be expected to include . . . further expert discovery, class certification proceedings (with a potential interlocutory appeal under Rule 23(f) by the disappointed parties), summary judgment proceedings, one or more class trials, and one or more post-trial appeals."  (Dkt. 256, Defendants' Memorandum in Support of Joint Motion for Final Approval of Class Action Settlement at 19).  According to

1  defendants, "[r]esolving the putative class claims for all putative class members in all states easily

2  could take five additional years." (Id.) (emphasis in original).  Given that this case "has already

3  consumed almost five years[,]" (Dkt. 254-2, Pls.' Final Approval Brief at 10), the court finds it

4  significant that the Class Members will receive "immediate recovery by way of the compromise to

5  the mere possibility of relief in the future, after protracted and expensive litigation."  Nat'l Rural

6  Telecommc'ns. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 526 (C.D. Cal. 2004).  In short, the court

7  finds that this factor supports a finding that the settlement is fair, adequate, and reasonable.

8                    2.    **The Risk of Maintaining Class Action Status Through Trial**.

9           Because plaintiffs had not yet filed a motion for class certification, there was a risk that the

10  class would not be certified.  That risk was magnified in this case because nationwide class

11  certification under California law or the laws of multiple states is rare.  See, e.g., Mazza v. Am.

12  Honda Motor Co., 666 F.3d 581, 585 (9th Cir. 2012) (vacating class certification order because

13  the district court "erroneously concluded that California law could be applied to the entire

14  nationwide class"); In re Pharm. Indus. Average Wholesale Price Litig., 252 F.R.D. 83, 94 (D.

15  Mass. 2008) ("While numerous courts have talked-the-talk that grouping of multiple state laws is

16  lawful and possible, very few courts have walked the grouping walk.").  This factor also weighs in

17  favor of approving the settlement.  See Gardner v. GC Servs., LP, 2012 WL 1119534, *4 (S.D.

18  Cal. 2012) ("[B]ecause settlement was reached prior to a hearing on Plaintiff's motion for class

19  certification, settlement was reached at a time when there was still a risk that the class would not

20  be certified by the Court.").

21                    3.    **The Amount Offered in Settlement**.

22          "[T]he very essence of a settlement is compromise, a yielding of absolutes and an

23  abandoning of highest hopes."  Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1242 (9th Cir.

24  1998) (internal quotation marks omitted).  In granting preliminary approval of the settlement, the

25  court concluded that the settlement amount was fair, reasonable, and adequate in light of the

26  litigation risks in the case.  (See Dkt. 199, PAO at 18-28).  Accordingly, this factor also weighs in

27  favor of granting final approval.

28

4.     **The Extent of Discovery Completed and Stage of Proceedings**.

"A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair." Nat'l Rural Telecommc'ns, 221 F.R.D. at 528. "A court is more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." Id. at 527. The court previously examined these factors at length, noting that the parties had conducted extensive discovery, (see Dkt. 199, PAO at 19), and "thoroughly investigated and considered their own and the opposing parties' positions[,]" (id. at 20), which enabled them to develop "a sound basis for measuring the terms of the Settlement against the risks of continued litigation[.]" (Id.). The parties therefore entered the settlement discussions with a substantial understanding of the factual and legal issues from which they could advocate for their respective positions. See Nat'l Rural Telecommc'ns, 221 F.R.D. at 527-28 (noting that parties' examination of the factual and legal bases of the disputed claims through completion of discovery "strongly militates in favor of the Court's approval of the settlement"); Barbosa v. Cargill Meat Solutions Corp., 297 F.R.D. 431, 447 (E.D. Cal. 2013) ("What is required is that sufficient discovery has been taken or investigation completed to enable counsel and the court to act intelligently.") (internal quotation marks omitted). This factor also supports approval of the settlement.

5.     **The Experience and Views of Counsel**.

"Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation. This is because parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." Nat'l Rural Telecommc'ns, 221 F.R.D. at 528 (internal quotation marks and citation omitted). The court has previously noted the diligence, experience, and competency of class counsel. (See Dkt. 199, PAO at 14). According to class counsel, "the settlement is eminently reasonable in light of the results achieved, as measured against the risks and costs of further litigation." (Dkt. 192-3, Fax Decl. at ¶ 16). Thus, this factor also supports approval of the settlement.

1        6.   **The Presence of a Government Participant**.

2        There is no government participant in this matter.  Accordingly, this factor is inapplicable.

3  See Wren v. RGIS Inventory Specialists, 2011 WL 1230826, *10, supplemented by 2011 WL

4  1838562 (N.D. Cal. 2011) (noting that lack of government entity involved in case rendered this

5  factor inapplicable to the analysis).

6        7.   **The Reaction of Class Members to the Proposed Settlement**.

7        "It is established that the absence of a large number of objections to a proposed class

8  action settlement raises a strong presumption that the terms of a proposed class settlement action

9  are favorable to the class members."  Nat'l Rural Telecommc'ns, 221 F.R.D. at 529.  Here, as

10  class counsel noted, "[t]he reaction of Class Members has been overwhelmingly positive: [o]ver

11  133,000 Class Members filed claims, while fewer than 500 timely excluded themselves from the

12  Class, and only 15 filed objections[.]"  (Dkt. 254-2, Pls.' Final Approval Brief at 1-2).  Since

13  approximately 3.6 million class members received notice of the settlement, (see id. at 1 n. 2),

14  these figures roughly correspond to a 0.0139% exclusion rate and a 0.0004% objection rate

15  among noticed class members.

16        Most of the objections were filed by "serial" objectors who are well-known for routinely filing

17  meritless objections to class action settlements for the improper purpose of extracting a fee rather

18  than to benefit the Class.  These serial objectors include: (1) Timothy R. Hanigan and Christopher

19  Bandas, (see Dkt. 301, Court's Order of August 12, 2016, at 3); (2) Steve A. Miller, John C. Kress,

20  and Jonathan E. Fortman, (see Dkt. 302, Court's Order of August 12, 2016, at 3 n. 1); (3) Patrick

21  S. Sweeney,[7] (see Dkt. 234, May 27, 2016 Objection of Patrick Sweeney ("Sweeney Obj."); see

22  Larsen v. Trader Joe's Co., 2014 WL 3404531, *7 (N.D. Cal. 2014); (4) Jan L. Miorelli, see In re:

23   

---

24      [7]  In fact, Mr. Sweeney is so prolific in objecting to class action settlements that the court received another objection from him in a different case, Spann v. J.C. Penney Corp., Case No.

25  SA CV 12-0215 FMO (KESx) (C.D. Cal.) ("Spann"), for which the court held a final approval hearing on the same day as in this case.  (See id., Dkt. 265, June 30, 2016 Objection of Patrick

26  Sweeney).  What's more, in both cases, Mr. Sweeney's objections contain information unrelated to the subject litigation.  (See id. at ECF 5) (arguing that "Class Members will be compensated for

27  a percentage of the amount they were charged for the insurance policies" even though no insurance policies were ever at issue in the case); (Dkt. 234, Sweeney Obj. at ¶ 9) (objecting to

28  a cy pres procedure even though no such procedure exists under the Settlement Agreement).

1   Target Corp. Customer Data Sec. Breach Litig., 2016 WL 4942081, *1 (D. Minn. 2016); (5)

2   Christopher T. Cain, see Hill v. State St. Corp., 2015 WL 1734996, *2 (D. Mass. 2015); (6) W.

3   Allen McDonald, see In re Enfamil LIPIL Mktg. & Sales Practices Litig., 2012 WL 1189763, *4

4   (S.D. Fla. 2012); (7) Steven Helfand,[8] see Brown v. Hain Celestial Grp., Inc., 2016 WL 631880,

5   *9-10 (N.D. Cal. 2016); and (8) Joseph Darrell Palmer, see Dennis v. Kellogg Co., 2013 WL

6   6055326, *4 n. 2 (S.D. Cal. 2013).

7          The court has already stricken three objections filed by the serial objectors.  The objection

8   filed by attorney Palmer on behalf of his clients Geri Whaley and John Hightower, (Dkt. 231,

9   Objections of Geri Whaley and John Hightower ("Palmer Obj.")), was stricken because Mr. Palmer

10  was not authorized to practice law at the time he filed the objection.  (See Dkt. 298, Court's Order

11  of August 12, 2016).  The objections filed by Mr. Sweeney, (see Dkt. 234, Sweeney Obj.), and Mr.

12  McDonald, (see Dkt. 236, Objection to Proposed Settlement and Motion for Attorneys' Fees

13  ("McDonald Obj.")), were stricken after class counsel confirmed that Mr. Sweeney and Mr.

14  McDonald had refused to comply with class counsel's discovery requests.  (See Dkt. 328, Court's

15  Order of August 25, 2016, at ¶ 2).  As the court noted during the final approval hearing, when

16  someone objects to a class action settlement, that person is subject to discovery related to that

17  objection.  See also In re Netflix Privacy Litig., 2013 WL 6173772, *2 (N.D. Cal. 2013) ("[A]n

18  objector who voluntarily appears in litigation is properly subject to discovery.").  An objector cannot

19  refuse to participate in discovery and still have his or her objection considered by the court.

20         Regardless, the court has reviewed and considered the merits of all of the objections filed

21  by the serial objectors, including those objections stricken by the court.  The objection filed by

22  attorneys Miller, Kress, and Fortman materially misrepresents the Settlement Agreement, stating

23  repeatedly that "only Mr. Chambers and class counsel [are] getting paid on this case[,]" (see Dkt.

24  226, Kelly Kress' Objections to Class Action Settlement and Attorneys' Fees ("Kress Obj.") at 2),

25  even though many Class Members will receive cash payments.  (See Dkt. 199, PAO at 5 & 25).

26  The record is replete with other examples of how Kelly Kress and her counsel failed to

27

28        [8]  Like Mr. Sweeney, Mr. Helfand also filed a meritless objection in the Spann case.  (See Spann, Dkt. 260, Objection by Walter F. Ellingwood (filed by Mr. Helfand)).

comprehend even the basic terms of the Settlement Agreement.  (See, e.g., Dkt. 323, Plaintiffs' Supplemental Memorandum in Response to Certain Objections [] ("Pls.' Suppl. Memo") at 13-17) (identifying inaccuracies in Ms. Kress's objection and discussing statements made during the depositions of Ms. Kress and her counsel).  The objection filed by attorneys Hanigan and Bandas, (see Dkt. 232, First Amended Objections of Christine Knott and Kimberly Smith ("Knott Obj.")), contradicts several statements made by their client and objector, Christine Knott, during her deposition.  For example, Ms. Knott stated that she: would not object to a fee award of $27 million to class counsel, (see Dkt. 270-1, Excerpts of Deposition of Christine Knott at 76-77); agrees with the court's approval of the sale of Steve Chambers' websites to Whirlpool, (see Dkt. 254-5, Excerpts of Deposition of Christine Knott at 150); and believes the rebates provided under the settlement are valuable even if the rebate-holder does not purchase a new Whirlpool dishwasher. (See id. at 212).  Perhaps the lack of consistency between Ms. Knott's deposition testimony and her written objection can be explained by the fact that she never spoke with Mr. Hanigan or Mr. Bandas before the objection was filed.  (See id. at 34-38).  In fact, during her deposition, Ms. Knott testified that she did not even know that Mr. Hanigan represented her.  (See id. at 38).

In short, having considered all the arguments set forth by the serial objectors, (see Dkt. 226, Kress Obj.; Dkt. 231, Palmer Obj.; Dkt. 232, Knott Obj.; Dkt. 234, Sweeney Obj.; Dkt. 235, Objection to Class Action Settlement of George Liacopoulos (filed by Mr. Miorelli); Dkt. 236, McDonald Obj.), the court finds their objections to be without merit.  See Roberts v. Electrolux Home Prods., Inc., 2014 WL 4568632, *11 (C.D. Cal. 2014) (rejecting analogous objections submitted by serial objectors because "[t]heir main claim, that nothing short of a total recall of all Dryers could constitute a fair and reasonable settlement, not only ignores the allegations of the case and the positions of the Parties, but is meritless and demonstrates a failure to appreciate the fact that settlements are by necessity compromises.").

The court has also reviewed and considered all the objections submitted by non-serial objectors, and finds that they do not undermine the settlement.[9]  One objector felt that the

---

[9]  One objector withdrew her objection after discovering that she was not eligible to receive compensation under the settlement.  (See Dkt. 249, Request to Withdraw Objection at 2; Dkt. 227,

settlement "does not compensate . . . owners for their anxiety and concern" over potential future Overheating Events, and that "some financial compensation . . . is appropriate in order to compensate for the concern and anxiety . . . if the machine is not replaced." (Dkt. 209, Objection of Joel Rubenstein).  The settlement, however, does address these issues; it provides insurance-like coverage for future Overheating Events as well as rebates for owners who wish to replace their machines.  (See Dkt. 199, PAO at 4-5).  Two other objectors are concerned that they will not qualify for relief because they do not have the documentation or evidence required under the Settlement Agreement.  (See Dkt. 212, Objection of Helen E. Summers; Dkt. 238, Objection of Steven E. Rogers).  It is not unfair, however, to require Class Members to provide some modicum of proof to support their claims; otherwise, the Claims Administrator would have no way of identifying and rejecting claims that are erroneous or fraudulent.  Nonetheless, objectors who do not have the necessary documentation may still be able to submit a valid claim, as the Settlement Agreement requires the Claims Administrator to search defendants' databases for applicable records before deeming a claim deficient.  (See Dkt. 192-4, Settlement Agreement at 23 & 25, ¶¶ IV.B.3 & IV.B.5).

Finally, one objector who experienced an Overheating Event contends that $200 is insufficient compensation, and that defendants should "modify the safety warnings in future owner's manuals to prevent owners from experiencing what [she] experienced."  (Dkt. 239, Objection of Vicki M. Finn at 1).  Given that the objector's dishwasher functioned properly for over seven years, (see id.), the court is satisfied that the $200 payment does not render the settlement unfair.  Further, changing future owners' manuals would be ineffective because Whirlpool's current dishwashers have a different design, (see Dkt. 254-2, Pls.' Final Approval Brief at 25), and the enhanced safety warnings required by the settlement do help to address the objector's concerns.  (See id.).  In short, under the circumstances, the limited requests for exclusion and the small number of objections filed by non-serial objectors support approval of the settlement.  See Nat'l

Objection to Proposed Settlement).  Another objector wrote to express her disappointment that Whirlpool had not recalled all of its dishwashers, but stated that she "do[es] not object to the settlement[.]"  (See Dkt. 237).  The court has reviewed and considered the merits of the remaining objections and has addressed each of them, directly or indirectly, throughout this Order.

1  Rural Telecommc'ns, 221 F.R.D. at 529; Churchill Vill., LLC v. Gen. Elec., 361 F.3d 566, 577 (9th

2  Cir. 2004) (upholding final approval of a class settlement where "only 45 of the approximately

3  90,000 notified class members objected to the settlement" and 500 class members opted out).

4          E.      Whether the Settlement is the Product of Collusion.

5          Because the parties negotiated and reached a settlement prior to formal certification of the

6  class, the court must ensure that the settlement was not the product of collusion.  See Bluetooth,

7  654 F.3d at 947-48.  In granting preliminary approval of the settlement, the court carefully

8  scrutinized the settlement and concluded that "there is no evidence of collusion or fraud leading

9  to, or taking part in, the settlement negotiations between the parties."  (Dkt. 199, PAO at 19).

10         With respect to "signs" of collusion, the court notes that, unlike Bluetooth, where the class

11  received no monetary award, a portion of the class members here will receive monetary relief.

12  (See Dkt. 199, PAO at 4-5).  Moreover, "[b]ecause the parties have not agreed to an amount or

13  even a range of attorneys' fees, and have placed the matter entirely into the Court's hands for

14  determination, there is no threat of the issue explicitly tainting the fairness of settlement

15  bargaining."  Turner v. Murphy Oil USA, Inc., 472 F.Supp.2d 830, 845 (E.D. La. 2007).  Finally,

16  because there is no common fund, no unclaimed funds will revert to defendants.  (See, generally,

17  Dkt. 192-4, Settlement Agreement).

18         In short, there are no signs of collusion in the negotiation of the settlement.  Indeed, the

19  settlement provides substantial relief for the class and was reached via arms-length negotiations

20  with the assistance of an experienced mediator.  (See Dkt. 199, PAO at 19); see also In re HP

21  Laser Jet Litig., 2011 WL 3861703, *4 (C.D. Cal. 2011) (finding that, although Bluetooth warning

22  signs were present, while not dispositive, the fact "that the parties appeared before a neutral third

23  party mediator" supported "a finding of non-collusion").  Thus, the court finds that the settlement

24  is fair, reasonable, and adequate, and not the product of collusion among the parties.

25  II.    AWARD OF ATTORNEY'S FEES, COSTS, AND SERVICE AWARDS.

26         A.      Attorney's Fee Award.

27         As part of the settlement, the parties agreed to "negotiate in good faith the award of

28  attorneys' fees and costs to be paid by [defendants] to Class Counsel, subject to court approval."

1 (Dkt. 192-4, Settlement Agreement at 47, § IX.B).  The parties further agreed that, if they "are

2 unable to agree on a stipulated amount of attorneys' fees and costs to be awarded to Plaintiffs'

3 counsel, the parties will submit their dispute regarding the award of attorneys' fees and costs to

4 the Court."  (Id.).  Because the parties could not agree on a stipulated amount of attorney's fees,

5 plaintiffs have filed a contested Fees Motion.  (See Dkt. 218, Fees Motion).

6                     1.    **Method of Determining the Award**.

7         Rule 23(h) provides that, "[i]n a certified class action, the court may award reasonable

8 attorney's fees . . . that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).

9 Generally speaking, courts have discretion to choose among two different methods for calculating

10 a reasonable attorney's fee award.  See Bluetooth, 654 F.3d at 941; Laffitte v. Robert Half Int'l

11 Inc., 1 Cal.5th 480, 504 (2016) ("The choice of a fee calculation method is generally one within the

12 discretion of the trial court[.]").  Under the "percentage-of-the-fund" or "percentage-of-recovery"

13 method, the "court simply awards the attorneys a percentage of the fund sufficient to provide class

14 counsel with a reasonable fee."  Hanlon, 150 F.3d at 1029.  This method is typically used when

15 a common fund is created.  See Bluetooth, 654 F.3d at 942.

16        Alternatively, under the lodestar method, the court multiplies the number of reasonable

17 hours expended by a reasonable hourly rate.  See Hanlon, 150 F.3d at 1029.  Once the lodestar

18 has been determined, the "figure may be adjusted upward or downward to account for several

19 factors including the quality of the representation, the benefit obtained for the class, the complexity

20 and novelty of the issues presented, and the risk of nonpayment."  Id.  The lodestar method is

21 typically utilized when the relief obtained is "not easily monetized," such as when injunctive relief

22 is part of the settlement.  See Bluetooth, 654 F.3d at 941.  The court's discretion in choosing

23 between these two methods "must be exercised so as to achieve a reasonable result."  Id. at 942;

24 see Laffitte, 1 Cal.5th at 504 ("[T]he goal under either the percentage or lodestar approach [is to]

25 award . . . a reasonable fee to compensate counsel for their efforts.").

26        Defendants assert that CAFA requires the court to apply a percentage-of-recovery

27 approach, which would limit the award of attorney's fees to a percentage of the actual redemption

28 value of the rebates awarded.  (See Dkt. 246, Opposition to Plaintiffs' Motion for Attorneys' Fees[]

1  ("Fees Opp.") at 25-28).  However, the court is not convinced that CAFA governs attorney's fees

2  in this case.  In diversity actions such as this one, the Ninth Circuit applies state law to determine

3  the right to fees and the method for calculating fees.  See Mangold v. Cal. Public Util. Comm'n,

4  67 F.3d 1470, 1478 (9th Cir. 1995) ("Existing Ninth Circuit precedent has applied state law in

5  determining not only the right to fees, but also in the method of calculating the fees."); Rodriguez

6  v. Disner, 688 F.3d 645, 653 n. 6 (9th Cir. 2012) ("If . . . we were exercising our diversity

7  jurisdiction, state law would control whether an attorney is entitled to fees and the method of

8  calculating such fees."); see also Roberts, 2014 WL 4568632, at *8 (holding that "the lodestar

9  method is the appropriate approach for the calculation of attorneys' fees in this case[,]" and not

10  mentioning CAFA).

11       Further, the Settlement Agreement provides that "the rights and obligations of the Parties

12  shall be construed and enforced in accordance with, and governed by, the laws of the State of

13  California." (Dkt. 192-4, Settlement Agreement at 55, § XV.G).  The Settlement Agreement does

14  not exclude attorney's fees from its choice of law provision, (see, generally, id.), nor does CAFA

15  preempt the parties' choice of law clause.  See Norris v. Commercial Credit Counseling Servs.,

16  Inc., 2010 WL 1379732, *3 (E.D. Tex. 2010) ("[T]he court declines to adopt the Plaintiffs' assertion

17  that CAFA preempts the contractual forum selection/choice-of-law clause."); Guenther v.

18  Crosscheck Inc., 2009 WL 1248107, *5 (N.D. Cal. 2009) ("CAFA does not trump a valid,

19  enforceable and mandatory forum-selection clause[.]").

20       But even assuming CAFA did apply, the court would still have discretion in choosing the

21  method of determining attorney's fees.  Under 28 U.S.C. § 1712(a), "[i]f a proposed settlement in

22  a class action provides for a recovery of coupons to a class member, the portion of any attorney's

23  fee award to class counsel that is attributable to the award of the coupons shall be based on the

24  value to class members of the coupons that are redeemed."  In so-called "coupon settlements" –

25  meaning settlements where the only relief afforded to class members is one or more coupons[10]

26

27       [10]  Although CAFA defines a variety of terms, see 28 U.S.C. § 1711, it does not define a
"coupon."  See, generally, id.  Courts have generally held that "a coupon is a discount on
28  merchandise or services offered by the defendant," Foos v. Ann, Inc., 2013 WL 5352969, *2 (S.D.
Cal. 2013) (emphasis omitted), which "require[s] class members to do future business with the

1   – some courts, including the Ninth Circuit, have held that it is inappropriate to award fees using

2   the lodestar method.  See, e.g., In re HP Inkjet Printer Litig. ("HP Inkjet"), 716 F.3d 1173, 1183-84

3   (9th Cir. 2013) (holding that "in a case where the class receives only coupon relief," attorney's fees

4   must "be calculated using the redemption value of the coupons"); Davis v. Cole Haan, Inc., 2013

5   WL 5718452, *2 & *3 (N.D. Cal. 2013) (holding that, where "the proposed settlement is a coupon

6   settlement[,] . . . the Court cannot award the requested lodestar award"); but see In re Sw. Airlines

7   Voucher Litig., 799 F.3d 701, 708-09 (7th Cir. 2015) (rejecting the majority view in HP Inkjet and

8   holding instead that 28 U.S.C. § 1712(a) "does not . . . prohibit the use of the lodestar method for

9   coupon settlements"); HP Inkjet, 716 F.3d at 1187 (Berzon, J., dissenting) ("On my reading of the

10  statute, CAFA allows the use of a lodestar to calculate attorney's fees . . . whether the relief

11  obtained for the class involves, in whole or in part, coupons, or whether it does not.").

12        This settlement, however, is not a pure coupon settlement.  In addition to coupon relief, the

13  settlement provides monetary and injunctive relief.  (See Dkt. 199, PAO at 4-5) (describing the

14  settlement terms).  For example, qualifying class members will receive full cash reimbursement

15  for repair costs and/or a cash payment of $200 or $300 for the purchase of a replacement

16  dishwasher.  (See id. at 4).  Moreover, all Class Members – as well as Non-Class Members and

17  the general public – will benefit from the enhanced safety instructions and revisions to Whirlpool's

18  service kit pointers and training bulletins required by the settlement.  (See id. at 5).  The settlement

19  also provides "insurance-like" coverage for future Overheating Events for owners of the

20  approximate 13.5 million Dishwashers still in service.  (See Dkt. 276, Reply in Support of Award

21  of Attorneys' Fees [] ("Fees Reply") at  2).

22        Where, as here, the settlement includes both coupon relief and monetary relief, CAFA

23  authorizes the court to calculate attorney's fees utilizing the lodestar method.  See 28 U.S.C. §

24  1712(b) ("If a proposed settlement in a class action provides for a recovery of coupons to class

25

26  defendant in order to receive compensation." True v. Am. Honda Motor Co., 749 F.Supp.2d 1052,
    1069 (C.D. Cal. 2010).  At the final approval hearing, plaintiffs argued that the rebates provided
27  under the settlement do not qualify as coupons.  The court need not resolve this question,
    however, because the lodestar method is appropriate regardless of whether the rebates are
28  coupons for CAFA purposes.

1   members, and a portion of the recovery of the coupons is not used to determine the attorney's fee

2   to be paid to class counsel, any attorney's fee award shall be based upon the amount of time class

3   counsel reasonably expended working on the action."); Davis, 2013 WL 5718452, at *2 ("Lodestar

4   fees may . . . be awarded if the class obtains non-coupon relief."); HP Inkjet, 716 F.3d at 1183

5   ("Whereas § 1712(a) governs cases where the class obtains only coupon relief, § 1712(b) applies

6   in situations where a coupon settlement also provides for non-coupon relief[.]").

7           Defendants argue in the alternative that the court should treat the settlement as a "mixed"

8   settlement under 28 U.S.C. § 1712(c), which requires the court to use the percentage-of-recovery

9   method to calculate the portion of attorney's fees based on coupon relief, see 28 U.S.C. §

10  1712(c)(1), and the lodestar method to calculate the portion of attorney's fees based on equitable

11  relief.  (See Dkt. 246, Fees Opp. at 29-30).  However, this provision only applies when the

12  settlement "provides for an award of coupons to class members and also provides for equitable

13  relief, including injunctive relief[.]" 28 U.S.C. § 1712(c).  It does not contemplate – and therefore

14  does not apply to – settlements that involve coupon relief and monetary relief.  See Shames v.

15  Hertz Corp., 2012 WL 5392159, *16 n. 14 (S.D. Cal. 2012) (holding that 28 U.S.C. § 1712(c) does

16  not apply to settlements that involve "monetary relief in the form of cash payments").  Attorney's

17  fees for such settlements are calculated under 28 U.S.C. § 1712(b).  See HP Inkjet, 716 F.3d at

18  1183.

19          Finally, defendants assert that even if the court has discretion to apply the lodestar method,

20  the court should nevertheless use the percentage-of-recovery method because "coupons are the

21  'primary' benefit" conferred by the settlement.  (See Dkt. 246, Fees Opp. at 26).  According to

22  defendants, "more than 99.8% of the Class is eligible to make a claim for only a coupon."  (Id. at

23  27) (emphasis in original).  But even if defendants' calculation is correct, that does not mean

24  rebates are the primary benefit of the settlement; the crux of this action deals with the Overheating

25  Events suffered by owners of Class Dishwashers, and the settlement entitles each of those

26  individuals to monetary relief.  (See Dkt. 199, PAO at 5 & 25).  The rebates are simply an

27  additional benefit beyond the primary relief of compensating "Class members whose dishwashers

28  have failed, and [providing] coverage for future failures." (Dkt. 276, Fees Reply at 7).  Taking up

1   defendant's invitation to apply the percentage-of-recovery method would punish class counsel for

2   obtaining additional relief.  For that reason, and because the settlement does not create a common

3   fund, the court finds that the lodestar method is appropriate.[11]  See Grays Harbor Adventist

4   Christian Sch. v. Carrier Corp., 2008 WL 1901988, *1 (W.D. Wash. 2008) ("Because the attorneys'

5   fees will be paid separately by [defendant] without reducing the relief available to the Class, the

6   lodestar method is appropriate.").

7                    2.    **Lodestar Figure**.

8          "The lodestar calculation begins with the multiplication of the number of hours reasonably

9   expended by a reasonable hourly rate."  Hanlon, 150 F.3d at 1029.  The number of hours

10  reasonably expended "is calculated by considering whether, in light of the circumstances, the time

11  could reasonably have been billed to a private client."  Moreno v. City of Sacramento, 534 F.3d

12  1106, 1111 (9th Cir. 2008).  In general, courts "'should defer to the winning lawyer's professional

13  judgment as to how much time he was required to spend on the case.'"  Chaudhry v. City of L.A.,

14  751 F.3d 1096, 1111 (9th Cir.), cert. denied, 135 S.Ct. 295 (2014) (quoting Moreno, 534 F.3d at

15  1112).  "Typically, '[a]n attorney's sworn testimony that, in fact, [he] took the time claimed . . . is

16  evidence of considerable weight on the issue of the time required."  Holt v. Kormann, 2012 WL

17  5829864, *6 (C.D. Cal. 2012) (internal quotation marks omitted).  Nevertheless, the court is tasked

18  with conducting its own independent review.  See Gates v. Deukmejian, 987 F.2d 1392, 1401 (9th

19  Cir. 1992) (holding that the court has a duty "to independently review plaintiffs' fee request").

20         "[T]he determination of a reasonable hourly rate is not made by reference to the rates

21  actually charged the prevailing party[,]" but rather, "by reference to the fees that private attorneys

22  of an ability and reputation comparable to that of prevailing counsel charge their paying clients for

23  legal work of similar complexity."  Welch v. Metro. Life Ins. Co., 480 F.3d 942, 946 (9th Cir. 2007)

24  (internal quotation marks omitted).  The court must determine the reasonable hourly rate in the

25  context of rates charged in "the relevant community[,]" which is "the forum in which the district

26  court sits."  Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 979 (9th Cir. 2008).   "The hours

27  _____

28        [11]  The court would apply the lodestar method, and would reach the same result with respect to the award of attorney's fees and costs, under either California law or 28 U.S.C. § 1712(b).

1  expended and the rate should be supported by adequate documentation and other evidence[.]"

2  <u>Hanlon</u>, 150 F.3d at 1029.  Once calculated, "there is a 'strong presumption' that the lodestar

3  figure is reasonable[.]"  <u>Perdue v. Kenny A. ex rel. Winn</u>, 559 U.S. 542, 554, 130 S.Ct. 1662, 1673

4  (2010) ("[T]he lodestar figure has, as its name suggests, become the guiding light of our

5  fee-shifting jurisprudence.") (internal quotation marks omitted).

6        The documentation submitted by class counsel shows an unadjusted lodestar of

7  $8,948,487.98.  (<u>See</u> Dkt. 218-3, Firm Time & Expense Summary at 2).  This figure consists of

8  23,860.75 hours worked by all class counsel, (<u>see id.</u>), multiplied by an average hourly rate of

9  approximately $375.  (<u>See</u> Dkt. 218-1, Memorandum of Points and Authorities in Support of

10  Plaintiffs' [Fees Motion] ("Fees Brief") at 19 n. 9).  Defendants do not challenge the total number

11  of hours billed by class counsel, nor do they point to any specific time entries for which class

12  counsel should not compensated.  (<u>See</u>, <u>generally</u>, Dkt. 246, Fees Opp.); <u>see also</u> <u>Gates</u>, 987

13  F.2d at 1397-98 ("The party opposing the fee application has a burden of rebuttal that requires

14  submission of evidence to the district court challenging the accuracy and reasonableness of the

15  hours charged or the facts asserted by the prevailing party in its submitted affidavits."); <u>Scarfo v.</u>

16  <u>Cabletron Sys. Inc.</u>, 54 F.3d 931, 965-66 (1st Cir. 1995) (holding that defendant's failure to

17  challenge plaintiff's counsel's assertion regarding billed time constituted waiver on appeal).

18        Defendants do, however, lodge a series of objections to the reasonableness of class

19  counsel's hourly rates and billing practices.  (<u>See</u> Dkt. 246, Fees Opp. at 34-49).  Defendants

20  assert that the court "should reduce the base lodestar because several firms seek to charge

21  excessive rates for document review[.]"  (<u>See id.</u> at 35).  In particular, defendants challenge the

22  fees sought by three plaintiffs' firms, Chimicles & Tikellis, LLP ("C&T"), Lieff Cabraser Heimann

23  & Bernstein, LLP ("LCHB"), and Weinstein Kitchenoff & Asher LLC ("WK&A"), which collectively

24  seek to recover approximately $2,200,000 in fees for 5,224 hours of document review, resulting

25  in a blended rate of $421.60 per hour.  (<u>See id.</u> at 36).  Having reviewed the law firms' time and

26  billing records, (<u>see</u> Dkt. 222-1, Declaration of Timothy N. Mathews [] ("Mathews Decl.") (C&T);

27  Dkt. 222-2, Declaration of Nicole D. Sugnet [] ("Sugnet Decl.") (LCHB); Dkt. 218-9, Declaration of

28  Robert S. Kitchenoff [] (WK&A)), the court finds that the number of hours expended on document

1    review and the hourly rates sought by counsel are reasonable.

2          The main thrust of defendants' argument is that plaintiffs' firms could have performed the

3    same document review at less cost by hiring contract attorneys instead of keeping document

4    review in-house.  (See Dkt. 246, Fees Opp. at 37-38) (suggesting that the court "adjust the rates

5    applicable to 75% of Class Counsel's document review time down to a contract attorney rate of

6    $60 per hour").  While the court "may permissibly look to the hourly rates charged by comparable

7    attorneys for similar work," it "may not attempt to impose its own judgment regarding the best way

8    to operate a law firm, nor to determine if different staffing decisions might have led to different fee

9    requests."  Moreno, 534 F.3d at 1115.  The court's determination must be driven by "[t]he difficulty

10   and skill level of the work performed, and the result achieved – not whether it would have been

11   cheaper to delegate the work to other attorneys[.]"  Id.  Thus, even if the court did consider a

12   hypothetical scenario where class counsel retained contract attorneys, the court could only

13   speculate as to how counsel's overall costs would have differed.  (See Dkt. 276, Fees Reply at

14   17) (explaining that hiring "minimally-qualified outside contractors" to conduct document review

15   "would have increased Class Counsel's overall document review lodestar") (emphasis in original).

16         Contrary to defendants' position, (see Dkt. 246, Fees Opp. at 37-38), it is not always

17   appropriate to hire contract attorneys to perform document review.  Arguably, when a party needs

18   to conduct basic document review to respond to voluminous discovery requests – a task that is

19   typically limited to "checking the box" for relevance and privilege – it might make sense to engage

20   an agency offering a pool of temporary contract attorneys.  The same is not true, however, when

21   a small plaintiff's firm engaged in high-stakes litigation needs to review voluminous disclosures by

22   well-heeled corporate defendants – a task that, to ensure critical evidence is not missed, requires

23   attention to detail and a sophisticated understanding of the facts and law at issue in the case.

24   Given class counsel's experience prosecuting similar complex civil cases, (see Dkt. 199, PAO at

25   14) ("Class Counsel are among the most capable and experienced lawyers in the country in these

26   kind of cases."), and the Ninth Circuit's admonition that the court "may not attempt to impose its

27   own judgment regarding the best way to operate a law firm[,]" see Moreno, 534 F.3d at 1115, the

28   court will not second-guess class counsel's staffing decisions in this case.

1    In any event, regardless of whether a task is performed by a law firm partner, a contract

2    attorney, or a paralegal, the reasonableness of the fees depends on "[t]he difficulty and skill level

3    of the work performed, and the result achieved[,]" Moreno, 534 F.3d at 1115, not the title of the

4    person who did the work.  See In re: Cathode Ray Tube Antitrust Litig. ("In re CRT"), 2016 WL

5    721680, *45 (N.D. Cal. 2016) ("[T]he legal community now commonly uses contract attorneys.

6    There is not the slightest justification to downgrade their billing rates or not apply a multiplier to

7    them.").  These considerations weigh in favor of approving the fees sought by class counsel.  With

8    respect to difficulty, the court does not agree that document review is menial or mindless work;

9    in complex civil litigation such as the instant case, it is a critically important and challenging task.

10   With respect to skill, while defendants argue that the court should consider class counsel's first-

11   level reviewers as "contract attorneys[,]" (see Dkt. 246, Fees Opp. at 37 n. 24), defendants have

12   not identified, and the court is not aware of, any reason to doubt the skill level of the work these

13   attorneys performed.  (See, generally, id.).  Finally, as to the result achieved, the court has already

14   concluded that class counsel negotiated a "compelling" settlement, particularly "given the

15   substantial litigation risks" at play.  (See Dkt. 199, PAO at 21).

16   Excluding fees attributable to Anthony Geyelin, whose role as lead attorney for the entire

17   document review involved very little first-level review,[12] (see Dkt. 276, Fees Reply at 18; Dkt. 276-

18   1, Supplemental Declaration of Timothy N. Mathews [] ("Mathews Suppl. Decl.") at ¶ 6), the

19   blended rate for the document review challenged by defendants is $260.75 per hour.[13]  (See Dkt.

20   276, Fees Reply at 18).  Courts have routinely approved document review fees at similar or higher

21   rates charged by "attorneys of an ability and reputation comparable to that of prevailing counsel

22

23   [12]  The court finds that it is appropriate to exclude Geyelin's fees from the calculation of a
24   blended document review rate because Geyelin's work was fundamentally different from that of
     the first-level document reviewers.  As "the central point person for the document review," Geyelin
25   "performed key roles with respect to deposition preparation, trial preparation, and other litigation
     tasks."  (Dkt. 276-1, Mathews Suppl. Decl. at ¶ 6; see Dkt. 217-2, Declaration of Timothy N.
26   Mathews at ¶¶ 25-26).

27   [13]  Even this figure may overstate the true blended hourly rate for class counsel's first-level
28   reviewers, because it includes work performed by attorney Christina Saler, who "did not perform
     any first level document review.  All of her work related to second level review and preparation of
     a detailed memorandum of facts."  (Dkt. 276, Fees Reply at 19 n. 20).

1   . . . for legal work of similar complexity." <u>Welch</u>, 480 F.3d at 946 (internal quotation marks

2   omitted); <u>see</u>, <u>e.g.</u>, <u>In re CRT</u>, 2016 WL 721680, at *43 (holding that class counsel's "rate for

3   document review at $350 per hour" was "reasonable and responsible"); <u>Perfect 10, Inc. v.</u>

4   <u>Giganews, Inc.</u>, 2015 WL 1746484, *21 (C.D. Cal. 2015) (approving "paralegal fees at rates

5   between $240 for a paralegal with five years' experience to $345 for a paralegal with 23 years'

6   experience").  Under the circumstances, the court finds that class counsel's requested document

7   review rates are reasonable.

8        Next, defendants contend that the court "should reduce the base lodestar for claimed hourly

9   rates that are unreasonably high[.]"[14] (<u>See</u> Dkt. 246, Fees Opp. at 38).  Defendants challenge the

10  rates claimed by two firms, LCHB and C&T, (<u>See</u> <u>id.</u> at 39-42), both of which are preeminent law

11  firms which almost exclusively prosecute high-stakes, complex class actions against the largest

12  companies in the world.  (<u>See</u> Dkt. 222-1, Mathews Decl. at ¶¶ 8 & 11-12 (C&T); Dkt. 222-2,

13  Sugnet Decl. at ¶¶ 2-5 (LCHB)).  Having reviewed the record, the court finds that counsel from

14  C&T and LCHB have provided sufficient documentation to support their claimed hourly rates.

15  Steven Schwartz and Timothy Mathews have extensive class action experience, including many

16  cases where they have served as co-lead counsel and obtained full recoveries on behalf of

17  consumers.  (<u>See</u> Dkt. 222-1, Mathews Decl. at ¶¶ 4-12) (describing a $42 million summary

18  judgment in a class action against Safeway and a $53 million class action recovery from Apple).

19  Nicole Sugnet and Kristen Sagafi of LCHB have achieved similarly impressive results in consumer

20  and other class actions against large companies.  (<u>See</u> Dkt. 222-2, Sugnet Decl. at ¶¶ 5-9)

21  (describing multi-million dollar settlements obtained in a variety of cases).

22       The rates charged by these attorneys range from $485 to $750 per hour.  (<u>See</u> Dkt. 246,

23  Fees Opp. at 40-41) (challenging the rates charged by Schwartz ($750/hour), Mathews

24  ($600/hour), Sagafi ($625/hour), and Sugnet ($485/hour)).  In Los Angeles, hourly rates between

25  _____

26  [14]  Defendants also argue that the court "should reduce the lodestar for unsupported rates[.]" (<u>See</u> Dkt. 246, Fees Opp. at 47).  Specifically, defendants argue that WK&A failed to submit

27  sufficient biographical information for four billers: Eckart, Ely, Quarembo, and Spiegel.  (<u>See</u> <u>id.</u>). To rebut this argument, class counsel submitted an additional declaration regarding the four

28  billers, which demonstrates that they are sufficiently experienced to justify their claimed billing rates.  (<u>See</u> Dkt. 276-5, Supplemental Declaration of Robert S. Kitchenoff [] at ¶¶ 12-16).

1   $485 and $750 are common.  See, e.g., Counts v. Meriweather, 2016 WL 1165888, *3-4 (C.D.

2   Cal. 2016) (finding hourly rates of $701.25, $552.50, and $446.25 per hour "reasonable and

3   consistent with the prevailing rates in the Central District"); Rodriguez v. Cty. of L.A., 96 F.Supp.3d

4   1012, 1023 (C.D. Cal. 2014) (approving rates from $500 to $975); (see also Dkt. 218-1, Fees Brief

5   at 19) (quoting a National Law Journal survey of regional billing rates published in 2014, showing

6   standard partner rates among top Los Angeles firms ranging from $490 to $975).  Thus, the court

7   finds that the challenged rates are reasonable and consistent with those charged by comparable

8   attorneys in the Central District.[15]

9        Defendants urge the court to ignore class counsel's actual billing rates and instead apply

10  the Laffey matrix, an inflation-adjusted table of hourly rates for attorneys and paralegals

11  maintained by the U.S. Attorney's Office for the District of Columbia.  (See Dkt. 246, Fees Opp.

12  at 42).  The Ninth Circuit has questioned the reliability of the Laffey matrix, describing it as an

13  unreliable measure of fees, particularly for legal markets on the west coast.  See Prison Legal

14  News v. Schwarzenegger, 608 F.3d 446, 454 (9th Cir. 2010) ("[J]ust because the Laffey matrix

15  has been accepted in the District of Columbia does not mean that it is a sound basis for

16  determining rates elsewhere, let alone in a legal market 3,000 miles away.  It is questionable

17  whether the matrix is a reliable measure of rates even in Alexandria, Virginia, just across the river

18  from the nation's capital.").  The court agrees that the Laffey matrix is a less useful tool than both

19  class counsel's true billing rates and the National Law Journal's 2014 survey, and therefore

20  declines to consider or apply it.

21       Defendants also challenge class counsel's submission of their current hourly rates, and

22  contend that those rates should be adjusted to represent the "historical" rates for all plaintiffs'

23  firms.  (See Dkt. 246, Fees Opp. at 45).  "District courts have the discretion to compensate

24  plaintiff's attorneys for a delay in payment by . . . applying the attorneys' current rates to all hours

25

26       [15]  Defendants also argue that "the price of legal services in San Francisco[,]" where LCHB is
    located, "is higher than in the Central District."  (See Dkt. 246, Fees Opp. at 40).  However, it
27  makes no difference whether San Francisco lawyers are generally more expensive than Los
    Angeles lawyers – the only question before the court is whether these particular attorneys' rates
28  are in line with the prevailing standards of the Central District.  See Camacho, 523 F.3d at 979.

billed during the course of the litigation[.]"  Welch, 480 F.3d at 947.  Here, class counsel has

waited approximately five years to collect a fee in this case, and during that time they spent over

$500,000 in out of pocket costs to prosecute the action.  (See Dkt. 218-1, Fees Brief at 2 & 45).

Under the circumstances, the court finds it appropriate to award class counsel attorney's fees

based on their current hourly rates as compensation for the delay in payment.

Finally, defendants assert that the court "should reduce the lodestar for improper billing

entries in quarter-hour increments."  (See Dkt. 246, Fees Opp. at 47).  While quarter-hour billing

is not per se unreasonable, several courts have imposed across-the-board fee reductions on the

ground that this practice may have resulted in excessive billing.  See, e.g., Welch, 480 F.3d at

948-49 (affirming district court's 20% across-the-board reduction for quarter-hour billing); Benihana

of Tokyo, LLC v. Angelo, Gordon & Co., 2015 WL 5439357, *7 (D. Haw. 2015) ("The Court finds

that a ten percent reduction in mainland counsel's hours is appropriate to ensure that Plaintiff does

not receive any undue benefit from her counsel's practice of quarter-hour billing.").  Courts are

particularly inclined to reduce fees when an attorney's time entries contain a large number of

quarter-hour or half-hour entries for simple tasks that are likely to have taken a fraction of the

recorded time, such as e-mails or telephone calls.  See, e.g., Benihana of Tokyo, LLC, 2015 WL

5439357, at *7 (reducing fees based on quarter-hour billing because "[t]here are many time entries

that reflect that counsel billed for fifteen minutes to review emails with co-counsel and simple pro

hac vice forms that likely took only a few minutes to review"); Rosales v. El Rancho Farms, 2015

WL 4460635, *30 (E.D. Cal. 2015) (reducing fees by 20% where an attorney's "billing 15 minutes

for reading a minute order suggests that the reported time was inflated significantly by the quarter-

hour billing minimum on other tasks such as reviewing emails, leaving a telephone message, and

conferences with co-counsel") (emphasis in original).

Here, over half of the time entries claimed by C&T attorneys Schwartz and Mathews are

for simple tasks that purportedly took 15 or 30 minutes to complete.  (See Dkt. 222-1, Mathews

Decl. at Exh. 4, ECF 5903-6078; see also Dkt. 246, Fees Opp. at 48 (identifying "857 quarter-hour

and half-hour entries for emails, phone calls, and intra-office conferences" which correspond to

51.6% of Mathews' entries and 53.4% of Schwartz's entries)).  Many of these entries are vague

in describing the scope of the tasks performed.  For example, one 15 minute entry refers to "pro

hac issues."  (See id. at ECF 5968).  Another 15 minute entry refers to an "email regarding

warranty stip[ulation]."  (See id. at ECF 5978).  Both of these tasks are of a type that could have

taken "only a few minutes to [complete]."  Benihana of Tokyo, LLC, 2015 WL 5439357, at *7, see

Welch, 480 F.3d at 949 ("[T]he court found the hours were inflated because counsel billed a

minimum of 15 minutes for numerous phone calls and e-mails that likely took a fraction of the

time.").  Under the circumstances, the court will apply a ten percent across-the-board reduction

on Schwartz and Mathews' overall fees, for a total reduction of $130,038.75.  (See Dkt. 221-1,

Schwartz Decl. at Exh. 2, ECF 5899) (listing Schwartz and Mathews' total combined lodestar as

$1,300,387.50); see also Moreno, 534 F.3d at 1112 (holding that the district court can impose a

"haircut" reduction of ten percent "based on its exercise of discretion and without a more specific

explanation").

        In short, the court calculates class counsel's lodestar at 8,818,449.23,[16] and finds this figure

to be reasonable and supported by adequate documentation.  See Blum v. Stenson, 465 U.S. 886,

897, 104 S.Ct. 1541, 1548 (1984) (holding that the resulting lodestar figure "is presumed to be [a]

reasonable fee").

                        3.    **Lodestar Multiplier**.

        Although the lodestar figure is presumptively reasonable, see Perdue, 559 U.S. at 554, 130

S.Ct. at 1673, "that presumption may be overcome in those rare circumstances in which the

lodestar does not adequately take into account a factor that may properly be considered in

determining a reasonable fee."  Id.  Thus, after computing the lodestar, "[t]he resulting figure may

be adjusted upward or downward to account for several factors[.]"  Hanlon, 150 F.3d at 1029; see

Stetson v. Grissom, 821 F.3d 1157, 1166 (9th Cir. 2016) ("The district court also has discretion

to adjust the lodestar upward or downward using a multiplier that reflects a host of reasonableness

factors[.]") (internal quotation marks omitted).  The factors that the court should consider, known

as the Kerr factors, include: (1) the time and labor required; (2) the novelty and difficulty of the

---

[16]  This figure equals the proposed lodestar of $8,948,487.98, less $130,038.75.

1   questions involved; (3) the skills necessary to perform the legal services properly; (4) the

2   preclusion of other employment by the attorney due to acceptance of the case; (5) the customary

3   fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the

4   circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation,

5   and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the

6   professional relationship with the client; and (12) awards in similar cases. See Kerr v. Screen

7   Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir.1975), abrogated on other grounds by City of

8   Burlington v. Dague, 505 U.S. 557, 112 S.Ct. 2638 (1992).

9       Class counsel requests that the court apply a 1.68 multiplier to their unadjusted lodestar.

10  (See Dkt. 218-1, Fees Brief at 26).  In the Ninth Circuit, multipliers "ranging from one to four are

11  frequently awarded . . . when the lodestar method is applied." Vizcaino v. Microsoft Corp., 290

12  F.3d 1043, 1051 n. 6 (9th Cir.), cert. denied, 537 U.S. 1018 (2002) (approving multiplier of 3.65);

13  see Parkinson v. Hyundai Motor Am., 796 F.Supp.2d 1160, 1170 (C.D. Cal. 2010) ("Where

14  appropriate, multipliers may range from 1.2 to 4 or even higher."); Van Vranken v. Atl. Richfield

15  Co., 901 F.Supp. 294, 298-99 (N.D. Cal. 1995) (holding that a multiplier of 3.6 was "well within the

16  acceptable range for fee awards in complicated class action litigation" and that "[m]ultipliers in the

17  3-4 range are common"). Thus, class counsel's request for a 1.68 multiplier is in line with, if not

18  lower than, the multipliers applied by courts in similarly complex class actions. See, e.g., Vizcaino,

19  290 F.3d at 1052-54 (tallying multipliers in dozens of class action suits); In re: Cathode Ray Tube

20  Antitrust Litig., 2016 WL 4126533, *10 (C.D. Cal. 2016) (multiplier of 1.96); In re High-Tech Emp.

21  Antritrust Litig., 2015 WL 5158730, *10 (N.D. Cal. 2015) (multiplier of 2.2); Barovic v. Ballmer,

22  2016 WL 199674, *4 (W.D. Wash. 2016) (multiplier of 2.5).

23      Here, nearly all of the Kerr factors support the requested multiplier.[17]  Litigating this case

24  required an extraordinary amount of time and labor; the case involved 18 plaintiffs from 11 states

25  ────────────────

26  [17]  Several of the Kerr factors are neutral or do not apply: (1) the record contains no evidence
     of whether class counsel were precluded from other employment due to accepting this case; (2)
27  the court is not aware of a "customary" fee for a case of this magnitude and complexity; (3) class
     counsel has not identified any time limitations or similar circumstances imposed by their clients;
28  and (4) the record contains no evidence of the nature or length of class counsel's professional
     relationships with their clients.

1  suing on behalf of millions of consumers, and took nearly five years of litigation and "intense

2  negotiations" to settle.  (See Dkt. 199, PAO at 2).  The case involved a number of difficult and

3  complex legal questions giving rise to substantial litigation risks.  (See id. at 21).  Even if class

4  counsel overcame these risks and prevailed at the class certification stage and at trial, the likely

5  result would be a judgment as to liability only.  (See Dkt. 218-1, Fees Brief at 10); see In re Sears,

6  Roebuck & Co. Front-loading Washer Prods. Liab. Litig., 2016 WL 772785, at *2 (N.D. Ill. 2016)

7  ("[T]he class was properly certified only for class liability proceedings, not for a determination of

8  classwide damages.").  These litigation risks, combined with the fact that defendants are "large

9  corporation[s] with substantial resources, financial and otherwise," City of Omaha Police & Fire

10  Ret. Sys. v. LHC Grp., 2015 WL 965696, *8 (W.D. La. 2015), make the case "undesirable."  Id.

11      Further, the results obtained by class counsel are impressive.  The settlement secures

12  monetary relief for Class Members who suffered an Overheating Event, provides insurance-like

13  coverage for future Overheating Events, promotes public safety by creating an incentive for

14  current owners to replace their Class Dishwashers, and requires new warnings about the dangers

15  of removing or bypassing TCOs.  (See Dkt. 199, PAO at 21).  These results are particularly

16  impressive given that class counsel began with an 11-state lawsuit and converted it into a

17  nationwide settlement.  (See id. at 2 & 21).  Achieving these results undoubtedly took a high level

18  of skill on the part of counsel whom the court has already described as "among the most capable

19  and experienced lawyers in the country in these kind of cases." (Id. at 14).  Finally, the court notes

20  that "one extremely important factor . . . is the contingent nature of success; for every successful

21  . . . action brought, several more may be lost, and in these no fee will be received."  White v. City

22  of Richmond, 559 F.Supp. 127, 133 (N.D. Cal. 1982).  "When [such an] action is successful,

23  therefore, the attorneys must be rewarded, not only for the hours reasonably expended in

24  prosecuting the action, but also for the risk that no fee would ever be forthcoming."  Id.  Here,

25  "[c]lass counsel took on an extremely risky and complicated case, invested a lot of time and

26  resources, and achieved a good result for the Class."  (Dkt. 199, PAO at 14). Under the

27  circumstances, class counsel deserve an upward adjustment in their attorney's fees request. The

28  court finds that the requested multiplier of 1.68 adequately accounts for the several "factor[s] that

1   may properly be considered in determining a reasonable fee." <u>Perdue</u>, 559 U.S. at 554, 130 S.Ct.

2   at 1673.

3          Defendants urge the court to apply a negative multiplier of 0.5, (<u>see</u> Dkt. 246, Fees Opp.

4   at 52), thereby cutting class counsel's award in half.  Defendants justify this request by reference

5   to only one <u>Kerr</u> factor: the "degree of success obtained."  (<u>Id.</u>); <u>see Kerr</u>, 526 F.2d at 70 (requiring

6   the court to consider "the amount involved and the results obtained" by class counsel).

7   Defendants contend that class counsel scored only a "modest" victory because "the total class

8   benefit . . . is between $4,220,000 and $6,803,000" even though "the amount in controversy was

9   more than $1,000,000,000."  (Dkt. 246, Fees Opp. at 54).  Defendants assert that class counsel

10  should not be granted an award of attorney's fees that "dwarf[s] the class's recovery."  (<u>Id.</u>).

11  Defendants' assertions are not persuasive.

12         Every settlement will involve a disparity between the amount in controversy – an

13  aspirational figure to begin with – and the final settlement amount; such is the nature of a

14  settlement, "the very essence of [which] is compromise, a yielding of absolutes and an abandoning

15  of highest hopes."  <u>Linney</u>, 151 F.3d at 1242 (internal quotation marks omitted).  The disparity will

16  be particularly high in complex class actions involving multiple claims and millions of putative class

17  members, as these conditions tend to inflate the theoretical amount in controversy in the first

18  instance.  That the ultimate settlement figure may be – in defendants' view – small in comparison

19  does not reflect a lack of success on class counsel's part, particularly where, as here, the

20  settlement includes non-monetary relief.  Further, class counsel's lodestar is not unreasonable

21  merely because it seems large in comparison to the monetary portion of a settlement involving

22  non-monetary relief.  See <u>Bravo v. City of Santa Maria</u>, 810 F.3d 659, 673 (9th Cir. 2016)

23  (Reinhardt, J., concurring) (approving $1,023,610.41 fee award on a $5,002 verdict and explaining

24  that, "[i]f the measure of awardable fees was limited by the damages received or anything like

25  them, the lawyers would not be compensated for time necessarily spent on the case"); <u>see also</u>

26  <u>Gonzalez v. City of Maywood</u>, 729 F.3d 1196, 1209 (9th Cir. 2013) (holding that a reasonable fee

27  must be determined "in light of the context of th[e] case, . . . not based on [the court's] own notion

28  of the correct ratio between the amount of attorney's fees and the amount the litigants recovered").

1    At the final approval hearing, defendants cited several cases that purportedly justify a

2    negative multiplier, including Roberts, 2014 WL 4568632; Tait v. BSH Home Appliances Corp.,

3    2015 WL 4537463 (C.D. Cal. 2015); and In re Bluetooth Headset Prods. Liab. Litig. ("Bluetooth

4    II"), 2012 WL 6869641 (C.D. Cal. 2012).  These cases either support the multiplier requested by

5    class counsel or are inapplicable to the circumstances of this case.

6        In Roberts, the court granted class counsel's request for a positive multiplier of 1.23, see

7    2014 WL 4568632, at *8, only slightly below that requested by class counsel here.  Notably, the

8    court in Roberts did not hold that a larger multiplier would have been unreasonable; the court

9    merely granted class counsel's request for a specific measure of attorney's fees and costs,

10   explaining that it "represented only a 1.23x multiplier on Class Counsel's fees[.]"  Id. (emphasis

11   added).  The court in Roberts also noted that "this multiplier will likely decrease as the Settlement

12   moves forward and Class Counsel continues to monitor claims and respond to inquiries from the

13   Class members."  Id.  The same is true here, "as Class Counsel will continue to invest significant

14   time in the claims process and administration, settlement approval, and possible appeals."  (Dkt.

15   276, Fees Reply at 13).  Moreover, class counsel in Roberts only prosecuted the case for two

16   years before it settled, see 2014 WL 4568632, at *8, whereas this case took two and a half times

17   as long to resolve.  (See Dkt. 199, PAO at 1-2); see also Kerr, 526 F.2d at 70 (requiring the court

18   to consider "the time and labor required" to prosecute the action).  In short, contrary to defendants'

19   contention, the Roberts case supports class counsel's request for a 1.68 multiplier.

20       In Tait, the court applied a negative multiplier after calculating the precise value of the

21   settlement and finding that class counsel's lodestar was not "reasonable in relation to the results

22   obtained."  See 2015 WL 4537463, at *13-14 ("[T]he maximum actual payment that will be made

23   to class members is $1,070,795 . . . . [C]lass counsel's lodestar with no multiplier ($8,498,409.02)

24   is a whopping 7.8 times [that] amount[.]") (emphasis in original).  The court in Tait was able to

25   substitute the value of the settlement for the "results obtained" because the settlement provided

26   only monetary relief.  See id. at *3 (describing the terms of the settlement).  However, in this case,

27   the court cannot calculate the value of the benefits obtained under the settlement, because the

28   settlement includes significant non-monetary relief in addition to cash payments.  (See Dkt. 199,

PAO at 4-5).

In Bluetooth II, the court applied a negative multiplier of 0.25 where "the settlement provide[d] for no monetary relief for the class at all" and "[t]he success actually obtained could (and should) have been achieved at far lower cost" as was "illustrated by Defendants' 'voluntary' addition of hearing loss warnings prior to settlement."  2012 WL 6869641, at *7.  In contrast, the settlement here does provide substantial monetary relief, (see Dkt. 199, PAO at 4-5), and – as illustrated by the fact that defendants do not dispute the reasonableness of the hours billed by class counsel – the record does not suggest that class counsel could have achieved the same results at lower cost.

Finally, the court is satisfied that a "cross-check" using the percentage-of-recovery method is not required.  "[W]here, as here, classwide benefits are not easily monetized, a cross-check is entirely discretionary."  Yamada v. Nobel Biocare Holding AG, 825 F.3d 536, 547 (9th Cir. 2016).  A percentage-of-recovery cross-check is unlikely to be helpful in this case for a number of reasons.  First, there is no common fund against which to apply a benchmark percentage.  (See, generally, Dkt. 192-4, Settlement Agreement); see also Hanlon, 150 F.3d at 1029 (establishing "25% of the common fund as a benchmark award for attorney fees" under the percentage-of-recovery method).  Second, the non-monetary benefits conferred under the settlement cannot be quantified with precision, if at all.  (See Dkt. 199, PAO at 4-5) (describing non-monetary benefits of settlement).  In fact, during the final approval hearing, defense counsel repeatedly used the term "unquantifiable" to describe the value of the protections afforded by the settlement's requirement for enhanced safety warnings.

Third, assuming defendants are correct that the percentage-of-recovery method applies only to "the value of claims actually made by the Dishwasher owners[,]" (see Dkt. 246, Fees Opp. at 30), the court could not perform an accurate analysis until 2021, when the claims deadline for future Overheating Events will pass.  (See Dkt. 218-1, Fees Brief at 36).  On the other hand, assuming plaintiffs are correct that the percentage-of-recovery method applies to "the total potential class recovery[,]" (id. at 35), the court's analysis would be imprecise to the point of uselessness – the parties' estimates of the gross value of the settlement range from $4,220,000

1  at the low end, (see Dkt. 246, Fees Opp. at 54), to $116,700,000 at the high end.  (See Dkt. 218-1,

2  Fees Brief at 35).   Given the inherent problems with accurately applying the percentage-of-

3  recovery method in this case, the court elects not to conduct a discretionary cross-check.  See

4  Yamada, 825 F.3d at 547.

5        In short, the court finds that the lodestar of $8,818,449.23 is reasonable and supported by

6  adequate documentation, and that a multiplier of 1.68 is warranted in light of the Kerr factors.  The

7  court will therefore award class counsel attorney's fees in the amount of $14,814,994.70.

8              4.   **Objections**.

9        Most of the objections regarding class counsel's request for attorney's fees invoke the

10  general theme that "the settlement does nothing for the consumers and is only a way of generating

11  cash payments for the lawyers."  (Dkt. 202, Objection of Alexander Korzun) (urging the court to

12  "take the 19 million dollar lawyer fees and divide that up" among the class members); (see Dkt.

13  203, Objection of Frances F. Wolfson) ("[T]hese unreasonable payments should be trimmed and

14  the proceeds distributed to members of the Class[.]"); (Dkt. 213, Objection of James P. Tierney)

15  (describing "the $19 million in attorney's fees" as "excessive" and "highly disproportionate").  The

16  court understands that some class members, unfamiliar with class action litigation, may be upset

17  at the perceived disparity between their own award and the attorney's fees recovered by class

18  counsel.[18]  But this perception does not render the fee award unreasonable, particularly in light

19  of the: (1) time, labor, and costs expended by class counsel (over a five-year period with no

20  guarantee of recovery); (2) complexity of the case; (3) risks of failure in litigation; and (4) total

21  benefits conferred under the settlement.

22

23

24

25

26
_____

27      [18]  Several objectors were under the impression that class counsel would seek $19 million in
    attorney's fees because that figure was included on the postcard notice sent to class members.

28  However, the actual measure of fees sought by – and awarded to – class counsel is nearly $4
    million less.

B.    Costs.

The Settlement Agreement provides that defendants will pay class counsel's reasonable costs and expenses incurred in litigating this action.  (See Dkt. 192-4, Settlement Agreement at 46, § IX.A).  Class counsel have collectively incurred a total of $508,292.67 in costs.  (See Dkt. 218-1, Fees Brief at 45; Dkt. 218-3, Firm Time & Expense Summary at 2).  Defendants initially argued that class counsel's request for costs should be reduced by $30,629.90, (see Dkt. 246, Fees Opp. at 54), but subsequently withdrew their opposition and consented to paying the full amount requested by class counsel.  (See Dkt. 276, Fees Reply at 33; Dkt. 276-1, Mathews Suppl. Decl. at ¶ 13).  The court has reviewed the detailed listing of the costs and expenses incurred by each of class counsel's firms, (see Dkt. 218-1, Fees Brief at 45), and finds that the costs incurred by class counsel over the course of this five-year-long lawsuit are reasonable.  The court therefore awards a total of $508,292.67 in costs.

C.    Service Awards.

"[N]amed plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments."  Staton, 327 F.3d at 977.  Here, plaintiffs request that the court grant incentive awards in the amount of $4,000.00 to each named plaintiff.  (See Dkt. 218-1, Fees Brief at 46-47).  Defendants do not oppose this request.  (See, generally, Dkt. 246, Fees Opp.).

Plaintiffs request the service awards "in recognition of the time and effort [plaintiffs] personally invested in this lawsuit."  (Dkt. 218-1, Fees Brief at 46).  In particular, the named plaintiffs subjected themselves to public attention by lending their names to the case, responding to written discovery requests, being deposed by defendants' counsel, allowing their dishwashers to be disassembled and inspected by defendants, reviewing and authorizing the filings of various iterations of the complaint, consulting with class counsel on a regular basis, and evaluating and supporting the proposed settlement.  (See id.); see also Rodriguez, 563 F.3d at 958-59 ("Incentive awards . . . are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in brining the action, and, sometimes, to recognize their willingness to act as a private attorney general.").

1      In its order granting preliminary approval, the court discussed the fairness and adequacy

2   of the service awards at issue and outlined the careful scrutiny required in this Circuit. (See Dkt.

3   199, PAO at 24-26); see also Radcliffe v. Experian Info. Solutions Inc., 715 F.3d 1157, 1163 (9th

4   Cir. 2013) (instructing "district courts to scrutinize carefully the awards so that they do not

5   undermine the adequacy of the class representatives.").  The court also found that, "because the

6   parties agree that the Settlement shall remain in force regardless of any service awards, . . . the

7   awards are unlikely to create a conflict of interest between the named plaintiffs and absent class

8   members." (Dkt. 199, PAO at 25).  The court further noted the "substantial responsibility" taken

9   on by plaintiffs in litigating this case, and that "the class has benefitted from the time and effort

10  they spent doing so."  (Id. at 26 n. 9).

11     "Many courts in the Ninth Circuit have . . . held that a $5,000 incentive award is

12  'presumptively reasonable.'" Hawthorne v. Umpqua Bank, 2015 WL 1927342, *8 (N.D. Cal. 2015);

13  see Resnick v. Frank, 779 F.3d 941, 947 (9th Cir. 2015) (approving $5,000 incentive award even

14  though it was "roughly 417 times larger than the $12 individual award" that unnamed class

15  members would receive).  In short, based on its review of the record, the court finds that the

16  $4,000.00 service awards are fair and reasonable, and are hereby approved.

17  III.   PURCHASE OF LEAD PLAINTIFF STEVE CHAMBERS' WEBSITES.

18     Plaintiffs request that the court approve the settlement provision requiring Whirlpool to

19  purchase lead plaintiff Steve Chambers' websites for $100,000.00. (See Dkt. 218-1, Fees Brief

20  at 47-49).  In its order granting preliminary approval, the court analyzed this settlement provision

21  in depth.  (See Dkt. 199, PAO at 26-28).  The court reviewed the parties' valuations of the

22  websites, considered the "substantial role" that the websites played in the litigation, and noted the

23  "significant investment by Mr. Chambers into the creation and maintenance" of the websites. (See

24  id. at 26 & 27).  The parties also advised the court during the final approval hearing that the

25  websites enabled Whirlpool to learn about, and ultimately make settlement offers to, other

26  potential class members while this litigation was pending.  As a result, and for the reasons set forth

27  in its Preliminary Approval Order, the court hereby affirms its finding that it is "fair and reasonable

28  for Whirlpool to purchase the Chambers websites for $100,000." (Id. at 28).

## **CONCLUSION**

Based on the foregoing, IT IS ORDERED THAT:

1.  The parties' Joint Motion for Final Approval of Class Action Settlement **(Document No. 254)** is **granted** as set forth herein.

2.  The court hereby **grants final approval** to the parties' Class Action Settlement Agreement and Release of All Claims ("Settlement Agreement") **(Document No. 192-4)**.  The court finds that the Settlement Agreement is fair, adequate, and reasonable; appears to be the product of arm's-length and informed negotiations; and treats all members of the class fairly.  The parties are ordered to perform their obligations pursuant to the terms of the Settlement Agreement and this Order.

3.  Plaintiffs' Motion for Award of Attorneys' Fees and Expenses and for Service Awards for Plaintiffs **(Document No. 218)** is **granted** as set forth herein.

4.  The settlement class is certified under Federal Rules of Civil Procedure 23(c):  All members of the class preliminarily approved on November 12, 2015, who did not properly and timely request exclusion pursuant to the procedures specified in the Settlement Agreement.

5.  The form, manner, and content of the Class Notice meet the requirements of Federal Rules of Civil Procedure 23(c)(2).

6.  The court affirms the appointment of plaintiffs Steve Chambers, Lynn Van Der Veer, Kevin O'Donnell, Joseph Cicchelli, Kurt Himler, Gary LeBlanc, George Bliss, Lyndee Walker, W. David Beal, Zila Koswener, Pamela Walchli, Raymond Paolini, Jr., and Jackie Steffes as class representatives.

7.  The court affirms the appointment of: Charles Fax of Rifkin, Weiner, Livingston, Levitan & Silver LLC; Robert Kitchenoff of Weinstein Kitchenoff & Asher LLC; Steven Schwartz and Timothy Mathews of Chimicles & Tikellis LLP; Nicole Sugnet of Lieff Cabraser Heimann & Bernstein, LLP; and Jeff Cohon of Cohon & Pollak, LLP as class counsel.

8.  Defendants shall pay each named plaintiff a service award of $4,000.00 in accordance with the terms of the Settlement Agreement.

9.  Defendants shall pay lead plaintiff Steve Chambers a payment of $100,000.00 for the

purchase of Mr. Chambers' websites in accordance with the terms of the Settlement Agreement.

10.  Defendants shall pay class counsel attorney's fees in the amount of $14,814,994.70 and costs in the amount $508,292.67.

11.  The Claims Administrator, Kurtzman Carson Consultants, LLC, shall be paid  for its fees and expenses in connection with the administration of the Settlement Agreement, in accordance with the terms of the Settlement Agreement.

12. All class members who did not validly and timely request exclusion from the settlement have released claims against defendant, as set forth in the Settlement Agreement.

13.  Except as to any class members who have validly and timely requested exclusion, this action is **dismissed with prejudice**, with all parties to bear their own fees and costs except as set forth herein and in the prior orders of the court.

14.  Without affecting the finality of this order in any way, the court hereby retains jurisdiction over the parties, including class members, for the purpose of construing, enforcing, and administering the order and Judgment, as well as the Settlement Agreement itself.

15.  Judgment shall be entered accordingly.

Dated this 11th day of October, 2016.


_____
                    /s/
        Fernando M. Olguin
    United States District Judge