| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | CENTRAL DISTRICT OF CALIFORNIA |
| 3 | WESTERN DIVISION |
| 4 | THE HON. JUDGE FERNANDO M. OLGUIN, JUDGE PRESIDING |
| 5 | |

```
 6   STEVE CHAMBERS, et al.,            )
                                        )
 7                   Plaintiff,         )
                                        )
 8         vs.                          ) NO. SA CV 11-1733-FMO
                                        )
 9   WHIRLPOOL CORP., et al.,           )
                                        )
10                   Defendants.        )
     _____)
```

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                 Los Angeles, California

16             Thursday, August 25, 2016

17

18

19

20

21

22          LISA M. GONZALEZ, CSR No. 5920, CCRR
                  U.S. District Courthouse
23          312 North Spring Street - Room 438
                 Los Angeles, California 90012
24                    213.894.2979
                   www.lisamariecsr.com
25

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFF:    CHIMICLES & TIKELLIS LLP
                           BY:  TIMOTHY N. MATHEWS, ESQ.
 4                         361 West Lancaster Avenue
                           One Haverford Centre
 5                         Haverford, PA  19041
                           (610) 642-8500
 6

 7                         COHON & POLLAK, LLP
                           BY:  JEFFREY M. COHON, ESQ.
 8                         10250 Constellation Boulevard
                           Suite 2320
 9                         Los Angeles, California  90067
                           (310) 231-4470
10

11                         RAFKIN, WEINER, LIVINGSTON, LEVITAN &
                                           SILVER LLC
12                         BY:  CHARLES S. FAX, ESQ.
                           7979 Old Georgetown Road Suite 400
13                         Bethesda, MD 20814
                           (301) 951-0150
14                         Fax: 301-951-0172
                           Email: cfax@rwlls.com
15

16   FOR THE OBJECTORS:    LAW OFFICE OF SAM MIORELLI, P.A.
                           BY:  SAM ANDREW MIORELLI, ESQ.
17                         764 Ellwood Avenue
                           Orlando, Florida  32804
18                         (352) 458-4092

19                         LANG, HANIGAN & CARVALHO, LLP
                           BY:  TIMOTHY R. HANIGAN, ESQ.
20                         21550 Oxnard Street
                           Suite 760
21                         Woodland Hills, California  91367
                           (818) 883-5644
22

23

24

25
```

1    APPEARANCES (Continued):

2

3    FOR THE DEFENDANTS:   WHEELER, TRIGG, O'DONNELL LLP
                          BY:  MICHAEL T. WILLIAMS, ESQ.
4                              GALEN D. BELLAMY, ESQ.
                          370 Seventeenth Street
5                         Suite 4500
                          Denver, Colorado  80202-5647
6                         (303) 244-1867

7                         UMBERG, ZIPSER, LLP
                          BY:  DEAN J. ZIPSER, ESQ.
8                         1920 Main Street
                          Suite 200
9                         Irvine, California  92614
                          (949) 679-0052

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    ***Los Angeles, California; Thursday, August 25, 2016;***

2                    ***10:27 A.M.***

3                      ***-o0o-***

4         THE CLERK:  Calling Item Number 5, SA CV-11-1733,

5    Steve Chambers, et al., versus Whirlpool Corp., et al.

6         Will counsel please make their appearances.

7         MR. FAX:  Good morning, Your Honor.  Chuck Fax,

8    co-lead counsel for plaintiffs.

9         MR. MATHEWS:  Good morning, Your Honor.  Tim

10   Mathews from Chimicles & Tikellis, also co-lead counsel for

11   plaintiffs.

12        MR. COHON:  Good morning, Your Honor.  Jeff Cohon

13   co-lead counsel for plaintiffs.

14        MR. MIORELLI:  Good morning, Your Honor.  Sam

15   Miorelli, counsel for Objector Liacopouolos, and my mother

16   Jan Miorelli in the capacity of his agent.

17        MR. HANIGAN:  Tim Hanigan on behalf of Objectors

18   Christine Knot and Kimberly Smith.

19        MR. WILLIAMS:  Good morning, Your Honor.  Mike

20   Williams on behalf of Whirlpool and Sears.

21        MR. BELLAMNY:  Good morning, Your Honor.  Galen

22   Bellamy on behalf of Whirlpool and Sears.

23        MR. ZIPSER:  Good morning, Your Honor.  Dean

24   Zipser, Umberg and Zipser, also on behalf of Whirlpool and

25   Sears.

1          THE COURT:  Why don't we get started first.  So it

2    sounds like there are two objectors.  So why don't we get

3    started.  I'll give you five minutes to state your

4    objection.  Please don't repeat what's in your written

5    objection because I've already read each of them.  You can

6    elaborate and clarify your objections.

7          Go ahead.

8          MR. HANIGAN:  Good morning, Your Honor.  Tim

9    Hanigan, once again.  I believe the objections we've set

10   forth in the written objections pretty much sums it up.  If

11   you have any questions, I'm here to answer those, but I

12   don't have anything in addition.

13         THE COURT:  No, I'm all set.

14         MR. HANIGAN:  Thank you, Your Honor.

15         MR. MIORELLI:  Good morning, Your Honor.  Sam

16   Miorelli.  I'm representing George Liacopouolos.  He's my

17   grandfather.

18         I'm going to start with just the things that --

19   some mop-up things, which is that we agree with the

20   Whirlpool opposition to the attorney's fees.  We note that

21   they came out with an answer pretty close to ours and they

22   had a whole lot more information at their disposal than we

23   did.  So just to be very specific, we agree with their

24   statement of fact, Section 4, as well as their argument,

25   Section 1, 2 and 3.

```
 1              You'll note that we had to make a lot of
 2    assumptions because we didn't have access to a lot of the
 3    confidential information in this case, and it appears that
 4    most of our assumptions were overly friendly to class
 5    counsel.  It does not mean that our objection on this point
 6    doesn't have merit.  I think it's important for the Court to
 7    hear from a member of the class regarding this issue, and I
 8    believe we had the most thorough class member objection on
 9    this point.
10              Unfortunately, the second thing I'm going to have
11    to talk to you about is these ad hominen attacks, which I
12    think are truly outrageous.  Class counsel recently has
13    accused me of taking advantage of my grandfather to enrich
14    myself, which is false.
15              George is an 87-year-old veteran of the Korean
16    War.  He became a mechanical engineer and held
17    mission-critical position on the Apollo Program.  He paid
18    for a significant portion of my education; and Marilynn, his
19    wife of 59 years, just like him, is in poor health.  Even
20    still they thought the postcard notice sounded weird.  And
21    they alerted my mother, who alerted me.  All four of us
22    discussed the settlement and agreed it was a bad deal for
23    them.
24              Since filing the objection, George has moved into
25    a rehab facility temporarily.  It's very expensive and not
```

1    covered fully by insurance or Medicare.  Marilyn spends over

2    $100 a week to visit George, as she cannot drive.  They have

3    savings, but not enough for this to go on forever.  This

4    settlement further depletes their resources if they want to

5    use the coupon or forces them to risk castrophe if they

6    don't, and that's not fair.

7         I specifically discussed this case with Marilynn

8    and George on Saturday.  Both are proud to have me appearing

9    here before you today, and I have not yet shown them the

10   outrageous accusation class counsel made a few days ago in

11   their filing.  I think it would break their heart to see

12   that.

13        I'll just point out to you that class counsel has

14   spent hundreds of pages making ad hominem attacks against

15   objectors in this court and in courts around the country.

16   And despite that, he's not provided a single substantive

17   sentence in response to objectors like my grandfather's

18   attack on his fees.

19        The final thing, I'll talk about is about the

20   inner class conflicts.  The settlement agreement declares

21   the NewGen owners are not class members, but gives them what

22   it calls settlement benefits anyway.  It's at docket 192-4

23   at 1920 and at 33 to 3423.

24        The settlement agreement also expressly

25   establishes two sub classes.  It admits that the -- the

1  class counsel admits that the NewGen and Raptor owners have

2  a much weaker claim, yet cites no case refuting the Supreme

3  Court's command against commingling them, which is set forth

4  in the *Ortiz* case.  This case goes even further though than

5  what happened in *Ortiz* because this case starts off by

6  declaring these people aren't members of the class and then

7  gives them a benefit anyway.

8          Now, class counsel can't show non-dilution of the

9  benefits of the class members just by claiming that

10  Whirlpool wanted it this way, and then using a strawman

11  theoretical of a potential maybe secret side agreement with

12  the NewGen owners.  That's not what *Ortiz* says has to

13  happen.  And circuit courts routinely reject the notion that

14  just separating how the payment comes is relevant.  They all

15  come from Whirlpool.  The circuit courts that address this

16  issue routinely say it's a constructive single payment.  The

17  different sub classes, the ones named and the ones not

18  named, but the ones that we identified --

19          THE COURT:  You have a minute left.

20          Go ahead.

21          MR. MIORELLI:  -- they have to have separate

22  counsel, and they didn't in this case.  That's not something

23  that's waivable by the class members.  It's not something

24  that the court can correct for them.  It's stateable to the

25  settlement agreement.

1          And then the final little point on this is that

2    the people who supposedly represent the non-class members

3    not only can they not be in the settlement agreement, but

4    they certainly can't be paid incentive awards for a

5    settlement to which they're not a member of the class.

6          So with that, we will rely on our written.

7          Thank you, Your Honor.

8          THE COURT:  Thank you very much.  Why don't we get

9    started.

10          The -- let me see.  I first have a couple of

11    questions from plaintiffs' counsel about your efforts to get

12    discovery from certain objectors.

13          According to the supplemental memorandum, you

14    served a subpoena on Objector Patrick Sweeney.  And he told

15    you he would provide the information sought in the subpoena

16    by August 2nd, 2006, and would sit for a deposition before

17    this hearing.  Mr. Sweeney then changed his mind and refused

18    to comply with the subpoena, became nonresponsive and never

19    sat for deposition; is that correct?

20          MR. FAX:  Yes, Your Honor.  The most recent word

21    on this comes from my co-counsel Steve Schwartz, who is in

22    Philadelphia at the moment.  He filed this morning, pursuant

23    to the court's order, the unredacted version of our latest

24    brief on this issue.  And that is the latest word, yes.

25          THE COURT:  So I see that Mr. Sweeney's objections

1   contain an argument about a cy pres provision which does not

2   exist in this settlment.  Your belief is that Mr. Sweeney,

3   who is a serial objector known for filing meritless

4   objections for improper purpose, copied that argument out of

5   some other objection in a different case; is that correct?

6        MR. FAX:  Yes, because there is no cy pres, as the

7   court knows.

8        THE COURT:  Okay.  Well, based on Mr. Sweeney's

9   failure to comply with the subpoena and the evidence showing

10  that the objection was filed for an improper purpose, the

11  court will strike Mr. Sweeney's objections located at docket

12  number 234.

13       As the court has indicated in other orders, when a

14  person objects to a class-action settlement, they subject

15  themself to discovery related to that objection.  An

16  objector can't refuse to participate in discovery and still

17  have their objection considered by the court, especially

18  when he or she is an officer of the court.

19       The supplemental memorandum also states that the

20  plaintiffs' counsel served a subpoena on Objector W. Allen

21  McDonald, secured an order from the Eastern District of

22  Tennessee compelling McDonald to provide testimony, sit for

23  a deposition.

24       Has McDonald still refused to comply with the

25  subpoena in that court's order?

```
1              MR. FAX:  That's my understanding, yes, Your

2    Honor.

3              THE COURT:  I guess based on Mr. McDonald's

4    failure to comply with that subpoena and the court's order,

5    the court is also going to strike his objections located at

6    Docket Number 236.

7              So now what do you have to say in terms of the

8    settlement?  I don't really have a tentative at this point.

9              So, go ahead.

10             MR. FAX:  Your Honor --

11             THE COURT:  Let me just say to all counsel, you

12   don't need to rehash your papers, just anything you want to

13   clarify, expand on a little bit.  I don't want you guys to

14   basically argue your papers to me.

15             MR. FAX:  Right.  I mean, there are three, as I

16   see it, there are three sets of issues.  There is the

17   substantive settlement, which the court addressed at the

18   preliminary hearing and indicated that it was doing the hard

19   work of analysis at that moment and was satisfied with the

20   preliminary settlement.  The court had a few issues.  I

21   think we addressed those in an amended form of the

22   settlement agreement, which we filed.

23             As far as I know, there have been no, and remain

24   no, issues among the parties with regard to the substantive

25   settlement.  It hasn't changed at all.
```

1           So unless the court has any specific questions

2    with regard to that set of issues, I don't think I need to

3    rehash that.

4           Some of the merits of the settlement do arise in

5    the context of the second set of issues which, of course, is

6    the contested motion for attorney's fees.  In the context of

7    that motion, I think -- I'm prepared to argue that motion;

8    and in the context of my argument, I will touch on certain

9    aspects of the substantive settlement.  So that's the second

10   piece.  And I think that is before the court, and that's

11   live at this moment.

12          And then the third set of issues, of course, are

13   the objections, and they've all been briefed --

14          THE COURT:  Do you want to address what

15   Mr. Miorelli or one of your co-counsel --

16          MR. FAX:  I can do it.

17          THE COURT:  Okay.

18          MR. FAX:  The substantive arguments that he makes

19   have all been addressed on papers.  I think the issue of

20   commingling is a red herring.  There's no dilution.  There's

21   absolutely no evidence that the fact that we have a

22   non-class settlement in a class settlement somehow

23   diminished the entitlement of the class.  To the contrary,

24   as we argue it, it really sharpened the focus.  We focused

25   on the class first.

1        The distinction between the class and the

2   non-class is self-evident.  It arose in the context of

3   discovery when it became clear that the incidence of

4   combustion were far, far greater in the Russian Rushmore

5   units, which are the substance of the class membership as

6   opposed to the Raptor and the other unit that is not within

7   the class settlement.

8        So I don't think there's anything of substance

9   that he raises that has not been adequately covered in our

10  papers in case law.  We could of had a side deal on the

11  non-class settlement and not even gotten into that, but we

12  wanted to put all of our cards on the table.

13       So that's really all I have to say about that.  I

14  would note that Mr. Miorelli is a serial objector.  We cite

15  to that in our papers.  We cite to some of his maneuvers in

16  at least one other case.

17       THE COURT:  The non-class members, they're

18  obviously not covered by the release?

19       MR. FAX:  That's right.  We were talking about a

20  limited release for the class.  And with respect to the

21  non-class members, there's an individually tailored release

22  for any non-class member who accepts the benefits of the

23  settlement afforded to the non-class member.  But there's

24  certainly no non-class-wide release.

25       And it also is limited -- it does not include

```
 1   damages beyond the machine itself, nor does it include any

 2   claim for personal injury.

 3            THE COURT:  This is -- given that I think it could

 4   be viewed as a very favorable settlement because these are

 5   people who are getting benefits that they don't even have to

 6   sue for because they're non-class members.

 7            MR. FAX:  Absolutely.

 8            THE COURT:  Okay.  Go ahead.

 9            MR. FAX:  Unless there is anything with respect to

10   any of the other objectors that the court wishes me to

11   address, I think that the only remaining -- the one-third of

12   the case that is really contested at this point beyond the

13   objections is the issue of attorney's fees or one of the

14   three sets of issues as I've identified them before.

15            And as to that, obviously, that issue has been

16   briefed fairly well, including a last-minute filing by the

17   defendants the other day that caught us by surprise.

18            THE COURT:  Let me ask you about that.  The

19   sur-reply, what's your position on that?  I haven't even

20   looked at it because it was filed so late, and I'm a little

21   concerned.

22            Let me just say that before I consider it, I want

23   a declaration from your expert telling me, under penalty of

24   perjury, what her travel plans were, what she's been doing

25   since she got back, why she hasn't been able to get to it
```

1    sooner.

2              Because, on the one hand, you want me to consider

3    it because of the amount of money it saves, makes sense.

4    But on the other hand, you're certainly not rushing it like

5    there's a lot of money.  Look, you guys can put things

6    together -- and I know both sides can put things together

7    overnight.  And if you can't find an expert who can get it

8    to you right away, find another expert is what you should

9    have done.

10             So before I will consider your -- rule on your

11   motion, I want a declaration from the expert setting out

12   under penalty of perjury what her travel plans were; when

13   she got back into town; and what she's been doing exactly

14   since she got back; when she talked to you guys; and why

15   it's taken her so long to work it out.

16             MR. FAX:  And, Your Honor, if I may interject.

17   With regard to that, if the court is not going to strike it,

18   then we would not only like the opportunity to respond --

19             THE COURT:  If I allow them to file it, you will

20   get an opportunity --

21             MR. FAX:  Thank you.

22             And we would also like the opportunity to review

23   the data that she looked at, because we've been down this

24   road before.  This issue arose in the context of the

25   pre-qualifieds.  Whirlpool identified approximately

1    700-and-some pre-qualifieds, and we insisted that we be

2    given access to their data.  And when we got it, we were

3    able to treble, treble the number of pre-qualifieds, and

4    they agreed to it.  Because whatever Dr. Ray is doing, we

5    don't think she's behaving the way the independent claims

6    administrator behaves.  That's why there is an independent

7    claims administrator.  Dr. Ray is a hired gun from Exponent,

8    their substantive expert was from Exponent, and Dr. Ray's

9    charge was basically look at all the hanging chads, like in

10   Florida, and try to find as many reasons to reject these

11   claims as possible.  That's one way to approach the problem.

12   That's not how the independent claims administrator

13   approaches it, number 1.

14           And number 2, her analysis fails to consider the

15   role that we, as counsel for the plaintiffs, are going to

16   play going forward.  Just as we insisted on the right to

17   review Whirlpool's work and representations with regard to

18   the pre-qualifieds, we are going to be involved intensively

19   in reviewing with the claims administrator their work to

20   ensure that the maximum relief is afforded to the maximum

21   number of people.  We are certainly not going to take

22   Dr. Ray's word for anything because we know what her goal

23   is.  Her goal is to minimize the value of the settlement.

24   That's a goal.  That's not the goal of the administrator.

25   The goal of the administrator is to provide fair coverage to

1   those people who fall within the contours of the class, as

2   defined by the settlement agreement.  It's a vastly

3   different way of approaching the problem.

4           And then we are going to be injecting ourselves.

5   And one of the reasons, frankly, we're asking for a multiple

6   is we're not asking for attorney's fees on attorney's fees,

7   we're not asking for attorney's fees for the process that

8   we're involved in today.  We won't be asking for attorney's

9   fees for the process that we will be involved in going

10  forward working with the claims administrator and working

11  with Whirlpool to ensure maximum coverage to the maximum

12  number of members of the class.  And so in anticipation of

13  that, for among other reasons, we think that we're entitled

14  to a modest, frankly, multiple on our fees.

15          So in conjunction with anything that the court is

16  going to consider with respect to Dr. Ray, we very much want

17  to look at what she looked at, and what they looked at.

18          THE COURT:  Well, the threshold question, though,

19  is:  Is there new evidence in your reply or arguments,

20  because that -- if there is no new evidence or arguments,

21  then it's not coming in.

22          MR. FAX:  Right.  Our position is there is not.

23  The analysis, the additional analysis that my

24  brother-in-arms Tim Mathews who's seated here, the

25  additional analysis that he did, was based upon Dr. Ray's

 1   declaration in their opposition.  Looking again, at forms

 2   that she had looked at and that she cited to in her

 3   declaration.  That's all that he did.

 4          Now, this is material --

 5          THE COURT:  Let me ask, then, what is the new

 6   evidence, Counsel?

 7          MR. WILLIAMS:  The new evidence is lawyer

 8   testimony in an affidavit, Your Honor, challenging her

 9   adjudication of two of five claims that Mr. Mathews

10   reviewed.  He's wrong as to both of them.

11          One of them he says is valid, and there's no

12   reason to deny it, but the overheating event on the ECB

13   occurred after --

14          THE COURT:  That's not new evidence --

15          MR. WILLIAMS:  It's new testimony that was not

16   submitted with their --

17          THE COURT:  He's just challenging her approach in

18   what she did.  It's just rebuttal.  It's just rebuttal.

19          MR. WILLIAMS:  It's not.  He submitted actual

20   claims forms that weren't in the record and make statements

21   about.  What we want to do is put in the other stuff that

22   completes the picture.  For example, the record showing that

23   the overheating event occurred when the machine was more

24   than 13 years old; therefore, that one would be denied.  And

25   I absolutely reject this --

```
 1          THE COURT:  Didn't the expert review those
 2  documents?
 3          MR. WILLIAMS:  She did, but they weren't --
 4          THE COURT:  Then, why is it new evidence?
 5          MR. WILLIAMS:  They weren't put in the record.
 6          THE COURT:  But the expert reviewed the documents.
 7  They're in the record.  The expert reviewed them.
 8          MR. WILLIAMS:  Your Honor, I think Ninth Circuit
 9  law is clear that if a new declaration or affidavit comes in
10  with a reply and we haven't had a chance to respond to it,
11  the court should only entertain his declaration if we also
12  get to respond.  And I'm totally fine with their seeing the
13  data and getting a sur-reply to her reply.  That's all fine.
14  I'm also perfectly fine with a declaration under oath as to
15  where she was, what she was doing --
16          THE COURT:  Okay.
17          MR. FAX:  I'm sorry.  I agree with the point in
18  the court's question to counsel -- I disagree with counsel's
19  observation.  This is a reply memorandum that addressed a
20  declaration that she filed.  Now, we're entitled to respond
21  to her declaration.  And for them to say, "Well, no, no.
22  But if you're responding to the declaration, then we're
23  entitled to another declaration," I don't think that makes
24  any sense because all we're doing is responding to her
25  declaration.
```

1          THE COURT:  Yeah.

2          MR. FAX:  It's got to end somewhere.

3          THE COURT:  Well, it does.  So what we'll do is

4    we'll have the declaration from the expert, turn over all

5    the data to them by 5:00 o'clock tomorrow.  The declaration

6    by 5:00 o'clock tomorrow, because I don't want to keep this

7    under submission for very long; and then you can file an

8    opposition.  This is a little thing and whether or not I'm

9    even going to consider it.  I don't need a reply.  If I

10   decide I need a reply, I'll issue an order, because I'm not

11   going to stretch this out until --

12         So you can file an opposition on Monday and get

13   everything by 5:00 o'clock to them; and file the declaration

14   with the court tomorrow by 5:00 o'clock.

15         And then get the data to them, and then I'll

16   decide whether to allow the sur-reply.

17         And then if I do allow it, I'll allow them to

18   reply to their sur-reply.

19         So let's move on to the next thing.

20         MR. FAX:  So, again, unless there are specific

21   questions that the court has regarding any of the

22   objections, I'm prepared to argue the issue of attorney's

23   fees.

24         THE COURT:  I think there was also a motion -- all

25   these last-minute filings.  There was a motion filed for a

```
 1    leave to file a reply from one of the objectors.

 2              MR. FAX:  I think that's McDonald, I believe; is

 3    that what the court is referring to?  I was in transit

 4    yesterday.

 5              MR. MATHEWS:  Kress.

 6              THE COURT:  Kress.  I guess you should probably

 7    file by Monday a position on that --

 8              MR. FAX:  Okay.

 9              THE COURT:  -- whether you want me to consider the

10    reply in opposition.

11              MR. FAX:  We can do that.

12              THE COURT:  Why don't you do that.  I haven't

13    looked at that either.  And you saw -- that other case, that

14    was a pretty big case too.  I don't know how this became

15    class-action Thursday, but it did.

16              So there's a lot of material on both cases.  I

17    read all week.  A lot of reading that you guys gave me, both

18    cases.

19              Does that take care of all the filings,

20    last-minute filings?

21              MR. FAX:  I think so.  I got kind of confused

22    myself because I was on a plane, and I had access to the

23    Internet but the stuff was coming fast and furious from our

24    side, as well as from objectors.

25              THE COURT:  Let me --
```

1          Go ahead on the fees, then.

2          MR. FAX:  Thank you, Your Honor.

3          As the court knows, we are seeking approval of

4     $15 million in attorney's fees and approximately $508,000 in

5     expenses to date, plus additional expenses to be incurred.

6          With respect to the expenses, initially Whirlpool

7     had raised some questions concerning several discrete

8     matters; we conferred with them, we provided back-up, and I

9     think I can represent fairly that there's no objection any

10    more to the expenses requested.

11         THE COURT:  That was one of my questions that I

12    had.  So that's been worked out.

13         MR. FAX:  The lodestar that we've presented to the

14    court and all of the back up, including massive billing

15    records going back five years for all counsel, the lodestar

16    is slightly over $8.9 million; and the multiple that we seek

17    is a -- what we believe is a modest multiple of 1.68.

18         Now, contrary to the assertion of some of the

19    objections, as the court knows, this is a very hotly

20    contested issue.  To say that there is no collusion here is

21    to sort of state the obvious.  I mean, we get along with

22    each other, at least I like them, but that's as far as the

23    collusion goes.

24         THE COURT:  The quality of the work on both sides,

25    excellent in this case.

1           MR. FAX:  Thank you, Your Honor.

2           We maintain that the requested fee award is

3    reasonable under the lodestar-multiplier analysis, which we

4    assert is the correct measure to be used by the court in

5    awarding fee.  And given the magnitude and the quality of

6    the work performed, plus the results achieved, we suggest

7    that the 1.68 multiplier is modest and appropriate based on

8    an analysis of the relevant factors in the case law and in

9    comparison to multiples approved in other cases.

10           And, finally, to the extent that the court feels

11    it appropriate to cross-check the amount of the award

12    calculated under the lodestar-plus-multiplier analysis

13    against the percentage of recovery, we think if that

14    analysis were done, we would similarly be entitled to the

15    award that we are seeking.

16           Now, there's a lot of briefing on the issue of the

17    propriety of the utilization of the lodestar method.

18    There's a tremendous amount of case law on it.  We suggest

19    it should not be a matter of serious debate.  California law

20    governs this case and this settlement under the terms of the

21    settlement agreement.  California law is clear that when you

22    have a settlement that contains a cash element and also an

23    unquantifiable injunctive relief, that the appropriate --

24    and there is not a common fund established, the appropriate

25    methodology is the lodestar methodology.  And that is what

24

1    we have here.

2           Whirlpool wants to argue that the coupon -- that

3    the coupon feature -- it characterizes as a coupon feature.

4    I don't agree with that characterization.  But taking for

5    purposes of the argument they're characterization of the

6    coupon feature, they're arguing that this is a coupon case

7    and, therefore, certain CAFA restrictions apply and the

8    analysis has to be much more rigorous, and so on and so

9    forth.  I think respectfully that's the tail wagging the

10   dog.

11          In this case, whether you call it a coupon or a

12   voucher or something else, or an enhancement, that's really

13   what it is.  It's an enhancement to a settlement that stands

14   on its own merits and that has a cash benefit that cannot be

15   quantified because it's opened ended and it has intangible

16   injunctive relief benefit particularly with respect to

17   safety and the community at large.  And we've briefed that

18   fairly well.  I don't think I need to rehearse that set of

19   issues in the argument, unless the court wishes me to.

20          So the question is:  Looking at -- applying the

21   lodestar method, plus the opportunity for a multiplier, do

22   we meet the criteria?  Do we fall under the *Kerr* criteria

23   and other cases that identify the variables that go into a

24   determination by the Court as to the propriety of the award

25   being sought by counsel?  And I submit that in this case,

 1   the answer is four square yes on all counts.

 2         One of the issues to be considered is the quality

 3   of plaintiffs' counsel.  I'll let defense counsel speak to

 4   that issue.  Modesty prevents me from touting our own

 5   virtues, but I think -- we feel satisfied that we did our

 6   job.  We think we did our job as well as it could be done.

 7   We don't think we over litigated the case.  We litigated the

 8   case as much as we had to litigate the case, as much as

 9   Whirlpool made us litigate the case.

10         Whirlpool has always been in control of all of the

11   information about all of the machines throughout the

12   United States.  Whirlpool always knew what the magnitude of

13   the problem was.  They knew this internally, and they could

14   have, theoretically, settled the case on day one with us

15   because they knew what we would ultimately find through

16   discovery.

17         Likewise, Whirlpool could have settled the case in

18   2014, when we went to our first set of mediations in Boston

19   before Professor Green.  We were there, Whirlpool was there,

20   it was intensive mediation.  They could have settled it

21   then, but they declined to do so.

22         They suggest in their papers incorrectly that we

23   wanted a settlement after the front-loading case was tried

24   in Cleveland and Whirlpool prevailed.  In fact, that's not

25   what happened in this case.  They came to us after the trial

1    in Cleveland.  They came to us and asked us whether we would

2    consider going back to mediation to try to settle our case.

3    They approached us.  And I suggest to the court that the

4    reason they approached us is because of the work that we had

5    done, the necessary work that we had done in this case to

6    make our case.

7            Between the first mediation and the second

8    mediation, the year-and-a-half span, we took the depositions

9    of their in-house technical personnel.  We were able to

10   analyze fairly well the technical data that they provided to

11   us because we had retained two electrical engineering

12   experts who did a massive amount of work.  We produced our

13   electrical engineering experts' reports to them.  They never

14   produced any reports to us.  They had a consulting expert

15   who works for the same company that Dr. Ray works for not

16   coincidentally.  They never produced a report to us, but we

17   produced our reports to them.

18           We issued over 40 sets of subpoenas to insurance

19   companies that had paid out claims based upon combusting

20   Whirlpool-manufactured dishwashers, circuit board

21   combustion.  We wanted to see the details of all of those

22   files, and we were going to get those files.  All of this

23   was necessary work.  We did not over litigate it.  We did

24   what we had to do, and they came back to the settlement

25   table and we settled, and we're very satisfied with the

1   settlement.

2           And we think that when the claims administrator

3   does its job, the return rate on claims will be much, much

4   higher than argued by Dr. Ray, based upon her hanging-chad

5   analysis.

6           I should also add something else.  Once Whirlpool

7   became aware, once Whirlpool focused on our litigation and

8   they focused on the Web site that Steve Chambers had put up

9   where he would post claims and vignettes by people from all

10  over the country who contacted him, talking about their

11  experiences with combusting Whirlpool dishwashers, Whirlpool

12  started contacting those people and settling with them.

13          And I know this because they would call me.  And

14  they would say, "I've got a call from Whirlpool, and they

15  offered me the following settlement to resolve my complaint.

16  Should I do it?"  And, of course, I said all the right

17  things, "I'm not their lawyer," et cetera, and I advised

18  them generally the direction in which we were going.  And

19  more often than not, I did not discourage them from

20  accepting the terms offered by Whirlpool because, in fact,

21  they were comparable to the terms that we were negotiating

22  for; namely, full reimbursement, even if the warranty or the

23  extended warranty had already expired.  And that's what we

24  were going for, and that's what we got.

25          But my point is that Whirlpool was basically

1   settling hundreds, if not thousands, of claims that are off

2   the books.  They're not part of these numbers, but

3   conceptually, morally, they should be because -- and what

4   they do is they increase dramatically the claims' rates.

5           THE COURT:  Is there any way to get ahold of that

6   data?

7           MR. FAX:  Well, we could do discovery on that.

8   We, frankly, got caught up in other matters and did not do

9   it.  I don't know whether discovery during the settlement

10  phase would even have been appropriate.  I'm not sure about

11  that.  But with the Court's permission and with the

12  agreement of Whirlpool, I'm sure we can get that data; and

13  it would materially, I suggest, based upon my empirical

14  experience listening to these people calling me all the

15  time, and also my paralegal, I suggest it could be

16  significant.  And it adds to the dimensions of what we're

17  talking about here.

18          And so when we talk about the adequacy of counsel

19  and the adequacy of the effort, I firmly believe, I really

20  believe to a certainty that we did what we needed to do and

21  no more.

22          I was responsible for making assignments.  We had

23  five law firms involved in one phase or another of the

24  litigation, but there was no duplication of effort, none.

25  And you can see that when you go through the time sheets and

1  the narrative descriptions of who was doing what.

2          The main attack, as far as I can discern it, the

3  main attack of Whirlpool's counsel goes to the work of an

4  attorney at the Chimicles firm, Anthony Geyelin, a very

5  senior guy, who I think had been the Commissioner of

6  Insurance at the Commonwealth of Maryland before going into

7  private practice.  In the parts where we come from, it's a

8  fairly prestigious position in state government.  It may

9  even be an elected position in Pennsylvania.  I'm not sure.

10  In Maryland, it's an appointed position.

11          But I worked with Tony, and Tony is a very, very

12  sophisticated guy.  He's a senior attorney, and he was

13  responsible for the in-depth organization and analysis of

14  over 350,000 documents, most of which were highly technical

15  documents, documents that I couldn't begin to understand,

16  frankly.

17          My paralegal, Ernie Liberatti, who had a

18  background in technology in the Air Force and was a

19  brilliant guy, he understood this stuff.  I did not.  I

20  can't speak for Tim Mathews and other counsel; but Tony did.

21  And, of course, Whirlpool did because Whirlpool had

22  generated all this material.

23          So Whirlpool is upset with the degree of effort

24  that we needed to undertake and that Tony Galan at the

25  Chimicles firm had to undertake to understand the material

1  that Whirlpool, of course, understood all along, which was,

2  namely, a series of related design defects in these circuit

3  boards that created the propensity for overheating and

4  possible combustion; and the distinction between certain

5  sets of circuit boards and other circuit boards; the

6  evolution of the product because it was not a static

7  product.  We're talking about a period of years during which

8  the product evolved or devolved, depending on how you look

9  at it.

10         And then there finally came a breakthrough in 2011

11  when they changed, they actually changed fundamentally the

12  design and the problem was solved.  They could have done

13  that earlier.  We discovered that in the documentation.

14  They knew what the solution was, but it was more expense

15  than they wanted to incur until they finally made the

16  command decision to change the design.

17         All of this was part of the substance of Tony's

18  work, and I was there -- I stood with him.  It's a short

19  drive from where I live to their office in Pennsylvania,

20  about two hours.  I went up with some frequency and got

21  tutorials from Tony as to what he and his team were

22  uncovering.

23         So with respect to, as far as I can tell, a single

24  issue that counsel focuses on in terms of alleged

25  overbilling, I dispute it.  And I dispute it based upon my

1   own personal observation and my deep regard and respect for

2   the work that Tony did.

3        With respect to the results achieved, the court

4   generally knows the contours of the settlement, but if I can

5   say, if we step back and look at a 10,000-foot level to what

6   we've accomplished, from my perspective, here is what we

7   have accomplished.  We started out with an 11-state class

8   action, which relied upon state law, and we end up with a

9   countrywide settlement covering all 50 states and

10   territories of the United States.

11        So just on that level alone, I think that's a huge

12   accomplishment, converting an 11-state class action into a

13   settlement that's nationwide, number 1.

14        Number 2, when you look at the elements of the

15   class action -- I know the court spent a lot of time on the

16   motion to dismiss because it was a complicated motion and

17   understandably so.  It was a very, very well-written motion.

18   I mean, these gentlemen did an amazing job, I thought.

19        THE COURT:  It was in the 90s, the pages, when you

20   guys settled the case, and I wasn't done --

21        MR. FAX:  And there's a reason for that.  The

22   reason is that you had to look at a plethora of statutes

23   state by state and they differed, the elements differed, and

24   the results were going to be different, and we're talking

25   about liability, forget about damages.  I mean, our ability

```
1    to certify a class action for 11 states beyond the liability
2    alone, you know, very, very difficult, very high hurdle.
3          So here we convert an 11-state class action
4    probably certified on liability alone if we got any
5    certification -- that's another hurdle -- to a 50-state plus
6    U.S. territory settlement that obviously includes the issues
7    of liability and damages; and I think that alone is
8    something.  It's really something, in my view.
9          We took machines that had one- or two-year
10   warranties at best -- maybe there were some three-year
11   warranties out there, maybe even a five-year warranty, but
12   this problem tends to arise after years six and seven of
13   normal machine activity.  So we took that and in the
14   settlement we obtained basically extended warranties for the
15   useful life of the machine effectively.  Effectively going
16   forward.
17         So -- and that unlimited warranty, according to
18   our expert, whom they dispute, is worth a lot of money, a
19   lot of money.  And irrespective of what the claims rate is,
20   we cite to Ninth Circuit law that says that when you're
21   valuing a settlement under the lodestar methodology, you
22   don't wait for -- you don't wait to count up on a calculator
23   who claimed and who did not, you do it as a function of the
24   prospective relief afforded to the class as a whole, the
25   opportunity.  That's what you're valuing.  That's why,
```

1   frankly, at the end of the day, I don't think the Dr. Ray

2   analysis is really that useful anyway because, at most, that

3   goes to the question of a cross check on the percentage

4   recovery basis, and I don't think the court even has to get

5   there.  It's the tail wagging the dog.  But we got

6   warranties which fully reimburse potentially, fully

7   reimbursed consumers for their costs, which is what the

8   warranty would have done if the warranty had been in place.

9           We believe firmly that the settlement is likely a

10  better result than we would have obtained at all, if we'd

11  gotten any result, if we had overcome the motion to dismiss;

12  if we'd overcome the opposition to the motion for class

13  certification; if we'd overcome the interlocutory appeal; if

14  we'd overcome summary judgment; if we had obtained the jury

15  verdict; if we had survived on appeal from the jury verdict;

16  if we'd done all the those things four or five years from

17  now, maybe longer, we still don't think we would get as good

18  a result as we got with the work that was necessarily done.

19          And had we done all that, in all liklihood, it

20  would have been a judgment for liability for 11 states.

21          So the third issue is the complexity and intensity

22  of the litigation.  This was a tough case.  Counsel for

23  Whirlpool -- there aren't any better counsel than counsel

24  for Whirlpool in my experience.  I've been practicing law

25  for 42 years.  They're great lawyers.  They really are.  I

1  would proudly associate with them on any case in which there

2  weren't a conflict.

3      We've laid out in our declarations the nature of

4  the work that we had to do based upon the challenges that we

5  faced, and that does not even take into account the two

6  years before suit was filed or the year-and-a-half before

7  suit was filed in which Steve Chambers sought individual

8  relief from Whirlpool.  But was rebuffed and then begin to

9  assemble his web site and collect the data that enabled our

10 experts to identify the problem, which, in turn, gave us

11 grounds to file the class-action suit.

12     And when you get down to the engineering substance

13 of it, that will never be resolved.  Whirlpool has always

14 insisted and insists to this day that there was never

15 anything wrong.  They never will give up on that position.

16 They have not admitted to it as part of the settlement.

17 That's not a required element of the settlement.  It's not

18 necessary for the settlement.  But it shows you the

19 intensity and the complexity of the case, that to this day

20 there's an engineering dispute on it.  That also suggests

21 the degree of difficulty that we might have in persuading a

22 finder of fact that indeed Whirlpool should be held liable.

23     The settlement negotiations were very difficult

24 and complicated and extensive.  They included not only the

25 sessions spanning about almost two years, the in-person

1    sessions, but also phone calls, ex parte phone calls between

2    the mediator and Mike Williams and myself and so forth.  So

3    that was another element of complexity.

4            The discovery was very thorough and was about to

5    get even more so.  All the plaintiffs were deposed; the key

6    design and engineering personnel at Whirlpool were deposed.

7    I mentioned the 40 subpoenas we had issued to insurance

8    companies, and we were beginning to receive returns on

9    those.

10           So the question is:  With all of that as

11   underpinning, is the fee fundamentally fair, adequate, and

12   reasonable?  And as I argued, the methodology in California

13   in this case for establishing the fairness and

14   reasonableness and adequacy of the settlement is the

15   lodestar method.  And I mentioned some of the reasons for

16   that, California law.  Our consumer claims arise under

17   fee-shifting statutes as to which the lodestar method is

18   used; that's the *Tate* case.  The settlement includes

19   significant non-monetary relief as to which the lodestar is

20   the appropriate measure –– that's the *Amada* case; and we've

21   cited to *Roberts versus Electrolux*, a Central District of

22   California case in which Judge Snyder applied the lodestar

23   method in awarding an $8 million fee, including a 1.23

24   multiple on lodestar.

25           We would argue that the relief in our case is even

1   broader than *Roberts*, and that our fee is and the multiple

2   should be commensurately higher, but Judge Snyder's model,

3   we think, is apt.

4          I think with regard to the percentage cross check,

5   I'll spend a minute on that because I know that that's a

6   centerpiece of Mr. Williams' argument.  Several points

7   should be emphasized with regard to the value of the

8   settlement.  The settlement is uncapped, for one.  Both the

9   class and the non-class are entitled to recover 100 percent

10  of their damages consisting of costs related to repair their

11  dishwashers, and there's no release, as I said, no release

12  for personal injury or consequential damages; and attorney's

13  fees are paid separately.  They do not come out of the class

14  recovery.  Another important point.

15         By the way, Your Honor, would the court like me to

16  go through the details of the settlement, the elements of

17  the settlement?  You're familiar with it?

18         THE COURT:  Yeah.

19         MR. FAX:  Now, as I've mentioned throughout my

20  argument, Whirlpool has constantly underplayed the number of

21  overheating incidents that have occurred.  This began with

22  their expert's confidential assertion during his deposition

23  that -- not their expert -- well, their in-house expert, one

24  of the technical people involved in the design and testing

25  of the circuit boards.  He said that, at most, there were in

37

1  the range of 2,200 incidents.  Dr. Ray herself admits to

2  17,000 overheating incidents.  So already they go from 2,200

3  to 17,000.  That, in and of itself, is a gross

4  understatement because it assumes that every overheating

5  event has been reported, and it does not take into account

6  those that we don't know about.

7       In fact, what we do know is that over 26,000

8  reimbursement claims have been made as of July 2nd, 2016,

9  when we filed our reply memorandum in support of our motion

10 for attorney's fees and that does not include the payoffs

11 that Whirlpool made privately off the books, so to speak,

12 not in conjunction with this settlement.

13      Now, we know that Dr. Ray in their opposition to

14 our motion opines that 94 percent of the claims made for

15 reimbursement are invalid.  And, as I argued at the outset,

16 Your Honor, we think her methodology is skewed; we think her

17 analysis is wrong; and we know that they made the same kind

18 of mistake when they were looking at pre-qualifieds.  We're

19 confident that in working with the independent claims

20 administrator, we will have a true number, an accurate

21 number and a fair number without reliance on their paid

22 in-house consultant who's looking at hanging chads.

23      The 26,000 claims made as of July 2nd have an

24 aggregate value of almost $11 million.  Not one of these

25 claims has been conclusively denied by the claims

1   administrator.  And the process of denial, were there a

2   denial, requires that the administrator go through a number

3   of hoops that Dr. Ray never went through, including

4   contacting us, contacting the consumer himself or herself

5   and asking questions.  Calling up Mrs. Jones and saying, "I

6   see that this is missing certain information.  Do you have

7   that information," or "What happened?"  She didn't do that,

8   but the claims administrator would; and we would be involved

9   in that.  So we would make sure that that kind of inquiry

10  occurred.

11          That number is going to increase because we have

12  agreed to a supplemental notice program and extension of the

13  deadline for Kenmore owners to file their claims.  I believe

14  that deadline is August 17th, something like that.  And we

15  haven't seen the results of that.

16          As for future claims, we'll take Whirlpool's

17  estimate, which is higher than our expert's estimate.  Our

18  expert, I think he estimated in the range of 9 million

19  machines in the marketplace right now.  Whirlpool estimates

20  that there are approximately 13.4 covered dishwashers still

21  in service as of the notice date.  Our expert opined

22  conservatively 8.4 million machines.

23          Each of these 13.4 million machines is eligible

24  for future overheating event coverage.  That's an extended

25  warranty, in effect, an insurance policy, which covers a

 1  hundred percent, offers them $100 or 30 percent off a new

 2  Whirlpool-manufactured dishwasher.

 3        Now, the reason why I suggest that that is not a

 4  coupon is -- as I understand the coupon --

 5        The Court's indulging me.  I want to make sure I'm

 6  not over --

 7        THE COURT:  I got to give them time.  We got to

 8  finish up by noon.

 9        MR. FAX:  I can do it in five minutes.

10        THE COURT:  Go ahead.

11        MR. FAX:  As I understand a coupon, a coupon says

12  if you buy something you don't need, you can get a discount.

13  That's a coupon.  That's not what this is.  If somebody has

14  an old dishwasher that combusts, they need a new dishwasher.

15  It makes no sense to repair the old dishwasher.  Whirlpool

16  does not want to repair the old dishwasher, because that

17  just recreates the same potential problem.  Because to

18  repair one of these old dishwashers, you have to insert the

19  same model or same type of circuitboard.  So you're just

20  putting the dishwasher at risk again.

21        This could be a dishwasher that's 13 years old.

22  So it's ammortized, it's full value, it's worth zero.  So

23  the consumer gets $100 or, alternatively, 30 percent off a

24  new Whirlpool-manufactured dishwasher, which could be worth

25  a lot of money.  A dishwasher could be 700, 800, could be

1   over $1,000.  So they have to buy a dishwasher, unless

2   they're going to wash their dishes by hands for the rest of

3   their lives.  It's not like a coupon, it's something

4   different.  And it's a hell of a benefit, in my view.

5           Our expert estimates that the value of this

6   insurance-like coverage is $6 per dishwasher, based on a

7   comparison to extended warranties in the market.

8           Now, Whirlpool argues that no, no, no, you value

9   this benefit as a function of the number of consumers who

10  take advantage of it.  And they end up valuing that at less

11  than a penny, I think, per consumer, in terms of their

12  estimation of the claims rate, if you will, on that benefit.

13  That's fundamentally wrong.  That's not the way you value

14  what, in effect, is an insurance policy.  You value it as a

15  function of what the premium, what a citizen such as you or

16  I would pay for that benefit today, for that insurance

17  coverage.  And we submitted a declaration from our expert,

18  and he values it at $6 a unit.  And when you do the math,

19  you come up with some very, very significant numbers.

20          So we have -- we have -- that actually comes to

21  $81 million at $6.  And if you divide it in two, let's say

22  it's $3, so that's $40 million.  Anyway you slice it, that's

23  a very, very valuable benefit.

24          The settlement includes rebate claims, new

25  dishwasher rebate claims, which Whirlpool acknowledges fall

in the range of 2 million to $4.5 million.  Our expert

values those claims at between 7.5 million and $33 million.

But for purposes of argument, let's take their figures.

Then there are pre-qualified claims, $236,000;

then there was the intangible value of the safety warnings.

Whirlpool makes a very, very interesting argument, which I

actually thought was tongue-in-cheek.  Whirlpool said: "No,

no, no.  These safety warnings aren't worth anything because

the service personnel already know the problem with regard

to the TCOs and, therefore, there's no value to alerting

them to the TCOs," which is probably not true, because if

their service personnel already knew the problem with the

TCOs, we wouldn't be having recurring fires caused by TCOs

that had been disabled.  That's still going on.

I got a call the other day -- in fact, I've got

several calls in the last week from consumers, so it's

obviously a problem.  That's a problem that either the

service personnel don't know about or they know about it,

and they don't care.  Therefore, it is important.  In either

case, it's critically important for Whirlpool to warn them

and alert them and tell them what their responsibilities

are.

And this provides, we submit, a huge benefit to

the public and one that we think is of great, great value,

intangible value.

1         We've done the math and we've provided charts in

2    our brief.  When you take the various values, including the

3    almost $2 million of the cost of notice and administration,

4    when you take all these various values, we comes up with a

5    settlement in the range of 56 to $152 million.  If you split

6    the difference, you come up with a settlement in the range

7    of $100 million.  And this is only for purposes of a cross

8    check.  Again, the tail wagging the dog; right?

9         So if we are going to go to a cross check, and we

10   compare the lodestar plus the multiplier that we are asking

11   for to the quantitative cross check, we submit that the

12   numbers that we are asking for are reasonable, the

13   settlement itself is huge, is worth a fortune.

14        And I would close by observing that the settlement

15   covers between 15, if you take Dr. Ray's figures, between

16   15 percent and 20 percent of the households in the

17   United States.  That is the magnitude of the settlement.

18   And for that, we submit our fee request is reasonable.

19   Thank you, Your Honor.

20        MR. WILLIAMS:  Your Honor, good morning.  I did

21   come prepared with some slides, but in light of your

22   instruction that we don't need to argue what's in the

23   motion, what I'd like to do is hand up just the

24   demonstratives that elaborate what's in the briefs and focus

25   on those, and I'll skip everything else.

43

1          With your permission, I'll approach.

2          MR. FAX:  Your Honor, I'd like to know in the

3    nature of voir dire whether, first of all, this contains any

4    material that we haven't seen.

5          THE COURT:  Yeah, is this out of the briefs?

6          MR. WILLIAMS:  Yes.  It's mostly discussion on

7    cases that were cited and where this one sort of fits in.

8          THE COURT:  Are you just giving me pages in the

9    briefs?

10          MR. WILLIAMS:  No, no, it's demonstrative, you

11   know, showing --

12          THE COURT:  That's new stuff.  I don't need it.

13   Give it back to him.  Just argue it.

14          MR. WILLIAMS:  Sure.  That's fine.

15          MR. FAX:  And, also, one other question.  Forgive

16   me, Your Honor, but can I assume that this is not material

17   in the sur-reply brief that's still sub judice on the

18   question of admissibility.

19          THE COURT:  Well, I don't know.  You'd have to ask

20   -- but let me just say that if you're trying to show me

21   pages out of your brief or charts that are attached as an

22   exhibit, that's fine, but if this is stuff that you created

23   without giving it to them ahead of time, I don't think that

24   that's fair.

25          Look, I'll give you the time he gave.  Just don't

1    rehash your brief.  I don't need anything else.  It's an

2    oral argument.  I've already read the papers very carefully.

3    I can assure you that I read the papers very carefully

4    myself, so just argue, elaborate, address his concerns, and

5    we'll go from there.

6              MR. WILLIAMS:  I will do that, Your Honor.  Just

7    in responding to that point, this is not a trial.  It's just

8    a motion hearing.  I just wanted to explain --

9              THE COURT:  It is.  What troubles me is all this

10   last-minute materials that everyone is trying to submit or

11   give me or that kind of stuff.  I just don't like it.  I set

12   very firm deadlines, and so to me, I'll take it at face

13   value what you're saying.  But it's just the notion that

14   you're trying to put more paperwork in front of me, and I've

15   got all this already.  Okay?

16             So go ahead and make your argument.  And if I have

17   any questions, I'll ask.

18             MR. WILLIAMS:  Your Honor, the point of the

19   demonstratives is just to help you follow the discussion.

20   That's all.  And you can hand it back.

21             THE COURT:  It's in your brief; right?

22             MR. WILLIAMS:  Yes, all of the information, but

23   I'm pulling out the key information from comparative cases.

24   With that, we obviously agree with class counsel that the

25   settlement is fair, reasonable, and adequate, and we do

1  think it's a good result for this class on what we believe

2  were weak merits; and we agree that they're entitled to a

3  reasonable attorney fee for their work on behalf of the

4  class and the results they achieved.

5       We even agree that they're entitled to a fee

6  that's in the millions of dollars.  This is real money we're

7  talking about.  We're not asking for a six-figure fee, we're

8  saying that the starting point is just under $2 million and

9  goes above $3 million.  We strongly disagree that 15 million

10  is reasonable in light of the law in the Ninth Circuit and

11  the factual record before this court.

12       To the contrary, the claim fee is excessive and

13  unreasonable under the law, most notably the Ninth Circuit's

14  decision in *HP Inkjet* and would dwarf the actual recovery by

15  class counsel's clients, the class members.

16       We believe that class counsel are urging legal

17  error on this court, and we are very concerned that the

18  court and the parties not walk into a legal error that will

19  allow people like our colleagues in the back of the

20  courtroom to hold this settlement up longer than necessary.

21  We do not want to subject this settlement to unnecessary

22  scrutiny and criticism in the Ninth Circuit.

23       Now, we examined all of the fee decisions in

24  consumer class actions that were cited by either plaintiffs

25  or defendants in their briefs, and we compiled a list of

1  those decisions.  It's new information, so I won't hand it

2  up given what the Court just said.  But this $15 million

3  claimed fee, putting aside the J.C. Penney fee, which would

4  rank up there on this list, this would be the fourth highest

5  fee in any other consumer class actions that were cited to

6  this court in the parties' voluminous briefs.

7           And in each one of those three cases where the fee

8  was north of $10 million, the settlement recovery for the

9  class was undisputed that it was astronomically high,

10  starting at about $100 million and going into the billions

11  of dollars.

12           And so those cases where fees of this magnitude

13  are awarded are dramatically different than this case.  Even

14  the cases that they focus on most heavily, like *Tate* and

15  *Roberts versus Electrolux*, there were seven-figure fees.

16  I'm going to focus mostly on consumer appliance settlements

17  because I think they're the most revealing and instructive

18  on this record.

19           *Roberts* was a $7.4 million fee for a settlement as

20  I'll discuss with Your Honor is better recovery for the

21  class in that case than in this case.

22           And in *Tate*, they had a $9.2 million claim

23  lodestar.  It was reduced by 55 percent to $4.1 million.

24           THE COURT:  But before you go on, I want -- I

25  don't think that -- I understand that the results of the

1   case are one factor, but the Ninth Circuit has said that a

2   reasonable fee must be determined in light of the context of

3   the case, not based on the court's own notion of the correct

4   ratio between the amount of attorney's fees and the amount

5   the litigants recovered.  And that's all you're going on.

6   You're just saying, "They recovered this" and "the fees are

7   this."  Well, at what point do the lawyers not get paid?

8          I mean, in another case -- I'll tell you that I

9   had a case where we went to trial and -- it was not a class

10  action, it was just an individual case, went to trial.  The

11  jury awarded $5,000, and I awarded over a million dollars in

12  fees.  And it was affirmed by the Ninth Circuit.

13         Let me put it this way, what is your lodestar on

14  the case?

15         MR. WILLIAMS:  I would be happy to disclose it.

16  I'm not sure.  It's confidential.  It's far lower than

17  theirs.

18         THE COURT:  My point is, at some point if you

19  don't pay the lawyers for the work that they do, there won't

20  be any incentive for them to take these cases, so the result

21  is a factor.  But talk about the whole context of the case.

22         MR. WILLIAMS:  I will.  And we agree that they

23  should be paid.  That's why I'm saying, you know, we're

24  talking about fee and cost in the range of 2.25 to

25  3-and-a-half.  So we agree they should be paid, and it

1   should be real money.

2            THE COURT:  You're focusing on all these other

3   cases and what the result was.  But we have their lodestar;

4   right?

5            Are you doubting that they put that work into the

6   case?

7            MR. WILLIAMS:  I'd like to say a couple of things.

8   One is we're not challenging the reasonableness of the hours

9   because we worked comparable hours, so I don't really doubt

10  that there was actual time.  Where we think they're gouging

11  and it's not appropriate are on the rates for routine things

12  like document review.  Their model for document review was

13  big law 1990s and early 2000s where you put partnership

14  track associates at 375 to 475.  Mr. Geyelin claims he was

15  in a room with these documents for more than a

16  year-and-a-half, 2,800 hours.

17            Now, we will give him credit for hundreds of hours

18  of time that we think is deep analysis engineering review

19  and so forth, and we've done that in our papers, but the

20  2,000 hours where he's just going through documents and

21  first-level review, they can't charge 460 for that.

22            Now, in addition to that, the claim lodestar here,

23  we think there's some red flags with it.

24            THE COURT:  Why can't they charge 460 for that?

25            MR. WILLIAMS:  We think it's appropriate for them

1  to charge 460 for the time he's really spent working with

2  experts, identifying trial exhibits and so forth, not for

3  the first-level review where he went through every one of

4  the 350,000 pages of documents.

5          THE COURT:  You turned over the documents; right?

6          MR. WILLIAMS:  We did turn over.

7          THE COURT:  They had to review what you turned

8  over; right?

9          MR. WILLIAMS:  But they didn't need a 42-year

10  lawyer charging partner rates doing that work.  They could

11  of had junior associates and contract attorneys do that,

12  that's what the fee-paying business model is today.  We hire

13  contract lawyers; Mr. Zipser hires contract lawyers.

14          Your Honor, if you just look at the fee model and

15  the billing practices of Mr. Cohon's firm and Mr. Fax's

16  firm, that would suggest to you that the claim lodestar of

17  8.95 million should be reduced by 1.7 million, just using

18  two class counsel firms as a comparative of what's right and

19  what's not reduces the claim lodestar by a large seven

20  figure.

21          We look at the 8.9 claim million compared to the

22  other consumer appliance class actions like *Roberts* and *Tate*

23  and *Grays Harbor* and this is way towards the top, but they

24  didn't even brief class certification.  As they, Mr. Fax

25  told you, we stopped in the middle of expert discovery.

1   *Grays Harbor* went through class certification proceedings --

2   this is the furnace case -- in multiple states and went up

3   on appeal.  The *Roberts* case was --

4           THE COURT:  Again, but the issue is -- again, are

5   you doubting that they didn't put the hours in that they put

6   into the case?  It doesn't matter what stage they went to.

7   Did they put the hours into the case?  Are you doubting that

8   -- I mean, I don't care what the lawyers did in that case.

9   Did they put those hours into this case?

10          MR. WILLIAMS:  As I said, we're okay with the

11  hours, we're not okay with the rates charged and the

12  allocation of resources among --

13          THE COURT:  That's fair enough.  Maybe you

14  produced millions of more pages of documents that had to go

15  through so that takes a lot more hours.

16          MR. WILLIAMS:  We certainly did not.  I know

17  because I litigated *Roberts*.  What I'm saying is the red

18  flag to me is those cases went further and had lower claim

19  lodestars, and to me there's an explanation for why it's so

20  much higher in this case.  And the explanation is the rates.

21          Now, if you compare this case to *Tate*, *Roberts*,

22  and *Grays*, their $15 million fee would be about 625 percent

23  of the low end of the class recovery here, and we don't

24  think that's appropriate under any circumstance.

25          In the *Roberts* case, class counsel there delivered

1  a better superior class settlement for half the fee claimed

2  here, half.  7.4 million.

3          They had free repairs for at-risk appliances, so

4  tens of thousands of service calls out in customers' homes

5  to clean lint from dryers.

6          They had safety warnings, true safety warnings

7  that went out in the mail to every individual owner warning

8  them of the risk of lint fire.  Here, the word warning does

9  not appear in the settlement agreement.  We have not agreed

10  to issue a warning to any class member.  We are not agreeing

11  to issue a warning to any service technician.  And we did

12  submit in Exhibits 8 and 9 to our opposition, we tell

13  service technicians -- and we've been doing it throughout

14  the class period -- that the TCL is a safety device.  It

15  needs to be properly installed.  You need to check it.

16          All we've agreed to do is take that information in

17  those disparate service documents and training bulletins

18  over time and have a concise paragraph in each one of those

19  documents that says:  "Important.  Here's the information."

20  They admit in their opening brief that that is

21  unquantifiable.  They've admitted it here today.  It's

22  unquantifiable.  And their brief actually says zero dollars

23  should be associated to that.  They throw out the $10

24  million as a high, and there's not a shred of evidence that

25  would allow this court to quantify that.

1          They're all putative class members who were pled

2     in the complaint were included in the settlement class.

3     Here, they started the case with 18.4 million dishwasher

4     owners, and this idea that they've achieved the results

5     they've set out to achieve is just wrong and contradicted by

6     the factual evidence.  They have excluded from the

7     settlement class 12.6 million people, 68 percent of the

8     dishwasher buyers are outside the class in this case.

9          In addition to that, in their Fourth-amended

10    Complaint, they've pled every form of economic damages under

11    the sun in a nationwide safety recall.  That's what this

12    case was about, that's what their clients testified to in

13    depositions, that's what every pleading they filed in this

14    case said, a nation-wide recall and billions of dollars in

15    economic loss, billions.

16          THE COURT:  You know, this is a settlement, and

17    you know, what the plaintiffs put in their complaint and

18    what they settle is always two different things.  That's not

19    the point.  The point is:  Is this a good settlement and did

20    they put the time in?  You know, you keep focusing on

21    everything, but your -- if the measure of awardable fees was

22    limited by the damages received or anything like that, then

23    lawyers would never be compensated for the time spent on a

24    case; right?

25          I'm just asking you -- you keep saying they

1    legitimately spend all these hours, you have trouble with

2    their rates.  That's your concern.

3             MR. WILLIAMS:  It's more than that.  Because

4    *Hensley* -- the Supreme Court in *Hensley* instructs that the

5    results are the most important factor, and the Ninth Circuit

6    reminds us of this, over and over again, in *Bluetooth* and

7    *HP Inkjet*.  In *Bluetooth* and *HP Inkjet*, the Ninth Circuit

8    said you have to look at what the value is to the class, you

9    can't come up with these speculative hypotheticals.  And in

10   both of those cases, the plaintiff lawyers in *Inkjet* had a

11   $7.4 million lodestar and Judge Fogel gave them

12   $1.35 million on remand, looking at what they had actually

13   accomplished.  That same sort of analysis has to happen here

14   because, over and over again, the Supreme Court and the

15   Ninth Circuit have said it's the degree of success and the

16   results achieved.  So that's why I keep coming back to it,

17   Your Honor.

18            THE COURT:  I just quoted you cases from the

19   Ninth Circuit where they said that you look at the context

20   of the case, and that you cannot base it on your notion of

21   what you think the correct ratio of the settlement is or

22   what you think -- what they actually got.

23            MR. WILLIAMS:  Well, I would view Ninth Circuit

24   law differently than that, Your Honor.  If you look at last

25   year's decision in *Allen versus Bedolla*, they talk about

1  making sure the recovery doesn't outstrip the class

2  recovery.  This is the way we think the law is moving pretty

3  quickly to focus on actuals, not hypotheticals.

4          And the difference in the Ninth Circuit cases --

5  There's two differences.  One is CAFA.  We're about to come

6  to that.  But the other difference is, in the cases where

7  they were awarded fees on the hypothetical recovery, it was

8  because the defendant agreed to do that.

9          Like in the *Williams* case in 1997, which is a

10  securities case, they said it's four-and-a-half million

11  dollars and that's what the fees are going to be based on.

12  Here there was no agreement as to what this was worth to the

13  class.  All along we thought it was a very modest result,

14  which is why we agreed to it.  In our view, it's less than

15  cost of defense settlement, which is why we're here today,

16  not a 55 million to 116 million.  That has absolutely

17  nothing to do with the economic reality of the case.

18          So we think the court ought to look more at

19  *Inkjet*, *Bluetooth*, and the *Allen* case, because those are the

20  most recent 2013 to 2016 pronouncements.

21          Now, let's talk about CAFA.  Unfortunately, I

22  think *Inkjet* really does box in the court as to what to do

23  with the coupon relief, which is mostly what we've provided

24  to the class members here.  And even though I think Judge

25  Fogel's original analysis was more than competent, they

1    reversed him because he didn't wait to find out what the

2    redemption value was of the coupons, and he guesstimated

3    what that was.

4              So here we think the rational approach -- I think

5    there's really three options.  The first option is, let's

6    just wait because the redemption period we'll know in the

7    spring.  We'll know both as to the actual value of the past

8    overheating points, and I'll take Chuck Fax up on his bet as

9    to whether the final cash payout for the past overheating

10   claims is closer to my number or his.

11             MR. WILLIAMS:  I will take him on that bet, and we

12   will know the past overheating claim values in the spring.

13   We will know the actual redemptions of the coupons, of the

14   rebates in the spring.  That way, the court will know and

15   then we don't have to worry about this second-guessing that

16   could happen at the --

17             THE COURT:  What about the future overheating in

18   2021?

19             MR. WILLIAMS:  I would like to come to that.

20             THE COURT:  This case is already very old.  So I'm

21   not going to sit on this case --

22             MR. WILLIAMS:  And we don't suggest that you

23   should.

24             A few points there.  One, they keep saying -- they

25   said it in their opening brief, they said it in their reply,

1   Mr. Fax said it in his oral statements to you today that

2   this is an extended warranty.  It's not.  Paragraph 15K of

3   the agreement says there will be no extended warranties.

4   They promised it, they bargained for it.  They cannot come

5   in here and say it's an extended warranty.  What it is is an

6   offer, a contingent offer to people who have this very rare

7   experience.  If you have it, you can come to us and make a

8   claim for a coupon or a lesser amount in cash.

9           THE COURT:  So, I think, because you keep focusing

10   on that issue, are you willing to provide all the evidence

11   that your client has on all the settlements it made with all

12   the class members relating to this?

13           MR. WILLIAMS:  Yes, I believe we already did in

14   discovery.  We might not have had depositions on it, but

15   they were --

16           THE COURT:  He just said earlier they don't know

17   how many people you settled with.  He said he got all these

18   phone calls to class members when you reached out to them.

19   After the dishwashers had the overheating event that you

20   guys reached out to them separately.  You know, you picked

21   off the class members; right?  This is a common defense

22   counsel thing.

23           MR. WILLIAMS:  That's actually not what happened.

24           THE COURT:  Did you get the information?

25           MR. FAX:  My recollection is, I think we may have

1    gotten some information as of an early date.  We did ask for

2    the information.

3            THE COURT:  Well, as of this date, do you know how

4    many people you've settled with confidentially or otherwise

5    relating to these overheating events?

6            MR. WILLIAMS:  There's two parts.  One is, all

7    along we have a safety cookbook at the call center so that

8    when people call us with these problems, we will provide

9    out-of-warranty relief; and we collect the machines as part

10   of our ongoing monitoring of field safety appliances.  So

11   before we ever heard from them, we were years ahead of them

12   looking at this issue.  We had concluded in 2008, Your

13   Honor, that this wasn't a safety issue and there needed to

14   be no recall, and we had collected, on our own, over 1,100

15   machines.

16           Now, then, the litigation comes and after the

17   litigation comes, Mr. Chambers and I believe class counsel

18   said in one of their papers in their opening that they went

19   to the agency and had discussions with the agency.  After

20   one of their meetings with the agency, the agency came to

21   our director of product safety, and he said, "Have you

22   called all of these people who reported?" -- there talking

23   about these people that went on their Web site -- "Have you

24   tried to verify any of their allegations?"  And I believe

25   our answer was, no, we hadn't.  We have this litigation

1  pending.

2          So at that point in time, we began the outreach

3  because the government wanted us to do it.  And I believe we

4  did -- in response to that, we were able to reach several

5  hundred people, probably at least 200 people, and get those

6  machines back.  And we had a spreadsheet where we tracked

7  all this, and I do recall producing it to Mr. Fax.

8          THE COURT:  Well, I think I want you to check

9  after this because given your arguments you're making

10 relating to the -- how I should judge the value of the case,

11 I think that I need to take into account all these other

12 people that are class members that you've settled with.

13         So talk it over with them and work out a

14 stipulation to give them all the information because I need

15 to know everybody that you've settled with, confidential or

16 otherwise.  You can file the document under seal, so just

17 the lawyers can see it and the court.

18         MR. WILLIAMS:  We can do that.  I'm pretty sure

19 when we finished the outreach campaign, we turned over the

20 spreadsheet showing who we got.  But I would like to say

21 this --

22         THE COURT:  Yes.

23         MR. WILLIAMS:  -- this argument that they are

24 entitled to claim a percentage recovery on those settlements

25 is entirely new.  It's not in either of their briefs, and

1    there's no evidence on it in the record.

2            So, again, I'm not opposed to continuing the

3    discussion about what all the value is that should be

4    included, but let's do it fairly and honestly and not by

5    ambush.

6            THE COURT:  If you already have the information,

7    Mr. Fax, then we don't need -- I assume it's all in the

8    record then.  It's all been incorporated.

9            MR. FAX:  I don't believe we have current

10   information, Your Honor.  I could be wrong, but I don't

11   think so.

12           I mean, I -- because the last exchange of

13   substantive information, of discovery information, was a

14   long time ago.  It was like two years ago or a

15   year-and-a-half ago.

16           THE COURT:  Maybe you guys should talk about it.

17   Let me put it this way.  Talk about it, and if you need to

18   work something out, file something; if not, just forget it.

19   I'm just going to base it on the papers I have in front of

20   me.

21           MR. WILLIAMS:  I did want to address your question

22   about the future overheating event of it, because I think

23   it's real important because the claims period has closed for

24   rebates and past overheating events.  So we're going to

25   know.  And Your Honor doesn't need to decide whether Dr. Ray

1    is right or Mr. Fax is right.

2            One small point.  He said our expert opined that

3    the value of the rebates is 7 million to 33 million.

4    There's no plaintiffs' expert who has rendered that opinion.

5    All there is lawyer arguments, so we cannot honor that.

6            But turning to the future overheating event, I

7    think it's really important to look at it in terms of what

8    the settlement agreement actually says; and what the

9    settlement agreement actually says is for the 12.6 million

10   putative class members who own NewGen and Raptor, they're

11   not included in the class.  And all we're giving them is an

12   opportunity if they have this rare event to come forward and

13   claim cash or a coupon, and they have to do an individual

14   settlement with us.  I think it's Exhibit 12 to the

15   settlement agreement.  And they have to sign that.  And they

16   can choose not to do that.  And it's -- the value that their

17   expert puts on it is based on a few false assumptions.  One

18   is that all the 26,000 or, at the time he wrote his report,

19   21,000 overheating event claims are valid.  We know that's

20   not true today.  We know that 80 percent of the past

21   overheating claims are deficient on their face, as they

22   stand today.  And we agree that the administrator has to go

23   through them and follow that process and some will be cured.

24   But I've done probably 10 consumer appliance class actions

25   claims made like this one.  I know how these things are

```
 1    going to go.  The final number is going to be closer to ours

 2    than theirs.  I know they'll do a great job making sure

 3    everyone is being kept honest.  So that is just wrong.

 4           When we look at the actual claim forms -- and

 5    we've looked at 400 of them -- of the documented ones.  So

 6    you have to take the 26,000 and strip off 80 percent off the

 7    top because they either don't have any document at all to

 8    meet the proof requirements under the settlement agreement

 9    or they had a document that was so facially deficient, like

10    the settlement administrator told us one person drew a

11    picture of a dishwasher on a napkin and took a photo of it

12    and submitted it in.  So this is the type of deficient stuff

13    we've stripped out.

14           But in addition to that, what happens is when you

15    send a notice to 6 million people saying:  "You can make a

16    claim for an overheating event," you get a lot of confusion.

17    People who aren't sure; people who misremember.

18           And so as we look through their service records,

19    we see people submitting claims for drain pump repairs; we

20    see people submitting claims for motors; we see people

21    submitting claims for broken heating elements.  None of

22    those things have anything to do with the control board.

23    We're not trying to interfere with the claims process, we're

24    just trying to say, if you look at it fairly, it has to be

25    about a control board, it has to be about overheating, and
```

1    they have to prove that they incurred some out-of-pocket

2    costs.  Those three checkmarks mean that most of those

3    overheating claims are not going to be granted.

4            Now, we agreed in the settlement agreement to a

5    methodology to identify the overheating events.  They agreed

6    to it.  And that's what allowed us to get to the agreement

7    on who had out-of-pocket costs, which is the 2,591

8    pre-qualified people.  That number, 2,591, tells you

9    everything you need to know about whether we're right that

10   there's fewer than 20,000 of these people out there or

11   whether they're right that there's 420,000 people out there.

12           In addition to that, we sent a notice to more than

13   3.8 million people by mail, and then all of the publication

14   notice.  And we said, "If you had this, come forward."

15           And so we can look at the pre-qualified claims and

16   see which ones are actually potentially related to this one

17   or not.  And only about 8 to 10 percent are related to

18   electronic control board overheating event, which lines up

19   perfectly with our internal data.  We send the notice out to

20   the world, we say:  "Step forward and raise your hand if you

21   had this problem," and about 1,400 people, we believe, on

22   the low side, are actually going to qualify for that.

23           And if you say:  "Well, maybe it's going to be

24   higher than that," it probably will, but that's consistent

25   with our number as to what the universe is, because when you

1  send out a notice in a class action, only about 10 percent

2  of people who had this problem will respond; maybe

3  7 percent, maybe 8 percent.  And that's exactly what we see

4  when we look in the claims.

5          So I'm not speculating.  I have the data on my

6  side, and the Court will know from KCC's report in a few

7  months whether I'm right or they're right or Dr. Ray is

8  right or Mr. Fax is right.

9          I would like to talk a little bit about his expert

10  report.  I had a slide that I was going to cover with you

11  that sort of summarizes what we think are the important

12  admissions in their plaintiffs' expert report.  And I have

13  it tabbed and flagged for you so you can see where all this

14  is if Your Honor would like to see that.  He failed to look

15  at our service records or see our service records at all.

16  He just didn't look.  He said:  "I am informed that there

17  are 21,000 overheating claims."  He didn't look at any of

18  those overheating claims to see whether they were really

19  control boards or motors or heating elements and so forth.

20  He failed to -- so he relied on class counsel.

21          He admits that this coverage that he claims

22  doesn't exist anywhere in the marketplace.  It just doesn't.

23  He says it's for one component, and it's for one defect.

24  And we all know, because we settled this case for this

25  reason that this defect effects less than 0.1 percent of

1    these dishwasher owners.

2              And, by the way, Your Honor, as Dr. Ray's report

3    showed, the rate for the NewGen Raptors for this was sort of

4    an early life problem.  It's the first two years, and then

5    it falls off the map.  So it's hardly happening at all.  In

6    fact, I think we've had one overheating, future overheating

7    event claim that's been brought to my attention since

8    February, which I think tells you what you need to know

9    about whether it's going to be 120,000 of these things or

10   695.  If I were to go to a million consumers and say, "I'm

11   going to offer you a warranty" -- put aside the fact that

12   they agreed that we didn't extend the warranty in the

13   settlement contract.  They can't refute that now.

14             And I said, "I'm going to offer you an extended

15   warranty that covers one component in your dishwasher for

16   two years if it's an old dishwasher or up to five years if

17   it's a more recent dishwasher, but the only time you can use

18   that coverage is if lightening struck your machine."  In

19   this case, the actual incident rate is less than your chance

20   of being struck by lightening in any given year, truthfully.

21   And I said, "I want you to pay me $6 for that extended

22   warranty."  There would be no takers.  You don't have to

23   take my word for it, they said it's not quantifiable.  He

24   came up here and he said it's not quantifiable.  But in the

25   reply --

1        THE COURT:  But doesn't the fact that it's not

2  quantifiable support the notion that I should be using the

3  lodestar method here?

4        MR. WILLIAMS:  We actually think you should do

5  both.  Because we want to avoid legal error, we think you

6  should do percentage for the coupons because if we don't do

7  that, we think it subjects this to a risk of reversal that's

8  too high.  We think that you should do the lodestar for the

9  non-coupon portions of the settlement.  And because those

10  are smaller than the coupon settlement, we think that limits

11  them, prevents them from getting a positive multiplier.  And

12  we think there are enough -- Your Honor will have to do the

13  lodestar analysis, you and your staff.  Unfortunately, I

14  can't do that.

15        I think you'll probably find different things and

16  criticisms around the edges than we did, but we think you

17  have to do the coupons percentage base, do the cash portion

18  lodestar.  But because the lodestar is based on a cash

19  recovery of less than a million dollars, in our view -- and

20  we're going to know this -- we think it effectively limits

21  what that additional lodestar base fee will be.

22        So that's why we say, you know, you take the

23  coupons and you get to this 1.9 to 2.8, and then if you look

24  at the cash and you do a lodestar, you add some more

25  lodestar into it, but it doesn't take you to 15 million.  It

1    doesn't even take you to 9.

2            THE COURT:  What's your position on what they said

3    earlier:  This is governed by California law and CAFA

4    doesn't really apply here?

5            MR. WILLIAMS:  This is the second reason why I

6    think they're urging legal error.  I think they're

7    forgetting the supremacy clause.  And Congress has passed a

8    statute directly on point saying:  "If you're going to base

9    any portion of a fee award on coupons provided in a class

10   action subject to the Class Action Fairness Act, you have to

11   look at the actual value of the coupons redeemed."  And to

12   the extent that conflicts with California state law, which

13   there are cases saying you don't have to do a

14   percentage-based approach to coupons --

15           THE COURT:  So this case is here on diversity

16   though; right?  So don't I apply California law?

17           MR. WILLIAMS:  So if you weren't being drawn

18   directly into conflict.  So if they were the same, then

19   there would be no issue.  But the law of California is

20   federal law when federal law is in conflict under the

21   supremacy clause.

22           THE COURT:  But jurisdiction -- my jurisdiction

23   here is diversity; right?

24           MR. WILLIAMS:  It's CAFA diversity jurisdiction,

25   plus there are two federal claims -- they said it was all

1  state law claims in the Fourth-amended Complaint.  That's

2  not true.  There's Federal Declaratory Judgment Act, there's

3  Federal Magnuson and Moss Warranty Act.  And there's no case

4  that they have cited that has done this.  I think for good

5  reason.  There's the *Dardarian* (ph) case out of the Northern

6  District of California that addresses this issue, and I

7  think rejects it correctly.  And *Inkjet*.

8          Incidentally, there's the same choice of law

9  provision in *Inkjet* settlement agreement.  Again, I brought

10  a copy of it because I wanted to check in preparation for

11  today.  Same choice of law provision.  No dispute that CAFA

12  applied to that.

13          THE COURT:  So the issue, then, is whether -- I

14  see where you're going.

15          MR. WILLIAMS:  There was an issue -- I started to

16  say what the options are for how we do this timing-wise.

17  There's the wait-and-see till the spring, and there's also

18  halfway through the redemption period, under Section

19  1712(d), we could ask KCC for an expert opinion as to what

20  the coupon redemptions are going to be before they're all in

21  and Your Honor could rely on that.  And we'd be comfortable

22  doing that midway through the redemption period.

23          I think option three is the *Roberts* approach.

24  Probably because class counsel didn't litigate that case,

25  they don't appreciate what happened there.  There were

1    coupons there that could be used on any Electrolux

2    appliance.  It didn't have to be a clothes dryer.  And what

3    they said was:  "We're going to disavow any fee based on the

4    coupon.  No part of our valuation as class counsel for this

5    settlement is going to be based on the coupon."  So that

6    allowed Judge Snyder to avoid Section 1712(a).  But they

7    haven't done that here.  If they want to do that here, then

8    we can just do a straight lodestar like *Tate*, like *Roberts*.

9    Then we get into the question of what's the right adjusted

10   lodestar after we consider the results achieved, which again

11   we're going to have to do under *Bluetooth* and so forth, if

12   that makes sense.

13           So there in *Roberts*, again, the fee is half of

14   what they requested here.  Now, it's important to note that

15   in the *Roberts* case, we thought their negotiating

16   position -- I defended that case -- was reasonable.  We did

17   not contest the fee.  And so there was unrebutted expert

18   testimony as to what the value of the settlement was there.

19           This case, nothing close to unrebutted expert

20   testimony on the plaintiffs' side.  Their guy, if you look

21   at what he says he did, definitely stands rebutted; and we

22   have the data, empirical data on our side.

23           The final thing I wanted to say about

24   Mr. Solomon's opinion is, he says you should take a look at

25   what an extended warranty on a -- a ten-year extended

1    warranty would cost from the -- and he says, "ten years of

2    coverage, let's take 2 percent of that."  He just pulls it

3    out of thin air.  This benefit doesn't cover any machine for

4    ten years.  It starts on February 25th, 2016.  All the years

5    of dishwasher life that came before it are water under the

6    bridge for which they cannot count under that future

7    overheating event.  That's not disputed.  In their reply,

8    they actually say it cannot be realistically -- it's not

9    realistically possible to quantify this thing.

10           So I think they've abandoned -- if you read their

11   reply, they've abandoned the $26 million figure for purposes

12   of this motion.  You can't in reply say:  "Judge, I get why

13   you might discredit the $6, just go with 2."  What evidence

14   do we have for the $2?  No consumer is going to pay $2 for

15   an extended warranty that you only get to use 1 in 4 million

16   dishwashers.

17           The last thing is the injunctive relief.  I think

18   I already addressed that earlier.  Their opening memo says

19   it's probably unquantifiable, valued on zero on the lodestar

20   low side, $10 million on the high side.  Today they

21   reiterated that it's unquantifiable.  We agree, it's

22   unquantifiable.  We hope someone reads it and maybe some

23   small fire would be prevented.  The thing that's important

24   to note -- I did not intend to come up here and litigate the

25   merits.  He says these TCO events continue to happen and

1    people are calling about fires.  None of that is in the

2    record.

3            And when we litigated this case, there were

4    something like six to eight fires that occurred outside the

5    dishwasher itself.  The whole case was about:  Does our

6    safety design contain these overheating events so the fire

7    never gets out?  And that's what we persuaded the

8    government.  Our safety design is robust.  If you don't

9    tamper with this product post-sale, you are not going to

10   have a fire.  The exceptions, we can count them on two

11   hands.  It's not like it's happening out there everyday.

12           Now, if it were happening out there everyday, they

13   would need an expert opinion to say:  "Here's what they are;

14   here's when they occurred.  And, by the way, after this

15   injunctive release happens, we've done this statistical

16   analysis based on a survey of service technicians that

17   they're going to read it, that it's going to affect their

18   practices, and so on."  We don't have any of that in the

19   record today.

20           Finally, these are old dishwashers.  So when

21   people have this overheating event or a problem with their

22   control board in year 12, 13, 15, they're not calling our

23   service technicians anymore to pay to repair the machines.

24   They're getting new dishwashers.  Every day hundreds, if not

25   thousands, of these things are rolling off the market

1   because they've served their full useful life.  So we should

2   not overestimate the future overheating event.

3           I think if the court were to credit those numbers

4   or anything even remotely in that ballpark, what would

5   happen is it would be viewed as allowing them to do an end

6   run around CAFA.  So what they can't do directly through the

7   coupon, they'd be doing it by calling this an extended

8   warranty.  This case is distinguishable from every extended

9   warranty case they cited to you precisely because we refused

10  to give them an extended warranty in the settlement

11  negotiation.  It was not bargained for; it was not granted.

12          So, Your Honor, that's really all I wanted to

13  cover today.  I know it sounds harsh.  It feels harsh to

14  stand here and say:  "These guys did a good job.  I respect

15  them."  You know, competent, able, exercised great business

16  judgment when it was time to pull the rip cord on this

17  thing, and it clearly was once a recall was not going to

18  happen; to say:  "You got to dramatically cut their

19  lodestar," but the fact of the matter that's the nature of

20  the business.

21          THE COURT:  But getting back to the recall, you

22  take the position that it's a negative thing, that it didn't

23  happen; right?  But I will tell you that as a former

24  government lawyer, Department of Justice, we often make the

25  decision not to pursue cases because they were being

1   privately pursued, and they were going to get the relief

2   there or get some form of relief, and very limited

3   resources, so we didn't pursue the cases.  I sort of see it

4   as a positive thing.  We don't know what was in the mind

5   of -- you know, they're going to say whatever buzz words

6   they need to say to close the investigation; right?  You got

7   to make a finding.

8           But I will tell you from sitting in a lot of those

9   meetings that -- in other words, it goes both ways.  In

10  fact, you think it's a bad thing for their settlement that

11  there was no recall.  It could be that maybe the internal

12  decision was:  "Well, you know, we've got these plaintiffs

13  out there that are doing this big class action, and we have

14  all these other things coming up, and we just don't have the

15  resources to pursue them."  I don't know.  We don't know.

16  I'm just saying that I view it more as a neutral factor.

17  You harp on that a lot in your brief, and I see why you do

18  but --

19          MR. WILLIAMS:  We're proud of the safety of these

20  things, and it's not just because we're bulldog, tenacious

21  litigators.  We believe they were safe and that going in and

22  servicing these things would create risks that didn't exist

23  out there.

24          But I do want to say there's a lot of argument

25  that sort of suggests, well, there's this public safety

1    benefit and so on.  That's fine to argue that.  I understand

2    why they're arguing that.  The court's task is to value it.

3    We say, well, we told people about our allegations, so now

4    they know.  We did.  We used the 23e device to tell people

5    about an unproven allegation.  It has a value.  I'm

6    crediting it.

7            When I say Your Honor can give them credit for

8    1.9 million in notice and administration expenses, I'm

9    giving the court the value that that's worth.  We disagree

10   with it.  We wish they didn't tell our customers who we

11   think have safe dishwashers that.  Our view is it's circular

12   to say:  "Well, we told them about our unproven allegation,

13   now some of them want to replace a dishwasher."  As

14   Whirlpool, the designer of this machine, who has been

15   studying the field safety and is very proud of it, we say:

16   "Why would you get out of a safe machine into a machine that

17   might have an unknown risk?"  You can't say, "Well, we think

18   the new machines are safer."  Again, there's no evidence of

19   that before Your Honor, so we can't really credit that.

20           The same thing goes for some of these other

21   benefits.  You say, well, if someone is worried about

22   combustion, and they get into a new machine.  The court has

23   a way to value that.  It's the value of the coupons

24   redeemed.  I'm not saying it doesn't have any value.

25           Some people are scared.  There was an objector

1   that we deposed a few weeks ago who said, "I read this

2   notice, and I want to get a new dishwasher."  That happens.

3   We know it's a very tiny percentage of the class because

4   only 2.3 percent have responded with a rebate claim.  We can

5   value what that is, and the value is the actual rebate's

6   redeemed.  Everything else is speculative.

7          So back to the lodestar -- slashing the lodestar.

8   Again, it may sound harsh to the court, and there are

9   many -- there are reasons why we have a fee-shifting

10  provision and we allow class counsel to recover fees.  We

11  agree with all that.  We just say it has to be reasonable in

12  light of the results achieved here.

13         And if we look at *Tate*, and *Inkjet* and *Bluetooth*,

14  those courts all said, you know, you recover something, it

15  has value, but unfortunately you invested more into it than

16  it ultimately turned out to be worth.

17         And in *HP Inkjet*, Judge Fogel applied an

18  18 percent multiplier.  I'm sure it felt harsh to Judge

19  Fogel to do that, but his reading of *Inkjet* was that is what

20  I'm required to do.

21         In *Bluetooth*, a 14 percent multiplier.  There was

22  a 1.6 million lodestar there and the class counsel got

23  232,000 in fees.

24         Again, it's the nature of contingent fee

25  litigation.  Sometimes you win big, and you get Toyota

1  unattended acceleration with $1.1 billion, and the defendant

2  says:  "Yep, that's what were given the class."  Other times

3  you get something less than what you set out to achieve.

4          In *Tate*, the same thing applies.  That case was

5  actually, in a lot of ways, a better settlement result here

6  because they had the same aggregate class-wide damages claim

7  on behalf of every purchaser of a front-loading washer and

8  the defendant settled and said:  "We're going to give

9  everyone who bought one of these an opportunity to claim

10 $55."  The plaintiff's expert said, "Premium price or

11 diminution-in-value damages were $113 to, I believe, $196.

12 And so the settlement cost was $55.  Only 3 percent of

13 people came forward, but the maximum theoretical value was

14 35.

15         And so Judge Carter said:  "Look, it was

16 reasonable for the parties to stipulate to the 4.1 million

17 fee there because they probably thought the class members

18 were going to respond more positively to the settlement, but

19 given that they didn't, we have to adjust the lodestar, and

20 I find 4.1 and a 9.2 lodestar is fair."  We think those are

21 the cases that this court should focus on as it takes the

22 motion under advisement.  I think *Roberts*, *Grays Harbor*,

23 *Tate*, *Inkjet*, *Bluetooth*, you have everything you need to

24 know right there.  And we look forward to answering any

25 questions Your Honor has.

```
1              THE COURT:  No questions.

2              Go ahead.

3              MR. FAX:  I notice Mr. Williams neglected to cite

4    Williams vs. MGM Communications Company, the Ninth Circuit

5    case that held that the total potential class recovery, not

6    the value of claims made by class members should be used as

7    the basis for performing the percentage of fund analysis,

8    and additional cases we've cited.

9              Your Honor, I've taken a lot of notes on his

10   argument.  I think we've really covered all of these points

11   in our brief, but I would ask if the court has any specific

12   questions of me at this time.

13             THE COURT:  I don't.  I guess the only real issue

14   that I have a little bit of a question about, but I think I

15   just have to get a little more into the brief and the case

16   law, is the state law issue versus the CAFA aspect of it.

17             But if you wanted to maybe address a little bit of

18   what he said with respect to that.

19             MR. FAX:  I can.  We actually do discuss this in

20   our reply brief, and he made the suggestion.  I think it

21   could be mooted, because if you remove the issue of what he

22   calls a coupon -- I don't think it's a coupon, but what he

23   calls a coupon, if you remove that issue and you just value

24   the settlement independent of that, therefore, you don't

25   implicate CAFA, you come to the same result.  And we make
```

1  that argument, and I refer the court to our reply brief.  So

2  I think that is a methodology that avoids the issue.

3       I also have to take issue again, if I may.

4  Mr. Williams said, "They pulled the rip cord," again

5  suggesting that we were the ones that wanted to settle the

6  case.  The opposite is the case.  He approached us the

7  second time around after all the work that we had done.

8       And if the court wants to get some sense of what

9  we discovered, I direct the court to our motion to lift

10  confidentiality, which we filed.  I don't have the ECF

11  number, but it goes to documents that they marked as

12  confidential as to which we wanted confidentiality removed.

13  The court never had to rule on it because that's when they

14  came to us and said, "We'd like to talk settlement," so we

15  put all of that on ice.  But that motion lifts the skirt, if

16  you will, on Whirlpool's confidentiality and shows what we

17  learned about the poor technology that they were investing

18  in that we uncovered.  And we think we've done a service for

19  the nation at large and for 15 to 20 percent of the people

20  in this country who own these machines.  And for that, we

21  believe we're entitled to our lodestar, plus a reasonable

22  multiplier.

23       Thank you, your Honor.

24       THE COURT:  One last question, and I'll let you

25  guys go.  I'll take this under submission.

1          Let me just ask defense counsel.  I saw that you

2    provided the required CAFA notice to state and federal

3    officials.  I just wanted to know whether there were any

4    objections received in response to that notice.

5          MR. WILLIAMS:  No, Your Honor.  There were no

6    objections, and I don't recall anyone even reaching out to

7    us with questions.

8          THE COURT:  Okay.  Then the matter, then, will be

9    taken under submission.

10          And the only thing, there's a little bit of

11    supplemental briefing for the sur-reply.

12          MR. WILLIAMS:  I did want to just raise this

13    issue.  The CAFA thing is a big one here.  I'm not sure if

14    you're saying you will no longer seek fees based on the

15    coupon value.

16          MR. MATHEWS:  If I could maybe clarify this,

17    Your Honor.  I think what we said in our reply brief was

18    that -- we made the arguments we've made with respect to

19    CAFA, but we also said for purposes of a valuation cross

20    check, you can ignore the rebate component and still get the

21    exact same result.

22          MR. WILLIAMS:  The reason why I raised this.  To

23    the extent that they really only addressed our argument and

24    reply in one page and they did not cite a decision that does

25    what they're asking this court to do, it may be a good idea

1   to do, you know, three-page briefs or something on it.  Just

2   so --

3           THE COURT:  Let me take a look at it, and if I

4   find that it's something that I want to explore further,

5   I'll issue an order and ask for more briefing on that.

6           MR. WILLIAMS:  Thank you.

7           THE COURT:  The matter is submitted.

8

9           *(Thereupon, proceedings adjourned)*

10

11                          *-oOo-*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                             *CERTIFICATE*

4

5          *I hereby certify that pursuant to Section 753,*

6    *Title 28, United States Code, the foregoing is a true and*

7    *correct transcript of the stenographically reported*

8    *proceedings held in the above-entitled matter and that the*

9    *transcript format is in conformance with the regulations of*

10   *the Judicial Conference of the United States.*

11

12   *Date:  OCTOBER 24, 2016*

13

14                              Lisa M. Gonzalez
                       /s/_____
15                     Lisa M. Gonzalez, U.S. Court Reporter
                       CSR No. 5920
16

17

18

19

20

21

22

23

24

25

MR. FAX: [32]  9/19 10/5 10/25 11/9
11/14 12/15 12/17 13/18 14/6 14/8
15/15 15/20 17/21 19/16 20/1 20/19
21/1 21/7 21/10 21/20 22/1 22/12
22/25 28/6 31/20 39/8 43/1 43/14
56/24 59/8 76/2 76/18
MR. MATHEWS: [3]  4/8 21/4 78/15
MR. WILLIAMS: [33]  18/6 43/9 44/5
44/17 44/21 47/14 47/21 48/6 48/24
49/5 49/8 50/9 50/15 53/2 53/22 55/10
55/18 55/21 56/12 56/22 57/5 58/17
58/22 59/20 65/3 66/4 66/16 66/23
67/14 72/18 78/4 78/11 78/21
THE CLERK: [1]  4/3
THE COURT: [70]  4/25 5/12 8/18 9/7
9/24 10/7 11/2 11/10 12/13 12/16
13/16 14/2 14/7 14/17 15/18 17/17
18/4 18/13 18/16 18/25 19/3 19/5
19/25 20/2 20/23 21/5 21/8 21/11
21/24 22/10 22/23 28/4 31/18 39/6
43/4 43/7 43/11 43/18 44/8 44/20
46/23 47/17 48/1 48/23 49/4 49/6 50/3
50/12 52/15 53/17 55/16 55/19 56/8
56/15 57/2 58/7 58/21 59/5 59/15
64/25 66/1 66/14 66/21 67/12 71/20
75/25 76/12 77/23 78/7 79/2

$
$1,000 [1]  40/1
$1.1 [1]  75/1
$1.35 [1]  53/12
$1.35 million [1]  53/12
$10 [3]  46/8 51/23 69/20
$10 million [1]  46/8
$100 [5]  7/2 39/1 39/23 42/7 46/10
$11 [1]  37/24
$11 million [1]  37/24
$113 [1]  75/11
$15 [3]  22/4 46/2 50/22
$15 million [3]  22/4 46/2 50/22
$152 [1]  42/5
$196 [1]  75/11
$2 [4]  42/3 45/8 69/14 69/14
$2 million [2]  42/3 45/8
$236,000 [1]  41/4
$26 [1]  69/11
$26 million [1]  69/11
$3 [2]  40/22 45/9
$3 million [1]  45/9
$33 [1]  41/2
$4.1 [1]  46/23
$4.5 [1]  41/1
$40 [1]  40/22
$40 million [1]  40/22
$5,000 [1]  47/11
$508,000 [1]  22/4
$55 [2]  75/10 75/12
$6 [5]  40/6 40/18 40/21 64/21 69/13
$7.4 [2]  46/19 53/11
$7.4 million [2]  46/19 53/11
$8 [1]  35/23
$8 million [1]  35/23
$8.9 [1]  22/16
$8.9 million [1]  22/16
$81 [1]  40/21
$81 million [1]  40/21
$9.2 [1]  46/22

-
-oOo [1]  4/2
-oOo [1]  79/11

/
/ 
/s [1]  80/14

0
0.1 [1]  63/25
0052 [1]  3/9
0150 [1]  2/13
0172 [1]  2/14

1
1,100 [1]  57/14
1,400 [1]  62/21
1.23 [1]  35/23
1.6 [1]  74/22
1.68 [2]  22/17 23/7
1.7 [1]  49/17
1.9 [1]  65/23
1.9 million [1]  73/8
10 [1]  60/24
10 percent [2]  62/17 63/1
10,000-foot [1]  31/5
100 percent [1]  36/9
10250 [1]  2/8
10:27 [1]  4/2
11 [2]  32/1 33/20
11-1733-FMO [1]  1/8
11-state [3]  31/7 31/12 32/3
116 million [1]  54/16
12 [2]  60/14 70/22
12.6 [1]  60/9
12.6 million [1]  52/7
120,000 [1]  64/9
13 [3]  18/24 39/21 70/22
13.4 [1]  38/20
13.4 million [1]  38/23
14 percent [1]  74/21
15 [4]  42/15 45/9 70/22 77/19
15 million [1]  65/25
15 percent [1]  42/16
15K [1]  56/2
17,000 [2]  37/2 37/3
1712 [2]  67/19 68/6
1733 [1]  4/4
17th [1]  38/14
18 percent [1]  74/18
18.4 million [1]  52/3
1867 [1]  3/6
19041 [1]  2/5
192-4 [1]  7/22
1920 [2]  3/8 7/23
1990s [1]  48/13
1997 [1]  54/9

2
2 million [1]  41/1
2 percent [1]  69/2
2,000 [1]  48/20
2,200 [2]  37/1 37/2
2,591 [2]  62/7 62/8
2,800 [1]  48/16
2.25 [1]  47/24
2.3 [1]  74/4
2.8 [1]  65/23
20 [1]  77/19
20 percent [1]  42/16
20,000 [1]  62/10

200 [2]  3/8 58/5
2006 [1]  9/16
2008 [1]  57/12
2011 [1]  30/10
2013 [1]  54/20
2014 [1]  25/18
2016 [6]  1/16 4/1 37/8 54/20 69/4
 80/12
2021 [1]  55/18
20814 [1]  2/13
21,000 [2]  60/19 63/17
213.894.2979 [1]  1/24
21550 [1]  2/20
231-4470 [1]  2/9
232,000 [1]  74/23
2320 [1]  2/8
234 [1]  10/12
236 [1]  11/6
23e [1]  73/4
24 [1]  80/12
244-1867 [1]  3/6
25 [2]  1/16 4/1
25th [1]  69/4
26,000 [4]  37/7 37/23 60/18 61/6
28 [1]  80/6
2nd [3]  9/16 37/8 37/23

3
3 percent [1]  75/12
3-and-a-half [1]  47/25
3.8 million [1]  62/13
30 [2]  39/1 39/23
301 [1]  2/13
301-951-0172 [1]  2/14
303 [1]  3/6
310 [1]  2/9
312 [1]  1/23
32804 [1]  2/17
33 [1]  7/23
33 million [1]  60/3
3423 [1]  7/23
35 [1]  75/14
350,000 [2]  29/14 49/4
352 [1]  2/18
361 [1]  2/4
370 [1]  3/4
375 [1]  48/14

4
4.1 [2]  75/16 75/20
40 [2]  26/18 35/7
400 [2]  2/12 61/5
4092 [1]  2/18
42 [1]  33/25
42-year [1]  49/9
420,000 [1]  62/11
438 [1]  1/23
4470 [1]  2/9
4500 [1]  3/5
458-4092 [1]  2/18
460 [3]  48/21 48/24 49/1
475 [1]  48/14

5
50 [1]  31/9
50-state [1]  32/5
55 million [1]  54/16
55 percent [1]  46/23
56 [1]  42/5

**5**

5644 [1] 2/21
5647 [1] 3/5
59 [1] 6/19
5920 [2] 1/22 80/15
5:00 [3] 20/5 20/6 20/13
5:00 o'clock [1] 20/14

**6**

6 million [1] 61/15
610 [1] 2/5
625 percent [1] 50/22
642-8500 [1] 2/5
679-0052 [1] 3/9
68 percent [1] 52/7
695 [1] 64/10

**7**

7 million [1] 60/3
7 percent [1] 63/3
7.4 million [1] 51/2
7.5 [1] 41/2
700 [1] 39/25
700-and-some [1] 16/1
753 [1] 80/5
760 [1] 2/20
764 [1] 2/17
7979 [1] 2/12

**8**

8 percent [1] 63/3
8.4 million [1] 38/22
8.9 [1] 49/21
8.95 [1] 49/17
80 percent [2] 60/20 61/6
800 [1] 39/25
80202-5647 [1] 3/5
818 [1] 2/21
8500 [1] 2/5
87-year-old [1] 6/15
883-5644 [1] 2/21

**9**

9.2 [1] 75/20
90012 [1] 1/23
90067 [1] 2/9
90s [1] 31/19
91367 [1] 2/21
92614 [1] 3/9
94 percent [1] 37/14
949 [1] 3/9
951-0150 [1] 2/13

**A**

A.M [1] 4/2
abandoned [2] 69/10 69/11
ability [1] 31/25
able [5] 14/25 16/3 26/9 58/4 71/15
about [56] 6/11 7/19 7/19 9/11 10/1
13/13 13/19 14/18 18/21 25/11 27/10
28/10 28/17 28/18 30/7 30/20 31/25
31/25 34/25 35/4 37/6 41/18 41/18
45/7 46/10 47/21 47/24 50/22 52/12
53/25 54/5 54/21 55/15 55/17 57/23
59/3 59/16 59/17 59/22 61/25 61/25
62/9 62/17 62/21 63/1 63/9 64/9 68/23
70/1 70/5 73/3 73/5 73/12 73/21 76/14
77/17
above [2] 45/9 80/8
above-entitled [1] 80/8

absolutely [4] 12/21 14/7 18/25 54/16
accusation [1] 7/10
accepting [1] 20/25
accepts [1] 13/22
access [3] 6/2 16/2 21/22
accomplished [3] 31/6 31/7 53/13
accomplishment [1] 31/12
according [9] 9/13 32/17
account [3] 34/5 37/5 58/11
accurate [1] 37/20
accusation [1] 7/10
accused [1] 6/13
achieve [2] 52/5 75/3
achieved [7] 23/6 31/3 45/4 52/4 53/16 68/10 74/12
acknowledges [1] 40/25
Act [3] 66/10 67/2 67/3
action [13] 10/14 21/15 31/8 31/12
31/15 32/1 32/3 34/11 47/10 63/1
66/10 66/10 72/13
actions [4] 45/24 46/5 49/22 60/24
activity [1] 32/13
actual [9] 18/19 45/14 48/10 55/7 55/13
61/4 64/19 66/11 74/5
actually [15] 30/11 40/20 41/7 51/22
53/12 53/22 56/23 60/8 60/9 62/16
62/22 65/4 69/8 75/5 76/19
actuals [1] 54/3
ad [2] 6/11 7/14
add [2] 27/6 65/24
addition [5] 5/12 48/22 52/9 61/14
62/12
additional [5] 17/23 17/25 22/5 65/21
76/8
address [6] 8/15 12/14 14/11 44/4
59/21 76/17
addressed [6] 11/17 11/21 12/19 19/19
69/18 78/23
addresses [1] 67/6
adds [1] 28/16
adequacy [3] 28/18 28/19 35/14
adequate [2] 35/11 44/25
adequately [1] 13/9
adjourned [1] 79/9
adjudication [1] 18/9
adjust [1] 75/19
adjusted [1] 68/9
administration [2] 42/3 73/8
administrator [14] 16/6 16/7 16/12
16/19 16/24 16/25 17/10 27/2 37/20
38/1 38/2 38/8 60/22 61/10
admissibility [1] 43/18
admissions [1] 63/12
admit [1] 51/20
admits [4] 7/25 8/1 37/1 63/21
admitted [2] 34/16 51/21
advantage [2] 6/13 40/10
advised [1] 27/17
advisement [1] 75/22
affect [1] 70/17
affidavit [2] 18/8 19/9
affirmed [1] 47/12
afforded [3] 13/23 16/20 32/24
after [11] 18/13 25/23 25/25 32/12
56/19 57/16 57/19 58/9 68/10 70/14
77/7
again [18] 5/9 18/1 20/20 39/20 42/8
50/4 50/4 53/6 53/14 59/2 67/9 68/10
68/13 73/18 74/8 74/24 77/3 77/4
against [5] 7/14 8/3 23/13

agency [4] 57/19 57/19 57/20 57/20
aggregate [2] 37/24 75/6
ago [5] 7/10 59/14 59/14 59/15 74/1
agree [12] 5/19 5/23 19/17 24/4 44/24
45/2 45/5 47/22 47/25 60/22 69/21
74/11
agreed [10] 6/22 16/4 38/12 51/9 51/16
54/8 54/14 62/4 62/5 64/12
agreeing [1] 51/10
agreement [19] 7/20 7/24 8/11 8/25 9/3
11/22 17/2 23/21 28/12 51/9 54/22
56/3 60/8 60/9 60/15 61/8 62/4 62/6
67/9
ahead [10] 5/7 8/20 11/9 14/8 22/1
39/10 43/23 44/16 57/11 76/2
ahold [1] 28/5
air [2] 29/18 69/3
al [4] 1/6 1/9 4/5 4/5
alert [1] 41/21
alerted [2] 6/21 6/21
alerting [1] 41/10
all [81]
allegation [2] 73/5 73/12
allegations [2] 57/24 73/3
alleged [1] 30/24
Allen [3] 10/20 53/25 54/19
allocation [1] 50/12
allow [7] 15/19 20/16 20/17 20/17
45/19 51/25 74/10
allowed [2] 62/6 68/6
allowing [1] 71/5
almost [3] 34/25 37/24 42/3
alone [4] 31/11 32/2 32/4 32/7
along [4] 22/21 30/1 54/13 57/7
already [11] 5/5 27/23 37/2 41/9 41/12
44/2 44/15 55/20 56/13 59/6 69/18
also [19] 4/10 4/24 7/24 10/19 11/5
13/25 15/22 19/11 19/14 20/24 23/22
27/6 28/15 34/20 35/1 43/15 67/17
77/3 78/19
alternatively [1] 39/23
always [4] 25/10 25/12 34/13 52/18
am [1] 63/16
Amada [1] 35/20
amazing [1] 31/18
ambush [1] 59/5
amended [3] 11/21 52/9 67/1
ammortized [1] 39/22
among [3] 11/24 17/13 50/12
amount [15] 15/3 23/11 23/18 26/12
47/4 47/4 56/8
analysis [20] 11/19 16/14 17/23 17/23
17/25 23/3 23/8 23/12 23/14 24/8 27/5
29/13 33/2 37/17 48/18 53/13 54/25
65/13 70/16 76/7
analyze [1] 26/10
ANDREW [1] 2/16
Angeles [3] 1/15 1/23 2/9 4/1
another [7] 15/8 19/23 28/23 32/5 35/3
36/14 47/8
answer [5] 5/11 5/21 25/1 57/25
answering [1] 75/24
Anthony [1] 29/4
anticipation [1] 17/12
any [34] 5/11 12/1 13/22 14/1 14/10
19/24 20/21 22/9 26/14 28/8 32/4
33/11 33/23 34/1 43/3 44/17 46/5
47/20 50/24 51/10 51/11 57/24 61/7
63/17 64/20 66/9 68/1 68/3 69/3 70/18

**A**

any... [4]  73/24 75/24 76/11 78/3
anymore [1]  70/23
anyone [1]  78/6
anything [12]  5/12 11/12 13/8 14/9
 16/22 17/15 34/15 41/8 44/1 52/22
 61/22 71/4
anyway [4]  7/22 8/7 33/2 40/22
anywhere [1]  63/22
Apollo [1]  6/17
appeal [3]  33/13 33/15 50/3
appear [1]  5/9
appearances [3]  2/1 3/1 4/6
appearing [1]  7/8
appears [1]  6/3
appliance [4]  46/16 49/22 60/24 68/2
appliances [2]  51/3 57/10
applied [3]  35/22 67/12 74/17
applies [1]  75/4
apply [3]  24/7 66/4 66/16
applying [1]  24/20
appointed [1]  29/10
appreciate [1]  67/25
approach [6]  16/11 18/17 43/1 55/4
 66/14 67/23
approached [3]  26/3 26/4 77/6
approaches [1]  16/13
approaching [1]  17/3
appropriate [9]  23/7 23/11 23/23 23/24
 28/10 35/20 48/11 48/25 50/24
approval [1]  22/3
approved [1]  23/9
approximately [3]  15/25 22/4 38/20
apt [1]  36/3
are [76]  5/2 6/12 7/8 7/21 11/15 11/16
 12/12 13/5 14/4 14/5 16/15 16/18
 16/21 17/4 20/20 22/3 23/15 28/1
 33/25 36/9 36/13 37/15 38/20 41/4
 41/22 42/9 42/10 42/12 42/12 43/8
 43/21 45/16 45/17 46/13 46/13 47/1
 47/6 48/5 48/11 50/4 50/7 51/10 52/8
 53/5 54/11 54/19 56/10 58/12 58/23
 60/19 60/21 60/25 62/3 62/16 62/17
 62/22 63/11 63/17 65/10 65/12 66/13
 66/25 67/16 67/20 69/5 70/1 70/9
 70/13 70/20 70/25 72/13 73/18 73/25
 74/8 74/9 75/20
aren't [4]  8/6 33/23 41/8 61/17
argue [10]  11/14 12/7 12/24 20/22 24/2
 35/25 42/22 43/13 44/4 73/1
argued [3]  27/4 35/12 37/15
argues [1]  40/8
arguing [2]  24/6 73/2
argument [17]  5/24 10/1 10/4 12/8 24/5
 24/19 36/6 36/20 41/3 41/6 44/2 44/16
 58/23 72/24 76/10 77/1 78/23
arguments [6]  12/18 17/19 17/20 58/9
 60/5 78/18
arise [3]  12/4 32/12 35/16
arms [1]  17/24
arose [2]  13/2 15/24
around [4]  7/15 65/16 71/6 77/7
as [89]
aside [2]  46/3 64/11
ask [9]  14/18 18/5 43/19 44/17 57/1
 67/19 76/11 78/1 79/5
asked [1]  26/1
asking [10]  17/5 17/6 17/7 17/8 38/5
 42/10 42/12 45/7 52/25 78/25
aspect [1]  76/16

aspects [1]  12/9
assessment [1]  35/5
assert [1]  23/1
assertion [2]  22/18 36/22
assignments [1]  28/22
associate [1]  34/1
associated [1]  51/23
associates [2]  48/14 49/11
assume [2]  43/16 59/7
assumes [1]  37/4
assumptions [3]  6/2 6/4 60/17
assure [1]  44/3
astronomically [1]  46/9
at-risk [1]  51/3
attached [1]  43/21
attack [3]  7/18 29/2 29/3
attacks [2]  6/11 7/14
attention [1]  64/7
attorney [3]  29/4 29/12 45/3
attorney's [12]  5/20 12/6 14/13 17/6
 17/6 17/7 17/8 20/22 22/4 36/12 37/10
 47/4
attorneys [1]  49/11
August [1]  1/16 4/1 9/16 38/14
August 17th [1]  38/14
August 25 [2]  1/16 4/1
August 2nd [1]  9/16
Avenue [2]  2/4 2/17
avoid [2]  65/5 68/6
avoids [1]  77/2
award [5]  23/2 23/11 23/15 24/24 66/9
awardable [1]  52/21
awarded [4]  46/13 47/11 47/11 54/7
awarding [2]  23/5 35/23
awards [1]  9/4
aware [1]  77/2
away [1]  15/8

**B**

back [16]  14/25 15/13 15/14 22/8 22/14
 22/15 26/2 26/24 31/5 43/13 44/20
 45/19 53/16 58/6 71/21 74/7
back-up [1]  22/8
background [1]  29/18
bad [2]  6/22 72/10
ballpark [1]  71/4
bargained [2]  56/4 71/11
base [5]  53/20 59/19 65/17 65/21 66/8
based [19]  10/8 11/3 17/25 23/7 26/19
 27/4 28/13 30/25 34/4 40/6 47/3 54/11
 60/17 65/18 66/14 68/3 68/5 70/16
 78/14
basically [4]  11/14 16/9 27/25 32/14
basis [2]  33/4 76/7
be [77]  5/23 9/3 9/4 14/4 16/1 16/18
 17/4 17/8 17/9 18/24 22/5 23/4 23/14
 23/19 24/8 24/14 25/2 25/6 27/3 28/3
 28/15 29/9 31/24 34/13 34/22 36/2
 36/7 38/8 39/21 39/24 39/25 39/25
 41/13 46/4 47/2 47/15 47/20 47/23
 47/25 48/1 49/17 50/22 51/15 51/23
 52/23 54/11 56/3 57/14 59/3 59/10
 60/23 61/1 61/24 61/25 62/3 62/23
 64/9 64/22 65/2 65/21 66/19 67/20
 67/21 68/1 68/2 68/5 69/8 69/23 71/5
 71/7 72/11 74/11 74/16 76/6 76/21
 78/8 78/25
became [5]  6/16 9/18 13/3 21/14 27/7
because [69]  5/5 6/2 8/5 10/6 14/4 14/6
 14/20 15/2 15/3 15/23 16/4 16/22

17/20 19/24 20/6 20/10 21/22 24/15
 25/18 28/2 28/7 29/5 29/10 29/13
 29/21 30/6 31/16 33/2 36/5 37/4 38/11
 39/16 39/17 41/8 41/11 46/17 48/9
 50/17 53/3 53/14 54/8 54/19 55/1 55/6
 56/9 58/3 58/9 58/14 59/12 59/22
 59/23 61/7 62/25 63/24 65/5 65/6 65/9
 65/18 67/10 67/24 71/1 71/9 71/25
 72/20 74/3 75/6 75/17 76/21 77/13
Bedolla [1]  53/25
been [24]  11/23 12/13 12/19 13/9
 14/15 14/24 14/25 15/13 15/23 22/12
 25/10 28/10 29/5 33/8 33/20 33/24
 37/5 37/8 37/25 41/14 51/13 59/8 64/7
 73/14
before [17]  7/9 9/16 12/10 14/14 14/22
 15/10 15/24 25/19 29/6 34/6 34/6
 45/11 46/24 57/11 67/20 69/5 73/19
began [2]  36/21 58/2
begin [2]  29/15 34/8
beginning [1]  35/8
behalf [6]  4/17 4/20 4/22 4/24 45/3
 75/7
behaves [1]  16/6
behaving [1]  16/5
being [5]  24/25 61/3 64/20 66/17 71/25
belief [1]  10/2
believe [19]  5/9 6/8 21/2 22/17 28/19
 28/20 33/9 38/13 45/1 45/16 56/13
 57/17 57/24 58/3 59/9 62/21 72/21
 75/11 77/21
BELLAMNY [1]  4/21
BELLAMY [2]  3/4 4/22
benefit [11]  8/7 24/14 24/16 40/4 40/9
 40/12 40/16 40/23 41/23 69/3 73/1
benefits [7]  7/22 8/9 13/22 14/5 73/21
best [1]  32/10
bet [2]  55/8 55/11
Bethesda [1]  2/13
better [5]  33/10 33/23 46/20 51/1 75/5
between [8]  13/1 26/7 30/4 35/1 41/2
 42/15 42/15 47/4
beyond [3]  14/1 14/12 32/1
big [5]  21/14 48/13 72/13 74/25 78/13
billing [2]  22/14 49/15
billion [1]  75/1
billions [3]  46/10 52/14 52/15
bit [5]  11/13 63/9 76/14 76/17 78/10
Bluetooth [7]  53/6 53/7 54/19 68/11
 74/13 74/21 75/23
board [5]  26/20 61/22 61/25 62/18
 70/22
boards [5]  30/3 30/5 30/5 36/25 63/19
books [2]  28/2 37/11
Boston [1]  25/18
both [11]  7/8 15/6 18/10 21/16 21/17
 22/24 36/8 53/10 55/7 65/5 72/9
bought [1]  75/9
Boulevard [1]  2/8
box [1]  54/22
break [1]  7/11
breakthrough [1]  30/10
bridge [1]  69/6
brief [16]  9/24 42/2 43/17 43/21 44/1
 44/21 49/24 51/20 51/22 55/25 72/17
 76/11 76/15 76/20 77/1 78/17
briefed [3]  12/13 14/16 24/17
briefing [3]  23/16 78/11 79/5
briefs [7]  42/24 43/5 43/9 45/25 46/6
 58/25 79/1

**B**

brilliant [1] 29/19
broader [1] 36/1
broken [1] 61/21
brother [1] 17/24
brother-in-arms [1] 17/24
brought [2] 64/7 67/9
bulldog [1] 72/20
bulletins [1] 51/17
business [3] 49/12 71/15 71/20
buy [2] 39/12 40/1
buyers [1] 52/8
buzz [1] 72/5

**C**

CAFA [12] 24/7 54/5 54/21 66/3 66/24 67/11 71/6 76/16 76/25 78/2 78/13 78/19
calculated [1] 23/12
calculator [1] 32/22
CALIFORNIA [17] 1/2 1/15 1/23 2/9 2/21 3/9 4/1 23/19 23/21 35/12 35/16 35/22 66/3 66/12 66/16 66/19 67/6
call [6] 24/11 27/13 27/14 41/15 57/7 57/8
called [1] 57/22
calling [6] 4/4 28/14 38/5 70/1 70/22 71/7
calls [8] 7/22 35/1 35/1 41/16 51/4 56/18 76/22 76/23
came [10] 5/21 25/25 26/1 26/24 30/10 57/20 64/24 69/5 75/13 77/14
campaign [1] 58/19
can [36] 5/5 8/24 9/3 12/16 15/5 15/6 15/7 20/7 20/12 21/11 22/9 28/12 28/25 29/2 30/23 31/4 39/9 39/12 43/16 44/3 44/20 56/7 58/16 58/17 58/18 60/16 61/15 62/15 63/13 64/17 68/8 70/10 73/7 74/4 76/19 78/20
can't [14] 8/8 9/4 10/16 15/7 29/20 48/21 48/24 53/9 64/13 65/14 69/12 71/6 73/17 73/19
cannot [7] 7/2 24/14 53/20 56/4 60/5 69/6 69/8
capacity [1] 4/16
cards [1] 13/12
care [3] 21/19 41/19 50/8
carefully [2] 44/2 44/3
Carter [1] 75/15
CARVALHO [1] 2/19
case [92]
cases [21] 21/16 21/18 23/9 24/23 43/7 44/23 46/7 46/12 46/14 47/20 48/3 50/18 53/10 53/18 54/4 54/6 66/13 71/25 72/3 75/21 76/8
cash [8] 23/22 24/14 55/9 56/8 60/1 65/17 65/18 65/24
castrophe [1] 7/5
caught [2] 14/17 28/8
caused [1] 41/13
CCRR [1] 1/22
center [1] 57/7
centerpiece [1] 36/6
CENTRAL [2] 1/2 35/21
Centre [1] 2/4
certain [5] 9/12 12/8 24/7 30/4 38/6
certainly [5] 9/4 13/24 15/4 16/21 50/16
certainty [1] 28/20
CERTIFICATE [1] 80/3
certification [4] 32/5 33/13 49/24 50/1

certified [1] 32/4
certifies [1] 36/5
cetera [1] 71/10
cfax [1] 2/14
chad [1] 27/4
chads [2] 16/9 37/22
challenges [1] 34/4
challenging [3] 18/8 18/17 48/8
CHAMBERS [5] 1/6 4/5 27/8 34/7 57/17
chance [2] 19/10 64/19
change [1] 30/16
changed [4] 9/17 11/25 30/11 30/11
characterization [2] 24/4 24/5
characterizes [1] 24/3
charge [4] 16/9 48/21 48/24 49/1
charged [1] 50/11
charging [1] 49/10
CHARLES [1] 2/3
charts [2] 42/1 43/21
check [10] 23/11 33/3 36/4 42/8 42/9 42/11 51/15 58/8 67/10 78/20
checkmarks [1] 62/2
cheek [1] 41/7
CHIMICLES [4] 2/3 4/10 29/4 29/25
choice [2] 67/8 67/11
choose [1] 60/16
Christine [1] 4/18
Chuck [2] 4/7 55/8
circuit [20] 8/13 8/15 19/8 26/20 30/2 30/5 30/5 32/20 36/25 45/10 45/22 47/1 47/12 53/5 53/7 53/15 53/19 53/23 54/4 76/4
Circuit's [1] 45/13
circuitboard [1] 39/19
circular [1] 73/11
circumstance [1] 50/24
cite [5] 13/14 13/15 13/20 76/3 78/24
cited [8] 18/2 35/21 43/7 45/24 46/5 67/4 71/9 76/8
cites [1] 8/2
citizen [1] 40/15
claim [19] 8/2 14/2 45/12 46/22 48/22 49/16 49/19 49/21 50/18 55/12 56/8 58/24 60/13 61/4 61/16 64/7 74/4 75/6 75/9
claimed [3] 32/23 46/3 51/1
claiming [1] 8/9
claims [48] 16/5 16/7 16/11 16/12 16/19 17/10 18/9 18/20 26/19 27/2 27/3 27/9 28/1 32/19 35/16 37/8 37/14 37/19 37/23 37/25 37/25 38/8 38/13 38/16 40/12 40/24 40/25 41/2 41/4 48/14 55/10 59/23 60/19 60/21 60/25 61/19 61/20 61/21 61/23 62/15 63/4 63/17 63/18 63/21 66/25 67/1 76/6
claims' [1] 28/4
clarify [3] 5/6 11/13 78/16
class [97]
class-action [3] 10/14 21/15 34/11
class-wide [1] 75/6
classes [2] 7/25 8/17
clause [2] 66/7 66/21
clean [1] 51/5
clear [3] 13/3 19/9 23/21
clearly [1] 71/17
Cleveland [2] 25/24 26/1
client [1] 56/11
clients [2] 45/15 52/12

close [4] 5/21 42/14 68/19 72/6
closing [4] 59/23
closer [2] 55/10 61/1
clothes [1] 68/2
co [5] 4/8 4/10 4/13 9/21 12/15
co-counsel [2] 9/21 12/15
co-lead [3] 4/8 4/10 4/13
Code [1] 80/6
COHON [4] 2/7 2/7 4/12 4/12
Cohon's [1] 49/15
coincidentally [1] 26/16
colleagues [1] 45/19
collect [2] 34/9 57/9
collected [1] 57/14
collusion [2] 22/20 22/23
Colorado [1] 3/5
combusting [2] 26/19 27/11
combustion [4] 13/4 26/21 30/4 73/22
combusts [1] 39/14
come [15] 8/15 29/7 36/13 40/19 42/6 42/21 53/9 54/5 55/19 56/4 56/7 60/12 62/14 69/24 76/25
comes [7] 8/14 9/21 19/9 40/20 42/4 57/16 57/17
comfortable [1] 67/21
coming [4] 17/21 21/23 53/16 72/14
command [2] 8/3 30/16
commensurately [1] 36/2
commingling [2] 8/3 12/20
Commissioner [1] 29/5
common [2] 23/24 56/21
Commonwealth [1] 29/6
Communications [1] 76/4
community [1] 24/17
companies [2] 26/19 35/8
company [2] 26/15 76/4
comparable [2] 27/21 48/9
comparative [2] 44/23 49/18
compare [2] 42/10 50/21
compared [2] 49/21
comparison [2] 23/9 40/7
compelling [1] 10/22
compensated [1] 52/23
competent [2] 54/25 71/15
compiled [1] 45/25
complaint [5] 27/15 52/2 52/10 52/17 67/1
completes [1] 18/22
complexity [3] 33/21 34/19 35/3
complicated [2] 31/16 34/24
comply [4] 9/18 10/9 10/24 11/4
component [3] 63/23 64/15 78/20
conceptually [1] 28/3
concern [1] 53/2
concerned [2] 14/21 45/17
concerning [1] 22/7
concerns [1] 44/4
concise [1] 51/18
concluded [1] 57/12
conclusively [1] 37/25
Conference [1] 80/10
conferred [1] 22/8
confident [1] 37/19
confidential [5] 6/3 36/22 47/16 58/15 77/12
confidentiality [3] 77/10 77/12 77/16
confidentially [1] 57/4
conflict [3] 34/2 66/18 66/20
conflicts [2] 7/20 66/12
conformance [1] 80/9

**C**

confused [1]  21/21
confusion [1]  61/16
Congress [1]  66/7
conjunction [2]  17/15 37/12
consequential [1]  36/12
conservatively [1]  38/22
consider [9]  14/22 15/2 15/10 16/14
 17/16 20/9 21/9 26/2 68/10
considered [2]  10/17 25/2
consistent [1]  62/24
consisting [1]  36/10
constantly [1]  36/20
Constellation [1]  2/8
constructive [1]  8/16
consultant [1]  37/22
consulting [1]  26/14
consumer [10]  35/16 38/4 39/23 40/11
 45/24 46/5 46/16 49/22 60/24 69/14
consumers [4]  33/7 40/9 41/16 64/10
contacted [1]  27/10
contacting [3]  27/12 38/4 38/4
contain [2]  10/1 70/6
contains [2]  23/22 43/3
contest [1]  68/17
contested [3]  12/6 14/12 22/20
context [8]  12/5 12/6 12/8 13/2 15/24
 47/2 47/21 53/19
contingent [2]  56/6 74/24
continue [1]  69/25
Continued [1]  3/1
continuing [1]  59/2
contours [2]  17/1 31/4
contract [4]  49/11 49/13 49/13 64/13
contradicted [1]  52/5
contrary [3]  12/23 22/18 45/12
control [6]  25/10 61/22 61/25 62/18
 63/19 70/22
convert [1]  32/3
converting [1]  31/12
cookbook [1]  57/7
copied [1]  10/4
copy [1]  67/10
cord [2]  71/16 77/4
CORP [2]  1/9 4/5
correct [7]  8/24 9/19 10/5 23/4 47/3
 53/21 80/7
correctly [1]  67/7
cost [5]  42/3 47/24 54/15 69/1 75/12
costs [4]  33/7 36/10 62/2 62/7
could [22]  13/10 14/3 25/6 25/13 25/17
 25/20 28/7 28/15 30/12 39/21 39/24
 39/25 39/25 49/10 55/16 59/10 67/19
 67/21 68/1 72/11 76/21 78/16
couldn't [1]  29/15
counsel [43]  4/6 4/8 4/10 4/13 4/15 6/5
 6/12 7/10 7/13 8/1 8/8 8/22 9/11 9/21
 10/20 11/11 12/15 16/15 18/6 19/18
 22/15 24/25 25/3 25/3 28/18 29/3
 29/20 30/24 33/22 33/23 33/23 44/24
 45/16 49/18 50/25 56/22 57/17 63/20
 67/24 68/4 74/10 74/22 78/1
counsel's [2]  19/18 45/15
count [3]  32/22 69/6 70/10
country [1]  7/15 27/10 77/20
countrywide [1]  31/9
counts [1]  25/1
couple [2]  9/10 48/7
coupon [26]  7/5 24/2 24/3 24/3 24/6
 24/6 24/11 39/4 39/4 39/11 39/11

39/13 40/3 54/23 56/8 60/13 65/9
 65/16 71/19 73/5 75/22 76/3 76/22
 76/22 76/24 76/25 77/6
coupons [10]  55/2 55/13 65/6 65/17
 65/23 66/9 66/11 66/14 68/1 73/23
course [5]  12/5 12/12 27/16 29/21 30/1
court [63]  1/1 6/6 7/15 8/24 10/7 10/11
 10/13 10/17 10/18 11/5 11/17 11/20
 12/1 12/10 14/10 15/17 17/15 19/11
 19/16 20/14 20/21 21/3 22/3 22/14
 22/19 23/4 23/10 24/19 24/24 26/3
 31/3 31/15 33/4 36/15 36/18 39/10
 45/11 45/17 45/18 46/2 46/6 51/25
 53/4 53/14 54/18 54/22 55/14 56/24
 58/17 63/6 71/3 73/9 73/22 74/8 75/21
 76/11 77/1 77/8 77/9 77/13 78/25 79/7
 80/15
court's [9]  8/3 9/23 10/25 11/4 19/18
 28/11 39/5 47/3 73/2
Courthouse [1]  1/22
courtroom [1]  45/20
courts [4]  7/15 8/13 8/15 74/14
cover [3]  63/10 69/3 71/13
coverage [8]  16/25 17/11 38/24 40/6
 40/17 63/21 64/18 69/2
covered [5]  7/1 13/9 13/18 38/20 76/10
covering [1]  31/9
covers [3]  38/25 42/15 64/15
create [1]  72/22
created [2]  30/3 43/22
credit [4]  48/17 71/3 73/7 73/19
crediting [1]  73/6
criteria [2]  24/22 24/22
critical [1]  6/17
critically [1]  41/20
criticism [1]  45/22
criticisms [1]  65/16
cross [7]  23/11 33/3 36/4 42/7 42/9
 42/11 78/19
cross-check [1]  23/11
CSR [2]  1/22 80/15
cured [1]  60/23
current [1]  59/9
customers [1]  73/10
customers' [1]  51/4
cut [1]  71/18
CV [2]  1/8 4/4
CV-11-1733 [1]  4/4
cy [2]  10/1 10/6

**D**

damages [9]  14/1 31/25 32/7 36/10
 36/12 52/10 52/22 75/6 75/11
Dardarian [1]  67/5
data [13]  15/23 16/2 19/13 20/5 20/15
 26/10 28/6 28/12 34/9 62/19 63/5
 68/22 68/22
date [5]  22/5 38/21 57/1 57/3 80/12
day [7]  14/17 25/14 33/1 34/14 34/19
 41/15 70/24
days [1]  7/10
deadline [2]  38/13 38/14
deadlines [1]  44/12
deal [2]  6/22 13/10
DEAN [2]  3/7 4/23
debate [1]  23/19
decide [2]  20/10 20/16 59/25
decision [6]  30/16 45/14 53/25 71/25
 72/12 78/24
decisions [2]  45/23 46/1

declaration [16]  14/23 15/11 18/1 18/3
 18/3 18/5 18/7 18/9 18/12 18/22
 19/23 19/25 20/4 20/5 20/13 40/17
declarations [1]  34/3
Declaratory [1]  67/2
declares [1]  7/20
declaring [1]  8/6
declined [1]  25/21
deep [2]  31/1 48/18
defect [2]  63/23 63/25
defects [1]  30/2
defendant [3]  54/8 75/1 75/8
defendants [4]  1/10 3/3 14/17 45/25
defended [1]  68/16
defense [4]  25/3 54/15 56/21 78/1
deficient [1]  60/21 61/9 61/12
defined [1]  17/2
definitely [1]  68/21
degree [3]  29/23 34/21 53/15
delivered [1]  50/25
demonstrative [1]  43/10
demonstratives [2]  42/24 44/19
denial [2]  38/1 38/2
denied [2]  18/24 37/25
Denver [1]  3/5
deny [1]  18/12
Department [1]  71/24
depending [1]  30/8
depletes [1]  7/4
deposed [3]  35/5 35/6 74/1
deposition [2]  9/16 9/19 10/23 36/22
depositions [3]  26/8 52/13 56/14
depth [1]  29/13
descriptions [1]  29/1
design [7]  30/2 30/12 30/16 35/6 36/24
 70/6 70/8
designer [1]  73/14
despite [1]  7/16
details [2]  26/21 36/16
determination [1]  24/24
determined [1]  47/2
device [2]  51/14 73/4
devolved [1]  30/8
did [41]  5/23 17/25 18/3 18/18 19/3
 21/15 25/5 25/6 26/12 26/23 26/23
 27/19 28/8 28/20 29/19 29/20 29/21
 31/2 31/18 32/23 42/20 49/6 50/7 50/8
 50/9 50/16 51/11 52/19 56/13 56/24
 57/1 58/4 59/21 65/16 68/16 68/21
 69/24 71/14 73/4 78/12 78/24
didn't [18]  6/2 8/22 19/1 38/7 49/9
 49/24 50/5 55/1 63/16 63/17 64/12
 67/24 68/2 71/22 72/3 72/22 73/10
 75/19
differed [2]  31/23 31/23
difference [3]  42/6 54/4 54/6
differences [1]  54/5
different [8]  8/17 10/5 17/3 31/24 40/4
 46/13 52/18 65/19
differently [1]  53/24
difficult [2]  32/2 34/23
difficulty [1]  34/21
dilution [2]  8/8 12/20
dimensions [1]  28/16
diminished [1]  12/23
diminution [1]  75/11
diminution-in-value [1]  75/11
dire [1]  43/3
direct [1]  77/9
direction [1]  27/18

**D**

directly [3]  66/8 66/18 71/6
director [1]  57/21
disabled [1]  41/14
disagree [3]  19/18 45/9 73/9
disavow [1]  68/3
discern [1]  29/2
disclose [1]  47/15
discount [1]  39/12
discourage [1]  27/19
discovered [2]  30/13 77/9
discovery [11]  9/12 10/15 10/16 13/3 25/16 28/7 28/9 35/4 49/25 56/14 59/13
discredit [1]  69/13
discrete [1]  22/7
discuss [2]  46/20 76/19
discussed [2]  6/22 7/7
discussion [3]  43/6 44/19 59/3
discussions [1]  57/19
dishes [1]  40/2
dishwasher [23]  39/2 39/14 39/14 39/15 39/16 39/20 39/21 39/24 39/25 40/1 40/6 40/25 52/3 52/8 61/11 64/1 64/15 64/16 64/17 69/5 70/5 73/13 74/2
dishwashers [10]  26/20 27/11 36/11 38/20 39/18 56/19 69/16 70/20 70/24 73/11
dismiss [2]  31/16 33/11
disparate [1]  51/17
disposal [1]  5/22
dispute [5]  30/25 30/25 32/18 34/20 67/11
disputed [1]  69/7
distinction [2]  13/1 30/4
distinguishable [1]  71/8
DISTRICT [6]  1/1 1/2 1/22 10/21 35/21 67/6
diversity [3]  66/15 66/23 66/24
divide [1]  40/21
DIVISION [1]  1/3
do [70]  11/7 12/4 12/14 12/16 18/21 20/3 20/17 21/11 21/12 24/21 24/22 25/21 26/24 27/16 28/4 28/7 28/8 28/20 32/23 34/4 36/13 37/7 38/6 38/7 39/9 40/18 42/23 44/6 44/25 45/21 47/7 47/19 49/11 51/16 54/8 54/17 54/22 57/3 58/3 58/7 58/18 59/4 60/13 60/16 61/2 61/22 65/4 65/6 65/6 65/8 65/12 65/14 65/17 65/17 65/24 66/13 67/16 68/7 68/8 68/11 69/14 71/5 71/6 72/17 72/24 74/19 74/20 76/19 78/25 79/1
docket [3]  7/22 10/11 11/6
document [5]  48/12 48/12 58/16 61/7 61/9
documentation [1]  30/13
documented [1]  61/5
documents [13]  19/2 19/6 29/14 29/15 29/15 48/15 48/20 49/4 49/5 50/14 51/17 51/19 77/11
does [15]  6/5 10/1 13/25 14/1 20/3 21/19 27/3 34/5 37/5 37/10 39/16 51/8 54/22 70/5 78/24
doesn't [12]  6/6 50/6 54/1 59/25 63/22 63/22 65/1 65/25 66/1 66/4 69/3 73/24
dog [3]  24/10 33/5 42/8
doing [12]  11/18 14/24 15/13 16/4 15/15 19/24 29/1 49/10 51/13 67/22

71/7 72/13
dollars [5]  55/11 55/12 55/14 55/15 55/16
don't [66]  5/1 5/2 5/4 5/12 7/6 9/8 11/8 11/12 11/13 12/2 13/8 14/5 16/5 19/23 20/6 20/9 21/12 21/14 24/4 24/18 25/7 28/9 32/22 32/22 33/1 33/4 33/17 37/6 39/12 41/18 41/19 42/22 43/12 43/19 43/23 43/25 44/1 44/11 46/25 47/19 48/9 50/8 50/23 55/15 55/22 56/16 59/7 59/9 59/10 61/7 64/22 65/6 66/13 66/16 67/25 70/8 70/18 72/4 72/14 72/15 72/15 76/13 76/22 76/24 77/10 78/6
done [19]  15/9 23/14 25/6 26/5 26/5 30/12 31/20 33/8 33/16 33/18 33/19 42/1 48/19 60/24 67/4 68/7 70/15 77/7 77/18
doubt [1]  48/9
doubting [3]  48/5 50/5 50/7
down [2]  15/23 34/12
Dr. [16]  16/4 16/7 16/8 16/22 17/16 17/25 26/15 27/4 33/1 37/1 37/13 38/3 42/15 59/25 63/7 64/2
Dr. Ray [11]  16/4 16/7 17/16 26/15 27/4 33/1 37/1 37/13 38/3 59/25 63/7
Dr. Ray's [5]  16/8 16/22 17/25 42/15 64/2
drain [1]  61/19
dramatically [3]  28/4 46/13 71/18
drawn [1]  66/17
drew [1]  61/10
drive [2]  7/2 30/19
dryer [1]  68/2
dryers [1]  51/5
duplication [1]  28/24
during [3]  28/9 30/7 36/22
dwarf [1]  45/14

**E**

each [5]  5/5 22/22 38/23 46/7 51/18
earlier [4]  30/13 56/16 66/3 69/18
early [3]  48/13 57/1 64/4
Eastern [1]  10/21
ECB [1]  18/12
ECF [1]  77/10
economic [2]  52/10 52/15 54/17
edges [1]  65/16
education [1]  6/18
effect [2]  38/25 40/14
effectively [3]  32/15 32/15 65/20
effects [1]  63/25
effort [3]  28/19 28/24 29/23
efforts [1]  9/11
eight [1]  70/4
either [6]  21/13 41/17 41/19 45/24 58/25 61/7
elaborate [3]  5/6 42/24 44/4
elected [1]  29/9
electrical [2]  26/11 26/13
Electrolux [3]  35/21 46/15 68/1
electronic [1]  52/18
element [3]  23/22 34/17 35/3
elements [5]  31/14 31/23 36/16 61/21 63/19
eligible [1]  38/23
Ellwood [1]  2/17
else [5]  24/12 27/6 42/25 44/1 74/6
Email [1]  2/14
emphasized [1]  36/7

empirical [2]  28/13 68/22
enable [6]  36/3 97
end [6]  20/2 31/8 33/1 40/10 50/23 71/5
ended [1]  24/15
engineer [1]  6/16
engineering [6]  26/11 26/13 34/12 34/20 35/6 48/18
enhancement [2]  24/12 24/13
enough [3]  7/3 50/13 65/12
enrich [1]  6/13
ensure [2]  16/20 17/11
entertain [1]  19/11
entirely [1]  58/25
entitled [10]  17/13 19/20 19/23 23/14 36/9 45/2 45/5 58/24 77/21 80/8
entitlement [1]  12/23
Ernie [1]  29/17
error [4]  45/17 45/18 65/5 66/6
especially [1]  10/17
ESQ [8]  2/3 2/7 2/12 2/16 2/19 3/3 3/4 3/7
established [1]  23/24
establishes [1]  7/25
establishing [1]  35/13
estimate [2]  38/17 38/17
estimated [1]  38/18
estimates [2]  38/19 40/5
estimation [1]  40/12
et [5]  1/6 1/9 4/5 4/5 27/17
even [21]  6/19 8/4 13/11 14/5 14/19 20/9 27/22 28/10 29/9 32/11 33/4 34/5 35/5 35/25 45/5 46/13 49/24 54/24 66/1 71/4 78/6
event [15]  18/12 18/23 37/5 38/24 56/19 59/22 60/6 60/12 60/19 61/16 62/18 64/7 69/7 70/21 71/2
events [5]  57/5 59/24 62/5 69/25 70/6
ever [1]  57/11
every [8]  37/4 49/3 51/7 52/10 52/13 70/24 71/8 75/7
everybody [1]  58/15
everyday [2]  70/11 70/12
everyone [3]  44/10 61/3 75/9
everything [6]  20/13 42/25 52/21 62/9 74/6 75/23
evidence [14]  10/9 12/21 17/19 17/20 18/6 18/7 18/14 19/4 51/24 52/6 56/10 59/1 69/13 73/18
evident [1]  13/2
evolution [1]  30/6
evolved [1]  30/8
ex [1]  35/1
exact [1]  78/21
exactly [2]  15/13 63/3
examined [1]  45/23
example [1]  18/22
excellent [1]  22/25
exceptions [1]  70/10
excessive [1]  45/12
exchange [1]  59/12
excluded [1]  52/6
exercised [1]  71/15
exhibit [2]  43/22 60/14
exhibits [2]  49/2 51/12
exist [3]  10/2 63/22 72/22
expand [1]  11/13
expense [1]  30/14
expenses [5]  22/5 22/5 22/6 22/10 73/8
experience [1]  6/25

**E**

experience [3] 28/14 33/24 56/7
experiences [1] 27/11
expert [29] 14/23 15/7 15/8 15/11 16/8
 19/1 19/6 19/7 20/4 26/14 32/18 36/23
 36/23 38/18 38/21 40/5 40/17 41/1
 49/25 60/2 60/4 60/17 63/9 63/12
 67/19 68/17 68/19 70/13 75/10
expert's [2] 36/22 38/17
experts [3] 26/12 34/10 49/2
experts' [1] 26/13
expired [1] 27/23
explain [1] 44/8
explanation [2] 50/19 50/20
explore [1] 79/4
Exponent [2] 16/7 16/8
expressly [1] 7/24
extend [1] 64/12
extended [15] 27/23 32/14 38/24 40/7
 56/2 56/3 56/5 64/14 64/21 68/25
 68/25 69/15 71/7 71/8 71/10
extension [1] 38/12
extensive [1] 34/24
extent [3] 23/10 66/12 78/23

**F**

face [2] 44/12 60/21
faced [1] 34/5
facially [1] 61/9
facility [1] 6/25
fact [12] 5/24 12/21 25/24 27/20 34/22
 37/7 41/15 64/6 64/11 65/1 71/19
 72/10
factor [4] 47/1 47/21 53/5 72/16
factors [1] 23/8
factual [2] 45/11 52/6
failed [2] 63/14 63/20
fails [1] 16/14
failure [1] 10/9 11/4
fair [8] 7/6 16/25 35/11 37/21 43/24
 44/25 50/13 75/20
fairly [7] 14/16 22/9 24/18 26/10 29/8
 59/4 61/24
fairness [1] 35/13 66/10
fall [3] 17/1 24/22 40/25
falls [1] 64/5
false [2] 6/14 60/17
familiar [1] 36/17
far [7] 11/23 13/4 13/4 22/22 29/2
 30/23 47/16
fast [1] 21/23
favorable [1] 14/4
FAX [13] 2/12 2/14 4/7 4/7 36/19 39/11
 49/24 55/8 56/1 58/7 59/7 60/1 63/8
Fax's [1] 49/15
feature [3] 24/3 24/3 24/6
February [2] 64/8 69/4
February 25th [1] 69/4
federal [6] 66/20 66/20 66/25 67/2 67/3
 78/2
fee [31] 23/2 23/5 35/11 35/17 35/23
 36/1 42/18 45/3 45/5 45/7 45/12 45/23
 46/3 46/3 46/5 46/7 46/19 47/2 47/24
 49/12 49/14 50/22 51/1 65/21 66/9
 68/3 68/13 68/17 74/9 74/24 75/17
fee-paying [1] 49/12
fee-shifting [2] 35/17 74/9
feel [1] 25/5
feels [2] 23/10 71/13
fees [25] 5/20 7/18 12/6 14/13 17/6

17/6 17/7 17/9 17/14 20/23 22/1 22/4
 35/24 40/19 41/2 42/2 42/21 45/4
 47/12 52/21 74/3 74/10 74/23
 78/14
felt [1] 74/18
FERNANDO [1] 1/4
few [6] 7/10 11/20 55/24 60/17 63/6
 74/1
fewer [1] 62/10
field [2] 57/10 73/15
figure [4] 45/7 46/15 49/20 69/11
figures [2] 41/3 42/15
file [10] 15/19 20/7 20/12 20/13 21/1
 21/7 34/11 38/13 58/16 59/18
filed [11] 9/22 10/10 11/22 14/20 19/20
 20/25 34/6 34/7 37/9 52/13 77/10
files [2] 26/22 26/22
filing [4] 6/24 7/11 10/3 14/16
filings [3] 20/25 21/19 21/20
final [5] 7/19 9/1 55/9 61/1 68/23
finally [4] 23/10 30/10 30/15 70/20
find [8] 15/7 15/8 16/10 25/15 55/1
 65/15 75/20 79/4
finder [1] 34/22
finding [1] 72/7
fine [6] 19/12 19/13 19/14 43/14 43/22
 73/1
finish [1] 39/8
finished [1] 58/19
fire [4] 51/8 69/23 70/6 70/10
fires [3] 41/13 70/1 70/4
firm [5] 29/4 29/25 44/12 49/15 49/16
firmly [2] 28/19 33/9
firms [2] 28/23 49/18
first [10] 5/1 9/10 12/25 25/18 26/7
 43/3 48/21 49/3 55/5 64/4
first-level [2] 48/21 49/3
fits [1] 43/7
five [8] 5/3 18/9 22/15 28/23 32/11
 33/16 39/9 64/16
five-year [1] 32/11
flag [1] 50/18
flagged [1] 63/13
flags [1] 48/23
Florida [2] 2/17 16/10
FMO [1] 1/8
focus [6] 12/24 42/24 46/14 46/16 54/3
 75/21
focused [3] 12/24 27/7 27/8
focuses [1] 30/24
focusing [3] 48/2 52/20 56/9
Fogel [3] 53/11 74/17 74/19
Fogel's [1] 54/25
follow [2] 44/19 60/23
following [1] 27/15
foot [1] 31/5
Force [1] 29/18
forces [1] 7/5
foregoing [1] 80/6
forever [1] 7/3
forget [2] 31/25 59/18
forgetting [1] 66/7
Forgive [1] 43/15
form [3] 11/21 52/10 72/2
format [1] 80/9
former [1] 71/23
forms [3] 18/1 18/20 61/4
forth [8] 5/10 8/3 24/9 35/2 48/19 49/2
 63/19 68/11
fortune [1] 42/13

forward [8] 16/16 17/10 32/16 60/12
 62/4 62/20 73/9 75/24
four [4] 6/21 25/1 33/16 54/10
four-and-a-half [1] 54/10
fourth [3] 46/4 52/9 67/1
Fourth-amended [2] 52/9 67/1
frankly [5] 17/5 17/14 28/8 29/16 33/1
free [1] 51/3
frequency [1] 30/20
friendly [1] 6/4
front [4] 25/23 44/14 59/19 75/7
front-loading [2] 25/23 75/7
full [3] 27/22 39/22 71/1
fully [3] 7/1 33/6 33/6
function [3] 32/23 40/9 40/15
fund [2] 23/24 76/7
fundamentally [3] 30/11 35/11 40/13
furious [1] 21/23
furnace [1] 50/2
further [4] 7/4 8/4 50/18 79/4
future [8] 38/16 38/24 55/17 59/22 60/6
 64/6 69/6 71/2

**G**

Galan [1] 29/24
GALEN [2] 3/4 4/21
gave [4] 21/17 34/10 43/25 53/11
generally [2] 27/18 31/4
generated [1] 29/22
gentlemen [1] 31/18
George [5] 5/16 6/15 6/24 7/2 7/8
Georgetown [1] 2/12
get [38] 5/1 5/2 9/8 9/11 14/25 15/7
 15/20 19/12 20/12 20/15 22/21 26/22
 28/5 28/12 33/4 33/17 34/12 35/5
 39/12 47/7 56/24 58/5 61/16 62/6
 65/23 68/9 69/12 69/15 72/1 72/2
 73/16 73/22 74/2 74/25 75/3 76/15
 77/8 78/20
gets [2] 39/23 70/7
getting [5] 14/5 19/13 65/11 70/24
 71/21
Geyelin [2] 29/4 48/14
give [11] 5/3 34/15 39/7 43/13 43/25
 44/11 48/17 58/14 71/10 73/7 75/8
given [8] 14/3 16/2 23/5 46/2 58/9
 64/20 75/2 75/19
gives [2] 7/21 8/7
giving [4] 43/8 43/23 60/11 73/9
go [23] 5/7 7/3 8/20 11/9 14/8 22/1
 24/23 28/25 36/16 37/2 38/2 39/10
 42/9 44/5 44/16 46/24 50/14 60/22
 61/1 64/10 69/13 76/2 77/25
goal [5] 16/22 16/23 16/24 16/24 16/25
goes [8] 8/4 22/23 29/3 33/3 45/9 72/9
 73/20 77/11
going [59] 5/18 6/10 11/5 15/17 16/15
 16/16 16/18 16/21 17/4 17/9 17/16
 20/9 20/11 22/15 26/2 26/22 27/18
 27/24 29/6 31/24 32/15 38/11 40/2
 41/14 42/9 46/10 46/16 47/5 48/20
 54/11 55/21 59/19 59/24 61/1 61/1
 62/3 62/22 62/23 63/10 64/9 64/11
 64/14 65/20 66/8 67/14 67/20 68/3
 68/5 68/11 69/14 70/9 70/17 70/17
 71/17 72/1 72/5 72/21 75/8 75/18
GONZALEZ [3] 1/22 80/14 80/15
good [16] 4/7 4/9 4/12 4/14 4/19 4/21
 4/23 5/8 5/15 33/17 42/20 45/1 52/19
 67/4 71/14 78/25

G

got [25]  14/25 15/13 15/14 16/2 20/2
21/21 27/14 27/24 28/8 30/20 32/4
33/5 33/18 39/7 39/7 41/15 41/15
44/15 53/22 56/17 58/20 71/18 72/6
72/12 74/22
gotten [3]  13/11 33/11 57/1
gouging [1]  48/10
governed [1]  66/3
government [4]  29/8 58/3 70/8 71/24
governs [1]  23/20
grandfather [2]  5/17 6/13
grandfather's [1]  7/17
granted [2]  62/3 71/11
Grays [4]  49/23 50/1 50/22 75/22
great [5]  33/25 41/24 41/24 61/2 71/15
greater [1]  13/4
Green [1]  25/19
gross [1]  37/3
grounds [1]  34/11
guess [3]  11/3 21/6 76/13
guessing [1]  55/15
guesstimated [1]  55/2
gun [1]  16/7
guy [4]  29/5 29/12 29/19 68/20
guys [9]  11/13 15/5 15/14 21/17 31/20
56/20 59/16 71/14 77/25

H

had [60]  5/22 6/1 6/8 11/20 13/10 18/2
19/10 21/22 22/7 22/12 25/8 26/4 26/5
26/11 26/14 26/19 26/24 27/8 27/23
28/22 29/5 29/17 29/21 29/25 31/22
32/9 33/8 33/11 33/14 33/15 33/19
34/4 35/7 41/14 46/22 47/9 49/7 49/11
50/14 50/18 51/3 51/6 53/10 53/12
56/14 56/19 57/12 57/14 57/19 58/6
61/9 62/7 62/14 62/21 63/2 63/10 64/6
75/6 77/7 77/13
hadn't [1]  57/25
half [9]  26/8 34/6 47/25 48/16 51/1
51/2 54/10 59/15 68/13
halfway [1]  67/18
hand [6]  15/2 15/4 42/23 44/20 46/1
62/20
hands [2]  40/2 70/11
hanging [3]  16/9 27/4 37/22
hanging-chad [1]  27/4
HANIGAN [7]  2/19 2/19 4/17 4/17 5/8
5/9 5/14
happen [7]  8/13 53/13 55/16 69/25
71/5 71/18 71/23
happened [5]  8/5 25/25 38/7 56/23
67/25
happening [3]  64/5 70/11 70/12
happens [3]  61/14 70/15 74/2
happy [1]  47/15
Harbor [3]  49/23 50/1 75/22
hard [1]  11/18
hardly [1]  64/5
harp [1]  72/17
harsh [4]  71/13 71/13 74/8 74/18
has [38]  6/12 6/24 7/13 8/12 10/13
10/24 12/1 13/9 14/15 20/21 24/8
24/14 24/15 25/10 33/4 34/13 36/20
37/5 37/25 39/13 47/1 53/13 54/16
56/11 59/23 60/4 60/22 61/24 61/25
66/7 67/4 73/5 73/14 73/22 74/11
74/15 75/25 76/11
hasn't [2]  11/25 14/25

have [102]
Document 355 9/17 Filed 10/21/16
43/4 68/7
Haverford [2]  2/4 2/5
having [1]  41/13
he [52]  6/16 6/17 9/14 9/15 9/22 10/18
12/18 13/9 17/25 18/3 18/11 18/19
27/9 29/12 29/19 30/21 36/25 38/18
40/18 43/25 48/14 49/3 55/1 55/2
56/16 56/17 56/17 57/21 60/2 60/18
63/14 63/16 63/16 63/17 63/20 63/20
63/21 63/21 63/23 64/23 64/24 68/21
68/21 68/24 69/1 69/2 69/25 76/18
76/20 76/21 76/22 77/6
he's [7]  5/16 7/16 18/10 18/17 29/12
48/20 49/1
health [1]  6/19
hear [1]  6/7
heard [1]  57/11
hearing [3]  9/17 11/18 44/8
heart [1]  7/11
heating [2]  61/21 63/19
heavily [1]  46/14
held [4]  6/16 34/22 76/5 80/8
hell [1]  40/4
help [1]  44/19
Hensley [2]  53/4 53/4
her [15]  14/24 15/12 15/15 16/14 16/22
16/23 18/2 18/8 18/17 19/13 19/21
19/24 27/4 37/16 37/16
here [33]  5/11 7/9 17/24 22/20 24/1
28/17 31/6 32/3 48/22 50/23 51/2 51/8
51/21 52/3 53/13 54/12 54/15 54/24
55/4 56/5 64/24 65/3 66/4 66/15 66/23
68/7 68/7 68/14 69/24 71/14 74/12
75/5 78/13
here's [3]  51/19 70/13 70/14
hereby [1]  80/5
herring [1]  12/20
herself [2]  37/1 38/4
high [5]  32/2 46/9 51/24 65/8 69/20
higher [5]  27/4 36/2 38/17 50/20 62/24
highest [1]  46/4
highly [1]  29/14
Hills [1]  2/21
him [7]  6/19 27/10 30/18 43/13 48/17
55/1 55/11
himself [1]  38/4
hire [1]  49/12
hired [1]  16/7
hires [1]  49/13
his [18]  4/16 6/18 7/18 9/17 11/5 13/15
19/11 30/21 34/9 36/22 44/4 55/8
55/10 56/1 60/18 63/9 74/19 76/9
hold [1]  45/20
homes [1]  51/4
hominem [1]  7/14
hominen [1]  6/11
HON [1]  1/4
honest [1]  61/3
honestly [1]  59/4
honor [47]  41/3 4/9 4/12 4/14 4/19 4/21
4/23 5/8 5/14 5/15 9/7 9/20 11/2 11/10
15/16 18/8 19/8 22/2 23/1 35/16 37/16
42/19 42/20 43/2 43/16 44/6 44/18
46/20 49/14 53/17 53/24 57/13 59/10
59/25 60/5 63/14 64/2 65/12 67/21
71/12 73/7 73/19 75/25 76/9 77/23
78/5 78/17
hoops [1]  38/3

hope [1]  69/22
hour [2]  28/9 34/13
hours [12]  30/20 48/8 48/9 48/16 48/17
48/20 50/5 50/7 50/9 50/11 50/15 53/1
hours into [1]  50/7
house [3]  26/9 36/23 37/22
households [1]  42/16
how [9]  8/14 16/12 21/14 30/8 56/17
57/3 58/10 60/25 67/16
HP [4]  45/14 53/7 53/7 74/17
HP Inkjet [1]  53/7
huge [3]  31/11 41/23 42/13
hundred [2]  39/1 58/5
hundreds [4]  7/14 28/1 48/17 70/24
hurdle [2]  32/2 32/5
hypothetical [1]  54/7
hypotheticals [2]  53/9 54/3

I

I'd [3]  42/23 43/2 48/7
I'll [19]  5/3 7/13 7/19 20/10 20/15 20/17
25/3 36/5 42/25 43/1 43/25 44/12
44/17 46/20 47/8 55/8 77/24 77/25
79/5
I'm [39]  5/11 5/13 5/16 5/18 6/10 12/7
14/20 19/12 19/14 19/17 20/8 20/10
20/22 27/17 28/10 28/12 29/9 39/5
44/23 46/16 47/16 47/23 50/17 52/25
55/20 58/18 59/2 59/19 63/5 63/7
64/10 64/14 72/16 73/5 73/8 73/24
74/18 74/20 78/13
I've [10]  5/5 14/14 27/14 33/24 36/19
41/15 44/2 44/14 60/24 76/9
ice [1]  77/15
idea [2]  52/4 78/25
idenfied [2]  8/18 14/14 15/25
identify [3]  24/23 34/10 62/5
identifying [1]  49/2
ignore [1]  78/20
implicate [1]  76/25
important [11]  6/6 36/14 41/19 41/20
51/19 53/5 59/23 60/7 63/11 68/14
69/23
improper [2]  10/4 10/10
in-depth [1]  29/13
in-house [1]  26/9 36/23 37/22
in-person [1]  34/25
incentive [2]  9/4 47/20
incidence [1]  13/3
incident [1]  64/19
Incidentally [1]  67/8
incidents [3]  36/21 37/1 37/2
include [3]  13/25 14/1 37/10
included [4]  34/24 52/2 59/4 60/11
includes [3]  32/6 35/18 40/24
including [5]  14/16 22/14 35/23 38/3
42/2
incorporated [1]  59/8
incorrectly [1]  25/22
increase [2]  28/4 38/11
incur [1]  30/15
incurred [2]  22/5 62/1
indeed [1]  34/22
independent [5]  16/5 16/6 16/12 37/19
76/24
indicated [2]  10/13 11/18
individual [4]  34/7 47/10 51/7 60/13
individually [1]  13/21
indulging [1]  39/5
information [19]  5/22 6/3 9/15 25/11

## I

information... [15]  38/6 38/7 44/22
44/23 46/1 51/16 51/19 56/24 57/1
57/2 58/14 59/6 59/10 59/13 59/13
informed [1]  63/16
initially [1]  22/6
injecting [1]  17/4
injunctive [4]  23/23 24/16 69/17 70/15
injury [2]  14/2 36/12
Inkjet [12]  45/14 53/7 53/7 53/10 54/19
54/22 67/7 67/9 74/13 74/17 74/19
75/23
inner [1]  7/20
inquiry [1]  38/9
insert [1]  39/18
insisted [3]  16/1 16/16 34/14
insists [1]  34/14
installed [1]  51/15
instruction [1]  42/22
instructive [1]  46/17
instructs [1]  53/4
insurance [8]  7/1 26/18 29/6 35/7 38/25
40/6 40/14 40/16
insurance-like [1]  40/6
intangible [3]  24/15 41/5 41/25
intend [1]  69/24
intensity [2]  33/21 34/19
intensive [1]  25/20
intensively [1]  16/18
interesting [1]  41/6
interfere [1]  61/23
interject [1]  15/16
interlocutory [1]  33/13
internal [2]  62/19 72/11
internally [1]  25/13
Internet [1]  21/23
invalid [1]  37/15
invested [1]  74/15
investigation [1]  72/6
investing [1]  77/17
involved [6]  16/18 17/8 17/9 28/23
36/24 38/8
irrespective [1]  32/19
Irvine [1]  3/9
is [233]
issue [32]  6/7 8/16 9/24 12/19 14/13
14/15 15/24 20/10 20/22 22/20 23/16
25/4 30/24 33/21 50/4 51/10 51/11
56/10 57/12 57/13 66/19 67/6 67/13
67/15 76/13 76/16 76/21 76/23 77/2
77/3 78/13 79/5
issued [2]  26/18 35/7
issues [10]  11/16 11/20 11/24 12/2
12/5 12/12 14/14 24/19 25/2 32/6
it [199]
it's [87]
Item [1]  4/4
its [2]  24/14 27/3
itself [4]  14/1 37/3 42/13 70/5

## J

J.C [1]  46/3
Jan [1]  4/16
Jeff [1]  4/12
JEFFREY [1]  2/7
job [6]  25/6 25/6 27/3 31/18 61/2 71/14
Jones [1]  38/5
judge [12]  1/4 1/4 35/22 36/2 53/11
54/24 58/10 68/6 69/12 74/17 74/18
75/15

judgment [4]  33/14 33/20 67/2 71/16
Judicial [1]  80/5
Judicial [1]  80/5
July [2]  37/8 37/23
July 2nd [1]  37/8
junior [1]  49/11
jurisdiction [3]  66/22 66/22 66/24
jury [3]  33/14 33/15 47/11
just [60]  5/18 5/23 6/19 7/13 8/9 8/14
11/11 11/12 14/22 16/16 18/17 18/18
18/18 31/11 39/17 39/19 42/23 43/8
43/13 43/20 43/25 44/4 44/6 44/7 44/8
44/11 44/13 44/19 45/8 46/2 47/6
47/10 48/20 49/14 49/17 52/5 52/25
53/18 55/6 56/16 58/16 59/18 59/19
61/3 61/24 63/16 63/22 68/8 69/2
69/13 72/14 72/16 72/20 74/11 76/15
76/23 78/1 78/3 78/12 79/1
Justice [1]  71/24

## K

KCC [1]  67/19
KCC's [1]  63/6
keep [6]  20/6 52/20 52/25 53/16 55/24
56/9
Kenmore [1]  38/13
kept [1]  61/3
Kerr [1]  24/22
key [2]  35/5 44/23
Kimberly [1]  4/18
kind [4]  21/21 37/17 38/9 44/11
knew [5]  25/12 25/13 25/15 30/14
41/12
Knot [1]  4/18
know [57]  11/23 15/6 16/22 21/14
27/13 28/9 31/15 32/2 36/5 37/6 37/7
37/13 37/17 41/9 41/18 41/18 43/2
43/11 43/19 47/23 50/16 52/16 52/17
52/20 55/6 55/7 55/12 55/13 55/14
56/16 56/20 57/3 58/15 59/25 60/19
60/20 60/25 61/2 62/9 63/6 63/24 64/8
65/20 65/22 71/13 71/15 72/4 72/5
72/12 72/15 72/15 73/4 74/3 74/14
75/24 78/3 79/1
known [1]  4/18
knows [4]  10/7 22/3 22/19 31/4
Korean [1]  6/15
Kress [1]  21/5 21/6

## L

laid [1]  34/3
Lancaster [1]  2/4
LANG [1]  2/19
large [3]  24/17 49/19 77/19
last [9]  14/16 20/25 21/20 41/16 44/10
53/24 59/12 69/17 77/24
last-minute [4]  14/16 20/25 21/20 44/10
late [1]  14/20
latest [2]  9/23 9/24
law [28]  2/16 13/10 19/9 23/8 23/18
23/19 23/21 28/23 31/8 32/20 33/24
35/16 45/10 45/13 48/13 53/24 54/2
66/3 66/12 66/16 66/19 66/20 66/20
67/1 67/8 67/11 76/16 76/16
lawyer [5]  18/7 27/17 49/10 60/5 71/24
lawyers [9]  33/25 47/7 47/19 49/13
49/13 50/8 52/23 53/10 58/17
lead [3]  4/8 4/10 4/13
learned [1]  77/17
least [3]  13/16 22/22 58/5

leave [1]  21/1
led [2]  20/7 30/6
legal [4]  45/16 45/18 65/5 66/6
legitimately [1]  53/1
less [6]  40/10 54/14 63/25 64/19 65/19
75/3
lesser [1]  56/8
let [13]  9/10 11/11 14/18 14/22 18/5
21/25 25/3 43/20 47/13 59/17 77/24
78/1 79/3
let's [7]  20/19 40/21 41/3 54/21 55/5
59/4 69/2
level [4]  31/5 31/11 48/21 49/3
LEVITAN [1]  2/11
liability [5]  31/25 32/1 32/4 32/7 33/20
liable [1]  34/22
Liacopoulos [2]  4/15 5/16
Liberatti [1]  29/17
life [4]  32/15 64/4 69/5 71/1
lift [1]  77/9
lifts [1]  77/15
light [4]  42/21 45/10 47/2 74/12
lightening [2]  64/18 64/20
like [34]  5/2 6/19 7/17 15/4 15/18 15/22
16/9 22/22 36/15 38/14 40/3 40/6
42/23 43/2 44/11 45/19 46/14 48/7
48/12 49/22 52/22 54/9 55/19 58/20
59/14 60/25 61/9 63/9 63/14 68/8 68/8
70/4 70/11 77/14
likely [1]  33/9
Likewise [1]  25/17
liklihood [1]  33/19
limited [4]  13/20 13/25 52/22 72/2
limits [2]  65/10 65/20
lines [1]  62/18
lint [2]  51/5 51/8
LISA [3]  1/22 80/14 80/15
list [2]  45/25 46/4
listening [1]  28/14
litigants [1]  47/5
litigate [5]  25/8 25/9 26/23 67/24 69/24
litigated [4]  25/7 25/7 50/17 70/3
litigation [7]  27/7 28/24 33/22 57/16
57/17 57/25 74/25
litigators [1]  72/21
little [9]  9/1 11/13 14/20 20/8 63/9
76/14 76/15 76/17 78/10
live [2]  12/11 30/19
lives [1]  40/3
LIVINGSTON [1]  2/11
LLC [1]  2/11
LLP [5]  2/3 2/7 2/19 3/3 3/7
loading [2]  25/23 75/7
located [2]  10/11 11/5
lodestar [39]  22/13 22/15 23/3 23/12
23/17 23/25 24/21 32/21 35/15 35/17
35/19 35/22 35/24 42/10 46/23 47/13
48/3 48/22 49/16 49/19 53/11 65/3
65/8 65/13 65/18 65/18 65/21 65/24
65/25 68/8 68/10 69/19 71/19 74/7
74/7 74/22 75/19 75/20 77/21
lodestar-multiplier [1]  23/3
lodestar-plus-multiplier [1]  23/12
lodestars [1]  50/19
long [3]  15/15 20/7 59/14
longer [3]  33/17 45/20 78/14
look [31]  15/5 16/9 17/17 30/8 31/5
31/14 31/22 43/25 49/14 49/21 53/8
53/19 53/24 54/18 60/7 61/4 61/18
61/24 62/15 63/4 63/14 63/16 63/17

## L

look... [8]  65/23 66/11 68/20 68/24
74/13 75/15 75/24 79/3
looked [7]  14/20 15/23 17/17 17/17
18/2 21/13 61/5
looking [6]  18/1 24/20 37/18 37/22
53/12 57/12
Los [4]  1/15 1/23 2/9 4/1
loss [1]  52/15
lot [18]  5/22 6/1 6/2 15/5 21/16 21/17
23/16 31/15 32/18 32/19 39/25 50/15
61/16 72/8 72/17 72/24 75/5 76/9
low [3]  50/23 62/22 69/20
lower [2]  47/16 50/18

## M

machine [10]  14/1 18/23 32/13 32/15
64/18 69/3 73/14 73/16 73/16 73/22
machines [11]  25/11 32/9 38/19 38/22
38/23 57/9 57/15 58/6 70/23 73/18
77/20
made [14]  7/10 25/9 30/15 37/8 37/11
37/14 37/17 37/23 56/11 60/25 76/6
76/20 78/18 78/18
magnitude [4]  23/5 25/12 42/17 46/12
Magnuson [1]  67/3
mail [2]  51/7 62/13
main [3]  3/8 29/2 29/3
maintain [1]  23/7
make [12]  4/6 6/1 18/20 26/6 38/9 39/5
44/16 56/7 61/15 71/24 72/7 76/25
makes [6]  12/18 15/3 19/23 39/15 41/6
68/12
making [5]  7/14 28/22 54/1 58/9 61/2
maneuvers [1]  13/15
manufactured [3]  26/20 39/2 39/24
many [4]  16/10 56/17 57/4 74/9
map [1]  64/5
Marilyn [1]  7/1
Marilynn [2]  6/18 7/7
marked [1]  77/11
market [2]  40/7 70/25
marketplace [2]  38/19 63/22
Maryland [2]  29/6 29/10
massive [2]  22/14 26/12
material [6]  18/4 21/16 29/22 29/25
43/4 43/16
materially [1]  28/13
materials [1]  44/10
math [2]  40/18 42/1
MATHEWS [5]  2/3 4/10 17/24 18/9
29/20
matter [6]  23/19 50/6 71/19 78/8 79/7
80/8
matters [2]  22/8 28/8
maximum [5]  16/20 16/20 17/11 17/11
75/13
may [6]  15/16 29/8 56/25 74/8 77/3
78/25
maybe [13]  8/11 32/10 32/11 33/17
50/13 59/16 62/23 63/2 63/3 69/22
72/11 76/17 78/16
McDonald [4]  10/21 10/22 10/24 21/2
McDonald's [1]  11/3
MD [1]  2/13
me [39]  6/13 6/21 7/8 9/10 11/11 11/14
14/10 14/18 14/22 14/23 15/2 18/5
21/9 21/17 21/25 24/19 25/4 27/13
27/15 28/14 36/15 39/5 43/8 43/16
43/20 43/20 44/9 44/11 44/12 44/14

47/13 50/18 50/19 59/17 59/20 64/21
70/12 71/5 72/9
mean [9]  6/5 10/6 22/21 31/18 31/25
47/8 50/8 59/12 62/2
measure [3]  23/4 35/20 52/21
mechanical [1]  6/16
mediation [4]  25/20 26/2 26/7 26/8
mediations [1]  25/18
mediator [1]  35/2
Medicare [1]  7/1
meet [2]  24/22 61/8
meetings [2]  57/20 72/9
member [6]  6/7 6/8 9/5 13/22 13/23
51/10
members [19]  7/21 8/6 8/9 8/23 9/2
13/17 13/21 14/6 17/12 45/15 52/1
54/24 56/12 56/18 56/21 58/12 60/10
75/17 76/6
membership [1]  13/5
memo [1]  69/18
memorandum [4]  9/13 10/19 19/19
37/9
mentioned [3]  35/7 35/15 36/19
merit [1]  6/6
meritless [1]  10/3
merits [4]  12/4 24/14 45/2 69/25
method [6]  23/17 24/21 35/15 35/17
35/23 65/3
methodology [7]  23/25 23/25 32/21
35/12 37/16 62/5 77/2
MGM [1]  76/4
MICHAEL [1]  3/3
middle [1]  65/25
midway [1]  67/22
might [4]  34/21 56/14 69/13 73/17
Mike [2]  4/19 35/2
million [53]  22/4 22/16 35/23 37/24
38/18 38/22 38/23 40/21 40/22 41/1
41/1 41/2 41/2 42/3 42/5 42/7 45/8
45/9 45/9 46/2 46/8 46/10 46/19 46/22
46/23 47/11 49/17 49/17 49/21 50/22
51/2 51/24 52/3 52/7 53/11 53/12
54/10 54/16 54/16 60/3 60/3 60/9
61/15 62/13 64/10 65/19 65/25 69/11
69/15 69/20 73/8 74/22 75/16
millions [2]  45/6 50/14
mind [2]  9/17 72/4
minimize [1]  16/23
minute [6]  8/19 14/16 20/25 21/20 36/5
44/10
minutes [2]  5/3 39/9
MIORELLI [10]  2/16 2/16 4/14 4/15
4/16 5/15 5/16 8/21 12/15 13/14
misremember [1]  61/17
missing [1]  38/6
mission [1]  6/17
mission-critical [1]  6/17
mistake [1]  37/18
model [5]  36/2 39/19 48/12 49/12 49/14
modest [4]  17/14 22/17 23/7 54/13
Modesty [1]  25/4
moment [3]  9/22 11/19 12/11
Monday [2]  20/12 21/7
monetary [1]  35/19
money [7]  15/3 15/5 32/18 32/19 39/25
45/6 48/1
monitoring [1]  57/10
months [1]  63/7
mooted [1]  76/21
mop [1]  5/19

mop-up [1]  5/19
morale [1]  9/6
more [23]  5/22 18/23 22/10 24/8 27/19
28/21 30/14 35/5 44/14 48/15 50/14
50/15 53/3 54/18 54/25 62/12 64/17
65/24 72/16 74/15 75/18 76/15 79/5
morning [11]  4/7 4/9 4/12 4/14 4/19
4/21 4/23 5/8 5/15 9/22 42/20
Moss [1]  67/3
most [12]  6/4 6/8 9/20 29/14 33/2
36/25 45/13 46/14 46/17 53/5 54/20
62/2
mostly [3]  43/6 46/16 54/23
mother [2]  4/15 6/21
motion [19]  12/6 12/7 12/7 15/11 20/24
20/25 31/16 31/16 31/17 33/11 33/12
37/9 37/14 42/23 44/8 69/12 75/22
77/9 77/15
motors [2]  61/20 63/19
move [1]  20/19
moved [1]  6/24
moving [1]  54/2
MR [26]  4/7 4/12 4/14 4/17 4/19 4/21
4/23 5/8 5/14 5/15 8/21 10/2 10/11
18/15 18/19 19/3 19/5 19/8 36/19
39/11 42/20 43/6 43/14 49/13 56/1
79/6
Mr. [20]  9/17 9/25 10/8 11/3 12/15
13/14 18/9 36/6 48/14 49/15 49/15
49/24 57/17 58/7 59/7 60/1 63/8 68/24
76/3 77/4
Mr. Chambers [1]  57/17
Mr. Cohon's [1]  49/15
Mr. Fax [5]  49/24 58/7 59/7 60/1 63/8
Mr. Fax's [1]  49/15
Mr. Geyelin [1]  48/14
Mr. Mathews [1]  18/9
Mr. McDonald's [1]  11/3
Mr. Miorelli [2]  12/15 13/14
Mr. Solomon's [1]  68/24
Mr. Sweeney [1]  9/17
Mr. Sweeney's [2]  9/25 10/8
Mr. Williams [2]  76/3 77/4
Mr. Williams' [1]  36/6
Mrs [1]  38/5
much [10]  5/10 8/2 9/8 17/16 24/8 25/8
25/8 27/3 27/3 50/20
multiple [7]  17/5 17/14 22/16 22/17
35/24 36/1 50/2
multiples [1]  23/9
multiplier [9]  23/3 23/7 23/12 24/21
42/10 65/11 74/18 74/21 77/22
must [1]  47/2
my [30]  4/15 5/16 6/13 6/18 6/21 7/17
9/21 11/11 11/12 18/7 17/23 22/11 27/15
27/25 28/13 28/15 29/17 30/25 31/1
31/6 32/3 33/24 36/19 40/4 47/18
55/10 56/25 63/5 64/7 64/23 66/22
myself [4]  6/14 21/22 35/2 44/4

## N

named [2]  8/17 8/18
namely [2]  27/22 30/2
napkin [1]  61/11
narrative [1]  29/1
nation [2]  52/14 77/19
nation-wide [1]  52/14
nationwide [2]  31/13 52/11
nature [4]  34/3 43/3 71/19 74/24
necessarily [1]  33/18

## N

necessary [4]  26/5 26/23 34/18 45/20
need [10]  11/12 12/2 20/9 20/10 24/18
39/12 39/14 42/22 43/12 44/1 49/9
51/15 58/11 58/14 59/7 59/17 59/25
62/9 64/8 70/13 72/6 75/23
needed [3]  28/20 29/24 57/13
needs [1]  51/15
negative [1]  71/22
neglected [1]  76/3
negotiating [2]  27/21 68/15
negotiation [1]  71/11
negotiations [1]  34/23
neutral [1]  72/16
never [10]  9/18 26/13 26/16 34/13
34/14 34/15 38/3 52/23 70/7 77/13
new [19]  17/19 17/20 18/5 18/7 18/14
18/15 19/4 19/9 39/1 39/14 39/24
40/24 43/12 46/1 58/25 70/24 73/18
73/22 74/2
NewGen [5]  7/21 8/1 8/12 60/10 64/3
next [1]  20/19
Ninth [14]  19/8 32/20 45/10 45/13
45/22 47/1 47/12 53/5 53/7 53/15
53/19 53/23 54/4 76/4
Ninth Circuit [12]  19/8 32/20 45/10
45/22 47/1 47/12 53/5 53/15 53/19
53/23 54/4 76/4
Ninth Circuit's [1]  45/13
no [49]  1/8 1/22 5/13 8/2 10/6 11/23
11/24 12/20 12/21 13/24 17/20 18/11
19/21 19/21 22/9 22/20 28/21 28/24
36/11 36/11 39/15 40/8 40/8 40/8 41/7
41/8 41/8 41/10 43/10 43/10 54/12
56/3 57/14 57/25 59/1 60/4 64/22
66/19 67/3 67/11 68/4 69/14 72/11
73/18 76/1 78/5 78/5 78/14 80/15
non [14]  8/8 9/2 12/22 13/2 13/11
13/17 13/21 13/22 13/23 13/24 14/6
35/19 36/9 65/9
non-class [10]  9/2 12/22 13/2 13/11
13/17 13/21 13/22 13/23 14/6 36/9
non-class-wide [1]  13/24
non-coupon [1]  65/9
non-dilution [1]  8/8
non-monetary [1]  35/19
none [3]  28/24 61/21 70/1
nonresponsive [1]  9/18
noon [1]  39/8
normal [1]  32/13
north [2]  1/23 46/8
Northern [1]  67/5
not [128]
notably [1]  45/13
note [5]  5/20 6/1 13/14 68/14 69/24
notes [1]  76/9
nothing [2]  54/17 68/19
notice [14]  6/20 38/12 38/21 42/3 61/15
62/12 62/14 62/19 63/1 73/8 74/2 76/3
78/2 78/4
notion [5]  8/13 44/13 47/3 53/20 65/2
now [24]  8/8 11/7 18/4 19/20 22/18
23/16 33/17 36/19 37/13 38/19 39/3
40/8 45/23 48/17 48/22 50/21 54/21
57/16 62/4 64/13 68/14 70/12 73/3
73/13
number [22]  4/4 10/12 11/6 16/3 16/13
16/14 16/21 17/12 31/13 31/14 36/20
37/20 37/21 37/21 38/2 38/11 40/9
50/10 61/1 62/8 62/25 77/11

## O

numbers [4]  28/2 40/19 42/12 71/3
o'clock [4]  20/5 20/6 20/13 20/14
O'DONNELL [1]  3/3
o0o [1]  4/3
oath [1]  19/14
objection [10]  5/4 5/5 6/5 6/8 6/24 10/5
10/10 10/15 10/17 22/9
objections [13]  5/6 5/9 5/10 9/25 10/4
10/11 11/5 12/13 14/13 20/22 22/19
78/4 78/6
objector [7]  4/15 9/14 10/3 10/16 10/20
13/14 73/25
objectors [9]  2/16 4/17 5/2 7/15 7/17
9/12 14/10 21/1 21/24
objects [1]  10/14
observation [2]  19/19 31/1
observing [1]  42/14
obtained [3]  32/14 33/10 33/14
obvious [1]  22/21
obviously [5]  13/18 14/15 32/6 41/17
44/24
occurred [6]  18/13 18/23 36/21 38/10
70/4 70/14
OCTOBER [1]  80/12
off [10]  8/5 28/1 37/11 39/1 39/23
56/21 61/6 61/6 64/5 70/25
offer [4]  56/6 56/6 64/11 64/14
offered [2]  27/15 27/20
offers [1]  39/1
office [2]  2/16 30/19
officer [1]  10/18
officials [1]  78/3
often [2]  27/19 71/24
okay [9]  10/8 12/17 14/8 19/16 21/8
44/15 50/10 50/11 78/8
old [11]  2/12 6/15 18/24 39/14 39/15
39/16 39/18 39/21 55/20 64/16 70/20
OLGUIN [1]  1/4
once [4]  5/9 27/6 27/7 71/17
one [46]  2/4 12/15 13/16 14/11 14/13
15/2 16/11 17/5 18/11 18/24 21/1
22/11 25/2 25/14 28/23 32/9 36/8
36/23 37/24 39/18 41/24 43/7 43/15
46/7 47/1 48/8 49/3 51/18 54/5 55/24
57/6 57/18 57/20 60/2 60/17 60/25
61/10 62/16 63/23 63/23 64/6 64/15
75/9 77/24 78/13 78/24
one-third [1]  14/11
ones [6]  8/17 8/17 8/18 61/5 62/16
77/5
ongoing [1]  57/10
only [15]  9/3 14/11 15/18 19/11 34/24
42/7 62/17 63/1 64/17 69/15 74/4
75/12 76/13 78/10 78/23
o0o [1]  79/11
opened [1]  24/15
opening [4]  51/20 55/25 57/18 69/18
opined [2]  38/21 60/2
opines [1]  37/14
opinion [4]  60/4 67/19 68/24 70/13
opportunity [7]  15/18 15/20 15/22 24/21
32/25 60/12 75/9
opposed [2]  13/6 59/2
opposite [1]  77/6
opposition [5]  5/20 18/1 20/8 20/12
21/10 33/12 37/13 51/12
option [2]  55/5 67/23
options [2]  55/5 67/16

## O (continued)

oral [2]  44/2 56/1
orange [3]  2/19 1/21 10/25 11/20 20/10
79/5
orders [1]  10/13
organization [1]  29/13
original [1]  54/25
Orlando [1]  2/17
Ortiz [3]  8/4 8/5 8/12
other [27]  10/5 10/13 13/6 13/16 14/10
14/17 15/4 17/13 18/21 21/13 22/22
23/9 24/23 28/8 29/20 30/5 41/15
43/15 46/5 48/2 49/22 54/6 58/11 72/9
72/14 73/20 75/2
otherwise [2]  57/4 58/16
ought [1]  54/18
our [67]  6/4 6/5 9/6 9/23 13/9 13/12
13/15 17/14 17/22 21/23 25/4 25/5
25/6 25/18 26/2 26/6 26/12 26/17 27/7
31/25 32/18 34/3 34/9 35/16 35/25
36/1 37/9 37/9 37/14 38/17 38/17
38/21 40/5 40/17 41/1 42/2 42/18
45/19 48/19 51/12 54/14 57/10 57/14
57/21 57/25 60/2 62/19 62/25 63/15
63/15 65/19 68/4 68/22 70/5 70/8
70/22 73/3 73/10 73/11 73/12 76/11
76/20 77/1 77/9 77/21 78/17 78/23
ours [2]  5/21 61/1
ourselves [1]  17/4
out [43]  5/21 7/13 10/4 15/11 15/15
20/11 22/12 26/19 31/7 32/11 34/3
36/13 43/5 43/21 44/23 51/4 51/7
51/23 52/5 55/1 56/18 56/20 57/9
58/13 59/18 61/13 62/1 62/7 62/10
62/11 62/19 63/1 67/5 69/3 70/7 70/11
70/12 72/13 72/23 73/16 74/16 75/3
78/6
out-of-pocket [2]  62/1 62/7
out-of-warranty [1]  57/9
outrageous [2]  6/12 7/10
outreach [2]  58/2 58/19
outset [1]  37/15
outside [2]  52/8 70/4
outstrip [1]  54/1
over [23]  7/1 20/4 22/16 25/7 26/18
26/23 27/10 29/14 37/7 39/6 40/1
47/11 49/5 49/6 49/8 51/18 53/6 53/6
53/14 53/14 57/14 58/13 58/19
overbilling [1]  30/25
overcome [4]  33/11 33/12 33/13 33/14
overestimate [1]  71/2
overheating [31]  18/12 18/23 30/3
36/21 37/2 37/4 38/24 55/8 55/9 55/12
55/17 56/19 57/5 59/22 59/24 60/6
60/19 60/21 61/16 61/25 62/3 62/5
62/18 63/17 63/18 64/6 64/6 69/7 70/6
70/21 71/2
overly [1]  6/4
overnight [1]  15/7
own [7]  24/14 25/4 31/1 47/3 57/14
60/10 77/20
owner [1]  51/7
owners [6]  7/21 8/1 8/12 38/13 52/4
64/1
Oxnard [1]  2/20

## P

P.A [1]  2/16
PA [1]  2/5
page [2]  78/24 79/1
pages [6]  7/14 31/19 43/8 43/21 49/4

## P

pages... [1] 50/14
paid [8] 6/17 9/4 26/19 36/13 37/21 47/7 47/23 47/25
papers [11] 11/2 11/12 11/14 12/19 13/10 13/15 25/22 44/2 44/3 48/19 57/18 59/19
paperwork [1] 44/14
paragraph [2] 51/18 56/2
paralegal [2] 28/15 29/17
part [5] 28/2 30/17 34/16 57/9 68/4
parte [1] 35/1
participate [1] 10/16
particularly [1] 24/17
parties [3] 11/24 45/18 75/16
parties' [1] 46/6
partner [1] 49/10
partnership [1] 48/13
parts [2] 29/7 57/6
passed [1] 66/7
past [5] 55/7 55/9 55/12 59/24 60/20
Patrick [1] 9/14
pay [5] 40/16 47/19 64/21 69/14 70/23
paying [1] 49/12
payment [2] 8/14 8/16
payoffs [1] 37/10
payout [1] 55/9
penalty [2] 14/23 15/12
pending [1] 58/1
Penney [1] 46/3
Pennsylvania [1] 29/9 30/19
penny [1] 40/11
people [39] 8/6 9/2 14/5 16/21 17/1 27/9 27/12 28/14 36/24 45/19 52/7 56/6 56/17 57/4 57/8 57/22 57/23 58/5 58/5 58/12 61/15 61/17 61/17 61/19 61/20 61/20 62/8 62/10 62/11 62/13 62/21 63/2 70/1 70/21 73/3 73/4 73/25 75/13 77/19
per [2] 40/6 40/11
percent [23] 36/9 37/14 39/1 39/1 39/23 42/16 42/16 46/23 50/22 52/7 60/20 61/6 62/17 63/1 63/3 63/3 63/25 69/2 74/4 74/18 74/21 75/12 77/19
percentage [9] 23/13 33/3 36/4 58/24 65/6 65/17 66/14 74/3 76/7
percentage-based [1] 66/14
perfectly [2] 19/14 62/19
performed [1] 23/6
performing [1] 76/7
period [6] 30/7 51/14 55/6 59/23 67/18 67/22
perjury [2] 14/24 15/12
permission [2] 28/11 43/1
person [3] 10/14 34/25 61/10
personal [3] 14/2 31/1 36/12
personnel [5] 26/9 35/6 41/9 41/12 41/18
perspective [1] 31/6
persuaded [1] 70/7
persuading [1] 34/21
ph [1] 67/5
phase [2] 28/10 28/23
Philadelphia [1] 9/22
phone [3] 35/1 35/1 56/18
photo [1] 61/11
picked [1] 56/20
picture [2] 18/22 61/11
piece [1] 12/10
place [1] 33/8

plaintiff [3] 1/7 2/3 53/10
plaintiff's [1] 7/15
plaintiffs [8] 4/10 4/13 16/15 35/5 45/24 52/17 72/12
plaintiffs' [6] 9/11 10/20 25/3 60/4 63/12 68/20
plane [1] 21/22
plans [2] 14/24 15/12
play [1] 16/16
pleading [1] 52/13
please [2] 4/6 5/4
pled [2] 52/1 52/10
plethora [1] 31/22
plus [8] 22/5 23/6 23/12 24/21 32/5 42/10 66/25 77/21
pocket [2] 62/1 62/7
point [20] 6/5 6/9 7/13 9/1 11/8 14/12 19/17 27/25 36/14 44/7 44/18 45/8 47/7 47/18 47/18 52/19 52/19 58/2 60/2 66/8
points [4] 36/6 55/8 55/24 76/10
policy [2] 38/25 40/14
POLLAK [1] 2/7
poor [2] 6/19 77/17
portion [3] 6/18 65/17 66/9
portions [1] 65/9
position [11] 6/17 14/19 17/22 21/7 29/8 29/9 29/10 34/15 66/2 68/16 71/22
positive [2] 65/11 72/4
positively [1] 75/18
possible [3] 16/11 30/4 69/9
post [2] 27/9 70/9
post-sale [1] 70/9
postcard [1] 6/20
potential [3] 8/11 39/17 76/5
potentially [2] 33/6 62/16
practice [1] 29/7
practices [2] 49/15 70/18
practicing [1] 33/24
pre [8] 15/25 16/1 16/3 16/18 37/18 41/4 62/8 62/15
pre-qualified [3] 41/4 62/8 62/15
pre-qualifieds [5] 15/25 16/1 16/3 16/18 37/18
precisely [1] 71/9
preliminary [2] 11/18 11/20
premium [2] 40/15 75/10
preparation [1] 67/10
prepared [3] 12/7 20/22 42/21
pres [2] 10/1 10/6
presented [1] 22/13
PRESIDING [1] 1/4
prestigious [1] 29/8
pretty [5] 5/10 5/21 21/14 54/2 58/18
prevailed [1] 25/24
prevented [1] 69/23
prevents [2] 25/4 65/11
price [1] 75/10
private [1] 29/7
privately [2] 37/11 72/1
probably [10] 21/6 32/4 41/11 58/5 60/24 62/24 65/15 67/24 69/19 75/17
problem [15] 16/11 17/3 25/13 30/12 32/12 34/10 39/17 41/9 41/12 41/17 41/17 62/21 63/2 64/4 70/21
problems [1] 57/8
proceedings [4] 1/14 50/1 79/9 80/8
process [5] 17/7 17/9 38/1 60/23 61/23
produced [1] 26/12 26/14 26/16 26/17

50/14
producing [2] 43/7
product [5] 30/6 30/7 30/8 57/21 70/9
Professor [1] 25/19
program [2] 6/17 38/12
promised [1] 56/4
pronouncements [1] 54/20
proof [1] 61/8
propensity [1] 30/3
properly [1] 51/15
propriety [2] 23/17 24/24
prospective [1] 32/24
proud [3] 7/8 72/19 73/15
proudly [1] 34/1
prove [1] 62/1
provide [5] 9/15 10/22 16/25 56/10 57/8
provided [7] 7/16 22/8 26/10 42/1 54/23 66/9 78/2
provides [1] 41/23
provision [4] 10/1 67/9 67/11 74/10
public [2] 41/24 72/25
publication [1] 62/13
pull [1] 71/16
pulled [1] 77/4
pulling [1] 44/23
pulls [1] 69/2
pump [1] 61/19
purchasor [1] 75/7
purpose [2] 10/4 10/10
purposes [5] 24/5 41/3 42/7 69/11 78/19
pursuant [2] 9/22 80/5
pursue [3] 71/25 72/3 72/15
pursued [1] 72/1
put [19] 13/12 15/5 15/6 18/21 19/5 27/8 44/14 47/13 48/5 48/13 50/5 50/5 50/7 50/9 52/17 52/20 59/17 64/11 77/15
putative [2] 52/1 60/10
puts [1] 60/17
putting [2] 39/20 46/3

## Q

qualified [3] 41/4 62/8 62/15
qualifieds [5] 15/25 16/1 16/3 16/18 37/18
qualify [1] 62/22
quality [3] 22/24 23/5 25/2
quantifiable [3] 64/23 64/24 65/2
quantified [1] 24/15
quantify [2] 51/25 69/9
quantitative [1] 42/11
question [11] 17/18 19/18 24/20 33/3 35/10 43/15 43/18 59/21 68/9 76/14 77/24
questions [12] 5/11 9/11 12/1 20/21 22/7 22/11 38/5 44/17 75/25 76/1 76/12 78/7
quickly [1] 54/3
quoted [1] 53/18

## R

RAFKIN [1] 2/11
raise [2] 62/20 78/12
raised [1] 22/7 78/22
raises [1] 13/9
range [6] 37/1 38/18 41/1 42/5 42/6 47/24
rank [1] 46/4
Raptor [3] 8/1 13/6 60/10

**R**

Raptors [1]  64/3
rare [2]  56/6 60/12
rate [5]  27/3 32/19 40/12 64/3 64/19
rates [6]  28/4 48/11 49/10 50/11 50/20 53/2
ratio [2]  47/4 53/21
rational [1]  55/4
Ray [11]  16/4 16/7 17/16 26/15 27/4 33/1 37/1 37/13 38/3 59/25 63/7
Ray's [5]  16/8 16/22 17/25 42/15 64/2
reach [1]  58/4
reached [2]  56/18 56/20
reaching [1]  78/6
read [7]  5/5 21/17 44/2 44/3 69/10 70/17 74/1
reading [2]  21/17 74/19
reads [1]  69/22
real [4]  45/6 48/1 59/23 76/13
realistically [2]  69/8 69/9
reality [1]  54/17
really [20]  11/8 12/24 13/13 14/12 24/12 28/19 32/8 33/2 33/25 48/9 49/1 54/22 55/5 60/7 63/18 66/4 71/12 73/19 76/10 78/23
reason [9]  18/12 26/4 31/21 31/22 39/3 63/25 66/5 67/5 78/22
reasonable [12]  23/3 35/12 42/12 42/18 44/25 45/3 45/10 47/2 68/16 74/11 75/16 77/21
reasonableness [2]  35/14 48/8
reasons [5]  16/10 17/5 17/13 35/15 74/9
rebate [4]  40/24 40/25 74/4 78/20
rebate's [1]  74/5
rebates [3]  55/14 59/24 60/3
rebuffed [1]  34/8
rebuttal [2]  18/18 18/18
rebutted [1]  68/21
recall [8]  52/11 52/14 57/14 58/7 71/17 71/21 72/11 78/6
receive [1]  35/8
received [2]  52/22 78/4
recent [3]  9/20 54/20 64/17
recently [1]  6/12
recollection [1]  56/25
record [10]  18/20 18/22 19/5 19/7 45/11 46/18 59/1 59/8 70/2 70/19
records [2]  22/15 61/18 63/15 63/15
recover [3]  36/9 74/10 74/14
recovered [2]  47/5 47/6
recovery [13]  23/13 33/4 36/14 45/14 46/8 46/20 50/23 54/1 54/2 54/7 58/24 65/19 76/5
recreates [1]  39/17
recurring [1]  41/13
red [3]  12/20 48/23 50/17
redeemed [3]  66/11 73/24 74/6
redemption [2]  55/2 55/6 67/18 67/22
redemptions [2]  55/13 67/20
reduced [2]  46/23 49/17
reduces [1]  49/19
refer [1]  77/1
referring [1]  21/3
refuse [1]  10/16
refused [3]  9/17 10/24 71/9
refute [1]  64/13
refuting [1]  8/2
regard [8]  11/24 12/2 15/17 16/17 31/1 36/4 36/7 41/9

regarding [2]  6/7 20/21
rehab [1]  6/25
rehash [3]  11/12 12/3 44/1
rehearse [1]  24/18
reimburse [1]  33/6
reimbursed [1]  33/8
reimbursement [3]  27/22 37/8 37/15
reiterated [1]  69/21
reject [3]  8/13 16/10 18/25
rejects [1]  67/7
related [5]  10/15 30/2 36/10 62/16 62/17
relating [3]  56/12 57/5 58/10
release [7]  13/18 13/20 13/21 13/24 36/11 36/11 70/15
relevant [2]  8/14 23/8
reliance [1]  37/21
relied [2]  31/8 63/20
relief [12]  16/20 23/23 24/16 32/24 34/8 35/19 35/25 54/23 57/9 69/17 72/1 72/2
rely [2]  9/6 67/21
remain [1]  11/23
remaining [1]  14/11
remand [1]  53/12
reminds [1]  53/6
remotely [1]  71/4
remove [2]  76/21 76/23
removed [1]  77/12
rendered [1]  60/4
repair [5]  36/10 39/15 39/16 39/18 70/23
repairs [2]  51/3 61/19
repeat [1]  5/4
replace [1]  73/13
reply [25]  14/19 17/19 19/10 19/13 19/13 19/19 20/9 20/10 20/16 20/18 20/18 21/1 21/10 37/9 43/17 55/25 64/25 69/7 69/11 69/12 76/20 77/1 78/11 78/17 78/24
report [6]  26/16 60/18 63/6 63/10 63/12 64/2
reported [3]  37/5 57/22 80/7
Reporter [1]  80/15
REPORTER'S [1]  1/14
reports [3]  26/13 26/14 26/17
represent [2]  9/2 22/9
representations [1]  16/17
representing [1]  5/16
request [1]  42/18
requested [3]  22/10 23/2 68/14
required [3]  34/17 74/20 78/2
requirements [1]  61/8
requires [1]  73/4
resolve [1]  27/15
resolved [1]  34/13
resources [4]  7/4 50/12 72/3 72/15
respect [11]  13/20 14/9 17/16 22/6 24/16 30/23 31/1 31/3 71/14 76/18 78/18
respectfully [1]  24/9
respond [6]  15/18 19/10 19/12 19/20 63/2 75/18
responded [1]  74/4
responding [3]  19/22 19/24 44/7
response [3]  7/17 58/4 78/4
responsibilities [1]  41/21
responsible [2]  28/22 29/13
rest [1]  40/2

restrictions [1]  24/7
restructuring [2]  36/18 36/21
result [6]  33/1 44/9 47/9 47/14 47/20 48/3 54/13 54/13 75/5 76/25 78/21
results [11]  23/6 31/3 31/24 38/15 45/4 46/25 52/4 53/5 53/16 68/10 74/12
retained [1]  26/11
return [1]  27/3
returns [1]  35/8
revealing [1]  46/17
reversal [1]  65/7
reversed [1]  55/1
review [9]  15/22 16/17 19/1 48/12 48/12 48/18 48/21 49/3 49/7
reviewed [3]  18/10 19/6 19/7
reviewing [1]  16/19
right [29]  11/15 13/19 15/8 16/16 17/22 27/16 38/19 42/8 44/21 48/4 49/5 49/8 49/18 52/24 56/21 60/1 60/1 62/9 62/11 63/7 63/7 63/8 63/8 66/16 66/23 68/9 71/23 72/6 75/24
rigorous [1]  24/8
rip [2]  71/16 77/4
risk [6]  7/5 39/20 51/3 51/8 65/7 73/17
risks [1]  72/22
road [2]  2/12 15/24
Roberts [14]  35/21 36/1 46/15 46/19 49/22 50/3 50/17 50/21 50/25 67/23 68/8 68/13 68/15 75/22
robust [1]  70/8
role [1]  16/15
rolling [1]  70/25
room [2]  1/23 48/15
routine [1]  48/11
routinely [2]  8/13 8/16
rule [2]  15/10 77/13
run [1]  71/6
rushing [1]  15/4
Rushmore [1]  13/4
Russian [1]  13/4
rwlls.com [1]  2/14

**S**

SA [2]  1/8 4/4
safe [3]  72/21 73/11 73/16
safer [1]  73/18
safety [16]  24/17 41/5 41/8 51/6 51/6 51/14 52/11 57/7 57/10 57/13 57/21 70/6 70/8 72/19 72/25 73/15
said [39]  27/16 36/11 36/25 41/7 46/2 47/1 50/10 52/14 53/8 53/15 53/19 54/10 55/25 55/25 56/1 56/16 56/17 57/18 57/21 60/2 62/14 63/16 64/14 64/21 64/23 64/24 66/2 66/25 68/3 74/1 74/14 75/8 75/10 75/15 76/18 77/4 77/14 78/17 78/19
sale [1]  70/9
SAM [4]  2/16 2/16 4/14 5/15
same [14]  26/15 37/17 39/17 39/19 39/19 53/13 66/18 67/8 67/11 73/20 75/4 75/6 76/25 78/21
sat [1]  9/19
satisfied [3]  11/19 25/5 26/25
Saturday [1]  7/8
saves [1]  15/3
savings [1]  7/3
saw [2]  21/13 78/1
say [36]  8/16 11/7 11/11 13/13 14/22 19/21 22/20 27/14 31/5 40/21 43/20 48/7 56/5 58/20 61/24 62/20 62/23 64/10 65/22 67/16 68/23 69/8 69/12

**S**

say... [13]  70/13 71/14 71/18 72/5 72/6
72/24 73/3 73/7 73/12 73/15 73/17
73/21 74/11
saying [14]  38/5 44/13 45/8 47/6 47/23
50/17 52/25 55/24 61/15 66/8 66/13
72/16 73/24 78/14
says [16]  8/12 18/11 32/20 39/11 51/19
51/22 56/3 60/8 60/9 63/23 68/21
68/24 69/1 69/18 69/25 75/2
scared [1]  73/25
Schwartz [1]  9/21
scrutiny [1]  45/22
seal [1]  58/16
Sears [3]  4/20 4/22 4/25
seated [1]  17/24
second [2]  6/10 12/5 12/9 26/7 55/15
66/5 77/7
second-guessing [1]  55/15
secret [1]  8/11
Section [5]  5/24 5/25 67/18 68/6 80/5
secured [1]  10/21
securities [1]  54/10
see [21]  7/16 9/16 9/25 11/16 26/21
28/25 38/6 58/17 61/19 61/20 61/20
62/16 63/3 63/13 63/14 63/15 63/18
67/14 67/17 72/3 72/17
seeing [1]  19/12
seek [2]  22/16 78/14
seeking [2]  22/3 23/15
seen [1]  8/15 43/4
self [1]  13/2
self-evident [1]  13/2
send [3]  61/15 62/19 63/1
senior [2]  29/5 29/12
sense [5]  15/3 19/24 39/15 68/12 77/8
sent [1]  62/12
sentence [1]  7/17
separate [1]  8/21
separately [2]  36/13 56/20
separating [1]  8/14
serial [2]  10/3 13/14
series [1]  30/2
serious [1]  23/19
served [3]  9/14 10/20 71/1
service [14]  38/21 41/9 41/12 41/18
51/4 51/11 51/13 51/17 61/18 63/15
63/15 70/16 70/23 77/18
servicing [1]  72/22
sessions [2]  34/25 35/1
set [11]  5/9 5/13 8/3 12/2 12/5 12/12
24/18 25/18 44/11 52/5 75/3
sets [4]  11/16 14/14 26/18 30/5
setting [1]  15/11
settle [3]  26/2 52/18 77/5
settled [11]  25/14 25/17 25/20 26/25
31/20 56/17 57/4 58/12 58/15 63/24
75/8
settlement [90]
settlements [3]  46/16 56/11 58/24
settling [2]  27/12 28/1
settlment [1]  10/2
seven [3]  32/12 46/15 49/19
seven-figure [1]  46/15
Seventeenth [1]  3/4
several [4]  22/7 36/6 41/16 58/4
sharpened [1]  12/24
she [17]  7/2 10/18 14/25 14/25 15/13
15/14 15/14 15/23 17/17 18/2 18/2
18/18 19/3 19/15 19/15 19/20 38/7

she's [3]  14/24 15/13 16/5
shift [1]  16/25
shifting [2]  30/6 31/5
short [1]  30/18
should [27]  15/8 19/11 21/6 23/19 27/6
27/16 28/3 34/22 36/2 36/7 47/23
47/25 48/1 49/17 51/23 55/23 58/10
59/3 59/16 65/2 65/4 65/6 65/8 68/24
71/1 75/21 76/6
show [2]  8/8 43/20
showed [1]  64/3
showing [4]  10/9 18/22 43/11 58/20
shown [1]  7/9
shows [2]  34/18 77/16
shred [1]  51/24
side [9]  8/11 13/10 21/24 62/22 63/6
68/20 68/22 69/20 69/20
sides [2]  15/6 22/24
sign [1]  60/15
significant [4]  6/18 28/16 35/19 40/19
SILVER [1]  2/11
similarly [1]  23/14
since [4]  6/24 14/25 15/14 64/7
single [3]  17/16 8/16 30/23
sit [3]  9/16 10/22 55/21
site [3]  27/8 34/9 57/23
sitting [1]  72/8
six [3]  32/12 45/7 70/4
six-figure [1]  45/7
skewed [1]  37/16
skip [1]  42/25
skirt [1]  77/15
slashing [1]  74/7
slice [1]  40/22
slide [1]  63/10
slides [1]  42/21
slightly [1]  22/16
small [2]  60/2 69/23
smaller [1]  65/10
Smith [1]  4/18
Snyder [2]  35/22 68/6
Snyder's [1]  36/2
so [116]
Solomon's [1]  68/24
solution [1]  30/14
solved [1]  30/12
some [14]  5/19 10/5 12/4 13/15 16/1
22/7 22/18 30/20 32/10 35/15 40/19
42/21 47/18 48/23 57/1 60/23 62/1
65/24 69/22 72/2 73/13 73/20 73/25
77/8
somebody [1]  39/13
somehow [1]  12/22
someone [2]  69/22 73/21
something [16]  8/22 8/23 24/12 27/6
32/8 32/8 38/14 39/12 40/3 59/18
59/18 70/4 74/14 75/3 79/1 79/4
Sometimes [1]  74/25
somewhere [1]  20/2
sooner [1]  15/1
sophisticated [1]  29/12
sorry [1]  19/17
sort [7]  22/21 43/7 53/13 63/11 64/3
72/3 72/25
sought [2]  9/15 24/25 34/7
sound [1]  74/8
sounded [1]  6/20
sounds [2]  5/2 71/13
span [1]  26/8
spanning [1]  34/25

speak [3]  25/3 29/20 37/11
specifically [1]  7/7
speculating [1]  63/5
speculative [2]  53/9 74/6
spend [2]  36/5 53/1
spends [1]  7/11
spent [4]  7/14 31/15 49/1 52/23
split [1]  42/5
spreadsheet [2]  58/6 58/20
spring [5]  1/23 55/7 55/12 55/14 67/17
square [1]  25/1
staff [1]  65/13
stage [1]  50/6
stand [2]  60/22 71/14
stands [2]  24/13 68/21
start [1]  5/18
started [7]  5/1 5/3 9/9 27/12 31/7 52/3
67/15
starting [2]  45/8 46/10
starts [2]  8/5 69/4
state [14]  5/3 22/21 29/8 31/7 31/8
31/12 31/23 31/23 32/3 32/5 66/12
67/1 76/16 78/2
stateable [1]  8/24
statement [1]  5/24
statements [2]  18/20 56/1
states [11]  1/1 10/19 25/12 31/9 31/10
32/1 33/20 42/17 50/2 80/6 80/10
static [1]  30/6
statistical [1]  70/15
statute [1]  66/8
statutes [3]  31/22 35/17
stenographically [1]  80/7
step [2]  31/5 62/20
STEVE [5]  1/6 4/5 9/21 27/8 34/7
still [8]  6/20 10/16 10/24 33/17 38/20
41/14 43/17 78/20
stipulate [1]  75/16
stipulation [1]  58/14
stood [1]  30/18
stopped [1]  49/25
straight [1]  68/8
strawman [1]  8/10
Street [4]  1/23 2/20 3/4 3/8
stretch [1]  20/11
strike [3]  10/11 11/5 15/17
strip [1]  61/6
stripped [1]  61/13
strongly [1]  45/9
struck [2]  64/18 64/20
studying [1]  73/15
stuff [7]  18/21 21/23 29/19 43/12 43/22
44/11 61/12
sub [3]  7/25 8/17 43/17
subject [3]  10/14 45/21 66/10
subjects [1]  65/7
submission [3]  20/7 77/25 78/9
submit [6]  24/25 41/23 42/11 42/18
44/10 51/12
submitted [5]  18/16 18/19 40/17 61/12
79/7
submitting [3]  61/19 61/20 61/21
subpoena [7]  9/14 9/15 9/18 10/9 10/20
10/25 11/4
subpoenas [2]  26/18 35/7
substance [4]  13/5 13/8 30/17 34/12
substantive [7]  7/16 11/17 11/24 12/9
12/18 16/8 59/13
success [1]  53/15

**S**

such [1] 40/15
sue [1] 14/6
suggest [9] 23/6 23/18 25/22 26/3
 28/13 28/15 39/3 49/16 55/22
suggesting [1] 77/5
suggestion [1] 76/20
suggests [2] 34/20 72/25
suit [3] 34/6 34/7 34/11
Suite [5] 2/8 2/12 2/20 3/5 3/8
summarizes [1] 63/11
summary [1] 33/14
sums [1] 5/10
sun [1] 52/11
superior [1] 51/1
supplemental [4] 9/13 10/19 38/12
 78/11
support [2] 37/9 65/2
supposedly [1] 9/2
supremacy [2] 66/7 66/21
Supreme [3] 8/2 53/4 53/14
sur [6] 14/19 19/13 20/16 20/18 43/17
 78/11
sur-reply [6] 14/19 19/13 20/16 20/18
 43/17 78/11
sure [13] 28/10 28/12 29/9 38/9 39/5
 43/14 47/16 54/1 58/18 61/2 61/17
 74/18 78/13
surprise [1] 14/17
survey [1] 70/16
survived [1] 33/15
Sweeney [3] 9/14 9/17 10/2
Sweeney's [3] 9/25 10/8 10/11

**T**

tabbed [1] 63/13
table [2] 13/12 26/25
tail [3] 24/9 33/5 42/8
tailored [1] 13/21
take [27] 16/21 21/19 34/5 37/5 38/16
 40/10 41/3 42/2 42/4 42/15 44/12
 47/20 51/16 55/8 55/11 58/11 61/6
 64/23 65/22 65/25 66/1 68/24 69/2
 71/22 77/3 77/25 79/3
taken [3] 15/15 76/9 78/9
takers [1] 64/22
takes [2] 50/15 75/21
taking [2] 6/13 24/4
talk [11] 6/11 7/19 28/18 47/21 53/25
 54/21 58/13 59/16 59/17 63/9 77/14
talked [1] 15/14
talking [8] 13/19 27/10 28/17 30/7
 31/24 45/7 47/24 57/22
tamper [1] 70/9
task [1] 73/2
Tate [9] 35/18 46/14 46/22 49/22 50/21
 68/8 74/13 75/4 75/23
TCL [1] 51/14
TCO [1] 69/25
TCOs [4] 41/10 41/11 41/13 41/13
team [1] 30/21
technical [4] 26/9 26/10 29/14 36/24
technician [1] 51/11
technicians [3] 51/13 70/16 70/23
technology [2] 29/18 77/17
tell [8] 30/23 41/21 47/8 51/12 71/23
 72/8 73/4 73/10
telling [1] 14/23
tells [2] 62/8 64/8
temporarily [1] 6/25

ten [3] 68/25 69/1 69/4
tenacious [1] 17/3
tenacity [1] 17/8
tends [1] 32/12
Tennessee [1] 10/22
tens [1] 51/4
tentative [1] 11/8
terms [7] 11/7 23/20 27/20 27/21 30/24
 40/11 60/7
territories [1] 31/10
territory [1] 32/6
testified [1] 52/12
testimony [5] 10/22 18/8 18/15 68/18
 68/20
testing [1] 36/24
than [31] 5/22 8/4 18/24 27/4 27/19
 30/15 33/10 33/23 36/1 38/17 40/11
 45/20 46/13 46/21 47/16 48/15 53/3
 53/24 54/14 54/25 61/2 62/10 62/12
 62/24 63/25 64/19 65/10 65/16 65/19
 74/15 75/3
Thank [5] 5/14 9/7 9/8 15/21 22/2 23/1
 42/19 77/23 79/6
that [452]
that's [81]
the ECB [1] 18/12
their [68] 4/6 5/22 5/23 5/24 7/4 7/11
 7/11 10/17 16/2 16/8 16/19 18/1 18/16
 19/12 20/18 25/22 26/9 27/10 27/17
 30/19 33/7 36/10 36/10 36/22 36/23
 36/23 37/13 37/21 38/13 40/2 40/3
 40/11 41/3 41/12 41/21 45/3 45/25
 48/3 48/12 50/22 51/20 51/22 52/9
 52/12 52/17 53/2 55/25 55/25 57/18
 57/18 57/20 57/23 57/24 58/25 60/16
 60/21 61/18 63/12 68/15 68/20 69/7
 69/10 69/18 70/17 70/21 71/1 71/18
 72/10
theirs [2] 47/17 61/2
them [56] 5/5 6/23 7/5 7/9 7/21 8/3 8/7
 8/24 14/14 15/19 18/10 18/11 19/7
 19/21 20/5 20/13 20/15 20/17 22/8
 22/22 26/13 26/17 27/12 27/18 27/19
 34/1 39/1 39/7 41/11 41/20 41/21
 41/21 43/23 47/20 48/25 51/8 53/11
 56/18 56/20 57/11 57/11 58/13 58/14
 60/11 60/23 61/5 65/11 65/11 70/10
 71/5 71/10 71/15 72/5 73/7 73/12
 73/13
themself [1] 10/15
then [35] 8/6 8/10 9/1 9/17 12/12 15/18
 17/4 17/21 18/5 19/4 19/22 20/7 20/15
 20/15 20/17 22/1 25/21 30/10 34/8
 41/4 41/5 52/22 55/15 57/16 59/7 59/8
 62/13 64/4 65/23 66/18 67/13 68/7
 68/9 78/8 78/8
theoretical [2] 8/11 75/13
theoretically [1] 25/14
there [52] 5/2 10/6 11/15 11/16 11/16
 11/23 14/9 16/6 17/19 17/20 17/22
 20/20 20/24 20/25 22/20 23/24 25/19
 25/19 28/5 28/24 30/10 30/18 32/10
 32/11 33/5 33/23 34/1 34/14 36/25
 38/1 38/20 41/4 41/5 44/5 46/4 46/15
 47/19 48/10 50/25 54/12 55/24 56/3
 57/13 57/22 60/5 62/10 62/11 63/16
 64/22 65/12 66/13 66/19 66/25 67/15
 67/25 67/25 68/1 68/13 68/17 68/18
 70/3 70/11 70/12 72/2 72/11 72/13
 72/23 73/25 74/8 74/9 74/21 74/22

75/17 75/24 78/3 78/5
there's [30] 5/20 6/2 7/23 11/21 13/21
 13/23 15/5 18/11 21/16 22/9 23/16
 23/18 31/21 34/20 36/11 41/10 48/23
 50/19 51/24 54/5 55/5 57/6 59/1 60/4
 62/10 62/11 67/2 67/2 67/3 67/5 67/8
 67/17 67/17 72/24 72/25 73/18 78/10
therefore [5] 18/24 24/7 41/10 41/19
 76/24
Thereupon [1] 79/9
these [42] 6/11 8/6 14/4 16/10 20/25
 28/2 28/14 30/2 31/18 37/24 38/23
 39/18 41/8 42/4 47/20 48/2 48/15 53/1
 53/9 56/17 57/5 57/8 57/22 57/23
 58/11 60/25 62/10 64/1 64/9 69/25
 70/6 70/20 70/25 71/14 72/12 72/14
 72/19 72/22 73/20 75/9 76/10 77/20
they [156]
they'd [1] 71/7
they'll [1] 61/2
they're [26] 9/5 13/17 14/6 19/7 24/5
 24/6 28/2 33/25 40/2 45/2 45/5 46/17
 48/10 52/1 60/10 62/11 63/7 66/6 66/6
 67/20 70/17 70/22 70/24 72/5 73/2
 78/25
they've [8] 12/13 15/21 52/4 52/5 52/10
 69/10 69/11 71/1
thin [1] 69/3
thing [17] 6/10 7/19 20/8 20/19 56/22
 68/23 69/9 69/17 69/23 71/17 71/22
 72/4 72/10 73/20 75/4 76/10 78/13
things [17] 5/18 5/19 15/5 15/6 27/17
 33/16 48/7 48/11 52/18 60/25 61/22
 64/9 65/15 70/25 72/14 72/20 72/22
think [96]
third [3] 12/12 14/11 33/21
thorough [2] 6/8 35/4
those [32] 5/11 11/21 17/1 19/1 26/21
 26/22 27/12 33/16 35/9 37/6 41/2
 42/25 46/1 46/7 46/12 50/9 50/18
 51/17 51/18 53/10 54/19 58/5 58/24
 61/22 62/2 62/2 63/18 65/9 71/3 72/8
 74/14 75/20
though [4] 8/4 17/18 54/24 66/16
thought [6] 6/20 31/18 41/7 54/13
 68/15 75/17
thousands [3] 28/1 51/4 70/25
three [9] 11/15 11/16 14/14 32/10 46/7
 55/5 62/2 67/23 79/1
three-page [1] 79/1
three-year [1] 32/10
threshold [1] 17/18
through [14] 25/15 28/25 36/16 38/2
 38/3 48/20 49/3 50/1 50/15 60/23
 61/18 67/18 67/22 71/6
throughout [3] 25/11 36/19 51/13
throw [1] 51/23
Thursday [3] 1/16 4/1 21/15
TIKELLIS [2] 2/3 4/10
till [1] 67/17
Tim [5] 4/9 4/17 5/8 17/24 29/20
time [19] 28/15 28/25 31/15 39/7 43/23
 43/25 48/10 48/18 49/1 51/18 52/20
 52/23 58/2 59/14 60/18 64/17 71/16
 76/12 77/7
times [1] 75/2
timing [1] 67/16
timing-wise [1] 67/16
TIMOTHY [2] 2/3 2/19

**T**

tiny [1] 74/3
Title [1] 80/6
today [13] 7/9 17/8 40/16 49/12 51/21 54/15 56/1 60/20 60/22 67/11 69/20 70/19 71/13
together [2] 15/6 15/6
told [5] 9/14 49/25 61/10 73/3 73/12
tomorrow [3] 20/5 20/6 20/14
tongue [1] 41/7
tongue-in-cheek [1] 41/7
Tony [5] 29/11 29/11 29/20 29/24 30/21 31/2
Tony's [1] 30/17
too [2] 21/14 65/8
took [4] 26/8 32/9 32/13 61/11
top [2] 49/23 61/7
total [1] 76/5
totally [1] 19/12
touch [1] 12/8
tough [1] 33/22
touting [1] 25/4
towards [1] 49/23
town [1] 15/13
Toyota [1] 74/25
track [1] 48/14
tracked [1] 58/6
training [1] 51/17
transcript [3] 1/14 80/7 80/9
transit [1] 21/3
travel [2] 14/24 15/12
treble [2] 16/3 16/3
tremendous [1] 23/18
trial [5] 25/25 44/7 47/9 47/10 49/2
trial and [1] 47/9
tried [2] 25/23 57/24
TRIGG [1] 3/3
trouble [1] 53/1
troubles [1] 44/9
true [6] 37/20 41/11 51/6 60/20 67/2 80/6
truly [1] 6/12
truthfully [1] 64/20
try [2] 16/10 26/2
trying [5] 43/20 44/10 44/14 61/23 61/24
turn [3] 20/4 34/10 49/6
turned [4] 49/5 49/7 58/19 74/16
turning [1] 60/6
tutorials [1] 30/22
two [18] 5/2 7/25 18/9 26/11 30/20 32/9 34/5 34/25 40/21 49/18 52/18 54/5 57/6 59/14 64/4 64/14 66/25 70/10
two-year [1] 32/9
type [2] 39/19 61/12

**U**

U.S [3] 1/22 32/6 80/15
ultimately [2] 25/15 74/16
UMBERG [2] 3/7 4/24
unattended [1] 75/1
uncapped [1] 36/8
uncovered [1] 77/18
uncovering [1] 30/22
under [24] 14/23 15/12 19/14 20/7 23/3 23/12 23/20 24/22 32/21 35/16 45/8 45/13 50/24 52/10 58/16 61/8 66/20 67/18 68/11 69/5 69/6 75/22 77/25 78/9
underpinning [1] 35/11

underplayed [1] 36/20
understand [6] 32/15 32/25 33/4 33/16 46/25 73/1
understandably [1] 31/17
understanding [1] 11/1
understatement [1] 37/4
understood [2] 29/19 30/1
undertake [2] 29/24 29/25
undisputed [1] 46/9
unfortunately [4] 6/10 54/21 65/13 74/15
unit [2] 13/6 40/18
UNITED [6] 1/1 25/12 31/10 42/17 80/6 80/10
United States [3] 25/12 31/10 42/17
units [1] 13/5
universe [1] 62/25
unknown [1] 73/17
unless [5] 12/1 14/9 20/20 24/19 40/1
unlimited [1] 32/17
unnecessary [1] 45/21
unproven [2] 73/5 73/12
unquantifiable [6] 23/23 51/21 51/22 69/19 69/21 69/22
unreasonable [1] 45/13
unrebutted [2] 68/17 68/19
unredacted [1] 9/23
until [2] 20/11 30/15
up [28] 5/10 5/19 22/8 22/14 27/8 28/8 30/20 31/8 32/22 34/15 38/5 39/8 40/10 40/19 42/4 42/6 42/23 45/20 46/2 46/4 50/2 53/9 55/8 62/18 64/16 64/24 69/24 72/14
upon [7] 17/25 26/19 27/4 28/13 30/25 31/8 34/4
upset [1] 29/23
urging [2] 45/16 66/6
us [24] 6/21 14/17 25/9 25/14 25/25 26/1 26/1 26/3 26/4 26/11 26/14 26/16 34/10 38/4 53/6 56/7 57/8 58/3 60/14 61/10 62/6 77/6 77/14 78/7
use [3] 7/5 64/17 69/15
used [5] 23/4 35/18 68/1 73/4 76/6
useful [3] 32/15 33/2 71/1
using [3] 8/10 49/17 65/2
utilization [1] 23/17

**V**

valid [2] 18/11 60/19
valuable [1] 30/23
valuation [2] 68/4 78/19
value [36] 16/23 36/7 37/24 39/22 40/5 40/8 40/13 40/14 41/5 41/10 41/24 41/25 44/13 53/8 55/2 55/7 58/10 59/3 60/3 60/16 66/11 68/18 73/2 73/5 73/9 73/23 73/23 73/24 74/5 74/5 74/15 75/11 75/13 76/6 76/23 78/15
valued [1] 69/19
values [5] 40/18 41/2 42/2 42/4 55/12
valuing [3] 32/21 32/25 40/10
variables [1] 24/23
various [2] 42/2 42/4
vastly [1] 17/2
verdict [2] 33/15 33/15
verify [1] 57/24
version [1] 9/23
versus [5] 4/5 35/21 46/15 53/25 76/16
very [34] 5/23 6/25 9/8 14/4 17/16 20/7 22/19 26/25 29/4 29/11 29/11 31/17 31/17 32/2 32/2 32/2 34/23 35/4 40/19

40/19 40/23 40/23 41/6 41/6 44/2 44/3 44/6 45/6 51/15 55/25 66/6 72/2 73/15 74/3
veteran [1] 6/15
view [7] 32/8 40/4 53/23 54/14 65/19 72/16 73/11
viewed [2] 14/4 71/5
vignettes [1] 27/9
virtues [1] 25/5
visit [1] 7/2
voir [1] 43/3
voir dire [1] 43/3
voluminous [1] 46/6
voucher [1] 24/12

**W**

wagging [3] 24/9 33/5 42/8
wait [5] 32/22 32/22 55/1 55/6 67/17
wait-and-see [1] 67/17
waivable [1] 8/23
walk [1] 45/18
want [25] 7/4 11/12 11/13 12/14 14/22 15/2 15/11 17/16 18/21 20/6 21/9 39/5 39/16 45/21 46/24 58/8 59/21 64/21 65/5 68/7 72/24 73/13 74/2 78/12 79/4
wanted [14] 8/10 13/12 25/23 26/21 30/15 44/8 58/3 67/10 68/23 71/12 76/17 77/5 77/12 78/3
wants [2] 24/2 77/8
War [1] 6/16
warn [1] 41/20
warning [4] 51/7 51/8 51/10 51/11
warnings [4] 41/5 41/8 51/6 51/6
warranties [6] 32/10 32/11 32/14 33/6 40/7 56/3
warranty [21] 27/22 27/23 32/11 32/17 33/8 33/8 38/25 56/2 56/5 57/9 64/11 64/12 64/15 64/22 67/3 68/25 69/1 69/15 71/8 71/9 71/10
was [102]
wash [1] 40/2
washer [1] 75/7
wasn't [2] 31/20 57/13
water [1] 69/5
way [15] 8/10 16/5 16/11 17/3 28/5 36/15 40/13 47/13 49/23 54/2 55/14 59/17 64/2 70/14 73/23
ways [2] 72/9 75/5
we [315]
we'd [7] 33/10 33/12 33/13 33/14 33/16 67/21 77/14
we'll [6] 20/3 20/4 38/16 44/5 55/6 55/7
we're [34] 17/5 17/6 17/7 17/8 17/13 19/20 19/22 19/24 26/25 28/16 30/7 31/24 37/18 45/6 45/7 45/7 47/23 48/8 50/10 50/11 54/5 54/15 59/24 60/11 61/23 61/23 62/9 65/20 68/3 68/11 72/19 72/20 75/8 77/21
we've [26] 5/9 15/23 22/13 24/17 31/6 34/3 35/20 42/1 42/1 48/19 51/13 51/16 54/23 61/5 61/13 64/6 70/15 72/12 76/8 76/10 77/18 78/18
weak [1] 45/2
weaker [1] 8/2
web [3] 27/8 34/9 57/23
week [3] 7/2 21/17 41/16
weeks [1] 74/1
WEINER [1] 2/11
weird [1] 6/20
well [25] 5/24 10/8 14/16 17/18 19/21

**W**

well... [20]  20/3 21/24 24/18 25/6 26/10 28/7 31/17 36/23 43/19 47/7 53/23 57/3 58/8 62/23 72/12 72/25 73/3 73/12 73/17 73/21
well-written [1]  31/17
went [13]  25/18 30/20 38/3 47/9 47/10 49/3 50/1 50/2 50/6 50/18 51/7 57/18 57/23
were [53]  6/4 13/4 13/19 14/24 15/12 16/2 23/14 25/19 26/9 26/22 27/18 27/21 27/21 27/24 29/14 30/21 31/24 32/10 34/23 35/5 35/6 35/8 36/25 37/18 38/1 43/7 45/2 45/24 46/5 46/15 52/1 52/2 54/7 56/15 57/11 58/4 63/18 64/10 66/18 67/25 70/3 70/12 71/3 71/25 72/1 72/21 75/2 75/11 75/18 77/5 77/17 78/3 78/5
weren't [5]  18/20 19/3 19/5 34/2 66/17
West [1]  2/4
WESTERN [1]  1/3
what [114]
what's [8]  5/4 14/19 42/22 42/24 49/18 49/19 66/2 68/9
whatever [2]  16/4 72/5
WHEELER [1]  3/3
when [36]  10/13 10/18 13/3 15/12 15/14 16/2 18/23 23/21 25/18 27/2 28/18 28/25 30/11 31/14 31/19 32/20 34/12 37/9 37/18 40/18 42/2 42/4 56/18 57/8 58/19 61/4 61/14 62/25 63/4 66/20 70/3 70/14 70/20 71/16 73/7 77/13
where [17]  19/15 27/9 29/7 30/19 43/7 46/7 46/12 47/9 48/10 48/13 48/20 49/3 53/19 54/6 58/6 63/13 67/14
whether [16]  20/8 20/16 21/9 24/11 26/1 28/9 43/3 55/9 59/25 62/9 62/11 63/7 63/18 64/9 67/13 78/3
which [44]  5/19 6/11 6/14 8/3 9/5 10/1 11/17 11/22 12/5 13/5 23/3 27/18 29/14 30/1 30/7 31/8 33/6 33/7 34/1 34/7 34/10 35/17 35/19 35/22 38/17 38/25 39/24 40/25 41/6 41/11 46/3 54/9 54/14 54/15 54/23 62/7 62/16 62/18 64/8 66/12 68/10 69/6 77/10 77/12
WHIRLPOOL [49]  1/9 4/5 4/20 4/22 4/24 5/20 8/10 8/15 15/25 17/11 22/6 24/2 25/9 25/10 25/12 25/17 25/19 25/24 26/20 27/6 27/7 27/11 27/11 27/14 27/20 27/25 28/12 29/21 29/21 29/23 30/1 33/23 33/24 34/8 34/13 34/22 35/6 36/20 37/11 38/19 39/2 39/15 39/24 40/8 40/25 41/6 41/7 41/20 73/14
Whirlpool's [4]  16/17 29/3 38/16 77/16
Whirlpool-manufactured [3]  26/20 39/2 39/24
who [32]  6/21 9/2 9/21 10/3 13/22 14/5 15/7 17/1 26/12 26/15 27/10 29/1 29/5 29/17 32/23 34/23 40/9 52/1 56/6 57/22 58/20 60/4 60/10 61/17 61/17 62/7 63/2 73/10 73/14 74/1 75/9 77/20
who's [2]  17/24 37/22
whole [4]  5/22 32/24 47/21 70/5
whom [1]  32/18
why [24]  5/1 5/2 9/8 14/25 15/14 16/6 19/4 21/12 32/25 39/3 47/23 48/24 59/19 53/16 54/14 54/15 65/22 66/5

**W**

wife [1]  6/19
will [33]  4/6 9/6 10/11 12/8 15/10 15/19 17/9 27/3 34/13 34/15 37/20 40/12 44/6 45/18 47/22 48/17 55/11 55/12 55/13 55/14 56/3 57/8 60/23 62/24 63/2 63/6 65/12 65/21 71/23 72/8 77/16 78/8 78/14
WILLIAMS [17]  3/3 4/19 4/20 18/15 18/19 19/3 19/5 19/8 35/2 42/20 43/6 43/14 54/9 76/3 76/4 77/4 79/6
Williams' [1]  36/6
willing [1]  56/10
win [1]  74/25
wise [1]  67/16
wish [1]  73/10
wishes [2]  14/10 24/19
within [2]  13/6 17/1
without [2]  37/21 43/23
won't [3]  17/8 46/1 47/19
Woodland [1]  2/21
word [5]  9/20 9/24 16/22 51/8 64/23
words [2]  72/5 72/9
work [22]  11/19 15/15 16/17 16/19 22/24 23/6 26/4 26/5 26/12 26/23 29/3 30/18 31/2 33/18 34/4 45/3 47/19 48/5 49/10 58/13 59/18 77/7
worked [3]  22/12 29/11 48/9
working [4]  17/10 17/10 37/19 49/1
works [2]  26/15 26/15
world [1]  62/20
worried [1]  73/21
worry [1]  55/15
worth [8]  32/18 39/22 39/24 41/8 42/13 54/12 73/9 74/16
would [50]  7/11 9/15 9/16 13/14 15/18 15/22 18/24 23/14 25/15 26/1 27/9 27/13 27/14 28/10 28/13 33/8 33/10 33/17 33/20 34/1 35/25 36/15 38/8 38/8 38/9 40/16 42/14 45/14 46/3 46/4 47/15 49/16 50/22 51/25 52/23 53/23 55/19 58/20 63/9 63/14 64/22 66/19 69/1 69/23 70/13 71/4 71/5 72/22 73/16 76/11
wouldn't [1]  41/13
written [4]  5/4 5/10 9/6 31/17
wrong [7]  18/10 34/15 37/17 40/13 52/5 59/10 61/3
wrote [1]  60/18
www.lisamariecsr.com [1]  1/24

**Y**

Yeah [3]  20/1 36/18 43/5
year [12]  6/15 26/8 32/9 32/10 32/11 34/6 48/16 49/9 59/15 64/20 68/25 70/22
year's [1]  53/25
year-and-a-half [4]  26/8 34/6 48/16 59/15
years [18]  6/19 18/24 22/15 30/7 32/12 33/16 33/25 34/6 34/25 39/21 57/11 59/14 64/4 64/16 64/16 69/1 69/4 69/4
Yep [1]  75/2
yes [9]  9/20 9/24 10/6 11/1 25/1 43/6 44/22 56/13 58/22
yesterday [1]  21/4
yet [2]  7/9 8/2
you [210]
You'd [1]  43/19

**Y**

you'll [2]  6/1 65/15
you're [17]  5/1 7/19 9/11 12/4 30/25 36/17 39/19 43/20 44/13 44/14 47/5 47/6 48/2 58/9 66/8 67/14 78/14
you've [3]  57/4 58/12 58/15
your [79]  4/7 4/9 4/12 4/14 4/19 4/21 4/23 5/3 5/4 5/6 5/8 5/14 5/15 9/7 9/11 9/20 10/2 11/1 11/10 11/12 11/14 12/15 14/19 14/23 15/10 15/10 15/16 17/19 18/8 19/8 22/2 23/1 36/15 37/16 42/19 42/20 42/21 43/1 43/2 43/16 43/21 44/1 44/6 44/16 44/18 44/21 46/20 47/13 49/14 52/21 53/2 53/17 53/20 53/24 56/11 57/12 58/9 59/10 59/21 59/25 62/20 63/14 64/2 64/15 64/18 64/19 65/13 66/2 67/21 71/12 72/17 73/7 73/19 75/25 76/9 77/23 78/5 78/17
your Honor [22]  11/10 15/16 18/8 19/8 36/15 42/20 43/2 43/16 44/18 46/20 49/14 59/10 59/25 64/2 65/12 67/21 71/12 73/7 73/19 76/9 77/23 78/17

**Z**

zero [3]  39/22 51/22 69/19
ZIPSER [6]  3/7 3/7 4/23 4/24 4/24 49/13